**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LIV GOLF NEW JERSEY LLC, *et al.*, | Case No. 26-20189 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND HONOR PREPETITION OBLIGATIONS RELATED THERETO, (B) MAINTAIN EXISTING BANK ACCOUNTS, (C) PERFORM INTERCOMPANY TRANSACTIONS IN THE ORDINARY COURSE, AND (D) MAINTAIN EXISTING BUSINESS FORMS; AND (II) GRANTING RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is 50 Hudson Yards, Suite 65B, New York, NY 10001.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (the "Motion"):[2]

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing, but not directing, the Debtors to (i) continue using their cash management system, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing debtor bank accounts, business forms, and books and records, and (iv) continue intercompany transactions and funding consistent with the Debtors' historical practices, and grant administrative expense status to any such postpetition intercompany transactions; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing approximately thirty (30) days after the commencement of these chapter 11 cases to consider entry of the Final Order approving the relief requested herein.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent

---

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration.

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105, 345, 363 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 9013-1 and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## Background

5. The Debtors own and operate an international men's professional golf league (the "League"). Founded in 2021 and financially backed by The Public Investment Fund of the Kingdom of Saudi Arabia (the "PIF"), the Debtors host tournaments at golf courses around the world (the "Tournaments"). The Tournaments feature world-class entertainment as well as League-contracted professional golfers (the "Players") who compete in both individual and team competitions that take place alongside each other. The Debtors have built a recognizable global brand through attracting fans, broadcasters and commercial partners. Additional background, including the events leading to these chapter 11 cases is set forth in the First Day Declaration.

6. On September 8, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## The Cash Management System

### I. Overview

7. In the ordinary course of business, the Debtors use a complex centralized cash management system to collect receipts, pay invoices, fund payroll, and fund its operational expenses (the "Cash Management System"). The Cash Management System connects collections from customers with disbursements that fund the Debtors' daily operations. It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, allocate working capital across its many local operations, control the Debtors' bank accounts, and maintain separate accounting for each Debtor in accordance with generally accepted accounting principles.

8. Given the economic and geographic scale of Debtors' business, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations, to the detriment of its estates and stakeholders. To minimize the disruption caused by the filing of these chapter 11 cases and to maximize the value of Debtors' estates, the Debtors request authority to continue using the Cash Management System in substantially the form in which it currently exists.

### II. The Bank Accounts and Flow of Funds

9. As a complex international enterprise, the Debtors depend on the efficient collection, transfer, and disbursement of funds. Through the Cash Management System, the Debtors collect revenue from and pay expenses to geographically dispersed customers and vendors, while a centralized corporate treasury group maintains control of company funds, ensures cash availability, and generates consistent and accurate accounting of the Debtors' finances.

10. As of the Petition Date, the Cash Management System comprises 40 bank accounts (the "Bank Accounts") maintained by the Debtors in the ordinary course of business at two banks,

JPMorgan Chase Bank, N.A. ("JPMorgan") and Barclays PLC ("Barclays" and together with JPMorgan, the "Cash Management Banks"). The Cash Management Banks are FDIC-insured or insured by the equivalent governmental deposit scheme in the applicable local jurisdiction.

11. A diagram of the Cash Management System (the "Cash Management System Diagram") and a complete list of Bank Accounts are attached to the Interim and Final Orders as Exhibit 1 and Exhibit 2, respectively.

12. The company primarily utilizes holding accounts (the "Holding Accounts"), general operating accounts (the "Operating Accounts") maintained at League Entities[3] (such accounts, the "League Operating Accounts") and Team Entities[4] (such accounts, the "Team Operating Accounts") and a disbursement account (the "Disbursement Account") to satisfy the various cash management needs of the business. Funds received from investors are deposited directly into the League Operating Accounts or the Holding Accounts which are managed by Altum, an independent fiduciary engaged by the Debtors. At the Debtors' request, Altum transfers funds from the Holding Accounts to certain League Operating Accounts. The League Operating Accounts also receive receipts from the Debtors' operations, including receipts from ticket sales, hosting fees, broadcasters and other revenue sources, by check, wire transfer, ACH transfer, credit card or other applicable payment method. The Team Operating Accounts similarly receive receipts from the operations of the Team Entities. Funds deposited into the Operating Accounts are

[3] The "League Entities" consist of Debtors LIV Golf Incorporated, LIV Golf Ltd., LIV Golf Events Ltd. and LIV Golf New Jersey LLC.

[4] The "Team Entities" consist of Debtors Fairway TM Co 1, LLC, Fairway TM Co 2, LLC, Fairway TM Co 3, LLC, Fairway TM Co 4, LLC, Fairway TM Co 5, LLC, Fairway TM Co 6, LLC, Fairway TM Co 7, LLC, Fairway TM Co 8, LLC, Fairway TM Co 9, LLC, Fairway TM Co 10, LLC, Fairway TM Co 11, LLC, Fairway TM Co 12, LLC and Fairway TM Co 13, LLC.

subsequently transferred, as needed, into other Operating Accounts or the Disbursement Account based on the cash requirements of the Debtors.

13. Funds in the Operating Accounts and Disbursement Account are disbursed in the ordinary course of business to satisfy the Debtors' various operating expenses, such as payroll and other employee obligations, vendor and supplier payments, and other ordinary-course business expenditures. The Team Operating Accounts are used to fund team payroll, operating expenses and other disbursements. For payroll, funds are generally transferred directly from the applicable Operating Account to a payroll processor. For vendor or supplier payments, cash is generally disbursed directly from the applicable Operating Account or Disbursement Account. For certain payments made in foreign currencies, the company disburses funds to a third-party payment processor (e.g., Corpay, Inc.), which converts the payment to the requested currency and then remits it directly to the beneficiary.

14. The Debtors maintain an account at JPMorgan (ending in 3022) that will be used as the Debtors' adequate assurance deposit account in these chapter 11 cases (as further described in the Utilities Motion[5]).

15. In the ordinary course of business, the Debtors buy and sell various currencies to satisfy the funding requirements of legal entities operating in countries outside the United States. The Debtors utilize third-parties to facilitate currency transactions, which require cash to temporarily leave the Cash Management System before being redeposited into the appropriate receiving Operating Account after a settlement period of about one business day. To effectuate

---

[5] Additional information regarding the Adequate Assurance Account, including the funding, maintenance and use thereof, is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion"), filed contemporaneously herewith.

these transactions, the third-parties charge a fee for their services. In the 12 months before the Petition Date, the Debtors paid approximately $10,000 per month in fees related to the third-party currency transactions.

**III. Credit Card Programs**

16. The Debtors maintain corporate purchasing card programs with JPMorgan and Barclays (the "Purchasing Card Program"). The cards issued under the Purchasing Card Program are used primarily by personnel to cover the business expenses they incur while performing their duties, including hotel stays and meals, travel, incidentals, supplies, and other necessary and approved business expenditures. Expenses incurred on these credit cards are billed directly to the Debtors and do not pass through the applicable employees' personal financial accounts.

17. The Debtors' current spending based on an average over the last twelve months under the Purchasing Card Program is approximately $250,000 per month. Given that the business is event driven, as described in the First Day Declaration, credit card usage fluctuates based on the number of events in a given month. However, credit card balances are paid one month in arrears. The program is subject to a total program limit and, to keep these cards active, the Debtors must pay down the full balance monthly. The JPMorgan Purchasing Card Program is fully collateralized by a collateral account (the "Credit Card Collateral Account") holding funds equal to the total JPMorgan program limit. The Barclays Purchasing Card Program is not collateralized.

18. The Debtors request authority to (i) continue the Purchasing Card Program in the ordinary course on prepetition terms, including paying all associated fees and other amounts due on account of the program, and (ii) honor and pay any prepetition obligations under the Purchasing Card Program that become due in the ordinary monthly cycle after the Petition Date.

**IV. Credit Card Processors**

19. In the ordinary course of business, certain payments of the Debtors' customers are processed and settled by credit card processors such as Fever Labs Inc., Stripe, Inc. and Shopify, Inc. (collectively, the "Credit Card Processors"). The Credit Card Processors provide processing, settlement, and related services that enable the Debtors to receive cash receipts promptly and reliably from customers across the United States and internationally.

20. In the ordinary course, settlement proceeds from the Credit Card Processors are remitted to the Debtors net of customary processor amounts, including processor fees and chargebacks (collectively, the "Processing Charges"), and may reflect standard settlement timing and adjustments. These netting practices are typical in the payments industry. In certain instances, the Debtors also make payments to Fever Labs Inc. to reimburse it for customer ticket refunds or to fund customer ticket refunds to be issued by Fever Labs Inc. By this Motion, the Debtors seek authority to continue making such payments and issuing or funding such refunds in the ordinary course of business.

21. Continuity of merchant processing is important to the Debtors' ability to collect receivables and operate without interruption. Disruption to the Credit Card Processors' services or to ordinary settlement netting would materially impair cash collections, create avoidable administrative burden, and risk immediate harm to the estates. Accordingly, the Debtors request authority to continue using the Credit Card Processors in the ordinary course and to pay or permit the netting of all Processing Charges that come due in the ordinary settlement cycle, all consistent with the budget approved by the Court.

**V. Bank Fees**

22. In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts periodic service charges, costs, and other fees

charged by the Cash Management Banks in connection with maintaining the Cash Management System (collectively, the "Bank Fees"). In the 12 months before the Petition Date, the Debtors paid approximately $25,000 per month in gross service charges related to Bank Fees.

23. JPMorgan and Barclays assess gross service charges while providing earnings credits that are applied against those charges. As a result, the Debtors often do not owe service fees on account of its Bank Accounts. After netting, no material Bank Fees will be outstanding as of the Petition Date.

24. The Debtors request authority, but not direction, to pay (or to permit the payment of) any Bank Fees in the ordinary course of business, regardless of whether any Bank Fees accrued before or after the Petition Date.

## VI. Intercompany Transactions and Claims

25. The Company operates as a single, integrated global enterprise under common management, and thus, in the ordinary course of business, the Debtors maintain and engage in routine business relationships with each other (such transactions, the "Intercompany Transactions"), resulting in intercompany claims (the "Intercompany Claims"). The Intercompany Transactions are an essential component of the Debtors' complex global operations, and they are integral to the Debtors' ability to process payroll and payments to third-party vendors, provide enterprise-wide management and support services, and otherwise facilitate operations on a daily basis.

26. As set forth in the Cash Management System Diagram, the Cash Management System is primarily comprised of four types of Intercompany Transactions: (1) transfers from the Holding Accounts to the League Operating Accounts to fund business operations, payroll and employee obligations, and other ordinary course expenses; (2) transfers from one League Operating Account to another League Operating Account to fund payments in U.S. dollars and

foreign currencies, payroll remittances to the Debtors' third-party payroll processors, and other ordinary course expenses; (3) transfers from the League Operating Accounts to the Team Operating Accounts; and (4) transfers from the Team Operating Accounts to the League Operating Accounts.

27. Transfers described in clause (3) above are made in the form of prize money that the Teams Entities contractually earned as part of their performance in the Tournaments, working capital loans (the "Working Capital Loans"), or preferred equity contributions. These transfers provide additional liquidity for the Teams to pay employees and employee-related obligations, contractors, player payments, and other ordinary course business expenses.

28. Transfers described in clause (4) above are made on a periodic basis and consist of repayments of the Working Capital Loans, repayments of the preferred equity, and reimbursements to the League for amounts of expenses paid by such League on the applicable Team's behalf, net of any sponsorship revenue collected by the League on the team's behalf.

29. The Debtors record each category of Intercompany Transaction separately in their accounting system and record all Intercompany Transactions and Intercompany Balances in their centralized accounting system, the results of which are recorded on the Debtors' balance sheets and regularly reconciled. The Debtors will continue to track postpetition Intercompany Transactions consistent with historical practice.

30. The Intercompany Transactions are an essential component of the Debtors' operations and Cash Management System. Any interruption of the Intercompany Transactions would severely disrupt the Debtors' operations and greatly harm the Debtors' estates and their stakeholders. Accordingly, the Debtors seek authority—and, to the extent applicable, relief from the automatic stay—to continue the Intercompany Transactions (including with respect to

"netting" or setoffs) in the ordinary course of business on a postpetition basis, in a manner substantially consistent with the Debtors' past practice and to grant administrative expense status to Intercompany Claims due from the Debtors to other Debtors as a result of Intercompany Transactions.

## VII. Compliance With the Bankruptcy Code and U.S. Trustee Guidelines

31. Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money of a debtor's estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Moreover, section 345(b) of the Bankruptcy Code requires a debtor's bank to post a bond unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States." *Id.* § 345(b).

32. The U.S. Trustee, through the U.S. Trustee Guidelines or otherwise, generally requires chapter 11 debtors to, among other things, (i) maintain estate funds at institutions designated by the U.S. Trustee as authorized depositories on a pre-approved list (any such institution, an "Authorized Depository"); (ii) close prepetition accounts and open new debtor-in-possession accounts; (iii) obtain checks and other business forms that bear the "Debtors in Possession" designation and the bankruptcy case number; and (iv) maintain a distinction between prepetition and postpetition activity.

33. JPMorgan is an Authorized Depository, but Barclays is not. Absent relief from section 345(b), the Debtors would be required to close the Bank Accounts with Barclays, open new bank accounts at an Authorized Depository Institution, and transfer all funds held in Barclays to the newly opened bank accounts. Needless to say, complying with such a requirement would

be highly disruptive to the Debtors' business in the critical early days of these chapter 11 cases, when stability and consistency are most crucial.

34. For the reasons discussed below, the Debtors should be authorized to continue utilizing their existing Bank Accounts, including those with Barclays, in the ordinary course of business.

35. Additionally, in the ordinary course of business, the Debtors use preprinted business forms, including letterhead, and invoices (collectively, the "Business Forms"). To minimize expense and avoid confusion, the Debtors respectfully request authority to continue using their existing Business Forms, substantially in the forms existing immediately prior to the Petition Date and without reference to the Debtors' status as debtors in possession; provided, that once the Debtors' existing check stock is exhausted, the Debtors shall, when reordering checks, require the designation "Debtors in Possession" and the corresponding lead bankruptcy case number on all checks; provided, further, that, with respect to checks the Debtors or their agents produce electronically, the Debtors shall begin printing the "Debtors in Possession" legend and the corresponding lead case number on such items within fourteen (14) calendar days after entry of the Interim Order.

36. The Debtors maintain books and records that document their financial results and operating information (the "Books and Records"). Consistent with the U.S. Trustee Guidelines, the Debtors will maintain their Books and Records to the same extent as prior to the Petition Date and will distinguish between prepetition and postpetition activity.

37. In the ordinary course, the Debtors make and receive payments by wires, ACH transfers, direct deposits, credit card settlements, and other similar methods. Continuity of these payment channels is essential to the Debtors' ability to manage payroll, vendor disbursements, and

credit card settlements. The Debtors respectfully request authority to continue using these customary payment methods in the ordinary course and consistent with prepetition practice.

## <u>Basis for Relief Requested</u>

### I. Maintaining the Existing Cash Management System Is Essential to Maximizing the Value of the Debtors' Estates.

38. The Cash Management System constitutes an ordinary course and essential business practice of the Debtors. The Cash Management System provides material benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information. Thus, to ensure the stable operation of the Debtors' business and realize the benefits of the Cash Management System, the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts.

39. Pursuant to 28 U.S.C. § 586(a)(3) and the U.S. Trustee Guidelines, debtors in possession are required to, among other things: (a) close all existing bank accounts and open new debtor-in-possession accounts; (b) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks that bear the designation "Debtors in Possession" and reference the bankruptcy case number and type of account on such checks (collectively, the "<u>Accounting Requirements</u>"). The Accounting Requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims. Considering the breadth and complexity of the Debtors' international businesses and financial affairs and the sheer volume of collections, disbursements, and movement of funds through the Cash Management System on a

daily basis, enforcement of the Accounting Requirements during these chapter 11 cases would severely disrupt the ordinary financial operations of the Debtors by imposing inefficiencies and unnecessary expenses.

40. Notwithstanding the Accounting Requirements, continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy courts regularly treat requests for authority to continue using existing cash management systems as a relatively "simple matter[.]" *In re Baldwin United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). In *Columbia Gas*, the Third Circuit emphasized that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that the debtor's cash management system allowed it "to administer more efficiently and effectively its financial operations and assets").

41. Requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Importantly, the Cash Management System provides the Debtors with the ability to, among other things, quickly assess the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce

administrative costs through a centralized method of coordinating the collection and movement of funds. Any disruption of the Cash Management System could have a severe negative effect on the Debtors' restructuring efforts.

42. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Maintaining the current Cash Management System will also allow the Debtors' treasury and accounting employees to focus on their daily responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System. Finally, the Debtors can distinguish between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones. With the protective measures put in place by the Debtors and their advisors, the benefits of continuing the Cash Management System decidedly outweigh the costs.

43. Parties in interest will not be harmed by the Debtors maintaining the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department. In light of such protective measures, maintaining the Cash Management System is in the best interests of the Debtors' estates and stakeholders.

44. In addition, all Cash Management Banks where the Debtors maintain Bank Accounts have been or are in the process of being advised not to honor checks, drafts, or other requests for payment issued prior to the Petition Date, except as otherwise expressly permitted by

an order of the Court and as directed by the Debtors. Therefore, the goals of the U.S. Trustee Guidelines can be satisfied, and the Debtors' creditors will be protected without closing the Bank Accounts.[6]

45. As part of the requested relief, the Debtors also seek a waiver of the requirement to establish specific bank accounts for tax payments. The Debtors' tax obligations can be paid out of the Bank Accounts as they are in the ordinary course of business, and the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the accounts, as set forth in the Accounting Requirements. Moreover, the creation of a new debtor-in-possession account designated solely for tax obligations would be unnecessary and inefficient.

46. For these reasons, the Debtors submit that cause exists to continue to allow the Debtors to use the existing Bank Accounts as described herein. The Debtors will work in good faith with the U.S. Trustee, however, to resolve any concerns regarding the continued use of these accounts on a postpetition basis.

47. Courts in this and other districts have regularly allowed debtors in large chapter 11 cases to maintain their existing cash management systems and such relief generally is non-controversial. *See, e.g., FreshRealm, Inc.*, 26-14656 (MEH) (Bankr. D.N.J. June 2, 2026) (authorizing the debtors to continue using the cash management system maintained by the debtors prepetition on a final basis); *In re STG Logistics, Inc.*, 26-10258 (MEH) (Bankr. D.N.J. Feb. 10, 2026 (same); *In re Del Monte Foods Corp. II*, No. 25-16984 (MBK) (Bankr. D.N.J. Aug. 13, 2025) (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Mar. 18, 2024) (same); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re*

---

6 Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

*WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Feb. 6, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (same); *In re Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK) (Bankr. D.N.J. June 6, 2023) (same).

## II. The Debtors Should be Authorized to Pay Prepetition Obligations Relating to the Cash Management System.

48. Section 363(b) of the Bankruptcy Code permits the Debtors, subject to Court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims where appropriate business justification exists).

49. Paying prepetition amounts associated with the Cash Management System, Bank Fees, Processing Charges, and Credit Card Programs, including amounts associated with customer refunds, reflects sound business judgment. The Cash Management System enables the Debtors to quickly assess the location and amount of funds, track and control cash centrally, ensure liquidity, and reduce administrative costs through coordinated collections and disbursements, including the processing of customer refunds in the ordinary course of business. Given the size and complexity of the Debtors' operations, any disruption to the Cash Management System or these ordinary-course practices could impair the Debtors' restructuring efforts, disrupt the Debtors' operations and relationships with customers and other stakeholders, and impose needless costs on creditors and other stakeholders. By contrast, maintaining the Cash Management System and related ordinary-course practices will facilitate a smooth transition into chapter 11 by minimizing administrative inefficiencies and delays in paying postpetition obligations and allowing treasury and accounting personnel to focus on core responsibilities rather than building a new system.

50. Nonpayment of prepetition Bank Fees or prepetition amounts related to the Credit Card Programs would cause immediate harm to the estates. If the Debtors do not pay prepetition Bank Fees, its banking relationships may be materially harmed, and management may be forced to devote time and resources to avoidable disputes with the Banks. Moreover, the Banks likely have rights of setoff with respect to unpaid Bank Fees. Likewise, failure to pay prepetition amounts outstanding under the Credit Card Programs would significantly disrupt employees' ability to perform ordinary-course duties.

51. Accordingly, authorizing the Debtors to continue operating the Cash Management System in the ordinary course and to pay prepetition Bank Fees, Processing Charges, and amounts outstanding under the Credit Card Programs is a sound exercise of business judgment. The requested relief will preserve the Debtors' existing cash management practices, avoid unnecessary disruption to the Debtors' operations during these chapter 11 cases, maintain critical banking and payment relationships, and maximize value for the benefit of the Debtors' estates and all stakeholders.

## III. The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims.

52. The Cash Management System relies on its ability to process Intercompany Transactions quickly and efficiently. The Debtors' funds move through the Cash Management System as described above. At any given time, there may be Intercompany Claims owed by one Debtor to another Debtor in the ordinary course as part of the Cash Management System. The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described. The Debtors, moreover, will continue to maintain records of such Intercompany Transactions. If the Intercompany Transactions were to be

discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and their estates.

53. Further, granting the Debtors relief to continue Intercompany Transactions between each other (and to honor any prepetition obligations with respect thereto) is warranted under the circumstances. If such Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.

54. The Debtors anticipate that postpetition Intercompany Transactions will be consistent with those made prepetition. Accordingly, the Debtors submit that the Intercompany Transactions are in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such transactions and to honor their obligations with respect thereto.

55. The Debtors submit that postpetition Intercompany Transactions arising in the ordinary course are authorized as a matter of law pursuant to section 363(c)(1) of the Bankruptcy Code, and no additional relief is required. However, out of an abundance of caution, the Debtors request authority to continue to enter into the Intercompany Transactions in the ordinary course of business and in accordance with the Interim Order and Final Order.[7]

56. Because these transactions represent extensions of intercompany credit made in the ordinary course of the Debtors' operations that are an essential component of the Cash Management System, the Debtors request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order and request

[7] For the avoidance of doubt, the Debtors request authority to set off mutual prepetition obligations and mutual postpetition obligations in connection with the Cash Management System solely to the extent consistent with the Debtors' past practices.

that pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments (or other transfers of cash, whether to or from the Debtors) from a Debtor to another Debtor on account of a postpetition Intercompany Transaction be accorded administrative expense status, subject and junior to any claims, including adequate protection claims, cash collateral and/or claims for postpetition financing, granted in connection with approving the use of such cash collateral and/or the Debtors' entry into any postpetition financing facilities or credit agreements. This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

57. Similar relief has been granted in other comparable multi-debtor chapter 11 cases in this district and others. *See, e.g.*, *In re STG Logistics, Inc.*, 26-10258 (MEH) (Bankr. D.N.J. Feb. 10, 2026 (authorizing the continued performance of the intercompany transactions by the debtors on a final basis); *In re Del Monte Foods Corp. II*, No. 25-16984 (MBK) (Bankr. D.N.J. Aug. 13, 2025) (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Mar. 18, 2024) (same); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Feb. 6, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (same); *In re Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK) (Bankr. D.N.J. June 6, 2023) (same).

## IV. The Court Should Authorize the Debtors to Continue Using Existing Business Forms and Books and Records.

58. To avoid disruption of the Cash Management System and unnecessary expenses, the Debtors request authorization to continue to use the Business Forms and Books and Records

substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.

59. The Debtors submit that parties in interest will not be prejudiced by this relief. Parties doing business with the Debtors likely will be aware of their status as debtors in possession and, thus, changing Business Forms is unnecessary and would be unduly burdensome. The Debtors further submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtors in Possession." With respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtors in Possession."

60. The Debtors should also be permitted to maintain their existing Books and Records rather than open a new set as required under the U.S. Trustee Guidelines. The Debtors use a sophisticated recordkeeping system that enables them to consolidate their Books and Records for financial reporting purposes while tracking operations and results of individual entities across their corporate structure. Continued use of the Debtors' current Books and Records, therefore, will maximize efficiency, reduce administrative strain on the Debtors in these chapter 11 cases, and preserve value for the Debtors' stakeholders.

## V. Authorizing the Cash Management Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business is Warranted.

61. As discussed above, strict implementation of the U.S. Trustee Guidelines would needlessly interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their estates. Thus, the Debtors request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Cash Management Banks should be authorized to receive, process, honor, and pay any and all

checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

62. The Debtors further request that the Court authorize the Cash Management Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or after the Petition Date. The Debtors also request that, to the extent a bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of a mistake made despite implementation of customary item handling procedures, such bank will not be deemed to be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition. The Debtors submit that such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

63. Moreover, the Debtors request that the Court authorize the Cash Management Banks to (a) continue to charge the Debtors the Bank Fees, as applicable, and (b) charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the

Bank Fees of the respective bank at which the Bank Account is located. Finally, the Debtors request that the Court authorize the Debtors to pay any Bank Fees, including prepetition amounts.

64. The relief requested herein is consistent with relief regularly granted by Courts in this and other districts. *See, e.g.*, *In re FreshRealm, Inc.*, Case No. 26-14656 (MEH) (Bankr. D.N.J. June 2, 2026) (authorizing cash management banks to continue to maintain, service, and administer debtors' bank accounts as accounts of the debtors as debtors in possession on a final basis); *In re STG Logistics, Inc.*, 26-10258 (MEH) (Bankr. D.N.J. Feb. 10, 2026 (same); *In re Del Monte Foods Corp. II*, No. 25-16984 (MBK) (Bankr. D.N.J. Aug. 13, 2025) (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Mar. 18, 2024) (same); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Feb. 6, 2024) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Dec. 22, 2023) (same); *In re Whittaker, Clark & Daniels, Inc.*, No. 23-13575 (MBK) (Bankr. D.N.J. June 6, 2023) (same).

## VI. Cause Exists to Waive the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis.

65. To the extent that the requirements of section 345 of the Bankruptcy Code are inconsistent, or otherwise conflict, with (a) the cash management practices under the Cash Management System or (b) any action taken by the Debtors in accordance with an order of this Court, the Debtors seek a waiver of the requirements of section 345 of the Bankruptcy Code to allow the Debtors to continue their existing cash management practices.

66. Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money of a debtor's estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits that are not "insured or guaranteed by the United

States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise." *Id.* § 345(b). To comply with section 345 of the Bankruptcy Code, the U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds at an Authorized Depository.

67. Although Barclays is not an Authorized Depository, the Debtors submit that cause exists to waive the U.S. Trustee Guidelines regarding Authorized Depositories on an interim and final basis. In evaluating whether "cause" exists, courts have considered a number of factors, including:

a. the sophistication of the debtor's business;
b. the size of the debtor's business operations;
c. the amount of the investments involved;
d. the bank ratings (e.g., Moody's Investors Service, Inc. and Standard & Poor's Financial Services LLC) of the financial institution where the debtor-in-possession funds are held;
e. the complexity of the case;
f. the safeguards in place within the debtor's own business for ensuring the safety of the funds;
g. the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;
h. the benefit to the debtor;
i. the harm, if any, to the debtor;
j. the harm, if any, to the estate; and
k. the reasonableness of the debtor's request for relief from the requirements of section 345(b) in light of the overall circumstances of the case.

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

68. Although not an Authorized Depository Institution, Barclays is well-capitalized, financially stable, widely recognized as a reputable banking institution, and insured by the FDIC.

These Bank Accounts that the Debtors hold with Barclays are critical to continuing the Debtors' ordinary course operations. Requiring the Debtors to open new accounts at an Authorized Depository Institution or substitute those accounts into the Cash Management System in place of the Bank Accounts at Barclays would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates. In addition, efforts to relocate the Bank Accounts maintained at Barclays would further divert attention from stabilizing the Debtors' ordinary-course business operations, all for little, if any, tangible benefit. The Debtors' estates and creditors will not be harmed by maintaining the status quo, given the established stability of Barclays and the FDIC-insured protection applicable to those accounts there. Furthermore, the Debtors will work in good faith with the U.S. Trustee to resolve any concerns regarding the continued postpetition use of these accounts. Cause therefore exists to allow the Debtors to continue utilizing the Bank Accounts located at Barclays in the ordinary course of business.

69. Accordingly, the Debtors seek (a) pursuant to the Interim Order, a forty-five (45) day extension to come into compliance with section 345(b) of the Bankruptcy Code without prejudice to the Debtors' right to seek an additional extension, and (b) pursuant to the Final Order, a full waiver of the requirements of section 345(b) of the Bankruptcy Code. Granting the Debtors relief from section 345(b)'s requirements will allow the Debtors to continue utilizing the existing Bank Accounts without needless disruption and will inure to the benefit of all stakeholders

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

70. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, anticipated debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or

wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003(a) Are Satisfied**

71. Bankruptcy Rule 6003(a) empowers a court to grant relief within the first twenty-one (21) days after the Petition Date to the extent that "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). As set forth in this Motion, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and the Court should grant the requested relief.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

72. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

**Reservation of Rights**

73. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**No Prior Request**

74. No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

75. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to PIF as prepetition lender and DIP Lender; (d) counsel to BC Partners; (e) the office of the attorney general for each of the states in which the Debtors operate; (f) the United States Attorney's Office for the District of New Jersey; (g) the Internal Revenue Service; (h) the Cash Management Banks**;** and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors request that the Court enter interim and final orders, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: September 8, 2026

/s/ *Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

**Proposed Interim Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND HONOR PREPETITION OBLIGATIONS RELATED THERETO, (B) MAINTAIN EXISTING BANK ACCOUNTS, (C) PERFORM INTERCOMPANY TRANSACTIONS IN THE ORDINARY COURSE, AND (D) MAINTAIN EXISTING BUSINESS FORMS; AND (II) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through eighteen (18), is **ORDERED.**

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

Upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Course, and (D) Maintain Existing Business Forms; and (II) Granting Related Relief* (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an interim order (this "Interim Order") (a) authorizing, but not directing, the Debtors to (i) continue using their Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Bank Accounts, Business Forms, and Books and Records, and (iv) continue Intercompany Transactions and funding consistent with the Debtors' historical practices, and granting administrative expense status to any such postpetition Intercompany Transactions, (b) scheduling a final hearing (the "Final Hearing") to consider approval of the Motion on a final basis, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

enter an interim order consistent with Article III of the United States Constitution; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** on an interim basis as set forth herein.

2. The Final Hearing on the Motion will be held on **_______, 2026 at _____________ (Eastern Time)**. Objections, if any, that relate to the Motion shall be filed and served so as to be actually received by the following parties on or before **_______________, 2026 at 4:00 p.m. (Eastern Time)**: (i) proposed counsel to the Debtors, (a) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn. Scott J. Greenberg (sgreenberg@gibsondunn.com), Matthew J. Williams (mjwilliams@gibsondunn.com), Keith R. Martorana (kmartorana@gibsondunn.com), Robert E. Fitzgerald (rfitzgerald@gibsondunn.com), and Tommy Scheffer (tscheffer@gibsondunn.com), and (b) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn. Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Seth Van Aalten (svanaalten@coleschotz.com), Anthony De Leo (adeleo@coleschotz.com), Matteo Percontino (mpercontino@coleschotz.com); (ii) the Office

of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, New Jersey 07102, Attn. Jeffrey M. Sponder (Jeffrey.M.Sponder@usdoj.gov) and Rachel Wolf (Rachel.Wolf@usdoj.gov); (iii) counsel to PIF; (iv) counsel to BC Partners, (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn. James H.M. Sprayregen (jsprayregen@paulweiss.com), Robert A. Britton (rbritton@paulweiss.com), Douglas R. Keeton (dkeeton@paulweiss.com), and Mitchell Mengden (mmengden@paulweiss.com) and (b) Rimon PC, 100 Jericho Quadrangle, Suite 300, Jericho, NY 11753, Attn. Ronald J. Friedman (ronald.friedman@rimonlaw.com) and Douglas J. Schneller (douglas.schneller@rimonlaw.com); and (v) if any statutory committee has been appointed in these chapter 11 cases, counsel to such committee. If no objections are filed to the Motion, the Court may enter an order approving the relief requested in the Motion on a final basis without further notice or hearing.

3. Any objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

4. Notwithstanding anything to the contrary in the Motion or this Interim Order, any payment made or claim incurred by the Debtors pursuant to the authority granted in this Interim Order must be in compliance with, and any authorization of the Debtors contained herein is subject to: (a) any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the use of cash collateral; (b) the documentation in respect of any such debtor-in-possession financing or use of cash

collateral; and (c) any budget or cash flow forecasts in connection therewith (in each case, the "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and this Interim Order, the terms of the DIP Order shall control.

5. The Debtors are authorized, on an interim basis, subject to the terms set forth herein, but not directed, to: (a) continue using the Cash Management System maintained by the Debtors before the Petition Date, substantially as identified on **Exhibit 1** attached hereto, and honor any prepetition obligations related to the use thereof, including Bank Fees, Processing Charges, amounts outstanding under the Purchasing Card Program and amounts associated with customer refunds; (b) use, in their present form, all preprinted correspondence and Business Forms, including letterhead, without reference to the Debtors' status as debtors in possession and continue using, in their present form, the Books and Records; (c) continue to perform Intercompany Transactions in the ordinary course of business and consistent with past practice, and in accordance with terms and conditions of the DIP Order; (d) maintain all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit 2** attached hereto, in the names and with the account numbers existing immediately before the Petition Date, without the need to comply with any requirement under the U.S. Trustee Guidelines requiring the opening of separate debtor-in-possession accounts; (e) treat the Bank Accounts for all purposes as debtor-in-possession accounts; (f) deposit funds in and withdraw funds from the Bank Accounts in the ordinary course and by all means, including checks, wire transfers, direct deposits, ACH transfers, EFTs, credit card settlements and other electronic means; and (g) pay the Bank Fees, including

any prepetition amounts, and any ordinary-course Bank Fees incurred in connection with the Bank Accounts, and otherwise perform their obligations under the documents governing the Bank Accounts; (h) continue the Purchasing Card Program in the ordinary course of business on prepetition terms, including paying all associated fees and other amounts due on account thereof, and honor and pay any prepetition obligations under the Purchasing Card Program that become due in the ordinary monthly cycle after the Petition Date; and (i) continue using the Credit Card Processors in the ordinary course of business, including paying or permitting the netting of Processing Charges that come due in the ordinary settlement cycle and making payments to reimburse or fund customer refunds; provided that, in the case of each (a) through (i), such action is taken in the ordinary course of business and consistent with historical practices.

6. Notwithstanding the foregoing, once the Debtors' existing stock of Business Forms including checks have been used, the Debtors shall, when reordering (or with respect to checks or other Business Forms the Debtors or their agents print themselves), require or print, as applicable, the designation "Debtors in Possession" and the corresponding bankruptcy case number on all items. Further, within fourteen (14) calendar days of the entry of this Interim Order, the Debtors shall update any electronically produced checks to reflect their status as debtors in possession and to include the corresponding lead bankruptcy case number.

7. The Debtors are authorized, but not directed, on an interim basis, to continue paying their tax obligations from the Bank Accounts in the ordinary course of business and shall not be required to establish a separate debtor-in-possession bank account solely for the payment of tax

obligations.

8. The Cash Management Banks are authorized, but not directed, on an interim basis, to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business consistent with historical practices and the Cash Management System, and to receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, ACH transfers, EFTs and other electronic payments issued or drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order; provided that, subject to paragraph seven (7) of this Order, the Debtors shall instruct or request any Cash Management Bank to pay or honor any check, draft or other payment issued on a Bank Account prior to the Petition Date but presented to such Cash Management Bank for payment after the Petition Date only to the extent authorized by an order of the Court.

9. The Cash Management Banks are authorized, but not directed, on an interim basis, to debit the Bank Accounts in the ordinary course of business, consistent with historical practices, without further order of this Court for: (a) all checks drawn on the Debtors' accounts that were cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Cash Management Bank prior to the Petition Date that have been dishonored

or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as Bank Fees.

10. Any existing deposit agreements between or among the Debtors, the Cash Management Banks and other parties shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by the Court.

11. If any Bank Accounts existing as of the Petition Date are not in compliance with section 345(b) of the Bankruptcy Code or the U.S. Trustee Guidelines, the Debtors shall have until thirty (30) calendar days from the entry of this Interim Order, or such longer time as agreed with the U.S. Trustee, without prejudice to seeking an additional extension, to either come into compliance with section 345(b) of the Bankruptcy Code and any applicable requirements or guidelines of the U.S. Trustee or make such other arrangements as are agreed to by the U.S. Trustee or approved by the Court; provided that nothing herein shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent an agreement cannot be reached.

12. Notwithstanding the Debtors’ use of the Cash Management System, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6) based on the disbursements of, or on behalf of, each Debtor regardless of which entity actually makes such disbursements.

13. Subject to the terms hereof, and the prior consent of the DIP Lender, the Debtors are authorized, but not directed, in the ordinary course of business and consistent with historical practices, on an interim basis, to implement changes to the Cash Management System and procedures, including, without limitation, opening any new bank accounts or closing existing Bank Accounts and entering into ancillary agreements, including deposit account control agreements, related to the foregoing, as the Debtors may deem necessary and appropriate; *provided*, *however*, that the Debtors shall provide counsel to BC Partners, the U.S. Trustee and counsel to any statutory committees that may be appointed in these chapter 11 cases with not less than five (5) business days' prior written notice before making any material changes to the Cash Management System (email being sufficient). If an objection is filed with respect to such changes, the Debtors shall not implement such changes without (a) the consensual resolution of such objection or (b) further authorization of this Court. Any new bank account opened by the Debtors shall be established at an institution that is (a) a party to a Uniform Depository Agreement with the U.S. Trustee for Region 3 or is willing to immediately execute a Uniform Depository Agreement, and (b) bound by the terms of this Interim Order. The opening or closing of a bank account shall be timely indicated on the Debtors' monthly operating reports. Any new debtor-in-possession bank account must bear the designation "Debtor-in-Possession" and designated as "Debtor-in-Possession" accounts with the lead case number. Any new bank account shall be subject to a control agreements that are acceptable to the DIP Lenders. The Debtors shall provide notice within one (1) business day to the U.S. Trustee, counsel to BC Partners, counsel to the DIP Lender, and counsel to any statutory

committees that may be appointed in these chapter 11 cases of the opening of a new bank account or closing of any existing bank accounts. The U.S. Trustee, counsel to BC Partners, counsel to the DIP Lender, and counsel to any statutory committees that may be appointed in these chapter 11 cases shall have fourteen (14) calendar days from receipt of such notice to file any objection with regard to the opening or closing of a bank account, or such later date as may be extended by the Court or agreed to between such parties, as applicable. For avoidance of doubt, the Debtors shall implement changes to the Cash Management System and procedures without the prior consent of the DIP Lender.

14. The relief granted in this Interim Order is extended to any new bank account opened by the Debtors in the ordinary course of business and consistent with historical practice after the date hereof, which account shall be deemed a "Bank Account," and to the bank at which such account is opened, which bank shall be deemed a "Cash Management Bank."

15. For Cash Management Banks at which the Debtors hold Bank Accounts that are party to a Uniform Depository Agreement with the U.S. Trustee for Region 3, within five (5) calendar days of entry of this Interim Order, the Debtors shall (a) contact each Cash Management Bank, (b) provide each Cash Management Bank with each of the Debtors' employer identification numbers, and (c) identify each of the Bank Accounts held at such Banks as being held by a debtor in possession in a bankruptcy case, and request such Cash Management Banks to code the Bank Accounts as a "debtors in possession" account, and provide the lead case number.

16. For the Cash Management Banks at which the Debtors hold Bank Accounts that are not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good faith efforts to cause the Cash Management Banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within thirty (30) calendar days of the date of this Interim Order. The Debtors' and U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned Cash Management Banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully preserved.

17. All banks maintaining any of the Bank Accounts that are provided with notice of this Interim Order shall not honor or pay any payments drawn on the Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop-payment orders in accordance with the documents governing such Bank Accounts.

18. The Cash Management Banks are authorized, without further order of this Court, on an interim basis, to deduct or debit any applicable Bank Fees from the applicable Bank Accounts in the ordinary course of business consistent with historical practices, and the automatic stay is modified to the extent necessary to permit the Cash Management Banks to effectuate such debits.

19. The Cash Management Banks are authorized, without further order of this Court, on an interim basis, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items resulting from ACH transactions, wire transfers, EFTs or other electronic transfers of any kind, regardless of

whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

20. Subject to the terms set forth herein, any bank, including the Cash Management Banks, on an interim basis, may rely upon the representations of the Debtors with respect to whether any check, draft, wire or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Interim Order (a) at the direction of the Debtors, (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored or (c) as a result of a mistake made despite implementation of reasonable customary handling procedures shall be deemed to be nor shall be liable to the Debtors, their estates or any other party on account of such prepetition check or other item being honored postpetition or otherwise deemed to be in violation of this Interim Order.

21. Any banks, including the Cash Management Banks, are further authorized, on an interim basis, to honor the Debtors' directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; provided that the Cash Management Banks shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

22. The Debtors are authorized, but not directed, on an interim basis, to honor their obligations with respect to Intercompany Transactions and to continue engaging in Intercompany

Transactions, including with respect to netting or setoffs, in connection with the Cash Management System in the ordinary course of business on a postpetition basis in a manner substantially consistent with the Debtors' past practices. For the avoidance of doubt, the Debtors are authorized, but not directed, on an interim basis, to set off mutual prepetition obligations and mutual postpetition obligations in connection with the Cash Management System solely to the extent consistent with the Debtors' past practices and the DIP Order.

23. The Debtors shall maintain accurate and detailed records of all transfers within the Cash Management System, including Intercompany Transactions and the payment of Intercompany Claims, so that all transfers and transactions may be readily traced, ascertained and recorded properly on the Debtors' Books and Records and on applicable intercompany accounts (if any) to the same extent as maintained prior to commencement of the chapter 11 cases, and distinguished between prepetition and postpetition transactions for purposes of determining administrative expense status. Upon the request of the U.S. Trustee, counsel to BC Partners, counsel to the DIP Lender, or counsel to any statutory committees appointed in these chapter 11 cases, the Debtors shall make such records available to such parties.

24. During the period prior to entry of the Final Order, all postpetition payments or other transfers of cash from a Debtor to another Debtor on account of any postpetition Intercompany Transaction authorized hereunder that result in an Intercompany Claim are hereby accorded administrative expense status pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; provided that any such administrative expense claim shall be subject and junior

to any claims, including adequate protection claims, cash collateral and/or claims for postpetition financing, granted in connection with approving the use of such cash collateral and/or the Debtors' entry into any postpetition financing facilities or credit agreements. For the avoidance of doubt, the relief granted in this Interim Order shall not constitute a finding as to the validity, priority, or status of any prepetition intercompany balance, and all parties reserve their rights to contest the validity, priority, or status of any such prepetition intercompany balance. Nothing contained in the Motion or this Interim Order, nor any action taken by the Debtors pursuant to this Interim Order, shall be deemed a waiver of rights of any party-in-interest to dispute the amount of, basis for, validity or treatment of any Intercompany Transaction or any intercompany claim or the allocation of expenses or other costs.

25. The Debtors are further authorized, but not directed, on an interim basis, to maintain the Purchasing Card Program with the Cash Management Banks, subject to the terms and conditions thereof, and the Debtors shall honor all prepetition and postpetition obligations arising in connection with the programs and services maintained by the Debtors and pay or reimburse any ordinary course amounts owed in connection therewith, including any fees, charges, refunds, chargebacks, reserves and other amounts due and owing from the Debtors to Cash Management Banks, and Cash Management Banks are authorized to receive or obtain payment for such obligations, as provided under, and in the manner set forth in, the applicable agreement governing such program or service.

26. The Debtors are authorized, on an interim basis, to continue the Credit Card

Processors in the ordinary course of business and to pay or permit the netting of all Processing Charges that come due in the ordinary settlement cycle, all consistent with the Budget approved by the Court.

27. Nothing contained in the Motion or this Interim Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability or perfection of any security interest, lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

28. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an implication or admission as to the amount of, basis for or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Interim Order, the Motion or any order granting the relief requested by the Motion; (e) a request, approval or authorization to assume, adopt or reject any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on

property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens, whether contractual, common law, statutory or otherwise, that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. Any payment made pursuant to this Interim Order is not intended and shall not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

29. The Debtors are authorized, but not directed, on an interim basis, to issue postpetition checks or effect postpetition fund transfer requests in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein and to the extent authorized by this Interim Order.

30. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

31. Within two (2) calendar days after entry of this Interim Order, the Debtors shall serve a copy of this Interim Order on each applicable bank and financial institution that is directed to comply with the terms of this Interim Order.

32. Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due.

33. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

34. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

35. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, the terms and conditions of this Interim Order shall be effective and enforceable immediately upon entry hereof.

36. Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

37. The Debtors shall serve a copy of this Interim Order and the Motion on all parties required to receive such service pursuant to Local Rule 9013-5(f).

38. Any party may move for modification of this Interim Order in accordance with Local Rule 9013-5(e).

39. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

**<u>Exhibit 1</u>**

**Cash Management Diagram**




*[1] Includes 4 dormant accounts.See exhibit 1 for full account listing*

# Exhibit 2

## Bank Accounts

Exhibit 2

| Bank Name | Account Number (Last Four Digits) | Account Description | Debtor Entity | Bank Account Name | Country of Account | Account Currency |
|---|---|---|---|---|---|---|
| Barclays | 4741 | Holding | LIV Golf Holdings | LIV Golf Holdings | UK (Jersey) | USD |
| Barclays | 0522 | Holding | LIV Golf Holdings | LIV Golf Holdings | UK (Jersey) | USD |
| Barclays | 9766 | Holding | LIV Golf Investments Ltd | LIV Golf Investments LTD | UK (Jersey) | USD |
| Barclays | 3803 | Holding | LIV Golf Investments Ltd | LIV Golf Investments LTD | UK (Jersey) | USD |
| Barclays | 0091 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | UK (England) | GBP |
| Barclays | 5755 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | United States | USD |
| JP Morgan Chase | 9720 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | United States | USD |
| JP Morgan Chase | 7157 | Collateral | LIV Golf Incorporated | JPMC CC Account | United States | USD |
| Barclays | 3734 | Operating | LIV Golf Ltd | LIV Golf Ltd | UK (England) | GBP |
| Barclays | 8411 | Operating | LIV Golf Ltd | LIV Golf Ltd | United States | USD |
| JP Morgan Chase | 1450 | Operating | LIV Golf Events Ltd | Wedge Event 5 UK USD | UK (England) | USD |
| JP Morgan Chase | 5198 | Operating | LIV Golf Events Ltd | LIV Golf Events LTD | UK (England) | GBP |
| JP Morgan Chase | 3013 | Operating | LIV Golf Events Ltd | Wedge Event 5co Limited | UK (England) | THB |
| JP Morgan Chase | 1025 | Operating | LIV Golf Events Ltd | LIV Golf Events External Company | South Africa | ZAR |
| JP Morgan Chase | 1066 | Operating | LIV Golf Events Ltd | LIV Golf Events External Company | South Africa | USD |
| JP Morgan Chase | 6935 | Operating | LIV Golf Events Ltd | LIV Golf Events (Korean Branch) | South Korea | KRW |
| JP Morgan Chase | 6936 | Operating | LIV Golf Events Ltd | LIV Golf Events (Korean Branch) | South Korea | USD |
| JP Morgan Chase | 9221 | Operating | LIV Golf Events Ltd | LIV Golf Events (Australia Branch) | Australia | AUD |
| JP Morgan Chase | 4426 | Operating | LIV Golf Events Ltd | LIV Golf Events (Australia Branch) | Australia | USD |
| JP Morgan Chase | 3973 | Operating | LIV Golf Events Ltd | LIV Golf Events (Singapore Branch) | Singapore | SGD |
| JP Morgan Chase | 4088 | Operating | LIV Golf Events Ltd | LIV Golf Events (Singapore Branch) | Singapore | USD |
| JP Morgan Chase | 3022 | Adequate Assur. | LIV Golf New Jersey LLC | LIV Golf New Jersey LLC | United States | USD |
| JP Morgan Chase | 3026 | Disbursement | LIV Golf New Jersey LLC | LIV Golf New Jersey LLC | United States | USD |
| JP Morgan Chase | 7065 | Operating | Fairway TM Co 1, LLC | Fairway TM Co 1, LLC | United States | USD |
| JP Morgan Chase | 7073 | Operating | Fairway TM Co 2, LLC | Fairway TM Co 2, LLC | United States | USD |
| JP Morgan Chase | 7099 | Operating | Fairway TM Co 3, LLC | Fairway TM Co 3, LLC | United States | USD |
| JP Morgan Chase | 7107 | Operating | Fairway TM Co 4, LLC | Fairway TM Co 4, LLC | United States | USD |
| JP Morgan Chase | 7115 | Operating | Fairway TM Co 5, LLC | Fairway TM Co 5, LLC | United States | USD |
| JP Morgan Chase | 7123 | Operating | Fairway TM Co 6, LLC | Fairway TM Co 6, LLC | United States | USD |
| JP Morgan Chase | 8998 | Operating | Fairway TM Co 7, LLC | Fairway TM Co 7, LLC | United States | USD |
| JP Morgan Chase | 9129 | Operating | Fairway TM Co 8, LLC | Fairway TM Co 8, LLC | United States | USD |
| JP Morgan Chase | 5776 | Operating | Fairway TM Co 9, LLC | Fairway TM Co 9, LLC | United States | USD |
| JP Morgan Chase | 5883 | Operating | Fairway TM Co 10, LLC | Fairway TM Co 10, LLC | United States | USD |
| JP Morgan Chase | 5925 | Operating | Fairway TM Co 11, LLC | Fairway TM Co 11, LLC | United States | USD |
| JP Morgan Chase | 6063 | Operating | Fairway TM Co 12, LLC | Fairway TM Co 12, LLC | United States | USD |
| JP Morgan Chase | 3991 | Operating | Fairway TM Co 13, LLC | Fairway TM Co 13, LLC | United States | USD |
| JP Morgan Chase | 5175 | Dormant | Wedge Event Co 1 | Wedge Event Co 1 | United States | USD |
| JP Morgan Chase | 2531 | Dormant | Wedge Event Co 2 | Wedge Event Co 2 | United States | USD |
| JP Morgan Chase | 2226 | Dormant | Wedge Event Co 3 | Wedge Event Co 3 | United States | USD |
| JP Morgan Chase | 2531 | Dormant | Wedge Event Co 4 | Wedge Event Co 4 | United States | USD |

# Exhibit B

**Proposed Final Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
|---|---|
| In re: | Chapter 11 |
| LIV GOLF NEW JERSEY LLC, *et al.*, | Case No. 26-20189 (MBK) |
| Debtors.[1] | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM AND HONOR PREPETITION OBLIGATIONS RELATED THERETO, (B) MAINTAIN EXISTING BANK ACCOUNTS, (C) PERFORM INTERCOMPANY TRANSACTIONS IN THE ORDINARY COURSE, AND (D) MAINTAIN EXISTING BUSINESS FORMS; AND (II) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through sixteen (16), is **ORDERED.**

1 The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

Upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Course, and (D) Maintain Existing Business Forms; and (II) Granting Related Relief* (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of a final order (this "Final Order") (a) authorizing, but not directing, the Debtors to (i) continue using their Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Bank Accounts, Business Forms, and Books and Records, and (iv) continue Intercompany Transactions and funding consistent with the Debtors' historical practices, and granting administrative expense status to any such postpetition Intercompany Transactions; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that the

---

2 Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"), if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** on a final basis as set forth herein.

2. Any objections to the entry of this Final Order, to the extent not withdrawn or settled, are overruled.

3. Notwithstanding anything to the contrary in the Motion or this Final Order, any payment made or claim incurred by the Debtors pursuant to the authority granted in this Final Order must be in compliance with, and any authorization of the Debtors contained herein is subject to: (a) any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the use of cash collateral; (b) the documentation in respect of any such debtor-in-possession financing or use of cash collateral; and (c) any budget or cash flow forecasts in connection therewith (in each case, the "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and this Final Order, the terms of the DIP Order shall control.

4. The Debtors are authorized, subject to the terms set forth herein, but not directed, to: (a) continue using the Cash Management System maintained by the Debtors before the Petition Date, substantially as identified on **Exhibit 1** attached hereto, and honor any prepetition obligations related to the use thereof, including Bank Fees, Processing Charges, amounts outstanding under the Purchasing Card Program and amounts associated with customer refunds; (b) use, in their present form, all preprinted correspondence and Business Forms, including letterhead, without reference to the Debtors' status as debtors in possession and continue using, in their present form, the Books and Records; (c) continue to perform Intercompany Transactions in the ordinary course of business and consistent with past practice; (d) maintain all of their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit 2** attached hereto, in the names and with the account numbers existing immediately before the Petition Date, without the need to comply with any requirement under the U.S. Trustee Guidelines requiring the opening of separate debtor-in-possession accounts; (e) treat the Bank Accounts for all purposes as debtor-in-possession accounts; (f) deposit funds in and withdraw funds from the Bank Accounts in the ordinary course and by all means, including checks, wire transfers, direct deposits, ACH transfers, EFTs, credit card settlements and other electronic means; (g) pay the Bank Fees, including any prepetition amounts, and any ordinary-course Bank Fees incurred in connection with the Bank Accounts, and otherwise perform their obligations under the documents governing the Bank Accounts; (h) continue the Purchasing Card Program in the ordinary course of business on prepetition terms, including paying all associated fees and other amounts due on account thereof,

and honor and pay any prepetition obligations under the Purchasing Card Program that become due in the ordinary monthly cycle after the Petition Date; and (i) continue using the Credit Card Processors in the ordinary course of business, including paying or permitting the netting of Processing Charges that come due in the ordinary settlement cycle and making payments to reimburse or fund customer refunds; provided that, in the case of each (a) through (i), such action is taken in the ordinary course of business and consistent with historical practices.

5. Once the Debtors' existing stock of Business Forms including checks have been used, the Debtors shall, when reordering (or with respect to checks or other Business Forms the Debtors or their agents print themselves), require or print, as applicable, the designation "Debtors in Possession" and the corresponding bankruptcy case number on all items. With respect to electronically produced checks, the Debtors shall continue to reflect their status as debtors in possession and include the corresponding lead bankruptcy case number thereon.

6. The Debtors are authorized, but not directed, on a final basis, to continue paying their tax obligations from the Bank Accounts in the ordinary course of business and shall not be required to establish a separate debtor-in-possession bank account solely for the payment of tax obligations.

7. The Cash Management Banks are authorized, but not directed, on a final basis, to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business consistent with historical practices and the Cash Management System, and to receive, process, honor and pay, to

the extent of available funds, any and all checks, drafts, wires, credit card payments, ACH transfers, EFTs and other electronic payments issued or drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order; provided, subject to paragraph six (6) of this Final Order, that the Debtors shall instruct or request any Cash Management Bank to pay or honor any check, draft or other payment issued on a Bank Account prior to the Petition Date but presented to such Cash Management Bank for payment after the Petition Date only to the extent authorized by an order of the Court.

8. The Cash Management Banks are authorized, but not directed, on a final basis, to debit the Bank Accounts in the ordinary course of business, consistent with historical practices, without further order of this Court for: (a) all checks drawn on the Debtors' accounts that were cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (b) all checks or other items deposited in one of the Debtors' accounts with such Cash Management Bank prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as Bank Fees.

9. Any existing deposit agreements between or among the Debtors, the Cash Management Banks and other parties shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by the Court.

10. To the extent the Bank Accounts existing as of the Petition Date are not in compliance with section 345(b) of the Bankruptcy Code or any provision of the U.S. Trustee Guidelines, the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines are hereby waived.

11. Notwithstanding the Debtors' use of the Cash Management System, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6) based on the disbursements of, or on behalf of, each Debtor regardless of which entity actually makes such disbursements.

12. Subject to the terms hereof, the Debtors are authorized, but not directed, in the ordinary course of business and consistent with historical practices, on a final basis, to implement changes to the Cash Management System and procedures, including, without limitation, opening any new bank accounts or closing existing Bank Accounts and entering into ancillary agreements, including deposit account control agreements, related to the foregoing, as the Debtors may deem necessary and appropriate; *provided, however,* that the Debtors shall provide counsel to BC Partners, the U.S. Trustee and counsel to any statutory committees that may be appointed in these chapter 11 cases with not less than five (5) business days' prior written notice before making any

material changes to the Cash Management System (email being sufficient). If an objection is filed with respect to such changes, the Debtors shall not implement such changes without (a) the consensual resolution of such objection or (b) further authorization of this Court. Any new bank account opened by the Debtors shall be established at an institution that is (a) a party to a Uniform Depository Agreement with the U.S. Trustee for Region 3 or is willing to immediately execute a Uniform Depository Agreement, and (b) bound by the terms of this Final Order. The opening or closing of a bank account shall be timely indicated on the Debtors' monthly operating reports. Any new debtor-in-possession bank account must bear the designation "Debtor-in-Possession" and designated as "Debtor-in-Possession" accounts with the lead case number. The Debtors shall provide notice within one (1) business days to the U.S. Trustee, counsel to BC Partners, counsel to the DIP Lender, and counsel to any statutory committees that may be appointed in these chapter 11 cases of the opening of a new bank account or closing of any existing bank accounts. The U.S. Trustee, counsel to BC Partners, counsel to the DIP Lender, and counsel to any statutory committees that may be appointed in these chapter 11 cases shall have fourteen (14) calendar days from receipt of such notice to file any objection with regard to the opening or closing of a bank account, or such later date as may be extended by the Court or agreed to between such parties, as applicable.

13. The relief granted in this Final Order is extended to any new bank account opened by the Debtors in the ordinary course of business and consistent with historical practice after the date hereof, which account shall be deemed a "Bank Account," and to the bank at which such

account is opened, which bank shall be deemed a "Cash Management Bank."

14. For Cash Management Banks at which the Debtors hold Bank Accounts that are party to a Uniform Depository Agreement with the U.S. Trustee for Region 3, within five (5) calendar days of entry of this Final Order, the Debtors shall (a) contact each Cash Management Bank, (b) provide each Cash Management Bank with each of the Debtors' employer identification numbers, and (c) identify each of the Bank Accounts held at such Banks as being held by a debtor in possession in a bankruptcy case, and request such Cash Management Banks to code the Bank Accounts as a "debtors in possession" account, and provide the case number.

15. For the Cash Management Banks at which the Debtors hold Bank Accounts that are not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good faith efforts to cause the Cash Management Banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within thirty (30) calendar days of the date of this Final Order. The Debtors' and U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned Cash Management Banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully preserved.

16. All banks maintaining any of the Bank Accounts that are provided with notice of this Final Order shall not honor or pay any payments drawn on the Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop-payment orders in accordance with the documents governing such Bank Accounts.

17. The Cash Management Banks are authorized, without further order of this Court, on a final basis, to deduct or debit any applicable Bank Fees from the applicable Bank Accounts in the ordinary course of business consistent with historical practices, and the automatic stay is modified to the extent necessary to permit the Cash Management Banks to effectuate such debits.

18. The Cash Management Banks are authorized, without further order of this Court, on a final basis, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items resulting from ACH transactions, wire transfers, EFTs or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

19. Subject to the terms set forth herein, any bank, including the Cash Management Banks, on a final basis, may rely upon the representations of the Debtors with respect to whether any check, draft, wire or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Final Order (a) at the direction of the Debtors, (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored or (c) as a result of a mistake made despite implementation of reasonable customary handling procedures shall be deemed to be nor shall be liable to the Debtors, their estates or any other party on account of such prepetition check or other item being honored postpetition or otherwise deemed to be in violation of this Final Order.

20. Any banks, including the Cash Management Banks, are further authorized, on a final basis, to honor the Debtors' directions with respect to the opening and closing of any Bank Account and accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; provided that the Cash Management Banks shall not have any liability to any party for relying on such representations to the extent such reliance otherwise complies with applicable law.

21. The Debtors are authorized, but not directed, on a final basis, to honor their obligations with respect to Intercompany Transactions and to continue engaging in Intercompany Transactions, including with respect to netting or setoffs, in connection with the Cash Management System in the ordinary course of business on a postpetition basis in a manner substantially consistent with the Debtors' past practices. For the avoidance of doubt, the Debtors are authorized, but not directed to, on a final basis, to set off mutual prepetition obligations and mutual postpetition obligations in connection with the Cash Management System solely to the extent consistent with the Debtors' past practices.

22. The Debtors shall maintain accurate and detailed records of all transfers with the Cash Management System, including Intercompany Transactions and the payment of Intercompany Claims, so that all transfers and transactions may be readily traced, ascertained and recorded properly on the Debtors' Books and Records and applicable intercompany accounts (if any) to the same extent as maintained prior to commencement on the chapter 11 cases, and distinguished between prepetition and postpetition transactions for purposes of determining

administrative expense status. Upon the request of counsel to BC Partners, the Debtors shall make such records available to such parties.

23. All postpetition payments or other transfers of cash from a Debtor to another Debtor on account of any postpetition Intercompany Transaction authorized hereunder that result in an Intercompany Claim are hereby accorded administrative expense status pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; provided that any such administrative expense claim shall be subject and junior to any claims, including adequate protection claims, cash collateral and/or claims for postpetition financing, granted in connection with approving the use of such cash collateral and/or the Debtors' entry into any postpetition financing facilities or credit agreements. For the avoidance of doubt, the relief granted in this Final Order shall not constitute a finding as to the validity, priority, or status of any prepetition intercompany balance, and all parties reserve their rights to contest the validity, priority, or status of any such prepetition intercompany balance. Nothing contained in the Motion or this Final Order, nor any action taken by the Debtors pursuant to this Final Order, shall be deemed a waiver of rights of any party-in-interest to dispute the amount of, basis for, validity or treatment of any Intercompany Transaction or any intercompany claim or the allocation of expenses or other costs.

24. The Debtors are further authorized, but not directed, on a final basis, to maintain the Purchasing Card Program with the Cash Management Banks, subject to the terms and conditions thereof, and the Debtors shall honor all prepetition and postpetition obligations arising in connection with the programs and services maintained by the Debtors and pay or reimburse any

ordinary course amounts owed in connection therewith, including any fees, charges, refunds, chargebacks, reserves and other amounts due and owing from the Debtors to Cash Management Banks, and Cash Management Banks are authorized to receive or obtain payment for such obligations, as provided under, and in the manner set forth in, the applicable agreement governing such program or service.

25. The Debtors are authorized, on a final basis, to continue the Credit Card Processors in the ordinary course of business and to pay or permit the netting of all Processing Charges that come due in the ordinary settlement cycle, all consistent with the Budget approved by the Court.

26. Nothing contained in the Motion or this Final Order shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability or perfection of any security interest, lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

27. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an implication or admission as to the amount of, basis for or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or

defined in this Final Order, the Motion or any order granting the relief requested by the Motion; (e) a request, approval or authorization to assume, adopt or reject any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability or perfection of any lien on, security interest in or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens, whether contractual, common law, statutory or otherwise, that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. Any payment made pursuant to this Final Order is not intended and shall not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

28. The Debtors are authorized, but not directed, on a final basis, to issue postpetition checks or effect postpetition fund transfer requests in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein and to the extent authorized by this Final Order.

29. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

30. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

31. 31. Within two (2) calendar days after entry of this Final Order, the Debtors shall serve a copy of this Final Order on each applicable bank and financial institution that is directed to comply with the terms of this Final Order.

32. Nothing in this Final Order authorizes the Debtors to accelerate any payments not otherwise due.

33. Notwithstanding Bankruptcy Rule 6004(h) to the extent applicable, the terms and conditions of this Final Order shall be effective and enforceable immediately upon entry hereof.

34. Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

35. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Final Order.

# **Exhibit 1**

## **Cash Management Diagram**




[1] Includes 4 dormant accounts.See exhibit 1 for full account listing

# **Exhibit 2**

## **Bank Accounts**

Exhibit 2

| Bank Name | Account Number (Last Four Digits) | Account Description | Debtor Entity | Bank Account Name | Country of Account | Account Currency |
|---|---|---|---|---|---|---|
| Barclays | 4741 | Holding | LIV Golf Holdings | LIV Golf Holdings | UK (Jersey) | USD |
| Barclays | 0522 | Holding | LIV Golf Holdings | LIV Golf Holdings | UK (Jersey) | USD |
| Barclays | 9766 | Holding | LIV Golf Investments Ltd | LIV Golf Investments LTD | UK (Jersey) | USD |
| Barclays | 3803 | Holding | LIV Golf Investments Ltd | LIV Golf Investments LTD | UK (Jersey) | USD |
| Barclays | 0091 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | UK (England) | GBP |
| Barclays | 5755 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | United States | USD |
| JP Morgan Chase | 9720 | Operating | LIV Golf Incorporated | LIV Golf Incorporated | United States | USD |
| JP Morgan Chase | 7157 | Collateral | LIV Golf Incorporated | JPMC CC Account | United States | USD |
| Barclays | 3734 | Operating | LIV Golf Ltd | LIV Golf Ltd | UK (England) | GBP |
| Barclays | 8411 | Operating | LIV Golf Ltd | LIV Golf Ltd | United States | USD |
| JP Morgan Chase | 1450 | Operating | LIV Golf Events Ltd | Wedge Event 5 UK USD | UK (England) | USD |
| JP Morgan Chase | 5198 | Operating | LIV Golf Events Ltd | LIV Golf Events LTD | UK (England) | GBP |
| JP Morgan Chase | 3013 | Operating | LIV Golf Events Ltd | Wedge Event 5co Limited | UK (England) | THB |
| JP Morgan Chase | 1025 | Operating | LIV Golf Events Ltd | LIV Golf Events External Company | South Africa | ZAR |
| JP Morgan Chase | 1066 | Operating | LIV Golf Events Ltd | LIV Golf Events External Company | South Africa | USD |
| JP Morgan Chase | 6935 | Operating | LIV Golf Events Ltd | LIV Golf Events (Korean Branch) | South Korea | KRW |
| JP Morgan Chase | 6936 | Operating | LIV Golf Events Ltd | LIV Golf Events (Korean Branch) | South Korea | USD |
| JP Morgan Chase | 9221 | Operating | LIV Golf Events Ltd | LIV Golf Events (Australia Branch) | Australia | AUD |
| JP Morgan Chase | 4426 | Operating | LIV Golf Events Ltd | LIV Golf Events (Australia Branch) | Australia | USD |
| JP Morgan Chase | 3973 | Operating | LIV Golf Events Ltd | LIV Golf Events (Singapore Branch) | Singapore | SGD |
| JP Morgan Chase | 4088 | Operating | LIV Golf Events Ltd | LIV Golf Events (Singapore Branch) | Singapore | USD |
| JP Morgan Chase | 3022 | Adequate Assur. | LIV Golf New Jersey LLC | LIV Golf New Jersey LLC | United States | USD |
| JP Morgan Chase | 3026 | Disbursement | LIV Golf New Jersey LLC | LIV Golf New Jersey LLC | United States | USD |
| JP Morgan Chase | 7065 | Operating | Fairway TM Co 1, LLC | Fairway TM Co 1, LLC | United States | USD |
| JP Morgan Chase | 7073 | Operating | Fairway TM Co 2, LLC | Fairway TM Co 2, LLC | United States | USD |
| JP Morgan Chase | 7099 | Operating | Fairway TM Co 3, LLC | Fairway TM Co 3, LLC | United States | USD |
| JP Morgan Chase | 7107 | Operating | Fairway TM Co 4, LLC | Fairway TM Co 4, LLC | United States | USD |
| JP Morgan Chase | 7115 | Operating | Fairway TM Co 5, LLC | Fairway TM Co 5, LLC | United States | USD |
| JP Morgan Chase | 7123 | Operating | Fairway TM Co 6, LLC | Fairway TM Co 6, LLC | United States | USD |
| JP Morgan Chase | 8998 | Operating | Fairway TM Co 7, LLC | Fairway TM Co 7, LLC | United States | USD |
| JP Morgan Chase | 9129 | Operating | Fairway TM Co 8, LLC | Fairway TM Co 8, LLC | United States | USD |
| JP Morgan Chase | 5776 | Operating | Fairway TM Co 9, LLC | Fairway TM Co 9, LLC | United States | USD |
| JP Morgan Chase | 5883 | Operating | Fairway TM Co 10, LLC | Fairway TM Co 10, LLC | United States | USD |
| JP Morgan Chase | 5925 | Operating | Fairway TM Co 11, LLC | Fairway TM Co 11, LLC | United States | USD |
| JP Morgan Chase | 6063 | Operating | Fairway TM Co 12, LLC | Fairway TM Co 12, LLC | United States | USD |
| JP Morgan Chase | 3991 | Operating | Fairway TM Co 13, LLC | Fairway TM Co 13, LLC | United States | USD |
| JP Morgan Chase | 5175 | Dormant | Wedge Event Co 1 | Wedge Event Co 1 | United States | USD |
| JP Morgan Chase | 2531 | Dormant | Wedge Event Co 2 | Wedge Event Co 2 | United States | USD |
| JP Morgan Chase | 2226 | Dormant | Wedge Event Co 3 | Wedge Event Co 3 | United States | USD |
| JP Morgan Chase | 2531 | Dormant | Wedge Event Co 4 | Wedge Event Co 4 | United States | USD |