**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al*.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Joint Administration Requested) |

# DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL, (II) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, AND (III) PROVIDE ADEQUATE PROTECTION, (B) SCHEDULING FINAL HEARING, AND (C) GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (the "Motion")[2] for the relief set forth herein. In support of this Motion, the Debtors submit the *Declaration of Bradley Robins in Support of the Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief* (the "DIP Declaration"), filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state the following:

## Introduction

1. With approximately $15 million in cash on hand as of the Petition Date (as defined below), the Debtors have an immediate and critical need for an infusion of capital—in the form of postpetition financing—and for the continued use of Cash Collateral (as defined below) as they enter these chapter 11 cases to preserve the value of the Debtors' estates and implement the restructuring contemplated by the Approved Plan (as defined below). The Approved Plan is expected to implement either (a) a going-concern transaction with BC Partners Advisors L.P. ("BC Partners"), the lead investor identified through the Debtors' prepetition marketing process, pursuant to the restructuring support agreement entered into on September 8, 2026 (the "BC Partners RSA"), or (b) if that transaction cannot be finalized within the timeline set forth in the DIP Facility (as defined below), an orderly wind-down of the Debtors' estates through a liquidating

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration.

trust funded in part by a cash contribution to be made by PIF (the "PIF Cash Consideration") for the benefit of holders of allowed general unsecured claims (the "Approved Plan"). *See* First Day Declaration ¶¶ 9, 11, 59–61. Accordingly, the Debtors seek authorization to enter into the DIP Term Loan Facility (as defined below) in an aggregate principal amount not to exceed $49,600,000, with up to $14.0 million of such amount available upon interim approval of this Motion.

2. Absent the liquidity provided by the DIP Term Loan Facility and the continued use of Cash Collateral, the Debtors will not have sufficient cash on hand to pay their obligations as they come due, including payments to foreign vendors, utilities, insurers and employees, as well as to fund the administrative costs of these chapter 11 cases. Without immediate access to the DIP Term Loan Facility and Cash Collateral, the Debtors' ability to continue operating as a going concern pending consummation of the Approved Plan would be jeopardized, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders. *See* DIP Declaration ¶ 23.

3. The proposed DIP Term Loan Facility is a senior secured superpriority priming term loan credit facility in an aggregate principal amount not to exceed $49,600,000 provided by The Public Investment Fund of the Kingdom of Saudi Arabia ("PIF" or the "DIP Lender"), the Debtors' existing prepetition secured lender. The DIP Loans will bear interest at a fixed rate of 12.0% per annum, paid in kind, and the DIP Facility will mature no later than the Scheduled Maturity Date, which is the date that is 120 calendar days after the Petition Date, subject to earlier maturity as provided in the DIP Loan Documents. *See* DIP Credit Agreement § 2, 6, 8. The DIP Term Loan Facility consists of (i) an interim term loan in an aggregate principal amount not to exceed $14,000,000 at any time outstanding, available in a single draw on the Closing Date (as

defined in the DIP Credit Agreement) upon entry of the Interim Order (the "Interim DIP Term Loan"), and (ii) upon entry of the Final Order (as defined below) and the satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents (as defined below), a delayed draw term loan in an aggregate principal amount not to exceed $49,600,000 (less the aggregate principal amount of the Interim DIP Term Loan) at any time outstanding, available in a single draw to be made following entry of the Final Order, and in no event later than thirty-five (35) days after the Petition Date (the "Delayed Draw Term Loan," and together with the Interim DIP Term Loan, the "DIP Term Loans"). In addition, subject to and effective upon, and in each case as of, (x) the entry of the Interim Order, Prepetition Obligations (as defined below) in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan, and (y) the entry of the Final Order, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan, shall, in each case without further action by any party, be automatically deemed exchanged via assignment on a cashless basis into, and shall be deemed to constitute, loans issued and outstanding under the DIP Credit Agreement (collectively, the "DIP Roll-Up Loans"). The DIP Term Loans, together with the DIP Roll-Up Loans, are referred to herein as the "DIP Loans," and the facility for the DIP Loans is referred to herein as the "DIP Facility."

4. Importantly, the DIP Facility is fully consensual. PIF is both the Debtors' only prepetition secured lender (in such capacity, the "Prepetition Lender") and the DIP Lender. The Prepetition Lender has consented to the priming of the Prepetition Liens (as defined below) by the DIP Liens (as defined below) and to the Debtors' use of Cash Collateral, in each case on the terms and conditions set forth in the Interim Order. As a result, the relief requested herein does not present the risk of a value-destructive priming fight at the outset of these chapter 11 cases, and the

DIP Liens will be junior only to the Carve-Out (as defined in the Interim Order) and any valid, enforceable, perfected, and non-avoidable liens of third parties that are senior to the Prepetition Liens and permitted under the Prepetition Facility Agreement (as defined below), if any (such liens, the "Senior Third Party Permitted Liens").

5. The DIP Facility also contains structural protections that ensure the Debtors draw only what they need, when they need it. All proceeds of the DIP Term Loan Facility will be funded into a blocked account of the DIP Borrower (the "DIP Facility Blocked Account") and may be disbursed only upon weekly Disbursement Requests (as defined in the Interim Order) made in accordance with the Approved Budget (as defined below), and only to the extent the Debtors' projected aggregate unrestricted cash (less any forecast collections) falls below a minimum cash threshold of $5,000,000. *See* DIP Credit Agreement § 2.3, 36.4. The Debtors will operate subject to an initial 13-week rolling consolidated budget and cash flow forecast attached to the Interim Order as **Exhibit 2** (as updated from time to time in accordance with the DIP Loan Documents, the "DIP Budget," and each DIP Budget approved in accordance with the DIP Credit Agreement, an "Approved Budget"), with weekly variance reporting to the DIP Lender.

6. The DIP Facility is the product of two prepetition marketing processes. The Debtors' broad marketing process for a strategic transaction—which reached more than 300 potential investors—yielded no offer of postpetition financing to fund these chapter 11 cases other than from BC Partners, whose bid is contingent on the consummation of a chapter 11 plan and whose supplemental financing under the BC Partners RSA is directed to start-up costs of the LIV 2.0 (as defined below) transaction. In August 2026, the Debtors' investment banker separately solicited postpetition financing proposals from twelve (12) third-party financial institutions experienced in debtor-in-possession financing; every one of them declined, citing the junior

position that any third-party financing would occupy relative to PIF's prepetition secured position and insufficient collateral value, and none submitted a proposal on any basis. *See* DIP Declaration ¶¶ 11–15; First Day Declaration ¶¶ 59–61. The Debtors, in consultation with their advisors, have determined that they are unable to obtain adequate postpetition financing on an unsecured, junior, or otherwise more favorable basis than the terms provided in the DIP Loan Documents and the Interim Order. *See* DIP Declaration ¶¶ 13–15.

7. Ultimately, the Debtors, with the assistance of their advisors, determined, after careful consideration and in an exercise of their business judgment, that entering into the proposed DIP Facility and the consensual use of Cash Collateral on the terms set forth in the Interim Order are necessary and in the best interests of their estates and stakeholders. The DIP Facility will provide the Debtors with the liquidity necessary to administer these chapter 11 cases efficiently and consummate the Approved Plan. Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

## Jurisdiction and Venue

8. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final

orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, 9013-4, and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## **Background**

11. The Debtors own and operate an international men's professional golf league (the "League"). Founded in 2021 and financially backed by PIF, the Debtors host tournaments at golf courses around the world (the "Tournaments"). The Tournaments feature world-class entertainment as well as League-contracted professional golfers (the "Players") who compete in both individual and team competitions that take place alongside each other. The Debtors have built a recognizable global brand through attracting fans, broadcasters and commercial partners. *See* First Day Declaration ¶¶ 4–7, 15–21, 40. Additional background, including the events leading to these chapter 11 cases, is set forth in the First Day Declaration.

12. On September 8, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No

request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Relief Requested**

13. By this Motion, the Debtors seek entry of the Interim Order and the Final Order:

a. authorizing LIV Golf Incorporated ("LIV Golf" or the "DIP Borrower"), pursuant to sections 363, 364(c)(1), (2), and (3), and 364(d)(1) of the Bankruptcy Code, to enter into a senior secured priming term loan credit facility in an aggregate principal amount not to exceed $49,600,000 (the "DIP Term Loan Facility") pursuant to the terms and conditions of the Debtor-in-Possession Facility Agreement in substantially the form attached to the Interim Order as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," and, collectively with the DIP Orders, the Approved Budget, the DIP Guarantees (as defined below), and all other agreements, documents, and instruments delivered or executed in connection therewith, including each of the DIP Finance Documents (as defined in the DIP Credit Agreement), the "DIP Loan Documents"), provided by PIF, as DIP Lender, in each case for use in accordance with the Approved Budget, consisting of:

(i). the Interim DIP Term Loan, in an aggregate principal amount not to exceed $14,000,000 at any time outstanding, available in a single draw on the Closing Date (or such other date agreed to by the DIP Lender and LIV Golf) during the period from the Closing Date through and including the earlier to occur of (x) the date of entry of the Final Order and (y) the Termination Date (as defined in the Interim Order) (such period, the "Interim Period"); and

(ii). the Delayed Draw Term Loan, upon the entry of the Final Order and the satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents, in an aggregate principal amount not to exceed $49,600,000 (less the aggregate principal amount of the Interim DIP Term Loan) at any time outstanding, available pursuant to a single draw to be made on a date to be determined following entry of the Final Order (or such other date agreed to by the DIP Lender and LIV Golf);

b. subject to the terms and conditions set forth in the Interim Order, the Final Order, and the DIP Credit Agreement, authorizing, (x) upon entry of the Interim Order (and as of the date thereof), that Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan, and (y) upon entry of the Final Order (and as of the date thereof), that Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan, shall be substituted and exchanged (and deemed prepaid by), and shall be deemed to be for

all purposes, loans issued and outstanding under the DIP Credit Agreement as DIP Roll-Up Loans;

c. authorizing LIV Golf Investments Ltd ("Parent"), LIV Golf Holdings, Ltd ("Holdings"), and each of the other Debtors as Guarantors under the DIP Loan Documents (the "Subsidiary Guarantors," and collectively with Parent and Holdings, the "DIP Guarantors") to enter into guarantees (the "DIP Guarantees") to jointly and severally guarantee the DIP Borrower's obligations under and in respect of the DIP Facility, as provided in the Interim Order and the other DIP Loan Documents;

d. authorizing the DIP Borrower and each of the DIP Guarantors (collectively, the "DIP Loan Parties") to enter into, execute, and deliver documentation evidencing the DIP Facility, including the DIP Credit Agreement and the other DIP Loan Documents, in each case to which it is a party, and to perform such other and further acts as may be necessary or appropriate in connection therewith;

e. authorizing the Debtors to use proceeds of the DIP Loans solely in accordance with the Approved Budget, the Interim Order, and the other DIP Loan Documents;

f. granting to the DIP Lender, in respect of the DIP Obligations (as defined in the Interim Order), allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in substantially all assets and property of the DIP Loan Parties (now owned or hereafter acquired), including the equity interests in the DIP Borrower, pursuant to sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code, in each case subject to the Carve-Out and as, and to the extent, set forth in the Interim Order and the DIP Loan Documents;

g. authorizing the Debtors to use any "cash collateral," as such term is defined in section 363 of the Bankruptcy Code, in which the Prepetition Lender and/or the DIP Lender have an interest (the "Cash Collateral"), solely in accordance with the Approved Budget, the Interim Order, and the other DIP Loan Documents;

h. granting, as of the Petition Date, adequate protection for the benefit of the Prepetition Lender, including the Adequate Protection Superpriority Claim and the Adequate Protection Liens (each as defined in the Interim Order) and the payment of the fees and expenses of the Prepetition Lender, solely to the extent of and as compensation for any Diminution in Value (as defined in the Interim Order);

i. waiving the Debtors' right to surcharge the DIP Collateral (as defined in the Interim Order) and, subject to and effective upon entry of the Final Order, the Prepetition Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

j. subject to and effective upon entry of the Final Order, providing that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender, and waiving the equitable doctrine of marshaling and other similar doctrines with respect to the DIP Lender (effective upon entry of the Interim Order) and, subject to entry of the Final Order, the Prepetition Lender;

k. modifying or waiving the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including pursuant to Bankruptcy Rules 6003 and 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim Order, and the other DIP Loan Documents and to provide for the immediate effectiveness of the Interim Order;

l. authorizing and approving the tax attribute preservation provisions set forth in the Interim Order, including the restrictions applicable to the DIP Lender with respect to declarations of worthlessness, transfers of equity interests in the Debtors' holding companies;

m. scheduling a final hearing (the "Final Hearing") to consider the relief requested in this Motion and the entry of the Final Order and approving the form of notice with respect to the Final Hearing; and

n. granting related relief.

**Concise Statement Pursuant to Bankruptcy Rules 4001(b) and 4001(c) and Local Rule 4001-3**

## I. Concise Statement regarding the DIP Facility.

14. The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-3.[3]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | LIV Golf Incorporated ("LIV Golf" or the "DIP Borrower").<br>*See* DIP Credit Agreement § 2. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | LIV Golf Investments Ltd ("Parent"), LIV Golf Holdings, Ltd ("Holdings"), and each of the other Debtors as Guarantors under the DIP Loan Documents (the "Subsidiary Guarantors," and collectively with Parent and Holdings, the "DIP Guarantors"). Pursuant to the DIP Guarantees, the DIP Guarantors jointly and severally guarantee the DIP Borrower's obligations under and in respect of the DIP Facility.<br>*See* DIP Credit Agreement § 15; Schedule 1. |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | The Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"), as lender, together with any successors and assigns permitted under the DIP Credit Agreement. PIF is also the Prepetition Lender. The DIP Lender may assign or participate the DIP Obligations only with the prior consent of the DIP Borrower.<br>*See* DIP Credit Agreement Preamble. |

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Parties shall provide the DIP Lender and the Prepetition Lender (and their respective consultants, advisors, and professionals) all financial information required under the DIP Loan Documents and the Prepetition Facility Documents, weekly Variance Reports, updated DIP Budgets, and reasonable access to the Debtors' books, records, assets, and properties for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral.<br>*See* Interim Order ¶¶ 6–7; DIP Credit Agreement § 17. |
| **Term**<br>Bankruptcy Rules 4001(b)(1)(B), 4001(c)(1)(B)<br>Local Rule 4001-3 | The term of the DIP Facility commences on the Closing Date and ends on the Termination Date (as defined in the DIP Credit Agreement), which is the earliest to occur of: (i) the Scheduled Maturity Date, *i.e.*, the date that is 120 calendar days after the Petition Date; (ii) the effective date of any chapter 11 plan of the Debtors; (iii) the date that is thirty-five (35) days after the Petition Date, if the Final Order has not been entered by such date; (iv) the entry of a court order either (a) dismissing any of the chapter 11 cases or converting one or more of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or (b) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (v) the entry of an order approving the sale of all or substantially all of the Debtors' assets and property; and (vi) the occurrence of an Event of Default under the DIP Loan Documents.<br>*See* DIP Credit Agreement § 1.1, 6(a); Interim Order ¶ 21(a). |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3(b)(2)(A) | DIP Term Loans in an aggregate principal amount not to exceed $49,600,000, consisting of: (a) the Interim DIP Term Loan in an aggregate principal amount not to exceed $14,000,000 at any time outstanding, available in a single draw on the Closing Date (or such other date agreed to by the DIP Lender and LIV Golf) upon entry of the Interim Order; and (b) the Delayed Draw Term Loan, upon entry of the Final Order and the satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents, in an aggregate principal amount not to exceed $49,600,000 (less the aggregate principal amount of the Interim DIP Term Loan) at any time outstanding, available in a single draw to be made on a date to be determined following entry of the Final Order (or such other date agreed to by the DIP Lender and LIV Golf). The Interim DIP Term Loan is in the aggregate principal amount of $14,000,000. Commitments under the DIP Term Loan Facility are permanently reduced on the date of each borrowing of DIP Loans, and amounts borrowed that are repaid or prepaid may not be reborrowed.<br>*See* DIP Credit Agreement § 2.1–2.4. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3(b)(2)(B) | The DIP Lender shall have no obligation to make any DIP Loans unless all applicable conditions precedent under the DIP Loan Documents have been satisfied or waived in accordance with the terms thereof. Conditions precedent to the Interim DIP Term Loan include: the execution and delivery of the DIP Loan Documents; the commencement of these chapter 11 cases; the entry of the Interim Order within three (3) days after the Petition Date; the commencement of the UK Recognition Applications and the filing of the Jersey Administration application (each as defined in the DIP Credit Agreement); delivery to the DIP Lender of the initial Approved Budget (including a reasonably detailed summary of material assumptions); the execution and delivery of account control agreements in respect of the DIP Facility Blocked Account and the Proceeds Account; delivery of a cash management protocol; and payment of the reasonable and documented fees and expenses of the DIP Lender and the Prepetition Lender then due. Funding of the Delayed Draw Term Loan is subject to, among other things, the entry of the Final Order on or before the thirty-fifth (35th) day after the Petition Date and the DIP Loan Parties' compliance with the reporting requirements under the DIP Credit Agreement and with the Approved Budget. Each borrowing and each disbursement is subject to customary conditions, including the accuracy of representations and warranties, the absence of any Default or Event of Default, and the DIP Orders and the other DIP Loan Documents remaining in full force and effect; and the aggregate amount of DIP Loan proceeds borrowed pursuant to Disbursement Requests may not exceed the DIP Term Loan Facility Amount less the sum of (i) the actual amount of receivables received by the DIP Loan Parties between September 4, 2026 and the Petition Date and (ii) the lesser of (A) $27,300,000 (the "Threshold Amount") and (B) the actual amount of receivables received by the DIP Loan Parties after the Petition Date, and failure to comply with the foregoing constitutes an Event of Default.<br>All proceeds of the DIP Term Loan Facility shall be deposited into the DIP Facility Blocked Account (which may be an escrow account), which shall be under the sole dominion and control of the DIP Lender, and may be disbursed no more than once each week, based on the funding requirements of the DIP Loan Parties for such week and in accordance with the Approved Budget, upon a written disbursement request (each, a "Disbursement Request") delivered on the Wednesday of the prior week, with disbursements made not more than once each week, on Monday, at the direction of the DIP Lender (email being sufficient). The DIP Borrower shall (i) not make any Disbursement Request for any week unless the DIP Loan Parties' aggregate unrestricted cash less any forecast collections is projected to be less than $5,000,000 (the "Minimum Cash") at any time during such week and (ii) limit such Disbursement Request to an amount required to make disbursements for such week in excess of the Minimum Cash. Once disbursed, proceeds shall be deposited into the Proceeds Account, shall remain DIP Collateral, and shall be applied by the DIP Borrower in accordance with the Approved Budget.<br>*See* DIP Credit Agreement § 4, 5, 36.4; Schedule 2. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3(b)(2)(C) | Interest accrues on the outstanding principal balance of the DIP Loans at a per annum fixed rate of 12.0%, paid in kind. After the occurrence and during the continuance of any Event of Default, all DIP Loans (including accrued and unpaid interest thereon) and all other amounts outstanding under the DIP Loan Documents bear interest at a rate equal to 2.0% per annum above the otherwise applicable rate, payable on demand. Interest accrues on Borrowings (as defined in the DIP Credit Agreement) only once such Borrowings are available for use by the DIP Borrower.<br>*See* DIP Credit Agreement § 8. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3(b)(2)(C) | None. The DIP Facility does not contemplate any upfront, commitment, backstop, exit, or similar fees. The Debtors will pay the reasonable and documented fees, costs, and expenses of the DIP Lender and its advisors and consultants (including White & Case LLP and FTI Consulting), without further approval of the Court and without the requirement to comply with the U.S. Trustee guidelines. Amounts indicated in the Approved Budget for the fees and expenses of the DIP Lender's and the Prepetition Lender's professionals are to be deposited, on the Interim Funding Date and the Final Funding Date, into a blocked account under the DIP Lender's control (the "Lender Reserve Account"), which is available solely to pay such fees and expenses and not to satisfy the Carve-Out or any other obligations of the DIP Loan Parties. See Interim Order ¶ 7; DIP Credit Agreement § 36.2.<br>*See* DIP Credit Agreement § 14. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)<br>Local Rule 4001-3 | Proceeds of the DIP Facility and Cash Collateral may be used solely for the purposes, and in the amounts, set forth in the Approved Budget and in accordance with the Interim Order and the other DIP Loan Documents, including (i) for the Debtors' operations and working capital needs, including the costs of administering these chapter 11 cases and adequate protection payments, (ii) to pay obligations arising from or related to the Carve-Out, and (iii) to pay transaction costs, fees, and expenses incurred in connection with the DIP Facility, these chapter 11 cases, and the transactions contemplated thereunder, including the Wind-Down (as defined in the DIP Credit Agreement). No proceeds of the DIP Loans or Cash Collateral may be used (i) to make any payment in settlement or satisfaction of any prepetition claim or administrative claim (other than the DIP Obligations or Prepetition Obligations as provided in the Interim Order and the DIP Credit Agreement), unless in compliance with the Approved Budget, (ii) to make any payment, advance, intercompany advance or transfer, or other remittance or transfer not in accordance with the DIP Credit Agreement and the Approved Budget, or (iii) to make any payment otherwise prohibited by the Interim Order or the other DIP Loan Documents.<br>In addition, no portion of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, any Cash Collateral, or the Carve-Out may be used in connection with, among other things, investigating, challenging, or prosecuting any claims or causes of action against the DIP Lender or the Prepetition Lender, including any Challenge (as defined in the Interim Order); *provided* that (x) the Special Committee (*i.e.*, the SIC) shall be permitted to use Cash Collateral and proceeds of the DIP Facility for the purposes of conducting an independent investigation in accordance with the Approved Budget, and (y) no more than $25,000 in the aggregate may be used by a Committee (if any) or a chapter 7 or chapter 11 trustee (if any) to investigate (but not prosecute) the Stipulations before termination of the Challenge Period. In no event may the Debtors use amounts specified in the Approved Budget for the fees and expenses of the DIP Lender's and the Prepetition Lender's professionals for any other purpose.<br>*See* Interim Order ¶¶ I, 3, 12; DIP Credit Agreement § 3.1. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(1)(B), 4001(c)(1)(B)(ii) | As adequate protection for any Diminution in Value of the Prepetition Lender's interests in the Prepetition Collateral, the Prepetition Lender shall receive: (a) replacement and additional security interests in and liens upon all of the DIP Collateral (the "Adequate Protection Liens"), junior and subject only to the DIP Liens, any Senior Third Party Permitted Liens (if any), and the Carve-Out; (b) an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), solely to the extent of any Diminution in Value, junior and subject only to the DIP Superpriority Claims and the Carve-Out; and (c) upon entry of the Interim Order, accrual of interest on the Prepetition Obligations at the applicable contract rate, paid in kind, immediate cash payment of all accrued and unpaid fees and disbursements owing to the Prepetition Lender under the Prepetition Facility Documents and, thereafter, when due, payment of all reasonable and documented professional and advisory fees, costs, and expenses of the Prepetition Lender (including White & Case LLP and FTI Consulting), subject to the notice and objection procedures in the Interim Order.<br>*See* Interim Order ¶ 4. |
| **Roll-Up**<br>Local Rule 4001-3(b)(2)(D) | Effective upon, and in each case as of, (a) the entry of the Interim Order, without any further action by the Debtors or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan, and (b) the entry of the Final Order, without any further action by the Debtors or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan, shall be automatically deemed exchanged via assignment on a cashless basis into and deemed to constitute DIP Roll-Up Loans pursuant to the terms of the DIP Orders and the other DIP Loan Documents. The DIP Roll-Up Loans constitute consideration in exchange for, and solely on account of, the agreement of the Prepetition Lender to the incurrence of (and the agreement of the DIP Lender to fund) the DIP Term Loan Facility, and not adequate protection for, or otherwise on account of, any Prepetition Obligations. The authorization of the DIP Roll-Up Loans is subject to paragraph 11 of the Interim Order, and in the event of a successful Challenge the Court may fashion any appropriate relief in respect of the DIP Roll-Up Loans. The Prepetition Lender would not otherwise consent to the use of its Cash Collateral, and the DIP Lender would not be willing to provide the DIP Term Loan Facility, without approval of the DIP Roll-Up Loans upon entry of the Interim Order.<br>*See* Interim Order ¶ 2(b); DIP Credit Agreement § 2.5. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Budget and Variance Reporting**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3 | The initial DIP Budget attached to the Interim Order as Exhibit 2 constitutes an "Approved Budget" under the DIP Credit Agreement. The DIP Budget is a rolling consolidated 13-week cash flow forecast and budget of the Debtors (not extending beyond the Scheduled Maturity Date) and includes a line item for weekly professional fee forecasts for estate professionals. Following entry of the Interim Order, the Debtors shall submit an updated DIP Budget no later than every four weeks, on Wednesday of such week, with the first such updated DIP Budget to be delivered on the Wednesday of the fourth week following the week the Petition Date occurred, each of which shall become an Approved Budget once (a) affirmatively approved by the DIP Lender or (b) not objected to by the DIP Lender in writing within five (5) business days of delivery. If an updated DIP Budget is objected to or not approved, the prior or existing Approved Budget continues in effect until a new DIP Budget is approved. The Debtors shall, on or before the third business day of each week (with the first such delivery on September 16, 2026, covering the period from the Petition Date through September 11, 2026), with copies of DIP Budgets and Variance Reports delivered concurrently to counsel to any statutory committee, provide weekly Variance Reports (as defined in the Interim Order) on the results of operations (including actual cash receipts and expenditures) for the most recently ended one-week period and on a cumulative basis; delivery of a Variance Report is deemed to include a representation that it fairly presents the results of cash receipts and disbursements of the DIP Loan Parties. The Approved Budget shall be adhered to on a cumulative basis: actual operating disbursements of the DIP Loan Parties may not vary from the amounts set forth in the Approved Budget for the applicable period by more than the greater of (i) 10% or (ii) $200,000, each on a cumulative basis, resetting on a going-forward basis upon the approval of each new Approved Budget (the "Permitted Variance"). (other than the initial Variance Report to be delivered on September 16, 2026) Fees and expenses of professionals and advisors of the Debtors, the DIP Lender, the Prepetition Lender, and any Committee are not limited to the amounts set forth in the Approved Budget and are not tested for budget compliance.<br>*See* Interim Order ¶¶ 5, 7; DIP Credit Agreement § 3.3, 17.7. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br>Local Rule 4001-3 | It is a condition to the DIP Term Loan Facility and the use of Cash Collateral that the Debtors comply with the case milestones set forth in the DIP Credit Agreement (the "Milestones"). The failure to comply with any Milestone (unless such failure is the result solely of (a) any action or inaction on the part of the DIP Lender or the Prepetition Lender, or (b) the availability of the Court) shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement. The Milestones include:<br>(i) no later than September 8, 2026, the commencement of these chapter 11 cases and, within 24 hours thereafter, the filing of the first day pleadings (including this Motion and the cash management motion);<br>(ii) no later than three (3) days after the Petition Date, entry of the Interim Order;<br>(iii) no later than thirty (30) days after the Petition Date, the filing of a chapter 11 plan in form and substance satisfactory to the DIP Lender (*i.e.*, the Approved Plan) and a related disclosure statement;<br>(iv) no later than thirty-five (35) days after the Petition Date, entry of the Final Order;<br>(v) no later than eighty (80) days after the Petition Date, entry of an order approving the disclosure statement;<br>(vi) no later than one hundred ten (110) days after the Petition Date, entry of an order confirming the Approved Plan; and<br>(vii) no later than one hundred twenty (120) days after the Petition Date, the occurrence of the effective date of the Approved Plan.<br>*See* Interim Order ¶ 8; DIP Credit Agreement § 18.41, 19.2. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Events of Default under the DIP Credit Agreement include, among other things: the making of Disbursement Requests in excess of the amounts permitted under the DIP Loan Documents; failure to make payments when due under the DIP Loan Documents; failure to make required deposits into the accounts into which the Debtors are required to make deposits; breach of any covenant; breach of representations and warranties; judgments and attachments; the making of payments outside of the Approved Budget; failure to satisfy a Milestone (unless such failure is the result solely of (a) any action or inaction on the part of the DIP Lender or (b) the availability of the Court); the filing of any chapter 11 plan other than the Approved Plan; specified adverse developments in the Foreign Proceedings (as defined in the DIP Credit Agreement), including the dismissal or denial of the UK Recognition Applications or the Jersey Administration; and the filing of any motion or proposed order for approval of bidding procedures, a sale process, or a proposed sale other than in form and substance acceptable to the DIP Lender.<br><br>In addition, the Interim Order provides that it shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement if, among other things: (i) without the prior written consent of the DIP Lender and the Prepetition Lender, an order is entered authorizing the obtaining of credit secured by a lien on the DIP Collateral, or entitled to administrative priority status, that is superior to or *pari passu* with those granted pursuant to the Interim Order, or authorizing the use of proceeds of the DIP Facility or Cash Collateral for any purpose other than as permitted under the DIP Credit Agreement, the Interim Order, and the Approved Budget; (ii) the Debtors' cash management system is not maintained in accordance with the DIP Loan Documents and the Cash Management Order in all material respects; (iii) the Debtors sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except in the ordinary course of business, as expressly permitted under the DIP Credit Agreement, or pursuant to an Approved Plan; or (iv) the Debtors fail to comply with any Milestone.<br><br>*See* Interim Order ¶¶ 8, 16, 18, 19, 21; DIP Credit Agreement § 19. |
| **Remedies; Waiver / Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the Prepetition Lender under the Interim Order and the other DIP Loan Documents and (ii) authorize the DIP Lender and the Prepetition Lender to retain and apply payments and otherwise enforce their respective rights and remedies thereunder. Upon and after the occurrence of the Termination Date, the DIP Lender and the Prepetition Lender shall be entitled to exercise all rights and remedies in respect of the DIP Collateral and the Prepetition Collateral; *provided* that, following the giving of notice of an Event of Default, remedies may be exercised only after the passage of a seven (7) calendar day notice period (the "Default Notice Period"), during which the Debtors, any Committee, or any party in interest is entitled to an emergency hearing and the Debtors may continue to use Cash Collateral and proceeds of DIP Loans in the Proceeds Account solely (x) in the ordinary course of business and in accordance with the Approved Budget to fund expenses critically necessary to preserve the value of the DIP Collateral and (y) to satisfy the Carve-Out.<br><br>*See* Interim Order ¶ 21. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3 | The "Carve-Out" means the sum of: (i) all fees required to be paid to the clerk of the Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a), together with the statutory rate of interest; (ii) all reasonable and documented fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed by the Court, all Allowed Professional Fees incurred by the Debtor Professionals and any Committee professionals at any time on or before the delivery by the DIP Lender of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after such delivery; and (iv) Allowed Professional Fees incurred beginning one calendar day after the date of delivery of a Carve-Out Trigger Notice, in accordance with the Approved Budget (excluding any success or transaction fees), in an aggregate amount not to exceed $4,500,000 (the "Post Carve-Out Trigger Notice Cap"), with all such Professionals sharing the Post Carve-Out Trigger Notice Cap, with the Post Carve-Out Trigger Notice Cap reduced dollar-for-dollar by fees and expenses incurred by the Debtors and paid to the applicable Professionals following delivery of a Carve-Out Trigger Notice. The Carve-Out is senior to the DIP Liens, the DIP Superpriority Claim, the DIP Roll-Up Loans, the Prepetition Liens, the Prepetition Obligations, the Adequate Protection Liens, and the Adequate Protection Superpriority Claim. The Carve-Out has no recourse to the Lender Reserve Account or amounts on deposit therein. The Interim Order also contains weekly professional fee estimate, reserve funding (commencing with the week ended September 18, 2026), with the Post Carve-Out Trigger Notice Cap funded only once, and reserve application mechanics, including the Funded Reserve Account and the Carve-Out Reserves.<br>*See* Interim Order ¶ 13. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x)<br>Local Rule 4001-3 | The Debtors shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, and the DIP Collateral, and, subject to the entry of the Final Order, the Prepetition Lender, the Adequate Protection Liens, the Prepetition Liens, and the Prepetition Collateral.<br>*See* Interim Order ¶ 15. |
| **Section 552(b); Marshaling**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3 | Subject to the entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral. Neither the DIP Lender nor, subject to the entry of the Final Order, the Prepetition Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine.<br>*See* Interim Order ¶¶ 24(g)–(h). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Preservation of Tax Attributes**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-3 | The Interim Order provides that the Debtors' net operating loss carryforwards and other U.S. federal, state, local, and non-U.S. tax attributes (the "Tax Attributes") are property of the Debtors' estates under section 541 of the Bankruptcy Code and protected by the automatic stay under section 362(a)(3) of the Bankruptcy Code. Prior to the Tax Restriction Termination Date (as defined in the Interim Order), the DIP Lender may not: (i) claim any worthlessness or abandonment deduction with respect to equity interests in the Debtors for any taxable year ending on or before the effective date of the Approved Plan (except to the extent required under applicable law); (ii) directly or indirectly sell, transfer, or otherwise dispose of (including by pledge, hypothecation, or grant of any option, warrant, or derivative interest) any equity interests it directly holds in a holding company of the Debtors that would reasonably be expected to result in an "ownership change" of the DIP Borrower under section 382 of the Internal Revenue Code (other than the granting or perfection of the DIP Liens, the Adequate Protection Liens, and the liens securing the Prepetition Obligations)—in each case subject to a consent mechanism tied to the preservation of the Tax Attributes under section 382 of the Internal Revenue Code. The DIP Lender is not in violation on account of actions taken by or in respect of any Debtor that is itself an equity holder, and the DIP Lender has consented to the restrictions in each of its capacities and agreed that the Debtors are entitled to specific performance and injunctive relief (but not monetary damages) in respect of any breach.<br>*See* Interim Order ¶ 25; DIP Credit Agreement § 39. |
| **Liens and Priorities**<br>Bankruptcy Rules 4001(c)(1)(B)(i), (vii)<br>Local Rule 4001-3 | Effective immediately upon entry of the Interim Order, the DIP Lender is granted the following automatically perfected DIP Liens on all DIP Collateral:<br>(i) subject to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected, and non-avoidable liens as of the Petition Date; and<br>(ii) subject to the Carve-Out, pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, liens on and security interests in all other DIP Collateral, junior only to Senior Third Party Permitted Liens (if any) and senior to the Prepetition Liens (and the Adequate Protection Liens) and all other liens on the DIP Collateral (other than the Carve-Out).<br>The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute allowed DIP Superpriority Claims against each of the DIP Loan Parties (jointly and severally), subject to the Carve-Out. DIP Collateral excludes Avoidance Actions and the proceeds thereof; *provided* that, upon entry of the Final Order, DIP Collateral shall include all proceeds of Avoidance Actions.<br>*See* Interim Order ¶¶ 2(e)–(h), 21(e). |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br>Local Rule 4001-3 | The DIP Liens do not extend to Avoidance Actions or the proceeds thereof. Upon entry of the Final Order, the DIP Liens shall extend to all proceeds of Avoidance Actions. The DIP Superpriority Claims and the Adequate Protection Superpriority Claim are payable from all assets and properties of the DIP Loan Parties, including the proceeds of Avoidance Actions, from entry of the Interim Order.<br>*See* Interim Order ¶¶ 2(e), 2(h), 4(a)–(b). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Stipulations to Prepetition Liens and Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-3 | Subject only to the rights of parties in interest set forth in paragraph 11 of the Interim Order, the Debtors stipulate to, among other things:<br><br>(i) the Prepetition Obligations in the aggregate principal amount of not less than $495 million, plus accrued and unpaid interest, fees, expenses, prepayment premiums, and all other obligations under the Prepetition Facility Documents;<br><br>(ii) the legality, validity, binding effect, and enforceability of the Prepetition Facility Documents and the Prepetition Obligations;<br><br>(iii) the validity, perfection, and first priority of the Prepetition Liens on the Prepetition Collateral, subject only to Senior Third Party Permitted Liens (if any);<br><br>(iv) that neither the DIP Lender nor the Prepetition Lender is a control person of the Debtors, and that, in making or administering loans, permitting the use of Cash Collateral, accepting the Approved Budget, or taking other actions permitted by the Interim Order or the DIP Loan Documents, neither is in control of the Debtors' operations or acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors; and<br><br>(v) the absence of claims or causes of action against the Prepetition Lender or the DIP Lender.<br><br>*See* Interim Order ¶¶ E–F, M, 11. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-3 | The Stipulations and all other admissions, agreements, and releases contained in the Interim Order, and the DIP Roll-Up Loans, are binding on all parties in interest, including any Committee, unless a party in interest with standing and requisite authority timely and properly commences a Challenge before the earlier of: (A) the date on which objections to confirmation of an Approved Plan are due, and (B) (x) no later than sixty (60) calendar days from the entry of the Interim Order for any party in interest with requisite standing, and (y) if a chapter 7 or chapter 11 trustee is appointed or elected before the end of the Challenge Period, solely as to such trustee, the later of seventy-five (75) calendar days after entry of the Interim Order and thirty (30) calendar days after such trustee's appointment, in each case as such period may be extended by the Prepetition Lender in its sole discretion or by the Court for cause upon a motion filed and served within the Challenge Period, and the Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge that becomes final and non-appealable. Any Challenge not timely and properly asserted shall be deemed forever waived, released, and barred. Following a successful Challenge, the Court may fashion any appropriate remedy, provided that no such remedy shall affect the validity, priority, or any other aspect of the DIP Obligations or the DIP Liens; an order conferring standing is a prerequisite to prosecution of a Challenge by a Committee or other party in interest.<br><br>*See* Interim Order ¶ 11. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Release**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to paragraph 11 of the Interim Order, the Debtors release the DIP Lender (solely in its capacity as such) and, subject only to the completion of an independent investigation by the Special Committee (as defined in the Interim Order, *i.e.*, the SIC), the Prepetition Lender (solely in its capacity as such), together with their respective affiliates and related parties, from all claims and causes of action arising out of, in connection with, or relating to the Prepetition Facility, the Prepetition Facility Documents, the Prepetition Collateral, the DIP Facility, the DIP Loan Documents, the DIP Collateral, and the transactions contemplated thereunder.<br>*See* Interim Order ¶¶ F(vii), 11. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Obligations include indemnities and similar obligations in respect of the DIP Term Loans, the DIP Roll-Up Loans, the DIP Facility, and the DIP Loan Documents. Under the DIP Credit Agreement, the DIP Loan Parties must indemnify the DIP Lender against costs, losses, and liabilities arising from, among other things, the occurrence of any Event of Default, the investigation of suspected Defaults, any failure to pay amounts due under the DIP Loan Documents, the funding of (or arrangements to fund) requested DIP Loans, prepayments not made in accordance with a notice of prepayment, and reliance on notices reasonably believed to be genuine, together with certain tax and currency indemnities and the costs and expenses of enforcing and preserving rights under the DIP Loan Documents (including fees and expenses of the DIP Lender Advisers).<br>*See* Interim Order ¶ 2(a); DIP Credit Agreement § 10.3, 12, 14, 15.1. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B) | The Prepetition Lender and the DIP Lender. The Debtors stipulate that all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, and securities constitute Cash Collateral of the Prepetition Lender and the DIP Lender.<br>*See* Interim Order ¶ I. |
| **Credit Bid**<br>Local Rule 4001-3 | The DIP Lender and, provided there has not been a successful Challenge and subject to section 363(k) of the Bankruptcy Code, the Prepetition Lender shall have the right to credit bid (either directly or through one or more acquisition vehicles) up to the full amount of the DIP Obligations, the Prepetition Obligations, and any Adequate Protection Superpriority Claims in connection with any sale of all or any portion of the Prepetition Collateral or the DIP Collateral, and each shall be deemed a "qualified bidder" and its bid a "qualified bid."<br>*See* Interim Order ¶ 24(c). |
| **Waiver of Applicable Stays; Immediate Effectiveness**<br>Bankruptcy Rule 4001(c)(1)(B) | Any applicable stay (including, without limitation, under Bankruptcy Rules 6003 and 6004(h)) is waived and shall not apply to the Interim Order, and the Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.<br>*See* Interim Order ¶¶ 24(m), 24(o). |

## II. The Debtors' Prepetition Capital Structure.

15. As of the Petition Date, the Debtors have approximately $495 million (plus unpaid interest) in total outstanding funded debt obligations, all of which arise under the Prepetition

Facility (as defined below). *See* First Day Declaration ¶ 39. The following table depicts the Debtors' prepetition capital structure:

| **Funded Debt** | **Maturity** | **Approximate Principal Amount Outstanding** |
|---|---|---|
| Prepetition Facility | December 31, 2026 | $495 |
| **Total Outstanding Funded Debt** | | **$495** |

### A. The Prepetition Facility.

16. Holdings, as borrower (in such capacity, the "Prepetition Borrower"), Parent, and each other subsidiary of Parent from time to time party thereto (including the DIP Borrower) as a guarantor (the "Prepetition Subsidiary Guarantors," together with Parent, the "Prepetition Guarantors," and, collectively with the Prepetition Borrower, the "Prepetition Obligors"), and PIF, as lender, are parties to that certain Facility Agreement, dated as of June 4, 2026 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Facility Agreement," and together with each of the other Finance Documents (as defined in the Prepetition Facility Agreement), the "Prepetition Facility Documents"). The Prepetition Facility Agreement provides for a term loan facility (the "Prepetition Facility") made available by the Prepetition Lender to the Prepetition Borrower, subject to the satisfaction of certain conditions and requirements, in an amount up to the Facility Commitment (as defined in the Prepetition Facility Agreement). As of the Petition Date, the Prepetition Obligors are indebted and liable to the Prepetition Lender under the Prepetition Facility Documents in the aggregate principal amount of not less than $495 million, plus accrued and unpaid interest thereon, plus fees, expenses, prepayment premiums, and all other obligations arising thereunder (collectively, the "Prepetition Obligations").

17. Pursuant to the Prepetition Facility Agreement, the Prepetition Obligations are secured by first priority liens on and security interests in (collectively, the "Prepetition Liens") substantially all of the Prepetition Obligors' assets and property and the equity interests in the DIP Borrower (collectively, the "Prepetition Collateral"), subject only to Senior Third Party Permitted Liens, if any. Pursuant to the Prepetition Facility Documents, the Prepetition Guarantors provided to the Prepetition Lender an unconditional joint and several guaranty of the Prepetition Obligations of the Prepetition Obligors secured by the Prepetition Collateral.

**B. Equity Interests.**

18. Parent, a private company limited by shares incorporated in Jersey and the ultimate parent of the Debtors, had issued as of the Petition Date: (a) 5,269,395,765 preference shares and 421,500 class A ordinary shares (representing 98.48% of common ownership) to PIF, the Debtors' ultimate equity owner, which, through entities it controls, has invested approximately $5 billion in equity capital since the Debtors' inception in 2021; (b) 4,500 class B ordinary shares (representing 1.05% of common ownership) to Performance54 Group Limited (UK), a company majority owned by PIF; and (c) 1,000 class C ordinary shares (representing 0.23% of common ownership) to each of the Debtors' former chief executive officer and a current Player. *See* First Day Declaration ¶ 37.

## The DIP Facility

## I. The Debtors' Need for Access to Financing and the Use of Cash Collateral.

19. The Debtors require immediate access to the DIP Term Loan Facility and the continued use of Cash Collateral to preserve the value of their estates. *See* DIP Declaration ¶¶ 9–10. As of the Petition Date, the Debtors have only approximately $15 million in cash on hand. *See* DIP Declaration ¶ 9. Without immediate access to the liquidity provided by the DIP Term

Loan Facility and the continued use of Cash Collateral, the Debtors would be unable to fund the administrative costs of these chapter 11 cases and any payments to foreign vendors, utilities, insurers, employee wages and benefits, and other key disbursements. *See* DIP Declaration ¶¶ 9–10. The Debtors also rely on the Cash Collateral generated from their operations to administer these chapter 11 cases and substantially all of the Debtors' cash constitutes Cash Collateral. *See* DIP Declaration ¶ 9. The ability to satisfy these expenses when they come due is essential to the Debtors' continued postpetition operations during the pendency of these chapter 11 cases.

20. Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed their cash needs and prepared projections of postpetition liquidity needs for the Debtors' business in the initial thirteen weeks of these chapter 11 cases, resulting in the initial DIP Budget attached to the Interim Order as **Exhibit 2**. *See* DIP Declaration ¶ 10. In developing the initial DIP Budget, the Debtors accounted for anticipated operating receipts and disbursements during the projected period and considered several cost factors, including restructuring costs (including professional fees) and employee, utility, insurer and foreign vendor obligations. *See* DIP Declaration ¶ 10. The Debtors and their advisors believe that the DIP Budget and the projections therein provide an accurate reflection of the Debtors' likely funding requirements over the next thirteen weeks and are reasonable and appropriate under the circumstances. *See* DIP Declaration ¶ 10.

21. Based on these analyses, the Debtors determined that they would require incremental new money to fund these chapter 11 cases and meet their cash flow needs in order to continue postpetition operations and strive toward consummation of the Approved Plan, and that up to $14.0 million of new money in interim financing is required prior to entry of the Final Order. *See* DIP Declaration ¶ 10. The Debtors therefore believe the immediate use of Cash Collateral and

entry into the DIP Facility are essential to preserve and maximize the value of their estates and adequately administer these chapter 11 cases.

22. The DIP Facility is further the linchpin of the Debtors' contemplated path through these chapter 11 cases. Following a broad prepetition marketing process conducted by the Debtors' investment banker—including outreach to more than 300 potential investors, approximately 100 of which executed non-disclosure agreements and approximately 30 of which engaged in detailed diligence—the Debtors identified BC Partners as the lead investor prepared to invest substantial funds to cover the Debtors' ongoing operations under a new, more sustainable operating model ("LIV 2.0"). On September 8, 2026, the Debtors and BC Partners entered into the BC Partners RSA, pursuant to which BC Partners has agreed, subject to its terms, to fund the BC Partners Bid and to provide supplemental postpetition financing for certain start-up costs of the new operating model (the "Incremental BC Partners DIP"), and the Debtors continue to engage with several potential minority investors and the Players; the DIP Facility affords the Debtors thirty (30) days to finalize that transaction and file a chapter 11 plan implementing it (*i.e.*, the Approved Plan). *See* First Day Declaration ¶¶ 9, 59–61.

23. If the going-concern transaction cannot be consummated on the timeline set forth in the DIP Facility, the Debtors intend to shift their efforts to an orderly and efficient wind-down of their estates, and the Approved Plan is expected to accommodate that outcome through, among other things, the vesting of the Debtors' remaining assets in a liquidating trust administered by a liquidating trustee charged with reconciling claims, making distributions, and winding down the Debtors' estates, with the DIP Facility to be repaid in full in cash on or before the effective date of the Approved Plan. In either case, the DIP Facility is sized and structured to fund the Debtors through consummation: the Milestones and the 120-day Scheduled Maturity Date track the

contemplated plan timeline set forth in the DIP Facility—a plan filing within thirty (30) days, confirmation within one hundred ten (110) days, and effectiveness within one hundred twenty (120) days after the Petition Date—and proceeds of the DIP Facility may be used to fund the costs of administering these chapter 11 cases, including the Wind-Down (as defined in the DIP Credit Agreement). *See* First Day Declaration ¶ 11; DIP Credit Agreement § 1.1, 3.1.

**A. Alternative Sources of Financing Are Not Available on Better Terms.**

24. Following PIF's April 30, 2026 announcement that it would not fund the Debtors' operations beyond the 2026 season, PIF provided the Prepetition Facility to fund the remainder of the 2026 season and to afford the Debtors the opportunity to pursue strategic alternatives, and the Debtors, through their investment banker, solicited proposals from parties both inside and outside of the existing capital structure regarding postpetition financing and sought out investors or buyers for the Debtors' business. *See* First Day Declaration ¶¶ 9, 11, 49, 59. The Debtors have been unable to obtain, on more favorable terms and conditions than those provided in the DIP Loan Documents, (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien. *See* DIP Declaration ¶¶ 13–15, 25. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claims to the DIP Lender and without granting the adequate protection set forth in the Interim Order. *See id.*

**B. The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates.**

25. Absent the liquidity provided by the DIP Facility and the continued use of Cash Collateral, the Debtors would face numerous value-destructive consequences. *See* First Day Declaration ¶ 11; DIP Declaration ¶ 25. Cash on hand and near-term revenues would not be sufficient to fund the Debtors' administration of these chapter 11 cases. *See id.* Without the ability to use Cash Collateral, the Debtors would be unable to meet near-term working capital needs, which, in turn, would risk damaging the Debtors' relationships with their Players, vendors, commercial partners, and employees.

26. Further, the proposed DIP Facility will provide the Debtors' employees, contract counterparties, foreign vendors, utilities, insurers and other stakeholders with assurance that these chapter 11 cases are sufficiently funded. *See* DIP Declaration ¶ 23. The DIP Facility will provide the Debtors with sufficient liquidity to fund the administration of these chapter 11 cases as the Debtors seek to consummate the Approved Plan. Absent the DIP Facility, the Debtors could not fund the pursuit of the going-concern transaction, the administration of these chapter 11 cases, or the orderly wind-down alternative contemplated by the Approved Plan, and would instead face a value-destructive freefall liquidation. Accordingly, the DIP Facility is reasonable and appropriate under the facts and circumstances of these chapter 11 cases and should be approved. *See* DIP Declaration ¶¶ 22–27.

## Basis for Relief

### I. The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.

#### A. Entry into the DIP Loan Documents Is a Sound Exercise of the Debtors' Business Judgment.

27. The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and use Cash Collateral.

28. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances, as discussed in more depth below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

29. Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In*

*re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

30. Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargain[s]" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 Bankr. LEXIS 1700, at *13-14 (Bankr. S.D.N.Y. 2009) (emphasis added).

31. The Debtors' determination to move forward with the DIP Facility following arm's-length negotiations with the DIP Lender and careful evaluation of potential alternatives is a sound exercise of their business judgment. *See* DIP Declaration ¶¶ 16, 21. The Debtors and their advisors determined that the Debtors would require significant postpetition financing to stabilize their operations in pursuit of the Approved Plan, which they propose to obtain through the DIP Facility and access to Cash Collateral. Access to the proposed DIP Facility and Cash Collateral will enable the Debtors to (a) continue operating their business in the ordinary course postpetition, (b) fund the administration of these chapter 11 cases, (c) finance payroll and other working-capital needs, and (d) preserve going-concern value throughout the chapter 11 process pending consummation of the Approved Plan. *See* DIP Declaration ¶¶ 10, 23. Without immediate access to the DIP Facility, the Debtors would experience significant business disruption and would face a number of other value-destructive consequences. *See id.*

32. The DIP Facility and proposed terms for continued use of postpetition Cash Collateral are tailored to the Debtors' capital structure and go-forward funding needs. *See* DIP Declaration ¶ 23. The DIP Facility's draw-control mechanics—including the DIP Facility Blocked Account, weekly Disbursement Requests tied to the Approved Budget, and the Minimum Cash threshold—ensure that the Debtors incur postpetition debt only as and when needed. The DIP Facility is also fully consensual: the Prepetition Lender, which is the DIP Lender, has consented to the priming of the Prepetition Liens and to the use of Cash Collateral on the terms of the Interim Order, avoiding the delay, expense, and risk of a contested financing dispute at the outset of these chapter 11 cases. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

**B. The Business Judgment Standard Applies Notwithstanding the DIP Lender's Insider Status, and the DIP Facility Would in Any Event Satisfy Entire Fairness.**

33. The Debtors recognize that PIF—the DIP Lender and the Prepetition Lender—is also the Debtors' ultimate majority equity owner, holding approximately 98.48% of the common ownership of Parent, and is accordingly an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code. The Debtors structured their governance and negotiation process with that relationship squarely in mind. As set out in further detail in the First Day Declaration, on April 13, 2026, the Debtors appointed Gene Davis and Jon Zinman, individuals with extensive restructuring experience, as independent directors (the "Independent Directors"), and the Independent Directors were subsequently appointed as the sole members of a newly formed Strategic Initiative Committee (the "SIC") of LIV Golf Holdings Ltd, to which the Debtors delegated, among other things, (a) exclusive authority to review, discuss, consider, negotiate, approve, authorize and act upon any conflict matter, and (b) authority to take any and all actions with respect to any strategic, restructuring, financing, and/or sale transaction or series of such transactions. The SIC has met twice weekly (or more frequently as needed) with the Debtors' advisors throughout the process, and, after a thorough process, ultimately authorized the Debtors' entry into the DIP Facility. *See* First Day Declaration ¶¶ 45–48.

34. Because the DIP Facility was reviewed, negotiated, and approved under the exclusive authority of the SIC, the Debtors' entry into the DIP Loan Documents is properly reviewed under the business judgment standard notwithstanding the DIP Lender's insider status. In evaluating whether deference under the business judgment rule is warranted, courts look to the fiduciary principles governing corporate directors and managers in the debtor's state of incorporation. *See In re SPAC Recovery Co.*, 676 B.R. 260, 269-270 (Bankr. S.D.N.Y. 2026). The business judgment rule applies unless (i) the directors did not make a decision, (ii) the decision

was uninformed, (iii) the directors were not disinterested or independent, or (iv) the directors were grossly negligent, *see In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011), and is overcome only where the party opposing the decision establishes that the fiduciaries "acted in bad faith or with fraudulent intent." *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005). None of those circumstances is present here: the SIC—composed solely of the disinterested and independent Independent Directors, advised by counsel, and informed by the Debtors' advisors and the results of the Debtors' extensive prepetition marketing process—made the decision to enter into the DIP Facility. Courts in this District have approved postpetition financing provided by a debtor's controlling equity holder in analogous circumstances. *See In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Dec. 11, 2023) [Docket No. 427] (order approving postpetition letter-of-credit and junior term loan facilities provided by SoftBank Vision Fund II, the debtors' largest equity holder); *In re CCA Construction, Inc.*, No. 24-22548 (CMG) (Bankr. D.N.J. Feb. 18, 2025) [Docket No. 174] (order approving postpetition financing provided by the debtors' direct equity owner). Even if the Court were to review the DIP Facility under the entire fairness standard, the result would be the same. Entire fairness comprises "two aspects, fair dealing and fair price," which are examined together. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985). Although the proponent of a challenged transaction ordinarily bears the burden of establishing entire fairness, the burden shifts entirely to the challenging party where the transaction was approved by an independent committee of directors or where an independent negotiator with real bargaining power negotiated the transaction on an arm's-length basis. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). The DIP Borrower is a Delaware corporation, and these principles apply here with full force. *See* First Day Declaration ¶¶ 16, 31.

35. Both aspects of entire fairness are satisfied. As to fair dealing, the DIP Facility was negotiated between separately advised parties—PIF was represented by its own counsel and financial advisor (White & Case LLP and FTI Consulting), while the process on the Debtors' side was overseen, and entry into the DIP Facility was ultimately approved, by the SIC, advised by counsel—and multiple iterations of the DIP Term Sheet and the definitive DIP Loan Documents were exchanged and negotiated at arm's length. *See* First Day Declaration ¶¶ 45–48; DIP Declaration ¶¶ 16, 21. As to fair price, the economic terms of the DIP Facility—including a 12.0% per annum fixed rate paid in kind and the absence of any upfront, commitment, backstop, exit, or similar fees—are at or below the range of terms approved in comparable postpetition financings, and the Debtors' extensive prepetition marketing process did not yield any actionable alternative source of postpetition financing. *See* DIP Declaration ¶¶ 24–25. Accordingly, entry into the DIP Facility is a sound exercise of the Debtors' business judgment and, in any event, satisfies the entire fairness standard.

### C. The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.

36. The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lender postpetition security interests in and liens on the DIP Collateral that are valid, binding, perfected, continuing, enforceable, and non-avoidable immediately upon entry of the Interim Order.

1. Liens on encumbered and unencumbered assets of the kind described above are common features of postpetition financing facilities. Postpetition financing facilities approved in this District routinely are secured by liens on substantially all of a debtor's assets, including unencumbered assets. *See, e.g.*, *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J.

May 7, 2025); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023).[4]

2. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b. the credit transaction is necessary to preserve the assets of the estate; and

c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

3. The Debtors satisfy each part of this test. *First*, as described in the DIP Declaration, the Debtors are unable to obtain unsecured credit. *See* DIP Declaration ¶¶ 13–15. *Second*, absent the capital infusion to be provided by the DIP Facility, the Debtors would lack liquidity to fund

---

4 Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

the administration of these chapter 11 cases as the Debtors seek to consummate the Approved Plan and would instead face a value-destructive freefall liquidation. *See* DIP Declaration ¶¶ 9, 25. *Finally*, given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents and the Interim Order, are fair, reasonable, and represent the best terms available to the Debtors to obtain postpetition financing. *See* DIP Declaration ¶ 27. For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

4. In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

5. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the affected secured parties have consented or (b) such parties' interests in collateral are adequately protected. *See Anchor Sav.*

*Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

6. Here, the priming contemplated by the DIP Facility is fully consensual. The Prepetition Lender—the only holder of the Prepetition Liens to be primed by the DIP Liens—is itself the DIP Lender and has expressly consented to the priming of the Prepetition Liens and the subordination thereof to the DIP Liens and the Carve-Out, in each case on the terms set forth in the Interim Order. The DIP Liens do not prime any valid, enforceable, perfected, and non-avoidable Senior Third Party Permitted Liens, if any exist. In addition, the Prepetition Lender will receive the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the other adequate protection provided under the Interim Order. Accordingly, approving the DIP Liens pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code and the DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code is reasonable and appropriate.

### D. The Proposed "Roll-Up" of Obligations Under the DIP Facility Is Appropriate and Should Be Approved.

7. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbotts Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (so holding). The business judgment rule shields such business decisions from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

8. The deemed exchange of prepetition funded indebtedness into postpetition financing obligations (often referred to as a “roll-up”) is a common feature in debtor in possession financing arrangements. Courts in this jurisdiction and other jurisdictions have approved similar DIP financing features. *See, e.g.*, *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (authorizing a “creeping” roll-up of prepetition first lien loans pursuant to interim order and a final roll-up of remaining amounts pursuant to final order); *In re David’s Bridal, LLC*, No. 23-13131 (CMG) (Bankr. D.N.J. May 24, 2023) (authorizing a “creeping” roll-up of prepetition ABL facility pursuant to interim order and a final roll-up of remaining amounts pursuant to final order); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 24, 2023) (authorizing an approximately $240 million DIP financing that included a roll-up of up to $200 million in prepetition secured first in, last out term loans debt pursuant to interim order).

9. The DIP Facility contemplates DIP Roll-Up Loans in two stages: Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan, deemed exchanged upon entry of the Interim Order, and Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan, deemed exchanged upon entry of the Final Order, in each case automatically and via assignment on a cashless basis. The Prepetition Lender would not otherwise consent to the use of its Cash Collateral, and the DIP Lender would not be willing to provide the DIP Term Loan Facility or extend credit to the Debtors thereunder, without approval of the DIP Roll-Up Loans upon entry of the Interim Order and the Final Order, as applicable. The authorization of the DIP Roll-Up Loans is expressly subject to paragraph 11 of the Interim Order, and following any successful Challenge the Court may fashion any appropriate relief in respect of the DIP Roll-Up Loans. *See* DIP Declaration ¶¶ 19, 26. Moreover, because

PIF is the Debtors' only prepetition secured lender and the sole DIP Lender, the DIP Roll-Up Loans are non-coercive and do not prefer any similarly situated creditor over another. The Debtors were unable to obtain DIP financing on similar terms that did not provide for the rolling-up of prepetition amounts. *See* DIP Declaration ¶ 19.

**E. No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

10. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

11. The Debtors do not believe that more favorable alternative postpetition financing is reasonably available. As described in the DIP Declaration, the Debtors and their advisors canvassed the market twice. First, the Debtors' prepetition strategic marketing process—which involved outreach to more than 300 potential investors, non-disclosure agreements with

approximately 100 of them, detailed diligence by approximately 30, and final bids from five leading prospects—produced no offer of postpetition financing from any party other than BC Partners, whose Lead Bid is contingent on the consummation of a chapter 11 plan and whose supplemental postpetition financing under the BC Partners RSA is directed to start-up costs of the LIV 2.0 transaction rather than to funding the Debtors' operations and the administration of these chapter 11 cases. Second, beginning in August 2026, the Debtors' investment banker conducted a targeted DIP marketing process, contacting twelve (12) sophisticated third-party financial institutions experienced in providing debtor-in-possession financing in complex distressed situations and capable of providing financing in the amount and timeframe the Debtors required, and requesting indicative terms by September 3, 2026. Each of the twelve declined to pursue a financing, and no party submitted a proposal on any basis—unsecured, junior, or priming—citing the junior structure of any third-party financing relative to PIF's position as the Debtors' sole prepetition secured lender and insufficient collateral value to support such a financing. As of the Petition Date, no further discussions with third-party financing sources are scheduled. *See* DIP Declaration ¶¶ 11–15, 25. Thus, the Debtors believe that the DIP Facility represents the best available and viable financing option under the facts and circumstances of these chapter 11 cases. Accordingly, the Debtors submit that they have satisfied the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors.

## II. The Debtors Should Be Authorized to Use the Cash Collateral.

12. Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition Lender—the only party (other than the DIP Lender) with an interest in the Cash Collateral—has consented to the Debtors' use of Cash

Collateral, subject to the terms and limitations set forth in the Interim Order and the Approved Budget.

13. Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 *Collier on Bankruptcy* ¶ 361.01[1] at 361–66 (15th ed. 1993)) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

14. As set forth in the Interim Order, the Debtors propose to provide the Prepetition Lender with a variety of adequate protection to protect against the postpetition Diminution in Value of the Prepetition Lender's interests in the Prepetition Collateral (including the Cash

Collateral) resulting from, among other things, the use, sale, or lease by the Prepetition Obligors of the Prepetition Collateral, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay. The adequate protection includes:

a. the Adequate Protection Liens on all of the DIP Collateral, junior and subject only to the DIP Liens, any Senior Third Party Permitted Liens (if any), and the Carve-Out;

b. the Adequate Protection Superpriority Claim as provided for in section 507(b) of the Bankruptcy Code, solely to the extent of any Diminution in Value, junior and subject only to the DIP Superpriority Claims and the Carve-Out;

c. upon entry of the Interim Order, immediate cash payment of all accrued and unpaid fees and disbursements owing to the Prepetition Lender under the Prepetition Facility Documents and, thereafter, when due, payment of all reasonable and documented professional and advisory fees, costs, and expenses of the Prepetition Lender, subject to the notice and objection procedures set forth in the Interim Order; and

d. additional protections in the form of (i) section 506(c) and 552(b) waivers and a marshaling waiver (in each case, as to the Prepetition Lender, subject to entry of the Final Order), and (ii) financial reporting, budget compliance, and Milestone compliance under the Interim Order and the DIP Loan Documents.

15. The proposed adequate protection to be provided for the benefit of the Prepetition Lender is appropriate and sufficient to protect the Prepetition Lender from any Diminution in Value of its interests in the Prepetition Collateral (including the Cash Collateral). The Debtors' provision of the adequate protection is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## III. The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Lender Under the DIP Loan Documents.

16. Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay interest and certain fees and expenses to the DIP Lender. These economic terms

are customary and reasonable under the circumstances and are comparable to terms agreed upon in similar debtor in possession financings. In particular, as described above, the Debtors have agreed to pay: (a) interest on the outstanding principal balance of the DIP Loans at a per annum fixed rate of 12.0%, paid in kind; (b) after the occurrence and during the continuance of any Event of Default, interest on all DIP Loans (including accrued and unpaid interest thereon) and all other amounts outstanding under the DIP Loan Documents at a rate equal to 2.0% per annum above the otherwise applicable rate, payable on demand; and (c) the reasonable and documented fees, costs, and expenses of the DIP Lender and its advisors and consultants (including White & Case LLP and FTI Consulting). The DIP Facility does not contemplate any upfront, commitment, backstop, exit, or similar fees. *See* DIP Credit Agreement § 8, 14.

17. The Debtors considered the economic terms described above when determining in their business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to maintain postpetition operations and effectively administer these chapter 11 cases. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV. The Tax Attribute Provisions of the Interim Order Are Appropriate and Should Be Approved.

18. The Debtors' net operating loss carryforwards and certain other tax attributes (collectively, the "Tax Attributes") are valuable estate assets that may substantially reduce the Debtors' future tax liability and thereby support the recoveries contemplated by the Approved Plan. Tax Attributes are property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code, and actions that would terminate or diminish their value are subject to the automatic stay under section 362(a)(3) of the Bankruptcy Code. *See In re Prudential Lines Inc.*,

928 F.2d 565, 573–74 (2d Cir. 1991) (holding that a debtor's NOL carryforward is property of the estate and that causing its termination, or adversely affecting its value, violates the automatic stay). Because PIF holds approximately 98.48% of the common ownership of Parent, certain actions by PIF or related persons—including claiming a worthlessness deduction with respect to equity interests in the Debtors or transferring such equity interests—could result in an "ownership change" of the DIP Borrower under section 382 of the Internal Revenue Code, or otherwise impair the Debtors' ability to qualify for the special rules of sections 382(l)(5) and 382(l)(6) thereof, and thereby substantially limit or eliminate the value of the Tax Attributes. *See* Interim Order ¶ 25; DIP Credit Agreement § 39.

19. To protect against that risk, paragraph 25 of the Interim Order restricts the DIP Lender, through the Tax Restriction Termination Date (as defined in the Interim Order), from claiming worthlessness or abandonment deductions with respect to equity interests in the Debtors, from transferring or encumbering equity interests it directly holds in a holding company of the Debtors where the transfer would reasonably be expected to result in an "ownership change" of the DIP Borrower under section 382—in each case subject to a consent mechanism permitting otherwise-restricted actions upon a determination that they would not reasonably be expected to impair the Tax Attributes. These provisions are narrowly tailored to enforce the automatic stay and to preserve estate value, and they are fully consensual: the DIP Lender has consented to them in each of its capacities—as DIP Lender, as Prepetition Lender, and as a direct or indirect holder of equity interests in the Debtors—and has agreed that the Debtors are entitled to specific performance and injunctive relief in respect of any breach. Approval of these provisions as part of the DIP Facility is a sound exercise of the Debtors' business judgment for the reasons set forth above, and the Court should approve them. *See* Interim Order ¶ 25; DIP Credit Agreement § 39.

## V. The DIP Lender Should Be Deemed a Good-Faith Lender Under Section 364(e).

20. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

21. As explained herein and in the DIP Declaration, the DIP Loan Documents are the result of (a) the Debtors' determination that, under the current circumstances, the DIP financing offered by the DIP Lender provides the best available postpetition financing alternative available to the Debtors and (b) arm's-length, good-faith negotiations between the Debtors and the DIP Lender. *See* DIP Declaration ¶¶ 21, 25, 27. The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

## VI. The Automatic Stay Should Be Modified on a Limited Basis.

22. The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the Prepetition Lender under the Interim Order and the other DIP Loan Documents. Finally, the proposed Interim Order provides that, upon and after the occurrence of the Termination Date, and subject to the seven (7) calendar day Default Notice Period and the emergency hearing rights set forth in the Interim Order, the automatic stay shall be modified to the extent necessary to permit the DIP Lender and the Prepetition Lender to exercise all rights and remedies in respect of the DIP Collateral and the Prepetition Collateral in accordance with the Interim Order, the other DIP Loan Documents, and the Prepetition Facility Documents.

23. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g., In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. May 7, 2025) (modifying the automatic stay as necessary to effectuate the terms of the order); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 4, 2024) (same); *In re Careismatic Brands, LLC,* No. 24-10561 (VFP) (Bankr. D.N.J. Feb. 29, 2024) (same); *In re WeWork Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (same).

### VII. Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

24. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

25. For the reasons noted above and as set forth in the DIP Declaration, the Debtors have an immediate postpetition need to use Cash Collateral and to access the liquidity provided by the DIP Term Loan Facility. Substantially all of the Debtors' cash constitutes Cash Collateral, and the Debtors will not be able to meet their near-term liquidity needs without immediate and prompt access to Cash Collateral and the Interim DIP Term Loan. *See* DIP Declaration ¶ 9. The Debtors rely on this liquidity to, among other things, honor employee wages and benefits and consummate the Approved Plan. *See* DIP Declaration ¶¶ 9–10. The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases. The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral and the Interim DIP Term Loan and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. *See* DIP Declaration ¶ 9.

26. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive the Interim DIP Term Loan and to use Cash Collateral. The Debtors require this initial liquidity prior to the Final Hearing and entry of the Final Order to continue operating

and to implement the relief requested in the Debtors' other "first day" motions. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**Request for Final Hearing**

27. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than thirty (30) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

28. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

**Reservation of Rights**

29. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or

otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## No Prior Request

30. No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Notice

31. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the PIF as Prepetition Lender and DIP Lender; (d) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (e) the office of the attorney general for each of the states in which the Debtors operate; (f) the United States Attorney's Office for the District of New Jersey; (g) the Internal Revenue Service; (h) the Securities and

Exchange Commission; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors request that the Court enter the DIP Orders, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: September 8, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email: msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email: sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

**Interim Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL, (II) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND GRANT SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, AND (III) PROVIDE ADEQUATE PROTECTION, (B) SCHEDULING FINAL HEARING, AND (C) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through eighty-one (81), is **ORDERED**.

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Upon the motion, dated September 8, 2026 (the "Motion") of LIV Golf Incorporated ("LIV Golf" or the "DIP Borrower") and its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), for the entry of an order pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rules 4001-1, 4001-3, 9013-1, 9013-2, 9013-3, and 9013-4 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules") (A) authorizing the Debtors to (I) use cash collateral, (II) obtain senior secured superpriority post-petition financing and granting senior liens and superpriority administrative expense claims and, (III) provide adequate protection, (B) scheduling a final hearing, and (C) granting related relief, the Debtors sought, among other things:

(i) the Court's authorization, pursuant to sections 363 and 364(c)(1), (2), and (3), and 364(d)(1) of the Bankruptcy Code, for the DIP Borrower to enter into a senior secured priming new money term loan credit facility (the "DIP Term Loan Facility") (A) in an aggregate principal amount not to exceed $49,600,000 (the "DIP Term Loan Facility Amount") pursuant to the terms and conditions of the Debtor-in-Possession Facility Agreement in substantially the form attached hereto as **Exhibit 1** and as otherwise agreed to by the DIP Lender (as defined below) and the DIP Borrower (as amended, restated, amended and restated, supplemented or otherwise modified from to time in accordance with the terms hereof and thereof, the "DIP Credit

Agreement"[2] and, collectively with this order (the "Interim Order"), the Final Order (as defined below), the Approved Budget (as defined below), the DIP Guarantees (as defined below), and all other agreements, documents, and instruments delivered or executed in connection therewith, including each of the DIP Finance Documents (as defined in the DIP Credit Agreement), in each case as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Loan Documents"), provided by the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"), as lender (in such capacity, together with any successors and assigns permitted under the DIP Credit Agreement, the "DIP Lender"), in each case for use in accordance with the Approved Budget: (1) during the period (the "Interim Period") from the Closing Date through and including the earlier to occur of (x) the date of entry of the Final Order by this Court and (y) the Termination Date (as defined below), in an aggregate principal amount not to exceed $14,000,000 at any time outstanding (the "Interim DIP Term Loan"), or as otherwise provided in the DIP Credit Agreement, which Interim DIP Term Loan shall be available in a single draw on the Closing Date (or such later date agreed to by the DIP Lender and the DIP Borrower) (the "Interim Funding Date"), and (2) upon the entry of the Final Order and the satisfaction (or waiver) of all applicable conditions precedent under the DIP Loan Documents in accordance therewith, until the Termination Date, in an aggregate principal amount not to exceed the DIP Term Loan Facility Amount (less the aggregate principal amount of the Interim DIP Term Loan) at any time outstanding (the "Delayed Draw Term Loan," and together with the Interim DIP Term Loan, the "DIP Term Loans"), or as otherwise provided in the

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

DIP Credit Agreement, which Delayed Draw Term Loan shall be available pursuant to a single draw to be made following entry of the Final Order, but in no event later than thirty-five (35) days after the Petition Date (or such later date agreed to by the DIP Lender and the DIP Borrower) (the "Final Funding Date");

(ii) subject to the terms and conditions set forth herein, therein and in the DIP Credit Agreement, the Court's authorization (x) upon entry of the Interim Order (and as of the date thereof), that Prepetition Obligations (as defined below) in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan shall be substituted and exchanged (and deemed prepaid by), and shall be deemed to be, loans issued and outstanding under the DIP Credit Agreement (the "Interim DIP Roll-Up Loans") and (y) upon entry of the Final Order (and as of the date thereof), that Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan shall be substituted and exchanged (and deemed prepaid by), and shall be deemed to be for all purposes, loans issued and outstanding under the DIP Credit Agreement (together with the Interim DIP Roll-Up Loan, the "DIP Roll-Up Loans," and the DIP Roll-Up Loans collectively with the DIP Term Loans and with the DIP Term Loan Facility, respectively, the "DIP Loans" and the "DIP Facility," respectively);

(iii) the Court's authorization for LIV Golf Investments Ltd ("Parent"), LIV Golf Holdings, Ltd ("Holdings"), and each of the other Debtors that is a Guarantor under the DIP Loan Documents (the "Subsidiary Guarantors," and collectively with Parent and Holdings, the "DIP Guarantors"), to enter into guarantees (the "DIP Guarantees"), to jointly and severally

guarantee the DIP Borrower's obligations under and in respect of the DIP Facility, as provided herein and in the other DIP Loan Documents;

(iv) the Court's authorization for the DIP Borrower and each of the DIP Guarantors (the DIP Borrower and the DIP Guarantors, collectively, the "DIP Loan Parties") to enter into, execute and deliver documentation evidencing the DIP Facility, including, without limitation, the DIP Credit Agreement and the other DIP Loan Documents, in each case to which it is a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(v) the Court's authorization for the Debtors to use proceeds of the DIP Term Loans solely in accordance with the 13-week rolling consolidated budget and cash flow forecast prepared by the Debtors annexed hereto as **Exhibit 2** (such budget and cash flow forecast, as updated from time to time in accordance with the terms of the DIP Loan Documents, in each case subject to the prior approval of the DIP Lender, the "DIP Budget"), which DIP Budget is an Approved Budget (as defined below), and as otherwise provided herein and in the other DIP Loan Documents;

(vi) the Court's authorization to grant to the DIP Lender, in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in substantially all assets and property of the Debtors (now owned or hereafter acquired), including the equity interests in the DIP Borrower, pursuant to sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code, in each case as, and to the extent, set forth more fully below and in the DIP Loan Documents;

(vii) the Court's authorization for the Debtors to use any "cash collateral" as such term is defined in section 363 of the Bankruptcy Code in which the Prepetition Lender (as defined below) and/or the DIP Lender have an interest (the "Cash Collateral") solely in accordance with the Approved Budget and the other DIP Loan Documents;

(viii) the Court's authorization to grant, as of the Petition Date, adequate protection for the benefit of the Prepetition Lender, as set forth more fully below, including the Adequate Protection Superpriority Claim and Adequate Protection Liens (each as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), the payment of fees and expenses of the Prepetition Lender, and the Debtors' satisfaction of the Milestones (as defined below) in accordance with the DIP Credit Agreement through the implementation of the Approved Plan;

(ix) the modification or waiver by the Court of the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including pursuant to Bankruptcy Rules 6003 and 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, this Interim Order, and the other DIP Loan Documents and to provide for the immediate effectiveness of this Interim Order;

(x) the scheduling by the Court of an interim hearing (the "Interim Hearing") to consider entry of this Interim Order;

(xi) the scheduling by the Court of a final hearing (the "Final Hearing") to consider entry of an order (in form and substance acceptable to the DIP Lender and the DIP Loan Parties, the "Final Order" and, together with the Interim Order, the "DIP Orders") granting the

relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

(xii) approval of the Final Order.

The Court having considered the Motion, the terms of the DIP Facility, and the DIP Loan Documents, the *Declaration of Bradley A. Robins in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief*, the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors in Support of the Debtors' Chapter 11 Petitions and First Day Motions*, and the evidence submitted at the Interim Hearing held before this Court on September 9, 2026 in support of entry of this Interim Order; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors, and their estates, and essential to maintain operation of the Debtors' businesses and preserve value pending consummation of an Approved Plan; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]:**

A. **Petition Date**. On September 8, 2026, (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Court"). The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

B. **Jurisdiction and Venue**. The Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Committee Formation**. As of the date hereof, no official committee of unsecured creditors has been appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

D. **Notice**. The Interim Hearing was held pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Notice of the Interim Hearing and the relief requested in the Motion has been provided to (a) the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee"); (b) counsel to the Prepetition Lender and the DIP Lender; (c) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors;

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

(d) the Office of the United States Attorney General for the State of New Jersey; (e) the Internal Revenue Service; (f) those creditors holding the 30 largest unsecured claims against the Debtors' estates; and (g) the Securities and Exchange Commission (the "Notice Parties"). Under the circumstances, such notice of the Interim Hearing and the relief requested in the Motion constitutes appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and the Local Rules.

E. **Prepetition Indebtedness**.

(i) **Prepetition PIF Facility Agreement**. Holdings, as borrower (the "Prepetition Borrower"), Parent, and each other subsidiary of Parent from time to time party thereto (including the DIP Borrower) as a guarantor (the "Prepetition Subsidiary Guarantors," together with Parent, the "Prepetition Guarantors" and, collectively with Prepetition Borrower, the "Prepetition Obligors"), and PIF, as lender (in such capacity, the "Prepetition Lender"), are parties to that certain Facility Agreement, dated as of June 4, 2026 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Facility Agreement," and together with each of the other Finance Documents (as defined in the Prepetition Facility Agreement), the "Prepetition Facility Documents"). The Prepetition Facility Agreement provided for a term loan facility (the "Prepetition Facility") made available by the Prepetition Lender to the Prepetition Borrower under the Prepetition Facility Agreement, subject to the satisfaction of certain conditions and requirements, in an amount up to the Facility Commitment (as defined in the Prepetition Facility Agreement).

(ii) Pursuant to the Prepetition Facility Agreement, the Prepetition Obligations (as defined below) are secured by first priority liens on and security interests (collectively, the "Prepetition Liens") in the Prepetition Collateral (as defined below), subject only to Senior Third Party Permitted Liens (as defined below), if any.

(iii) Pursuant to the Prepetition Facility Documents, the Prepetition Guarantors provided to the Prepetition Lender an unconditional joint and several guaranty of the Prepetition Obligations of the Prepetition Obligors secured by the Prepetition Collateral.

F. **Stipulations as to Prepetition Obligations**. Without limiting the rights of any other party in interest, solely as and to the extent set forth in paragraph 11 hereof, the Debtors stipulate and agree that (the provisions set forth in this paragraph F, together with the provisions set forth in paragraph I below (solely with respect to the Prepetition Lender and the Prepetition Collateral), the "Stipulations"):

(i) **Prepetition Obligations**. As of the Petition Date, the Prepetition Obligors are indebted and liable to the Prepetition Lender under the Prepetition Facility Documents, without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $495,000,000 with respect to the Prepetition Facility Agreement, plus accrued and unpaid interest thereon, plus fees, expenses, prepayment premiums, and all other obligations (including all Secured Obligations under (and as defined in) the Prepetition Facility Agreement), including any attorneys', accountants', consultants', appraisers', and financial and other advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Facility Documents (collectively, the "Prepetition Obligations").

(ii) **Enforceability, Etc. of the Prepetition Obligations**. The Prepetition Facility Documents and the Prepetition Obligations are (a) legal, valid, binding, and enforceable against the Prepetition Obligors, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance, or other claim, cause of action, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(iii) **Validity, Perfection, and Priority of the Prepetition Liens**. The Prepetition Liens granted by the Prepetition Obligors under the Prepetition Facility Documents to or for the benefit of the Prepetition Lender as security for the Prepetition Obligations encumber substantially all of the Prepetition Obligors' assets and property and the equity interests in the DIP Borrower (all such assets and property, as the same existed on or at any time prior to the Petition Date, including all cash and non-cash proceeds thereof, collectively, the "Prepetition Collateral"). The Prepetition Liens on the Prepetition Collateral have been properly recorded and perfected under applicable law, and are legal, valid, binding, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, recharacterization, subordination, or other challenge of any kind or nature under the Bankruptcy Code, under applicable nonbankruptcy law, or otherwise, and were granted to or for the benefit of the Prepetition Lender for fair consideration and reasonably equivalent value, contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby. As of the Petition Date, and without giving effect to this Interim Order, the Debtors are not aware, after making due inquiry, of any liens or security interests having priority over the Prepetition Liens. As of the Petition Date,

(a) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Obligors enforceable in accordance with the terms of the Prepetition Facility Documents; (b) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or any other applicable law; (c) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Facility or the Prepetition Facility Documents; (d) subject to the conclusion of the independent investigation and the recommendation of the independent committee of the board of directors of the Debtors (the "Special Committee"), the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, perfection, and priority of the liens securing the Prepetition Obligations; and (e) the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(iv) **Indemnity**. The Prepetition Lender and the DIP Lender have acted in good faith and without negligence, misconduct, or violation of public policy or law in respect of all

actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and DIP Superpriority Claims (each as defined below), the incurrence of the DIP Loans, and the granting of the Adequate Protection Liens and Adequate Protection Superpriority Claims and any of the other rights, privileges, remedies, and protections granted hereunder or under any other DIP Loan Document, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification (including any and all rights of the Prepetition Lender to indemnification under the Prepetition Facility Agreement), the Prepetition Lender (subject only to the completion of an independent investigation by the Special Committee and paragraph 11 herein) and the DIP Lender shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto. No exception or defense in contract, law, or equity exists as to any obligation set forth, as the case may be, in this paragraph F(iv), in the Prepetition Facility Documents, or in the DIP Loan Documents, to indemnify and/or hold harmless the Prepetition Lender or the DIP Lender, as the case may be, and any such defenses are hereby waived.

(v) **No Control**. Neither the DIP Lender nor the Prepetition Lender is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Loan Documents, the Prepetition Facility, and/or the Prepetition Facility Documents.

(vi) **No Claims, Causes of Action**. As of the date hereof, there exist no claims or causes of action against the Prepetition Lender or the DIP Lender with respect to, in connection with, related to, or arising from the Prepetition Facility Documents and/or the DIP Loan Documents that may be asserted by the Debtors or any other person or entity.

(vii) **Release**. The Debtors hereby forever and irrevocably release, discharge, and acquit (i)(A) the DIP Lender, (B) all former, current, and future Affiliates of the DIP Lender (other than the Debtors or the Debtors' subsidiaries), and (C) all former, current, and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, investment committee members, sub-advisors, and predecessors and successors in interest of each of the DIP Lender and each of its Affiliates (other than the Debtors or the Debtors' subsidiaries), in each case acting in their respective capacities as such, and (ii) subject only to the completion of an independent investigation by the Special Committee, (A) the Prepetition Lender, (B) all former, current, and future Affiliates of the Prepetition Lender (other than the Debtors or the Debtors' subsidiaries), and (C) all former, current, and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, investment committee members, sub-advisors, and predecessors and successors in interest of the Prepetition Lender and each of its Affiliates (other than the Debtors or the Debtors' subsidiaries), in each case acting in their respective capacities as such (the persons listed in clauses (i) and (ii), collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes,

remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation, or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the DIP Collateral and, subject to the completion of an independent investigation by the Special Committee, the Prepetition Facility, the Prepetition Facility Documents, the Prepetition Collateral, and in each case the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability," "shadow directorship," or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the DIP Lender or, subject to the completion of an independent investigation by the Special Committee, the Prepetition Lender; *provided*, that nothing in this paragraph is intended to limit or release any commitments and obligations of the DIP Lender under the DIP Loan Documents, and provided further that this provision is without limitation of any prior releases given to the DIP Lender or the Prepetition Lender by the Debtors. The Debtors further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the DIP Obligations and, subject to the completion of an independent investigation by the Special Committee, the Prepetition Obligations which the Debtors now have or may claim to have against the Releasees arising out

of, connected with, or relating to any and all acts, omissions, or events occurring prior to the entry of this Interim Order by the Court.

G. **Immediate Need for Postpetition Financing and Use of Cash Collateral**. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Good cause has been shown for entry of this Interim Order. An immediate need exists for the Debtors to use Cash Collateral on an interim basis and to obtain credit in an amount up to the Interim DIP Term Loan pursuant to this Interim Order and the other DIP Loan Documents in order to, among other things, enable the Debtors to maintain operation of the Debtors' businesses pending consummation of an Approved Plan, and to administer and preserve the value of their estates for the benefit of stakeholders. In the absence of the immediate availability of such funds and liquidity in accordance with the terms hereof, the ability of the Debtors to continue to operate as a going concern, pending consummation of an Approved Plan, would not be possible, and immediate and irreparable harm to the Debtors and their estates and creditors would occur. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize returns for creditors requires the availability of the DIP Term Loans and the use of Cash Collateral for operations and working capital needs.

H. **No Credit Available on More Favorable Terms**. The Debtors have been unable to obtain on more favorable terms and conditions than those provided in the DIP Loan Documents and this Interim Order (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the

Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (as defined below) to the DIP Lender, and without granting the adequate protection as set forth herein.

I. **Use of Cash Collateral and Proceeds of the DIP Facility, DIP Collateral, and Prepetition Collateral**. The Debtors represent and stipulate that all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, and securities constitute Cash Collateral of the DIP Lender and, subject to paragraph 11 the Prepetition Lender. All Cash Collateral, all proceeds of the DIP Collateral and, subject to paragraph 11, the Prepetition Collateral, including proceeds realized from any sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses payable under this Interim Order or the Final Order) shall be used or applied in accordance with, and solely as permitted by, the terms and conditions of this Interim Order, the Approved Budget, and the other DIP Loan Documents, and for no other purpose.

J. **Adequate Protection for the Prepetition Lender**. The Prepetition Lender has negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates, maintain operation of the Debtors' businesses, and preserve value pending consummation of an Approved Plan, in accordance with the terms hereof and the other DIP Loan Documents, including the Approved Budget. The Prepetition Lender has agreed to permit the Debtors to use the Prepetition Collateral,

including the Cash Collateral, solely in accordance with the terms hereof and the Approved Budget during the Interim Period subject to the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code. The Prepetition Lender is entitled to the adequate protection as and to the extent set forth herein pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the Prepetition Lender's consent thereto; provided that nothing in this Interim Order or the other DIP Loan Documents shall (x) be construed as a consent by the Prepetition Lender that it would be adequately protected in the event debtor in possession financing is provided by a third party (*i.e.*, any party other than the DIP Lender) or a consent to the terms of any other such financing, including the consent to any lien encumbering the Prepetition Collateral (whether senior or junior) or to the use of Cash Collateral (except under the terms hereof), or (y) prejudice, limit, or otherwise impair the rights of the Prepetition Lender to seek new, different, or additional adequate protection under any circumstances. The Prepetition Lender's consent to the Debtors' use of Cash Collateral and the granting of DIP Liens on the Prepetition Collateral is expressly conditioned upon entry of this Interim Order and does not and shall not constitute consent other than pursuant to this Interim Order and on the terms set forth herein.

K. **Sections 506(b) and 552; Marshaling**. In light of, and in exchange for (i) the DIP Lender's willingness to provide the DIP Term Loan Facility to the extent set forth herein, (ii) the DIP Lender's agreement that its liens and superpriority claims and the Prepetition Lender's agreement that its Prepetition Liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out (as defined herein), in each case as set forth herein; (iii) the consensual use of Cash Collateral in accordance with the Approved Budget and the terms of this Interim Order and the other DIP Loan Documents; and (iv) the DIP Lender's and the Prepetition Lender's agreement to the payment, in accordance with the Approved Budget and subject to the terms and conditions of this Interim Order and the other DIP Loan Documents, of certain expenses of administration of these Chapter 11 Cases, the DIP Lender, and subject to entry of the Final Order, the Prepetition Lender are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code and a waiver of the provisions of section 506(c) of the Bankruptcy Code and of the equitable doctrine of marshaling and other similar doctrines.

L. **Extension of Financing**. The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Loan Documents (including the Approved Budget) and subject to (i) the entry of this Interim Order and the Final Order, (ii) approval of the terms and provisions of this Interim Order and the other DIP Loan Documents, including the Milestones, the DIP Roll-Up Loans, and the waivers set forth herein, and (iii) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the reversal or modification on appeal of the authorization hereunder for the Debtors to incur the debt under the DIP Facility, or the grant

hereunder of the priority of the DIP Liens and the Adequate Protection Liens, does not affect the validity of such debt, or any priority of any such lien so granted as provided in section 364(e) of the Bankruptcy Code to the extent provided therein.

M. **Limitation of Liability**. The Debtors stipulate, and subject to paragraph 11, this Court finds that in making decisions to advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash Collateral, in accepting the Approved Budget and any future Approved Budget, or in taking any other actions permitted by this Interim Order or the DIP Loan Documents, none of the DIP Lender or the Prepetition Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

N. **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i) The terms and conditions of the DIP Facility are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and consideration;

(ii) all obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and the other DIP Loan Documents by any Debtor are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby;

(iii) the DIP Facility was negotiated in good faith and at arm's length among the Debtors and the DIP Lender; and

(iv) the use of the proceeds to be extended under the DIP Term Loan Facility will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code to the extent provided therein.

O. **Relief Essential; Best Interest**. The relief requested in the Motion (and provided in this Interim Order) is necessary, essential, and appropriate to maintain operation of the Debtors' businesses and preserve value to allow the Debtors to consummate an Approved Plan, and for the management and preservation of the Debtors' assets and property, in each case for the benefit of the Debtors and their estates and stakeholders, and satisfies the requirements of Bankruptcy Rule 6003. It is in the best interest of the Debtors' estates, and consistent with the Debtors' exercise of their fiduciary duties, that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations, grant the liens and claims contemplated herein and under the DIP Loan Documents to the DIP Lender and the Prepetition Lender, and use Prepetition Collateral, including Cash Collateral, as contemplated herein.

P. **Findings Regarding Corporate Authority**. Each Debtor has all requisite corporate power and authority to enter into, ratify, and perform all of its obligations under the DIP Loan Documents to which it is a party.

Q. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).

**NOW, THEREFORE**, on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing, and with

the consent of the Debtors, the Prepetition Lender, and the DIP Lender, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The Motion is granted on an interim basis in accordance with the terms and conditions set forth in this Interim Order. Any objections to the Motion with respect to entry of this Interim Order, to the extent not withdrawn, waived, or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2. **DIP Facility**.

(a) **DIP Obligations, Etc**. The DIP Loan Parties are expressly and immediately authorized and empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to this Interim Order (and, upon its entry, the Final Order) and the other DIP Loan Documents, to execute and deliver all DIP Loan Documents and all other related instruments, certificates, agreements, and documents, and to take all actions which may be reasonably required or otherwise necessary for the performance by the DIP Loan Parties under the DIP Facility, including the granting and perfection of the DIP Liens described and provided for herein. The DIP Loan Parties are hereby authorized and directed to pay all principal, interest, fees, and expenses, indemnities, and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the reasonable and documented fees and expenses of the attorneys and financial and other advisors and consultants of the DIP Lender, as and to the extent provided for herein and in the other DIP Loan Documents (collectively, all loans, advances, extensions of

credit, financial accommodations, expenses, and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Term Loans, the DIP Roll-Up Loans, the DIP Facility, and the DIP Loan Documents, including all "DIP Obligations" under, and as defined in, the DIP Credit Agreement, the "DIP Obligations"). The DIP Orders, the other DIP Loan Documents, and all DIP Obligations shall represent, constitute, and evidence, as the case may be, valid and binding obligations of the DIP Loan Parties, enforceable against the DIP Loan Parties, their estates, and any successors thereto in accordance with their terms. All obligations incurred, payments made, and transfers or grants of security set forth in this Interim Order and in the other DIP Loan Documents by any DIP Loan Party are granted to or for the benefit of the DIP Lender for fair consideration and reasonably equivalent value, and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of security under the DIP Loan Documents as approved under this Interim Order shall be voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment, or counterclaim. The term of the DIP Facility shall commence on the Closing Date and end on the Termination Date (as defined below), subject to the terms and conditions set forth herein and in the other DIP Loan Documents.

(b) **Roll-Up.** Effective upon, and in each case as of, (a) the entry of this Interim Order, without any further action by the Debtors or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Interim DIP Term Loan shall be automatically deemed exchanged via assignment on a cashless

basis into and shall be deemed to constitute DIP Roll-Up Loans pursuant to the terms of this Interim Order and the other DIP Loan Documents and (b) the entry of the Final Order, without any further action by the Debtors or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the aggregate amount of the Delayed Draw Term Loan shall be automatically deemed exchanged via assignment on a cashless basis into and deemed to constitute DIP Roll-Up Loans pursuant to the terms of this Interim Order or the Final Order (as applicable) and the other DIP Loan Documents. The authorization of the DIP Roll-Up Loans are subject to the provisions of paragraphs 11 of this Interim Order, and in the event of a successful Challenge (as defined herein), the Court may fashion any appropriate relief in respect of the Roll-Up Loans. The Prepetition Lender would not otherwise consent to the use of its Cash Collateral and the DIP Lender would not be willing to provide the DIP Term Loan Facility or extend credit to the Debtors thereunder, without approval of the DIP Roll-Up Loans upon entry of this Interim Order. The DIP Roll-Up Loans shall be authorized as and deemed for all purposes to be consideration in exchange for, and solely on account of, the agreement of the Prepetition Lender to the incurrence of (and the agreement of the DIP Lender to fund) the DIP Term Loan Facility and not as adequate protection for, or otherwise on account of, any Prepetition Obligations.

(c) **Authorization to Borrow, Etc**. In order to continue to operate its business, subject to the terms and conditions of this Interim Order and the other DIP Loan Documents (including the Approved Budget), the DIP Borrower is hereby authorized to borrow under, and the DIP Guarantors are authorized to guarantee, the DIP Obligations incurred during the Interim Period.

(d) **Conditions Precedent**. The DIP Lender shall have no obligation to make any DIP Loans or any other financial accommodation hereunder or under the other DIP Loan Documents (and the Debtors shall not make any request therefor) unless all applicable conditions precedent to making DIP Loans under the DIP Loan Documents have been satisfied or waived in accordance with the terms thereof.

(e) **DIP Collateral**. As used herein, "DIP Collateral" shall mean all now owned or hereafter acquired assets, interests, rights, and property of any nature whatsoever, of the Debtors including, without limitation, all property in which the Debtors and their estates have an interest, whether real or personal, tangible or intangible, or otherwise, whenever acquired and wherever located, including, without limitation (I) all Prepetition Collateral, all assets and property pledged under the Prepetition Facility Documents or the DIP Loan Documents, including all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), recoverable VAT, other receivables and rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, bank accounts, deposit accounts, "core concentration accounts," "cash collateral accounts," and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, domain names, other intellectual

property, all licenses therefor, interests of any Debtor in any foreign subsidiary and all proceeds, rents, profits, products, and substitutions, if any, of any of the foregoing; (II) any claims and causes of action of the DIP Loan Parties of any kind or nature and all proceeds thereof (other than any actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code ("Avoidance Actions") and proceeds thereof), provided that, upon entry of a Final Order granting such relief, DIP Collateral shall include all proceeds of Avoidance Actions, and (III) the DIP Facility Blocked Account, the Proceeds Account, and the Lender Reserve Account (each as defined below), and in each case all amounts at any time on deposit therein, as well as in any residual interest in the Funded Reserve Account and the Funded Reserves, after payment in full of the Carve-Out.

(f) **DIP Liens**. Effective immediately upon the entry of this Interim Order, the DIP Lender is hereby granted the following security interests and liens on all DIP Collateral, which security interests and liens shall immediately be valid, binding, perfected, continuing, enforceable, and non-avoidable (all liens and security interests granted to the DIP Lender pursuant to this Interim Order, any Final Order, and the other DIP Loan Documents, the "DIP Liens"):

(I) subject only to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, enforceable, perfected, and non-avoidable first-priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected, and non-avoidable liens as of the Petition Date; and

(II) subject to the Carve-Out, pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, valid, binding, enforceable, perfected, and non-avoidable liens on and

security interests in all other DIP Collateral, which liens and security interests shall in each case be (x) immediately junior to any liens of any third party, *i.e.*, any party other than the Prepetition Lender, but solely to the extent that such third party liens and security interests are in each case valid, enforceable, perfected, and non-avoidable as of the Petition Date (or are perfected subsequent to the Petition Date as and to the extent permitted by section 546(b) of the Bankruptcy Code) and are senior to the Prepetition Liens and permitted under the Prepetition Facility Agreement (such liens, if any, the "Senior Third Party Permitted Liens"),[4] and (y) senior to the Prepetition Liens (and the Adequate Protection Liens), and to all other liens on the DIP Collateral.

(g) **Other Provisions Relating to the DIP Liens**. Effective immediately upon entry of this Interim Order, the DIP Liens shall secure all of the DIP Obligations and such liens (and any superpriority claims and other senior liens, including adequate protection liens, granted hereunder) shall at all times have a higher priority and shall remain senior to the rights of the Debtors, any chapter 7 or chapter 11 trustee, and any secured, administrative priority, unsecured, or other claims of any party in these Chapter 11 Cases under the Bankruptcy Code (except as (and solely to the extent) expressly provided herein, including with respect to the Carve-Out), and the DIP Liens and Adequate Protection Liens shall not become subject, junior, or subordinated to any "priming" or other liens, nor made *pari passu* with any other lien, under Bankruptcy Code section 364 or otherwise, in these Chapter 11 Cases (except as (and solely to the extent) expressly provided

[4] Nothing herein shall constitute a finding or ruling by this Court that any asserted Senior Third Party Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party in interest, including but not limited to the Debtors, the DIP Lender, the Prepetition Lender, or a Committee (if any), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Senior Third Party Permitted Lien and/or security interests.

herein with respect to the Carve-Out), including to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (2) any lien or security interest existing on or arising on or after the Petition Date, or (3) any other lien, claim, or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise, in each case other than as (and solely to the extent) expressly set forth herein, including with respect to the Carve-Out. The DIP Liens and the Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens and subject to and only upon the entry of a Final Order granting such relief, the Adequate Protection Liens shall not be subject to section 510 of the Bankruptcy Code, to the "equities of the case" exception of section 552 of the Bankruptcy Code, to section 506(c) of the Bankruptcy Code, or to sections 549, 550, or 551 of the Bankruptcy Code.

(h) **Superpriority Administrative Claim Status**. Subject only to the Carve-Out, the DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute allowed superpriority claims (the "DIP Superpriority Claims") of the DIP Lender against each of the DIP Loan Parties (jointly and severally), and be payable from all assets and properties of the DIP Loan Parties, with priority over any and all other administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including, without limitation, all

administrative expenses of the kind specified in any other provisions of the Bankruptcy Code, including sections 503(b) and 507(b) of the Bankruptcy Code, including to the extent allowed under the Bankruptcy Code, any and all other administrative expenses of other claims arising under sections 105, 326, 327, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c) (subject to entry of a Final Order granting such relief), 507(a) (other than section 507(a)(1)), 507(b), 507(d), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and shall be payable from all pre- and postpetition assets and property, whether existing on the Petition Date or thereafter acquired, of the Debtors and all proceeds thereof. Other than as expressly provided herein, including in paragraph 13 hereof with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, or any of the DIP Obligations, or with any other claims of the DIP Lender arising hereunder or under the other DIP Loan Documents, or otherwise in connection with the DIP Facility.

3. **Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility**. Subject to the terms and conditions of this Interim Order and the other DIP Loan Documents, and to the adequate protection granted to or for the benefit of the Prepetition Lender

as hereinafter set forth, the Debtors are authorized during the Interim Period (and not beyond, pending entry of the Final Order) to (a) use Cash Collateral and (b) request and use proceeds of the DIP Loans, in each case as set forth in the Approved Budget and in accordance with this Interim Order and the other DIP Loan Documents. Notwithstanding anything herein to the contrary, subject only to the Carve-Out as provided herein, the Debtors' right to request or use proceeds of DIP Loans or to use Cash Collateral shall terminate on the Termination Date. Nothing in this Interim Order or in the other DIP Loan Documents shall authorize the disposition of any assets of the Debtors or their estates or any proceeds resulting therefrom outside the ordinary course of business, except as expressly permitted herein and in the DIP Loan Documents (subject to any required Court approval) and, for the avoidance of doubt, no proceeds of the DIP Loans (including any payments from or proceeds of DIP Collateral) or any Cash Collateral shall be used (i) to make any payment in settlement or satisfaction of any prepetition claim or administrative claim (other than the DIP Obligations or Prepetition Obligations as provided herein and in the DIP Credit Agreement), unless in compliance with the Approved Budget; (ii) to make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and the Approved Budget; or (iii) to make any payment otherwise prohibited by this Interim Order or the other DIP Loan Documents.

4. **<u>Adequate Protection for Prepetition Lender</u>**. As adequate protection for any diminution in value of the Prepetition Lender's interests in the Prepetition Collateral, from and after the Petition Date resulting from, among other things, the use, sale or lease by the Debtors of the Prepetition Collateral (including the use of Cash Collateral), the granting of the DIP Liens, and

the subordination of the Prepetition Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code ("Diminution in Value"), the Prepetition Lender shall receive the following adequate protection from and after the Petition Date:

(a) **Adequate Protection Liens**. The Prepetition Lender shall receive, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, replacement and additional security interests in and liens upon (the "Adequate Protection Liens") all of the DIP Collateral. The Adequate Protection Liens shall be junior and subject only to the DIP Liens, any Senior Third Party Permitted Liens (if any), and the Carve-Out as provided herein.

(b) **Adequate Protection Superpriority Claim**. The Prepetition Lender shall have an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in section 507(b) of the Bankruptcy Code, which claims shall have priority over all priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c) (subject to entry of a Final Order granting such relief), 507(a) (other than section 507(a)(1)), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise, junior and subject only to the DIP Superpriority Claims and the Carve-Out, which Adequate Protection Superpriority Claim shall be payable from all assets and properties of the Debtors, including all DIP Collateral, and shall be enforceable against each Debtor and its estate.

(c) **Adequate Protection Payments, Etc.** Upon the entry of this Interim Order, (1) interest on any outstanding Prepetition Obligations shall continue to accrue at the applicable contract rate provided for in the Prepetition Facility Documents and shall be paid in kind, (2) the Prepetition Lender shall receive from the DIP Loan Parties immediate cash payment of all accrued and unpaid fees and disbursements, including all reasonable and documented legal and advisory fees and out-of-pocket costs and expenses) owing to the Prepetition Lender under the Prepetition Facility Documents and (3) thereafter, when due, the Debtors shall also pay all reasonable and documented professional and advisory fees, costs, and expenses of the Prepetition Lender incurred in connection with the negotiation, documentation, administration, and monitoring of the Prepetition Facility Documents and/or the DIP Loan Documents, including, without limitation, the reasonable and documented fees and expenses of legal, financial, and other advisory professionals (including, without limitation, White & Case LLP, FTI Consulting, and any other counsel and consultants of the Prepetition Lender, including the fees and expenses of any local counsel and other consultants in each relevant jurisdiction relating to the Prepetition Facility Agreement and any replacement or additional advisors thereto), which payments shall in each case be made from the Lender Reserve Account; *provided* that payment of any fees and expenses of the Prepetition Lender's professionals incurred on and after the Petition Date shall be subject to the notice and objection provisions of paragraph 24(b) of this Interim Order.

5. **DIP Budget**.

(a) The DIP Budget attached hereto as **Exhibit 2** (the "Initial DIP Budget") constitutes an "Approved Budget" under the DIP Credit Agreement. Following the entry of this

Interim Order, the Debtors shall, in accordance with the DIP Credit Agreement, provide an updated DIP Budget no later than every four weeks, on Wednesday of such week, with the first such updated DIP Budget to be delivered on the Wednesday of the fourth week following the week the Petition Date occurred and any such DIP Budgets shall also be delivered at the same time to counsel representing any statutory committees appointed in these cases. Each DIP Budget and updated DIP Budget shall include on a weekly basis all uses, and anticipated uses, of the DIP Term Loan Facility and Cash Collateral, revenues or other payments projected to be received and all expenditures proposed to be made during such week, in each case for the going-forward 13-week period (provided that such 13-week period shall not extend past the Scheduled Maturity Date), and shall be in form and substance, and in general line-item detail, satisfactory to the DIP Lender, and shall in each case become an Approved Budget as specified (and defined) in and in accordance with the DIP Credit Agreement.

(b) The Initial DIP Budget (and any subsequent Approved Budget) will remain the Approved Budget until a proposed updated DIP Budget becomes an Approved Budget in accordance with the terms of the DIP Credit Agreement. The Approved Budget may only be amended, supplemented, modified, restated, amended and restated, replaced, or extended in accordance with the DIP Loan Documents. Any such amendment, supplement, modification, restatement, amendment and restatement, replacement, or extension in accordance with DIP Loan Documents may be effectuated without further order of the Court. The Approved Budget is an

integral part of this Interim Order and has been relied upon by the DIP Lender to provide the DIP Term Loan Facility, allow use of Cash Collateral, and consent to this Interim Order.

(c) Pursuant to the terms of the DIP Credit Agreement, the Debtors shall, on or before the third business day of each week (with the first such delivery date being September 16, 2026, and covering the period from the Petition Date through September 11, 2026), provide weekly variance reporting on the results of operations (including actual cash receipts and expenditures) for the most recently ended one-week period and on a cumulative basis, in accordance with the DIP Credit Agreement and in form, and containing supporting information, reasonably acceptable to the DIP Lender and the DIP Loan Parties (each such report, a "Variance Report") and any such Variance Reports shall also be delivered at the same time to counsel representing any statutory committees appointed in these cases. The Debtors shall operate in accordance with the Approved Budget and all disbursements of the Debtors shall be in accordance with the Approved Budget, subject to the Permitted Variance (as defined below). Actual amounts of the DIP Loan Parties' operating disbursements may not vary from the amounts set forth in the Approved Budget by more than the greater of (i) 10% or (ii) $200,000, each on a cumulative basis, resetting on a going-forward basis upon the approval of each new Approved Budget (the "Permitted Variance") (other than the initial Variance Report to be delivered on September 16, 2026). Each weekly Variance Report (other than the initial Variance Report to be delivered on September 16, 2026) shall indicate whether the DIP Loan Parties are in compliance with the Approved Budget (subject to the Permitted Variance), provided that any fees and expenses of (x) any professionals and advisors of the DIP Lender and Prepetition Lender and (y) any professionals and advisors of the Debtors or

the Committee (if any) shall not be tested for purposes of determining the DIP Loan Parties' compliance with the Approved Budget and shall not be limited to the amounts set forth in the Approved Budget (provided that in no event shall any professionals or advisors of the Debtors or the Committee (if any) have recourse to the Lender Reserve Account or any amounts from time to time on deposit therein), and delivery of each such Variance Report shall be deemed to constitute a representation that it fairly presents the results of cash receipts and disbursements of the DIP Loan Parties.

(d) As a condition to the DIP Term Loan Facility, all proceeds of the DIP Term Loan Facility shall be deposited into a blocked account of the DIP Borrower (which may be an escrow account) at a financial institution reasonably acceptable to the DIP Lender and the DIP Loan Parties (the "DIP Facility Blocked Account"), which shall be under the sole dominion and control of the DIP Lender (or, if it is an escrow account, the DIP Lender shall have sole and exclusive consent rights with respect thereto and right to direct distributions therefrom).

(e) Amounts on deposit in the DIP Facility Blocked Account may be disbursed, not more than once each week, on Monday of each week in which prior written notice from the DIP Borrower (each, a "Disbursement Request") was delivered on the Wednesday of the prior week in accordance with the terms and conditions of the DIP Credit Agreement, and at the direction of the DIP Lender (email being sufficient), based on the funding requirements of the DIP Loan Parties for such week, and in each case in accordance with the Approved Budget and subject to satisfaction or waiver of the applicable conditions to disbursement set forth in the DIP Loan Documents, provided that the aggregate amount of proceeds of the DIP Term Loan Facility

borrowed by the DIP Loan Parties pursuant to Disbursement Requests shall not, as a result of any borrowing, exceed the DIP Term Loan Facility Amount less the sum of (i) the actual amount of receivables received by the DIP Loan Parties between the dates of September 4, 2026 and the Petition Date, and (ii) the lesser of (A) $27,300,000 (the "Threshold Amount") and (B) the actual amount of receivables received by the DIP Loan Parties after the Petition Date, and failure to comply with any of the foregoing shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement.

(f) Once disbursed from the DIP Facility Blocked Account in accordance with a Disbursement Request, proceeds of the DIP Term Loans shall be deposited into a segregated account at a financial institution reasonably acceptable to the DIP Lender and the DIP Loan Parties (the "Proceeds Account") until applied by the DIP Borrower in accordance with the Approved Budget. The documentation to establish the DIP Facility Blocked Account and the Proceeds Account shall in each case be in form and substance acceptable to the DIP Lender and the DIP Loan Parties, and the DIP Facility Blocked Account and the Proceeds Account, and all amounts on deposit in each such account (including any other Cash Collateral held therein) shall constitute DIP Collateral. The DIP Lender shall be deemed to have "control" over each of the DIP Facility Blocked Account and the Proceeds Account (and all amounts on deposit in each such account) for all purposes of perfection under the Uniform Commercial Code pursuant to this Interim Order, and, if required under the DIP Credit Agreement or otherwise requested by the DIP Lender, the DIP Loan Parties shall enter into control agreements with respect to the DIP Facility Blocked

Account and/or the Proceeds Account, in each case in form and substance acceptable to the DIP Lender.

(g) Notwithstanding the foregoing, the DIP Borrower shall (i) not make any Disbursement Request for any week unless the DIP Loan Parties' aggregate unrestricted cash less any forecast collections is projected to be less than $5,000,000 (the "Minimum Cash") at any time during such week and (ii) limit such Disbursement Request to an amount required to make disbursements for such week in excess of the Minimum Cash.

(h) As a further condition of the DIP Facility, (1) on the Interim Funding Date (or as otherwise agreed or required by the DIP Lender), the aggregate amount indicated under the Approved Budget for payment of the DIP Lender's and Prepetition Lender's professionals during the Interim Period, and (2) on the Final Funding Date (or as otherwise agreed or required by the DIP Lender), the aggregate remaining amount indicated under the Approved Budget for payment of the DIP Lender's and Prepetition Lender's professionals through the Scheduled Maturity Date shall in each case be deposited into a blocked account of the DIP Borrower (which may be an escrow account) at a financial institution acceptable to the DIP Lender and the DIP Loan Parties (the "Lender Reserve Account"), which account shall be under the sole dominion and control of the DIP Lender (or, if it is an escrow account, the DIP Lender shall have sole and exclusive consent rights with respect thereto and right to direct distributions therefrom). Amounts on deposit in the Lender Reserve Account may be disbursed from time to time upon written request solely to pay fees and expenses of the DIP Lender's and Prepetition Lender's professionals, in accordance with this Interim Order, including paragraph 24(b) hereof, and the other DIP Loan Documents.

Notwithstanding anything to the contrary herein, in no event shall the Lender Reserve Account or any amounts from time to time on deposit therein be available to satisfy any other obligations of the DIP Loan Parties, including the Carve Out.

(i) The documentation to establish the Lender Reserve Account shall be in form and substance acceptable to the DIP Lender and the DIP Loan Parties, and the Lender Reserve Account, and all amounts on deposit in such account shall constitute DIP Collateral. The DIP Lender shall be deemed to have "control" over Lender Reserve Account (and all amounts on deposit in such account) for all purposes of perfection under the Uniform Commercial Code pursuant to this Interim Order, and, if required under the DIP Credit Agreement or otherwise requested by the DIP Lender, the DIP Loan Parties shall enter into control agreements with respect to the Lender Reserve Account, in each case in form and substance acceptable to the DIP Lender. The Lender Reserve Account, and the treatment and priority thereof as provided herein, are an integral part of this Interim Order and have been relied upon by the DIP Lender to provide the DIP Term Loan Facility, allow use of Cash Collateral, and consent to this Interim Order.

6. **Monitoring of Collateral**. The Prepetition Lender, the DIP Lender, and their respective consultants and advisors, shall be given reasonable access to the Debtors' books, records, assets, and properties for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral, at the Debtors' cost and expense, as provided in the DIP Credit Agreement.

7. **Financial Reporting, Etc**. Without limitation of the requirements of the DIP Loan Documents and the Prepetition Facility Documents, the DIP Loan Parties shall provide to the DIP Lender and to the Prepetition Lender (and, in each case, their consultants, advisors, and

professionals) (i) all financial information required under the DIP Loan Documents and the Prepetition Facility Documents and (ii) access upon reasonable notice and during regular business hours to the DIP Loan Parties' books and records, assets, and properties, for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral. The DIP Loan Parties shall also provide such reports and information required to be provided in the DIP Loan Documents and the Prepetition Facility Documents and reasonably cooperate, discuss with, and provide to the DIP Lender and the Prepetition Lender (and, in each case, their consultants, advisors, and professionals) all such information as may be reasonably requested by the DIP Lender or the Prepetition Lender. In addition, the Debtors hereby authorize their accountants, attorneys, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Lender and the Prepetition Lender (and, in each case, their consultants, advisors, and professionals) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors consistent with the requirements set forth in the DIP Credit Agreement.

8. **Milestones**. It is a condition to the DIP Term Loan Facility and the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in the DIP Credit Agreement (the "Milestones"). The failure to comply with any Milestone (unless such failure is the result solely of (a) any action or inaction on the part of the DIP Lender or Prepetition Lender, or (b) the availability of the Court) shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement.

9. **Subordination of Intercompany, Affiliate Liens**. All intercompany or affiliate liens of the Debtors, if any (other than any liens granted to the DIP Lender), will be contractually subordinated to the DIP Liens and the Adequate Protection Liens granted pursuant to this Interim Order and under the DIP Loan Documents, on terms satisfactory to the DIP Lender.

10. **DIP Lien and Adequate Protection Replacement Lien Perfection**. Automatically upon entry of this Interim Order, the DIP Liens, and the Adequate Protection Liens shall be deemed to be valid, perfected, enforceable, non-avoidable, and effective by operation of law, and not subject to challenge as of the Petition Date, without the need of any further action of any kind. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases. The DIP Loan Parties shall execute and deliver to the DIP Lender all such financing statements, mortgages, security agreements, notices, and other

documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect, or to insure the contemplated priority of the DIP Liens and the Adequate Protection Liens, and the DIP Loan Parties shall take all such further actions that may be required under any applicable law or pursuant to any DIP Loan Document, or that the DIP Lender or the Prepetition Lender, as applicable, may request in order to grant, preserve, protect, or perfect the DIP Liens and the Adequate Protection Liens granted pursuant to this Interim Order. The DIP Lender, in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the DIP Loan Parties have real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. To the extent that the Prepetition Lender is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to create, validate, attach, perfect, or prioritize liens (any such instrument or document, a "Security Document"); the DIP Lender is also hereby deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies, and the secured party under each such Security Document, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and the other DIP Loan Documents. The Prepetition Lender shall serve as agent for the DIP Lender for purposes of

perfecting the DIP Lender's security interests and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

11. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**.

(a) The Debtors' Stipulations are and shall be irrevocably binding upon the Debtors, and on any and all of the Debtors' successors in interest and assigns (including, without limitation, any chapter 7 or chapter 11 trustee, responsible person, examiner with expanded powers, or other estate representative, subject to the Challenge Period (as defined below)) in all circumstances and for all purposes.

(b) The Stipulations shall be binding upon the Debtors' estates, all other persons and entities (including any Committee) and each of their respective successors in interest and assigns in all circumstances and for all purposes, unless, and solely to the extent that (i) such parties in interest (including any Committee) in each case with standing and requisite authority to do so (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) have timely filed the proper pleadings, and timely commenced the appropriate proceedings under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth below in this paragraph 11, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations or the Prepetition Liens, (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses, (C) objecting to or challenging

any of the Debtors' Stipulations, (D) objecting to or challenging the Roll Up, or (E) otherwise asserting or prosecuting any action against the Prepetition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees in connection with or related to the matters covered by the Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge"), before the earlier of: (A) the date on which objections to confirmation of an Approved Plan are due, and (B) (x) no later than sixty (60) calendar days from the entry of the Interim Order for any party in interest with requisite standing, and (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (1) 75 calendar days after entry of this Interim Order or (2) the date that is 30 calendar days after their appointment (such period, the "Challenge Period" and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "Challenge Period Termination Date"), as such date may be extended to any such party in interest by the Prepetition Lender (in its sole discretion) or by any such later date as has been ordered by the Court for cause upon a motion filed and served within the Challenge Period (before giving effect to such extension), and (ii) the Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding, and any such judgment has become final and is not subject to any further review or appeal.

(c) Any Challenge not asserted by the timely and proper filing of a pleading by a party in interest with the requisite standing and authority as contemplated herein prior to the

Challenge Period Termination Date shall be deemed forever waived, released, and barred with respect to such party in interest. To the extent a party in interest with requisite standing and authority timely and properly commences a Challenge prior to the Challenge Period Termination Date, all claims, causes of action, and other matters not specifically set forth in such Challenge shall be deemed forever waived, released, and barred with respect to such party in interest.

(d) To the extent the Stipulations (or any of them) are (x) not subject to a Challenge timely and properly commenced prior to the Challenge Period Termination Date or (y) subject to a Challenge timely and properly commenced prior to the Challenge Period Termination Date, to the extent any such Challenge does not result in a final and non-appealable judgment or order of the Court that is inconsistent with such Stipulations, then, in each case, without further notice, motion, or application to, or order of, or hearing before, this Court and without the need or requirement to file any proof of claim: (i) any and all such Challenges by any Committee, or any other party in interest shall be deemed to be forever waived, released, and barred (including in any Successor Case), and the Prepetition Obligations shall be deemed to be an allowed secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code for all purposes in connection with these Chapter 11 Cases, and (ii) all of the Stipulations and all other waivers, releases, and affirmations set forth in this Interim Order (or any not properly and timely challenged) shall be in full force and effect and shall be binding, conclusive, and final on any person, entity, or party in interest, including any Committee (in each case, and their successors and assigns), in the Chapter 11 Cases and in any Successor Case for all purposes, without any further order of the Court, and shall not be subject to challenge or objection by any Committee or any other party in interest,

including, without limitation, any other statutory committee, any trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. For the avoidance of doubt, notwithstanding anything else to the contrary in this Interim Order, any chapter 7 or chapter 11 trustee appointed or elected in the Debtors' cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations, releases, and stipulations of the Debtors in this Interim Order

(e) If any Challenge is timely and properly filed during the Challenge Period, the Stipulations and all other waivers, releases, and affirmations contained in this Interim Order shall nonetheless remain binding and preclusive, as provided in this paragraph 11, on all other parties in interest (including any Committee), and on any other person or entity, except for the plaintiff or movant timely and successfully asserting such Challenge, as set forth in a final, non-appealable order of a court of competent jurisdiction. Notwithstanding anything to the contrary herein, the right to commence any Challenge under this Interim Order is preserved only as against any particular Prepetition Obligation or against the Prepetition Lender to the extent such

Challenge is commenced timely and properly prior to the Challenge Period Termination Date, and in respect of such Prepetition Obligation, and is otherwise waived as set forth in this paragraph 11.

(f) All remedies or defenses of any party with respect to any Challenge are hereby preserved; *provided*, *however*, the DIP Lender and the Prepetition Lender stipulate and agree that they shall not raise as a defense in connection with any challenge the ability of creditors to file derivate suits on behalf of limited liability companies. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) including any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Obligations, and an order of the Court (or any other court of competent jurisdiction) conferring such standing on a Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by a Committee or such other party in interest. The Court may fashion any appropriate remedy following a successful Challenge; *provided* that no such remedy shall affect the validity, priority, or any other aspect of the DIP Obligations or the DIP Liens.

12. **Limitations on Use of DIP Facility and Cash Collateral**. Notwithstanding anything herein to the contrary, no portion of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, any Cash Collateral, or the Carve-Out, and no disbursements set forth in the Approved Budget, may be used (including for the payment of professional fees, disbursements, costs, or expenses incurred by any person) in connection with (i) investigating, challenging, or in relation to the challenge of, any of the Prepetition Liens, Prepetition Obligations, DIP Liens, or DIP Obligations (or the value of the Prepetition Collateral or the DIP Collateral), or

directly or indirectly asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any state, local or foreign law) in respect of the Prepetition Obligations or DIP Obligations, against the DIP Lender, the Prepetition Lender, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, (ii) seeking to amend or modify any of the rights or interests granted to the DIP Lender or the Prepetition Lender under this Interim Order, the other DIP Loan Documents, or the Prepetition Facility Documents, in a manner adverse to the DIP Lender or the Prepetition Lender, including seeking to use Cash Collateral on a contested basis, without the prior written consent of the DIP Lender, (iii) preventing, hindering, impeding, or delaying the realization by the Prepetition Lender or DIP Lender upon any Prepetition Collateral or DIP Collateral, respectively, as permitted under this Interim Order or the enforcement of their respective rights under this Interim Order, the Final Order, any other DIP Loan Document or any Prepetition Facility Document, (iv) in requesting authorization, or supporting any request for authorization, to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the DIP Lender or (y) if such financing is sufficient to indefeasibly pay and satisfy all Prepetition Obligations and DIP Obligations in full in cash and such financing is immediately so used, (v) in connection with any claims or causes of actions against the Releasees, including formal or informal discovery proceedings in anticipation thereof, and/or in challenging any Prepetition Obligations, DIP Obligations, Prepetition Liens, Adequate Protection Liens or DIP Liens, or (vi) otherwise directly or indirectly asserting, joining,

commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of, the Prepetition Lender or the DIP Lender, arising out of, in connection with, or relating to the Prepetition Facility Documents or the DIP Loan Documents and the DIP Facility, or in each case the transactions contemplated thereunder, including, without limitation, (i) any action arising under the Bankruptcy Code, (ii) any so-called "lender liability" claims and causes of action, (iii) any action with respect to the validity and extent of the DIP Obligations or Prepetition Obligations, or the validity, extent, perfection and priority of the DIP Liens or Prepetition Liens, (iv) any action seeking to invalidate, set aside, avoid, reduce, set-off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens or the Prepetition Liens, in whole or in part, or (v) appeal or otherwise challenge this Interim Order or the Final Order; provided that (x) the Special Committee shall be permitted to use Cash Collateral and proceeds of the DIP Facility subject to and in accordance with the Approved Budget for the purpose of conducting an independent investigation and (y) no more than $25,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, and the Cash Collateral (including any proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, or the Cash Collateral used to fund the Carve-Out) may be used by a Committee (if any) appointed in these Chapter 11 Cases and a chapter

7 or chapter 11 trustee, if any, to investigate (but not prosecute or Challenge, or commence, or initiate the prosecution of, any Challenge, including the preparation of any complaint or motion on account of, or objection to) the Stipulations before termination of the Challenge Period. Notwithstanding anything to the contrary herein, in any other DIP Loan Document, in any other order, or otherwise, in no event shall the Debtors be permitted to use any amounts on deposit in the Lender Reserve Account, for any purpose, including to fund the Carve-Out or for any payment or distribution to any Person, other than for payment of the fees and expenses of the DIP Lender's and Prepetition Lender's professionals in accordance with this Interim Order and the other DIP Loan Documents, and the Debtors hereby waive any right to seek nonconsensual use of any or all of the Cash Collateral at any time on deposit in the Lender Reserve Account. Any failure to comply with the foregoing shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement.

13. **Carve-Out**.

(a) As used in this Interim Order, the "Carve-Out" means the sum of: (i) all fees required to be paid to the clerk of the Court and all statutory fees payable to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with the statutory rate of interest (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Court at any time, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals, whether by interim

order, final order, procedural order, or otherwise, all reasonable and documented unpaid fees and expenses (the "Allowed Professional Fees") incurred by estate professionals retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any Committee pursuant to section 328 or 1103 of the Bankruptcy Code, (together with the Debtor Professionals, the "Professionals") at any time, on or before the delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) the Allowed Professional Fees of the Professionals incurred beginning one calendar day after the date of delivery by the DIP Lender of a Carve-Out Trigger Notice in accordance with the Approved Budget (and excluding any success or transaction fees) in an aggregate amount not to exceed $4,500,000 (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap"), with all such Professionals sharing the Post Carve-Out Trigger Notice Cap; *provided* that the Post Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by the Debtors and paid to the applicable Professionals following delivery of a Carve-Out Trigger Notice. For the avoidance of doubt and notwithstanding anything to the contrary contained in this Interim Order, the DIP Loan Documents, or the Prepetition Facility Documents, the Carve-Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, the Prepetition Liens, and the Prepetition Obligations.

(b) For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the DIP Lender (or a

professional, representative, or advisor of the DIP Lender on behalf of the DIP Lender) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) or termination of the Debtors' right to use Cash Collateral, stating that the Post Carve-Out Trigger Notice Cap has been invoked.

(c) Delivery of Weekly Fee Statements. Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided that, within one business day of the occurrence of the Carve-Out Declaration Date (as defined below), each Professional shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Carve-Out Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered promptly to the DIP Lender). If any Professional fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional's entitlement

(if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the DIP Budget for such period for such Professional Person.

(d) Carve Out Reserves.

i. Commencing with the week ended September 18, 2026, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date (which, for the avoidance of doubt, shall include any cash held in the Proceeds Account, but shall not include (x) the DIP Facility Blocked Account unless and until drawn pursuant to a Disbursement Request and in accordance with the terms and conditions hereunder and under the DIP Loan Documents or (y) the Lender Reserve Account or any amounts from time to time on deposit therein) and, to the extent insufficient, any available cash thereafter held by any Debtor (which, for the avoidance of doubt, shall include any cash held in the Proceeds Account, but shall not include (x) the DIP Facility Blocked Account unless and until drawn pursuant to a Disbursement Request and in accordance with the terms and conditions hereunder and under the DIP Loan Documents or (y) the Lender Reserve Account or any amounts from time to time on deposit therein) to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statements delivered on the immediately prior Wednesday to the Debtors and the DIP Lender, and (ii) the aggregate

amount of unpaid Allowed Professional Fees contemplated to be incurred in the DIP Budget during such week, *plus* (b) the Post-Carve Out Trigger Notice Cap (which, for the avoidance of doubt, with respect to the Post-Carve Out Trigger Notice Cap, will only be funded one time). The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Carve-Out Declaration Date shall be paid first from such Funded Reserve Account.

ii. On the day on which a Carve Out Trigger Notice is given by the DIP Lender to the Debtors with a copy to counsel to any Committee (the "Carve-Out Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to, and the Debtors shall utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and, to the extent the foregoing is insufficient, any available cash thereafter held by any Debtor (including but not limited to cash held in the Proceeds Account and, if necessary, in the DIP Facility Blocked Account (to the extent otherwise available to be borrowed under the DIP Facility but for the occurrence of the Event of Default), but not the Lender Reserve Account or any amounts from time to time on deposit therein) to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any other claims. On the

Carve-Out Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor (including but not limited to cash held in the Proceeds Account and, if necessary, the DIP Facility Blocked Account (to the extent otherwise available to be borrowed under the DIP Credit Facility but for the occurrence of the Event of Default), but not the Lender Reserve Account or any amounts from time to time on deposit therein), after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(e) Application of Carve Out Reserves.

i. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until indefeasibly paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed first to the DIP Lender on account of the DIP Obligations until indefeasibly paid in full, and thereafter to the Prepetition Lender.

ii. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in which case any such excess shall be paid to the Prepetition Lender.

iii. Notwithstanding anything to the contrary in the DIP Orders or the DIP Loan Documents, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 13(d), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 13(d), prior to making any payments to the DIP Lender or the Prepetition Lender, as applicable.

iv. Notwithstanding anything to the contrary in the DIP Orders, the DIP Loan Documents, or the Prepetition Facility Documents, following delivery of a Carve Out Trigger Notice, the DIP Lender, and the Prepetition Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets, as well as cash held in the DIP Facility Blocked Account and/or the Proceeds Account (but not including the Lender Reserve Account, to which the Carve Out shall have no recourse) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a first-

lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lender for application in accordance with the DIP Loan Documents.

v. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall, and (iii) in no way shall the Initial DIP Budget, any subsequent DIP Budget, Carve-Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors, nor construed as a cap or limitation on the obligations set forth in clause (i) of the definition of Carve-Out. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, the Roll-Up, the Adequate Protection Liens, the Prepetition Obligations, the DIP Superpriority Claims, and any and all other liens or claims securing the DIP Obligations and the Prepetition Obligations, including any adequate protection liens and claims (but, for the avoidance of doubt, shall not in any event be senior to any interest of the DIP Lender and the Prepetition Lender in, and shall not have any recourse to, the Lender Reserve Account or any amounts from time to time on deposit therein).

(f) Payment of Allowed Professional Fees Prior to the Carve-Out Declaration Date. Any payment or reimbursement made prior to the occurrence of the Carve-Out Declaration Date in respect of any Allowed Professional Fees shall not reduce the Post Carve-Out Trigger Cap.

(g) None of the DIP Lender or the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional, to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, or to fund any amounts in excess of the DIP Term Loan Facility Amount (subject to the terms and conditions of this Interim Order and the other DIP Loan Documents. The DIP Lender and the Prepetition Lender reserve the right to review and object to any fee statement, interim application, or monthly application issued or filed by the Professionals.

(h) Payment of Allowed Professional Fees on or After the Carve-Out Declaration Date. So long as the Carve Out Reserves have been fully funded, following delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted. Any payment or reimbursement made on or after the occurrence of the Carve-Out Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

14. **Payment of Compensation**. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any of the Debtors or the Committee (if any) or shall limit or otherwise affect the right of the DIP Lender or the Prepetition Lender or any other party in interest to object to the allowance and payment of any such fees and expenses. No professional fees shall be paid absent a Court order allowing such payment, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals. So long as no Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed by the Court and payable under sections 330 and 331 of the Bankruptcy Code or compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and the DIP Lender, as the same may be due and payable, and the same shall not reduce the Post Carve-Out Trigger Notice Cap.

15. **Section 506(c) Claims**. As a further condition of the DIP Term Loan Facility, any obligation of the DIP Lender to make DIP Loans, and the Debtors' authorization to use the Cash Collateral (and the consent of the DIP Lender and the Prepetition Lender to the payment of the Carve-Out to the extent provided herein), the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights, benefits, or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, and the DIP Collateral, and subject to the entry of the Final Order granting such relief, the Prepetition Lender, the Adequate Protection Liens, the Prepetition Liens, and the Prepetition

Collateral. Except to the extent of the Carve-Out, nothing contained in this Interim Order, in the Final Order, or in the other DIP Loan Documents shall be deemed a consent by the Prepetition Lender or the DIP Lender to any charge, lien, assessment, or claim against, or in respect of, the DIP Collateral or the Prepetition Collateral under sections 105 or 506(c) of the Bankruptcy Code or otherwise, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

16. **Collateral Rights; Limitations in Respect of Subsequent Court Orders**. Without limiting any other provisions of this Interim Order, unless the DIP Lender and the Prepetition Lender have provided their prior written consent, it shall be an Event of Default in accordance with the terms of the DIP Credit Agreement for there to be entered in these Chapter 11 Cases, or in any Successor Case, any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to this Interim Order to or for the benefit of the DIP Lender or the Prepetition Lender or (ii) the use of proceeds of the DIP Facility or Cash Collateral for any purpose other than as permitted under the DIP Credit Agreement and in accordance with this Interim Order and the Approved Budget.

17. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of paragraph 16 hereof, if at any time prior to the indefeasible repayment and satisfaction in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to make DIP Loans, including subsequent to the confirmation of any Chapter 11 plan

with respect to the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt in violation of this Interim Order or the other DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral in the amount necessary to satisfy all DIP Obligations then outstanding shall immediately be turned over to the DIP Lender for the indefeasible repayment and satisfaction in full in cash of all DIP Obligations then outstanding. For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt pursuant to section 364 of the Bankruptcy Code at any time prior to the indefeasible repayment in full in cash of the DIP Obligations and the Prepetition Obligations, the Prepetition Lender's rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

18. **Cash Management**. From and after the date of the entry of this Interim Order, the Debtors shall maintain cash management consistent with prepetition practices and in accordance with the DIP Credit Agreement, including, without limitation, clauses 36 and 37 thereof. Except as otherwise permitted under the DIP Credit Agreement or otherwise agreed to in writing by the DIP Lender and the Prepetition Lender, the Debtors shall maintain no accounts except those identified in any order of this Court approving the maintenance of the Debtors' cash management system, which order shall be in form and substance consistent with the DIP Loan Agreement and otherwise acceptable to the DIP Lender (the "Cash Management Order"). It shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement if the Debtors' cash

management system shall not at all times be maintained in accordance with the terms of the DIP Loan Documents and the Cash Management Order in all material respects, and otherwise in a manner which shall be reasonably satisfactory to the DIP Lender in accordance with the DIP Credit Agreement. The DIP Lender shall be deemed to have "control" over all cash management accounts (including the DIP Facility Blocked Account and the Proceeds Account) for all purposes of perfection under the Uniform Commercial Code pursuant to this Interim Order and, if required, pursuant to control agreements acceptable to the DIP Lender. The Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in the Cash Management Order), are authorized and directed to honor the terms of this Interim Order, including the "control" over cash management accounts (including the DIP Facility Blocked Account, the Proceeds Account, and the Lender Reserve Account).

19. **Disposition of DIP Collateral**. It shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement if the Debtors shall sell (including, without limitation, any sale and leaseback transaction), transfer (including any assignment of rights), lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as expressly permitted under the DIP Credit Agreement, or pursuant to an Approved Plan.

20. **Survival of Certain Provisions**. In the event of the entry of any order converting any of these Chapter 11 Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the Carve-Out shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP

Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claim, and Carve-Out shall maintain their respective priorities as provided by this Interim Order.

21. **Events of Default; Rights and Remedies Upon Event of Default**.

(a) Any automatic stay otherwise applicable to the DIP Lender and the Prepetition Lender, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Lender and the Prepetition Lender shall, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Lender to take any or all of the following actions, at the same time or different times, unless the Court orders otherwise, subject only to subparagraph (b) of this paragraph 21 as applicable, be immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral and the Prepetition Collateral, in accordance with this Interim Order, the other DIP Loan Documents, and the Prepetition Facility Documents, as applicable. The term "Termination Date" shall mean the earliest to occur of (i) the Scheduled Maturity Date, (ii) the effective date of any Chapter 11 plan of the Debtors, (iii) the date that is thirty-five (35) days after the Petition Date, if the Final Order has not been entered by such date, (iv) the entry of a court order either (a) dismissing any of the Chapter 11 Cases or converting one or more of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (v) the entry of an order approving the sale of all or substantially all of the

Debtors' assets and property, and (vi) the occurrence of any other Event of Default under this Interim Order or the DIP Credit Agreement.

(b) Notwithstanding the foregoing subparagraph (a) of this paragraph 21, immediately following the giving of notice by the DIP Lender (or, if the DIP Obligations have been indefeasibly paid in full in cash, the Prepetition Lender) to the Debtors, counsel to the Debtors, counsel for the Committee (if any), and the U.S. Trustee of the occurrence of an Event of Default, without any further action or approval of the Court: (i) the DIP Lender may declare all Commitments of the DIP Lender to provide any DIP Term Loans to be immediately terminated, and declare all DIP Loans, all interest thereon, and all other DIP Obligations, to be immediately due and payable; (ii) the Debtors shall have no right to request or, subject only to paragraph 21(b) hereof, use any proceeds of any DIP Loans or DIP Collateral, or to use Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents and this Interim Order; *provided* that during the Default Notice Period (as defined below), the Debtors shall be permitted to continue to use Cash Collateral and proceeds of DIP Loans in the Proceeds Account solely (x) in the ordinary course of business and in accordance with the Approved Budget and the other DIP Loan Documents to fund expenses critically necessary to preserve the value of the DIP Collateral and (y) to satisfy the Carve-Out in accordance with this Interim Order; (iii) the Debtors shall deliver and cause the delivery of the proceeds of the DIP Loans and the DIP Collateral to the DIP Lender as provided herein and in the DIP Loan Documents subject only to the funding of the Carve-Out and the proviso set forth in subsection (ii) above; and (iv) the DIP Lender shall be permitted to apply such proceeds in accordance with the

terms of this Interim Order and the DIP Loan Documents. The Debtors and any Committee shall be entitled to an emergency hearing before this Court within seven (7) calendar days after the giving of written notice by the DIP Lender or the Prepetition Lender, as applicable, of the occurrence of an Event of Default (such 7-calendar day period, the "Default Notice Period"), and each of the Debtors, the DIP Lender, and Prepetition Lender consent to a hearing on an expedited basis, at which hearing the Court shall consider whether an Event of Default has, in fact, occurred and is continuing; *provided* that if a request for such hearing is made prior to the end of the Default Notice Period but the Court is not available for a hearing during the Default Notice Period, then the Default Notice Period shall be extended to the first available date on which the Court is able to hold such hearing; *provided further* that the DIP Loan Parties and the Committee shall exercise all reasonable efforts to request a hearing during the Default Notice Period. Except as otherwise expressly provided herein, during the Default Notice Period, (i) the DIP Lender may not exercise any rights or remedies in respect of the DIP Collateral and (ii) the Prepetition Lender may not exercise any rights or remedies in respect of the Prepetition Collateral. Nothing herein shall preclude the DIP Lender or the Prepetition Lender from seeking an order from the Court upon written notice (electronically (including via facsimile) in a manner that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the Debtors, and counsel to the Committee (if any) authorizing the DIP Lender or the Prepetition Lender to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than seven (7) calendar days' notice, or the Debtors', Committee's, or any party in interest's right to contest such relief.

(c) If the Debtors or any Committee or any other party in interest, does not contest the occurrence of the Event of Default within the Default Notice Period, or if there is a timely contest of the occurrence of an Event of Default as set forth above and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the DIP Lender and the Prepetition Lender, shall automatically terminate in all respects.

(d) Upon the occurrence of the Termination Date (but subject, only in the case of the occurrence of the Termination Date resulting from an Event of Default, to the provisions of paragraph 21(b) hereof), the DIP Lender and the Prepetition Lender are authorized to exercise all remedies and proceed under or pursuant to the applicable DIP Loan Documents and the Prepetition Facility Documents, this Interim Order, and applicable law.

(e) The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all DIP Obligations and all liabilities and obligations to the Prepetition Lender hereunder and under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Lender and the Prepetition Lender to retain and apply payments, and otherwise enforce their respective rights and remedies hereunder, subject to the provisions of paragraph 21(b) hereof.

(f) The Debtors shall reasonably cooperate with the DIP Lender and the Prepetition Lender in their efforts to enforce their liens and security interests in the DIP Collateral or the Prepetition Collateral, as applicable, in accordance with this Interim Order and the other

DIP Loan Documents and (other than the rights set forth above during the Default Notice Period) the Debtors shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral or the Prepetition Collateral, as applicable.

(g) Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition Lender's or the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtors (including, as the case may be, other or additional adequate protection).

22. **Applications of Proceeds of Collateral, Payments and Collections**.

(a) As a condition to the DIP Loans and the authorization to use Cash Collateral, each Debtor has agreed that proceeds of any DIP Collateral and Prepetition Collateral, any amounts held on account of the DIP Collateral or Prepetition Collateral, and all payments and collections received by the Debtors with respect to all proceeds of DIP Collateral and Prepetition Collateral, shall be used and applied in accordance with the DIP Loan Documents (including repayment and reduction of the DIP Obligations), the Approved Budget and this Interim Order.

(b) Subject to the funding of the Carve-Out, if applicable, upon and after the occurrence of the Termination Date (subject to the provisions of paragraph 21(b), including the Default Notice Period as applicable), all proceeds of DIP Collateral and Prepetition Collateral, including, all Cash Collateral (and, for the avoidance of doubt, including all amounts received in excess of the Threshold Amount), whenever received, shall be paid and applied as follows: (i) *first*, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents until paid and satisfied in full in cash; (ii) *second*,

subject to paragraph 11 hereof, to permanently and indefeasibly repay and reduce any Prepetition Obligations (including any adequate protection obligations) then due and owing in accordance with the Prepetition Facility Documents, until paid and satisfied in full in cash; and (iii) *third*, to the Debtors' estates. For avoidance of doubt, nothing in this Interim Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Loan Documents.

23. **Proofs of Claim, Etc**. None of the DIP Lender or the Prepetition Lender shall be required to file proofs of claim in any of the Chapter 11 Cases or any Successor Case for any claim described herein, and the DIP Obligations, the Adequate Protection Superpriority Claim, and, subject only to paragraph 11 hereto, the Prepetition Obligations, respectively, shall constitute allowed claims in the Chapter 11 Cases. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Case to the contrary, the DIP Lender, and the Prepetition Lender, respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend or supplement, as each sees fit) a proof of claim or aggregate proofs of claim in any of the Chapter 11 Cases or any Successor Case for any claim described herein; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor. Any proof of claim filed by the DIP Lender or the Prepetition Lender shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by the DIP Lender or Prepetition Lender. Any order entered by the Court in relation to the establishment of a bar date for any claim (including

without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Case shall not apply to the DIP Lender or the Prepetition Lender.

24. **Other Rights and Obligations**.

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**. The DIP Lender and the Prepetition Lender have acted in good faith in connection with the DIP Facility, the DIP Loans, the other DIP Loan Documents, the Prepetition Facility Documents, and this Interim Order, and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code to the extent provided therein. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code to the extent provided therein, which is applicable to the DIP Facility as approved by this Interim Order, and notwithstanding any modification, amendment, reversal, vacatur, or stay of any or all of this Interim Order by a subsequent order of the Court or any other court, the DIP Lender and the Prepetition Lender are entitled to the protections provided in section 364(e) of the Bankruptcy Code to the extent provided therein, and no such appeal, modification, amendment, reversal, vacatur, or stay shall affect the validity and enforceability of any DIP Obligations, DIP Superpriority Claim, DIP Lien, Adequate Protection Superpriority Claim, or Adequate Protection Lien, or any other advances made hereunder or the claims, liens, security interest, or priority authorized or created hereby or pursuant to the DIP Loan Documents. Notwithstanding any such modification, amendment, reversal, vacatur, or stay, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment, reversal, vacatur, or stay of any DIP Liens or of the DIP Superpriority Claims granted

to or for the benefit of the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Liens and the DIP Superpriority Claims granted herein, with respect to any such claim.

(b) **Expenses**. To the fullest extent provided in the DIP Loan Documents, the Prepetition Facility Documents, and this Interim Order, the Debtors will pay all expenses incurred by the DIP Lender and the Prepetition Lender (including, without limitation, the reasonable and documented fees and disbursements of their counsel, including, White & Case LLP, FTI Consulting, and any other advisors and other local counsel that they shall retain, and any internal or third-party appraisers, consultants, financial, restructuring, or other advisors and auditors advising any such counsel), without duplication, in connection with (i) the preparation, execution, delivery, funding, and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the administration of the Prepetition Facility Documents, (iii) the Chapter 11 Cases or any Successor Case, and (iv) the enforcement of any rights or remedies under the DIP Loan Documents or the Prepetition Facility Documents, in each case whether or not the transactions contemplated hereby are fully consummated. Notwithstanding any other provisions of this Interim Order, any fees and expenses of the DIP Lender's and Prepetition Lender's professionals shall not be limited to the amounts set forth in the Approved Budget and the Prepetition Lender and the DIP Lender (and, in each case, their consultants, advisors, and professionals) shall not be required to file fee applications, but shall submit an invoice in summary form (which shall not be required to

include time entry detail and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine for fees and expenses incurred after entry of this Interim Order, and the U.S. Trustee reserves the right to seek unredacted copies of such invoices) to the Office of the U.S. Trustee and counsel for the Committee (if any) and counsel to the Debtors. Such invoices shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; provided, however, that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional. Any expenses sought to be reimbursed shall be specified, and broken out by type of expense. Thereafter, within ten (10) calendar days of presentment of such invoices, if no written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made, the Debtors shall pay in cash all such fees and expenses of the Prepetition Lender and the DIP Lender (and, in each case, their consultants, advisors, and professionals). Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise

resolved between the objecting party and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. This Court shall resolve any dispute as to the reasonableness of any fees and expenses. For the avoidance of doubt, and without limiting any of the forgoing or any other provision of this Interim Order or the fees specified in the DIP Credit Agreement, upon entry of this Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to section 364 of the Bankruptcy Code, entitled to all of the protections of section 364(e) of the Bankruptcy Code that may apply to such fees, and are deemed fully earned, indefeasibly paid, non-refundable, irrevocable, and non-avoidable as of the date of this Interim Order.

(c) **Credit Bid.** The DIP Lender and, subject to paragraph 11 and section 363(k) of the Bankruptcy Code, the Prepetition Lender shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the DIP Obligations and, subject to paragraph 11, the Prepetition Obligations and any Adequate Protection Superpriority Claims, or any of them, in connection with any sale of all or any portion of the DIP Collateral or the Prepetition Collateral, including (without limitation) any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, without the need for further court order authorizing the same. No Debtor shall object to the DIP Lender or, subject to paragraph 11, the Prepetition Lender credit bidding up to the full amount of the applicable outstanding DIP

Obligations, Prepetition Obligations and Adequate Protection Superpriority Claims), in each case including any accrued interest, fees, and expenses, in any sale of any DIP Collateral or Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. If the DIP Lender and, subject to paragraph 11, the Prepetition Lender (either directly or through one or more acquisition vehicles) make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any Prepetition Collateral or DIP Collateral, then for purposes of such auction or sale process or any applicable order of this Court, each of the DIP Lender and the Prepetition Lender shall be deemed to be a "qualified bidder" and its bid shall be a "qualified bid" regardless of whether any qualified bidder or qualified bid requirements are satisfied.

(d) **Binding Effect**. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender and the Prepetition Lender, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(e) **No Waiver**.

(I) The failure of the DIP Lender or the Prepetition Lender to seek relief or otherwise exercise any of their rights and remedies under this Interim Order, the other DIP Loan Documents, or the Prepetition Facility Documents or otherwise, as applicable, shall not constitute

a waiver of the DIP Lender's or the Prepetition Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses, or remedies of the DIP Lender or the Prepetition Lender under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Lender and the Prepetition Lender (i) to request conversion of any of the Chapter 11 Cases to cases under Chapter 7, dismissal of any of the Chapter 11 Cases, or the appointment of a trustee in any of the Chapter 11 Cases, or (ii) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan, or (iii) to exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise).

(II) The failure or delay on the part of the DIP Lender or the Prepetition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Facility Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder

by the DIP Lender or the Prepetition Lender shall be implied by any inaction or acquiescence by the DIP Lender or the Prepetition Lender, respectively.

(f) **No Third Party Rights**. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, third party, or incidental beneficiary.

(g) **No Marshaling**. Neither the DIP Lender nor, subject to the entry of the Final Order granting such relief, the Prepetition Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

(h) **Section 552(b)**. The Prepetition Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to the entry of the Final Order granting such relief, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

(i) **Amendment**. The Debtors and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Loan Documents (a "DIP Loan Amendment") without further approval of the Court, provided that any modification or amendment that (i) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (ii) increases the commitments of the DIP Lender to make DIP Term Loans under the DIP Loan Documents, (iii) changes the Termination Date or (iv) otherwise is materially adverse to the interests of the Debtors or their estates must, in each case,

be set forth in writing, signed by, or on behalf of, the Debtors and the DIP Lender and approved by the Court after notice to parties in interest, and provided further that the Debtors and the DIP Lender reserve the right to seek approval of any DIP Loan Amendment on an expedited basis.

(j) **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Interim Order prevail.

(k) **Other Case Orders**. The Debtors shall not seek entry of, and the Court shall not enter, any order approving bidding procedures, any sale of assets, or a disclosure statement or plan of reorganization in the Chapter 11 Cases unless such order and the underlying motion are in form and substance satisfactory to the DIP Lender, consistent with the DIP Loan Documents.

(l) **Survival of Interim Order**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Chapter 11 Cases, (iv) withdrawing of the reference of any of the Chapter 11 Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court. The terms and provisions of this Interim Order, the DIP Loan Documents, and the Prepetition Facility Documents, including the DIP Liens and DIP

Superpriority Claims granted pursuant to this Interim Order, the DIP Loan Documents, and the Prepetition Facility Documents and any priorities and protections granted to or for the benefit of the DIP Lender and Prepetition Lender (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim) hereunder and thereunder, shall continue in full force and effect to the fullest extent provided by section 364(e) of the Bankruptcy Code.

(m) **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(n) **No Waivers or Modification of Interim Order**. The Debtors irrevocably waive any right to seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and the Prepetition Lender, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender or the Prepetition Lender. The Debtors may not seek to modify or to alter relative lien priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection Liens set forth in this Interim Order.

(o) **Waiver of any Applicable Stay**. Any applicable stay (including, without limitation, under Bankruptcy Rules 6003 and 6004(h)) is hereby waived and shall not apply to this Interim Order.

25. **Preservation of Tax Attributes**. The following provisions shall apply *nunc pro tunc* to the Petition Date and after the entry of this Interim Order:

(a) **Tax Attributes**. The net operating loss carryforwards and other U.S. federal, state, local, and non-U.S. tax attributes of the Debtors (collectively, the "Tax Attributes")

are property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code, and any act to obtain possession of, or to exercise control over, the Tax Attributes is stayed pursuant to section 362(a)(3) of the Bankruptcy Code.

(b) **Definitions**. As used in this paragraph 25: (i) "Code" means the Internal Revenue Code of 1986, as amended; and (ii) "Tax Restriction Termination Date" means (A) if the Approved Plan becomes effective, the second anniversary of the effective date of the Approved Plan, and (B) otherwise, the date on which the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(c) **Restrictions on Declarations of Worthlessness**. The DIP Lender shall not claim, report, or otherwise take a position, on any U.S. tax return (in the event submitted by it) that any equity interests in any of the Debtors are worthless or have been abandoned, or otherwise claim on a U.S. tax return any loss or deduction in respect of the worthlessness or abandonment of any such equity interests, whether held directly or indirectly, for any U.S. tax year ending on or before the effective date of the Approved Plan, it being acknowledged that the DIP Lender is a "50-percent shareholder" (as defined in section 382(g)(4)(D) of the Code) with respect to the DIP Borrower; provided, however, that nothing in this subparagraph (c) shall prohibit the DIP Lender from taking any position, or claiming any loss or deduction, to the extent required under applicable law (including any mandatory tax reporting obligation).

(d) **Restrictions on Transfers of Equity Interests**. Prior to the Tax Restriction Termination Date, the DIP Lender shall not, directly or indirectly, sell, transfer or otherwise dispose of (including by pledge, hypothecation, or grant of any option, warrant, or other

derivative or economic interest, in whole or in part, any equity interests directly held by it in a holding company of the Debtors that would reasonably be expected to result in an "ownership change" of the Borrower within the meaning of Section 382 of the Code; provided that this subparagraph (d) shall not apply to the granting or perfection of the DIP Liens, the Adequate Protection Liens, or the liens securing the Prepetition Obligations.

(e) **Consent**. The DIP Lender may take an action otherwise restricted by subparagraph (d) of this paragraph 25 with the prior written consent of the Debtors (or, on and after the effective date of the Approved Plan, the reorganized Debtors) (such consent not to be unreasonably withheld, conditioned or delayed), given in consultation with the Debtors' tax advisors and based on a determination that such action would not reasonably be expected to (i) result in an "ownership change" of the DIP Borrower within the meaning of section 382 of the Code, (ii) adversely affect the DIP Borrower's ability to qualify for the application of section 382(l)(5) of the Code or, if applicable, section 382(l)(6) of the Code, or (iii) otherwise reduce or limit the Debtors' net operating loss carryforwards or other material U.S. federal income tax attributes.

(f) **No Violation**. Notwithstanding anything to the contrary in this paragraph 25, the DIP Lender shall not be in violation of the foregoing restrictions on account of any action taken by any direct or indirect owner of equity interests in a Debtor that is itself a Debtor, whether such action is taken by such Debtor directly, by an administrator, liquidator, receiver or other insolvency officeholder appointed in respect of such Debtor, or pursuant to or in connection with any local insolvency, restructuring or similar proceeding commenced in respect of such Debtor.

(g) **Consent and Agreement of the DIP Lender**. The DIP Lender, in each of its capacities as DIP Lender, Prepetition Lender, and direct or indirect holder of equity interests in the Debtors, consents to the relief set forth in this paragraph 25, agrees to be bound hereby, and acknowledges that monetary damages would be an inadequate remedy for any breach hereof and that the Debtors shall only be entitled to specific performance and injunctive relief in respect of any such breach. The Debtors hereby acknowledge that they shall not be entitled to monetary damages of any kind in respect of any breach by the DIP Lender of this paragraph 25, nor shall the Debtors be entitled to any other remedy available at law or in equity.

(h) **Survival**. The restrictions set forth in this paragraph 25 shall survive the termination of the commitments under, and the indefeasible repayment in full of, the DIP Facility, and shall survive the entry of any order described in paragraph 24(l) hereof, and shall continue in these proceedings and in any Successor Case, in each case through the Tax Restriction Termination Date. The restrictions set forth in this paragraph 25 are in addition to, and not in limitation of, the corresponding covenants of the DIP Lender set forth in the DIP Loan Documents.

26. **Final Hearing**.

(a) A Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [●], 2026 at [●] _.m. (EST) at the United States Bankruptcy Court for the District of New Jersey.

(b) On or before two (2) business days after entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this

Interim Order and the Motion, on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the clerk of the Court no later than [●] at [●] _.m. (EST), which objections shall be served so that the same are received on or before such date by: (a) proposed counsel for the Debtors, (i) Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193, Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com), Matthew J. Williams (mjwilliams@gibsondunn.com), Keith R. Martorana (kmartorana@gibsondunn.com), Robert E. Fitzgerald (rfitzgerald@gibsondunn.com), and Tommy Scheffer (tscheffer@gibsondunn.com) and (ii) Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn. Michael D. Sirota (msirota@coleschotz.com), Warren A. Usatine (wusatine@coleschotz.com), Seth Van Aalten (svanaalten@coleschotz.com), Anthony De Leo (adeleo@coleschotz.com), and Matteo Percontino (mpercontino@coleschotz.com); (b) counsel to the DIP Lender and Prepetition Lender, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Scott Greissman (sgreissman@whitecase.com) and Elizabeth Feld (efeld@whitecase.com); and (c) Office of the United States Trustee, Region 3: District of New Jersey, One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, New Jersey 07102, Attn: Jeffrey M. Sponder (jeffrey.m.sponder@usdoj.gov) and Rachel Wolf (Rachel.wolf@usdoj.gov).

27. **Retention of Jurisdiction**. The Court has and will retain jurisdiction interpret, implement, and enforce this Interim Order according to its terms.

# **EXHIBIT 1**

DIP CREDIT AGREEMENT

***Execution Version***

**Dated September 8, 2026**

# Debtor-in-Possession Facility Agreement

between

**LIV Golf Incorporated**
as Borrower

**Each entity listed in Schedule 1**
as Original Guarantors

**The Public Investment Fund of the Kingdom of Saudi Arabia**
as DIP Lender

# Table of Contents

| | | Page |
|---|---|---|
| 1. | Definitions and Interpretation | 1 |
| 2. | The DIP Facility | 22 |
| 3. | Purpose | 24 |
| 4. | Conditions Precedent to each Borrowing | 25 |
| 5. | Borrowing | 27 |
| 6. | Repayment | 28 |
| 7. | Prepayment and Cancellation | 28 |
| 8. | Interest | 31 |
| 9. | Interest Periods | 31 |
| 10. | Tax Gross-Up and Indemnities | 33 |
| 11. | Increased Costs | 36 |
| 12. | Other Indemnities | 37 |
| 13. | Mitigation by the DIP Lender | 38 |
| 14. | Costs and Expenses | 39 |
| 15. | Guarantee and Indemnity | 40 |
| 16. | Representations | 44 |
| 17. | Information Undertakings | 51 |
| 18. | General Undertakings | 54 |
| 19. | Events of Default | 65 |
| 20. | Changes to the DIP Lender | 72 |
| 21. | Changes to the Obligors | 72 |
| 22. | Conduct of Business by the DIP Lender | 74 |
| 23. | Payment Mechanics | 74 |
| 24. | Set-Off | 76 |
| 25. | Notices | 76 |
| 26. | Calculations and Certificates | 78 |
| 27. | Partial Invalidity | 78 |
| 28. | Remedies and Waivers | 78 |
| 29. | Amendments and Waivers | 78 |
| 30. | Confidentiality | 81 |
| 31. | Counterparts | 83 |
| 32. | Governing Law | 84 |
| 33. | Enforcement | 84 |
| 34. | DIP Priority and Collateral | 85 |
| 35. | Adequate Protection | 86 |
| 36. | DIP Facility Blocked Account and Lender Reserve Account | 87 |

**Page**

37. Proceeds Account ... 88

38. DIP Order ... 89

39. Additional Covenants, Representations, and Warranties ... 89

**Schedule 1 The Original Guarantors ... 91**

**Schedule 2 Conditions Precedent ... 93**

Part 1 Conditions Precedent to Initial Borrowing ... 93

Part 2 Conditions Precedent to Interim DIP Availability ... 96

Part 3 Conditions Precedent to Final DIP Availability ... 98

Part 4 Conditions Precedent Required to be Delivered by an Additional Guarantor ... 99

**Schedule 3 Borrowing Request ... 101**

**Schedule 4 Form of Accession Deed ... 102**

**Schedule 5 Disbursement Request ... 103**

**Schedule 6 Plan Term Sheet ... 105**

**This Agreement** is dated September 8, 2026 and made

**Between:**

**(1)** **LIV Golf Investments Ltd**, a company incorporated under the laws of Jersey with registration number 136610 whose registered office is at 19-21 Broad Street, St. Helier, JE2 3RR, Jersey as an original guarantor and as a debtor and debtor-in-possession (the "**Parent**");

**(2)** **LIV Golf Holdings Ltd**, a company incorporated under the laws of Jersey with registration number 136131 whose registered office is at 19-21 Broad Street, St. Helier, JE2 3RR, Jersey as an original guarantor and as a debtor and debtor-in-possession ("**Holdings**");

**(3)** **LIV Golf Incorporated**, a company incorporated under the laws of the State of Delaware, with registration number 6019012 whose executive offices are at 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 as borrower and as a debtor and debtor-in-possession (the "**Borrower**");

**(4)** **The Subsidiaries** of the Parent listed in Schedule 1 (*The Original Guarantors*) as original guarantors and as debtors and debtors-in-possession (together with the Parent and Holdings, the "**Original Guarantors**"); and

**(5)** **The Public Investment Fund of the Kingdom of Saudi Arabia** as lender (the "**DIP Lender**").

**It is agreed** as follows:

**Section 1**
**Interpretation**

## 1. Definitions and Interpretation

### 1.1 Definitions

In this Agreement:

"**Acceptable Bank**" means:

(a) a bank or financial institution which has a rating for its long-term unsecured and non- credit enhanced debt obligations of A- or higher by Standard & Poor's Rating Services or Fitch Ratings Ltd or A3 or higher by Moody's Investors Service Limited or a comparable rating from an internationally recognised credit rating agency; or

(b) any other bank or financial institution approved by the DIP Lender.

"**Accession Deed**" means a document substantially in the form set out in Schedule 4 (*Form of Accession Deed*).

"**Accounting Principles**" means in relation to the Group generally accepted accounting principles in Jersey, including IFRS.

"**Accounting Reference Date**" means 31 December.

"**Adequate Protection Liens**" shall have the meaning given to such term in the DIP Order.

"**Adequate Protection Superpriority Claim**" shall have the meaning given to such term in the DIP Order.

"**Additional Guarantor**" means a Debtor which becomes an Additional Guarantor in accordance with Clause 21 (*Changes to the Obligors*).

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Approved Budget**" has the meaning assigned to such term in Clause 3.3 (*DIP Budget*).

"**Approved Budget Variance Report**" means a weekly report: (i) setting forth in reasonable detail actual cash receipts and expenditures for the applicable Budget Period and all prior Budget Periods, in each case on both an individual line item basis and a cumulative basis, as compared to the projected amounts set forth in the then-applicable Approved Budget (which budget variances shall be tested such that, in week 1 of the period covered by such Approved Budget, only week 1 variances are tested; in week 2 of the period covered by such Approved Budget, weeks 1 and 2 variances are tested on a cumulative basis; and so on through the final week of the period covered by such Approved Budget, at which point all weeks covered by such Approved Budget are tested on a cumulative basis), including an indication as to whether each variance is temporary or permanent and an explanation, in reasonable detail, of any material variance; and (ii) demonstrating that the Obligors are in compliance with the Approved Budget (subject to the Permitted Variance) for the applicable Budget Period and on a cumulative basis for the Budget Period and all prior Budget Periods covered by such Approved Budget. Each Approved Budget Variance Report shall contain supporting information in form and substance reasonably satisfactory to the DIP Lender and the Obligors.

"**Approved Plan**" means a chapter 11 plan of reorganization implementing the transactions and containing the other terms and conditions set forth in the Plan Term Sheet, and which is otherwise in form and substance satisfactory to the DIP Lender.

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Availability Period**" means the period from and including the Closing Date to the date that is thirty-five (35) days after the Petition Date (or such other date agreed by the DIP Lender from time to time).

"**Available Facility**" means the DIP Facility Commitment **minus** the sum of:

(a) the amount of any outstanding DIP Loan; and

(b) in relation to any proposed Borrowing, the amount of any DIP Loan that is due to be made available on or before the proposed Borrowing Date.

"**Avoidance Actions"** mean any claims and causes of action of the Obligors of any kind or nature and all proceeds thereof (other than any actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code).

"**Bankruptcy Code**" means Title 11 of The United States Code (entitled "Bankruptcy"), as amended from time to time and as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of New Jersey.

"**Borrowing**" means a borrowing of the DIP Facility pursuant to a Borrowing Request.

"**Borrowing Date**" means the date of a Borrowing, being the date on which the relevant DIP Loan is to be made.

"**Borrowing Request**" means a notice substantially in the form set out in Schedule 3 (*Borrowing Request*).

"**Budget Period**" means each successive one-week period, commencing with the first full calendar week following the Petition Date.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in New York, London, Jersey and Riyadh.

"**Capital Expenditure**" means any expenditure or obligation in respect of expenditure which, in accordance with the Accounting Principles, is treated as capital expenditure (and including the capital element of any expenditure or obligation incurred in connection with a Finance Lease).

"**Carve-Out**" has the meaning assigned to such term in the DIP Order.

"**Carve-Out Trigger Notice"** has the meaning assigned to such term in the DIP Order.

"**Cash Collateral**" has the meaning assigned to such term in the DIP Order.

"**Cash Equivalent Investments**" means at any time:

(a) certificates of deposit maturing within one (1) year after the relevant date of calculation and issued by an Acceptable Bank;

(b) any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one (1) year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c) commercial paper not convertible or exchangeable to any other security:

(i) for which a recognised trading market exists;

(ii) issued by an issuer incorporated in the United States of America, the United Kingdom, any member state of the European Economic Area or any Participating Member State;

(iii) which matures within one (1) year after the relevant date of calculation; and

(iv) which has a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d) any investment in money market funds which:

(i) have a credit rating of either A-1 or higher by Standard & Poor's Rating Services or F1 or higher by Fitch Ratings Ltd or P-1 or higher by Moody's Investors Service Limited; and

(ii) invest substantially all their assets in securities of the types described in paragraphs (a) to (c) above,

to the extent that investment can be turned into cash on not more than thirty (30) days' notice; or

(e) any other debt security approved by the DIP Lender,

in each case, to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Liens (other than Liens arising under the Transaction Security Documents).

"**Cash Management Motion**" has the meaning given to such term in the Plan Term Sheet.

"**Cash Management Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" or "second day" hearing, together with all extensions, modifications and amendments entered by the Bankruptcy Court thereto, in form and substance satisfactory to the DIP Lender, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements or such other arrangements as shall be reasonably satisfactory to the DIP Lender and the Obligors in all material respects.

"**CBIR**" means the Cross-Border Insolvency Regulations 2006 (SI 2006/1030).

"**Change of Control**" means any person or group of persons acting in concert gains direct or indirect control of the Parent. For the purposes of this definition:

(a) "**control**" of the Parent means:

(i) the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(A) cast, or control the casting of, more than one-half of the maximum number of votes that might be cast at a general meeting of the Parent;

(B) appoint or remove all, or the majority, of the directors or other equivalent officers of the Parent; or

(C) give directions with respect to the operating and financial policies of the Parent with which the directors or other equivalent officers of the Parent are obliged to comply; or

(ii) the holding beneficially of more than 50 per cent. (50%) of the issued share capital of the Parent (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); and

(b) "**acting in concert**" means, a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition directly or indirectly of shares in the Parent by any of them, either directly or indirectly, to obtain or consolidate control of the Parent.

"**Chapter 11 Cases**" means the cases commenced by the Debtors in the Bankruptcy Court on or after the Petition Date, as applicable.

"**Charged Property**" means all of the assets of the Obligors which from time to time are, or are expressed to be, the subject of the Transaction Security.

"**Closing Date**" means the date on which the DIP Lender confirms to the Borrower satisfaction or waiver of the initial conditions precedent required to be delivered pursuant to Clause 4.1 (*Initial Conditions Precedent*).

"**Code**" means the US Internal Revenue Code of 1986.

"**Conditions Precedent to Final DIP Availability**" has the meaning given to such term in Part 3 (*Conditions Precedent to Final DIP Availability*) of Schedule 2 (*Conditions Precedent*).

"**Conditions Precedent to Interim DIP Availability**" has the meaning given to such term in Part 2 (*Conditions Precedent to Interim DIP Availability*) of Schedule 2 (*Conditions Precedent*).

"**Confidential Information**" means all information relating to the Parent, any Obligor, the Group, the DIP Finance Documents or the DIP Facility of which the DIP Lender becomes aware in its capacity as, or for the purposes of becoming, the DIP Lender or which is received by the DIP Lender in relation to, or for the purposes of becoming the DIP Lender under, the DIP Finance Documents or the DIP Facility or which is received from any member of the Group or any of its advisers in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(a) is or becomes public information other than as a direct or indirect result of any breach by the DIP Lender of Clause 30 (*Confidentiality*); or

(b) is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers;

(c) is known by the DIP Lender before the date the information is disclosed to it from any member of the Group or its advisers or is lawfully obtained by the DIP Lender after that date, from a source which is, as far as the DIP Lender is aware, unconnected with the Group and which, in either case, as far as the DIP Lender is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality; or

(d) is disclosed to the DIP Lender in its capacity as direct or indirect shareholder of the Parent.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a form agreed between the Borrower and the DIP Lender.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming a chapter 11 plan of reorganization for the Debtors, which order shall be in form and substance satisfactory to the DIP Lender.

"**Consent Letter**" has the meaning given to such term in Schedule 2 (*Conditions Precedent to Interim DIP Availability*).

"**Debtors**" means, collectively, (a) the Obligors, (b) the Subsidiaries of the Parent that filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on the Petition Date and (c) each other Subsidiary of the Parent that, after the Petition Date, files a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, whose case is jointly administered with the cases referred to in paragraph (b) above.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 19 (*Events of Default*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the DIP Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**DIP Budget**" means a rolling consolidated 13-week cash flow forecast and budget of the Debtors showing in reasonable line-item detail receipts and operating disbursements (including all professional fees) broken down by week, including anticipated uses of the DIP Facility, revenues or other payments projected to be received, and all expenditures proposed to be made during such period, prepared by the Debtors and approved by the DIP Lender. The initial DIP Budget shall be appended to the Interim DIP Order and shall be in form and substance satisfactory to the DIP Lender. The DIP Budget shall in each case include a line-item for weekly professional fee forecasts for each professional.

"**DIP Collateral**" means any and all assets of the Obligors, wherever located, that become subject to a Lien (other than Adequate Protection Liens) pursuant to the DIP Order and the other Transaction Security Documents, including, without limitation:

(a) Prepetition Collateral;

(b) Avoidance Actions;

(c) proceeds of all Avoidance Actions (subject to entry of the Final DIP Order);

(d) all cash in bank accounts (including in the DIP Facility Blocked Account, the Lender Reserve Account and the Proceeds Account and any cash remaining in the Funded Reserve Account, after payment in full of the Carve-Out); and

(e) all proceeds of the foregoing.

"**DIP Facility**" means the term loan facility made available under this Agreement, in two draws consisting of the Interim DIP Availability and the Final DIP Availability, as described in Clause 2 (*The DIP Facility*).

"**DIP Facility Blocked Account**" has the meaning given to such term in Clause 36.1 (*Establishment of DIP Facility Blocked Account*).

"**DIP Facility Commitment**" means USD 49,600,000, to the extent not cancelled or reduced under this Agreement.

"**DIP Finance Document**" means this Agreement, the DIP Order, the Approved Budget, any Accession Deed, any Transaction Security Document, any Borrowing Request and any other document designated as such by the DIP Lender and the Borrower.

"**DIP Lender Advisers**" means White & Case LLP, legal advisers to the DIP Lender in England and New York, Ogier (Jersey) LLP, legal advisers to the DIP Lender in Jersey, FTI Consulting, financial adviser to the DIP Lender, and any other counsel and consultants of the DIP Lender, including any local counsel and other consultants in each relevant jurisdiction.

"**DIP Liens**" has the meaning assigned to such term in the DIP Order.

"**DIP Loan**" means a loan made or to be made under the DIP Facility or the principal amount outstanding for the time being of that loan.

"**DIP Motion**" means a motion filed by the Debtors seeking entry of the DIP Order, which shall be in form and substance satisfactory to the DIP Lender.

"**DIP Obligations**" means all present and future liabilities and obligations at any time due, owing or incurred by any Obligor to the DIP Lender under the DIP Finance Documents, both actual and contingent and whether incurred solely or jointly and as principal or surety or in any other capacity.

"**DIP Order"** means, as the context may require, the Interim DIP Order or the Final DIP Order, whichever is then applicable.

"**DIP Superpriority Claims**" has the meaning given to such term in Clause 34.1 (*DIP Superpriority Claims*).

"**Disbursement Request**" means a notice substantially in the form set out in Schedule 5 (*Disbursement Request*).

"**Disclosure Statement**" means a disclosure statement in respect of a chapter 11 plan of the Debtors, which disclosure statement shall be in form and substance satisfactory to the DIP Lender.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the adequacy of the Disclosure Statement, which shall be in form and substance satisfactory to the DIP Lender.

"**Disruption Event**" means either or both of:

(a) a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the DIP Facility (or otherwise in order for the transactions contemplated by the DIP Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b) the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i) from performing its payment obligations under the DIP Finance Documents; or

(ii) from communicating with other Parties in accordance with the terms of the DIP Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

"**English Court**" means the High Court of Justice of England and Wales.

"**English Entities**" means LIV Golf Ltd and LIV Golf Events Ltd, each incorporated in England and Wales.

"**English Obligor**" means any Obligor incorporated in England and Wales.

"**Equity Interest**" means, with respect to any person, any share of capital stock of (or other ownership or profit interests in) such person, any warrant, option or other right for the purchase or other acquisition from such person of any share of capital stock of (or other ownership or profit interests in) such person whether or not certificated, any security convertible into or exchangeable for any share of capital stock of (or other ownership or profit interests in) such person or warrant, right or option for the purchase or other acquisition from such person of such shares (or such other interests), and any other ownership or profit interest in such person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such share, warrant, option, right or other interest is authorized or otherwise existing on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" means any person that for purposes of Title I or Title IV of ERISA or section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with any Obligor or a Subsidiary of an Obligor under section 414(b), (c), (m) or (o) of the Code or section 4001 of ERISA.

"**ERISA Event**" shall mean any one or more of the following:

(a) any "reportable event", as defined in section 4043 of ERISA, with respect to a Plan, as to which the PBGC has not waived the requirement of section 4043(a) of ERISA that it be notified of such event;

(b) the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of section 4041(b) of ERISA, the filing under section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under section 4041(c) of ERISA;

(c) the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

(d) the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under section 430 of the Code or section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; the failure to satisfy the minimum funding standard under section 412 of the Code or section 302 of ERISA, whether or not waived; or the filing of any request for or receipt of a minimum funding waiver under section 412 of the Code with respect to any Plan or Multiemployer Plan, or that such filing may be made; or a determination that any Plan is, or is expected to be, considered an "at risk" plan within the meaning of section 430 of the Code or section 303 of ERISA;

(e) engaging in a non exempt prohibited transaction within the meaning of section 4975 of the Code or section 406 of ERISA;

(f) the complete or partial withdrawal of any Obligor, Subsidiary of an Obligor or any ERISA Affiliate from a Multiemployer Plan, the insolvency under Title IV of ERISA of any Multiemployer Plan; or the receipt by any Obligor, any Subsidiary of an Obligor or any ERISA Affiliate, of any notice, or the receipt by any Multiemployer Plan from any Obligor, Subsidiary of an Obligor or any ERISA Affiliate of any notice, that a Multiemployer Plan is in endangered or critical status under section 305 of ERISA; or

(g) an Obligor, a Subsidiary of an Obligor or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under section 4007 of ERISA).

"**Event of Default**" means any event or circumstance specified as such in Clause 19 (*Events of Default*).

"**Facility Office**" means the office or offices through which the DIP Lender will perform its obligations under this Agreement.

"**FATCA**" means:

(a) sections 1471 to 1474 of the Code or any associated regulations;

(b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c) any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Deduction**" means a deduction or withholding from a payment under a DIP Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Finance Lease**" means any lease or hire purchase contract which would, in accordance with the applicable Accounting Principles, be treated as a finance or capital lease but excluding any real estate or operating lease which is or would be treated as a real estate or operating lease in accordance with the Accounting Principles as were applied as at 31 December 2018, but which

would be treated as a finance or capital lease in accordance with the Accounting Principles as applied by members of the Group at any subsequent relevant time.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a) moneys borrowed and debit balances at banks or other financial institutions;

(b) any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c) any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d) the amount of any liability in respect of Finance Leases;

(e) receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f) any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g) any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(h) any amount raised by the issue of shares which are redeemable;

(i) any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 180 days after the date of supply;

(j) any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the Accounting Principles; and

(k) the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (j) above.

"**Financial Quarter**" means the period commencing on the day after one Quarter Date and ending on the next Quarter Date.

"**Financial Year**" means the annual accounting period of the Group ending on or about 31 December in each year.

"**Final DIP Availability**" has the meaning given to such term in Clause 2.4(c) (*Final DIP Availability).*

"**Final DIP Availability Date**" has the meaning given to such term in Clause 2.4(a) (*Final DIP Availability).*

"**Final DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility on a final basis on the terms set forth in this Agreement and the other DIP Finance Documents, including the granting of the DIP Liens and DIP Superpriority Claims, containing customary

waivers with respect to section 506(c) of the Bankruptcy Code, of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and of the equitable doctrine of marshalling, and containing customary stipulations, and in form and substance acceptable to the DIP Lender and the Obligors, including in respect of releases of the DIP Lender and the Prepetition Lender.

"**Final Roll-Up**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**Final Roll-Up Obligations**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**First Day Motion**" has the meaning given to such term in Part 2 (*Conditions Precedent to Interim DIP Availability*) of Schedule 2 (*Conditions Precedent*).

"**First Day Order**" means any order of the Bankruptcy Court granting a First Day Motion.

"**Fixed Rate**" means twelve per cent. (12.0%) per annum.

"**Foreign Proceedings**" means, collectively, the UK Recognition Applications and the Jersey Administration.

"**Foreign Representative**" means the person appointed by the English Entities and confirmed by the Bankruptcy Court in the relevant First Day Order to act as the foreign representative of the English Entities for the purposes of the UK Recognition Applications under CBIR.

"**Funded Reserve Account**" has the meaning given to such term in Clause 37.5 (*Carve-Out*).

"**Group**" means the Parent and its Subsidiaries for the time being.

"**Group Structure Chart**" means the group structure chart in the agreed form.

"**Guarantor**" means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 21 (*Changes to the Obligors*).

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

"**HMT**" means His Majesty's Treasury of the United Kingdom.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements.

"**Intellectual Property**" means:

(a) any patents, trade marks, service marks, designs, business names, copyrights, database rights, design rights, domain names, moral rights, inventions, software, trade secrets, confidential information, know how and other intellectual property rights and interests (which may now or in the future subsist), whether registered or unregistered; and

(b) the benefit of all applications and rights to use such assets of each member of the Group (which may now or in the future subsist).

"**Interest Period**" means, in relation to a DIP Loan, each period determined in accordance with Clause 9 (*Interest Periods*).

"**Interim DIP Availability**" has the meaning given to such term in Clause 2.3(c) (*Interim DIP Availability*).

"**Interim DIP Availability Date**" has the meaning given to such term in Clause 2.3(a) (*Interim DIP Availability*).

"**Interim DIP Order**" means an order of the Bankruptcy Court approving the DIP Facility on an interim basis, on the terms set forth in this Agreement and the other DIP Finance Documents, including the granting of the DIP Liens and DIP Superpriority Claims and containing customary stipulations, and in form and substance acceptable to the DIP Lender and the Obligors, including in respect of releases of the DIP Lender and the Prepetition Lender.

"**Interim Roll-Up**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**Interim Roll-Up Obligations**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**Jersey Administration**" means the court-supervised administration of the Jersey Obligors pursuant to Part 21A of the Companies (Jersey) Law 1991, to be commenced by application to the Jersey Court.

"**Jersey Administration Order**" means the order of the Jersey Court appointing administrators of the Jersey Obligors pursuant to the Jersey Administration.

"**Jersey Court**" means the Royal Court of Jersey.

"**Jersey Obligor**" means an Obligor incorporated or established under the laws of Jersey.

"**Jersey Security Register**" means the security interests register maintained under Part 8 of the SIJL.

"**Jersey Transaction Security Documents**" means any Transaction Security Document governed by Jersey law.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity.

"**Legal Opinion**" means any legal opinion delivered to the DIP Lender under Clause 4.1 (*Initial Conditions Precedent*) or Clause 21 (*Changes to the Obligors*).

"**Legal Reservations**" means:

(a) the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b) similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(c) any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

"**Lender Reserve Account**" has the meaning given to such term in Clause 36.2 (*Establishment of Lender Reserve Account*).

"**Liens**" as applied to the property of any person means: (a) any security interest, encumbrance, mortgage, charge, deed to secure debt, deed of trust, assignment of leases and rents, pledge, lien, hypothecation, assignment, charge or lease, conditional sale or other title retention agreement, or other security title or encumbrance of any kind in respect of any property of such Person, or upon the income, rents or profits therefrom; (b) any arrangement, express or implied, under which any property of such person is transferred, sequestered or otherwise identified for the purpose of subjecting the same to the payment of Indebtedness or performance of any other obligation in priority to the payment of the general, unsecured creditors of such person; (c) the filing of any duly authorized financing statement under the UCC or its equivalent in any jurisdiction, other than any precautionary filing not otherwise constituting or giving rise to a Lien, including a financing statement filed (i) in respect of a lease pursuant to section 9-505 (or a successor provision) of the UCC or its equivalent as in effect in an applicable jurisdiction or

(ii) in connection with a sale or other disposition of accounts or other assets not prohibited by this Agreement in a transaction not otherwise constituting or giving rise to a Lien; and (d) any agreement by such person to grant, give or otherwise convey any of the foregoing.

"**Margin Stock**" means "margin stock" or "margin security", in each case within the meaning of Regulations T, U and X.

"**Material Adverse Effect**" means a material adverse effect on:

(a) the business, operations or financial condition of the Group taken as a whole; or

(b) the ability of an Obligor to perform its obligations under the DIP Finance Documents; or

(c) the validity or enforceability of, or the effectiveness or ranking of any Liens granted or purporting to be granted pursuant to any of, the DIP Finance Documents or the rights or remedies of the DIP Lender under any of the DIP Finance Documents.

"**Milestones**" has the meaning given to such term in Clause 18.41 (*Milestones*).

"**Minimum Cash**" means USD 5,000,000.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month:

(a) (subject to paragraph (c) below) if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day;

(b) if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month; and

(c) if an Interest Period begins on the last Business Day of a calendar month, that Interest Period shall end on the last Business Day in the calendar month in which that Interest Period is to end.

The above rules will only apply to the last Month of any period.

"**Multiemployer Plan**" means any "multiemployer plan" as defined in section 4001(a)(3) of ERISA, which is contributed to by (or to which there is an obligation to contribute of) an Obligor, a Subsidiary of an Obligor or an ERISA Affiliate, and each such plan for the five year period immediately following the latest date on which an Obligor, a Subsidiary of an Obligor or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"**Non-US Obligor**" means any Jersey Obligor, any English Obligor and any other Obligor incorporated or established outside of the US.

"**Obligor**" means the Borrower or a Guarantor.

"**Obligors' Agent**" means the Parent or such other person appointed to act on behalf of each Obligor in relation to the DIP Finance Documents pursuant to Clause 2.2 (*Obligors' Agent*).

"**OFAC**" means the Department of the Treasury's Office of Foreign Assets Control of the United States of America.

"**Original Financial Statements**" means the audited consolidated financial statements of the Group for the financial year ended December 2024.

"**Original Jurisdiction**" means, in relation to an Obligor, the jurisdiction under whose laws that Obligor is incorporated or formed as at the date of this Agreement or, in the case of an Additional Guarantor, as at the date on which that Additional Guarantor becomes Party as a Guarantor.

"**Original Obligor**" means the Borrower or an Original Guarantor.

"**Participating Member State**" means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"**Party**" means a party to this Agreement.

"**PBGC**" means the US Pension Benefit Guaranty Corporation.

"**Pensions Regulator**" means the body corporate called the Pensions Regulator established under Part I of the United Kingdom Pensions Act 2004.

"**Permitted Disposal**" means any sale, lease, licence, transfer or other disposal which, except in the case of paragraph (b), is on arm's length terms:

(a) of trading stock or cash made by any member of the Group in the ordinary course of trading of the disposing entity;

(b) of any asset by a member of the Group (the "**Disposing Company**") to another member of the Group (the "**Acquiring Company**"), but if:

 (i) the Disposing Company is an Obligor, the Acquiring Company must also be an Obligor;

 (ii) the Disposing Company had given Liens over the asset, the Acquiring Company must give equivalent Liens over that asset; and

 (iii) the Disposing Company is a Guarantor, the Acquiring Company must be a Guarantor guaranteeing at all times an amount no less than that guaranteed by the Disposing Company;

(c) of assets (other than shares, businesses, Real Property or Intellectual Property) in exchange for other assets comparable or superior as to type, value and quality (other than an exchange of a non-cash asset for cash);

(d) of obsolete or redundant vehicles, plant and equipment for cash;

(e) of Cash Equivalent Investments for cash or in exchange for other Cash Equivalent Investments;

(f) arising as a result of any Permitted Security; and

(g) disposals of any vehicles, to the extent notified to the DIP Lender prior to the date of this Agreement and provided that such disposal is carried out on arm's length terms and for full market value.

"**Permitted Financial Indebtedness**" means Financial Indebtedness:

(a) arising under a foreign exchange transaction for spot or forward delivery entered into in connection with protection against fluctuation in currency rates where that foreign

exchange exposure arises in the ordinary course of trade, but not a foreign exchange transaction for investment or speculative purposes; and

(b) arising under a Permitted Loan or a Permitted Guarantee or as permitted by Clause 18.34 (*Treasury Transactions*).

"**Permitted Guarantee**" means:

(a) the endorsement of negotiable instruments in the ordinary course of trade;

(b) any performance or similar bond guaranteeing performance by a member of the Group under any contract entered into in the ordinary course of trade;

(c) any guarantee permitted under Clause 18.22 (*Financial Indebtedness*); or

(d) any guarantee given in respect of the netting or set-off arrangements permitted pursuant to paragraph (b) of the definition of "**Permitted Security**".

"**Permitted Loan**" means:

(a) Financial Indebtedness which is referred to in the definition of, or otherwise constitutes, Permitted Financial Indebtedness;

(b) a loan made by an Obligor (other than the Parent) to another Obligor (other than the Parent) or made by a member of the Group which is not an Obligor to another member of the Group (other than the Parent);

(c) any Structural Intra-Group Loan,

so long as in the case of paragraphs (b) and (c) above, the creditor of such Financial Indebtedness shall (if it is an Obligor) grant security over its rights in respect of such Financial Indebtedness in favour of the DIP Lender on terms acceptable to the DIP Lender.

"**Permitted Security**" means:

(a) any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(b) any payment or close-out netting or set-off arrangement pursuant to any Treasury Transaction or foreign exchange transaction which constituted Permitted Financial Indebtedness, excluding any Liens or Quasi-Security under a credit support arrangement;

(c) any Lien arising by operation of law and in the ordinary course of trading;

(d) any Lien or Quasi-Security over or affecting any asset acquired by a member of the Group after the date of this Agreement if:

(i) the Lien or Quasi-Security was not created in contemplation of the acquisition of that asset by a member of the Group;

(ii) the principal amount secured has not been increased in contemplation of or since the acquisition of that asset by a member of the Group; and

(iii) the Lien or Quasi-Security is removed or discharged within three (3) months of the date of acquisition of such asset;

(iv) any Lien or Quasi-Security entered into pursuant to any DIP Finance Document;

(e) any Lien or Quasi-Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(f) any security arising over any bank accounts or custody accounts or other clearing banking facilities held by an Obligor in the ordinary course of its banking arrangements with any bank or financial institution under the standard terms and conditions of such bank or financial institution; or

(g) any Lien over any cash collateral account held by the Borrower to secure obligations under any corporate credit card facility, provided that the aggregate balance of all such cash collateral accounts does not at any time exceed USD 1,200,000 (or its equivalent in another currency).

"**Permitted Transaction**" means:

(a) any disposal required, Financial Indebtedness incurred, guarantee, indemnity or Lien or Quasi-Security given, or other transaction arising, under the Finance Documents (as defined in the Prepetition PIF Facility Agreement as of the Closing Date) or the DIP Finance Documents;

(b) the solvent liquidation or reorganisation of any member of the Group which is not an Obligor so long as any payments or assets distributed as a result of such liquidation or reorganisation are distributed to other members of the Group; or

(c) transactions (other than (i) any sale, lease, license, transfer or other disposal and (ii) the granting or creation of Liens or the incurring or permitting to subsist of Financial Indebtedness) conducted in the ordinary course of trading on arm's length terms.

"**Permitted Variance**" has the meaning given to such term in Clause 3.3 (*DIP Budget*).

"**Petition Date**" means September 8, 2026, being the date of the filing of the Chapter 11 Cases.

"**Plan**" means an "employee benefit plan" as defined in section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by an Obligor, a Subsidiary of an Obligor or any ERISA Affiliate or to which an Obligor, a Subsidiary of an Obligor or an ERISA Affiliate has an obligation to contribute, and such plan for the five year period immediately following the latest date on which an Obligor, a Subsidiary of an Obligor or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"**Plan Effective Date**" means the date on which a chapter 11 plan of reorganization for the Debtors in form and substance satisfactory to the DIP Lender becomes effective in accordance with its terms and the Confirmation Order.

"**Plan Term Sheet**" means the Plan Term Sheet set forth in Schedule 6 (*Plan Term Sheet*).

"**Prepetition Collateral**" means all collateral (including Cash Collateral) securing the Prepetition Obligations.

"**Prepetition Lender**" means the "Lender" as defined in the Prepetition PIF Facility Agreement.

"**Prepetition Obligations**" means the "Secured Obligations" as defined in the Prepetition PIF Facility Agreement.

"**Prepetition PIF Facility Agreement**" means the Facility Agreement dated June 4, 2026, by and among the Parent, Holdings (as borrower), certain subsidiaries of the Parent and the DIP Lender, as it may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms of this Agreement and the DIP Orders.

"**Proceeds Account**" has the meaning given to such term in Clause 37.1 (*Establishment*).

"**Proceeds Account Control Agreement**" has the meaning given to such term in Clause 37.3 (*Proceeds Account Control Agreement*).

"**Quarter Date**" means the last day of a Financial Quarter.

"**Quasi-Security**" has the meaning given to that term in Clause 18.14 (*Negative Pledge*).

"**Real Property**" means:

(a) any freehold, leasehold or immovable property; and

(b) any buildings, fixtures, fittings, fixed plant or machinery from time to time situated on or forming part of that freehold, leasehold or immovable property.

"**Recognition Order**" means, in respect of each English Entity, the order of the English Court recognising its Chapter 11 Case under CBIR as a foreign main proceeding (or as a foreign non-main proceeding), the draft of which as filed with the English Court shall be in form and substance acceptable to the DIP Lender.

"**Related Fund**" in relation to a fund (the "**first fund**"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Jurisdiction**" means, in relation to an Obligor:

(a) its Original Jurisdiction;

(b) any jurisdiction where any asset subject to or intended to be subject to the Transaction Security to be created by it is situated;

(c) any jurisdiction where it conducts its business; and

(d) the jurisdiction whose laws govern the perfection of any of the Transaction Security Documents entered into by it.

"**Repeating Representations**" means each of the representations set out in Clause 16.1 (*Status*) to Clause 16.6 (*Governing law and Enforcement*), Clause 16.10 (*No Default*), paragraph (c) of Clause 16.11 (*No Misleading Information*), paragraph (d) of Clause 16.12 (*Financial Statements*), Clause 16.21 (*Ranking*) to Clause 16.23 (*Legal and Beneficial Ownership*), Clause 16.26 (*Sanctions*), Clause 16.31 (*Compliance with ERISA*) and Clause 16.32 (*Investment Company Act*).

"**Representative**" means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

"**Roll-Up**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**Roll-Up Obligations**" has the meaning given to such term in Clause 2.5 (*Roll-Up*).

"**Sanctioned Territory**" means a country, region or territory that is the subject of country-wide, region-wide or territory-wide Sanctions.

"**Sanctions**" means the economic or financial sanctions laws, regulations, trade embargoes or other restrictive measures enacted, administered, implemented and/or enforced from time to time by any of the following (and including through any relevant Sanctions Authority):

(a) the United Nations;

(b) the European Union;

(c) the government of the United States of America;

(d) the government of the United Kingdom; and

(e) the government of Saudi Arabia.

"**Sanctions Authority**" means any agency or person which is duly appointed, empowered or authorised to enact, administer, implement and/or enforce Sanctions, including (without limitation):

(a) OFAC;

(b) the United States Department of State or the United States Department of Commerce; and

(c) HMT.

"**Sanctions List**" means any of the lists of designated sanctions targets maintained by a Sanctions Authority from time to time, including (without limitation) as at the date of this Agreement:

(a) in the case of OFAC:

(i) the Specially Designated Nationals and Blocked Persons List; and

(ii) the Consolidated Sanctions List; and

(b) in the case of the United States Department of State or the United States Department of Commerce:

(i) the Denied Persons List;

(ii) the List of Statutorily Debarred Parties;

(iii) the Entity List; and

(iv) the Terrorist Exclusion List;

(c) in the case of HMT:

(i) the Consolidated List of Financial Sanctions Targets; and

(ii) the List of Persons Subject to Restrictive Measures in View of Russia's Actions Destabilising the Situation in Ukraine; and

(d) in the case of the European Union, the Consolidated List of Persons, Groups and Entities Subject to EU Financial Sanctions.

"**Sanctions Restricted Person**" means a person that is:

(a) listed on a Sanctions List, or a Subsidiary of any one or more persons listed on a Sanctions List;

(b) located or resident in, or incorporated or organized under the laws of, a Sanctioned Territory; or

(c) otherwise a subject of Sanctions.

"**Scheduled Maturity Date**" shall mean the date that is one hundred and twenty (120) calendar days from the Petition Date.

"**Senior Management**" means the executive chairman of the Group, the chief financial officer or finance director of the Group or a managing director having an equivalent role of the Group.

"**SIJL**" means the Security Interests (Jersey) Law 2012.

"**Structural Intra-Group Loan**" means a loan by the Parent to the Borrower.

"**Subsidiary**" means in relation to any person, any entity which is controlled directly or indirectly by that person and any entity (whether or not so controlled) treated as a subsidiary in the latest financial statements of that person from time to time, and "**control**" for this purpose means the direct or indirect ownership of the majority of the voting share capital of such entity or the right or ability to direct its affairs and/or to control the composition of a majority of the board of directors (or equivalent body) of such entity, in each case whether by virtue of ownership of share capital, contract or otherwise, and, in respect of an entity incorporated in Jersey, includes a subsidiary within the meaning of Articles 2 and 2A of the Companies (Jersey) Law 1991.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Tax Restriction Termination Date**" has the meaning given to such term in Clause 39.1 (*Additional Covenants, Representations, and Warranties*).

"**Termination Date**" means the earliest to occur of: (a) the Scheduled Maturity Date; (b) the effective date of any chapter 11 plan of reorganization for the Debtors; (c) the date that is thirty-five (35) days after the Petition Date, if the Final DIP Order has not been entered by such date; (d) the date of entry of a court order either (i) dismissing any of the Chapter 11 Cases or converting one or more of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (ii) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of any of the Debtors; (e) the date of entry of an order approving the sale of all or substantially all of the Debtors' assets and property; and (f) the date of the occurrence of an Event of Default.

"**Transaction Security**" means the Liens created or expressed to be created in favour of the DIP Lender pursuant to the Transaction Security Documents.

"**Transaction Security Documents**" means:

(a) each of the documents listed as being a Transaction Security Document in paragraph 2(b) of Part 1 of Schedule 2 (*Conditions Precedent*);

(b) each of the documents listed as being a Transaction Security Document in paragraph 11 of Part 4 (*Conditions Precedent Required to be Delivered by an Additional Guarantor*) of Schedule 2 (*Conditions Precedent*); and

(c) any other document entered into by any Obligor creating or expressed to create any Lien over all or any part of its assets in respect of the obligations of any of the Obligors under any of the DIP Finance Documents.

"**Treasury Transactions**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the DIP Lender in any Charged Property is governed by the Uniform Commercial Code or other legislation governing the perfection, the effect of perfection or non-perfection or the priority of security interests as in effect in a jurisdiction other than New York, the term "UCC" shall mean the Uniform Commercial Code or such other legislation as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Unpaid Sum**" means any sum due and payable but unpaid by an Obligor under the DIP Finance Documents.

"**UK Recognition Application**" means each application by the Foreign Representative to the English Court for recognition of the Chapter 11 Cases of an English Entity under CBIR, together with any application for provisional, interim, or discretionary relief in connection therewith, and "**UK Recognition Applications**" means all of them.

"**US**" means the United States of America.

"**VAT**" means:

(a) any value added tax imposed by the Value Added Tax Act 1994 of the United Kingdom;

(b) any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(c) any other tax of a similar nature, whether imposed in the United Kingdom or in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraphs (a) or (b) above, or imposed elsewhere, including, without limitation, any goods and services tax as provided for under the Goods and Services Tax (Jersey) Law 2007.

"**Wind-Down**" means the liquidation and wind-down of the Debtors, including the distribution, as applicable, net of any costs, of the PIF Cash Consideration (as defined in the Plan Term Sheet), Retained Causes of Action (as defined in the Plan Term Sheet), and all other assets and property of the Debtors vested in the Liquidating Trust (as defined in the Plan Term Sheet) on the Plan Effective Date.

1.2 **Construction**

(a) Unless a contrary indication appears, any reference in this Agreement to:

(i) the "**Lender**", any "**Obligor**" or any "**Party**" shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of its rights and/or obligations under the DIP Finance Documents;

(ii) a document in "**agreed form**" is a document which is previously agreed in writing by or on behalf of the Borrower and the DIP Lender or, if not so agreed, is in the form specified by the DIP Lender;

(iii) "**assets**" includes present and future properties, revenues and rights of every description;

(iv) a "**DIP Finance Document**" or any other agreement or instrument is a reference to that DIP Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(v) "**guarantee**" means (other than in Clause 15 (*Guarantee and Indemnity*)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vi) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(vii) a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, or partnership or other entity (whether or not having separate legal personality);

(viii) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(ix) a provision of law is a reference to that provision as amended or re-enacted; and

(x) a time of day is a reference to Riyadh time, excluding references to obligations with respect to DIP Orders, Bankruptcy Court orders or related timelines, in respect of which a time of day is a reference to New York City time.

(b) The determination of the extent to which a rate is "**for a period equal in length**" to an Interest Period shall disregard any inconsistency arising from the last day of that Interest Period being determined pursuant to the terms of this Agreement.

(c) Section, Clause and Schedule headings are for ease of reference only.

(d) Unless a contrary indication appears, a term used in any other DIP Finance Document or in any notice given under or in connection with any DIP Finance Document has the same meaning in that DIP Finance Document or notice as in this Agreement.

(e) A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

(f) Any reference in this Agreement or any other DIP Finance Document to a merger, consolidation, amalgamation, conveyance, disposal, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, corporation or partnership, or an allocation of assets to a series of or one or more limited liability companies, partnerships or corporations, or the unwinding of such a division or allocation, as if it were a merger, consolidation, amalgamation conveyance, disposal, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate person. Any division of a limited liability company, corporation or partnership shall be deemed to constitute the formation of a separate person, and any such division shall constitute a separate person hereunder and under the other DIP Finance Documents (and each division of any limited liability company,

corporation or partnership that is a subsidiary, joint venture or any other like term shall also constitute such a person or entity).

(g) Any certificate required to be delivered by or on behalf of an Obligor under any DIP Finance Document may be signed by a director, officer, or authorized signatory of that Obligor or by an officer of the Borrower or Parent, and any reference in any DIP Finance Document to a certificate being signed by a director of an Obligor shall be construed accordingly.

1.3 **Currency Symbols And Definitions**

"**$**", "**USD**" and "**dollars**" denote the lawful currency of the United States of America.

1.4 **Third-Party Rights**

(a) Except as otherwise expressly provided in this Agreement or another DIP Finance Document, this Agreement is not intended to and does not confer any right or remedy upon any person other than the Parties and their permitted successors and assigns, and no such person shall have any right to enforce or rely upon any provision of this Agreement or any other DIP Finance Document

(b) Notwithstanding any term of any DIP Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

1.5 **Jersey terms**

In each DIP Finance Document, where it relates to a person: (i) incorporated; (ii) established; (iii) constituted; (iv) formed; (v) which carries on, or has carried on, business; or (vi) that has immovable property, in each case, in Jersey, a reference to "**Liens**" or a "**security interest**" includes, without limitation, any hypothèque whether conventional, judicial or arising by operation of law and any security interest created pursuant to the Security Interests (Jersey) Law 1983 or SIJL.

**Section 2**
**The DIP Facility**

## 2. The DIP Facility

### 2.1 The DIP Facility

Subject to the terms of this Agreement, the DIP Lender hereby makes available to the Borrower a DIP Loan facility in an amount equal to the DIP Facility Commitment.

### 2.2 Obligors' Agent

(a) Each Obligor (other than the Parent) by its execution of this Agreement or an Accession Deed irrevocably appoints the Parent (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the DIP Finance Documents and irrevocably authorises:

(i) the Parent on its behalf to supply all information concerning itself contemplated by this Agreement to the DIP Lender and to give all notices and instructions (including, in the case of the Borrower, Borrowing Requests and Disbursement Requests), to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii) the DIP Lender to give any notice, demand or other communication to that Obligor pursuant to the DIP Finance Documents to the Parent,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Borrowing Requests and Disbursement Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b) Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any DIP Finance Document on behalf of another Obligor or in connection with any DIP Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any DIP Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it. In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

### 2.3 Interim DIP Availability

(a) The DIP Lender shall notify the Borrower in writing of satisfaction (or waiver) of the Conditions Precedent to Interim DIP Availability (the date of such notice being the "**Interim DIP Availability Date**"), and such notice shall be conclusive and binding evidence of the occurrence thereof.

(b) The Borrower shall be deemed to have represented to the DIP Lender, at the time the DIP Loan in an aggregate principal amount equal to the Interim DIP Availability is made, that all of the Conditions Precedent to Interim DIP Availability have been satisfied.

(c) Subject to the terms and conditions hereof and of the Interim DIP Order, on the Interim DIP Availability Date, the DIP Lender agrees to make a DIP Loan to the Borrower in

an aggregate principal amount not exceeding USD 14,000,000 (the "**Interim DIP Availability**"). The proceeds of the DIP Loan made pursuant to this Clause 2.3 shall be deposited into the DIP Facility Blocked Account or the Lender Reserve Account, as applicable, and shall be used solely as permitted by the Approved Budget, subject to the Permitted Variance. Upon the DIP Lender's funding of the DIP Loan in an aggregate principal amount equal to the Interim DIP Availability, the DIP Facility Commitments shall be permanently reduced by the amount so funded.

2.4 **Final DIP Availability**

(a) The DIP Lender shall notify the Borrower in writing of satisfaction (or waiver) of the Conditions Precedent to Final DIP Availability (the date of such notice being the "**Final DIP Availability Date**"), and such notice shall be conclusive and binding evidence of the occurrence thereof.

(b) The Borrower shall be deemed to have represented to the DIP Lender, at the time the DIP Loan in an aggregate principal amount equal to the Final DIP Availability is made, that all of the Conditions Precedent to Final DIP Availability have been satisfied.

(c) Subject to the terms and conditions hereof and of the Final DIP Order, on the Final DIP Availability Date, the DIP Lender agrees to make a DIP Loan to the Borrower in an aggregate principal amount equal to the DIP Facility Commitment minus the amount of the DIP Loan previously borrowed pursuant to Clause 2.3(c) (the "**Final DIP Availability**"). The proceeds of the DIP Loan made pursuant to this Clause 2.4 shall be deposited into the DIP Facility Blocked Account or the Lender Reserve Account, as applicable, and shall be used solely as permitted by the Approved Budget. Upon the DIP Lender's funding of the DIP Loan in an aggregate principal amount equal to the Final DIP Availability, the DIP Facility Commitments shall be permanently reduced to zero.

2.5 **Roll-Up.**

Effective upon (A) the entry of the Interim DIP Order and the funding of the DIP Loan in an aggregate amount equal to the Interim DIP Availability pursuant to Clause 2.3 (*Interim DIP Availability*), and without any further action by the Borrower, any other Obligor, or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the Interim DIP Availability shall automatically be deemed exchanged, via assignment on a cashless basis, into, and shall be deemed to constitute, DIP Obligations (the "**Interim Roll-Up**" and such resulting obligations, the "**Interim Roll-Up Obligations**"); and (B) the entry of the Final DIP Order and the funding of the DIP Loan in an aggregate amount equal to the Final DIP Availability pursuant to Clause 2.4 (*Final DIP Availability*), and without any further action by the Borrower, any other Obligor, or any other party, Prepetition Obligations in an aggregate principal amount equal (on a dollar-for-dollar basis) to the Final DIP Availability shall automatically be deemed exchanged, via assignment on a cashless basis, into, and shall be deemed to constitute, DIP Obligations (the "**Final Roll-Up**" and such resulting obligations, the "**Final Roll-Up Obligations**," and together with the Interim Roll-Up and the Interim Roll-Up Obligations, the "**Roll-Up**" and the "**Roll-Up Obligations**," respectively). The Roll-Up shall be effected pursuant to, and calculated in accordance with, the DIP Order, this Agreement, and the Prepetition PIF Facility Agreement (as modified by the DIP Order). The Interim Roll-Up Obligations and the Final Roll-Up Obligations shall each constitute DIP Obligations for all purposes of this Agreement and the other DIP Finance Documents, including for purposes of the DIP Liens and the DIP Superpriority Claims, and shall be authorized and deemed, for all purposes, to be consideration in exchange for, and solely on account of, the DIP Lender's agreement to fund the DIP Loans hereunder, and not as adequate protection for, or otherwise

on account of, any Prepetition Obligations. The Roll-Up Obligations shall in each case remain subject to the reservation of rights set forth in the DIP Order.

# 3. Purpose

## 3.1 Purpose

(a) The Borrower shall apply all amounts borrowed by it under the DIP Facility solely for the purposes (and in the amounts) set forth in the Approved Budget and in accordance with the DIP Orders and the other DIP Finance Documents, including (i) for the Debtors' operations and working capital needs, including to fund the costs of the administration of the Chapter 11 Cases and to pay adequate protection payments as authorized by the Bankruptcy Court in the DIP Orders, in each case in a manner consistent with the Approved Budget, (ii) to pay obligations arising from or related to the Carve-Out, (iii) to pay transaction costs, fees and expenses (including professional fees) incurred in connection with the DIP Facility, the Chapter 11 Cases and the transactions contemplated thereunder (including the Wind-Down and, without limitation, reasonable and documented fees and expenses of the DIP Lender Advisers, which fees and expenses shall be paid from the Lender Reserve Account), and (iv) to fund the fees, costs and expenses of the Special Committee (as defined in the Plan Term Sheet) and its advisors in connection with the independent investigation contemplated by the DIP Order and the Plan Term Sheet, in each case in accordance with the Approved Budget.

(b) No portion of the proceeds under the DIP Facility, any Cash Collateral, or the Carve-Out may be used by any person, among other things, (i) for any purpose that is prohibited under the Bankruptcy Code, the DIP Orders, or the other DIP Finance Documents, (ii) to make any payment, advance, transfer or distribution, other than in accordance with the Approved Budget (other than payment of the DIP Lender's and Prepetition Lender's professional fees and expenses), or (iii) to investigate or pursue any investigation or claims, causes of action, defenses, counterclaims, litigation, or discovery against the DIP Lender or the Prepetition Lender (or their agents, professionals, employees, officers, subsidiaries, affiliates, etc.), including to investigate or commence any challenge to (x) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Obligors owing to the DIP Lender under the DIP Finance Documents or owing to the Prepetition Lender under the Prepetition PIF Facility Agreement, or (y) any liens or security interests securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the DIP Lender or the Prepetition Lender with respect thereto, provided that the Special Committee (as defined in the Plan Term Sheet) shall be permitted to use Cash Collateral and proceeds under the DIP Facility subject to and in accordance with the Approved Budget for the purpose of conducting an independent investigation.

## 3.2 Monitoring

The DIP Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

## 3.3 DIP Budget

(a) Approved Budget. The use of proceeds of the DIP Facility and any Cash Collateral shall at all times be consistent with the latest DIP Budget approved in accordance with this Clause 3.3, subject to the Permitted Variance. The Debtors shall deliver a proposed updated DIP Budget to the DIP Lender no later than 5:00 p.m. (New York City time) on Wednesday of every fourth week following the week in which the Petition Date occurs, and at any other time at their discretion, extending the forecast period on a

rolling 13-week basis (provided that such 13-week period shall not extend past the Scheduled Maturity Date). Any proposed updated DIP Budget shall be subject to the prior written approval of the DIP Lender; provided that if (i) a proposed updated DIP Budget is not objected to by the DIP Lender (email being sufficient) within five (5) Business Days of delivery to the DIP Lender it shall be deemed to constitute the "**Approved Budget**", and (ii) a proposed updated DIP Budget is objected to or not approved (or deemed approved), the DIP Budget most recently approved or deemed approved shall continue to constitute the Approved Budget. Each proposed updated DIP Budget shall be accompanied by such supporting documentation as the DIP Lender may reasonably request, and shall be prepared in good faith, with reasonable due care, and based on assumptions the Debtors believe to be reasonable at the time of delivery.

(b) Permitted Variance. The Debtors shall not permit (a) actual total receipts to be less than the total receipts set forth in the Approved Budget, or (b) actual total operating disbursements to exceed the total operating disbursements set forth in the Approved Budget, in each case, by more than the greater of (i) 10% and (ii) USD 200,000, tested on a cumulative basis, resetting on a going-forward basis upon the approval of each new Approved Budget (such variances from the Approved Budget, to the extent permitted, together, the "**Permitted Variance**").

(c) No duty to monitor; estimates only. The DIP Lender (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be obligated to pay, directly or indirectly from the DIP Collateral or otherwise, any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. Line items in the Approved Budget for payment of interest, fees, expenses, and other amounts to the DIP Lender are estimates only, and the Borrower shall remain obligated to pay all DIP Obligations in accordance with the terms of the DIP Finance Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of any DIP Finance Document or any of the borrowing restrictions or other terms set forth therein.

## 4. Conditions Precedent to each Borrowing

### 4.1 Initial Conditions Precedent

The Borrower may not deliver a Borrowing Request unless the DIP Lender has received all of the documents and other evidence listed in Part 1 of Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to the DIP Lender. The DIP Lender shall notify the Borrower promptly upon being so satisfied.

### 4.2 Further Conditions Precedent

The DIP Lender will only be obliged to comply with Clause 5.4 (*Lender's Obligation*) (with respect to the funding of a proposed DIP Loan) or Clause 36.4 (*Disbursements*) (with respect to disbursements from the DIP Facility Blocked Account) if:

(a) the DIP Lender shall have received a Borrowing Request in accordance with Clause 5.1 or a Disbursement Request in accordance with Clause 36.4, as applicable;

(b) the Obligors have confirmed that the Obligors have not expended amounts borrowed under the Prepetition PIF Facility Agreement outside of the proposed use of proceeds of such borrowed amounts as set forth in the applicable utilisation statement delivered under the Prepetition PIF Facility Agreement or as otherwise expressly disclosed to the Prepetition Lender prior to the Petition Date;

(c) on the date of the Borrowing Request or Disbursement Request and on the proposed Borrowing Date or the proposed date of the applicable disbursement from the DIP Facility Blocked Account:

(i) no Default or Event of Default is continuing or would result from the proposed DIP Loan; and

(ii) the representations and warranties made or deemed made by the Borrower and each other Obligor in the DIP Finance Documents shall be true and correct in all material respects (or, in the case of any representation or warranty qualified by materiality, in all respects), with the same force and effect as if made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case they shall have been true and correct as of such earlier date);

(iii) all necessary governmental and material third-party consents and approvals in connection with the DIP Facility shall have been obtained, without the imposition of any adverse conditions not acceptable to the DIP Lender, and shall remain in effect, and no law or regulation shall restrain, prevent, or impose materially adverse conditions upon the DIP Facility; and

(iv) the applicable DIP Order and each of the other DIP Finance Documents remain in full force and effect; and

(d) in the case of a disbursement from the DIP Facility Blocked Account, the aggregate amount disbursed from the DIP Facility Blocked Account pursuant to Disbursement Requests shall not, as a result of the applicable disbursement, exceed the DIP Facility Commitment less the sum of (1) the actual amount of the Obligors' receipts between the dates of September 4, 2026 and the Petition Date, and (2) the lesser of (A) USD 27,300,000 and (B) the actual amount of the Obligors' receipts after the Petition Date.

4.3 **Division of DIP Loans**

The Borrower may not request that a DIP Loan be divided.

**Section 3**
**Borrowing**

# 5. Borrowing

## 5.1 Delivery of a Borrowing Request

The Borrower may utilize the DIP Facility by delivery to the DIP Lender of a duly completed Borrowing Request. Any Borrowing Request has to be delivered by no later than [●] ([●]) Business Days prior to the anticipated Borrowing Date and shall specify the proposed Borrowing Date and the aggregate principal amount of such DIP Loan to be borrowed, which amount shall not exceed the Interim DIP Availability or the Final DIP Availability, as applicable, then available to be drawn. No Borrowing Request shall be required in respect of the Roll-Up, which shall occur automatically as provided in Clause 2.5 (*Roll-Up*).

## 5.2 Completion of a Borrowing Request

(a) Each Borrowing Request is irrevocable and will not be regarded as having been duly completed unless:

(i) the proposed Borrowing Date is a Business Day within the Availability Period;

(ii) the currency and amount of the Borrowing comply with Clause 5.3 (*Currency and Amount*); and

(iii) the proposed Interest Period complies with Clause 9 (*Interest Periods*).

(b) Only one DIP Loan may be requested in each Borrowing Request.

(c) The Borrower shall not submit more than one (1) Borrowing Request in any period of fourteen (14) consecutive days (calculated from the date of the most recent Borrowing Request submitted in accordance with this Clause 5), unless otherwise agreed by the DIP Lender in writing.

## 5.3 Currency and Amount

(a) The currency specified in a Borrowing Request must be dollars.

(b) The amount of the proposed DIP Loan must be a minimum of USD 1,000,000 or, if less, the Available Facility.

## 5.4 Lender’s Obligation

Subject to the satisfaction (or waiver by the DIP Lender) of the conditions set forth in Clause 4.1 (*Initial Conditions Precedent*) and 4.2 (*Further Conditions Precedent*) and the applicable Conditions Precedent to Interim DIP Availability and Conditions Precedent to Final DIP Availability, the DIP Lender shall deposit an amount equal to the applicable DIP Loan in immediately available funds into the DIP Facility Blocked Account and the Lender Reserve Account, as applicable, not later than 12:00 p.m. (New York City time) on the applicable Borrowing Date. The Borrower may not reborrow any portion of the DIP Loans once repaid or prepaid.

## 5.5 Cancellation of DIP Facility Commitment

The DIP Facility Commitment which, at that time, is unutilized shall be immediately cancelled at the end of the Availability Period.

**Section 4**
**Repayment, Prepayment and Cancellation**

## 6. Repayment

(a) Except as set forth in the Plan Term Sheet with respect to an Acceptable Business Transfer Transaction (as defined in the Plan Term Sheet), the Borrower shall repay all DIP Loans in full in cash (together with accrued interest thereon and all other amounts accrued or outstanding under the DIP Finance Documents) on the Termination Date. In the case of any Acceptable Business Transfer Transaction (as defined in the Plan Term Sheet), the DIP Loans shall be deemed satisfied as determined in accordance with the applicable Approved Plan.

(b) The Borrower may not reborrow any part of the DIP Facility which is repaid.

(c) The DIP Facility Commitments shall be automatically terminated (without the DIP Lender being required to make any demand on the Borrower or the other Obligors except as required by the DIP Order) on the Termination Date.

## 7. Prepayment and Cancellation

7.1 **Illegality**

Without prejudice to Clause 6 (*Repayment*), if, in any applicable jurisdiction, it becomes unlawful for the DIP Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain any DIP Loan:

(a) the DIP Lender shall promptly notify the Borrower upon becoming aware of that event and the Available Facility will be immediately cancelled; and

(b) the Borrower shall repay the DIP Loans on the last day of the Interest Period for each Loan occurring after the DIP Lender has notified the Borrower or, if earlier, the date specified by the DIP Lender in the notice delivered to the Borrower (being no earlier than the last day of any applicable grace period permitted by law).

7.2 **Exit**

Without prejudice to Clause 6 (*Repayment*), upon the occurrence of:

(a) a Change of Control; or

(b) the sale of all or substantially all of the assets of the Group whether in a single transaction or a series of related transactions,

the DIP Facility will be immediately cancelled and shall immediately cease to be available for further Borrowings, and all Borrowings, accrued interest and other amounts under the DIP Finance Documents, shall become immediately due and payable.

7.3 **Insurance Proceeds, Disposal Proceeds and Non-Permitted Debt Proceeds**

(a) For the purposes of this Clause 7.3:

"**Disposal**" means any sale, lease, license, transfer, loan or other disposal by a person of any asset, undertaking or business (whether by a voluntary or involuntary single transaction or series of transactions).

"**Disposal Proceeds**" means the consideration receivable by any member of the Group (including any amount receivable in repayment of intercompany debt) for any non-

ordinary course Disposal made by any member of the Group permitted pursuant to Clause 18.15 (*Disposals*) after deducting:

(i) any reasonable expenses which are incurred by any member of the Group with respect to that Disposal to persons who are not members of the Group; and

(ii) any Tax incurred and required to be paid by the seller in connection with that Disposal (as reasonably determined by the seller, on the basis of existing rates and taking account of any available credit, deduction or allowance).

"**Excluded Insurance Proceeds**" means any proceeds of an insurance claim which the Parent notifies the DIP Lender are, or are to be, applied:

(i) to meet a third party claim;

(ii) to cover operating losses in respect of which the relevant insurance claim was made; or

(iii) in the replacement, reinstatement and/or repair of the assets or otherwise in amelioration of the loss in respect of which the relevant insurance claim was made,

in each case as soon as possible (but in any event within sixty (60) days, or such longer period as the DIP Lender may agree) after receipt.

"**Insurance Proceeds**" means the proceeds of any insurance claim under any insurance maintained by any member of the Group except for Excluded Insurance Proceeds and after deducting any reasonable expenses in relation to that claim which are incurred by any member of the Group to persons who are not members of the Group.

"**Non-Permitted Debt Proceeds**" means the proceeds of any Financial Indebtedness incurred by any member of the Group, other than any Financial Indebtedness permitted pursuant to Clause 18.22 (*Financial Indebtedness*).

(b) Without prejudice to Clause 6 (*Repayment*), the Parent shall ensure that the Borrower prepays any Borrowings and cancels the Available Facility, in an amount equal to the amount of Insurance Proceeds, Disposal Proceeds and/or Non-Permitted Debt Proceeds (as applicable) promptly (and in any event within five (5) Business Days) of receipt in the following order:

(i) *first*, in prepayment of DIP Loans on a pro rata basis; and

(ii) *secondly*, in cancellation of the Available Facility.

7.4 **Voluntary Cancellation**

The Borrower may, if it gives the DIP Lender not less than five (5) Business Days' (or such shorter period as the DIP Lender may agree) prior notice, cancel the whole or any part (being a minimum amount of USD 10,000,000) of the Available Facility.

7.5 **Voluntary Prepayment of DIP Loans**

(a) The Borrower may, if it gives the DIP Lender not less than five (5) Business Days' (or such shorter period as the DIP Lender may agree) prior notice, prepay the whole or any part of any DIP Loan (but, if in part, being an amount that reduces the DIP Loan by a minimum amount of USD 10,000,000).

(b) A DIP Loan may only be prepaid after the last day of the Availability Period (or, if earlier, the day on which the Available Facility is zero).

7.6 **Restrictions**

(a) Any notice of cancellation or prepayment given by any Party under this Clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b) Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and without premium or penalty.

(c) The Borrower may not reborrow any part of the DIP Facility which is prepaid.

(d) The Borrower shall not repay or prepay all or any part of the DIP Loans or cancel all or any part of the DIP Facility Commitment except at the times and in the manner expressly provided for in this Agreement.

(e) No amount of the DIP Facility Commitment cancelled under this Agreement may be subsequently reinstated.

**Section 5**
**Costs of Borrowing**

# 8. Interest

## 8.1 Calculation of Interest

The rate of interest on each DIP Loan for each Interest Period is the percentage rate per annum which is equal to the Fixed Rate.

## 8.2 Payment of Interest

Subject to Clause 8.3 (*PIK Interest*), the Borrower shall pay accrued interest on each DIP Loan on the last day of each Interest Period.

## 8.3 PIK Interest

(a) Subject to paragraph (c) below, any interest payable in accordance with Clause 8.1 (*Calculation of Interest*) shall automatically be converted into payment-in-kind interest (the "**PIK Interest**") for up to one hundred per cent. (100%) of the interest payable in respect of DIP Loans outstanding on the last day of that Interest Period.

(b) Any PIK Interest accruing under paragraph (a) above shall be compounded with the outstanding amount of the DIP Loans on the last day of the relevant Interest Period, and shall thereafter be treated for all purposes of this Agreement as part of the principal amount of the relevant DIP Loan and shall bear interest together with the rest of the DIP Loan in accordance with this Clause 8.

(c) The Borrower may elect to disapply this Clause 8.3 by giving not less than five (5) Business Days' prior written notice to the DIP Lender before the end of an Interest Period whereupon:

(i) this Clause 8.3 shall cease to apply in respect of any interest payable at the end of that Interest Period; and

(ii) the Borrower shall pay accrued interest on each applicable DIP Loan on the last day of that Interest Period in accordance with Clause 8.1 (*Calculation of Interest*).

## 8.4 Default Interest

(a) Following the occurrence and during the continuance of any Event of Default, interest shall accrue on the amounts outstanding under the DIP Finance Documents (including, for the avoidance of doubt, accrued and unpaid interest thereon) at a rate which is two (2) per cent. per annum higher than the rate which would otherwise have been payable. Any interest accruing under this Clause 8.4 shall be immediately payable by the Obligors on demand by the DIP Lender.

(b) Default interest (if unpaid) arising on an overdue amount will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

# 9. Interest Periods

## 9.1 Selection of Interest Periods

(a) Subject to this Clause 9.1, each Interest Period for a DIP Loan shall be one (1) Month or any other period agreed between the Parent and the DIP Lender.

(b) The first Interest Period for each DIP Loan shall start on its Borrowing Date. The first Interest Period for any DIP Loan other than the Loan borrowed on the first Borrowing Date shall end on the last day of the then current Interest Period for the DIP Loan borrowed on the first Borrowing Date (and such DIP Loans shall be consolidated on that date in accordance with Clause 9.3 (*Consolidation of DIP Loans*)). Each subsequent Interest Period shall start on the last day of its preceding Interest Period.

(c) An Interest Period for a DIP Loan shall not extend beyond the Termination Date.

9.2 **Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day in that calendar month (if there is one) or the preceding Business Day (if there is not).

9.3 **Consolidation of DIP Loans**

If two or more Interest Periods relate to DIP Loans and end on the same date, those DIP Loans will be consolidated into, and treated as, a single DIP Loan on the last day of the Interest Period.

**Section 6**
**Additional Payment Obligations**

## 10. Tax Gross-Up and Indemnities

### 10.1 Definitions

In this Agreement:

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a DIP Finance Document, other than a FATCA Deduction.

Unless a contrary indication appears, in this Clause 10 a reference to "**determines**" or "**determined**" means a determination made in the absolute discretion of the person making the determination.

### 10.2 Tax Gross-Up

(a) Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b) The Parent shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the DIP Lender accordingly. Similarly, the DIP Lender shall notify the Borrower on becoming so aware in respect of a payment payable to the DIP Lender.

(c) If a Tax Deduction is required by law to be made by an Obligor, the amount of the payment due from that Obligor shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d) If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(e) Within thirty (30) days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the DIP Lender a statement under section 975 of the United Kingdom's Income Tax Act 2007 or other evidence reasonably satisfactory to the DIP Lender that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority. In the case of any Tax Deduction made by an Obligor incorporated or organized in the US, that Obligor shall deliver to the DIP Lender the original or a certified copy of a receipt issued by the relevant taxing authority evidencing that payment, a copy of the return reporting that payment or other evidence of that payment reasonably satisfactory to the DIP Lender.

### 10.3 Tax Indemnity

(a) The Parent shall (within three (3) Business Days of demand by the DIP Lender) pay to the DIP Lender an amount equal to the loss, liability or cost which the DIP Lender determines will be or has been (directly or indirectly) suffered for or on account of Tax by it in respect of a DIP Finance Document.

(b) Paragraph (a) above shall not apply:

(i) with respect to any Tax assessed on the DIP Lender:

(A) under the law of the jurisdiction in which the DIP Lender is incorporated or, if different, the jurisdiction (or jurisdictions) in which the DIP Lender is treated as resident for tax purposes; or

(B) under the law of the jurisdiction in which the DIP Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by the DIP Lender; or

(ii) to the extent a loss, liability or cost:

(A) is compensated for by an increased payment under Clause 10.2 (*Tax Gross-Up*); or

(B) relates to a FATCA Deduction required to be made by a Party.

(c) If the DIP Lender makes or intends on making a claim under paragraph (a) above it shall promptly notify the Parent of the event which will give, or has given, rise to the claim.

10.4 **Stamp Taxes**

The Parent shall pay and, within three (3) Business Days of demand, indemnify the DIP Lender against any cost, loss or liability that the DIP Lender incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any DIP Finance Document.

10.5 **VAT**

(a) All amounts expressed to be payable under a DIP Finance Document by any Non-US Obligor to the DIP Lender which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by the DIP Lender to any Non-US Obligor under a DIP Finance Document and the DIP Lender is required to account to the relevant tax authority for the VAT, that Non-US Obligor must pay to the DIP Lender (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and the DIP Lender must promptly provide an appropriate VAT invoice to that Non-US Obligor).

(b) Where a DIP Finance Document requires any Non-US Obligor to reimburse or indemnify the DIP Lender for any cost or expense, that Non-US Obligor shall reimburse or indemnify (as the case may be) the DIP Lender for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that the DIP Lender reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(c) Any reference in this Clause 10.5 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term “representative member” to have the same meaning as in the Value Added Tax Act 1994).

(d) In relation to any supply made by the DIP Lender to any Non-US Obligor under a DIP Finance Document, if reasonably requested by the DIP Lender, that Non-US Obligor

must promptly provide the DIP Lender with details of that Non-US Obligor's VAT registration and such other information as is reasonably requested in connection with the DIP Lender's VAT reporting requirements in relation to such supply.

10.6 **FATCA Information**

(a) Subject to paragraph (c) below, each Party shall, within ten (10) Business Days of a reasonable request by another Party:

(i) confirm to that other Party whether it is:

(A) a FATCA Exempt Party; or

(B) not a FATCA Exempt Party;

(ii) supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(iii) supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b) If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c) Paragraph (a) above shall not oblige the DIP Lender to do anything, and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

(i) any law or regulation;

(ii) any fiduciary duty; or

(iii) any duty of confidentiality.

(d) If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the DIP Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

10.7 **FATCA Deduction**

(a) Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b) Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment.

10.8 **Tax Treatment of Payments**

If any DIP Obligations are repaid or satisfied in connection with a chapter 11 plan of reorganization for the Debtors (including the Approved Plan), the Obligors shall ensure that such plan and any related confirmation order (including the Confirmation Order) include customary language providing that, for US federal income tax purposes, all payments made in respect of the DIP Obligations pursuant to such plan shall be treated as made first in repayment of principal and then, only after all principal has been repaid in full, in payment of accrued and unpaid interest (the "**Tax Ordering Provision**"). On the basis of the Tax Ordering Provision, no Obligor that is a United States person (within the meaning of section 7701(a)(30) of the Code) shall be required to deduct or withhold any Tax from any payment made pursuant to such plan in respect of the DIP Obligations, except to the extent that any portion of such payment is treated as interest for United States federal income tax purposes after all principal has been repaid in full, in which case the applicable Obligor shall make any required Tax Deduction in respect of such portion in accordance with this Agreement.

## 11. Increased Costs

11.1 **Increased Costs**

(a) Subject to Clause 11.3 (*Exceptions*) the Parent shall, within three (3) Business Days of a demand by the DIP Lender, pay to the DIP Lender the amount of any Increased Costs incurred by the DIP Lender or any of its Affiliates as a result of:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation; or

(ii) compliance with any law or regulation made after the date of this Agreement.

(b) In this Agreement:

(i) "**Increased Costs**" means:

(A) a reduction in the rate of return from the DIP Facility or on the DIP Lender's (or its Affiliate's) overall capital;

(B) an additional or increased cost; or

(C) a reduction of any amount due and payable under any DIP Finance Document,

which is incurred or suffered by the DIP Lender or any of its Affiliates to the extent that it is attributable to the DIP Lender having entered into its DIP Facility Commitment or funding or performing its obligations under any DIP Finance Document.

(ii) "**Basel III**" means:

(A) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(B) the rules for global systemically important banks contained in “Global systemically important banks: assessment methodology and the additional loss absorbency requirement Rules text” published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(C) any further guidance or standards published by the Basel Committee on Banking Supervision relating to “Basel III”.

11.2 **Increased Cost Claims**

(a) If the DIP Lender intends to make a claim pursuant to Clause 11(*Increased Costs*), it shall promptly notify the Borrower of the event giving rise to the claim.

(b) The DIP Lender shall, as soon as practicable after a demand by the Borrower, provide a certificate confirming the amount of its Increased Costs.

11.3 **Exceptions**

(a) Clause 11.1 (*Increased Costs*) does not apply to the extent any Increased Cost is:

(i) attributable to a Tax Deduction required by law to be made by an Obligor in respect of which an increased payment has been made under Clause 10.2 (*Tax Gross-Up*);

(ii) attributable to a FATCA Deduction required to be made by a Party;

(iii) compensated for by Clause 10.3 (*Tax Indemnity*) (or would have been compensated for under Clause 10.3 (*Tax Indemnity*) but was not so compensated solely because any of the exclusions in paragraph (b) of Clause 10.3 (*Tax Indemnity*) applied);

(iv) attributable to the wilful breach by the DIP Lender or its Affiliates of any law or regulation; or

(v) attributable to the implementation or application of or compliance with the “International Convergence of Capital Measurement and Capital Standards, a Revised Framework” published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (but excluding any amendment arising out of Basel III) (“**Basel II**”) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Lender or any of its Affiliates).

(b) In this Clause 11.3, a reference to a “**Tax Deduction**” has the same meaning given to that term in Clause 10.1(*Definitions*).

## 12. Other Indemnities

12.1 **Currency Indemnity**

(a) If any sum due from an Obligor under the DIP Finance Documents (a “**Sum**”), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the “**First Currency**”) in which that Sum is payable into another currency (the “**Second Currency**”) for the purpose of:

(i) making or filing a claim or proof against that Obligor;

(ii) obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within three (3) Business Days of demand, indemnify the DIP Lender against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b) Each Obligor waives any right it may have in any jurisdiction to pay any amount under the DIP Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

12.2 **Other Indemnities**

The Parent shall (or shall procure that an Obligor will), within three (3) Business Days of demand, indemnify the DIP Lender against any cost, loss or liability incurred by the DIP Lender as a result of:

(a) the occurrence of any Event of Default;

(b) investigating any event which it reasonably believes is a Default;

(c) a failure by an Obligor to pay any amount due under a DIP Finance Document on its due date;

(d) funding, or making arrangements to fund, a DIP Loan requested by the Parent or the Borrower in a Borrowing Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the DIP Lender alone);

(e) a DIP Loan (or part of a DIP Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower or the Parent; or

(f) acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised.

## 13. Mitigation by the DIP Lender

13.1 **Mitigation**

(a) The DIP Lender shall, in consultation with the Parent, take all reasonable steps to mitigate any circumstances which arise and which would result in the DIP Facility ceasing to be available or any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 10 (*Tax Gross-Up and Indemnities*) or Clause 11 (*Increased Costs*) including (but not limited to) transferring its rights and obligations under the DIP Finance Documents to another Affiliate or Facility Office.

(b) Paragraph (a) above does not in any way limit the obligations of any Obligor under the DIP Finance Documents.

13.2 **Limitation of Liability**

(a) The Parent shall promptly indemnify the DIP Lender for all costs and expenses reasonably incurred by the DIP Lender as a result of steps taken by it under Clause 13.1 (*Mitigation*).

(b) The DIP Lender is not obliged to take any steps under Clause 13.1 (*Mitigation*) if, in the opinion of the DIP Lender (acting reasonably), to do so might be prejudicial to it.

## 14. Costs and Expenses

### 14.1 Transaction Expenses

The Parent shall, subject to the terms of the applicable DIP Order, promptly on demand pay the DIP Lender the amount of all reasonable and documented costs and expenses (including, without limitation, costs and expenses of the DIP Lender Advisers) incurred by it in connection with the negotiation, preparation, printing, execution and perfection of:

(a) this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b) any other DIP Finance Documents executed after the date of this Agreement.

### 14.2 Amendment Costs

If:

(a) an Obligor requests an amendment, waiver or consent; or

(b) an amendment is required pursuant to Clause 23.7 (*Change of Currency*),

the Parent shall, subject to the terms of the applicable DIP Order, within three (3) Business Days of demand, reimburse the DIP Lender for the amount of all reasonable and documented costs and expenses (including, without limitation, costs and expenses of the DIP Lender Advisers) incurred by the DIP Lender in responding to, evaluating, negotiating or complying with that request or requirement.

### 14.3 Enforcement Costs

The Parent shall, subject to the terms of the applicable DIP Order, within three (3) Business Days of demand, pay to the DIP Lender the amount of all reasonable and documented costs and expenses (including, without limitation, costs and expenses of the DIP Lender Advisers) incurred by the DIP Lender in connection with the enforcement of, or the preservation of any rights under, any DIP Finance Document and the Transaction Security and any proceedings instituted by or against the DIP Lender as a consequence of taking or holding the Transaction Security or enforcing these rights.

**Section 7**
**Guarantee**

## 15. Guarantee and Indemnity

### 15.1 Guarantee and Indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a) guarantees to the DIP Lender the punctual performance by each other Obligor of all that Obligor's obligations under the DIP Finance Documents including, without limitation:

(i) obligations which, but for the automatic stay under section 362(a) of the Bankruptcy Code, would become due; and

(ii) any interest accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for in this Agreement, whether or not such interest is an allowed claim in any such proceeding;

(b) undertakes with the DIP Lender that whenever another Obligor does not pay any amount when due under or in connection with any DIP Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c) agrees with the DIP Lender that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify the DIP Lender immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any DIP Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 15 if the amount claimed had been recoverable on the basis of a guarantee.

### 15.2 Continuing Guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the DIP Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

### 15.3 Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by the DIP Lender in whole or in part on the basis of any payment, security or other disposition which is avoided, set aside, disgorged, or must be restored in insolvency, liquidation, administration, bankruptcy (including as a preferential or fraudulent transfer under the Bankruptcy Code, or under any similar state or federal law) or otherwise, without limitation, then the liability of each Guarantor under this Clause 15 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

### 15.4 Waiver of Defences

The obligations of each Guarantor under this Clause 15 will not be affected by an act, omission, matter or thing which, but for this Clause, would reduce, release or prejudice any of its

obligations under this Clause 15 (without limitation and whether or not known to it or the DIP Lender) including:

(a) any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e) any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of a DIP Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or any increase in any facility or the addition of any new facility under any DIP Finance Document or other document or security;

(f) any unenforceability, illegality or invalidity of any obligation of any person under any DIP Finance Document or any other document or security; or

(g) any insolvency or similar proceedings.

15.5 **Waiver of Jersey law customary rights**

(a) Any right which at any time any Jersey Obligor may have under the existing or future laws of Jersey whether by virtue of the droit de discussion or otherwise to require that recourse be had to the assets of any other person before any claim is enforced against such Jersey Obligor in respect of the obligations assumed by such Jersey Obligor under or in connection with any DIP Finance Document is hereby waived.

(b) Any right which at any time any Jersey Obligor may have under the existing or future laws of Jersey whether by virtue of the droit de division or otherwise to require that any liability under any guarantee or indemnity given in or in connection with any DIP Finance Document be divided or apportioned with any other person or reduced in any manner whatsoever is hereby waived.

15.6 **Guarantor Intent**

Without prejudice to the generality of Clause 15.4 (*Waiver of Defences*), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the DIP Finance Documents and/or any facility or amount made available under any of the DIP Finance Documents for the purposes of or in connection with any of the following: business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

15.7 **Immediate Recourse**

Each Guarantor waives any right it may have of first requiring the DIP Lender to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 15. This waiver applies irrespective of any law or any provision of a DIP Finance Document to the contrary.

15.8 **Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the DIP Finance Documents have been irrevocably paid in full, the DIP Lender (or any trustee or agent on its behalf) may:

(a) refrain from applying or enforcing any other moneys, security or rights held or received by the DIP Lender (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b) hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 15.

15.9 **Deferral of Guarantors' Rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the DIP Finance Documents have been irrevocably paid in full and unless the DIP Lender otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the DIP Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 15:

(a) to be indemnified by an Obligor;

(b) to claim any contribution from any other guarantor of any Obligor's obligations under the DIP Finance Documents;

(c) to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the DIP Lender under the DIP Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the DIP Finance Documents by the DIP Lender;

(d) to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under Clause 15 (*Guarantee and Indemnity*);

(e) to exercise any right of set off against any Obligor; and/or

(f) to claim or prove as a creditor of any Obligor in competition with the DIP Lender.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the DIP Lender by the Obligors under or in connection with the DIP Finance Documents to be repaid in full on trust for the DIP Lender and shall promptly pay or transfer the same to the DIP Lender or as the DIP Lender may direct for application in accordance with Clause 23 (*Payment Mechanics*).

15.10 **Release of Guarantors' Right of Contribution**

If any Guarantor (a "**Retiring Guarantor**") ceases to be a Guarantor in accordance with the terms of the DIP Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a) that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the DIP Finance Documents; and

(b) each other Guarantor waives any rights it may have by reason of the performance of its obligations under the DIP Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the DIP Lender under any DIP Finance Document or of any other security taken pursuant to, or in connection with, any DIP Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

15.11 **Additional Security**

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by the DIP Lender.

15.12 **Guarantee Limitations**

This guarantee does not apply to any liability to the extent that it would result in this guarantee constituting unlawful financial assistance within the meaning of sections 678 or 679 of the United Kingdom's Companies Act 2006 or any equivalent and applicable provisions under the laws of the Original Jurisdiction of the relevant Guarantor and, with respect to any Additional Guarantor, is subject to any limitations set out in the Accession Deed applicable to such Additional Guarantor. Each Obligor and the DIP Lender hereby confirm that it is their intention that the guarantee under this Clause 15 shall not constitute a fraudulent transfer or fraudulent conveyance for purposes of any bankruptcy, insolvency or similar federal, state or foreign law, including, without limitation, the Bankruptcy Code and the Uniform Fraudulent Voidable Transactions Act. To effectuate the foregoing intention, each Obligor that is incorporated or organized in the United States or any State or territory thereof or the District of Columbia and the DIP Lender hereby irrevocably agrees that the maximum aggregate amount of the obligations for which such Obligor shall be liable under such guarantee shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Obligor that are relevant under such laws, and after giving effect to any rights to contribution pursuant to any agreement providing for equitable contribution among such Obligor, result in such obligations of such Obligor not constituting a fraudulent transfer or fraudulent conveyance.

**Section 8**
**Representations, Undertakings and Events of Default**

## 16. Representations

Each Obligor makes the representations and warranties set out in this Clause 16 to the DIP Lender.

16.1 **Status**

(a) It is a company with limited liability, limited liability company, corporation, or limited partnership (as applicable), duly incorporated or formed and validly existing under the law of its Original Jurisdiction.

(b) Each of its Subsidiaries is a company with limited liability, limited liability company, corporation, or limited partnership (as applicable), duly incorporated or formed and validly existing under the law of its jurisdiction of incorporation or formation.

(c) It and each of its Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(d) Each Obligor or Subsidiary that is incorporated or organized in the United States or any State or territory thereof or the District of Columbia is in good standing under the laws of its jurisdiction of its incorporation or organization

16.2 **Binding Obligations**

Subject to the Legal Reservations and each filing referred to in Clause 16.8 (*No Filing or Stamp Taxes*):

(a) the obligations expressed to be assumed by it in each DIP Finance Document to which it is a party are legal, valid, binding and enforceable obligations; and

(b) (without limiting the generality of paragraph (a) above), each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

16.3 **Non-Conflict with other Obligations**

The entry into and performance by it of, and the transactions contemplated by, the DIP Finance Documents and the granting of the Transaction Security do not and will not conflict with:

(a) any law or regulation applicable to it;

(b) the constitutional documents of any member of the Group; or

(c) any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument.

16.4 **Power and Authority**

(a) It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the DIP Finance Documents to which it is or will be a party and the transactions contemplated by those DIP Finance Documents.

(b) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the DIP Finance Documents to which it is a party.

16.5 **Validity and Admissibility in Evidence**

(a) All Authorisations required or desirable:

(i) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the DIP Finance Documents to which it is a party; and

(ii) to make the DIP Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect except any Authorisation referred to in Clause 16.8 (*No Filing or Stamp Taxes*).

(b) All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

16.6 **Governing Law and Enforcement**

(a) The choice of governing law of the DIP Finance Documents will be recognised and enforced in its Relevant Jurisdictions.

(b) Any judgment obtained in relation to a DIP Finance Document in the jurisdiction of the governing law of that DIP Finance Document will be recognised and enforced in its Relevant Jurisdictions.

16.7 **Insolvency**

No:

(a) corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 19.5 (*Chapter 11 Cases*); or

(b) creditors' process described in Clause 19.7 (*Creditors' Process*),

has been taken or, to the knowledge of the Parent, threatened in relation to a member of the Group; and none of the circumstances described in Clause 19.5 (*Chapter 11 Cases*) applies to a member of the Group.

16.8 **No Filing or Stamp Taxes**

Under the laws of its Relevant Jurisdiction it is not necessary that the DIP Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the DIP Finance Documents or the transactions contemplated by the DIP Finance Documents except:

(a) registration of particulars of any Transaction Security Document entered into by an English Obligor at Companies House in England and Wales under section 859A of the Companies Act 2006 and payment of associated fees; and

(b) registration of the security interests created under the relevant Jersey Transaction Security Document on the Jersey Security Register (the "**Jersey Registrations**") and payment of associated registration fees.

which registrations, filings, taxes and fees have been or will be made and paid on or promptly after the date of the relevant DIP Finance Document (or in the case of the Jersey Registrations, by the DIP Lender (or its representative) at the date and time agreed in the relevant Consent Letter).

16.9 **[Reserved]**

16.10 **No Default**

(a) No Event of Default and, on the date of this Agreement and the Closing Date, no Default is continuing or is reasonably likely to result from the making of any Borrowing or any disbursement from the DIP Facility Blocked Account or the entry into, the performance of, or any transaction contemplated by, any DIP Finance Document.

(b) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

16.11 **No Misleading Information**

Save as disclosed in writing to the DIP Lender prior to the date of this Agreement:

(a) any factual information provided by it or any member of the Group to the DIP Lender in connection with the DIP Finance Documents was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated;

(b) nothing has occurred or been omitted from the information referred to in paragraph (a) above and no information has been given or withheld that results in that information being untrue or misleading in any material respect; and

(c) all other written information provided by it or any member of the Group (including its advisers) to the DIP Lender in connection with the DIP Finance Documents was true, complete and accurate in all material respects as at the date it was provided and is not misleading in any respect.

16.12 **Financial Statements**

(a) Its Original Financial Statements were prepared in accordance with the Accounting Principles consistently applied.

(b) Its Original Financial Statements fairly present its financial condition and its results of operations during the relevant Financial Year.

(c) To the best of its knowledge and belief, there has been no material adverse change in its assets, business or financial condition (or the assets, business or consolidated financial condition of the Group, in the case of the Parent) since the date of the Original Financial Statements.

(d) Its most recent financial statements delivered pursuant to Clause 17.1 (*Financial Statements*):

(i) have been prepared in accordance with the Accounting Principles as applied to the Original Financial Statements; and

(ii) fairly present its consolidated financial condition as at the end of, and its consolidated results of operations for, the period to which they relate.

(e) The budgets and forecasts supplied under this Agreement were arrived at after careful consideration and have been prepared in good faith on the basis of recent historical information and on the basis of assumptions which were reasonable as at the date they were prepared and supplied.

(f) To the best of its knowledge and belief, since the date of the most recent financial statements delivered pursuant to Clause 17.1 (*Financial Statements*) there has been no material adverse change in the assets, business or financial condition of the Group.

16.13 **No Proceedings**

(a) Except for the Chapter 11 Cases and Foreign Proceedings, no litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries.

(b) Except for the Chapter 11 Cases and Foreign Proceedings, no judgment or order of a court, arbitral body or agency which is reasonably likely to have a Material Adverse Effect has (to the best of its knowledge and belief (having made due and careful enquiry)) been made against it or any of its Subsidiaries.

16.14 **No Breach of Laws**

(a) It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(b) No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

16.15 **Taxation**

(a) It is not (and none of its Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax, in each case except (i) to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) for any Tax being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained and (iii) for any Tax the payment of which is prohibited or restricted by, or not authorised under, the Bankruptcy Code, the DIP Order or any other order of the Bankruptcy Court.

(b) Other than routine tax audits in the ordinary course of business (including, without limitation, the two pending tax audits in Singapore and Korea), no material claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes, other than as disclosed to the DIP Lender in writing prior to the date of this Agreement.

(c) It is resident for Tax purposes only in its Original Jurisdiction.

16.16 **Jersey Tax**

Each Jersey Obligor is charged to income tax in Jersey at a rate of zero per cent. under the Income Tax (Jersey) Law 1961.

16.17 **Jersey Regulation**

No Jersey Obligor is conducting or has conducted any unauthorised financial services business for the purposes of the Financial Services (Jersey) Law 1998.

16.18 **Anti-Corruption Law**

Each member of the Group has conducted its businesses in compliance with applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

16.19 **Anti-money laundering**

It has complied with any anti-money laundering, counter terrorist financing and counter proliferation financing requirements it may be subject to including, without limitation, pursuant to the Proceeds of Crime (Jersey) Law 1999, the Proceeds of Crime (Supervisory Bodies) (Jersey) Law 2008 and the Money Laundering (Jersey) Order 2008.

16.20 **Liens and Financial Indebtedness**

(a) No Lien or Quasi-Security exists over all or any of the present or future assets of any member of the Group other than as permitted by this Agreement.

(b) No member of the Group has any Financial Indebtedness outstanding other than as permitted by this Agreement.

16.21 **Ranking**

The Transaction Security has or will have first ranking priority and it is not subject to any prior ranking or *pari passu* ranking Liens.

16.22 **Good title to assets**

It and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

16.23 **Legal and Beneficial Ownership**

It and each of its Subsidiaries is the sole legal and beneficial owner of the respective assets over which it purports to grant Liens.

16.24 **Shares**

The shares of any member of the Group which are subject to the Transaction Security are fully paid and not subject to any option to purchase or similar rights. The constitutional documents of companies whose shares are subject to the Transaction Security do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Transaction Security.

16.25 **Intellectual Property**

(a) It and each of its Subsidiaries (or, solely for purposes of paragraph (ii) below, the members of the Group collectively):

(i) (without prejudice to paragraph (b) below) is the sole legal and beneficial owner of or has licensed to it on normal commercial terms all the Intellectual Property which is used in the conduct of its business and which is required by it in order to carry on its business as it is being conducted;

(ii) are the sole legal and beneficial owners of all Intellectual Property rights subsisting worldwide in the “LIV” brand in relation to golfing-related products and services (including all trade mark rights subsisting in that name and all associated stylised formats and devices);

(iii) does not, in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or is reasonably likely to have a Material Adverse Effect; and

(iv) has taken all formal or procedural actions (including payment of fees and filing affidavits of use and applications for renewals of registration) required to maintain any material Intellectual Property owned by it.

(b) There is no current claim, and, to the best of its knowledge and belief (having made due and careful enquiry), no threatened claim, in each case against any member of the Group that has or is reasonably likely to have a Material Adverse Effect, alleging that:

(i) any aspect of any member of the Group's business operations may infringe, violate, misuse, dilute, or misappropriate any Intellectual Property right of any other Person; or

(ii) any member of the Group’s Intellectual Property is invalid or unenforceable.

16.26 **Sanctions**

(a) None of it, any Subsidiary or any of their respective directors or officers, or any of its employees or Affiliates that will act in any capacity in connection with or directly benefit from the DIP Facility:

(i) is a Sanctions Restricted Person,

(ii) has any business affiliation or commercial dealings with, or investments in, any Sanctioned Territory or Sanctions Restricted Person; or

(iii) is in violation of Sanctions.

(b) It maintains as at the date of this Agreement policies and procedures designed to promote and achieve compliance with Sanctions.

16.27 **Accounting Reference Date**

The Accounting Reference Date of each member of the Group is 31 December.

16.28 **Pensions**

(a) Neither it nor any of its Subsidiaries is or has at any time been an employer (for the purposes of sections 38 to 51 of the United Kingdom’s Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the Pensions Schemes Act 1993).

(b) Neither it nor any of its Subsidiaries is or has at any time been “connected” with or an “associate” of (as those terms are used in sections 38 and 43 of the United Kingdom’s Pensions Act 2004) such an employer.

16.29 **No Adverse Consequences**

(a) It is not necessary under the laws of its Relevant Jurisdictions:

(i) in order to enable the DIP Lender to enforce its rights under any DIP Finance Document; or

(ii) by reason of the execution of any DIP Finance Document or the performance by it of its obligations under any DIP Finance Document,

that the DIP Lender should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(b) The DIP Lender is not or will not be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any DIP Finance Document.

16.30 **Group Structure Chart**

The Group Structure Chart delivered to the DIP Lender pursuant to Part 1 of Schedule 2 (*Conditions Precedent*) is true, complete and accurate in all material respects and shows the following information:

(a) each member of the Group, including current name and company registration number, its Original Jurisdiction (in the case of an Obligor), its jurisdiction of incorporation (in the case of a member of the Group which is not an Obligor) and/or its jurisdiction of establishment and a list of shareholders; and

(b) all minority interests in any member of the Group and any person in which any member of the Group holds shares in its issued share capital or equivalent ownership interest of such person.

16.31 **Compliance with ERISA**

(a) No ERISA Affiliate has caused or suffered to exist any ERISA Event which would individually or in the aggregate, have a Material Adverse Effect.

(b) No Obligor has caused or suffered to exist any event that could result in the imposition of a Lien with respect to any Plan that is a defined benefit pension plan other than a Title IV Plan or Multiemployer Plan, which would, individually or in the aggregate, have a Material Adverse Effect.

16.32 **Investment Company Act**

No Obligor, nor any of its Subsidiaries, is an "investment company" within the meaning of the US Investment Company Act of 1940, as amended. Neither the making of any Borrowing, nor any disbursement from the DIP Facility Blocked Account nor, the application of the proceeds of any such Borrowing or disbursement or repayment of any Borrowing by any Obligor, nor the consummation of the other transactions contemplated hereby, will violate any provision of such Act or any rule, regulation or order of the US Securities and Exchange Commission thereunder.

16.33 **Times When Representations Made**

(a) All the representations and warranties in this Clause 16 are made by each Original Obligor on the date of this Agreement and on the Closing Date.

(b) The Repeating Representations are deemed to be made by each Obligor:

(i) on the date of each Borrowing Request;

(ii) on each Borrowing Date;

(iii) on the date of each disbursement from the DIP Facility Blocked Account; and

(iv) on the first day of each Interest Period.

(c) All the representations and warranties in this Clause 16 except Clause 16.11 (*No Misleading Information*) and Clause 16.30 (*Group Structure Chart*) are deemed to be

made by each Additional Guarantor on the day on which it becomes (or it is proposed that it becomes) an Additional Guarantor.

(d) Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 17. Information Undertakings

The undertakings in this Clause 17 remain in force from the date of this Agreement for so long as any amount is outstanding under the DIP Finance Documents or any DIP Facility Commitment is in force.

In this Clause 17:

"**Annual Financial Statements**" means the financial statements for a Financial Year delivered pursuant to paragraph (a) of Clause 17.1 (*Financial Statements*).

"**Monthly Financial Statements**" means the financial statements delivered pursuant to paragraph (c) of Clause 17.1 (*Financial Statements*).

"**Quarterly Financial Statements**" means the financial statements delivered pursuant to paragraph (b) of Clause 17.1 (*Financial Statements*).

### 17.1 Financial Statements

The Parent shall supply to the DIP Lender:

(a) as soon as they are available, but in any event within one-hundred and twenty (120) days after the end of each of its Financial Years:

(i) its consolidated financial statements for that Financial Year; and

(ii) the financial statements (consolidated if appropriate) of each Obligor for that Financial Year;

(b) as soon as they are available, but in any event within thirty (30) days after the end of each Financial Quarter of each of its Financial Years its consolidated financial statements for that Financial Quarter; and

(c) as soon as they are available, but in any event within seven (7) days after the end of each month its financial statements on a consolidated basis for that month (to include cumulative management accounts for the Financial Year to date).

### 17.2 Requirements as to Financial Statements

(a) The Parent shall procure that each set of Annual Financial Statements, Quarterly Financial Statements and Monthly Financial Statements includes a balance sheet, profit and loss account and cashflow statement. In addition the Parent shall procure that:

(i) each set of Quarterly Financial Statements includes a cashflow forecast in respect of the Group relating to the immediately following Financial Quarter; and

(ii) each set of Monthly Financial Statements is accompanied by a statement by the directors of the Parent commenting on the performance of the Group for the month to which the financial statements relate and the Financial Year to date and any material developments or proposals affecting the Group or its business.

(b) Each set of financial statements delivered pursuant to Clause 17.1 (*Financial Statements*):

(i) shall be certified by a director of the relevant company as fairly presenting its financial condition and operations as at the date as at which those financial statements were drawn up;

(ii) in the case of consolidated financial statements of the Group and subject to paragraph (e) below, shall be substantially in the form of, and contain the equivalent commentary and information as provided in, the Original Financial Statements; and

(iii) shall be prepared using the Accounting Principles, accounting practices and financial reference periods consistent with those applied in the preparation of the Original Financial Statements for the Group.

(c) If the DIP Lender wishes to discuss the financial position of any member of the Group with the auditors of that member of the Group, the DIP Lender may notify the Parent, stating the questions or issues which the DIP Lender wishes to discuss with those auditors. In this event, the Parent must ensure that those auditors are authorised (at the expense of the Parent):

(i) to discuss the financial position of the relevant member of the Group with the DIP Lender; and

(ii) to disclose to the DIP Lender any information which the DIP Lender may reasonably request.

(d) Each set of Monthly Financial Statements shall be delivered substantially in the form agreed between the DIP Lender and the Borrower prior to the date of this Agreement.

17.3 **Year-End**

The Parent shall not change its Accounting Reference Date.

17.4 **Information: Miscellaneous**

The Parent shall supply to the DIP Lender:

(a) at the same time as they are dispatched, copies of all documents dispatched by the Parent to its shareholders generally (or any class of them) or dispatched by the Parent or any Obligors to its creditors generally (or any class of them);

(b) promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current, threatened or pending against any member of the Group;

(c) promptly upon becoming aware of them, the details of any judgment or order of a court, arbitral body or agency which is made against any member of the Group;

(d) promptly, such information as the DIP Lender may reasonably require about the Charged Property and compliance of the Obligors with the terms of any Transaction Security Documents; and

(e) promptly on request, such further information regarding the financial condition, assets and operations of the Group and/or any member of the Group (including any requested amplification or explanation of any item in the financial statements, budgets or other material provided by any Obligor under this Agreement, any changes to management

of the Group and an up to date copy of its shareholders' register (or equivalent in its Original Jurisdiction)) as the DIP Lender may reasonably request.

17.5 **Notification of Default**

(a) Each Obligor shall notify the DIP Lender of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b) Promptly upon a request by the DIP Lender, the Parent shall supply to the DIP Lender a certificate signed by two of its directors or senior officers on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

17.6 **"Know Your Customer" Checks**

(a) If:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii) any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Agreement; or

(iii) a proposed assignment or transfer by the DIP Lender of its rights and obligations under this Agreement,

obliges the DIP Lender (or, in the case of paragraph (ii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the DIP Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the DIP Lender (for itself or, in the case of the event described in paragraph (ii) above, on behalf of any prospective new Lender) in order for the DIP Lender or, in the case of the event described in paragraph (ii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the DIP Finance Documents.

(b) The Parent shall, by not less than ten (10) Business Days' prior written notice to the DIP Lender, notify the DIP Lender of its intention to request that one of its Subsidiaries becomes an Additional Guarantor pursuant to Clause 21 (*Changes to the Obligors*).

(c) Following the giving of any notice pursuant to paragraph (b) above, if the accession of such Additional Guarantor obliges the DIP Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Borrower shall promptly upon the request of the DIP Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the DIP Lender (for itself or on behalf of any prospective new Lender) in order for the DIP Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Subsidiary to this Agreement as an Additional Guarantor.

17.7 **DIP Reporting**

(a) The Debtors shall provide the DIP Lender and its advisors with drafts of all material pleadings, motions, and applications (together with proposed orders attached thereto, as applicable) to be filed in the Chapter 11 Cases, including, without limitation, (a) the motion seeking approval of the proposed form of each DIP Order, which shall be in form and substance satisfactory to the DIP Lender, (b) the motion seeking authority to continue the use of the Obligors' cash management system, and proposed related order thereto, which shall be in form and substance satisfactory to the DIP Lender, (c) any motions seeking approval of bidding procedures and any sale under section 363 of the Bankruptcy Code, and the proposed forms of orders related thereto, which shall be in form and substance satisfactory to the DIP Lender, (d) the Approved Plan, the Disclosure Statement, and any motions seeking approval of either of them, which shall be in form and substance satisfactory to the DIP Lender, and (e) any other motion and/or proposed form of order relating to the Chapter 11 Cases (including any First Day Motion), each of which shall be in form and substance reasonably satisfactory to the DIP Lender, in each case as soon as practicable in advance of filing with the Bankruptcy Court and with reasonable time for the DIP Lender and its advisors to comment thereon, and, in any event, no less than five (5) days before filing. Each material pleading, motion, application, and proposed order described in clauses (a) through (e) above shall be consistent, and shall not conflict, with this Agreement, the other DIP Finance Documents, or the DIP Order.

(b) Delivery. The Borrower shall deliver to the DIP Lender, no later than 5:00 p.m. (New York City time) on the third Business Day of each calendar week (with the first such delivery being September 16, 2026), an Approved Budget Variance Report.

(c) Deemed Representation. Delivery by the Borrower of an Approved Budget Variance Report shall be deemed to constitute a representation by the Borrower, on behalf of the Obligors, to the DIP Lender that such Approved Budget Variance Report fairly presents the results of cash receipts and disbursements of the Obligors.

(d) Professional fees excluded. For the avoidance of doubt, the Obligors', the DIP Lender's and the Prepetition Lender's professional fees shall not be limited to amounts set forth in the Approved Budget and shall not be tested for purposes of determining compliance with Clause 3.3 and this Clause 17.7 (provided that in no event shall any of the Obligors' professionals or advisors have recourse to the Lender Reserve Account or any amounts from time to time on deposit therein).

## 18. General Undertakings

The undertakings in this Clause 18 remain in force from the date of this Agreement for so long as any amount is outstanding under the DIP Finance Documents or any DIP Facility Commitment is in force.

18.1 **Authorisations**

Each Obligor shall promptly:

(a) obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b) supply certified copies to the DIP Lender of,

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(i) enable it to perform its obligations under the DIP Finance Documents;

(ii) ensure the legality, validity, enforceability or admissibility in evidence of any DIP Finance Document; and

(iii) carry on its business where failure to do so has or is reasonably likely to have a Material Adverse Effect.

18.2 **Compliance with Laws**

Each Obligor shall (and the Parent shall ensure that each member of the Group will) comply in all respects with all laws to which it may be subject, if failure so to comply has or is reasonably likely to have a Material Adverse Effect.

18.3 **Anti-Corruption Law**

(a) No Obligor shall (and the Parent shall ensure that no other member of the Group will) directly or indirectly use the proceeds of the DIP Facility for any purpose which would breach the United Kingdom's Bribery Act 2010, the United States Foreign Corrupt Practices Act of 1977 or other similar legislation in other jurisdictions.

(b) Each Obligor shall (and the Parent shall ensure that each other member of the Group will):

(i) conduct its businesses in compliance with applicable anti-corruption laws; and

(ii) maintain policies and procedures designed to promote and achieve compliance with such laws.

18.4 **Taxation**

(a) Each Obligor shall (and the Parent shall ensure that each member of the Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

(i) such payment is being contested in good faith;

(ii) adequate reserves are being maintained for those Taxes and the costs required to contest them which have been disclosed in its latest financial statements delivered to the DIP Lender under Clause 17.1 (*Financial Statements*); and

(iii) such payment can be lawfully withheld and failure to pay those Taxes does not have or is not reasonably likely to have a Material Adverse Effect.

(b) No member of the Group may change its residence for Tax purposes.

18.5 **Merger**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction, except in accordance with the Approved Plan.

18.6 **Change of Business**

The Parent shall procure that no substantial change is made to the general nature of the business of the Parent, the Obligors or the Group taken as a whole from that carried on at the date of this Agreement.

18.7 **Acquisitions**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them); or

(b) incorporate or form a company.

18.8 **Joint Ventures**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture; or

(b) transfer any assets or lend to or guarantee or give an indemnity for or give a Lien for the obligations of a Joint Venture or maintain the solvency of or provide working capital to any Joint Venture (or agree to do any of the foregoing).

18.9 **Changes to directors or officers**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) appoint, replace or otherwise terminate any director or officer of a member of the Group.

18.10 **Material Contracts**

(a) No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(i) enter into a contract; or

(ii) amend, vary or waive any term of, or take any other action relating to, a contract,

in each case, without the prior written consent of the DIP Lender.

(b) Paragraph (a) above shall not apply to:

(i) a replacement of an Existing Contract provided that:

(A) the scope of the replacement contract is substantially the same as the Existing Contract it replaces and is required for the completion of the remainder of the 2026 season;

(B) the Group's aggregate liability under the replacement contract over its life does not exceed the greater of:

(1) USD 500,000 more than the liability of the Group under the Existing Contract it replaces; and

(2) one hundred and five per cent. (105%) of the aggregate liability under the Existing Contract it replaces;

(C) the replacement contract is entered into on arm's length terms; and

(D) the term of the replacement contract does not extend beyond December 31, 2026;

(ii) any amendment, variation or waiver of an Existing Contract where:

(A) the aggregate increase in liability for the Group as a result of the amendment, variation or waiver does not exceed the greater of:

(1) USD 500,000; and

(2) five per cent. (5%) of the value of the Existing Contract over its life (in the form prior to effecting the proposed amendment, variation or waiver);

(B) the amendment, variation or waiver is required for the completion of the remainder of the 2026 season;

(C) the amendment, variation or waiver is on arm's length terms; and

(D) the term of the Existing Contract (as amended, varied or waived) does not extend beyond December 31, 2026;

(iii) any contract entered into or to be entered into by a member of the Group provided that each of the following conditions is satisfied:

(A) the contract is entered into for the completion of the 2026 season;

(B) the contract does not relate to a professional golf event sponsored or hosted by the Group;

(C) the contract is entered into on arm's length terms; and

(D) the contract value (being the aggregate of all guaranteed and contingent amounts payable by any member of the Group under the contract) over the tenor of the contract is less than USD 250,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time); and

(iv) an amendment to a contract that is of a minor, administrative or technical nature and that does not affect the commercial substance of that contract.

(c) For the purposes of this Clause 18.10:

"**contract**" means any contract, term sheet, letter of intent, memorandum of understanding, heads of terms or other similar agreement or arrangement.

"**Existing Contract**" means any contract entered into by a member of the Group prior to the date of this Agreement.

18.11 **Preservation of Assets**

Each Obligor shall (and the Parent shall ensure that each other member of the Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary or desirable in the conduct of its business.

18.12 **Amendments to constitutional documents**

No Obligor shall, without the prior written consent of the DIP Lender, amend, vary, waive or otherwise modify its constitutional documents (including, without limitation, its memorandum and articles of association, by-laws, partnership agreement, or equivalent constitutional document in any relevant jurisdiction) or change its legal form.

18.13 **Pari Passu Ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of the DIP Lender against it under the DIP Finance Documents rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

18.14 **Negative Pledge**

(a) In this Clause 18.14, "**Quasi-Security**" means an arrangement or transaction described in paragraph (b) below.

(b) Except as permitted under paragraph (c) below:

(i) no Obligor shall (and the Parent shall ensure that no other member of the Group will) create or permit to subsist any Lien over any of its assets;

(ii) no Obligor shall (and the Parent shall ensure that no other member of the Group will):

(A) sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or reacquired by an Obligor or any other member of the Group;

(B) sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(C) enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(D) enter into any other preferential arrangement having a similar effect,

in circumstances where the arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of an asset.

(c) Paragraphs (b)(i) and (b)(ii) above do not apply to any Lien or (as the case may be) Quasi-Security which is:

(i) Permitted Security; or

(ii) a Permitted Transaction.

18.15 **Disposals**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.

(b) Paragraph (a) above does not apply to any sale, lease, transfer or other disposal which is:

(i) a Permitted Disposal (other than a disposal, to another member of the Group, of a creditor's rights under a Structural Intra-Group Loan); or

(ii) a Permitted Transaction (other than a disposal, to another member of the Group, of a creditor's rights under a Structural Intra-Group Loan),

**provided that** the Borrower shall notify the DIP Lender of any such disposal and shall provide the DIP Lender with reasonable details relating to the disposal (including the sale price).

18.16 **Arm's Length Basis**

(a) Except as permitted by paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into any transaction with any person (including any Affiliate) except on arm's length terms and for full market value.

(b) The following transactions shall not be a breach of this Clause 18.16:

(i) intra-Group loans permitted under Clause 18.17 (*Loans or Credit*);

(ii) fees, costs and expenses payable under the DIP Finance Documents in the amounts set out in the DIP Finance Documents delivered to the DIP Lender under Clause 4.1 (*Initial Conditions Precedent*) or agreed by the DIP Lender; and

(iii) any Permitted Transaction.

18.17 **Loans or Credit**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) be a creditor in respect of any Financial Indebtedness.

(b) Paragraph (a) above does not apply to:

(i) a Permitted Loan; or

(ii) a Permitted Transaction.

18.18 **No Guarantees or Indemnities**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) incur or allow to remain outstanding any guarantee in respect of any obligation of any person.

(b) Paragraph (a) does not apply to a guarantee which is:

(i) a Permitted Guarantee; or

(ii) a Permitted Transaction.

18.19 **Dividends and Share Redemption**

(a) Except as permitted under paragraph (b) below, the Parent shall not (and will ensure that no other member of the Group will):

(i) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

(ii) repay or distribute any dividend or share premium reserve;

(iii) pay or allow any member of the Group to pay any management, advisory or other fee to or to the order of any of the shareholders of the Parent; or

(iv) redeem, repurchase, defease, retire or repay any of its share capital or resolve to do so.

(b) Paragraph (a) above does not apply to the payment of a dividend or other distribution to the Borrower or any of its wholly-owned Subsidiaries.

18.20 **Structural Intra-Group Loans**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) repay or prepay any principal amount (or capitalised interest) outstanding under the Structural Intra-Group Loans;

(b) pay any interest or any other amounts payable in connection with the Structural Intra-Group Loans; or

(c) purchase, redeem, defease or discharge any amount outstanding with respect to the Structural Intra-Group Loans.

18.21 **Capital Commitments**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) incur any Capital Expenditure.

(b) Paragraph (a) above does not apply to any Capital Expenditure entered into in the ordinary course of business:

(i) which is less than USD 100,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time) in respect of a single transaction in any Financial Year; and

(ii) when aggregated with all Capital Expenditure incurred by members of the Group in any Financial Year, which is less than USD 500,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time).

18.22 **Financial Indebtedness**

(a) Except as permitted under paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) incur or allow to remain outstanding any Financial Indebtedness.

(b) Paragraph (a) above does not apply to Financial Indebtedness which is:

(i) Permitted Financial Indebtedness; or

(ii) a Permitted Transaction.

18.23 **Share Capital**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) issue any shares to any person other than in connection with a Permitted Transaction;

(b) grant to any person any option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any share(s) or loan capital of a member of the Group (including any right of pre-emption, conversion or exchange);

(c) alter any right attaching to any share(s) or loan capital of a member of the Group;

(d) reduce, cancel, repay, purchase or redeem any of its share capital;

(e) amend or alter any dividend policies of a member of the Group; or

(f) register, or allow the registration of, any transfer of any of its share capital.

18.24 **Use of proceeds**

(a) The Borrower shall use the proceeds of the DIP Facility only for the purposes set out in Clause 3.1 (*Purpose*).

(b) No Obligor shall use any portion of the DIP Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

18.25 **Insurance**

(a) Each Obligor shall (and the Parent shall ensure that each other member of the Group will) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business.

(b) All insurances must be with reputable independent insurance companies or underwriters.

18.26 **Intellectual Property**

Each Obligor shall (and the Parent shall procure that each other member of the Group will):

(a) preserve and maintain the subsistence and validity of the Intellectual Property necessary for the business of the relevant Group member;

(b) use reasonable endeavours to prevent any infringement in any material respect of the Intellectual Property;

(c) make registrations, file affidavits of use, file applications for renewals of registration, and pay all registration fees and taxes necessary to maintain the Intellectual Property in full force and effect and record its interest in that Intellectual Property;

(d) not use or permit the Intellectual Property to be used in a way or take any step or omit to take any step in respect of that Intellectual Property which may materially and adversely affect the existence or value of the Intellectual Property or imperil the right of any member of the Group to use such property; and

(e) not discontinue the use of the Intellectual Property.

18.27 **Pensions / ERISA**

(a) The Parent shall not, and shall not permit any member of the Group to become or be deemed to be “plan assets” within the meaning of ERISA, the Code and the respective regulations promulgated thereunder. No ERISA Affiliate shall maintain, contribute to, or have an obligation to contribute to, an ERISA Plan or Multiemployer Plan.

(b) The Parent shall ensure that no member of the Group is:

(i) an employer (for the purposes of sections 38 to 51 of the United Kingdom’s Pensions Act 2004) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the United Kingdom’s Pension Schemes Act 1993); or

(ii) “connected” with or an “associate” of (as those terms are used in sections 38 or 43 of the United Kingdom’s Pensions Act 2004) such an employer unless there is no reasonable prospect of a Contribution Notice or Financial Support Direction being served on it or any of its Subsidiaries on account of it or any of its Subsidiaries being such an associate or so connected.

18.28 **Scheduling and venue of events**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) select or change the tournament week or location of any professional golf tournament sponsored or hosted by the Group; or

(b) enter into any binding agreement with a venue to host any professional golf tournament sponsored or hosted by the Group,

in each case, except in respect of any cancellation of any event in Michigan or New Orleans.

18.29 **Charitable Contributions**

No Obligor shall (and the Parent shall procure that no other member of the Group will) directly or indirectly, make, commit to make, or authorise any charitable contribution, donation, gift, grant, or similar payment to any charitable, philanthropic, or non-profit organisation or cause without the prior written consent of the DIP Lender.

18.30 **People with Significant Control Regime**

Each English Obligor shall (and the Parent shall ensure that each other member of the Group incorporated in England will):

(a) within the relevant timeframe, comply with any notice it receives pursuant to Part 21A of the Companies Act 2006 from any company incorporated in the United Kingdom whose shares are the subject of the Transaction Security; and

(b) promptly provide the DIP Lender with a copy of that notice.

18.31 **Employment**

No Obligor shall (and the Parent shall ensure that no other member of the Group will):

(a) hire, terminate (other than for cause), or materially change the title, role, location of employment, compensation or responsibilities of, the Chief Executive Officer, Commissioner of the Group or any direct executive report thereof;

(b) establish, or materially amend, any material employee benefits plan of the Group (other than any employee equity incentive plan);

(c) establish or amend any employee equity incentive plan of the Group;

(d) adopt any annual bonus plan or pool for the employees of the Group;

(e) enter into any collective bargaining or similar agreement with any trade union or similar employee body; or

(f) hire any employee, or retain any independent contractor (that is a natural person), of the Group with guaranteed annual compensation in excess of USD 50,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time), or modify the compensation of any employee or contractor such that their guaranteed annual compensation would exceed such amount.

18.32 **Access**

If a Default is continuing or the DIP Lender reasonably suspects a Default is continuing or may occur, each Obligor shall, and the Parent shall ensure that each member of the Group will, (not more than once in every Financial Year unless the DIP Lender reasonably suspects a Default is

continuing or may occur) permit the DIP Lender and/or accountants or other professional advisers and contractors of the DIP Lender free access at all reasonable times and on reasonable notice at the risk and cost of the Obligor to (a) the premises, assets, books, accounts and records of each member of the Group and (b) meet and discuss matters with Senior Management.

18.33 **Financial Assistance**

Each Obligor shall (and the Parent shall procure each other member of the Group will) comply in all respects with sections 678 and 679 of the United Kingdom's Companies Act 2006 and any equivalent legislation in other jurisdictions including in relation to the execution of the Transaction Security Documents and payment of amounts due under this Agreement.

18.34 **Treasury Transactions**

No Obligor shall (and the Parent will procure that no other member of the Group will) enter into any Treasury Transaction, other than spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes.

18.35 **IPO and Securities Registration**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) initiate any initial public offering or registration of securities of any member of the Group, or engage or hire any advisors in connection therewith.

18.36 **Media Rights**

(a) Subject to paragraph (b) below, no Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into any media rights distribution agreement for the live (whether linear or digital) broadcast of professional golf tournament competition coverage sponsored or hosted by the Group.

(b) Paragraph (a) above shall not apply to a media rights distribution agreement provided that each of the following conditions is satisfied:

(i) the agreement is entered into in respect of the 2026 season;

(ii) the media rights under that agreement relate to jurisdictions other than the United States and the United Kingdom;

(iii) the agreement involves aggregate rights fees of less than USD 100,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time) over the term of such agreement; and

(iv) the agreement is entered into in the ordinary course of business.

18.37 **Player Contracts**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into any legally binding commitment or arrangement with a player to compete as a professional golfer.

18.38 **Real Property and Employee Offices**

No Obligor shall (and the Parent shall ensure that no other member of the Group will), without the prior written consent of the DIP Lender:

(a) establish any employee office;

(b) purchase any Real Property; or

(c) enter into any lease for Real Property,

in each case, other than any lease which:

(i) is entered into in the ordinary course of business; and

(ii) contemplates a rental payment of no more than USD 100,000 (or its equivalent in another currency) (or such other amount notified by the DIP Lender to the Parent in writing from time to time).

18.39 **MENA Territory Agreements**

No Obligor shall (and the Parent shall ensure that no other member of the Group will) enter into any agreement with a counterparty that is incorporated in any of Bahrain, Egypt, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Oman, Palestine, Qatar, Sudan, Syria, United Arab Emirates or Yemen (each, a "**MENA Territory**"), other than:

(a) agreements with Affiliates of the DIP Lender; or

(b) agreements entered into in connection with a professional golf tournament hosted in such MENA Territory.

18.40 **Further Assurance**

(a) Each Obligor shall (and the Parent shall procure that each other member of the Group will) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the DIP Lender may reasonably specify (and in such form as the DIP Lender may reasonably require in favour of the DIP Lender or its nominee(s)):

(i) to perfect the Liens created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Lien over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the DIP Lender provided by or pursuant to the DIP Finance Documents or by law;

(ii) to confer on the DIP Lender a Lien over any property and assets of that Obligor located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii) to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b) Each Obligor shall (and the Parent shall procure that each other member of the Group will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Lien conferred or intended to be conferred on the DIP Lender by or pursuant to the DIP Finance Documents.

18.41 **Milestones**

The Debtors shall ensure that each of the milestones set forth below (the "**Milestones**") is achieved in accordance with the applicable timing referred to therein, or by such later date as approved in writing by the DIP Lender:

(a) By no later than 24 hours after the Petition Date, the Debtors shall have filed the First Day Motions, including, without limitation, the DIP Motion, and the Cash Management Motion.

(b) By no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the DIP Lender and reasonably satisfactory to the Obligors.

(c) By no later than thirty (30) days after the Petition Date, the Debtors shall have filed the Approved Plan and the Disclosure Statement.

(d) By no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, in form and substance satisfactory to the DIP Lender and reasonably satisfactory to the Obligors.

(e) By no later than eighty (80) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order.

(f) By no later than one-hundred ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

(g) By no later than one-hundred twenty (120) days after the Petition Date, the Plan Effective Date shall have occurred.

## 19. Events of Default

Each of the events or circumstances set out in Clause 19 is an Event of Default (save for Clause 19.16 (*Acceleration*)).

### 19.1 Non-Payment

An Obligor does not pay on the due date any amount payable pursuant to a DIP Finance Document at the place and in the currency in which it is expressed to be payable unless:

(a) its failure to pay is caused by:

(i) administrative or technical error; or

(ii) a Disruption Event; and

(b) payment is made within three (3) Business Days of its due date.

### 19.2 Other Obligations

(a) An Obligor does not comply with Clause 3.3 (*DIP Budget*), Clause 17.7 (*DIP Reporting*), any provision of any Transaction Security Document, Clause 21.2 (*Additional Guarantors*), Clauses 34 (*DIP Priority and Collateral*), Clause 35 (*Adequate Protection*), Clause 36 (*DIP Facility Blocked Account and Lender Reserve Account*) and/or Clause 37 (*Proceeds Account*).

(b) An Obligor does not comply with any provision of the DIP Finance Documents (other than those referred to in Clause 19.1 (*Non-Payment*) and paragraph (a) above).

(c) No Event of Default under paragraph (b) above will occur if the failure to comply is capable of remedy and is remedied within ten (10) Business Days of the earlier of (i) the DIP Lender giving notice to the Borrower or other relevant Obligor and (ii) the Borrower or any other Obligor becoming aware of the failure to comply.

(d) An Obligor makes a Disbursement Request in excess of the amounts permitted under Clause 36 (*DIP Facility Blocked Account and Lender Reserve Account*).

(e) An Obligor does not comply with Clause 18.41 (*Milestones*), unless such failure is the result solely of (i) any action or inaction on the part of the DIP Lender, or (ii) the availability of the Bankruptcy Court.

19.3 **Misrepresentation**

Any representation or statement made or deemed to be made by an Obligor in the DIP Finance Documents or any other document delivered by or on behalf of any Obligor under or in connection with any DIP Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

19.4 **Cross Default**

(a) Any Financial Indebtedness of any member of the Group is not paid when due nor within any originally applicable grace period.

(b) Any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(c) Any commitment for any Financial Indebtedness of any member of the Group is cancelled or suspended by a creditor of any member of the Group as a result of an event of default (however described).

(d) Any creditor of any member of the Group becomes entitled to declare any Financial Indebtedness of any member of the Group due and payable prior to its specified maturity as a result of an event of default (however described).

(e) No Event of Default will occur under this Clause 19.4:

(i) if the aggregate amount of Financial Indebtedness or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above is less than USD 5,000,000 (or its equivalent in any other currency or currencies); or

(ii) if the Borrower has disclosed the circumstances giving rise to any breach under this Clause 19.4 to the DIP Lender in writing prior to the date of this Agreement.

19.5 **Chapter 11 Cases**

Any of the following events occur in the Chapter 11 Cases:

(a) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (or any of the Obligors shall file an application or motion or pleading for entry of or in support of an order) (i) appointing a chapter 7 trustee, or a chapter 11 trustee under section 1104 of the Bankruptcy Code, (ii) appointing an examiner (other than a fee examiner) or receiver with enlarged powers (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under section 1106(b) of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise to a case under chapter 7 of the Bankruptcy Code or (iv) providing for the disposition without the DIP Lender's prior written consent of all, or a material portion of, the assets of any Obligor or any Subsidiary of any Obligor or any Equity Interest of any Obligor or any Subsidiary of any Obligor, either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases (other than the Approved Plan) or otherwise except as expressly permitted by this Agreement and the DIP Order or with the prior written consent of the DIP Lender;

(b) any Obligor or any Subsidiary of any Obligor fails to comply in all respects with any provision of the DIP Order;

(c) failure of the Debtors to make any deposit and/or maintain cash and other amounts solely in the DIP Facility Blocked Account, the Lender Reserve Account, the Proceeds Account, the Funded Reserve Account, or any other account into which the Debtors are required to make deposits, and in which they are permitted to maintain cash, under the DIP Finance Documents;

(d) an order shall have been entered by the Bankruptcy Court terminating or reducing the period pursuant to section 1121 of the Bankruptcy Code during which the Obligors have the exclusive right to file a plan of reorganization or solicit acceptance thereof, (or any of the Obligors shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Obligor) any other person's motion to, have such an order entered), in each case unless the DIP Lender consents in writing to such termination or reduction;

(e) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court, or any of the Obligors or any Subsidiary of an Obligor shall have filed or supported a motion or other pleading for entry of an order, (i) to revoke, reverse, vacate, terminate or rescind the Cash Management Order, (ii) to revoke, reverse, vacate, terminate, modify, supplement or amend any provision of the Interim DIP Order, the Final DIP Order or this Agreement, (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any of the Obligors, equal or superior to the priority of the DIP Lender in respect of the DIP Obligations (subject only to the Carve-Out as provided in the DIP Order), (iv) to grant or permit the grant of any Lien on the DIP Collateral other than as permitted under this Agreement and the DIP Order, (v) to permit charging of any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender or the Prepetition Lender, (vi) to prohibit or limit the extension under section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Lender on the DIP Collateral to any proceeds, products, offspring, or profits of the DIP Collateral acquired by any Obligor after the Petition Date, (vii) to authorize the use of Cash Collateral under section 363 of the Bankruptcy Code or to obtain financing for any of the Obligors under section 364 of the Bankruptcy Code, other than as contemplated by the DIP Finance Documents and the DIP Order; or (viii) otherwise take any other action or actions materially adverse to the DIP Lender or its rights and remedies hereunder, under any of the other DIP Finance Documents, or the DIP Order, or the DIP Lender's interest in any of the DIP Collateral;

(f) an order is entered by the Bankruptcy Court confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases (or an order shall be entered by the Bankruptcy Court approving a disclosure statement related to such plan) other than the Approved Plan, or any of the Debtors shall directly or indirectly file, propose, support, or fail to contest in good faith the filing or confirmation of such any plan other than the Approved Plan;

(g) the Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder or holders of a Lien on any part of the DIP Collateral securing the DIP Loans (other than the DIP Lender) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any such DIP Collateral) or to permit any such third parties to exercise any other remedies in respect of such Liens;

(h) any Obligor makes any payment, or seeks authority to make any payment, other than in accordance with this Agreement, the DIP Order, and the Approved Budget, in each case subject to the Permitted Variance;

(i) any of the Obligors shall commence or join in any legal proceeding to contest in any manner that the DIP Order constitutes a valid and enforceable agreement, or to assert that it has no further obligation or liability under the DIP Order or the other DIP Finance Documents;

(j) any Obligor shall make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or debt arising prior to the Petition Date other than payments expressly authorized (i) pursuant to this Agreement or the DIP Order, or (ii) pursuant to any "first day" or "second day" order entered by the Court in the Chapter 11 Cases or any other order entered by the Bankruptcy Court and in each case in accordance with the Approved Budget;

(k) the filing of any motion or proposed order for approval of bidding procedures, a sale process, and/or a proposed sale, in each case other than in form and substance acceptable to the DIP Lender;

(l) the entry of, or the filing of a motion or pleading seeking entry of, any order that is inconsistent with this Agreement, the DIP Order, or the other DIP Finance Documents, without the prior written consent of the DIP Lender;

(m) the granting, or an application by any Obligor for authority to grant, any Lien on the DIP Collateral, or any claim entitled to superpriority administrative expense status, in each case senior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Liens under the Prepetition PIF Facility Agreement, the Adequate Protection Liens, or the Adequate Protection Superpriority Claims, other than the Carve-Out;

(n) any Obligor shall consolidate or combine with any other person except to the extent expressly permitted by this Agreement or pursuant to the Approved Plan;

(o) the Obligors file, join or directly or indirectly support any motion, pleading, application or adversary proceeding (a) challenging the validity, enforceability, perfection or priority of, or seeking to avoid and recover, any Liens securing the Prepetition PIF Facility Agreement or any DIP Liens granted under this Agreement, the DIP Order, or the other DIP Finance Documents or (b) seeking disallowance, in full or in part, of any claims of the Prepetition Lender on account of the Prepetition PIF Facility Agreement or the DIP Lender under this Agreement, the DIP Order, or the other DIP Finance Documents;

(p) the Obligors file, join or directly or indirectly support any motion seeking approval of (or the entry of an order by the Court approving) adequate protection to any pre-petition creditor in respect of any Liens on any DIP Collateral, other than the Liens of the Prepetition Lender; or

(q) the Obligors file or support any motion or take any action in the Chapter 11 Cases seeking the entry of an order by the Bankruptcy Court precluding the DIP Lender or the Prepetition Lender from having the right to, or being permitted to exercise the right to, "credit bid" in respect of applicable collateral.

19.6 **Foreign Proceedings**

(a) Any of the following events occur in respect of the Foreign Proceedings:

(i) the UK Recognition Applications are fully dismissed, denied, or withdrawn (other than with the DIP Lender's prior written consent), or are not filed with

the English Court within two (2) Business Days after receipt by the Foreign Representative of a certified copy of the applicable First Day Order;

(ii) the English Court declines to grant the Recognition Order without a discretionary stay on terms substantially similar to the automatic stay within forty-five (45) days after the Petition Date (or such later date as the DIP Lender may agree in writing);

(iii) the Jersey Administration application is dismissed, denied, or withdrawn (other than with the DIP Lender's prior written consent), or is not filed with the Jersey Court within two (2) Business Days after entry of the Interim DIP Order; or

(iv) the Jersey Court declines to grant the Jersey Administration Order, or, once granted, the Jersey Administration Order is discharged, reversed, or otherwise ceases to remain in full force and effect, unless with the consent of the DIP Lender or as a result of the purpose specified in the Jersey Administration Order having been achieved.

(b) In circumstances where there is no ongoing Jersey Administration in respect of the relevant Jersey Obligor, any corporate action, legal proceedings or other procedure or step is taken (other than with the DIP Lender's prior written consent) in relation to the appointment in Jersey of a liquidator, administrator, the Viscount of the Royal Court of Jersey in respect of a Jersey Obligor or any of their assets or any analogous procedure or step is taken in connection with any of the events referred to in Article 8 of the Interpretation (Jersey) Law 1954, unless in each case such action, proceeding, procedure or step is frivolous or vexatious and is otherwise discharged, stayed or dismissed within 14 days of commencement.

19.7 **Creditors' Process**

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of USD 5,000,000 and is not discharged within (14) days.

19.8 **Unlawfulness and Invalidity**

(a) It is or becomes unlawful for an Obligor to perform any of its obligations under the DIP Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective.

(b) Any obligation or obligations of any Obligor under any DIP Finance Documents are not (subject to the Legal Reservations) or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the DIP Lender under the DIP Finance Documents.

(c) Any DIP Finance Document ceases to be in full force and effect or any Transaction Security ceases to be legal, valid, binding, enforceable or effective or is alleged by a party to it (other than the DIP Lender) to be ineffective.

19.9 **Cessation of Business**

Any member of the Group suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

19.10 **Change of Ownership**

An Obligor (other than the Parent) ceases to be a wholly-owned Subsidiary of the Parent at any time on or after the Petition Date.

19.11 **Expropriation**

The authority or ability of any member of the Group to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets.

19.12 **Repudiation and Rescission of Agreements**

An Obligor (or any other relevant party) rescinds or purports to rescind or repudiates or purports to repudiate a DIP Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a DIP Finance Document or any Transaction Security.

19.13 **Litigation**

Except for the Chapter 11 Cases and Foreign Proceedings, any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started or threatened, or any judgment or order of a court, arbitral body or agency is made, in relation to the DIP Finance Documents or the transactions contemplated in the DIP Finance Documents or against any member of the Group or its assets have, or has, or are, or is, reasonably likely to have a Material Adverse Effect or which would involve a liability, or a potential or alleged liability, exceeding USD 15,000,000 (or its equivalent in other currencies).

19.14 **Pensions**

The Pensions Regulator issues a Financial Support Direction or a Contribution Notice to any member of the Group unless the aggregate liability of the Obligors under all Financial Support Directions and Contributions Notices is less than 5,000,000 (or its equivalent in any other currency or currencies).

19.15 **Material Adverse Change**

Any event or circumstance occurs which the DIP Lender reasonably believes has or is reasonably likely to have a Material Adverse Effect.

19.16 **Acceleration**

(a) Without prejudice to paragraph (b) below, subject to the DIP Order and any notice and cure periods contained therein, on and at any time after the occurrence of an Event of Default which is continuing the DIP Lender may, without any further action or approval of the Bankruptcy Court, by notice to the Borrower:

(i) cancel the DIP Facility Commitments whereupon they shall immediately be cancelled;

(ii) without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Borrower, declare that all or part of the DIP Loans, together with accrued interest, and all other amounts accrued or outstanding under the DIP Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(iii) declare that all or part of the DIP Loans be payable on demand, at which time they shall immediately become payable on demand by the DIP Lender; and/or

(iv) exercise any and all other rights and remedies available to it under the DIP Order, the other DIP Finance Documents, applicable law (including the UCC), or in equity.

(b) Automatic stay modification; notice period. Upon the occurrence of an Event of Default, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically modified without further action or order of the Bankruptcy Court, and the DIP Lender, upon seven (7) calendar days’ prior written notice to the Borrower, shall be entitled to exercise all of its rights and remedies with respect to the DIP Collateral under the DIP Order and the other DIP Finance Documents. In any hearing following delivery of such notice, the only issue that may be raised in opposition to the DIP Lender's exercise of remedies (unless otherwise ordered by the Bankruptcy Court) shall be whether an Event of Default has, in fact, occurred and is continuing.

(c) No notice required in certain cases. Notwithstanding Clause 19.16(b), no prior notice shall be required for the DIP Lender to block or limit disbursements from the DIP Facility Blocked Account or the Lender Reserve Account or withdrawals from the Proceeds Account, including by delivering any control or activation notice to the applicable account bank pursuant to any control agreement. This Clause 19.16(c) is subject in all respects to the Carve-Out and the other provisions of the DIP Order, and nothing in this Clause 19.16(c) shall limit the Obligors’ ability to fund or satisfy the Carve-Out in accordance with, and subject to the terms of, the DIP Order.

(d) Permitted use of cash collateral during notice period. Notwithstanding Clauses 19.16(b) and (c), solely during the seven (7) calendar day notice period referred to in Clause 19.16(b), the Obligors shall be permitted to continue to use Cash Collateral (x) in the Proceeds Account, solely in the ordinary course of business and in accordance with the Approved Budget and the other DIP Finance Documents, to fund expenses critically necessary to preserve the DIP Collateral and (y) in the Proceeds Account and the DIP Facility Blocked Account, to satisfy the Carve-Out in accordance with this Agreement and the DIP Order.

**Section 9**
**Changes to Parties**

## 20. Changes to the DIP Lender

### 20.1 Assignments and Transfers by the DIP Lender

No DIP Obligations may be assigned, transferred, novated or sub-participated by the DIP Lender, in whole or in part, without the prior written consent of the Borrower (email being sufficient).

### 20.2 Security over Lender's Rights

In addition to the other rights provided to the DIP Lender under this Clause 20, the DIP Lender may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Liens in or over (whether by way of collateral or otherwise) all or any of its rights under any DIP Finance Document to secure obligations of the DIP Lender including, without limitation:

(a) any charge, assignment or other Lien to secure obligations to a federal reserve or central bank; and

(b) any charge, assignment or other Lien granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by the DIP Lender as security for those obligations or securities,

except that no such charge, assignment or Lien shall:

(i) release the DIP Lender from any of its obligations under the DIP Finance Documents or substitute the beneficiary of the relevant charge, assignment or Lien for the DIP Lender as a party to any of the DIP Finance Documents; or

(ii) require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the DIP Lender under the DIP Finance Documents.

## 21. Changes to the Obligors

### 21.1 Assignments and Transfer by Obligors

No Obligor may assign any of its rights or transfer any of its rights or obligations under the DIP Finance Documents.

### 21.2 Additional Guarantors

(a) Subject to compliance with the provisions of paragraphs (b) and (c) of Clause 17.6 (*"Know Your Customer" Checks*), each Debtor which is not an Original Obligor shall promptly become an Additional Guarantor. That Debtor shall become an Additional Guarantor immediately upon the occurrence of the following:

(i) delivery by the Parent to the DIP Lender of a duly completed and executed Accession Deed; and

(ii) receipt by the DIP Lender of all of the documents and other evidence listed in Part 4 (*Conditions Precedent Required to be Delivered by an Additional Guarantor*) of Schedule 2 (*Conditions Precedent*) in relation to that Additional Guarantor, each in form and substance satisfactory to the DIP Lender.

(b) The DIP Lender shall notify the Borrower promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Part 4 (*Conditions Precedent Required to be Delivered by an Additional Guarantor*) of Schedule 2 (*Conditions Precedent*).

21.3 **Repetition of Representations**

Delivery of an Accession Deed constitutes confirmation by the relevant Subsidiary that the representations and warranties referred to in paragraph (c) of Clause 16.33 (*Times When Representations Made*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

**Section 10**
**Administration**

## 22. Conduct of Business by the DIP Lender

No provision of this Agreement will:

(a) interfere with the right of the DIP Lender to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b) oblige the DIP Lender to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c) oblige the DIP Lender to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 23. Payment Mechanics

### 23.1 Payments between the Parties

(a) On each date on which an Obligor is required to make a payment under a DIP Finance Document, that Obligor shall make the same available to the DIP Lender (unless a contrary indication appears in a DIP Finance Document) for value on the due date at the time and in such funds specified by the DIP Lender as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b) Payment shall be made to such account in the principal financial centre of the country of that currency (or, in relation to euro, in a principal financial centre in such Participating Member State or London) with such bank as the DIP Lender specifies.

### 23.2 Distributions to an Obligor

The DIP Lender may (with the consent of the Obligor or in accordance with Clause 24 (*Set-Off*)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the DIP Finance Documents or in or towards purchase of any amount of any currency to be so applied.

### 23.3 Partial Payments

(a) If the DIP Lender receives a payment that is insufficient to discharge all the amounts then due and payable by an Obligor under the DIP Finance Documents, the DIP Lender shall apply that payment towards the obligations of that Obligor under the DIP Finance Documents in the following order:

(i) first, in or towards payment of any unpaid fees, costs and expenses owing to the DIP Lender under the DIP Finance Documents;

(ii) secondly, in or towards payment of any accrued interest, fee or commission due but unpaid under the DIP Finance Documents;

(iii) thirdly, in or towards payment of any principal due but unpaid under the DIP Finance Documents; and

(iv) fourthly, in or towards payment of any other sum due but unpaid under the DIP Finance Documents.

(b) Paragraph (a) above will override any appropriation made by an Obligor.

23.4 **No Set-Off by Obligors**

All payments to be made by an Obligor under the DIP Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

23.5 **Business Days**

(a) Any payment under the DIP Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b) During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

23.6 **Currency of Account**

(a) Subject to paragraphs (b) and (c) below, dollars is the currency of account and payment for any sum due from an Obligor under any DIP Finance Document.

(b) Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(c) Any amount expressed to be payable in a currency other than dollars shall be paid in that other currency.

23.7 **Change of Currency**

(a) Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i) any reference in the DIP Finance Documents to, and any obligations arising under the DIP Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the DIP Lender (after consultation with the Parent); and

(ii) any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the DIP Lender (acting reasonably).

(b) If a change in any currency of a country occurs, this Agreement will, to the extent the DIP Lender (acting reasonably and after consultation with the Parent) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the relevant market and otherwise to reflect the change in currency.

23.8 **Disruption to Payment Systems etc.**

If either the DIP Lender determines (in its discretion) that a Disruption Event has occurred or the DIP Lender is notified by the Parent that a Disruption Event has occurred:

(a) the DIP Lender may, and shall if requested to do so by the Parent, consult with the Parent with a view to agreeing such changes to the operation or administration of the DIP Facility as the DIP Lender may deem necessary in the circumstances;

(b) the DIP Lender shall not be obliged to consult with the Parent in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c) any such changes agreed upon by the DIP Lender and the Parent shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the DIP Finance Documents notwithstanding the provisions of Clause 29 (*Amendments and Waivers*); and

(d) the DIP Lender shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the DIP Lender) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 23.

## 24. Set-Off

The DIP Lender may set off any matured obligation due from an Obligor under the DIP Finance Documents (to the extent beneficially owned by the DIP Lender) against any matured obligation owed by the DIP Lender to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the DIP Lender may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 25. Notices

### 25.1 Communications in Writing

Any communication to be made under or in connection with the DIP Finance Documents shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 25.2 Addresses

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the DIP Finance Documents is:

(a) in the case of each Obligor, that identified with its name below; and

(b) in the case of the DIP Lender, that identified with its name below,

or any substitute address or email address or department or officer as each Party may notify to the other Parties, by not less than five (5) Business Days' notice.

### 25.3 Delivery

(a) Any communication or document made or delivered by one person to another under or in connection with the DIP Finance Documents will only be effective:

(i) if by way of email, when received in legible form; or

(ii) if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 25.2 (*Addresses*), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to the DIP Lender will be effective only when actually received by the DIP Lender and then only if it is expressly marked for the attention of the department or officer identified with the DIP Lender's

signature below (or any substitute department or officer as the DIP Lender shall specify for this purpose).

(c) Any communication or document made or delivered to the Borrower in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

(d) Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5:00 pm in the place of receipt shall be deemed only to become effective on the following day.

25.4 **Electronic Communication**

(a) Any communication or document to be made or delivered between any Obligor and the DIP Lender under or in connection with the DIP Finance Documents may be made or delivered by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) if the Obligors and the DIP Lender:

(i) notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means; and

(ii) notify each other of any change to their address or any other such information supplied by them by not less than five (5) Business Days' notice.

(b) Any such electronic communication or delivery as specified in paragraph (a) above to be made between an Obligor and the DIP Lender may only be made in that way to the extent that the Obligor and the DIP Lender agree that, unless and until notified to the contrary, this is to be an accepted form of communication or delivery.

(c) Any such electronic communication or document specified in paragraph (a) above made or delivered between the Obligors and the DIP Lender will be effective only when actually received (or made available) in readable form and in the case of any electronic communication or document made or delivered by an Obligor to the DIP Lender only if it is addressed in such a manner as the DIP Lender shall specify for this purpose.

(d) Any electronic communication or document which becomes effective, in accordance with paragraph (b) above, after 5:00 pm in the place in which the Party to whom the relevant communication or document is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(e) Any reference in a DIP Finance Document to a communication being sent or received or a document being delivered shall be construed to include that communication or document being made available in accordance with this Clause 25.4.

25.5 **English Language**

(a) Any notice given under or in connection with any DIP Finance Document must be in English.

(b) All other documents provided under or in connection with any DIP Finance Document must be:

(i) in English; or

(ii) if not in English, and if so required by the DIP Lender, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 26. Calculations and Certificates

26.1 **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a DIP Finance Document, the entries made in the accounts maintained by the DIP Lender are *prima facie* evidence of the matters to which they relate.

26.2 **Certificates and Determinations**

Any certification or determination by the DIP Lender of a rate or amount under any DIP Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

26.3 **Day Count Convention**

Any interest, commission or fee accruing under a DIP Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the relevant market differs, in accordance with that market practice.

## 27. Partial Invalidity

If, at any time, any provision of a DIP Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 28. Remedies and Waivers

No failure to exercise, nor any delay in exercising, on the part of the DIP Lender, any right or remedy under a DIP Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any of the DIP Finance Documents. No election to affirm any DIP Finance Document on the part of the DIP Lender shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each DIP Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 29. Amendments and Waivers

(a) Any term of the DIP Finance Documents may be amended or waived only with the consent of the DIP Lender and the Obligors and any such amendment or waiver will be binding on all Parties.

(b) Subject to paragraphs (c) and (d) below, the DIP Lender will be deemed to have given its consent ten (10) Business Days after the Parent has requested such amendment or waiver in writing and given notice of it in accordance with the terms of this Agreement:

(i) unless consent is expressly refused by the DIP Lender in writing within that time; or

(ii) the DIP Lender responds to the request in writing within that time requiring for an additional period to consider the request.

(c) Paragraph (b) above shall not apply in respect of an amendment, waiver or a consent of, or in relation to, any term of any DIP Finance Document that has the effect of changing or which relates to:

(i) an extension to the date of payment of any amount under the DIP Finance Documents;

(ii) a reduction in the Fixed Rate or a reduction in the amount of any payment of principal, interest, fees or commission payable;

(iii) a change in currency of payment of any amount under the DIP Finance Documents;

(iv) an increase in any DIP Facility Commitment or an extension of the Availability Period;

(v) a change to the Borrower or Guarantors other than in accordance with Clause 21 (*Changes to the Obligors*);

(vi) Clause 3.3 (*DIP Budget*);

(vii) Clause 5.1 (*Delivery of a Borrowing Request*), Clause 7.1 (*Illegality*), Clause 7.2 (*Exit*), the definition of "Change of Control" in Clause 1.1 (*Definitions*), Clause 7.6 (*Restrictions*), Clause 20 (*Changes to the DIP Lender*), Clause 21 (*Changes to the Obligors*), this Clause 29, Clause 32 (*Governing Law*) or Clause 33 (*Enforcement*);

(viii) (other than as expressly permitted by the provisions of any DIP Finance Document) the nature or scope of:

(A) the guarantee and indemnity granted under Clause 15 (*Guarantee and Indemnity*);

(B) the Charged Property; or

(C) the manner in which the proceeds of enforcement of the Transaction Security are distributed,

(except in the case of paragraphs (B) and (C) above, insofar as it relates to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is expressly permitted under this Agreement or any other DIP Finance Document);

(ix) the release of any guarantee and indemnity granted under Clause 15 (*Guarantee and Indemnity*) or of any Transaction Security unless permitted under this Agreement or any other DIP Finance Document or relating to a sale or disposal of an asset which is the subject of the Transaction Security where such sale or disposal is permitted under this Agreement or any other DIP Finance Document;

(x) Clause 17.1 (*Financial Statements*) and/or Clause 17.2 (*Requirements as to Financial Statements*);

(xi) Clause 17.3 (*Year-End*);

(xii) Clause 17.7 (*DIP Reporting*);

(xiii) Clause 18.7 (*Acquisitions*);

(xiv) Clause 18.6 (*Change of Business*);

(xv) Clause 18.5 (*Merger*);

(xvi) Clause 18.9 (*Changes to directors or officers*) ;

(xvii) Clause 18.12 (*Amendments to constitutional documents*);

(xviii) Clause 18.14 (*Negative Pledge*);

(xix) Clause 18.15 (*Disposals*);

(xx) Clause 18.16 (*Arm's Length Basis*);

(xxi) Clause 18.17 (*Loans or Credit*);

(xxii) Clause 18.19 (*Dividends and Share Redemption*);

(xxiii) Clause 18.21 (*Capital Commitments*);

(xxiv) Clause 18.23 (*Share Capital*);

(xxv) Clause 18.22 (*Financial Indebtedness*);

(xxvi) Clause 18.28 (*Scheduling and venue of events*);

(xxvii) Clause 18.29 (*Charitable Contributions*);

(xxviii) Clause 18.31 (*Employment*);

(xxix) Clause 18.35 (*IPO and Securities Registration*);

(xxx) Clause 18.36 (*Media Rights*);

(xxxi) Clause 18.37 (*Player Contracts*);

(xxxii) Clause 18.38 (*Real Property and Employee Offices*);

(xxxiii) Clause 18.39 (*MENA Territory Agreements*);

(xxxiv) Clause 18.41 (*Milestones*);

(xxxv) Clause 19.5 (*Chapter 11 Cases*);

(xxxvi) Clause 21.2 (*Additional Guarantors*);

(xxxvii)a waiver of or amendment to any Event of Default; or

(xxxviii) Clauses 34 (*DIP Priority and Collateral*), 35 (*Adequate Protection*), 36 (*DIP Facility Blocked Account and Lender Reserve Account*), 37 (*Proceeds Account*) and/or 38 (*DIP Order*),

and the express consent of the DIP Lender shall be required in respect of any such amendment, waiver or a consent.

(d) Any amendment or waiver relating to Clause 18.10 (*Material Contracts*) shall require the prior written consent of the Department Head of Direct Investments or Investments Division of the DIP Lender **provided that** the DIP Lender will be deemed to have given its consent within five (5) Business Days after the date on which the Parent has requested such amendment or waiver in writing unless consent is expressly refused by the DIP Lender in writing within that time or the DIP Lender responds to the request in writing within that time requiring for an additional period to consider the request.

## 30. Confidentiality

### 30.1 Confidentiality

The DIP Lender agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 30.2 (*Disclosure of Confidential Information*), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 30.2 Disclosure of Confidential Information

The DIP Lender may disclose:

(a) any terms hereof or any other Confidential Information to the extent required or appropriate to obtain entry of the DIP Order or defend the DIP Orders or as required by the Bankruptcy Court (in each case as determined in good faith by the Borrower);

(b) to any of its Affiliates and Related Funds and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as it shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(c) to any person:

(i) to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more DIP Finance Documents or which succeeds (or which may potentially succeed) it as DIP Lender and, in each case, to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(ii) with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more DIP Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Related Funds, Representatives and professional advisers;

(iii) who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or paragraph (b)(ii) above;

(iv) to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(v) to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vi) to whom or for whose benefit that Lender charges, assigns or otherwise creates Liens (or may do so) pursuant to Clause 20.2 (*Security over Lender's Rights*); or

(vii) with the consent of the Parent (such consent not to be unreasonably withheld or delayed);

in each case, such Confidential Information as the DIP Lender shall consider appropriate if:

(A) in relation to paragraphs (i) to (iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information; and

(B) in relation to paragraphs (iv), (v) and (vi) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price sensitive information except that there shall be no requirement to so inform if, in the opinion of the DIP Lender, it is not practicable so to do in the circumstances.

30.3 **Entire Agreement**

This Clause 30 constitutes the entire agreement between the Parties in relation to the obligations of the DIP Lender under the DIP Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

30.4 **Inside Information**

The DIP Lender acknowledges that some or all of the Confidential Information is or may be price sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and the DIP Lender undertakes not to use any Confidential Information for any unlawful purpose.

30.5 **Notification of Disclosure**

The DIP Lender agrees (to the extent permitted by law and regulation) to inform the Borrower:

(a) of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(iv) of Clause 30.2 (*Disclosure of Confidential Information*) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b) upon becoming aware that Confidential Information has been disclosed in breach of this Clause 30.

30.6 **Continuing Obligations**

The obligations in this Clause 30 are continuing and, in particular, shall survive and remain binding on the DIP Lender for a period of twelve (12) months from the earlier of:

(a) the date on which all amounts payable by the Obligors under or in connection with this Agreement have been paid in full and all DIP Facility Commitments have been cancelled or otherwise cease to be available; and

(b) the date on which the DIP Lender otherwise ceases to be a Party to this Agreement.

## 31. Counterparts

Each DIP Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the DIP Finance Document.

**Section 11**
**Governing Law and Enforcement**

## 32. Governing Law

THIS AGREEMENT, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

## 33. Enforcement

### 33.1 Jurisdiction

All judicial proceedings brought against any party hereto with respect to this Agreement shall be brought in the Bankruptcy Court or, upon the dismissal or other resolution of the Chapter 11 Cases, in any state or federal court of competent jurisdiction in the State of New York, and by execution and delivery of this Agreement, each Obligor accepts for itself and in connection with its properties, generally and unconditionally, the exclusive jurisdiction of the Bankruptcy Court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each Obligor irrevocably waives any right it may have to assert the doctrine of forum non conveniens or to object to venue to the extent any proceeding is brought in accordance with this clause.

### 33.2 Service of Process

Without prejudice to any other mode of service allowed under any relevant law, each Non-US Obligor irrevocably appoints the Borrower as its agent for service of process in relation to the Chapter 11 Cases and any proceedings before the Bankruptcy Court or any state or federal court in the State of New York.

### 33.3 Waiver of Jury Trial

EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER DIP FINANCE DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.

**Section 12**
**DIP Collateral**

## 34. DIP Priority and Collateral

### 34.1 Superpriority Claims

From and after the Petition Date, subject in all respects to the entry and terms of the Interim DIP Order and/or the Final DIP Order, as applicable, all of the DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, constitute joint and several allowed superpriority administrative claims against the Obligors (without the need to file any proof of claim) (the "**DIP Superpriority Claims**"), with priority over any and all other chapter 11 and chapter 7 administrative expenses, adequate protection claims, diminution in value claims, and all other claims asserted against the Obligors now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and any and all other administrative expenses or other claims arising under any other provisions of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 363, 364, 365, 503, 506(b), 506(c), 507(a), 507(b), 507(d), 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment, subject only to the Carve-Out.

### 34.2 DIP Liens

From and after the Petition Date, subject in all respects to the entry and terms of the Interim DIP Order and/or the Final DIP Order, as applicable, the DIP Obligations shall: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by valid, binding, enforceable, perfected, and non-avoidable first priority senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not encumbered by valid, enforceable, perfected, and non-avoidable Liens, subject only to the Carve-Out; and (ii) pursuant to sections 364(c)(3) and 364(d) of the Bankruptcy Code, be secured by valid, binding, enforceable, perfected, and non-avoidable Liens on and security interests in all other DIP Collateral, subject to the Carve-Out and junior only to any valid, perfected, enforceable, and non-avoidable Liens in favor of third parties in existence as of the Petition Date (or which are perfected subsequent to the Petition Date as and to the extent permitted by section 546(b) of the Bankruptcy Code) and which are senior to the Liens granted under the Finance Documents (as defined in the Prepetition PIF Facility Agreement) and permitted under the Prepetition PIF Facility Agreement, if any.

### 34.3 Effectiveness; no further action required

All of the DIP Liens shall be effective, perfected, and enforceable as of the entry of the Interim DIP Order and/or the Final DIP Order, as applicable, without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements, or other agreements save for each filing referred to in Clause 16.8 (*No Filing or Stamp Taxes*).

### 34.4 Joint and several; no marshalling

The DIP Obligations shall be the joint and several obligations of each Obligor, and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. The Obligors waive, and the DIP Order shall prohibit, the equitable doctrine of marshalling or any similar doctrine against any of the DIP Collateral or other interest of the DIP Lender.

### 34.5 DIP Order content

The Obligors shall not (and shall not permit any other Subsidiary of the Parent to) file or support any motion or other pleading for entry of an order with respect to any of the Chapter 11 Cases,

and no such order shall be entered by the Bankruptcy Court with the consent of any Obligor, that would: (i) revoke, reverse, stay, vacate, terminate, modify, supplement, or otherwise amend any provision of the Interim DIP Order or the Final DIP Order without the prior written consent of the DIP Lender; (ii) permit any administrative expense or any claim, now existing or hereafter arising, of any kind or nature whatsoever, to have administrative priority as to any of the Obligors equal or superior to the priority of the DIP Lender in respect of the DIP Obligations, other than the Carve-Out; (iii) grant or permit the grant of a Lien on the DIP Collateral other than as permitted under this Agreement; (iv) permit charging of any of the DIP Collateral under section 506(c) of the Bankruptcy Code against the DIP Lender or the Prepetition Lender; (v) limit or prohibit the extension, under section 552(b) of the Bankruptcy Code, of the DIP Liens or the Adequate Protection Liens to proceeds, products, offspring, or profits of the DIP Collateral acquired by any Obligor after the Petition Date; (vi) authorize the use of Cash Collateral under section 363 of the Bankruptcy Code, or obtain financing for any Obligor under section 364 of the Bankruptcy Code, other than as contemplated by the DIP Finance Documents or the DIP Order; or (vii) otherwise take any action materially adverse to the DIP Lender or the Prepetition Lender, their respective rights and remedies under the DIP Finance Documents, the Finance Documents (as defined in the Prepetition PIF Facility Agreement), or the DIP Order, or their respective interests in any of the DIP Collateral. Without limiting the foregoing, the Interim DIP Order and the Final DIP Order shall each contain: (A) customary stipulations (with respect to the Interim DIP Order, subject to a challenge period of sixty (60) days from the Petition Date (or such other period as may be ordered by the Bankruptcy Court)); (B) releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations of whatever nature related to or arising out of: (1) the obligations under the Prepetition PIF Facility Agreement, the collateral securing obligations thereunder, and documentation related thereto; and (2) the DIP Facility, the DIP Finance Documents, and the DIP Collateral, in each case through the date of the applicable DIP Order; (C) customary indemnities in favor of the DIP Lender and the Prepetition Lender; and (D) customary waivers under section 506(c) of the Bankruptcy Code, of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and of the equitable doctrine of marshalling (approval of which waivers with respect to sections 506(c) and 552(b) may, solely in the Interim DIP Order, be subject to the entry of the Final DIP Order).

## 35. Adequate Protection

Except as provided in the DIP Order, no Obligor shall incur, create, assume, suffer to exist, or apply to the Bankruptcy Court for authority to incur, create, assume, or suffer to exist: (i) any administrative expense, unsecured claim, or other superpriority claim or Lien that is pari passu with or senior to the claims of the DIP Lender hereunder, except for the Carve-Out; or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than the Adequate Protection Liens and the Adequate Protection Superpriority Claim granted to the Prepetition Lender pursuant to the DIP Order, and the Obligors shall oppose any motion seeking approval of adequate protection for the benefit of any party other than the Prepetition Lender without the prior written consent of the DIP Lender.

**Section 13**
**Accounts**

## 36. DIP Facility Blocked Account and Lender Reserve Account

### 36.1 Establishment of DIP Facility Blocked Account

The proceeds of the DIP Loans incurred by the Borrower pursuant to the Interim DIP Availability and the Final DIP Availability shall be deposited into, and held in, a blocked account (the "**DIP Facility Blocked Account**") established by the Borrower at a financial institution acceptable to the DIP Lender and the Obligors. The DIP Facility Blocked Account shall be under the sole dominion and control of the DIP Lender (or, if it is an escrow account, the DIP Lender shall have sole and exclusive signing rights with respect thereto and rights to direct distributions therefrom), pursuant to documentation, including any control, account or escrow agreement, in form and substance satisfactory to the DIP Lender and the Obligors. All such proceeds shall be held in the DIP Facility Blocked Account at all times until disbursed in accordance with Clause 36.4 (*Disbursements*) for the purposes set forth in the Approved Budget. The DIP Facility Blocked Account, and all amounts held therein, shall at all times be subject to the DIP Liens and shall constitute DIP Collateral.

### 36.2 Establishment of Lender Reserve Account

On the Closing Date (or as otherwise agreed or required by the DIP Lender), the aggregate amount indicated under the Approved Budget for payment of the DIP Lender's and Prepetition Lender's professionals during the Interim Period (as defined in the DIP Order), and on the Final DIP Availability Date (or as otherwise agreed or required by the DIP Lender), the aggregate remaining amount indicated under the Approved Budget for payment of the DIP Lender's and Prepetition Lender's professionals through the Scheduled Maturity Date shall in each case be deposited into, and held in, a blocked account (the "**Lender Reserve Account**") established by the Borrower at a financial institution acceptable to the DIP Lender and the Obligors. The Lender Reserve Account shall be under the sole dominion and control of the DIP Lender (or, if it is an escrow account, the DIP Lender shall have sole and exclusive signing rights with respect thereto and rights to direct distributions therefrom), pursuant to documentation, including any control, account or escrow agreement, in form and substance satisfactory to the DIP Lender and the Obligors. Amounts on deposit in the Lender Reserve Account may be disbursed from time to time upon written request solely to pay fees and expenses of the DIP Lender's and Prepetition Lender's professionals, in accordance with the DIP Order and the other DIP Loan Documents. The Lender Reserve Account, and all amounts held therein, shall at all times be subject to the DIP Liens and shall constitute DIP Collateral.

### 36.3 Control

Each of the DIP Facility Blocked Account and the Lender Reserve Account shall be under the sole dominion and control of the DIP Lender, and the DIP Lender shall be deemed to have "control" over the DIP Facility Blocked Account and the Lender Reserve Account for all perfection purposes under the DIP Order and pursuant to the control, account or escrow agreements referred to in Clauses 36.1 (*Establishment of DIP Facility Blocked Account*) and 36.2 (*Establishment of Lender Reserve Account*).

### 36.4 Disbursements

The Borrower may request disbursement of amounts held in the DIP Facility Blocked Account by delivering to the DIP Lender a Disbursement Request not more than once each week at the direction of the DIP Lender (email being sufficient); provided that (i) the Borrower shall not make a Disbursement Request for any week unless aggregate unrestricted cash of the Obligors is projected to be less than the Minimum Cash at any time during such week, (ii) the Borrower shall limit such Disbursement Request to an amount required to make disbursements for such

week in excess of the Minimum Cash, and (iii) the aggregate amount of each Disbursement Request, and the purposes for which it is made, shall be based on the funding requirements of the Borrower and the other Obligors for such week, and in accordance with the Approved Budget then in effect. Upon receipt of a Disbursement Request consistent with this Clause 36.4 (*Disbursements*) and satisfaction (or waiver by the DIP Lender) of the conditions set forth in Clause 4.2 (*Further Conditions Precedent*), the DIP Lender shall disburse funds from the DIP Facility Blocked Account to the Proceeds Account in an aggregate amount equal to the amount specified in such Disbursement Request. Each Disbursement Request shall be delivered no later than Wednesday of the prior week, and the requested amounts, once approved, shall be disbursed no later than 12:00 PM New York City time the following Monday (or, if the following Monday is not a Business Day, on the next following Business Day). Each submission by the Borrower of a Disbursement Request shall be deemed to constitute a representation and warranty by the Borrower, on behalf of the Obligors, to the DIP Lender that the conditions set forth in Clause 4.2 (*Further Conditions Precedent*) have been satisfied as of the date of the applicable disbursement.

36.5 **No obligation to fund in excess of account balance**

Notwithstanding anything herein to the contrary, and except as expressly set forth in the DIP Order, the DIP Lender shall have no obligation to disburse any amount in excess of the amounts then held in the DIP Facility Blocked Account or the Lender Reserve Account.

36.6 **Reliance; no independent verification.**

With respect to any disbursement, withdrawal, transfer, or application of funds from the DIP Facility Blocked Account, the DIP Lender shall be entitled to conclusively rely upon, and shall be fully protected and shall not incur any liability in relying upon, any Disbursement Request submitted by the Borrower, and shall have no responsibility to independently determine whether the conditions set forth in Clause 4.2 (*Further Conditions Precedent*) have been satisfied as of the date of the applicable disbursement.

## 37. Proceeds Account

37.1 **Establishment**

Once disbursed from the DIP Facility Blocked Account, proceeds of the DIP Loans shall be deposited into, and held in, a deposit account of the Borrower at a financial institution reasonably acceptable to the DIP Lender and the Obligors (the "**Proceeds Account**"), to be used solely in the amounts and for the purposes permitted by the Approved Budget. The Proceeds Account shall be subject to the Proceeds Account Control Agreement.

37.2 **Collateral status**

The Proceeds Account, and all proceeds of the DIP Loans and any other amounts held therein, shall at all times be subject to the DIP Liens and shall constitute DIP Collateral until applied by the Borrower in accordance with the Approved Budget.

37.3 **Proceeds Account Control Agreement**

The Borrower shall execute and deliver to the DIP Lender a deposit account control agreement with respect to the Proceeds Account, in form and substance satisfactory to the DIP Lender (the "**Proceeds Account Control Agreement**"). The terms of the Proceeds Account Control Agreement shall permit the Borrower to withdraw and apply amounts on deposit in the Proceeds

Account solely in accordance with the Approved Budget, the DIP Orders, and this Agreement, from the Closing Date until the Termination Date.

37.4 **Control**

The DIP Lender shall be deemed to have "control" over the Proceeds Account for all purposes of perfection under the DIP Order and pursuant to the Proceeds Account Control Agreement.

37.5 **Carve-Out**

Commencing with the week ended September 18, 2026, and on or before the Thursday of each week thereafter, the Obligors shall fund into a segregated account maintained by the Obligors and held in trust (the "**Funded Reserve Account**") from amounts on deposit in the Proceeds Account (but not from the DIP Facility Blocked Account, the Lender Reserve Account, or funds from time to time on deposit therein) an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of estimated fees and expenses set out in the weekly statements delivered in accordance with the DIP Order, and (ii) the aggregate amount of unpaid Allowed Professional Fees (as defined in the DIP Order) contemplated to be incurred in the DIP Budget during such week plus (b) the Post-Carve Out Trigger Notice Cap (as defined in the DIP Order), provided that upon delivery of a Carve-Out Trigger Notice by the DIP Lender, the Obligors shall be permitted to fund any remaining outstanding amounts comprising the Carve-Out into the Carve-Out reserve from available amounts in the Proceeds Account and from amounts that would be otherwise available for disbursement from the DIP Facility Blocked Account in accordance with Clause 36.4 (*Disbursements*) but for the occurrence of the Event of Default referred to in the Carve-Out Trigger Notice (but not from the Lender Reserve Account or any amounts from time to time on deposit therein). In no event shall the DIP Lender or Prepetition Lender be responsible for or obligated to pay any compensation to, or to reimburse any expenses of, any estate professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

## 38. DIP Order

The Parties hereby expressly agree that in the event of any express conflict between this Agreement and the DIP Order, the DIP Order shall control.

## 39. Additional Covenants, Representations, and Warranties

39.1 Notwithstanding Clause 22 (*Conduct of Business by the DIP Lender*), the DIP Lender shall not: (a) claim, report, or otherwise take a position, on any US tax return (in the event submitted by it) that any equity interests in any of the Debtors are worthless or have been abandoned, or otherwise claim on a US tax return any loss or deduction in respect of the worthlessness or abandonment of any such equity interests, whether held directly or indirectly, for any US tax year ending on or before the effective date of the Approved Plan, it being acknowledged that the DIP Lender is a "50-percent shareholder" (as defined in Section 382(g)(4)(D) of the Code) with respect to the Borrower; provided, however, that nothing in this clause (a) shall prohibit the DIP Lender from taking any position, or claiming any loss or deduction, to the extent required under applicable law (including any mandatory Tax reporting obligation); or (b) directly or indirectly, sell, transfer, or otherwise dispose of (including by pledge, hypothecation, or grant of any option, warrant, or other derivative or economic interest), in whole or in part, any equity interests directly held by it in a holding company of the Debtors that would reasonably be expected to result in an "ownership change" of the Borrower within the meaning of Section 382 of the Code; or in the case of clause (b), at any time prior to the Tax Restriction Termination Date (as defined below); provided that the DIP Lender may take an action otherwise restricted by clause (b) with the prior written consent of the Debtors (or, on and after the effective date of the Approved Plan, the reorganized Debtors) (such consent not to be

unreasonably withheld, conditioned or delayed), given in consultation with their tax advisors and based on a determination that such action would not reasonably be expected to (i) result in an "ownership change" of the Borrower within the meaning of Section 382 of the Code, (ii) adversely affect the Borrower's ability to qualify for the application of Section 382(l)(5) of the Code or, if applicable, Section 382(l)(6) of the Code, or (iii) otherwise reduce or limit the Debtors' net operating loss carryforwards or other material U.S. federal income tax attributes. For these purposes, the "**Tax Restriction Termination Date**" means (a) if the Approved Plan becomes effective, the second anniversary of the effective date of the Approved Plan, and (b) otherwise, the date on which the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the DIP Lender shall not be in violation of the foregoing restrictions on account of any action taken by any direct or indirect owner of Equity Interests in a Debtor that is itself a Debtor, whether such action is taken by such Debtor directly, by an administrator, liquidator, receiver or other insolvency officeholder appointed in respect of such Debtor, or pursuant to or in connection with any local insolvency, restructuring or similar proceeding commenced in respect of such Debtor.

39.2 The DIP Lender represents that, during the three-year period ending on the Petition Date, it has not claimed any deduction or taken any position described in Clause 39.1(a) (*Additional Covenants, Representations, and Warranties*) or effected any transfer described in Clause 39.1(b) (*Additional Covenants, Representations, and Warranties*).

39.3 The DIP Lender acknowledges that monetary damages would be an inadequate remedy for any breach of the covenants set out in this Clause 39 (*Additional Covenants, Representations, and Warranties*) and that the Debtors shall only be entitled to specific performance and injunctive relief in respect of any such breach. The Debtors hereby acknowledge that they shall not be entitled to monetary damages of any kind in respect of any breach by the DIP Lender of the covenants set out in this Clause 39 (*Additional Covenants, Representations, and Warranties*), nor shall the Debtors be entitled to any other remedy available at law or in equity.

39.4 The obligations in this Clause 39 (*Additional Covenants, Representations, and Warranties*) are continuing and, in particular, shall survive the termination of the commitments under, and the repayment in full of, the DIP Facility.

**This Agreement** has been entered into on the date stated at the beginning of this Agreement.

## Schedule 1

## The Original Guarantors

| **Name of Original Guarantor** | **Registration number (or equivalent, if any)** |
|---|---|
| LIV Golf Ltd | 13473438, England |
| LIV Golf New Jersey LLC | 0451495561, New Jersey, USA |
| LIV Golf Events Limited | 13943068, England |
| LIV Golf Holdings Ltd | 136131, Jersey |
| LIV Golf Investments Ltd | 136610, Jersey |
| Wedge IP Management Co, Limited | 13801850, England |
| Wedge IP Management Co, LLC | 6468038, Delaware, USA |
| Fairway TM Blocker 1, LLC | 7236266, Delaware, USA |
| Fairway TM Blocker 2, LLC | 7236268, Delaware, USA |
| Fairway TM Blocker 3, LLC | 7236271, Delaware, USA |
| Fairway TM Blocker 4, LLC | 7236273, Delaware, USA |
| Fairway TM Blocker 5, LLC | 7236279, Delaware, USA |
| Fairway TM Blocker 6, LLC | 7236280, Delaware, USA |
| Fairway TM Blocker 7, LLC | 7236282, Delaware, USA |
| Fairway TM Blocker 8, LLC | 7236285, Delaware, USA |
| Fairway TM Co 8 GP, LLC | 7236293, Delaware, USA |
| Fairway TM Blocker 9, LLC | 7236286, Delaware, USA |
| Fairway TM Blocker 10, LLC | 7236290, Delaware, USA |
| Fairway TM Blocker 11, LLC | 7158727, Delaware, USA |
| Fairway TM Blocker 12, LLC | 7158730, Delaware, USA |
| Fairway TM Co 12 GP, LLC | 10303140, Delaware, USA |
| Fairway TM Blocker 13, LLC | 2876228, Delaware, USA |
| Fairway TM Co 1, LLC | 7236296, Delaware, USA |
| Fairway TM Co 2, LLC | 7236300, Delaware, USA |
| Fairway TM Co 3, LLC | 7236306, Delaware, USA |
| Fairway TM Co 4, LLC | 7236309, Delaware, USA |
| Fairway TM Co 5, LLC | 7236314, Delaware, USA |

| | |
|---|---|
| Fairway TM Co 6, LLC | 7236322, Delaware, USA |
| Fairway TM Co 7, LLC | 7236326, Delaware, USA |
| Fairway TM Co 8, LP | 7238384, Delaware, USA |
| Fairway TM Co 9, LLC | 7236328, Delaware, USA |
| Fairway TM Co 10, LLC | 7236333, Delaware, USA |
| Fairway TM Co 11, LLC | 7158733, Delaware, USA |
| Fairway TM Co 12, LP | 7158734, Delaware, USA |
| Fairway TM Co 13, LLC | 2876231, Delaware, USA |
| LIV Golf US Media, LLC | 4307887, Delaware, USA |
| LIV Golf Events ISE Ltd | 13943048, England |
| Wedge Event 1 Co | 6559540, Delaware, USA |
| Wedge Event 2 Co | 6559565, Delaware, USA |
| Wedge Event 3 Co | 6559555, Delaware, USA |
| Wedge Event 4 Co | 6559545, Delaware, USA |
| Wedge WPB Inc. | 6565250, Delaware, USA |
| Wedge Event 7 Co | 6685610, Delaware, USA |
| Fairway TM Intermediate 1, LLC | 7236338, Delaware, USA |
| Fairway TM Intermediate 2, LLC | 7236341, Delaware, USA |
| Fairway TM Intermediate 3, LLC | 7236350, Delaware, USA |
| Fairway TM Intermediate 4, LLC | 7236352, Delaware, USA |
| Fairway TM Intermediate 5, LLC | 7236355, Delaware, USA |
| Fairway TM Intermediate 6, LLC | 7236357, Delaware, USA |
| Fairway TM Intermediate 7, LLC | 7236360, Delaware, USA |
| Fairway TM Intermediate 8, LLC | 7236362, Delaware, USA |
| Fairway TM Intermediate 9, LLC | 7236369, Delaware, USA |
| Fairway TM Intermediate 10, LLC | 7236372, Delaware, USA |
| Fairway TM Intermediate 11, LLC | 7158700, Delaware, USA |
| Fairway TM Intermediate 12, LLC | 7158702, Delaware, USA |
| Fairway TM Intermediate 13, LLC | 2876269, Delaware, USA |

# Schedule 2

# Conditions Precedent

## Part 1
## Conditions Precedent to Initial Borrowing

1. **Original Obligors**

(a) A copy of the constitutional documents of each Original Obligor and, if applicable, a copy of the certified charter and good standing certificate from the secretary of state (or equivalent body) of its jurisdiction of organization or formation (in the case of the Jersey Obligors only to the extent such certificate is available), in each case dated not more than ten (10) days prior to the date of this Agreement.

(b) A copy of any consents issued by the Jersey Financial Services Commission pursuant to the Control of Borrowing (Jersey) Order 1958 in respect of each Jersey Obligor.

(c) A copy of a resolution of the board of directors of each Original Obligor:

(i) approving the terms of, and the transactions contemplated by, the DIP Finance Documents to which it is a party and resolving that it execute, deliver and perform the DIP Finance Documents to which it is a party;

(ii) authorising a specified person or persons to execute the DIP Finance Documents to which it is a party on its behalf;

(iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including, if relevant, any Borrowing Request) to be signed and/or despatched by it under or in connection with the DIP Finance Documents to which it is a party; and

(iv) in the case of an Obligor other than the Parent, authorising the Parent to act as agent in connection with the DIP Finance Documents.

(d) a certificate of incumbency signed by the secretary or an assistant secretary (or other individual performing similar functions) of each Obligor with respect to the officers of such Obligor authorized to execute and deliver the DIP Finance Documents to which it is a party;

(e) If applicable, copy of a resolution signed by all the holders of the issued shares in each Original Guarantor, approving the terms of, and the transactions contemplated by, the DIP Finance Documents to which the Original Guarantor is a party.

(f) A certificate from each Original Obligor (signed by a director) confirming that borrowing or guaranteeing or securing, as appropriate, the DIP Facility Commitments (as appropriate) would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(g) A certificate from each Original Obligor (signed by a director) certifying that each copy document relating to it specified in this Part 1 of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of this Agreement.

(h) A certificate from a director of each Jersey Obligor addressed to Ogier (Jersey) LLP for the purposes of Ogier (Jersey) LLP's legal opinions.

2. **DIP Finance Documents**

(a) This Agreement duly executed by the Parties.

(b) A copy of the following Transaction Security Documents executed by the Original Obligors specified below opposite the relevant Transaction Security Document:

| **Name of Original Obligor** | **Transaction Security Document** |
|---|---|
| Parent | A Jersey law governed all assets security interest agreement |
| Holdings | A Jersey law governed all assets security interest agreement |
| Holdings | An English law governed all assets debenture |
| Borrower | An English law governed all assets debenture (including, without limitation, over stock of Wedge IP Management Co, Limited (England) and LIV Golf Ltd (England)) |
| LIV Golf Events Limited | An English law governed all assets debenture |
| LIV Golf Ltd | An English law governed all assets debenture |
| Wedge IP Management Co, Limited | An English law governed all assets debenture |
| LIV Golf Events ISE Ltd | An English law governed all assets debenture |

(c) A copy of all notices, acknowledgements or documents required to be sent under the Transaction Security Documents specified in paragraph (b) above and executed by the relevant Original Obligors and any other relevant parties.

(d) All original share certificates, transfers and stock transfer forms or equivalent duly executed by the relevant Obligor in blank in relation to the assets subject to or expressed to be subject to the Transaction Security specified in paragraph (b) above and other documents of title to be provided under the relevant Transaction Security Documents.

(e) A certified true copy of the updated register of members of Holdings as at the date of the Jersey Transaction Security Documents (including any required security notations).

(f) Consent letters (in the form acceptable to the DIP Lender) executed by each relevant Obligor consenting to the Jersey Registrations (each a "**Consent Letter**").

3. **Legal Opinions**

(a) A legal opinion of White & Case LLP, legal advisers to the DIP Lender in England.

(b) A legal opinion of Ogier (Jersey) LLP, legal advisers to the DIP Lender in Jersey.

4. **Other Documents and Evidence**

(a) The Group Structure Chart.

(b) In respect of each company incorporated in the United Kingdom whose shares are the subject of the Transaction Security (a "**Charged Company**"), either:

(i) a certificate of an authorised signatory of the Parent certifying that:

(A) each member of the Group has complied within the relevant timeframe with any notice it has received pursuant to Part 21A of the Companies Act 2006 from that Charged Company; and

(B) no “warning notice” or “restrictions notice” (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of those shares,

together with a copy of the “PSC register” (within the meaning of section 790C(10) of the Companies Act 2006) of that Charged Company, which, in the case of a Charged Company that is a member of the Group, is certified by an authorised signatory of the Parent to be correct, complete and not amended or superseded as at a date no earlier than the date of this Agreement; or

(ii) a certificate of an authorised signatory of the Parent certifying that such Charged Company is not required to comply with Part 21A of the Companies Act 2006.

(c) The Original Financial Statements.

(d) The results of a recent search of all effective UCC financing statements (or equivalent filings, including any other type of registration/publications form) made with respect to any personal or mixed property of any Original Obligor in the appropriate jurisdictions, together with copies of all such filings disclosed by such search.

(e) UCC financing statements for each Original Obligor.

(f) A copy of any other Authorisation or other document, opinion or assurance which the DIP Lender considers to be necessary or desirable (if it has notified the Parent accordingly) in connection with the entry into and performance of the transactions contemplated by any DIP Finance Document or for the validity and enforceability of any DIP Finance Document.

**Part 2**
**Conditions Precedent to Interim DIP Availability**

The obligation of the DIP Lender to make the DIP Loan comprising the Interim DIP Availability is subject to the satisfaction (or waiver by the DIP Lender) of each of the following conditions precedent (the "**Conditions Precedent to Interim DIP Availability"**):

1. Conditions Precedent to Initial Borrowing. The conditions precedent set out in Part 1 (*Conditions Precedent to Initial Borrowing*) of this Schedule 2 (*Conditions Precedent*) have been satisfied or waived by the DIP Lender.

2. Deliverables. The DIP Lender shall have received each of the following, in form and substance satisfactory to the DIP Lender and the Obligors:

2.1 each DIP Finance Document to be entered into on the Interim DIP Availability Date by a Obligor, in each case duly executed and delivered by a responsible officer of each Obligor party thereto; and

2.2 a customary certificate, dated the Interim DIP Availability Date and signed by an authorized officer of the Borrower, certifying that: (A) no litigation, action, suit, investigation, or other proceeding is pending or, to its knowledge, threatened that would reasonably be expected to have a Material Adverse Effect; and (B) no event or occurrence has occurred that would reasonably be expected to have a Material Adverse Effect (other than events leading up to, or reasonably expected to result from, the commencement of the Chapter 11 Cases and the continuation and prosecution thereof).

3. Commencement of Chapter 11 Cases. The Petition Date shall have occurred, and the Borrower and each other Obligor shall be a debtor and a debtor-in-possession.

4. Interim DIP Order. The Interim DIP Order shall have been entered by the Bankruptcy Court within three (3) days after the Petition Date, in form and substance satisfactory to the DIP Lender and the Obligors, authorizing and approving the DIP Facility, including the incurrence of the Interim Roll-Up Obligations and DIP Loans up to the Interim DIP Availability and the granting of the DIP Liens and DIP Superpriority Claims, and the Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated, or stayed, and no motion for reconsideration of the Interim DIP Order shall have been timely filed by any Debtor or any Subsidiary thereof.

5. DIP Liens effective. The Interim DIP Order, upon entry thereof, shall be effective to create in favor of the DIP Lender legal, valid, enforceable, perfected, and non-avoidable DIP Liens on the DIP Collateral as contemplated by Clause 34 (*DIP Priority and Collateral*), and the Obligors shall have made arrangements reasonably satisfactory to the DIP Lender for the filing of UCC financing statements (or any similar perfection requirement under applicable law) and the recording of the Interim DIP Order with applicable recording offices, to the extent required.

6. Approved Budget. The DIP Lender shall have received an initial Approved Budget, certified by a responsible officer of the Borrower, and including a reasonably detailed summary of material assumptions, in form and substance satisfactory to the DIP Lender.

7. First day orders and other filings. All motions, proposed orders and other documents to be filed with, and submitted to, the Bankruptcy Court in connection with the DIP Facility, including all proposed "first day" orders and motions to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter (each a "**First Day Motion**"), shall have been reviewed in advance by the DIP Lender or its counsel and shall be in form and substance satisfactory to the DIP Lender and the Obligors, and all other orders entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the DIP Lender and the Obligors.

8. No trustee, examiner, or receiver. No trustee, examiner (other than a fee examiner), or receiver shall have been appointed or designated with respect to the Obligors' business, properties, or assets, which, if granted, would result in a person other than the Obligors exercising control over the Obligors' assets, other than in connection with the Jersey Administration.

9. Fees and expenses. All reasonable and documented fees, costs and expenses (including, without limitation, fees and expenses of the DIP Lender Advisers) required to be paid by the Borrower to the DIP Lender and the Prepetition Lender on or before the Interim DIP Availability Date have been paid.

10. DIP Facility Blocked Account and Lender Reserve Account. The Borrower shall have established the DIP Facility Blocked Account and the Lender Reserve Account and shall have executed and delivered the control, account or escrow agreements referred to in Clause 36.1 (*Establishment of DIP Facility Blocked Account*) and Clause 36.2 (*Establishment of Lender Reserve Account*) with respect thereto, in form and substance satisfactory to the DIP Lender and the Obligors.

11. Proceeds Account. The Borrower shall have established the Proceeds Account and shall have executed and delivered the Proceeds Account Control Agreement.

12. Cash Management. All First Day Orders pertaining to cash management, and all motions and documents filed in connection therewith, shall be in form and substance reasonably satisfactory to the DIP Lender, and the Debtors shall have delivered a cash management protocol, including procedures regarding intercompany claims and cash transfers, in form and substance satisfactory to the DIP Lender and the Obligors.

13. Commencement of UK Recognition Applications. The Foreign Representative shall have filed the UK Recognition Applications with the English Court in respect of each English Entity.

14. Commencement of Jersey Administration. The Jersey Obligors shall have filed an application with the Jersey Court seeking the Jersey Administration Order, and shall have delivered (or procured the delivery of) notice of such application to each secured creditor of the Jersey Obligors (other than any creditor who has waived in writing the right to receive such notice) and to the Viscount of the Royal Court of Jersey on or before the date of such filing.

**Part 3**
**Conditions Precedent to Final DIP Availability**

The obligation of the DIP Lender to make the DIP Loan comprising the Final DIP Availability is subject to the satisfaction (or waiver by the DIP Lender) of each of the following further conditions precedent (the "**Conditions Precedent to Final DIP Availability**"):

1. Conditions Precedent to Initial Borrowing and Interim DIP Availability. The conditions precedent set out in Part 1 (*Conditions Precedent to Initial Borrowing*) and Part 2 (*Conditions Precedent to Interim DIP Availabilit*y) of this Schedule 2 (*Conditions Precedent*) have been satisfied or waived by the DIP Lender.

2. Interim DIP Availability Date has occurred. The Interim DIP Availability Date shall have occurred.

3. Certificate. The DIP Lender shall have received, in form and substance satisfactory to the DIP Lender and the Obligors, a customary certificate, dated the Final DIP Availability Date and signed by an authorized officer of the Borrower, certifying that: (A) no litigation, action, suit, investigation, or other proceeding is pending or, to its knowledge, threatened that would reasonably be expected to have a Material Adverse Effect; and (B) no event or occurrence has occurred that would reasonably be expected to have a Material Adverse Effect (other than events leading up to, or reasonably expected to result from, the commencement of the Chapter 11 Cases and the continuation and prosecution thereof).

4. Final DIP Order. The Final DIP Order authorizing and approving the DIP Facility on a final basis, including the incurrence of the Roll-Up Obligations and DIP Loans up to the Final DIP Availability and the granting of the DIP Liens and DIP Superpriority Claims, shall have been entered by the Bankruptcy Court on or before the thirty-fifth (35th) day after the Petition Date, shall be in full force and effect (including as to the Liens granted thereby), shall not have been reversed, vacated, or stayed, and shall not have been amended, restated, supplemented, or otherwise modified without the prior written consent of the DIP Lender, and no motion for reconsideration of the Final DIP Order shall have been timely filed by any Debtor or any Subsidiary thereof.

5. No trustee, examiner, or receiver. No trustee, examiner (other than a fee examiner), or receiver shall have been appointed or designated with respect to the Obligors' business, properties, or assets, which, if granted, would result in a person other than the Obligors exercising control over the Obligors' assets, other than in connection with the Jersey Administration.

6. Budget reports. The DIP Lender shall have received all periodic updates required herein, including pursuant to Clauses 3.3 and 17.7, to be delivered as of such date, each in form and substance reasonably satisfactory to the DIP Lender

7. Budget compliance. The Obligors shall be in compliance with the Approved Budget, subject to the Permitted Variance.

8. Fees and expenses. All reasonable and documented fees and expenses (including, without limitation, fees and expenses of the DIP Lender Advisers) required to be paid to the DIP Lender on or before the Final DIP Availability Date shall have been paid.

**Part 4**
**Conditions Precedent Required to be Delivered by an Additional Guarantor**

1. An Accession Deed, duly executed by the Additional Guarantor and the Parent.

2. A copy of the constitutional documents of the Additional Guarantor.

3. A copy of a resolution of the board of directors of the Additional Guarantor.

   (a) approving the terms of, and the transactions contemplated by, the Accession Deed and the DIP Finance Documents and resolving that it execute, deliver and perform the Accession Deed and any other DIP Finance Document to which it is a party;

   (b) authorising a specified person or persons to execute the Accession Deed and other DIP Finance Documents on its behalf;

   (c) authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices to be signed and/or despatched by it under or in connection with the DIP Finance Documents; and

   (d) authorising the Parent to act as its agent in connection with the DIP Finance Documents to which it is a party.

4. A specimen of the signature of each person authorised by the resolution referred to in paragraph 3 above.

5. If applicable, a copy of a resolution signed by all the holders of the issued shares of the Additional Guarantor, approving the terms of, and the transactions contemplated by, the DIP Finance Documents to which the Additional Guarantor is a party.

6. A certificate of the Additional Guarantor (signed by a director) confirming that guaranteeing the DIP Facility Commitments would not cause any guarantee, security or similar limit binding on it to be exceeded.

7. A certificate of an authorised signatory of the Additional Guarantor certifying that each copy document listed in this Part 4 (*Conditions Precedent Required to be Delivered by an Additional Guarantor*) of Schedule 2 (*Conditions Precedent*) is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the Accession Deed.

8. A copy of any other Authorisation or other document, opinion or assurance which the DIP Lender considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Deed or for the validity and enforceability of any DIP Finance Document.

9. If available, the latest financial statements of the Additional Guarantor.

10. Legal opinions addressed to the DIP Lender from their legal advisers or, with respect to an Additional Guarantor incorporated or established outside of the US, where customary in the relevant jurisdiction of the Additional Guarantor, the Additional Guarantor's legal advisers as to the law of the applicable jurisdiction.

11. Any security documents which are required by the DIP Lender to be executed by the proposed Additional Guarantor.

12. Any notices or documents required to be given or executed under the terms of those security documents.

13.

(a) If the Additional Guarantor is incorporated in England and Wales, Scotland or Northern Ireland, evidence that the Additional Guarantor has done all that is necessary (including, without limitation, by re-registering as a private company) to comply with sections 677 to 683 of the Companies Act 2006 in order to enable that Additional Guarantor to enter into the DIP Finance Documents and perform its obligations under the DIP Finance Documents.

(b) If the Additional Guarantor is not incorporated in England and Wales, Scotland or Northern Ireland, such documentary evidence as legal counsel to the DIP Lender may require, that such Additional Guarantor has complied with any law in its jurisdiction relating to financial assistance or analogous process.

# Schedule 3

## Borrowing Request

From: LIV Golf Incorporated

To: The Public Investment Fund of the Kingdom of Saudi Arabia

Dated: [●]

Dear Sirs

**LIV Golf Incorporated – the Debtor-in Possession Facility Agreement dated [●] (the "Agreement")**

1. We refer to the Agreement. This is a Borrowing Request. Terms defined in the Agreement have the same meaning in this Borrowing Request unless given a different meaning in this Borrowing Request.

2. We wish to borrow a DIP Loan on the following terms:

| | |
|---|---|
| Proposed Borrowing Date: | [●] (or, if that is not a Business Day, the next Business Day) |
| Currency of Loan: | USD |
| Amount: | [●] or, if less, the Available Facility |
| Interest Period: | 1 month |

3. The Borrower shall use the proceeds of this DIP Facility only for the purposes set out in Clause 3.1 (*Purpose*) of the Agreement.

4. We confirm that each condition specified in Clause 4.2 (*Further Conditions Precedent*) of the Agreement is satisfied on the date of this Borrowing Request.

5. The proceeds of this DIP Loan should be credited solely to the DIP Facility Blocked Account.

6. This Borrowing Request is irrevocable.

Yours faithfully

…………………………………
authorised signatory for
**LIV Golf Incorporated**

## Schedule 4

## Form of Accession Deed

To: [●] as DIP Lender

From: [Debtor] and [Parent]

Dated:

Dear Sirs

**LIV Golf Incorporated – the Debtor-in Possession Facility Agreement dated [●] (the "Agreement")**

1. We refer to the Agreement. This is an Accession Deed. Terms defined in the Agreement have the same meaning in this Accession Deed unless given a different meaning in this Accession Deed.

2. [*Debtor*] agrees to become an Additional Guarantor and to be bound by the terms of the Agreement as an Additional Guarantor pursuant to Clause 21.2 (*Additional Guarantors*) of the Agreement. [*Debtor*] is a company duly incorporated under the laws of [*name of relevant jurisdiction*].

3. [*Debtor's*] administrative details are as follows:

   Address:

   Fax No:

   Attention:

4. This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by the law of the State of New York.

....................................
authorised signatory for
[*the Parent*]

....................................
authorised signatory for
[*the Debtor*]

# Schedule 5

## Disbursement Request

From: LIV Golf Incorporated

To: The Public Investment Fund of the Kingdom of Saudi Arabia

Dated: [●]

Dear Sirs

**LIV Golf Incorporated – the Debtor-in Possession Facility Agreement dated [●] (the "Agreement")**

1. We refer to the Agreement. This is a Disbursement Request. Terms defined in the Agreement have the same meaning in this Disbursement Request unless given a different meaning in this Disbursement Request.

2. We wish to request a disbursement from the DIP Facility Blocked Account on the following terms:

| | |
|---|---|
| Proposed Disbursement Date: | [●] (or, if that is not a Business Day, the next Business Day) |
| Currency of disbursement: | USD |
| Amount: | [●] |

3. We confirm that (i) the aggregate unrestricted cash of the Obligors is projected to be less than the Minimum Cash during the week in which this Disbursement Request is made, (ii) this Disbursement Request is limited to the amount required to make disbursements for this week in excess of the Minimum Cash, and (iii) the aggregate amount of this Disbursement Request, and the purposes for which it is made, is consistent with the funding requirements in the Approved Budget.

4. We confirm that each condition specified in Clause 4.2 (*Further Conditions Precedent*) of the Agreement is satisfied on the date of this Disbursement Request.

5. The proceeds of this disbursement should be credited solely to the Proceeds Account.

6. This Disbursement Request is irrevocable.

Yours faithfully

…………………………………
authorised signatory for
**LIV Golf Incorporated**

# Schedule 6

## Plan Term Sheet

[*To be inserted*]

# Signatories

**The Borrower**

For and on behalf of **LIV Golf Incorporated**

_______________________________

Name:

Title:

**<u>Notice Details</u>**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

**The Original Guarantors**

For and on behalf of **LIV Golf Investments Ltd**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf Ltd**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf Holdings Ltd**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf New Jersey LLC**

_______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf Events Limited**

________________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge IP Management Co, Limited**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge IP Management Co, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 1, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 2, LLC**

______________________________

Name:
Title:

**<u>Notice Details</u>**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 3, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 4, LLC**

______________________________

Name:
Title:

**<u>Notice Details</u>**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 5, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 6, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 7, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 8, LLC**

_______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 8 GP, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 9, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 10, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 11, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Blocker 12, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Co 12 GP, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Blocker 13, LLC**

______________________________

Name:
Title:

**<u>Notice Details</u>**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 1, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Co 2, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 3, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 4, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 5, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 6, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Co 7, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 8, LP**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 9, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 10, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 11, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Co 12, LP**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Co 13, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf US Media, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **LIV Golf Events ISE Ltd**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge Event 1 Co**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge Event 2 Co**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge Event 3 Co**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge Event 4 Co**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge WPB Inc.**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Wedge Event 7 Co**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 1, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 2, LLC**

______________________________

Name:
Title:

**<u>Notice Details</u>**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 3, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 4, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 5, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 6, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 7, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 8, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 9, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 10, LLC**

______________________________
Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 11, LLC**

______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

For and on behalf of **Fairway TM Intermediate 12, LLC**

______________________________

Name:
Title:

**Notice Details**

Address: 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001

Email: Legalnotices@livgolf.com

Attention: Directors and Chief Legal Officer

For and on behalf of **Fairway TM Intermediate 13, LLC**

_______________________________

Name:
Title:

**Notice Details**

| | |
|---|---|
| Address: | 515 W 33rd St, 50 Hudson Yards, Suite 65B, New York, NY 10001 |
| Email: | Legalnotices@livgolf.com |
| Attention: | Directors and Chief Legal Officer |

**The DIP Lender**

For and on behalf of **The Public Investment Fund of the Kingdom of Saudi Arabia**

______________________________

Name: Yasir O. AlRumayyan
Title: Governor

**Notice Details**

| | |
|---|---|
| Address: | c/o The Public Investment Fund, The Public Investment Fund Tower, King Abdullah Financial District (KAFD), Building 1.16, Al Aqiq district, Riyadh 13519, The Kingdom of Saudi Arabia |
| Email: | wedge-investments@pif.gov.sa and wedge_legal@pif.gov.sa |
| Attention: | Turqi A. Alnowaiser |

**EXHIBIT 2**

INITIAL DIP BUDGET

**Weekly DIP Budget**
($000's)

| *Week #:* | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Consolidated** | 9/18 | 9/25 | 10/2 | 10/9 | 10/16 | 10/23 | 10/30 | 11/6 | 11/13 | 11/20 | 11/27 | 12/4 | 12/11 | Total |
| **Total Receipts** | - | - | - | - | 7,000 | - | - | 2,000 | 670 | 982 | - | - | - | 10,652 |
| **Total Disbursements** | (9,960) | (3,102) | (5,470) | (1,852) | (3,436) | (2,037) | (2,869) | (4,840) | (1,705) | (1,420) | (2,134) | (3,783) | (1,271) | (43,879) |
| **NET CASH FLOW** | (9,960) | (3,102) | (5,470) | (1,852) | 3,564 | (2,037) | (2,869) | (2,840) | (1,035) | (438) | (2,134) | (3,783) | (1,271) | (33,226) |
| **Beginning Available Cash** | 13,451 | 5,000 | 5,000 | 5,000 | 5,000 | 8,565 | 6,528 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 13,451 |
| Net Cash Flow | (9,960) | (3,102) | (5,470) | (1,852) | 3,564 | (2,037) | (2,869) | (2,840) | (1,035) | (438) | (2,134) | (3,783) | (1,271) | (33,226) |
| **Ending Available Cash before DIP Funding** | 3,492 | 1,898 | (470) | 3,148 | 8,564 | 6,528 | 3,659 | 2,160 | 3,965 | 4,562 | 2,866 | 1,217 | 3,729 | (19,775) |
| DIP Funding / (Repayment) | 1,508 | 3,102 | 5,470 | 1,852 | - | - | 1,341 | 2,840 | 1,035 | 438 | 2,134 | 3,783 | 1,271 | 24,775 |
| **Ending Available Cash after DIP Funding[1]** | 5,000 | 5,000 | 5,000 | 5,000 | 8,565 | 6,528 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| *Memo: DIP Commitment Changes* | | | | | | | | | | | | | | |
| **DIP Commitment before Receipts** | 49,600 | 49,600 | 49,600 | 49,600 | 49,600 | 42,600 | 42,600 | 42,600 | 40,600 | 39,930 | 38,948 | 38,948 | 38,948 | 49,600 |
| Less: Receipts | - | - | - | - | (7,000) | - | - | (2,000) | (670) | (982) | - | - | - | (10,652) |
| **Ending DIP Commitment after Receipts** | 49,600 | 49,600 | 49,600 | 49,600 | 42,600 | 42,600 | 42,600 | 40,600 | 39,930 | 38,948 | 38,948 | 38,948 | 38,948 | 38,948 |

(1) Available Cash excludes approx. $1.86M held in Korean Won and South African Rand that is subject to exchange controls in those jurisdictions