**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Joint Administration Requested) |

**DECLARATION OF BRADLEY A. ROBINS IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL, (II) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS, AND (III) PROVIDE ADEQUATE PROTECTION, (B) SCHEDULING FINAL HEARING, AND (C) GRANTING RELATED RELIEF**

I, Bradley A. Robins, hereby declare under penalty of perjury as follows:

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

1. I am a Partner at Ducera Partners LLC (together with its affiliates, including, where appropriate, Ducera Securities LLC, collectively, "Ducera"), an independent investment banking firm with offices located at 11 Times Square, 36th Floor, New York, New York 10036. Ducera is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases.[2]

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief* (the "Motion"),[3] filed contemporaneously herewith.

3. I am not being compensated specifically for this Declaration or related testimony, other than through payments received by Ducera as a professional proposed to be retained by the Debtors, subject to approval by the Court.[4] Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives; (b) my review of relevant documents, including the DIP Loan Documents and the DIP Budget; (c) information provided to me by the Debtors' management team, the Debtors' independent directors (the "Independent Directors"), or the Debtors' other

---

[2] The Debtors anticipate filing shortly hereafter an application to retain Ducera as their investment banker, effective as of the Petition Date (the "Ducera Retention Application").

[3] Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to them in the Motion, the Interim Order (as defined in the Motion), or the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), as applicable. The Motion and the First Day Declaration are filed contemporaneously herewith. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the First Day Declaration.

[4] In accordance with the Engagement Letter (as defined below), and subject to approval by the Court, Ducera will be entitled to receive certain fees in connection with the transactions described herein.

advisors, including AP Services, LLC, an affiliate of AlixPartners, LLP, providing interim management services to the Debtors ("AlixPartners"); (d) information provided to me by the employees of Ducera working directly with me or under my supervision; or (e) my experience as a restructuring and corporate finance professional. If called to testify, I could and would testify competently to the statements set forth herein. I am over the age of eighteen (18) and am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

4. Ducera is an independent investment bank with expertise in a range of corporate finance advisory services, including restructuring services. Ducera's professionals, with roots in complex corporate finance, offer impartial and independent strategic advice to stakeholders in a broad range of industries and situations, and specialize in, among other things, providing clients with capital structure and restructuring advice and services in workout and bankruptcy situations, including the solicitation, negotiation, and arrangement of postpetition financing. Founded in 2015, Ducera has served as investment banker to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of recent in-court restructurings, including: (a) *In re DISH DBS Corporation, DISH Wireless L.L.C., et al.*, No. 26-90627 (CML) (Bankr. S.D. Tex.); (b) *In re Wolfspeed, Inc., et al.*, No. 25-90163 (CML) (Bankr. S.D. Tex.); (c) *In re Franchise Group, Inc., et al.*, No. 24-12480 (LSS) (Bankr. D. Del.); (d) *In re Casa Systems, Inc.*, No. 24-10695 (KBO) (Bankr. D. Del.); (e) *In re Yellow Corporation, et al.*, No. 23-11069 (CTG) (Bankr. D. Del.); (f) *In re Diebold Holding Co., LLC*, No. 23-90602 (DRJ) (Bankr. S.D. Tex.); (g) *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del.); (h) *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex.); (i) *In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex.); (j) *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr.

S.D.N.Y.); (k) *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y.); (l) *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del.); (m) *In re Superior Energy Servs., Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex.); and (n) *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex.). Ducera Securities LLC, an affiliate of Ducera Partners LLC, is a broker-dealer registered with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority.

5. I am a Partner at Ducera and have more than thirty (30) years of experience advising companies, boards of directors, creditors, and other stakeholders in connection with restructuring, financing, merger, and other complex corporate finance transactions across a broad range of industry sectors. Select restructuring advisory engagements on which I have worked include: Adelphia Communications, American Airlines, BearingPoint, Chrysler, Delphi, Diebold Nixdorf, Energy Future Holdings Corporation, iHeartMedia, and Refco. Prior to joining Ducera in 2016, I spent approximately fifteen (15) years at Greenhill & Co., LLC, where I was a Partner and Co-Head of Financing Advisory and Restructuring for North America. Before Greenhill, I was a member of the restructuring group at Houlihan Lokey Howard & Zukin, and I began my career as an attorney at Wachtell, Lipton, Rosen & Katz. I received a Bachelor of Arts from Middlebury College and a Juris Doctor from the University of Pennsylvania's Carey Law School.

## **The Debtors' Retention of Ducera**

6. In May 2026, shortly after the April 30, 2026 announcement by The Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"), the Debtors' ultimate equity owner, that it would not fund the Debtors' operations beyond the 2026 season, the Debtors engaged Ducera as their investment banker pursuant to an engagement letter dated as of May 3, 2026 (the "Engagement Letter"). *See* First Day Declaration ¶ 9. Since that time, I have led the Ducera team

that has worked closely with the Debtors' management team, the Independent Directors and the Strategic Initiative Committee (the "SIC") of LIV Golf Holdings, Ltd ("Holdings"), whose sole members are the Independent Directors, and the Debtors' other advisors to evaluate and pursue the Debtors' strategic, financing, and restructuring alternatives. Ducera's work has included, among other things: (a) analyzing the Debtors' liquidity and projected cash flows; (b) understanding the Debtors' business, operations, and finances; (c) reviewing and analyzing the Debtors' capital structure and financing alternatives; (d) preparing a confidential information memorandum and conducting a broad marketing process for an investment in, or acquisition of, the Debtors' business (the "Strategic Marketing Process"); (e) soliciting, negotiating, and analyzing proposals for postpetition financing, including conducting a marketing process for postpetition financing from third-party financing sources (the "DIP Marketing Process"); (f) participating in negotiations with PIF regarding postpetition financing and the consensual use of Cash Collateral; (g) providing strategic advice to the Debtors' management team and governing bodies, including the SIC; and (h) assisting the Debtors in connection with preparations for the commencement of these chapter 11 cases. As a result of this work, and my engagement with the Debtors' other restructuring professionals, I am familiar with the Debtors' capital structure, business operations, and current liquidity needs, as well as the terms of the proposed DIP Facility.

**The Debtors' Prepetition Capital Structure and Liquidity Position**

7. As described in greater detail in the First Day Declaration and the Motion, since the Debtors' inception in 2021, entities controlled by PIF have invested approximately $5 billion in equity capital in the Debtors. Historically, the Debtors funded their operations solely through equity infusions from PIF and were not subject to any funded debt obligations. On April 30, 2026, PIF announced that it would not provide the long-term investment capital necessary to see the

League through to profitability and would fund only the remainder of the 2026 season. *See* First Day Declaration ¶¶ 43–44.

8. On June 4, 2026, Holdings, as borrower, LIV Golf Investments Ltd ("Parent") and certain other Debtors, as guarantors, and PIF, as lender, entered into the Prepetition Facility Agreement, pursuant to which PIF made the Prepetition Facility available to fund the remainder of the 2026 season and to afford the Debtors the time and means to pursue strategic alternatives. The Prepetition Obligations are secured by first priority liens on substantially all of the Prepetition Obligors' assets and property, including the equity interests in LIV Golf Incorporated (the "DIP Borrower"), subject only to Senior Third Party Permitted Liens, if any. As of the Petition Date, approximately $495 million (plus unpaid interest) was outstanding under the Prepetition Facility, and PIF is the Debtors' only prepetition secured lender. *See* First Day Declaration ¶ 39; Motion ¶¶ 15, 18. Accordingly, the Debtors have limited unencumbered assets available to secure postpetition financing.

9. As of the Petition Date, the Debtors had approximately $15 million in cash on hand, substantially all of which constitutes Cash Collateral. Based on my review of the cash flow forecasts prepared by the Debtors' management team with the assistance of AlixPartners, including the initial thirteen (13) week DIP Budget attached to the Interim Order as **Exhibit 2**, I do not believe the Debtors can fund their operations or the costs of administering these chapter 11 cases solely with the use of existing Cash Collateral. Absent approval of the DIP Facility and the consensual use of Cash Collateral, including on an interim basis, my understanding is that the Debtors would be unable to fund payments to foreign vendors, utilities, and insurers, employee wages and benefits, and the administrative costs of these chapter 11 cases, which would significantly impair the value of the Debtors' estates and would likely result in a value-destructive

freefall liquidation, foreclosing both the going-concern transaction contemplated by the Lead Bid (as defined below) and an orderly wind-down of the Debtors' estates.

10. Prior to the Petition Date, the Debtors, with the assistance of AlixPartners and in consultation with Ducera, analyzed their cash needs and prepared projections of their postpetition liquidity requirements for the initial thirteen (13) weeks of these chapter 11 cases, resulting in the initial DIP Budget. In developing the DIP Budget, the Debtors accounted for anticipated operating receipts and disbursements during the projection period and considered several cost factors, including restructuring costs (including professional fees) and employee, utility, insurer, and foreign vendor obligations. My understanding, based on discussions with the Debtors' management team and AlixPartners, is that the DIP Budget reflects the Debtors' anticipated funding requirements over the projection period, which are described in greater detail in the First Day Declaration. See First Day Declaration ¶¶ 11–12. Based on these analyses, the Debtors determined that they would require up to $49.6 million in new money postpetition financing to fund these chapter 11 cases and pursue consummation of the Approved Plan (as defined in the DIP Credit Agreement), of which up to $14 million is required prior to entry of the Final Order. *See* Motion ¶ 5.

**<u>The Debtors' Efforts to Obtain Financing</u>**

**I. The Strategic Marketing Process.**

11. Beginning in May 2026, Ducera launched a broad marketing process to identify an investor or investors willing to fund a new iteration of the Debtors' business under a new and more efficient operating model ("<u>LIV 2.0</u>"), or otherwise to acquire or invest in the Debtors' business. Ducera prepared a confidential information memorandum and contacted more than 300 potential investors. Approximately 100 potential investors executed non-disclosure agreements and were

granted access to a virtual data room, and approximately 30 of those parties engaged in detailed diligence. Ducera and the Debtors ultimately identified five leading prospects (in addition to potential minority investors), each of which was asked to submit a final non-binding bid by July 22, 2026 (the "Bid Deadline"). On the Bid Deadline, the Debtors received two non-binding term sheets. Following continued engagement with both potential investors, the Debtors, in consultation with Ducera, determined that one bid represented the best and most viable proposal (the "Lead Bid," and the investor thereunder, BC Partners Advisors L.P. ("BC Partners" or the "Lead Investor")). The Lead Bid contemplates, among other things, a $300 million investment (half of which is anticipated to be funded by the Lead Investor) on the emergence date to fund the ongoing operations of the Debtors' business under a new operating model. The Lead Bid is contingent upon, among other things, the consummation of a chapter 11 plan. *See* First Day Declaration ¶¶ 59–61.

12. The Strategic Marketing Process informed the Debtors' postpetition financing efforts in two respects. *First*, the process provided the Debtors and Ducera with a comprehensive view of the universe of parties with an interest in the Debtors' business and the terms on which such parties were prepared to commit capital. None of the parties that participated in the Strategic Marketing Process, other than the Lead Investor, offered to provide postpetition financing to the Debtors, and the Lead Investor's supplemental postpetition financing commitment under the BC Partners RSA (as defined in the Motion) is directed to start-up costs of the LIV 2.0 transaction rather than to funding the Debtors' operations and the administration of these chapter 11 cases. *Second*, because the Lead Bid is contingent upon the consummation of a chapter 11 plan, the Debtors required postpetition financing sufficient to fund their operations and the administration of these chapter 11 cases through the negotiation of definitive documentation with the Lead

Investor and confirmation of a chapter 11 plan implementing the LIV 2.0 transaction or, if that transaction cannot be consummated within the timeline afforded by the DIP Facility, an orderly wind-down of the Debtors' estates.

## II. The DIP Marketing Process.

13. In parallel with the Debtors' negotiations with PIF regarding postpetition financing, in August 2026, Ducera commenced the DIP Marketing Process to solicit proposals for postpetition financing from third-party financing sources. Ducera contacted twelve (12) third-party financial institutions that Ducera deemed to be sophisticated, experienced in providing debtor-in-possession financing in complex distressed situations, and capable of providing financing in the timeframe and amount required by the Debtors. Of the twelve (12) parties contacted by Ducera to solicit indicative terms, four (4) were already parties to non-disclosure agreements entered into in connection with the Strategic Marketing Process. Ducera provided each of the twelve (12) parties with a public teaser summarizing the opportunity and requested indicative terms by September 3, 2026. For the remaining eight (8) parties, execution of a non-disclosure agreement and access to additional diligence materials would follow the submission of indicative terms.

14. Each of the twelve (12) parties contacted declined to pursue a postpetition financing transaction with the Debtors, and no party submitted a proposal to provide postpetition financing on any basis. Based on the feedback received by Ducera, the parties that declined cited as their primary concerns (a) the junior structure of any third-party postpetition financing relative to PIF's position as the Debtors' sole prepetition secured lender and (b) insufficient collateral value to support such a financing. As of the Petition Date, no further discussions with third-party financing

sources are scheduled, and, in my view, no actionable third-party postpetition financing alternative is available to the Debtors.

15. Based on the results of the DIP Marketing Process, my experience, and current market conditions, I believe that the Debtors are unable to obtain postpetition financing on an unsecured basis, on a basis junior to the Prepetition Liens, or on any other basis on terms more favorable than those provided under the DIP Loan Documents, and that the Debtors are unable to obtain postpetition financing without granting the DIP Liens and the DIP Superpriority Claims to the DIP Lender and providing the adequate protection set forth in the Interim Order. No third-party expressed interest in postpetition financing even with a priming lien on substantially all of the Debtors' assets due to the perceived lack of collateral value to support the required amount of DIP financing.

## III. Negotiations with PIF.

16. In parallel with the DIP Marketing Process, the Debtors, with the assistance of Ducera and their other advisors, negotiated with PIF regarding the terms on which PIF would provide postpetition financing and consent to the Debtors' use of Cash Collateral. Because PIF is the Debtors' ultimate majority equity owner as well as their sole prepetition secured lender, the Debtors' evaluation of, and negotiations regarding, postpetition financing were conducted under the oversight and exclusive authority of the SIC, advised by counsel. PIF was separately represented by its own counsel, White & Case LLP, and its own financial advisor, FTI Consulting. Throughout the process, the SIC has met twice weekly (or more frequently as needed) with the Debtors' advisors, including Ducera, to consider transactional options and stakeholder feedback. Multiple iterations of the term sheet for the DIP Facility (the "DIP Term Sheet") and the definitive DIP Loan Documents were exchanged and negotiated at arm's length over the course of several

weeks. *See* First Day Declaration ¶¶ 45–48; Motion ¶¶ 33–35. As a result of these negotiations, the Debtors obtained material improvements to the terms of the DIP Facility relative to the terms initially proposed by PIF, and after such thorough process, the SIC authorized the Debtors' entry into the DIP Facility. *See* First Day Declaration ¶¶ 45–48.

**The Terms of the Proposed DIP Facility**

17. Following these negotiations, in the lead-up to the Petition Date, the Debtors and PIF reached agreement on the terms of the DIP Facility and the consensual use of Cash Collateral, as set forth in the DIP Loan Documents and the Interim Order. The principal economic and structural terms of the DIP Facility, which are summarized in greater detail in the Motion,[5] include the following:

(a) *Facility and Commitments*: a senior secured superpriority priming term loan credit facility provided by PIF, as DIP Lender, in an aggregate principal amount of new money DIP Term Loans not to exceed $49,600,000, consisting of (i) the Interim DIP Term Loan, in an aggregate principal amount not to exceed $14,000,000, available in a single draw upon entry of the Interim Order, and (ii) the Delayed Draw Term Loan, in an aggregate principal amount not to exceed $49,600,000 (less the aggregate principal amount of the Interim DIP Term Loan), available in a single draw following entry of the Final Order, and in no event later than thirty-five (35) days after the Petition Date and the satisfaction (or waiver) of the applicable conditions precedent. *See* DIP Credit Agreement § 2.

(b) *Roll-Up*: upon entry of the Interim Order and the Final Order, respectively, Prepetition Obligations in an aggregate principal amount equal, on a dollar-for-dollar basis, to the aggregate amount of the Interim DIP Term Loan and the Delayed Draw Term Loan, respectively, will be automatically deemed exchanged on a cashless basis into DIP Roll-Up Loans. *See* Interim Order ¶ 2(b); DIP Credit Agreement § 2.5.

(c) *Draw Mechanics*: all proceeds of the DIP Term Loans will be funded into the DIP Facility Blocked Account and may be disbursed no more than once each week, on Monday, upon Disbursement Requests delivered on the Wednesday of the prior week (at the direction of the DIP Lender, email being sufficient) and made in accordance with the Approved Budget, and only to the extent the Debtors'

[5] The summary of the DIP Facility set forth herein is qualified in its entirety by the provisions of the DIP Loan Documents and the Interim Order. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control.

aggregate unrestricted cash (less any forecast collections) is projected to be less than the Minimum Cash of $5,000,000 during the applicable week, and the aggregate amount of DIP Term Loans borrowed pursuant to Disbursement Requests may not exceed the DIP Term Loan Facility Amount less the sum of (i) the actual amount of receivables received by the DIP Loan Parties between September 4, 2026 and the Petition Date and (ii) the lesser of (A) $27,300,000 (the "Threshold Amount") and (B) the actual amount of receivables received by the DIP Loan Parties after the Petition Date. *See* DIP Credit Agreement § 4, 5, 36.4; Interim Order ¶ 5, 7.

(d) *Interest Rate*: a fixed rate of 12.0% per annum, paid in kind; following the occurrence and during the continuance of an Event of Default, an additional 2.0% per annum, payable on demand. *See* DIP Credit Agreement § 8.

(e) *Fees*: none. The DIP Facility does not contemplate any upfront, commitment, backstop, exit, or similar fees. The Debtors will pay the reasonable and documented fees, costs, and expenses of the DIP Lender and its advisors (including White & Case LLP and FTI Consulting). Amounts indicated in the Approved Budget for the fees and expenses of the DIP Lender's and the Prepetition Lender's professionals are to be deposited into a blocked account under the DIP Lender's control (the "Lender Reserve Account"), available solely to pay such fees and expenses. *See* DIP Credit Agreement § 14, 36.2; Interim Order ¶ 7.

(f) *Maturity*: the Scheduled Maturity Date is the date that is 120 calendar days after the Petition Date, subject to earlier termination upon the occurrence of the other events set forth in the DIP Credit Agreement, including the effective date of a chapter 11 plan. *See* DIP Credit Agreement § 1.1, 6(a).

(g) *Milestones*: the Milestones require, among other things, the filing of the Approved Plan and a related disclosure statement no later than thirty (30) days after the Petition Date, entry of the Final Order no later than thirty-five (35) days after the Petition Date, entry of an order approving the disclosure statement no later than eighty (80) days after the Petition Date, entry of an order confirming the Approved Plan no later than one hundred ten (110) days after the Petition Date, and the occurrence of the effective date of the Approved Plan no later than one hundred twenty (120) days after the Petition Date. *See* DIP Credit Agreement § 18.41, 19.2; Interim Order ¶ 8.

(h) *Budget and Reporting*: the Debtors will operate under a rolling thirteen (13) week DIP Budget, updated no later than every four weeks, with weekly Variance Reports and a Permitted Variance for operating disbursements equal to the greater of 10% or $200,000, tested on a cumulative basis. *See* Interim Order ¶¶ 5, 7; DIP Credit Agreement § 3.3, 17.7.

(i) *Consensual Priming and Adequate Protection*: PIF, as Prepetition Lender, has consented to the priming of the Prepetition Liens by the DIP Liens and to the Debtors' use of Cash Collateral and will receive, as adequate protection for any

> Diminution in Value, accrual of interest on the Prepetition Obligations at the applicable contract rate, paid in kind (subject to the Challenge rights preserved in the Interim Order), the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and payment of its reasonable and documented fees and expenses (from the Lender Reserve Account), in each case as set forth in the Interim Order. *See* Interim Order ¶ 4.

**<u>The Economic Terms of the DIP Facility, Taken as a Whole, Are Fair and Reasonable</u>**

**I. The Interest Rate and the Absence of Fees.**

18. The DIP Facility bears interest at a fixed rate of 12.0% per annum, paid in kind, and does not contemplate any upfront, commitment, backstop, exit, or similar fees. In my experience, debtor-in-possession financings of comparable size and circumstance frequently carry interest at comparable or higher rates, often payable in cash, together with one or more upfront, commitment, backstop, or exit fees that, in the aggregate, commonly add several percentage points to the all-in cost of such financings. My team and I reviewed precedent debtor-in-possession financings of comparable commitment size, including their interest rates, fees, and other economic terms. Based on this review, I have determined that the DIP Facility's interest rate is in line with those observed in the precedent facilities and, after accounting for the fees and other economic terms applicable to those facilities, the DIP Facility's overall economic terms are at or below the range of terms approved in these comparable postpetition financings. Because interest on the DIP Loans is paid in kind, the DIP Facility imposes no cash interest burden on the Debtors during these chapter 11 cases, which preserves liquidity for the Debtors' operations and the administration of these chapter 11 cases. In addition, interest accrues on Borrowings only once such Borrowings are available for use by the DIP Borrower, and the draw-control mechanics described above limit the amount of DIP Loans outstanding—and therefore the interest accruing—at any time to the Debtors' actual funding needs. I therefore believe that the interest rate and the absence of fees

under the DIP Facility are reasonable and compare favorably to the economic terms of comparable postpetition financings.

## II. The Roll-Up.

19. As described in the Motion, upon entry of the Interim Order and the Final Order, respectively, Prepetition Obligations in an aggregate principal amount equal, on a dollar-for-dollar basis, to the Interim DIP Term Loan and the Delayed Draw Term Loan, respectively, will be deemed exchanged into DIP Roll-Up Loans. I understand that the Prepetition Lender would not consent to the use of its Cash Collateral, and the DIP Lender would not be willing to provide the DIP Term Loan Facility, without approval of the DIP Roll-Up Loans, and that the DIP Roll-Up Loans were accordingly a condition to the Debtors' obtaining the new money DIP Term Loans. I further understand that the inclusion of a roll-up of prepetition secured debt is a common feature of debtor-in-possession financings provided by prepetition secured lenders, and, based on Ducera's review of precedent debtor-in-possession financings, the dollar-for-dollar (1.0:1.0) ratio of DIP Roll-Up Loans to new money DIP Term Loans is approximately equal to the average of the range observed in precedent transactions. Because PIF is the Debtors' only prepetition secured lender and the sole DIP Lender, the DIP Roll-Up Loans do not prefer any similarly situated creditor over another and do not prime the liens of any third party. Accordingly, I believe that the DIP Roll-Up Loans are reasonable and an integrated component of the DIP Facility. *See* Motion ¶ 45; Interim Order ¶ 2(b).

## III. Other Terms of the DIP Facility.

20. The DIP Facility also contains a number of terms that, in my experience, are favorable to the Debtors and are often unavailable to similarly situated debtors. These include: (a) the fully consensual nature of the DIP Facility, including the Prepetition Lender's consent to

the priming of the Prepetition Liens and to the continued use of Cash Collateral, which avoids the cost, delay, and risk of a contested financing dispute at the outset of these chapter 11 cases; (b) the absence of any upfront, commitment, backstop, exit, or similar fees; (c) interest payable solely on a payment-in-kind basis; and (d) a maturity and Milestones that are aligned with the Debtors' contemplated plan timeline and that afford the Debtors the opportunity to finalize the LIV 2.0 transaction with the Lead Investor and, failing that, to pursue an orderly wind-down, with proceeds of the DIP Facility available to fund the Wind-Down (as defined in the DIP Credit Agreement).

21. The terms of the DIP Facility, including the interest rate and the other economic terms, were the subject of arm's-length, good-faith negotiations between the Debtors, acting under the oversight of the SIC, and PIF, each represented by separate counsel and financial advisors. Based on my participation in and observation of those negotiations, I believe that the DIP Facility's economic terms are an integral component of the overall terms that were required by the DIP Lender in order to extend postpetition financing to the Debtors. Accordingly, under the current circumstances, given the absence of viable alternatives, and based on my experience as a restructuring professional, I believe that the economic terms of the DIP Facility, taken as a whole, are fair, reasonable, and in the best interests of the Debtors and their estates, and represent the best terms currently available to the Debtors.

**The Proposed DIP Facility Is the Best and Only Postpetition Financing Currently Available to the Debtors**

22. Based on the efforts of the Debtors and their advisors to secure postpetition financing, my experience in arranging debtor-in-possession financing in comparable cases, current market conditions, the Debtors' circumstances, and my participation in the negotiations regarding the DIP Facility, I believe that there is no alternative source of sufficient postpetition financing

currently available to the Debtors and that the DIP Facility is, in fact, the only actionable source of postpetition financing currently available to the Debtors.

23. *First*, the DIP Facility is expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to administer these chapter 11 cases effectively and efficiently and to pursue consummation of the Approved Plan. The DIP Facility is sized and structured to fund the Debtors through that timeline.

24. *Second*, the principal economic terms of the DIP Facility, including the interest rate, the DIP Roll-Up Loans, and the absence of fees, are reasonable under the circumstances and fall within the observed range for debtor-in-possession financings of this type. Because interest is structured on a payment-in-kind basis and the DIP Facility bears no fees, the DIP Facility will allow the Debtors to maintain liquidity during these chapter 11 cases.

25. *Third*, the Debtors' market test uncovered no practical alternative. As described above, Ducera contacted twelve (12) third-party financing sources, each of which declined to provide postpetition financing, and the Debtors did not receive any proposal to provide postpetition financing on an unsecured, junior, or any other basis. The Debtors and their advisors have considered, and will continue to consider, any postpetition financing proposals that may be received as potential alternatives to the DIP Facility.

26. *Fourth*, as the Debtors' existing prepetition secured lender and ultimate equity owner, PIF is familiar with the Debtors' business, operations, and capital structure, which enabled the parties to negotiate and document the DIP Facility within the timeframe required by the Debtors' liquidity position. The DIP Facility is fully consensual, provides for the continued use of Cash Collateral, and contains Milestones that provide visibility to a timely emergence from chapter 11 or an orderly wind-down. In my experience, the timing and certainty of closing, the

avoidance of a value-destructive priming fight, and the alignment of the financing with a path to consummation of a chapter 11 plan are important considerations in evaluating postpetition financing alternatives, and each weighs in favor of the DIP Facility.

**<u>Conclusion</u>**

27. For the reasons stated above, and based on my professional opinion and experience with and analysis of debtor-in-possession financing transactions, as well as my participation in the marketing and negotiation of postpetition financing alternatives for the Debtors, I believe that the proposed DIP Facility, taken as a whole, is fair and reasonable, features economic terms that compare favorably to those of similar financings, was negotiated at arm's length and in good faith under the oversight of the SIC, and represents the best—and only actionable—postpetition financing currently available to the Debtors under the facts and circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: September 8, 2026 /s/ *Bradley A. Robins*

Name: Bradley A. Robins
Title: Partner
Ducera Partners LLC