**GIBSON DUNN & CRUTCHER LLP**
Scott J. Greenberg (*pro hac vice* pending)
Matthew J. Williams (*pro hac vice* pending)
Keith R. Martorana (*pro hac vice* pending)
Robert E. Fitzgerald (*pro hac vice* pending)
Tommy Scheffer (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (312) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (*pro hac vice* pending)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Joint Administration Requested) |

**DECLARATION OF DAVID ORLOFSKY,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT**
**OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, David Orlofsky, Chief Restructuring Officer of the above captioned debtors and debtors in possession (collectively, the "Debtors," "LIV Golf" or the "Company") declare as follows under penalty of perjury:

1 The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Qualifications**

1. I am a Partner and Managing Director and Co-Leader of the Americas Turnaround and Restructuring Practice of AlixPartners, LLP ("AlixPartners"), and an Authorized Representative of AP Services, LLC ("APS"), an affiliate of AlixPartners. AlixPartners is an internationally recognized restructuring and turnaround firm, and was retained by the Debtors as their financial advisor in April 2026, an engagement that transitioned to APS providing interim management services and my current role as the Chief Restructuring Officer ("CRO") of LIV Golf and certain of its affiliates, a position I have held since September 7, 2026.

2. As CRO, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court (as defined below) and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions filed contemporaneously herewith. I have over 26 years of restructuring experience providing both interim management and advisory services to clients, including by serving as the Chief Restructuring Officer of Franchise Group, Party City, RCS Capital Corporation, Preferred Sands, and Mark IV Industries and the interim Chief Operating Officer and Chief Financial Officer of Malden Mills. I hold a bachelor's degree in business administration from Montclair State University.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my experience and personal knowledge, (b) information obtained from members of the Debtors' management team, employees, or advisors, (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge. I am over the age of eighteen (18)

and am authorized to submit this Declaration on behalf of the Debtors. If called as a witness, I could and would testify competently to the facts and opinions set forth in this Declaration.

**Introduction**

4. The Debtors own and operate the world's only global golf league (the "League") featuring 13 teams, a 14-tournament schedule, and many of the world's best golfers. The League was designed to expand the sport of golf on a global level and offer a new and exciting alternative to the PGA Tour and DP World Tour—established leagues which have historically dominated the market. To meet this goal, the League has engaged in constant innovation to set a new standard in the sport and redefine the fan experience through the lens of music, culture, and entertainment, while growing the game of golf for a new era of players and fans around the world.

5. In that vein, LIV Golf sought to change the entire approach to how the game was played by golfers and viewed by fans. Gameplay was accelerated through shotgun starts which reduced the average pace of play from 10-12 hours for a traditional golf tournament to only 4.5 hours for a LIV Golf tournament. In addition, LIV introduced a team concept to golf, whereby players compete both on an individual and team basis. This model offered greater excitement to fans, a more condensed broadcast experience as well as new sponsorship/branding opportunities. Finally, LIV Golf added a festival-style atmosphere to their tournaments, with extensive fan entertainment options, including celebrity appearances and concerts. This allowed the League to attract a younger, more diverse audience compared to traditional golf in line with its mission of growing the game of golf globally.

6. Acquiring top-tier talent was an important aspect to developing a premier golf league. To effectively establish itself as a serious contender, LIV Golf needed to find a way to recruit and retain high-performing golfers with strong fan recognition—a high hurdle in the face of unrelenting anticompetitive opposition to LIV Golf by the established leagues. Despite these

obstacles, LIV Golf was ultimately successful in acquiring this talent, and indeed now has one of the most impressive rosters of golfers within the sport. This success, however, came at significant cost. The only way to overcome these exclusionary practices by the entrenched golf tours was to obtain this talent through structural changes to the way golfers are traditionally compensated. The established tours compensate their players primarily through prize purses, while also requiring players to cover associated expenses like hotel and airfare for themselves and their support team. Separately, players need to attract their own sponsors for personal branding (e.g. patches on their shirt, hat, bag and other items). The established compensation model is almost entirely performance based and can often mean that players accrue thousands of dollars of out-of-pocket expenses that can only be recouped through winnings. By contrast, LIV Golf was forced to acquire top golfers through a combination of upfront payments as well as annual payments to cover the rights to the players' sponsorship inventory. The team concept requires consistent uniforms, and thus the teams were required to sell sponsorships for their own benefit and not for the benefit of any one player. The annual payments effectively compensated players for the lost earning potential from not being able to sell one's own sponsorships.

7. The League was successful in growing the game of golf globally, driving increased sponsorships and improving global broadcast ratings, but it still required significant investments to achieve a break-even balance sheet. These investments were provided by affiliates of its ultimate equity owner, The Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"). Since LIV Golf's inception in 2021, entities controlled by PIF have invested approximately $5 billion in equity capital. While LIV Golf has had success over its five-year span of operations from the standpoint of strong revenue growth, sponsorship, attendance, ticketing, broadcast rights

and other economic metrics, it continually ran at an operational loss, and was still years away from projected stand-alone profitability based on its prior structure.

8. In April 2026, PIF announced that the continued funding of LIV Golf no longer aligned with its investment strategy, and that it would cease making further equity infusions. However, PIF agreed to fund operations through the remainder of the 2026 season and committed to providing capital—in the form of a secured loan—which allowed the remainder of the 2026 season to proceed largely as planned, preserving value for all stakeholders.

9. Shortly thereafter, LIV Golf hired restructuring advisors—their existing counsel, Gibson, Dunn & Crutcher LLP ("Gibson Dunn") as restructuring counsel, AlixPartners as financial advisor (an engagement that transitioned to APS providing interim management services and my current role as CRO of LIV Golf and certain of its affiliates), and Ducera Securities LLC ("Ducera") as their investment banker—to help formulate a value-maximizing strategy for the benefit of LIV Golf's stakeholders. The Company also appointed Gene Davis and Jon Zinman, individuals with extensive restructuring experience, as independent directors to the boards of the Debtors (the "Independent Directors"). In connection therewith, Ducera launched a broad marketing process in the hopes of identifying an investor (or investors) to fund a new iteration of LIV Golf under a new and more efficient operating model ("LIV 2.0"). This marketing process bore fruit, and the Company identified a proposed lead investor, BC Partners Advisors L.P. ("BC Partners"), who expressed willingness to fund a large portion of the funds anticipated to be needed to sponsor the 2027 season and beyond—contingent upon, among other things, consummation of a chapter 11 plan of reorganization.

10. As described below, the Company entered into a binding Restructuring Support Agreement with BC Partners (the "BC Partners RSA") on the Petition Date and intends to move forward with a plan encompassing the terms set forth therein with due haste.

11. At the same time, the Company was and is in desperate need of funding to continue its operations and cover the costs of these chapter 11 cases. Absent an immediate filing accompanied by a debtor-in-possession loan, the Company would be unable to pursue its favored transaction—or even an orderly wind-down. As such, Ducera commenced a marketing process for a post-petition loan, while the Company and its professionals negotiated with PIF for potential additional funding. Following this marketing process, as described in the *Declaration of Bradley Robins in Support of the Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief* filed contemporaneously herewith, the only viable option for post-petition funding was provided by PIF in the form of a $49.6 million new money priming debtor-in-possession loan (the "DIP Facility").

12. The proposed DIP Facility will ensure a smooth transition into these chapter 11 cases and is designed to provide the Debtors with sufficient liquidity to fund their operations and the cases. The DIP Facility includes milestones that dictate an aggressive yet achievable case timeline, with a target date for emergence in January 2027.

13. As the Company's CRO, and in consultation with the Company's management team and advisors, it is my opinion that the DIP Facility is the product of robust, arm's-length

negotiations, fulfills the Debtors' restructuring goals, and is the best source of financing available to the Debtors. Accordingly, the Debtors are determined to move forward with the DIP Facility in a sound exercise of their business judgment. With this essential funding in place, the Debtors will be well positioned to pursue LIV 2.0.

## Background

14. On September 8, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, in the United States Bankruptcy Court for the District of New Jersey (the "Court"). To minimize the adverse effects on their business, the Debtors have filed certain motions and pleadings seeking various types of "first day" relief (the "First Day Motions"), which will allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.

15. To familiarize the Court with LIV Golf, its business, and the circumstances leading to these chapter 11 cases, this Declaration is organized into four sections:

- **Part I** provides a general overview of LIV Golf's history and business operations;
- **Part II** describes the Debtors' corporate structure and prepetition capital structure;
- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases; and
- **Part IV** discusses the relief requested in the First Day Motions.

### I. Overview of LIV Golf's History and Operations.

#### A. Corporate History.

16. The initial corporate entities comprising LIV Golf were formed in the United States (Delaware), Jersey and the United Kingdom beginning in June 2021. The organization launched

operations in March 2022 following equity funding received from entities controlled by PIF, which remains the ultimate equity owner of LIV Golf.

17. The League was designed to expand the sport on a global level and create new value within the golfing ecosystem while enhancing the game's societal impact. Almost immediately, LIV Golf shook up the traditional world of professional golf, bringing new energy and an enhanced spectator and player experience, which attracted a younger and more diverse fan base. Indeed, the original signature marketing slogan for LIV Golf was "Golf, but Louder."




18. LIV Golf intended to set itself apart from standard golf tours with the following fundamental changes:

**1. Revised Format.**

19. Initially, the LIV Golf format reduced the standard 72-hole tournament (4 rounds of 18) to 54 holes. In late 2025, LIV Golf changed its tournament format to increase the number of holes played to 72, based on player feedback and with the goal of obtaining maximum Official World Golf Ranking points for playing in LIV Golf tournaments as well as to increase the number of activation opportunities for sponsors. Another LIV Golf initiative included a "shotgun start," where all players begin at the same time, at different holes throughout the course. This format

ensures that action is occurring at all times on all holes, and provides a guaranteed time window where top golfers are playing in order to enhance broadcast opportunities.

**2. Top Talent.**

20. For the established golf tours, the bulk (or all) of the golfers' compensation is based on individual performance at tournaments in the form of individual prize purses. In addition, other golf tours use a "cut" model (which is not utilized by LIV Golf) whereby golfers whose total strokes after the first two days of tournament play exceed a certain score are ineligible to continue to the final two days and receive no prize money—while still incurring out-of-pocket costs required to compete. By contrast, LIV Golf utilizes a more stabilized compensation model to obtain talent with some guaranteed money, which makes the tournament more attractive to sponsors and fans. Specifically, LIV Golf compensates its players with a mix of (i) guaranteed up front "commitment" payments and "annual" payments, (ii) team equity for certain players[2], and (iii) performance-based individual and team-based prize purses. In exchange, players granted sponsorship rights to the League and/or their teams, subject to the rights retained under their respective contracts, and some players also gave up their name, image and likeness rights.

**3. Team Play.**

21. Unlike other golf tours—which are entirely individual achievement-based competitions—the LIV Golf tour adds team competition, and team prize money, to enhance fan excitement and branding opportunities. The league is currently comprised of 57 golfers, 52 of whom are divided into 13 four-member teams. The remaining five "wild card" golfers compete individually.[3] During the LIV Golf tour's season, which typically spans 14 events throughout the

---

[2] Team equity ownership is discussed below.

[3] Additionally, the League maintains "reserve" players which can substitute into teams if necessary to replace injured or otherwise absent Players.

year, individuals and teams earn points based upon performance. The season generally culminates in a team playoff competition where one team is crowned champion.[4]




**B. Business Operations.**

22. The Debtors' operations are broadly divided into two segments: the "League" and "Teams." The League is the primary revenue driver for the Debtors, and is further divided by geography: United States operations, which is managed by Debtor LIV Golf Incorporated, and international operations, which is managed by Debtor LIV Golf Ltd. The League entities operate all tour events, hold the rights to ticketing, hospitality, host city relationships, broadcasting and League or event-centered sponsorships, and contracts with vendors and are counterparties to certain player contracts.

23. The teams are comprised of 13 separate operating entities (one for each of the 13 four-player teams), and are wholly owned by Debtor LIV Golf Incorporated. Prior to the Team

---

4 In addition to the official LIV Golf tour events, the Company also co-sanctions with the Asian Tour an "International Series" which generally consists of eight to nine Asia-based competitions featuring future LIV Golf prospects.

Consolidation (described below), all but two of the teams were minority owned by one or more players. The teams generate revenue primarily through sponsorship deals that are team-specific, and are also typically counterparties to player contracts. The teams generated approximately 20% of LIV Golf's revenue in 2025.




24. The Debtors' revenues are generated predominantly from the following categories: (i) sponsorship (League and Team), which accounted for approximately 49% of 2025 revenue, (ii) tournament hosting fees, which accounted for approximately 22% of 2025 revenue, (iii) ticketing and hospitality, which accounted for approximately 16% of 2025 revenue, (iv) broadcasting rights, which accounted for approximately 5% of 2025 revenue, (v) merchandise sales, which accounted for approximately 5% of 2025 revenue and (vi) other revenue, including food and beverage commission, interest received and other miscellaneous items which accounted for the remaining approximately 3% of 2025 revenue.




**1. Sponsorship.**

25. Sponsorship dollars account for approximately half of LIV Golf's 2025 revenue and represent the Company's most significant growth driver. Sponsorship opportunities include individual team sponsorships (patches, equipment, shoes, uniforms), VIP hospitality programs, event level sponsorship, and season-long, leaguewide marketing partnerships. Sponsorship revenue has grown dramatically since the Company's inception, totaling approximately $16 million in 2023 and $102 million in 2025. On a go-forward basis, LIV Golf has secured approximately $300 million in long term sponsorship contracts from 2027 through 2029, with key blue chip partners.

**2. Hosting Fees.**

26. Hosting fees—fees that the host city, organization or venue pay to LIV Golf in exchange for the rights to host a tournament—account for almost a quarter of LIV Golf's 2025 revenue. Host cities benefit from the presence of a tournament from increased travel, lodging and entertainment of fans (and thus increased taxes) in addition to the overall heightening of a host city or golf course's profile. For these reasons, host cities and venues were willing to pay over $34 million in 2025 to LIV Golf for the rights to host tournaments. LIV Golf events on average drive

$40 million of economic impact to locations it visits and have generated over $1.5 billion of economic impact to local communities since inception.

**3. Ticketing and Hospitality**.

27. Ticketing and hospitality for events accounts for approximately 16% of LIV Golf's 2025 revenue. Tickets to events range from basic grounds passes (available in single day or multi-day options), to "grounds plus," which offers access to private hospitality structure and restrooms, to elevated/VIP options, which include access to premier seating, private clubs and more. Hospitality revenue is primarily from sales of food and beverages, which is available throughout the course. Ticketing and hospitality revenue have grown significantly year-over-year, driven primarily by increased fan attendance. For comparable events through June 2026, scanned attendance grew approximately 31% from 2025 to 2026, while event ticketing, hospitality, and food & beverage revenue grew 43%. Indeed, the LIV tournament held in Adelaide, Australia saw an unprecedented fan attendance of 115,000, while the South Africa tournament fan attendance was over 100,000.

**4. Broadcasting.**

28. Broadcasting rights provide approximately 5% of LIV Golf's 2025 revenue. LIV Golf has partnered with over 20 broadcasters covering over 200 territories and one billion in global household reach. These broadcasters generally pay fees (or participate in revenue share arrangements with LIV Golf) pursuant to long term contracts for the exclusive right to distribute television and media content produced by LIV Golf, including live event coverage. Most notably, in 2025 LIV Golf reached an agreement with Fox Sports to be the exclusive broadcaster of LIV Golf events to U.S. based audiences. This partnership shored up the credibility of LIV Golf's broadcast audience base, and increased viewership over 135% year-over-year.

**5. Merchandise Sales.**

29. Merchandise sales account for approximately 5% of LIV Golf's 2025 revenue. Hats, clothing and accessories (including league and team-specific products) are available on LIV Golf's online store, as well as at merchandise booths present at each LIV Golf tournament.

## II. Prepetition Corporate and Capital Structure.

### A. LIV Golf's Corporate Structure.

30. As set forth in the structure chart attached hereto as **Exhibit A**, Debtors LIV Golf Investments Ltd. and LIV Golf Holdings Ltd. are private companies limited by shares incorporated in the Island of Jersey. These entities own, directly or indirectly, a majority stake in each of the remaining debtors and are subject to a coordinated administrative proceeding in Jersey, which proceeding was filed contemporaneously with the U.S. bankruptcy petitions (the "Jersey Proceeding," and together with the UK Proceeding, the "Foreign Proceedings"). Immediately beneath LIV Golf Holdings Ltd. is LIV Golf Incorporated, a Delaware corporation which directly or indirectly owns each of the remaining Debtors.

31. The corporate structure is broadly divided into three operational branches: U.S. operations/events, international operations/events, and teams. In addition, LIV Golf Incorporated wholly owns Wedge IP Management Co., Limited and Wedge IP Management Co, LLC—non-operating companies which hold some of the Company's intellectual property.

32. U.S. operations/events are housed within Debtor LIV Golf Incorporated. This entity wholly owns, directly or indirectly, a series of corporations and LLCs that have been established for the purposes of operating each of LIV Golf's U.S. events, including LIV Golf New Jersey, LLC, a New Jersey LLC (and lead Debtor) which was an operator of LIV Golf's 2026 New Jersey event that transpired on August 6-9, 2026.

33. International operations/events are housed within Debtor LIV Golf Ltd., an English Limited Company. This entity wholly owns, directly or indirectly, a series of corporations that have been established for the purposes of operating each of LIV Golf's international events, including LIV Golf Events Limited, which has established a local branch in each of South Korea, South Africa, Australia, Hong Kong and Singapore (and a tax registration in Spain).[5] Two of the UK entities are subject to ancillary recognition proceedings in the United Kingdom (the "UK Proceeding") which were filed shortly after the U.S. bankruptcy petitions, and one of the First Day Motions filed contemporaneously herewith seeks authority to appoint me as the foreign representative for such purposes.

34. LIV Golf Incorporated is also the owner of the entities that comprise the teams. As noted above, one of the unique features of LIV Golf is its team structure: in addition to individual competition, the Players are contracted to (or otherwise play for) one of thirteen teams which compete against each other for points. The teams operate effectively as franchises, where they are permitted to enter into their own sponsorship contracts.

35. Prior to August 24, 2026 (the "Consolidation Date"), a common feature of the teams was a division of common equity between the League and the Players (and in some instances, sponsors). All but two of the teams were partially player-owned, with one or more team members holding up to 40% of the team common equity (more commonly, 25%). In all instances, the team entities were majority owned by LIV Golf Holdings Ltd. On the Consolidation Date,[6] the prior team structures were consolidated through mergers, the net effect of which was to cancel the

---

5 While certain of these branches are registered to do business in the named foreign jurisdictions, the branches are not independent legal entities from LIV Golf Events Limited, and thus have not filed insolvency petitions in any jurisdiction.

6 All but one of the teams were consolidated on the Consolidation Date. The final team entity, Fairway TM Co 13, LLC was consolidated on September 8, 2026, prior to the filing of these Chapter 11 Cases.

common equity holdings of the Players and sponsors (the "Team Consolidation"). The Team Consolidation was effected for the purposes of preserving the NOLs (one of the Debtors' most valuable assets).

**B. LIV Golf's Capital Structure**.

36. Historically, LIV Golf was not subject to any funded debt obligations. Rather, the substantial majority of its liabilities derived from long-term unsecured contracts with its players. As noted above, one of the fundamental differences between LIV Golf and the other established tours is that player compensation is not solely based on prize money. Prize money remains an aspect of the compensation structure, but LIV Golf's ability to attract top talent was localized in the stability associated with guaranteed compensation in exchange for sponsorship rights. While LIV Golf also incurs substantial unsecured obligations associated with vendors who run its events (and otherwise support LIV Golf's business operations), the player contracts comprise a significant portion of LIV Golf's overall unsecured obligations.

37. Until June 2026, LIV Golf funded operations solely through equity infusions of affiliated entities of its controlling shareholder, PIF. As of the Petition Date, LIV Golf Investments Ltd., the ultimate parent of the Debtors, had issued 5,269,395,765 preference shares and 421,500 class A ordinary shares (accounting for 98.48% common ownership) to PIF. In addition, LIV Golf Investments Ltd. issued (i) 4,500 class B ordinary shares (accounting for 1.05% common ownership) to Performance54 Group Limited (UK), a company majority owned by PIF, (ii) 1,000 class C ordinary shares (accounting for 0.23% common ownership) to the former CEO of LIV Golf, and (iii) 1,000 class C ordinary shares (accounting for 0.23% common ownership) to a current player.

38. As noted above, in April 2026 PIF announced that it would no longer fund LIV Golf operations past the end of the 2026 season. However, in June 2026 PIF informed LIV Golf that it would provide a secured loan to allow the remainder of the 2026 season to proceed largely as planned, which would afford LIV Golf the opportunity to seek investments to potentially preserve a go-forward operation following PIF's exit.

39. On June 4, 2026, LIV Golf Holdings, as borrower, entered into a secured Facility Agreement with PIF as lender, and LIV Golf Ltd, LIV Golf Incorporated, LIV Golf Investments Ltd., Wedge IP Management Co, Limited, and Wedge IP Management Co, LLC as guarantors (the "PIF Facility"). On or about August 27, 2026, LIV Golf New Jersey LLC acceded to the PIF Facility as guarantor, and on or about August 28, 2026, LIV Golf Events Ltd., Fairway TM Co 3, LLC and Fairway TM Intermediate 3 LLC acceded to the PIF Facility as guarantors. The PIF Facility is secured by substantially all of the assets of the borrower and the guarantors thereunder. As of the Petition Date, the outstanding balance, including all outstanding and unpaid interest, on the PIF Facility was approximately $495 million.

## III. Events Preceding These Chapter 11 Cases.

### A. Challenges.

40. From its inception, LIV Golf's mission was to offer a new and exciting option for players, fans and sponsors. Unlike other professional sports leagues that are primarily team driven, the field of professional golf is predominantly individual player based. As such, the investors in LIV Golf recognized that in order to be truly on par with the established tours, and confronted with their relentless and coordinated opposition, it would be necessary to provide upfront guaranteed payments to players in order to attract them from the dominant leagues and to buy out their sponsorship rights in order to allow for consistent team branding/sponsorship.

41. Inherently, this model required significant equity investments from PIF in order to satisfy the start-up costs associated with a new, global league. Indeed, since inception, entities controlled by PIF have invested approximately $5 billion in the form of equity.

42. The path to profitability was always a long-term strategy. LIV Golf ran at a loss for all years of operations, generating approximately $3.0 billion in net operating losses at LIV Golf Inc. and approximately $2 billion at LIV Golf Ltd., for a total of approximately $5 billion as of December 31, 2025 (the "NOLs").[7] LIV Golf firmly believes that, with appropriate funding and a level playing field with its competitors, its existing operating model would have reached profitability within five to seven years, primarily through continued revenue growth across both the League and teams, which had increased significantly in 2025 and 2026.

43. On April 30, 2026, PIF announced that it would not be providing the equity capital necessary to see the league through to profitability, and that it would only provide funding during the remainder of the 2026 season through a secured facility. PIF cited the fact that "[t]he substantial investment required by LIV Golf over a longer term is no longer consistent with the current phase of PIF's investment strategy." Without long term funding options, but with a commitment from PIF to provide funding during the then ongoing 2026 season, LIV Golf and its management immediately took actions to best position itself for value maximizing strategic alternatives.

**B. Proactive Approach to Address Financial and Operational Issues.**

44. Following the formal announcement by PIF that it would cease investing in LIV Golf following the 2026 season, the LIV Golf executive team took immediate steps to maximize

[7] As discussed further below, the NOLs are currently one of LIV Golf's most valuable assets, and one of the First Day Motions seeks authority to implement procedures necessary to protect that asset.

value for all stakeholders. First—and given the uncertainty of go-forward solvency—the Debtors took immediate steps to implement a robust and comprehensive governance process that would ensure independent and disinterested representation on the Company's boards and a thorough and fair process with respect to the Debtors' review of their restructuring alternatives. Second, the Company engaged various professional advisors who specialize in restructuring matters to help guide the Company as it evaluated its strategic alternatives. Third, the Company took certain operational steps to help minimize go-forward liabilities and retain key employees that were necessary to complete the 2026 season and implement the Company's next phase.

**1. Governance Changes.**

45. On April 13, 2026, the Company appointed the Independent Directors to the boards of LIV Golf Investments Ltd. and LIV Golf Holdings Ltd. The Independent Directors were subsequently added to the boards of all Debtors, other than any Debtor that is a member managed LLC.

46. On April 24, 2026, the Independent Directors were appointed as the sole members of a newly formed Strategic Initiative Committee ("SIC") of LIV Golf Holdings Ltd. The Debtors delegated to the SIC, among other things, (a) exclusive authority to review, discuss, consider, negotiate, approve, authorize and act upon any conflict matter, and (b) authority to take any and all actions with respect to any strategic, restructuring, financing, and/or sale transaction or series of such transactions.

47. As part of its mandate, the SIC determined that it must conduct an independent investigation and assess the merits and potential value of any potential claims and causes of action held by the Company. In furtherance thereof, and with the assistance of its independent counsel, Kobre & Kim LLP, the SIC conducted an initial assessment prior to the Petition Date and continues to actively assess (a) the existence of any potential claims or causes of action that the Debtors may

hold—including, without limitation—against certain insiders and other affiliated entities and (b) whether the Debtors should retain, release, or seek to settle any such potential claims or causes of action.

48. Since its formation, the SIC has held twice weekly meetings with the Company's advisors (or more frequently on an as-needed basis) to consider transactional options and stakeholder feedback, consider any potential conflict matters in connection therewith, and provide guidance to LIV Golf's management team and advisors regarding the SIC's position on such options. After this thorough process, the SIC ultimately authorized the Company's entry into the DIP Facility, the filing of these chapter 11 cases and the filing of the Foreign Proceedings.

**2. Hiring of Restructuring Professionals.**

49. In April 2026, the Debtors hired Gibson Dunn as restructuring counsel, and AlixPartners as their financial advisor. In May 2026, the Debtors hired Ducera as their investment banker.

50. Since that time, the Debtors' professionals have worked diligently with the Company and its key stakeholders in relation to these chapter 11 cases, DIP financing, and a value-maximizing process. For example, professionals from AlixPartners have operated alongside the Company to perform a comprehensive review and analysis of the Company's cost structure and cash flow forecasts to help get to the end of the 2026 season as well as help prepare for bankruptcy. Meanwhile, Gibson Dunn engaged with various stakeholders, players, vendors, litigation counterparties, and other key stakeholders regarding, amongst other things, settlement discussions, operational matters, and the path forward for these chapter 11 cases. Ducera solicited proposals from parties inside and outside of the existing capital structure regarding post-petition financing, and sought out investors or buyers for the Company's business. Each of AlixPartners, Gibson Dunn, and Ducera have been actively involved in the preparation of customary "first day" relief

to help the Company transition into chapter 11 and launch its restructuring initiatives as seamlessly as possible.

**3. Operational Changes.**

51. Following the decision by PIF that it would no longer provide funding to support LIV Golf's operations past the conclusion of the 2026 season, the Company and its advisors undertook a comprehensive review of its cost structure in an effort to preserve liquidity and position itself to pursue a value-maximizing restructuring. As part of that review, the Company identified and implemented a series of operational changes designed to reduce expenditures across the business while preserving the core competitive product offered to golfers, sponsors, and fans.

52. Among other things, the Company reduced spending on fan experience initiatives, including certain live event programming, hospitality offerings, and promotional activities that the Company determined were not essential to the continued operation of its business. The Company also curtailed expenditures on certain amenities that had previously been provided in connection with league events, including certain travel, lodging, and entertainment arrangements. In addition, management and its advisors made the difficult decision to cancel two tournaments, Michigan and New Orleans.

53. In addition, the Company scaled back certain non-critical accommodations that had previously been made available to golfers participating in the league, retaining those accommodations the Company determined were necessary to maintain player participation and the competitive integrity of the league, while eliminating or reducing those it determined to be non-essential in light of the Company's financial circumstances.

54. Finally, the Company evaluated the possibility of workforce reductions in connection with its restructuring and the mitigation of any liability related thereto. In connection therewith, the Company took preemptive measures to reduce any liability associated with

workforce reductions by issuing written notices to certain employees on July 8, 2026 under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*, the New York State Worker Adjustment and Retraining Notification Act, N.Y. Lab. Law § 860 *et seq.*, and equivalent legislation in the United Kingdom. On or about September 1, 2026 (US) and September 3, 2026 (UK), the Company effected a significant reduction in its workforce in the United States and the United Kingdom. As of the Petition Date, the Debtors employ 41 individuals, all of whom work in full-time positions (including executives, human resources, sales, customer service, marketing, accounting, finance, legal, administrative, and other personnel, the "Remaining Employees"). Approximately 22 of the Debtors' Remaining Employees are located in the United States and approximately 19 of the Debtors' Remaining Employees are located in the United Kingdom.

55. The Company believes that these cost reduction measures, implemented in advance of the commencement of these chapter 11 cases, were a necessary and prudent response and meaningfully reduced the Company's operating expenditures, thereby preserving value for the benefit of the Company's estate and stakeholders.

**4. Prepetition Retention Plan.**

56. On or about June 23, 2026 and August 7, 2026, the Company implemented a prepetition retention plan (the "Retention Plan") for the purpose of retaining certain key employees whom the Company determined to be critical to (a) the successful completion of the 2026 golf season and (b) the Company's evaluation and pursuit of a potential restructuring, including the commencement of these chapter 11 cases.

57. In designing the Retention Plan, the Company recognized that the uncertainty surrounding its financial condition and the loss of funding from PIF created a heightened risk that key employees possessing institutional knowledge and specialized skills necessary to the

Company's ongoing operations and restructuring efforts might seek alternative employment opportunities, to the detriment of the Company and its stakeholders. The Company further determined that the departure of such employees during this critical period would jeopardize the Company's ability to complete the 2026 season in an orderly manner and to execute a value-maximizing restructuring.

58. Accordingly, the Company, in the exercise of its business judgment, and following consultation with its advisors, implemented the Retention Plan to provide targeted retention payments to a limited group of key employees whose continued and dedicated service the Company determined to be essential to the completion of the 2026 season and the restructuring process. The Company believes that the Retention Plan was a necessary and appropriate exercise of sound business judgment, was designed to align the interests of participating employees with the successful completion of the season and the restructuring, and has been instrumental in preserving the stability of the Company's workforce during this critical period.

**C. The Proposed Transaction.**

59. Since its engagement, Ducera has worked diligently to market an investment opportunity in the Company to potential investors willing to support a restructuring transaction that would preserve LIV Golf's business as a going concern. This marketing process began in earnest in May 2026 when Ducera crafted a confidential information memorandum and launched an outreach to over 300 potential investors. 104 potential investors signed NDAs and accessed the virtual data room. Of those 104 potential investors, approximately 30 engaged in detailed diligence. Ultimately, five leading prospects were identified (along with potential minority investors), and each of these prospects were asked to submit final non-binding bids by July 22, 2026 (the "Bid Deadline").

60. On the Bid Deadline, the Debtors received two non-binding term sheets. While Ducera and the Company continued to engage with both potential investors, ultimately one bid was determined to be the best and most viable—the bid submitted by BC Partners (their proposal, the "BC Partners Bid"). The BC Partners Bid would facilitate a recapitalization of the Debtors by anchoring a $300 million investment in LIV 2.0.

61. The Debtors and their advisors spent weeks discussing and negotiating the BC Partners Bid and ultimately, on September 8, 2026, the Debtors and BC Partners entered into the BC Partners RSA, pursuant to which BC Partners has agreed, subject to the terms and conditions thereof, to provide the funding for the BC Partners Bid, as well as a substantial amount of supplemental DIP financing to fund certain start-up costs associated with LIV 2.0 (the "Incremental BC Partners DIP"). A copy of the BC Partners RSA is attached hereto as **Exhibit C**.

62. The BC Partners RSA contains certain key milestones, including:

- the filing of a motion seeking authority to assume the BC Partners RSA no later than 3 days after the Petition Date;
- a hearing on the RSA assumption motion and the Incremental BC Partners DIP no later than 10 days after the Petition Date;
- entry by the Debtors, PIF, and BC Partners into an acceptable RSA no later than the hearing to consider entry of the RSA assumption motion; and
- entry by the Debtors, PIF, BC Partners, and a requisite number of players into an acceptable RSA no later than 35 days after the Petition Date.

63. The BC Partners RSA also includes a break fee equal to 3% of BC Partners' total agreed investment, payable solely from the proceeds of an alternative investment or sale transaction.

64. The Debtors and their advisors believe that the BC Partners RSA represents a key agreement in these cases and positions the Debtors well to continue their goals of maximizing value for the benefit of all stakeholders.

## IV. Evidentiary Support for First Day Motions.

65. Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize their business operations and facilitate the efficient administration of these chapter 11 cases. I have reviewed each of the First Day Motions and I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit B**.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: September 8, 2026

/s/ *David Orlofsky*
Name: David Orlofsky
Title: Chief Restructuring Officer

# **Exhibit A**

## **Structure Chart**

= UK Entity

= Jersey Entity

= U.S. Entity

= Borrower under PIF Facility

= Guarantor under PIF Facility




**Detail (enlarged): Team 8 and Team 12 GP / LP structures**



# Exhibit B

## Evidentiary Support for First Day Motions[1]

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

# EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

## Administrative and Procedural Motions

### I. Debtors' Application for Entry of an Order (I) Authorizing the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent Effective as of Petition Date and (II) Granting Related Relief (the "Omni 156(c) Retention Application").

1. Omni Agent Solutions, Inc. ("Omni") is a leading chapter 11 administrator and is comprised of industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. Omni's professionals have significant experience in matters of this size and complexity and noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. Omni has developed cost-effective methods to handle the voluminous mailings associated with the noticing and claims-processing portions of chapter 11 cases to ensure the efficient, orderly, and fair treatment of all parties in interest.

2. The Omni 156(c) Retention Application (the "Retention Application") pertains only to work to be performed by Omni under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Rule 2002(f), and any work to be performed by Omni outside of the scope of the Retention Application is not covered by the application or by any order granting approval hereof. In its role as Claims and Noticing Agent, Omni may provide the following services, among others: (i) prepare and serve required notices and documents in these chapter 11 cases; (ii) maintain an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs; (iii) furnish a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved

[1] To the extent there is any conflict or inconsistency between the relief described herein and the relief requested in the applicable First Day Motion, the relief requested in the applicable First Day Motion shall govern.

by the Court, and notify such potential creditors of the existence, amount, and classification of their respective claims as set forth in the schedules and statements; (iv) maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received; (v) prepare and file, or cause to be filed, with the Clerk an affidavit or certificate of service; (vi) process all proofs of claim received; and (vii) maintain the official claims register for each Debtor.

3. In accordance with the Claims Agent Protocol, prior to the selection of Omni, the Debtors reviewed and compared engagement proposals from five court-approved claims and noticing agents, including Omni, to ensure a competitive process. Omni was selected as Claims and Noticing Agent after the review and competitive comparison of the five proposals.

4. Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Omni to act as the Claims and Noticing Agent is appropriate and necessary under the circumstances and in the best interest of the estates. Furthermore, it is my understanding, based on all engagement proposals obtained and reviewed, that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.

5. For the foregoing reasons, I believe that the relief requested in the Retention Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

## II. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (B) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information of Individuals, and (D) Serve Certain Parties in Interest by Email and (II) Granting Related Relief (the "Creditor Matrix Motion")

6. ***File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors and File a Consolidated List of Creditors for all Debtors.*** The Debtors request authority to file a single list of their 30 largest general unsecured creditors on a consolidated basis (the "Top 30

List”). Since the top creditor lists for each individual Debtor could overlap, and certain Debtors may have fewer than 30 significant unsecured creditors, the Debtors submit that filing separate lists for each Debtor would be of limited utility and would require an unnecessary expenditure of finite time and resources. Preparing and maintaining a separate creditor matrix for each Debtor would be time consuming and administratively burdensome. There are thousands of creditors and parties in interest in these chapter 11 cases, and the Debtors believe that authorizing the Debtors to maintain and file a consolidated list of creditors (the “Consolidated Creditor Matrix”) is warranted under the circumstances. I believe that filing a Top 30 List and a Consolidated Creditor Matrix is necessary for the efficient and orderly administration of these chapter 11 cases, appropriate under the facts and circumstances, and in the best interest of the Debtors’ estates.

7. ***Redact Certain Personally Identifiable Information.*** I believe that redaction of the home and email addresses of individual persons, including the Debtors’ employees and the Players, is appropriate under section 107(c)(1) of the Bankruptcy Code because such information can be used to locate survivors of domestic violence or to perpetrate identity theft, phishing scams, harassment, or stalking. In particular, given the high-profile celebrity nature of the Players, the risks associated with harassment and bad actors are heightened. Moreover, absent such relief, the Debtors may be in violation of applicable data privacy or data protection laws and regulations of the various jurisdictions in which they operate, exposing them to significant potential liability. For these reasons, I submit that the Debtors’ proposed redactions are appropriate.

8. ***Approve Service via Email.*** The Debtors have thousands of parties on the Consolidated Creditor Matrix, and serving notices by traditional mail would be burdensome and drain a material amount of the Debtors’ limited resources. I believe that email service is likely the

most efficient and cost-effective manner by which service of all interested parties can be completed, and it is also the most likely to facilitate creditor responses.

9. For the foregoing reasons, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**III. Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

10. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases for procedural purposes only will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, or multiple hearings on common issues. Joint administration also will allow the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

11. Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates. Parties in interest will not be harmed by the relief requested; rather, they will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

12. For the foregoing reasons, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**IV. Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules Motion").**

13. Pursuant to the Schedules Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by thirty (30) days, for a total of forty-four (44) days from the Petition Date, to and including October 22, 2026 without prejudice to the Debtors' ability to request additional extensions for cause shown, and (ii) granting related relief.

14. I believe that good and sufficient cause exists for granting an extension of time to file the Schedules and Statements. The ordinary course operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting systems. To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a myriad of claims of their creditors and the Debtors' many assets and contracts. This information is extensive and located in numerous places throughout the Debtors' organization. Collecting the necessary information requires an immense expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term.

15. In the days leading up to the Petition Date, the Debtors' principal focus has been preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating for a proposed debtor-in-possession financing facility and go-forward reorganization to facilitate a soft landing into chapter 11. The Debtors intend to refocus the attention of key personnel to compliance with chapter 11 obligations during the early days of these chapter 11 cases. Although the Debtors have commenced the process to prepare and finalize what will be voluminous Schedules and Statements, the Debtors anticipate that they may require up to thirty (30) additional days to complete the Schedules and Statements. Given the considerable burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases,

the competing demands upon the Debtors' employees to collect information, the time and attention the Debtors must devote to the restructuring process, and the hundreds of hours required to complete the Schedules and Statements, good cause exists to extend the deadline by thirty (30) days, until forty-four (44) days after the Petition Date.

16. The requested extension will improve the accuracy of the Schedules and Statements when filed and will prevent the potential necessity of considerable subsequent amendments. The Debtors request such an extension without prejudice to their rights to seek further extensions or waivers from the Court for cause shown. Furthermore, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these chapter 11 cases.

17. For the foregoing reasons, I believe the relief requested in the Schedules Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**V. Debtors' Motion for Entry of Interim and Final Orders (I) Appointing and Authorizing a Foreign Representative to Act for the Debtors in a Foreign Proceeding, (II) Authorizing the Payment of Costs Related to Foreign Proceedings, and (III) Granting Related Relief (the "Foreign Representative Motion").**

18. Pursuant to the Foreign Representative Motion, the Debtors seek entry of interim and final orders (a) appointing and authorizing me to act as the "foreign representative" on behalf of the Debtors' estates (in such capacity, the "Foreign Representative") in the UK Proceeding (as defined herein), which relief is requested on a final basis upon entry of the Interim Order, (b) authorizing the payment of certain fees, expenses, and costs associated with the Jersey Proceeding (as defined herein), subject to the supervision of the Jersey Court (as defined herein), on an interim basis upon entry of the Interim Order and on a final basis upon entry of the Final Order, (c) granting related relief, and (d) scheduling a final hearing to consider entry of the Final Order.

19. Two of the Debtors—LIV Golf Ltd and LIV Golf Events Ltd.—are organized under the laws of England and Wales and have assets in that jurisdiction (collectively, the "UK Debtors"). Two additional Debtors—LIV Golf Events ISE Ltd and Wedge IP Management Co, Limited—are also organized under the laws of England and Wales, but the Debtors are seeking recognition in England and Wales only in respect of the chapter 11 cases of the UK Debtors. Two of the Debtors—LIV Golf Investments Ltd and LIV Golf Holdings Ltd—are organized under the laws of Jersey (together with the laws of England and Wales, the "Foreign Legal Regimes") and have assets in that jurisdiction (collectively, the "Jersey Debtors," and together with the UK Debtors, the "Foreign Debtors"). The UK Debtors have certain assets located in England and Wales, including cash, accounts receivable, prepaid expenses, intercompany balances, fixed assets, and merchandise inventory, and LIV Golf Ltd employs 19 individuals at its London office who perform administrative functions in support of the Debtors' business as a whole. The Jersey Debtors are principally holding companies of the Debtors' group and have certain assets located in Jersey, including cash. As such, it is necessary to ensure that these chapter 11 cases, as well as the orders of this Court entered herein, are recognized in respect of each Foreign Debtor and that the protection of the automatic stay (or an equivalent moratorium), together with any additional relief as may be granted by the Foreign Courts (as defined herein), is obtained under the Foreign Legal Regimes.

20. ***The UK Proceeding***. To commence the UK Proceeding, the UK Debtors require authority for me to act as the Foreign Representative on behalf of the Debtors' estates, and each UK Debtor has previously authorized me to act as the Foreign Representative by written resolution. Upon appointment by the Court, I intend to apply to the High Court of Justice, Business and Property Courts of England and Wales, Insolvency and Companies List (ChD) (the "UK Court")

for recognition of the chapter 11 case of each UK Debtor under the Cross-Border Insolvency Regulations 2006 (the "CBIR") (such applications, the "UK Proceeding"). The purpose of the UK Proceeding is to request that the UK Court recognize the chapter 11 case of each UK Debtor as a "foreign main proceeding" or, alternatively, a "foreign non-main proceeding" under the provisions of the CBIR to, among other things, protect the UK Debtors' assets in England and Wales.

21. I understand that the UNCITRAL Model Law on Cross-Border Insolvency (1997) (the "Model Law") has the force of law in Great Britain by virtue of the CBIR, and that the CBIR defines a "foreign representative" to include a person authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding. I further understand that, under Article 15(2) of Schedule 1 to the CBIR, an application for recognition of a foreign proceeding must be accompanied by (a) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative, (b) a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative, or (c) in the absence of such evidence, any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative. Accordingly, an order of this Court authorizing me to act as the Foreign Representative with respect to these chapter 11 cases would, once entered and certified and together with certified copies of the petitions, satisfy the requirements of Articles 2 and 15(2) of Schedule 1 to the CBIR, thereby enabling me to seek recognition as the foreign representative and to apply to have these chapter 11 cases recognized by the UK Court.

22. ***The Jersey Proceeding***. I understand that, unlike Great Britain, Jersey has not enacted the Model Law, and that recognition of these chapter 11 cases in Jersey as foreign main or non-main proceedings is therefore not available. To ensure the protection of the Jersey Debtors'

assets and operations in Jersey, each of the Jersey Debtors has filed (or will file) with The Royal Court of Jersey (the "Jersey Court," and together with the UK Court, the "Foreign Courts") an application for an order placing such Jersey Debtor into administration pursuant to Part 20B of the Companies (Jersey) Law 1991 (collectively, the "Jersey Proceeding," and together with the UK Proceeding, the "Foreign Proceedings"). The Debtors propose to appoint Andrew McFarlane Wood and Alastair Beveridge to serve as joint administrators of the Jersey Debtors in the Jersey Proceeding (the "Joint Administrators"), and the Joint Administrators have selected Carey Olsen Jersey LLP ("Carey Olsen") as their counsel in the Jersey Proceeding.

23. Because the Jersey Proceeding is a plenary (rather than ancillary) proceeding, the Jersey Court has jurisdiction to approve the appointment of the Joint Administrators, and the Debtors do not request any relief with respect thereto in the Foreign Representative Motion. Similarly, the Jersey Court will have jurisdiction over the review and payment of the fees and expenses of the Joint Administrators, including those of Carey Olsen. However, because the Jersey Debtors are also Debtors in these chapter 11 cases, the Debtors request, out of an abundance of caution, authority, on an interim basis upon entry of the Interim Order and on a final basis upon entry of the Final Order, to pay the fees, costs, and expenses of the Joint Administrators and Carey Olsen, without further review by this Court, subject to the review and approval of the Jersey Court. Prior to the Petition Date, each of the Debtors signed a cross-border protocol (the "Cross Border Protocol") designed to streamline and coordinate these chapter 11 cases with the Jersey Proceeding, which outlines certain information-sharing procedures and establishes the primacy of these chapter 11 cases. The Debtors are not seeking approval of the Cross Border Protocol, but intend to abide by its terms as a prepetition agreement and to comply with it to the maximum extent possible and permitted by applicable law. In the interest of international comity and

avoiding duplicative or contrary rulings among the three courts presiding over the Debtors' estates, I believe it is appropriate for the Jersey Court to review and approve the fees, costs, and expenses of the Joint Administrators and their counsel and for the Debtors to pay such amounts without further review by this Court.

24. For the foregoing reasons, I believe that the relief requested in the Foreign Representative Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will facilitate the recognition of these chapter 11 cases and the protection of the Debtors' estates in England and Wales and Jersey.

## VI. Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures on Certain Transfers of Claims Against the Debtors and (II) Granting Related Relief (the "NOL Motion").

25. Debtor LIV Golf Incorporated ("LIV Golf Inc.") is the common parent of an affiliated group of corporations that files a consolidated U.S. federal income tax return (the "Tax Group"). Substantially all of the Tax Attributes[2] described below are attributable to LIV Golf Inc., which is the "old loss corporation" for purposes of section 382 of the Tax Code. The Debtors possess certain Tax Attributes, including, as of December 31, 2025, (a) NOL carryforwards of approximately $3.0 billion, and (b) carryforwards of disallowed business interest expense of approximately $6.0 million. The aggregate loss amount described in the First Day Declaration also includes approximately $2.0 billion of losses carried forward by Debtor LIV Golf Ltd for United Kingdom tax purposes. Those losses are not NOLs of the Tax Group, and the relief requested in this Motion is not directed at them. The Debtors expect to generate additional

---

[2] "Tax Attributes" are collectively, as defined in the NOL Motion, the Debtors' U.S. federal net operating loss carryforwards (including any such carryforwards of any consolidated group of which any Debtor is or was a member) (the "NOLs"), carryforwards of disallowed business interest expense under section 163(j) of Internal Revenue Code of 1986, as amended (the "Tax Code"), and other tax benefits.

amounts of Tax Attributes in the 2026 taxable year. The Tax Attributes are valuable assets of the Debtors' estates. The Tax Code generally permits a corporation to carry forward its NOLs and disallowed business interest expense to reduce taxable income, thereby reducing the corporation's tax liability in future periods. *See* 26 U.S.C. §§ 163(j) and 172. Accordingly, absent any existing or intervening limitations and depending on future operating results, the Tax Attributes could significantly reduce the Debtors' U.S. federal income tax liability for current and future periods, including by offsetting any taxable income that may result from transactions completed in connection with any chapter 11 plan. The Tax Attributes could therefore translate into future tax savings over time, and such savings could substantially enhance the Debtors' value and contribute to the Debtors' restructuring efforts.

26. The Debtors' ability to utilize the Tax Attributes to reduce future tax liability is subject to certain potential statutory limitations. Section 382 of the Tax Code limits the amount of U.S. federal taxable income that can be offset by a corporation's NOL carryforwards and carryforwards of disallowed business interest expense once that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "Ownership Change"). Pursuant to section 382 of the Tax Code, an Ownership Change generally occurs when the percentage of a corporation's equity held by one or more of its "5-percent shareholders" (each, as that term is used in section 382 of the Tax Code, a "5-Percent Shareholder") increases by more than fifty (50) percentage points above the lowest percentage of the corporation's equity owned by that shareholder(s) at any time during the relevant testing period (usually three years). *See id.* § 382(g).

27. The Debtors are currently pursuing a potential reorganization which contemplates the issuance of new common stock of the Debtors (or any successor to the Debtors) and the

distribution of such stock, or rights to receive or acquire such common stock, to certain creditors in, satisfaction, in whole or in part, of their respective claims (each as defined in section 101(5) of the Bankruptcy Code, a "Claim"), on terms and through a structure to be determined in connection with a potential chapter 11 plan. This potential issuance and distribution is expected to result in an Ownership Change, which would adversely affect the availability and value of the Debtors' Tax Attributes. Accordingly, the Debtors seek to avail themselves of, and currently expect to qualify for, special relief afforded by section 382(l)(5) of the Tax Code for changes in ownership under a confirmed chapter 11 plan. Such relief, however, may not be available if the trading, transfer, and accumulation of Claims prior to the effective date of a chapter 11 plan is left unrestricted. Therefore, it is in the best interests of the Debtors and their stakeholders to restrict the transfer of certain Claims against the Debtors that could impair the Debtors' ability to qualify for the relief afforded by section 382(l)(5) of the Tax Code.

28. Accordingly, by this Motion, the Debtors seek approval of certain procedures (the "Claims Procedures") in order to monitor and potentially restrict the transfer, trading, and accumulation of certain Claims against the Debtors, which Claims Procedures are expected to allow the Debtors to preserve their ability to seek necessary relief if it appears that any acquisitions or dispositions of Claims would impair the Debtors' ability to utilize the Tax Attributes.

29. For the foregoing reasons, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

## Operational Motions

### VII. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Wages, Salaries, and Other Compensation and (B) Continuation of Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").

30. By the Wages Motion, the Debtors seek authority, but not direction, to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, other

compensation, federal, state, and local withholding taxes and other amounts withheld (including garnishments and applicable shares of insurance premiums, 401(k) contributions and taxes), reimbursable expenses, retirement plans, health insurance, life insurance, short-and long-term disability coverage, and certain other benefits that the Debtors have historically provided to eligible individuals (collectively, the "Compensation and Benefits"), in each case in the ordinary course of business; and (b) continue to honor such obligations in the ordinary course on a postpetition basis, in the Debtors' discretion and solely with respect to the Remaining Employees, on an interim and final basis, as detailed and summarized in the chart below. In addition, the Debtors seek to pay all costs incidental to the Compensation and Benefits.

31. As of the Petition Date, the Debtors employ 41 individuals, all of whom work in full-time or part-time positions (including executives, human resources, sales, customer service, marketing, accounting, finance, legal, administrative, and other personnel, the "Remaining Employees"). Approximately 22 of the Debtors' Remaining Employees are located in the United States (the "U.S. Remaining Employees") and approximately 19 of the Debtors' Remaining Employees are located in the United Kingdom (the "U.K. Remaining Employees"). As described in greater detail in the First Day Declaration, the Debtors faced a tightening funding position in the weeks and months leading up to the Petition Date. Ultimately, the Debtors made the difficult decision to terminate (the "Reduction in Force" or "RIF") approximately 289 employees (the "Former Employees") and furlough approximately 22 Employees located in the United States (the "Furloughed Employees" and together with the Former Employees and Remaining Employees, the "Employees"). In connection with the RIF, the Debtors terminated all independent contractors previously utilized prepetition (the "Independent Contractors").

32. The Debtors are seeking to pay certain amounts necessary to preserve their estates' value. The Remaining Employees are intimately familiar with the Debtors' business and perform a wide variety of services that are critical to the Debtors' ability to successfully operate and administer these chapter 11 cases. Payment of the Unpaid Employee Compensation (as defined below) to both Former Employees and Remaining Employees and continuation of the Compensation and Benefits going forward for the Remaining Employees will preserve Remaining Employee loyalty and prevent the Debtors from losing such Employees at this critical juncture. With respect to the Furloughed Employees and certain Independent Contractors, it is the Debtors' intention to bring such individuals back in any LIV 2.0 structure. Therefore, the Debtors are also requesting the authority, but not direction, to (i) continue the Health Benefit Plans for the Furloughed Employees and (ii) pay the Unpaid Independent Contractor Compensation in amounts that will not exceed the Priority Cap (as defined below) for any specific Independent Contractor. Accordingly, the relief requested herein is warranted under the circumstances, and the Court should grant the Interim and Final Orders.[3]

33. I believe that the relief sought in the Wages Motion is necessary to preserve operational stability, efficiency, and ultimately, the value of the Debtors' estates. The relief requested in the Wages Motion will ensure that the Remaining Employees are fully engaged and motivated. Moreover, the timely payments and continuation of certain benefits sought in the Motion are critical to the Debtors' ability to bring back important personnel needed for any LIV 2.0 structure. For these reasons, and as more fully set forth in the Wages Motion, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their

[3] The relief requested in the Wages Motion is summarized in the chart set forth therein.

creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

**VIII. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Entered into Prepetition and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance, and (C) Continue to Pay Broker Fees and (II) Granting Related Relief (the "Insurance Motion").**

34. In the ordinary course of business, the Debtors maintain approximately 27 insurance policies (collectively, the "Insurance Policies") administered by various third-party insurance carriers (the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, losses related to the Debtors' real and personal property, professional and general liability, crime liability, cyber liability, directors' and officers' liability, fiduciary liability, automobile liability, workers' compensation, and employer and employment practices liability. In addition, certain of the Insurance Policies provide layers of excess liability coverage. The Debtors have selected policy specifications and insured limits that they believe to be appropriate given the relative risk of loss, the cost of the coverage, and industry practice. In the opinion of the Debtors' management, they maintain adequate insurance with limits and coverages that they believe to be commercially reasonable.

35. The Insurance Policies generally are one year in length and renew annually, with most of the policies renewing in February or July of each calendar year. The aggregate annual premium obligations associated with the Insurance Policies (the "Premiums") are approximately $4.5 million, plus applicable taxes and surcharges. The Debtors estimate that, as of the Petition Date, there is approximately $500,000 in outstanding Premiums due on account of the Insurance Policies, approximately $500,000 of which the Debtors expect will come due in the period between the Petition Date and entry of a final order (the "Interim Period").

36. I believe that the Debtors' ability to maintain the Insurance Policies, to pay prepetition obligations related thereto, to renew, supplement, and modify the same as needed, to enter into new insurance policies as needed in the ordinary course of business, is essential to preserving the value of the Debtors' estates. Moreover, in many instances, insurance coverage is required by the statutes, rules, regulations, and contracts that govern the Debtors' commercial activities.

37. Pursuant to certain of the Insurance Policies, the Debtors are required to pay various deductibles (the "Deductibles") depending upon the type of claim and Insurance Policy involved. Generally, if a claim is made against an Insurance Policy that is subject to a Deductible, the applicable Insurance Carrier administers the claims, makes payments in connection therewith, and then invoices the Debtors for the Deductible.[4] As a result, the Insurance Carriers may have prepetition claims against the Debtors. The Deductibles range up to $100,000 under the applicable Insurance Policies. The Debtors risk losing their Insurance Policies if they fail to pay Deductibles, which would not only greatly increase the risk related to the Debtors' operations but may cause the Debtors to violate state laws requiring them to have such policies. The Debtors estimate that, as of the Petition Date, there is approximately $260,000 in open claims, with approximately $5,000 in corresponding Deductibles to come due during the Interim Period. The Debtors seek authority, but not direction, to satisfy any prepetition amounts that may be due and owing on account of the Deductibles and to continue honoring all payment obligations under the Deductibles in the ordinary course of business and consistent with prepetition practice on a postpetition basis.

[4] When a policy is subject to a deductible, a compensable claim is typically assessed from dollar one, and then the deductible is subtracted from the claim.

38. Accordingly, I believe that relief authorizing the Debtors to satisfy any prepetition amounts that may be due and owing on account of the Deductibles and to continue honoring all payment obligations under the Deductibles in the ordinary course of business is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

39. The Debtors obtain their Insurance Policies through their insurance brokers, 1783 Group and The James B. Oswald Company (collectively, the "Insurance Brokers"). The Insurance Brokers, among other things, (a) assist the Debtors in obtaining comprehensive insurance for their operations in a cost-effective manner, (b) advise the Debtors on the negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and rates, and (c) provide ongoing support throughout the applicable policy periods for the Insurance Policies. In exchange for these services, the Debtors pay the Insurance Brokers a monthly fee (the "Broker Fees"). The Debtors estimate that, as of the Petition Date, they may owe approximately $190,000 in Broker Fees with approximately $170,000 to come due during the Interim Period. The Debtors seek authority, but not direction, to pay any prepetition Broker Fees and to continue honoring all Broker Fees as they come due in the ordinary course of business and consistent with prepetition practice on a postpetition basis.

40. For the foregoing reasons, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

## IX. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Honor Prepetition Obligations Related Thereto, (B) Maintain Existing Bank Accounts, (C) Perform Intercompany Transactions in the Ordinary Course, and (D) Maintain Existing Business Forms; and (II) Granting Related Relief (the "Cash Management Motion").

41. In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect receipts, pay invoices, fund

payroll and other operating expenses, manage liquidity, and facilitate cash forecasting and reporting. As of the Petition Date, the Cash Management System comprises approximately 40 bank accounts maintained at JPMorgan Chase Bank, N.A. and Barclays PLC (collectively, the "Cash Management Banks"). The Debtors primarily utilize holding accounts, operating accounts maintained by the League Entities and Team Entities, and a disbursement account through which funds are collected, transferred, and disbursed in the ordinary course of business. The Debtors' operating accounts receive, among other things, investor funding and operating receipts from ticket sales, hosting fees, broadcasters, and other revenue sources, and funds are transferred among the Debtors' accounts as necessary to satisfy payroll, vendor and supplier payments, and other ordinary-course operating expenses.

42. The Debtors also maintain corporate purchasing card programs with JPMorgan and Barclays (the "Purchasing Card Program"), which are used by personnel for ordinary-course business expenses, including travel, lodging, meals, incidentals, and supplies. Average monthly spending under the Purchasing Card Program during the twelve months preceding the Petition Date was approximately $250,000. In addition, the Debtors utilize certain credit card processors, including Fever Labs Inc., Stripe, Inc., and Shopify, Inc. (collectively, the "Credit Card Processors"), to process and settle customer payments. Settlement proceeds are generally remitted to the Debtors net of customary processing fees and chargebacks, and the Debtors also make certain payments to Fever Labs Inc. to reimburse or fund customer ticket refunds.

43. In connection with maintaining the Cash Management System, the Debtors incur periodic service charges, costs, and other fees charged by the Cash Management Banks (the "Bank Fees"). During the twelve months preceding the Petition Date, the Debtors paid approximately $25,000 per month in gross service charges related to Bank Fees, although earnings credits applied

against such charges generally reduce the amounts actually payable, and the Debtors do not expect any material Bank Fees to be outstanding as of the Petition Date.

44. Because the Debtors operate as a single, integrated global enterprise, they also routinely engage in intercompany transactions among the Debtor entities (the "Intercompany Transactions"). Such transactions include transfers among the Holding Accounts, League Operating Accounts, and Team Operating Accounts to fund business operations, payroll and employee obligations, third-party vendor payments, working capital needs, player payments, and other ordinary-course expenses. The Debtors separately record and regularly reconcile the Intercompany Transactions in their centralized accounting system and intend to continue tracking such transactions on a postpetition basis consistent with historical practice.

45. By the Cash Management Motion, the Debtors seek authority, among other things, to continue operating the Cash Management System substantially in the form existing prior to the Petition Date; maintain their existing Bank Accounts, Business Forms, and Books and Records; continue the Purchasing Card Program and use of the Credit Card Processors; honor certain prepetition obligations associated with the Cash Management System, including Bank Fees, Processing Charges, amounts outstanding under the Purchasing Card Program, and amounts associated with customer refunds; and continue the Intercompany Transactions in the ordinary course of business and consistent with historical practices. The Debtors also seek administrative expense status for postpetition Intercompany Claims, subject and junior to certain claims arising in connection with the Debtors' use of cash collateral and any postpetition financing.

46. I believe that continuation of the Cash Management System and related practices is necessary to minimize disruption to the Debtors' operations and preserve the value of their estates. Requiring the Debtors to replace their existing system or establish new bank accounts would

impose significant administrative burdens and costs, while the existing Cash Management System allows the Debtors to efficiently monitor and control cash, ensure liquidity, and coordinate collections and disbursements across their operations. The Debtors have also implemented internal controls designed to prevent unauthorized payment of prepetition obligations. Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest.

**X. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Foreign Vendors and Lien Claimants, and (II) Granting Related Relief (the "Foreign Vendors Motion").**

47. Pursuant to the Foreign Vendors Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of (i) Foreign Vendor Claims (as defined herein) in an aggregate amount not to exceed approximately $2.8 million on an interim basis and approximately $2.8 million on a final basis and (ii) Lien Claims (as defined herein) in an aggregate amount not to exceed approximately $200,000 on an interim basis and approximately $200,000 on a final basis, and (b) granting related relief.

48. In the course of operating the League, the Debtors transacted with a network of third-party vendors and independent contractors located outside the United States that supplied host venue access, tournament staging, hospitality and accommodation, broadcast and creative production, apparel and merchandise, sports marketing and consulting services, ground transportation, and on-site event and athletic support in the jurisdictions in which Tournaments were held, as well as with common carriers, freight forwarders, customs brokers, and warehousers that transported, cleared, and stored the Debtors' retail merchandise, promotional items, computers, and other office equipment between Tournament sites. As of the Petition Date, the

Debtors estimate that there is approximately $3.0 million of unpaid prepetition Foreign Vendor Claims and Lien Claims, approximately all of which will come due during the Interim Period.

49. The Debtors seek authority to pay the Foreign Vendor Claims and Lien Claims solely to the extent necessary to prevent Foreign Vendors and Lien Claimants (each as defined herein) from exercising remedies against the Debtors' assets—whether by commencing collection proceedings in non-U.S. courts, attaching or seizing such assets, or retaining and disposing of property in their possession under applicable law—in circumstances where the automatic stay cannot practically be enforced or the cost of attempting to do so would exceed the amounts owed. Foreign Vendors and Lien Claimants are uniquely situated from the Debtors' other creditors in that Foreign Vendors without ties to the United States may ignore the automatic stay and take actions against the Debtors or their property abroad, which would have a significant disruptive impact, and Lien Claimants may assert possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay) in an attempt to secure payment of their prepetition claims. Preserving those assets for the benefit of the Debtors' estates and their stakeholders is the purpose of the relief requested.

50. ***Foreign Vendors***. In the ordinary course of business, the Debtors transact with foreign vendors and individual independent contractors located in Australia, South Africa, Singapore, Hong Kong, South Korea, Sweden, Mexico, the United Arab Emirates, and the Kingdom of Saudi Arabia, among other jurisdictions (collectively, the "Foreign Vendors"). The Foreign Vendors supplied goods and services in connection with the Tournaments, consisting mostly of host golf club and venue services; tournament staging, hospitality, and accommodation; broadcast, audio-visual, and creative content production; sports data; apparel and merchandise; sports marketing, consulting, and management services; and ground transportation, and certain

Foreign Vendors are individuals who provided on-site event, production, physiotherapy, and consulting services on an independent-contractor basis. The Debtors identified the Foreign Vendors based on the jurisdiction in which each vendor is located, the nature and value of the Debtors' assets located in that jurisdiction, and the vendor's ability and likelihood to pursue remedies against those assets under local law. As of the Petition Date, the Debtors estimate that approximately $2.8 million in the aggregate remains outstanding on account of prepetition goods delivered and services rendered by the Foreign Vendors (the "Foreign Vendor Claims").

51. Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a significant and material risk that certain Foreign Vendors may sever their business relationships with the Debtors and otherwise take actions that disrupt the Debtors' business operations, the administration of these chapter 11 cases, or property abroad. Suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process, frequently react skeptically to various debtor protections, and may consider themselves beyond the jurisdiction of the Court. If the Foreign Vendor Claims are not paid, the Foreign Vendors may take action against the Debtors despite the automatic stay provisions of section 362(a) of the Bankruptcy Code. Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often a fruitless exercise. In the absence of enforcement of the automatic stay, the Foreign Vendors could initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors even prior to obtaining a judgment. It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in a Foreign Vendor's country in many instances, thereby compounding the loss and disruption in services. Accordingly, the Debtors seek authority to make

payments, in their sole discretion and business judgment, on account of the Foreign Vendor Claims in the ordinary course of business in an aggregate amount not to exceed approximately $2.8 million, all of which is due or will become due during the Interim Period and is requested to be made available upon entry of the Interim Order.

52. ***Lien Claimants***. The Debtors regularly transact business with a number of third parties—including commercial common carriers, air and ocean freight forwarders and consolidators, customs brokers, warehousers, and other third-party logistics providers—that transported, cleared through customs, and stored the Debtors' retail merchandise, promotional items, computers, and other office equipment as such property moved between Tournament sites (collectively, the "Lien Claimants"). Certain Lien Claimants may remain in possession of such property on account of shipments and storage arrangements that were unpaid as of the Petition Date. Under applicable non-bankruptcy law, the Lien Claimants have, or may in the future assert, shipper's, warehouse, possessory, or other similar liens against the Debtors' property in their possession and, if unpaid, may refuse to release such property, may continue to accrue storage, demurrage, and related charges against it, and may ultimately seek to sell it to satisfy their claims. Under the laws of most states, these parties will, in certain circumstances, have a lien on property in their possession that secures the charges or expenses incurred in connection with the transportation or storage of goods or the supply of labor (the "Lien Claims"). Thus, if the Lien Claims are not satisfied, the Lien Claimants may refuse to release the Debtors' property, thereby disrupting the Debtors' operations and, ultimately, harming the Debtors' estates.

53. To the extent any Lien Claimant has perfected a lien on any of the Debtors' property or, in the Debtors' judgment, could assert and perfect a lien on any such property, it is imperative that the Debtors be authorized to pay such Lien Claimants, regardless of whether their claims arose

prior to or after the Petition Date. Such payment will secure the release of any such lien and the Debtors' continued uninterrupted access to the goods and services provided by the Lien Claimants. Moreover, the value of the assets in the possession of the Lien Claimants generally exceeds the value of their respective prepetition claims, and the refusal of Lien Claimants to deliver or return the Debtors' goods as a result of not being paid would severely disrupt the Debtors' administration of these chapter 11 cases and could potentially cost the Debtors' estates a substantial amount of value. Accordingly, the Debtors seek authority to make payments, in their sole discretion and business judgment, on account of the Lien Claims in an aggregate amount not to exceed approximately $200,000, all of which is due or will become due during the Interim Period and is requested to be made available upon entry of the Interim Order.

54. I believe that the authority to honor unpaid prepetition Foreign Vendor Claims and Lien Claims in the initial days of these chapter 11 cases will facilitate the Debtors' efficient administration of these chapter 11 cases, and that the harm to the Debtors' estates that would result absent such relief far outweighs the costs associated with paying the Foreign Vendor Claims and Lien Claims.

55. For the foregoing reasons, I believe that the relief requested in the Foreign Vendors Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

## XI. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").

56. In the ordinary course of business, the Debtors collect, withhold, and incur income and franchise taxes, sales and use taxes, goods and services taxes ("GST"), value-added taxes and related fees ("VAT"), excise taxes, property taxes, withholding taxes, and fees to various third

party tax service providers (collectively, the "Taxes and Fees"). The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly, semi-annually, annually, or as otherwise applicable) depending on the nature and incurrence of the particular Taxes and Fees and as required by applicable laws and regulations. The Debtors generally, but not exclusively, pay and remit Taxes and Fees via electronic transfers, through an Authority's online portals, or by a third-party servicer. From time to time, the Debtors may also receive tax credits for overpayments or refunds with respect to Taxes and Fees. The Debtors generally use these credits in the ordinary course of business to offset against future Taxes and Fees or cause the amount of such credits to be refunded to the Debtors.

57. Additionally, the Debtors are subject to, or may become subject to, routine audit investigations on account of tax returns and/or tax obligations in respect of prior years (each, an "Audit," and collectively, the "Audits") during these chapter 11 cases, including as a result of any voluntary disclosures or similar procedural mechanisms, if applicable. Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "Assessments"). As of the Petition Date, the Debtors are subject to two pending Audits and do not believe they owe any material amounts on account of such Audits or in connection with future Audits. The Debtors seek authority, but not direction, to pay or remit tax obligations on account of any Assessments as they arise in the ordinary course of the Debtors' business, including as a result of any resolutions of issues addressed in an Audit.

58. The Debtors seek authority to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees (including any obligations subsequently determined upon Audit, Assessment, or otherwise to be owed), including: (a) Taxes and Fees that accrue or

are incurred postpetition; (b) Taxes and Fees that have accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) payments made prepetition by the Debtors that were lost or otherwise not received in full by any of the Authorities; and (d) Taxes and Fees incurred for prepetition periods that become due and payable after the commencement of these chapter 11 cases, including as a result of Audits or Assessments. In addition, for the avoidance of doubt, the Debtors seek authority to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).

59. In addition, the Debtors seek authority, but not direction, to: (a) settle some or all of the prepetition Taxes and Fees for less than their face amount without further notice or hearing; (b) file amended tax returns, including for prepetition periods, and pay any Taxes and Fees in connection therewith; and (c) post collateral or a letter of credit in connection with any dispute related to an Audit or Assessment.

60. Finally, subject to the Final Order, the Debtors seek authority to undertake certain typical activities related to tax planning, and to pay Taxes and Fees related thereto, in each case with respect to any Debtor and any direct or indirect subsidiary of a Debtor (whether or not a Debtor, each a "Company Entity") including: (a) converting Company Entities from one form to another (*e.g.*, converting an entity from a corporation to a limited liability company) via conversion, merger, or otherwise ("Entity Conversions"); (b) making, revoking, amending, or changing any tax election, including with respect to the tax classification of any Company Entity ("Entity Classification Elections"); (c) changing the position of any Company Entity within the Debtors' corporate structure, including by forming, dissolving, liquidating, or cancelling any Company Entity ("Entity Movements"); and (d) modifying or resolving intercompany claims and contributing, distributing, transferring, or otherwise moving assets, liabilities, or equity interests

among Company Entities ("Asset and Liability Movements" and, together with the Entity Conversions, Entity Classification Elections, and Entity Movements, the "Tax Planning Activities"), in the case of each of clauses (a) through (d), solely to the extent that such Tax Planning Activities (i) will not alter the substantive rights of any of the Debtors' creditors or equity holders in these chapter 11 cases and (ii) are not anticipated to impose material adverse tax consequences upon any of the Debtors' creditors or equity holders, in each case as reasonably determined by the Debtors and without regard to intercompany obligations or equity interests.

61. The Debtors estimate that approximately $18.5 million in Taxes and Fees is outstanding as of the Petition Date, approximately $10.8 million of which will come due during the Interim Period.

62. Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including, but not limited to: (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in some instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' chapter 11 cases. Taxes and Fees not paid on the due date as required by law may also result in fines and penalties, the accrual of interest, or both. In addition, nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates. Risking any of these negative outcomes is unnecessary. Accordingly, the Debtors seek authority

to pay the Taxes and Fees and Assessments as they become due, and to engage in Tax Planning Activities, as necessary.

63. For the foregoing reasons, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business in during these chapter 11 cases.

## XII. Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").

64. In connection with the operation of their business and management of their leased or managed properties, the Debtors obtain electricity, telecommunications, internet, and other similar services (collectively, the "Utility Services") from a number of utility providers (each, a "Utility Provider," and collectively, the "Utility Providers"). I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and are important to the overall success of these chapter 11 cases.

65. To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services. The Debtors pay approximately $16,000 each month for Utility Services, generally calculated as the historical average payment for the twelve-month period ending June 30, 2026. I do not anticipate this monthly average will change materially during the initial 30 days following the commencement of these chapter 11 cases. The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. The Debtors' cash-on-hand, cash generated in the ordinary course of business, and anticipated access to cash collateral and debtor-in-possession financing will provide sufficient liquidity to pay the Debtors' Utility Services

obligations in accordance with the Debtors' prepetition practice during the pendency of their chapter 11 cases. Nonetheless, to provide additional assurance of payment, the Debtors propose to deposit approximately $8,000 (the "Adequate Assurance Deposit") into a segregated non-interest bearing bank account (the "Adequate Assurance Account") for the benefit of the Utility Providers within twenty (20) calendar days of the Petition Date. The amount of the Adequate Assurance Deposit attributable to a given Utility Provider is equal to (i) approximately one-half of the Debtors' average monthly cost of such Utility Provider's Utility Services, generally calculated as the historical average payment for the twelve-month period ending June 30, 2026, less (ii) the amount of any security deposit held by such Utility Provider as of the Petition Date. I believe the Adequate Assurance Deposit, in conjunction with the Debtors' cash flow from operations and ability to pay for future Utility Services in accordance with their prepetition practice (collectively, the "Proposed Adequate Assurance"), provides adequate assurance of payment.

66. Should any Utility Provider refuse, alter, or discontinue any Utility Service, even for a brief period, the Debtors would be unable to operate their business. Such a development would be detrimental to all stakeholders and, ultimately, to the Debtors' ability to successfully reorganize. I submit that the Debtors' proposed procedures for requesting different or additional adequate assurance of future payment will provide a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

67. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

**XIII. Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and Unexpired Leases of Non-Residential Real Property and (B) Abandonment of any Personal Property, each Effective as of the Petition Date and (II) Granting Related Relief (the "Rejection Motion").**

68. A key element of the Debtors' restructuring is the overall reduction of operating costs, including executory contract and non-residential real property lease obligations. In particular, the current contracts between the Debtors and the Players do not reflect the contemplated compensation structure under LIV 2.0, and thus, while the Players are surely valuable contributors to the League, continuing to maintain these particular contracts post-petition in their current form would require the incurrence of potentially substantial administrative costs. To be clear, the rejection is to minimize administrative costs only, and the Debtors remain hopeful and optimistic that, notwithstanding the rejection of these particular contracts, they will be able to negotiate new, long-term contracts with Players as part of LIV 2.0. Accordingly, the Debtors seek authority to (i) reject certain executory contracts, including any amendments, modifications, or supplements thereto (each, a "Contract," and collectively, the "Contracts"), and certain leases, including any guaranties thereof and any amendments, modifications, or supplements thereto (each, a "Lease," and collectively, the "Leases"), for nonresidential real property located at the premises (as applicable, the "Premises"), and (ii) abandon certain equipment, fixtures, furniture, or other personal property that may be located at the Premises and not otherwise transitioned to another location (collectively, the "Personal Property"), each effective as of the Petition Date.

69. I believe the Debtors' meticulous, well-considered rejection plan is centered on value maximization. Prior to the Petition Date, the Debtors, with the assistance of their advisors, began a comprehensive review of their unexpired leases and executory contracts and considered ways to alleviate onerous obligations thereunder. As a result of this analysis, the Debtors determined, in their business judgment, that certain of their leases and executory contracts were

not necessary to, and would impose substantial burdens on, their ongoing business operations and restructuring efforts. Accordingly, in order to maximize the value of their estates, the Debtors seek to reject the following Contracts and Leases:

a. *West Palm Beach Office Lease*

i. Debtor LIV Golf Inc. is party to an office lease agreement dated November 24, 2021 (the "WPB Office Lease") with 222 Lakeview, LLC, a Delaware limited liability company, as landlord, under which LIV Golf Inc. leases 10,930 rentable square feet of office space in Suite 1400 of the Esperante Corporate Center, 222 Lakeview Avenue, West Palm Beach, Florida (the "WPB Premises"). The WPB Office Lease has a stated term of 66 months and is guaranteed by LIV Golf Ltd, a private limited company organized under the laws of the United Kingdom. Prior to the Petition Date, the Debtors determined, in their business judgment, that it was no longer necessary or desirable to occupy the WPB Premises and, with the landlord's consent, subleased the WPB Premises to Blank Rome LLP. Notwithstanding the partial mitigation of rent from the sublease, the WPB Office Lease continues to be a net operational loser for the Debtors. Accordingly, the Debtors now seek to reject the WPB Office Lease and any related agreements.

b. *West Palm Beach Office Sublease*

i. Debtor LIV Golf Inc., as sublandlord, is party to a sublease agreement dated February 10, 2026 (the "WPB Sublease") with Blank Rome LLP, a Pennsylvania limited liability partnership, as subtenant, under which LIV Golf Inc. subleases the WPB Premises to Blank Rome LLP. The Debtors seek to reject the WPB Sublease in connection with the proposed rejection of the WPB Office Lease and any related agreements.

c. *Scottsdale Membership Agreement*

i. Debtor LIV Golf Inc. is party to a membership agreement dated January 31, 2026 (the "Scottsdale Membership Agreement") with Industrious SDL 15051 North Kierland Boulevard LLC ("Industrious"), under which LIV Golf Inc. licenses a private office (Office 233) accommodating up to six seats and totaling 171 square feet located at 15051 N Kierland Boulevard, Suite 300, Scottsdale, Arizona (the "Scottsdale Premises"). The Scottsdale Membership Agreement has a 12-month term commencing April 1, 2026, and carries a monthly license fee of $3,000 plus a $4,500 security deposit. Prior to the Petition Date, the Debtors determined, in their business judgment, that it was no longer necessary or desirable to occupy the Scottsdale Premises and

vacated the Scottsdale Premises. Accordingly, the Debtors now seek to reject the Scottsdale Membership Agreement and any related agreements.

d. *Player Contracts* / *Indemnification Agreements*

i. Certain of the Debtors are party to participation agreements with Players and/or affiliated entities (including any related ancillary agreements, collectively, the "Player Contracts") which govern the relationship between the Players, the League and the teams. Under the Player Contracts, each Player commits to participate in League tournaments for a multi-year term, generally extending through the 2028 League season, in exchange for fixed and contingent compensation. The Player Contracts also govern licenses to Player name, image and likeness rights. In addition, one Player and his affiliated entity are party to an indemnification agreement (the "Indemnification Agreement") with certain Debtors pursuant to which the Debtors agree to indemnify such parties, subject to a $3 million aggregate cap, solely with respect to claims asserted by a specified sponsor under a pre-existing endorsement agreement, and which expires by its terms no later than July 1, 2027.

The Debtors intend to continue operating the League on a go-forward basis under a restructured business model that contemplates alternative compensation arrangements for participating Players, and the existing Player Contracts and Indemnification Agreement will not govern Player participation in the Debtors' go-forward business. Absent rejection, the Player Contracts and Indemnification Agreement would continue to impose substantial payment obligations on the Debtors' estates without corresponding benefit. Accordingly, the Debtors have determined, in their business judgment, that the Player Contracts and Indemnification Agreement do not provide any material benefit to their estates and should be rejected to cut off the potential incurrence of additional administrative costs or expenses associated therewith, and the Debtors seek to reject the Player Contracts and Indemnification Agreement at the outset of these chapter 11 cases, effective as of the Petition Date. For the avoidance of doubt, the Debtors do not seek to impair, and rejection of the Player Contracts and Indemnification Agreement shall not affect, any rights, licenses, or assignments previously granted or made to the Debtors under the Player Contracts or Indemnification Agreement, including with respect to content and Player identification rights, that by their express terms survive termination, all of which remain property of the Debtors' estates.

e. *Player Separation Agreements*

i. Certain of the Debtors are party to separation agreement(s) (the "Player Separation Agreement(s)"), pursuant to which the parties terminated a

Player's participation in the League in exchange for cash payments and other consideration. The Debtors have analyzed the terms of the Player Separation Agreement(s) and determined that they do not provide any material benefit to their estates and should be rejected to cut off the potential incurrence of additional administrative costs or expenses associated therewith during the pendency of these chapter 11 cases. Accordingly, the Debtors seek to reject the Player Separation Agreement(s) at the outset of these chapter 11 cases, effective as of the Petition Date.

f. *Other Contracts*

i. In addition to the Contracts and Leases described above, certain of the Debtors are party to various other contracts and services agreements with vendors, service providers, and other counterparties (including any related ancillary agreements, collectively, the "Other Contracts"). Pursuant to the Other Contracts, the applicable counterparties provide various services and other support to the Debtors, including, among other things, broadcast talent services, sponsorship sales services, social media support, digital services, production services, public relations services, business advisory services, medical services, influencer services, travel and logistics services, contract management software and related services, and concert booking services. The Other Contracts also include certain charitable and foundation partnership agreements. The Debtors have determined, in their business judgment, that the Other Contracts do not provide any material benefit to their estates and should be rejected to cut off the potential incurrence of additional administrative costs or expenses associated therewith, and the Debtors seek to reject the Other Contracts at the outset of these chapter 11 cases, effective as of the Petition Date.

70. The rejection of the Contracts and Leases is critical for the Debtors to efficiently divest and monetize assets and administer their estates during the pendency of these chapter 11 cases. By rejecting the Contracts and Leases at the outset of their chapter 11 cases, the Debtors will shed the related financial burdens and avoid postpetition expenses that will be incurred without any tangible benefit to their estates. As of the Petition Date, the Debtors have vacated the Premises related to the Leases sought to be rejected by the Rejection Motion. Therefore, absent rejection, the Debtors would be obligated to pay rent under the Leases and will no longer be in possession of the Premises to which the Leases pertain. In addition, the Debtors have reviewed

the market value of the Leases and determined, in their business judgment, that marketing the Leases for assignment or sublease to a third party would not generate any significant value for the estates, especially compared to the continued costs associated with maintaining the Premises. Relatedly, with respect to the Contracts, the Debtors have determined, in their business judgment, that such Contracts (a) are no longer required to operate the Debtors' business, (b) do not provide any value to the Debtors' estates, and/or (c) may give rise to additional claims against the Debtors without any corresponding benefit to the estates if they are not rejected as of the Petition Date.

71. During the ordinary course of business, the Debtors accumulated certain miscellaneous assets at the Premises, including certain furniture and office equipment, of limited value. Any Personal Property remaining at any of the Premises is either of inconsequential value to the Debtors' estates or the costs to the Debtors of retrieving, marketing, and reselling the Personal Property will exceed the recoveries, if any, that the Debtors and their estates could reasonably obtain in exchange for such property. For the avoidance of doubt, the Debtors seek to abandon such Personal Property pursuant to section 554 of the Bankruptcy Code.

72. For the foregoing reasons, I believe that the relief requested in the Rejection Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interests.

## XIV. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief (the "DIP Motion").

73. Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders (together, the "DIP Orders") (a) authorizing Debtor LIV Golf Incorporated (the "DIP Borrower") to enter into a senior secured superpriority priming term loan credit facility in an aggregate principal amount not to exceed $49,600,000 (the "DIP Term Loan Facility") provided by the Public Investment Fund of the Kingdom of Saudi Arabia (the "DIP Lender"), the Debtors' only

prepetition secured lender (in such capacity, the "Prepetition Lender"), pursuant to the DIP Credit Agreement and the other DIP Loan Documents (each as defined in the DIP Motion); (b) authorizing the deemed exchange of a portion of the Prepetition Obligations (as defined herein) into loans outstanding under the DIP Credit Agreement (the "DIP Roll-Up Loans"); (c) authorizing LIV Golf Investments Ltd ("Parent"), LIV Golf Holdings Ltd ("Holdings"), and each of the other Debtors that is a guarantor under the DIP Loan Documents (collectively, the "DIP Guarantors," and together with the DIP Borrower, the "DIP Loan Parties") to guarantee the DIP Borrower's obligations under the DIP Facility (as defined herein); (d) granting the DIP Lender superpriority administrative expense claims and first priority priming liens on substantially all assets and property of the DIP Loan Parties, subject to the Carve-Out (as defined in the Interim Order); (e) authorizing the Debtors to use Cash Collateral (as defined herein) in accordance with the Approved Budget (as defined herein); (f) granting adequate protection to the Prepetition Lender; (g) approving the section 506(c), section 552(b), and marshaling waivers, the modification of the automatic stay, and the tax attribute preservation provisions set forth in the Interim Order; (h) scheduling a final hearing to consider entry of the Final Order; and (i) granting related relief.

74. As of the Petition Date, the Debtors have approximately $495 million (plus unpaid interest) in total outstanding funded debt obligations, all of which arise under the term loan facility (the "Prepetition Facility") provided by the Prepetition Lender to Holdings, as borrower, under that certain Facility Agreement, dated as of June 4, 2026 (the "Prepetition Facility Agreement," and together with the other Finance Documents (as defined therein), the "Prepetition Facility Documents"), and guaranteed by Parent and each other subsidiary of Parent party thereto (including the DIP Borrower). As of the Petition Date, the obligors under the Prepetition Facility Documents are indebted to the Prepetition Lender in the aggregate principal amount of not less

than $495 million, plus accrued and unpaid interest, fees, expenses, prepayment premiums, and all other obligations arising thereunder (collectively, the "Prepetition Obligations"), which are secured by first priority liens on substantially all of such obligors' assets and property and the equity interests in the DIP Borrower (respectively, the "Prepetition Liens" and the "Prepetition Collateral"), subject only to Senior Third Party Permitted Liens (as defined in the DIP Motion), if any. PIF is also the Debtors' ultimate equity owner, holding approximately 98.48% of the common ownership of Parent, and, through entities it controls, has invested approximately $5 billion in equity capital since the Debtors' inception in 2021.

75. As of the Petition Date, the Debtors have only approximately $15 million in cash on hand, substantially all of which constitutes "cash collateral," as such term is defined in section 363 of the Bankruptcy Code, in which the Prepetition Lender and/or the DIP Lender have an interest (the "Cash Collateral"). Without immediate access to the liquidity provided by the DIP Term Loan Facility and the continued use of Cash Collateral, the Debtors would be unable to fund the administrative costs of these chapter 11 cases and payments to foreign vendors, utilities, insurers, and employees, among other key disbursements. Prior to the Petition Date, I, together with the AlixPartners team working under my supervision and the Debtors' management team, and in consultation with the Debtors' other advisors, reviewed and analyzed the Debtors' cash needs and prepared projections of postpetition liquidity needs for the initial thirteen weeks of these chapter 11 cases, resulting in the initial rolling consolidated 13-week budget and cash flow forecast attached to the Interim Order as Exhibit 2 (as updated from time to time in accordance with the DIP Loan Documents, the "DIP Budget," and each DIP Budget approved in accordance with the DIP Credit Agreement, an "Approved Budget"). The DIP Budget accounts for anticipated operating receipts and disbursements, restructuring costs (including professional fees), and

employee, utility, insurer, and foreign vendor obligations. I believe that the DIP Budget provides an accurate reflection of the Debtors' likely funding requirements over the next thirteen weeks and is reasonable and appropriate under the circumstances.

76. ***Sizing of the DIP Facility***. Based on these analyses, the Debtors determined that they would require up to $49,600,000 in new money postpetition financing to fund these chapter 11 cases, continue postpetition operations, and pursue consummation of the Approved Plan (as defined herein), of which up to $14.0 million is required prior to entry of the Final Order. The Interim DIP Term Loan (as defined herein) is in the aggregate principal amount of $14,000,000, with the balance of the DIP Term Loan Facility available as the Delayed Draw Term Loan (as defined herein) following entry of the Final Order. AlixPartners, under my supervision, developed the proposed sizing of the DIP Term Loan Facility and the Interim DIP Term Loan on the Debtors' behalf and negotiated that sizing with PIF and its advisors, in consultation with the Debtors' investment banker and other advisors. I believe that the DIP Term Loan Facility, as sized, provides the Debtors with the amount of capital necessary to administer these chapter 11 cases and pursue consummation of the Approved Plan, whether through the going-concern transaction or an orderly wind-down.

77. The DIP Facility is also the linchpin of the Debtors' contemplated path through these chapter 11 cases. As described in greater detail in the First Day Declaration, following a broad prepetition marketing process conducted by the Debtors' investment banker—including outreach to more than 300 potential investors, approximately 100 of which executed non-disclosure agreements and approximately 30 of which engaged in detailed diligence—the Debtors identified BC Partners Advisors L.P. ("BC Partners") as the lead investor prepared to invest substantial funds to cover the Debtors' ongoing operations under a new, more sustainable

operating model ("LIV 2.0"). On September 8, 2026, the Debtors and BC Partners entered into a restructuring support agreement (the "BC Partners RSA"), pursuant to which BC Partners has agreed, subject to its terms, to fund its bid and to provide supplemental postpetition financing for certain start-up costs of the LIV 2.0 transaction, and the Debtors continue to engage with several potential minority investors and the Players. The DIP Facility affords the Debtors thirty (30) days to finalize that transaction and file a chapter 11 plan, in form and substance satisfactory to the DIP Lender, implementing it. If the going-concern transaction cannot be finalized within that timeline, the Debtors intend to shift their efforts to an orderly wind-down of their estates through a liquidating trust (such chapter 11 plan, implementing either the going-concern transaction or the orderly wind-down, the "Approved Plan"). In either case, the DIP Facility is sized and structured to fund the Debtors through consummation of the Approved Plan.

78. ***Material Terms of the DIP Facility***. The DIP Term Loan Facility consists of (a) an interim term loan in an aggregate principal amount not to exceed $14,000,000, available in a single draw upon entry of the Interim Order (the "Interim DIP Term Loan"), and (b) upon entry of the Final Order and the satisfaction (or waiver) of the applicable conditions precedent, a delayed draw term loan in an aggregate principal amount not to exceed $49,600,000 (less the aggregate principal amount of the Interim DIP Term Loan), available in a single draw following entry of the Final Order, and in no event later than thirty-five (35) days after the Petition Date (the "Delayed Draw Term Loan," and together with the Interim DIP Term Loan, the "DIP Term Loans"). The conditions precedent to the Interim DIP Term Loan include, among other things, entry of the Interim Order within three (3) days after the Petition Date and the commencement of the UK Recognition Applications and the filing of the Jersey Administration application (each as defined in the DIP Credit Agreement). The DIP Loans (as defined herein) bear interest at a fixed rate of

12.0% per annum, paid in kind, and the DIP Facility does not contemplate any upfront, commitment, backstop, exit, or similar fees, although the Debtors will pay the reasonable and documented fees, costs, and expenses of the DIP Lender and its advisors (including White & Case LLP and FTI Consulting). The DIP Facility matures no later than 120 calendar days after the Petition Date, subject to earlier termination as provided in the DIP Loan Documents.

79. Effective upon entry of the Interim Order and the Final Order, respectively, Prepetition Obligations in an aggregate principal amount equal, on a dollar-for-dollar basis, to the Interim DIP Term Loan and the Delayed Draw Term Loan, respectively, will be automatically deemed exchanged via assignment on a cashless basis into DIP Roll-Up Loans under the DIP Credit Agreement (the DIP Term Loans, together with the DIP Roll-Up Loans, the "DIP Loans," and the facility for the DIP Loans, the "DIP Facility"). The authorization of the DIP Roll-Up Loans is subject to the challenge provisions of the Interim Order, and in the event of a successful challenge the Court may fashion any appropriate relief in respect of the DIP Roll-Up Loans. I understand that the Prepetition Lender would not otherwise consent to the use of its Cash Collateral, and that the DIP Lender would not be willing to provide the DIP Term Loan Facility, without approval of the DIP Roll-Up Loans, and the Debtors were unable to obtain DIP financing on similar terms that did not provide for a roll-up of prepetition amounts. PIF is both the Debtors' only prepetition secured lender and the sole DIP Lender, and the DIP Facility is fully consensual: the Prepetition Lender has consented to the priming of the Prepetition Liens by the DIP Liens (as defined in the Interim Order) and to the Debtors' use of Cash Collateral, in each case on the terms set forth in the Interim Order, and the DIP Liens will be junior only to the Carve-Out and any Senior Third Party Permitted Liens.

80. The DIP Facility contains structural protections designed to ensure that the Debtors draw only what they need, when they need it. All proceeds of the DIP Term Loan Facility will be funded into a blocked account of the DIP Borrower under the sole dominion and control of the DIP Lender (the "DIP Facility Blocked Account") and may be disbursed no more than once each week, upon written disbursement requests made in accordance with the Approved Budget, and only to the extent the DIP Loan Parties' aggregate unrestricted cash (less any forecast collections) is projected to be less than $5,000,000 (the "Minimum Cash") during the applicable week. The aggregate amount borrowed under the DIP Term Loan Facility may not exceed the aggregate principal amount of the DIP Term Loan Facility less the sum of (i) receivables received by the DIP Loan Parties between September 4, 2026 and the Petition Date and (ii) the lesser of $27,300,000 and receivables received by the DIP Loan Parties after the Petition Date. The Debtors will provide the DIP Lender with weekly variance reports and updated DIP Budgets no later than every four weeks, and actual operating disbursements may not vary from the Approved Budget by more than the greater of (i) 10% or (ii) $200,000, each on a cumulative basis. The DIP Facility also requires the Debtors to comply with certain case milestones (the "Milestones"), including entry of the Interim Order within three (3) days, the filing of the Approved Plan and a related disclosure statement within thirty (30) days, entry of the Final Order within thirty-five (35) days, entry of an order approving the disclosure statement within eighty (80) days, entry of an order confirming the Approved Plan within one hundred ten (110) days, and the occurrence of the effective date of the Approved Plan within one hundred twenty (120) days, in each case after the Petition Date. The Milestones and the 120-day maturity of the DIP Facility track the Debtors' contemplated plan timeline.

81. As adequate protection for any Diminution in Value (as defined in the Interim Order) of the Prepetition Lender's interests in the Prepetition Collateral, the Prepetition Lender will receive (a) replacement and additional liens on all of the DIP Collateral (as defined in the Interim Order), junior and subject only to the DIP Liens, any Senior Third Party Permitted Liens, and the Carve-Out (the "Adequate Protection Liens"); (b) an allowed superpriority administrative expense claim under section 507(b) of the Bankruptcy Code, solely to the extent of any Diminution in Value, junior and subject only to the DIP Superpriority Claims (as defined in the Interim Order) and the Carve-Out (the "Adequate Protection Superpriority Claim"); and (c) accrual of interest on the Prepetition Obligations at the applicable contract rate, paid in kind, payment of the accrued and unpaid fees and disbursements owing to the Prepetition Lender under the Prepetition Facility Documents and, thereafter, the reasonable and documented professional and advisory fees, costs, and expenses of the Prepetition Lender, subject to the notice and objection procedures set forth in the Interim Order. The DIP Liens, the DIP Superpriority Claims, the DIP Roll-Up Loans, and the foregoing adequate protection are each subject to the Carve-Out, which includes, among other things, statutory fees payable to the U.S. Trustee and allowed professional fees of the Debtors' and any official committee's professionals, including up to $4,500,000 of such fees incurred following delivery of a Carve-Out Trigger Notice (as defined in the Interim Order). Amounts included in the Approved Budget for the fees and expenses of the DIP Lender's and the Prepetition Lender's professionals will be deposited into a blocked account under the DIP Lender's control (the "Lender Reserve Account"), which is available solely to pay such fees and expenses, and the Carve-Out has no recourse to the Lender Reserve Account.

82. The Interim Order also contains provisions intended to preserve the Debtors' net operating loss carryforwards and other tax attributes (the "Tax Attributes"), which are valuable

estate assets. Because PIF holds approximately 98.48% of the common ownership of Parent, certain actions by PIF could result in an "ownership change" of the DIP Borrower under section 382 of the Internal Revenue Code and substantially limit or eliminate the value of the Tax Attributes. The Interim Order therefore restricts the DIP Lender, through the Tax Restriction Termination Date (as defined in the Interim Order), from claiming worthlessness or abandonment deductions with respect to equity interests in the Debtors (except to the extent required under applicable law) and from selling, transferring, or otherwise disposing of (including by pledge or the grant of any option or derivative interest) equity interests it directly holds in a holding company of the Debtors where such a transfer would reasonably be expected to result in an "ownership change" of the DIP Borrower, in each case subject to a consent mechanism tied to the preservation of the Tax Attributes. The DIP Lender has consented to these restrictions in each of its capacities and has agreed that the Debtors are entitled to specific performance and injunctive relief in respect of any breach.

83. ***The Debtors' Prepetition Process***. Following PIF's April 30, 2026 announcement that it would not fund the Debtors' operations beyond the 2026 season, PIF provided the Prepetition Facility to fund the remainder of the 2026 season and to afford the Debtors the opportunity to pursue strategic alternatives, and the Debtors, through their investment banker, solicited proposals from parties both inside and outside of the existing capital structure regarding postpetition financing and sought out investors or buyers for the Debtors' business. The Debtors' strategic marketing process yielded no offer of postpetition financing to fund these chapter 11 cases other than from BC Partners, whose bid is contingent on the consummation of a chapter 11 plan and whose supplemental postpetition financing under the BC Partners RSA is directed to start-up costs of the LIV 2.0 transaction rather than to funding the Debtors' operations and the

administration of these chapter 11 cases. Beginning in August 2026, the Debtors' investment banker separately solicited postpetition financing proposals from third-party financial institutions, as described in greater detail in the DIP Declaration (as defined herein). The Debtors, in consultation with their advisors, have determined that they are unable to obtain adequate postpetition financing on an unsecured, junior, or otherwise more favorable basis than the terms provided in the DIP Loan Documents and the Interim Order.

84. Because PIF—the DIP Lender and the Prepetition Lender—is also the Debtors' ultimate majority equity owner, the Debtors structured their governance and negotiation process with that relationship squarely in mind. As described in greater detail in the First Day Declaration, on April 13, 2026, the Debtors appointed Gene Davis and Jon Zinman, individuals with extensive restructuring experience, as independent directors (the "Independent Directors"), and the Independent Directors were subsequently appointed as the sole members of a newly formed Strategic Initiative Committee (the "SIC") of Holdings, to which the Debtors delegated, among other things, exclusive authority to review, negotiate, approve, and act upon any conflict matter and authority to act with respect to any strategic, restructuring, financing, and/or sale transaction. The SIC met at least twice weekly with the Debtors' advisors throughout the process and ultimately authorized the Debtors' entry into the DIP Facility. The DIP Facility was negotiated at arm's length between separately advised parties—PIF was represented by its own counsel and financial advisor (White & Case LLP and FTI Consulting), while the process on the Debtors' side was overseen, and entry into the DIP Facility was approved, by the SIC, advised by counsel—and multiple iterations of the DIP term sheet and the definitive DIP Loan Documents were exchanged and negotiated.

85. I believe that the Debtors' entry into the DIP Facility and the consensual use of Cash Collateral on the terms set forth in the Interim Order are necessary and in the best interests of the Debtors' estates and stakeholders. Absent the liquidity provided by the DIP Facility and the continued use of Cash Collateral, the Debtors would not have sufficient cash on hand to pay their obligations as they come due, would risk damaging their relationships with their vendors, commercial partners, and employees, and could not fund the pursuit of the going-concern transaction, the administration of these chapter 11 cases, or the orderly wind-down alternative contemplated by the Approved Plan, and would instead face a value-destructive freefall liquidation. The DIP Facility will also provide the Debtors' employees, contract counterparties, foreign vendors, utilities, insurers, and other stakeholders with assurance that these chapter 11 cases are sufficiently funded. The Debtors require access to the Interim DIP Term Loan and Cash Collateral prior to the Final Hearing to continue operating, to implement the relief requested in the Debtors' other first day motions, and to avoid immediate and irreparable harm to their estates. Additional evidentiary support for the DIP Motion, including with respect to the Debtors' efforts to obtain alternative postpetition financing and the reasonableness of the economic terms of the DIP Facility, is set forth in the Declaration of Bradley A. Robins in support of the DIP Motion (the "DIP Declaration"), filed contemporaneously herewith.

86. For the foregoing reasons, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases.

[*Remainder of page intentionally left blank.*]

# **<u>Exhibit C</u>**

## **Restructuring Support Agreement**

***Execution Version***

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES (AS DEFINED HEREIN) THAT WILL BE EFFECTUATED ON THE TERMS AND CONDITIONS SET FORTH IN THE BC PARTNERS TERM SHEET (AS DEFINED HEREIN). THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02 and as may be amended, supplemented, or otherwise modified from time to time in accordance with Section 14, this "**Agreement**") is made and entered into as of September 8, 2026 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

i. LIV Golf Investments Ltd. ("**LGIL**"), and each of its subsidiaries and affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1. Capitalized terms otherwise used but not defined herein shall have the meanings ascribed to them in the BC Partners Term Sheet or the DIP Term Sheet (as applicable).

signature pages to this Agreement to counsel to the Plan Sponsor (the Entities in this clause (i), collectively, the "**Company Parties**"); and

ii. BC Partners Advisors L.P. (collectively with the funds, accounts or investment vehicles managed or advised by, or managed or advised by affiliates that pursue a credit strategy of, BC Partners Advisors L.P., the "**Plan Sponsor**").

***RECITALS***

**WHEREAS**, the Company Parties and the Plan Sponsor have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' business and capital structure on the terms set forth in this Agreement and as specified in the investment term sheet attached as **Exhibit B** hereto (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, and including any exhibits and schedules thereto, the "**BC Partners Term Sheet**" and, such transactions as described in this Agreement and the BC Partners Term Sheet, the "**Restructuring Transactions**") and the DIP Term Sheet attached as **Exhibit C** (the "**DIP Term Sheet**" and, collectively, with the BC Partners Term Sheet, the "**Transaction Term Sheets**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Transaction Term Sheets.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

***AGREEMENT***

**Section 1.** ***Definitions and Interpretation.***

1.01. Definitions. The following terms shall have the following definitions:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the Transaction Term Sheets).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Allowed**" means a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a final order of the Bankruptcy Court.

"**Alternative Restructuring Engagement Notice**" has the meaning set forth in Section 8.05.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, debt investment, equity investment, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession-financing or exit financing), or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions contemplated in this Agreement. For the avoidance of doubt, any liquidation or conversion of any of the Chapter 11 Cases to cases under Chapter 7 (or any actions taken in connection therewith) shall not constitute an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means (a) the United States Bankruptcy Court for the District of New Jersey or (b) another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**BC Partners Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Management Motion**" means the motion filed by the Debtors with the Bankruptcy Court seeking authority to continue the use of the Debtors' cash management system.

"**Cash Management Order**" means the order of the Bankruptcy Court approving the Cash Management Motion.

"**Chapter 7**" means chapter 7 of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Parties' Advisors**" means (a) Gibson, Dunn & Crutcher LLP, (b) AlixPartners, LLP, (c) Cole Schotz P.C., (d) Ducera Partners LLC, (e) Kobre & Kim LLP (as special counsel to the Special Committee) and (f) any other professionals or advisors retained by the Company Parties.

"**Confidentiality Agreement**" means any confidentiality or non-disclosure agreement between a Company Party on the one hand and the Plan Sponsor on the other.

"**Confirmation Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan.

"**Consenting Player**" means any Player that becomes a party to this Agreement on terms and conditions acceptable to the Plan Sponsor.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Claim**" means, together, (a) any Claim on account of indebtedness under the DIP Facility and/or DIP Credit Agreement and (b) any Claim on account of indebtedness under any debtor-in-possession financing facility provided by PIF.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement acceptable to the DIP Lender, by and among certain Company Parties and the DIP Lender setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" means, collectively, the documentation governing the DIP Facility, including the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, budgets, and other security documents, the DIP Orders, the DIP Motion and any amendments, modifications and supplements to any of the foregoing. Notwithstanding anything to the contrary herein, the DIP Facility may be governed by the DIP Term Sheet at the election of the Plan Sponsor.

"**DIP Facility**" means the debtor-in-possession financing facility provided by the DIP Lender pursuant to the DIP Documents.

"**DIP Lender**" shall mean the Plan Sponsor as the Lender under the DIP Documents.

"**DIP Motion**" means any motion filed with the Bankruptcy Court seeking approval of the DIP Facility.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court, which may be the Confirmation Order, approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the Solicitation Materials.

"**Eligible Player Claims**" means Allowed Player Claims that (i) are held by a Consenting Player and (ii) are held by the Player that originally gave rise to such Allowed Player Claim.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Final DIP Order**" means any order, substantially consistent with the Interim DIP Order, entered by the Bankruptcy Court on a final basis approving the DIP Motion.

"**Final NOL Order**" means any order, substantially consistent with the Interim NOL Order, entered by the Bankruptcy Court on a final basis approving the NOL Motion.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file, which shall include the NOL Motion, the RSA Assumption Motion and the DIP Motion.

"**First Lien Credit Agreement**" means that certain Facility Agreement, dated as of June 4, 2026, entered into between, among others, LIV Golf Holdings Ltd., as borrower, the guarantors party thereto, and PIF as Lender.

"**Foreign Company Party**" means any Company Party incorporated in any jurisdiction other than the United States, any State thereof, or the District of Columbia.

"**Foreign Implementation Process**" has the meaning set forth in Section 3.03.

"**Governing Body**" means, in each case in its capacity as such, a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Company Parties.

"**Interest**" means the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits

interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" means any order entered by the Bankruptcy Court on an interim basis approving the DIP Motion.

"**Interim NOL Order**" means any order entered by the Bankruptcy Court on an interim basis approving the NOL Motion.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Incentive Plan**" means any management incentive plan adopted by the Reorganized Debtors in connection with the Restructuring Transactions.

"**Milestones**" means the milestones set forth in Section 4.

"**New Organizational Documents**" means the bylaws, charters, operating agreements, and other similar constating documents in respect of the Reorganized Debtors.

"**NOL Motion**" means the motion approving the procedures for trading of equity interests and claims in respect of the Debtors.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Actions**" has the meaning set forth in Section 8.02.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**PIF**" means the Public Investment Fund of the Kingdom of Saudi Arabia.

"**Plan**" means the Chapter 11 Plan governing the Restructuring Transactions to be filed by the Company Parties.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Plan Sponsor Advisors**" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Rimon PC and (c) any other local or special counsel or other professionals retained by the Plan Sponsor who are reasonably necessary to implement the Restructuring Transactions as determined by the Plan Sponsor in consultation with the Company Parties.

"**Plan Sponsor Fees and Expenses**" means all reasonable and documented prepetition and postpetition fees and expenses of the Plan Sponsor and the Plan Sponsor Advisors related to the Debtors, the Restructuring Transactions, this Agreement, the Definitive Documents or the Chapter 11 Cases.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Player**" means those independent contractors who participate in golf events presented by the Company Parties.

"**Player Claims**" means any Claim held by any Player, including any and all PPA Claims.

"**PPA Documents**" means the player participation agreement, player license and service agreement, or any other agreement governing the relationship between a Player and/or such Player's Affiliates on the one hand and the Company Parties on the other.

"**PPA Claims**" means any and all Claims or Equity Interests arising out of or related to the PPA Documents.

"**Reorganized Debtors**" means the Company Parties as reorganized pursuant to the Plan.

"**Requisite Players**" means Players holding Eligible Player Claims (solely with respect to clause (ii) of the definition thereof) that equal or exceed (a) 2/3 in amount and (b) 1/2 in number of such Eligible Player Claims held by all Players.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**RSA Assumption Motion**" means the motion seeking entry of the RSA Assumption Order.

"**RSA Assumption Order**" means an order authorizing and directing the Company Parties to assume and perform their obligations under this Agreement, including payment of the Termination Fee, in each case in accordance with the terms and subject to the conditions hereof.

"**Second Day Pleadings**" means any "second day" pleadings that the Company Parties determine are necessary or desirable to file; *provided* that retention applications shall not be considered "second day" pleadings.

"**Solicitation Materials**" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code, including the Disclosure Statement and Disclosure Statement Order.

"**Special Committee**" means the special committees of the Governing Bodies of LGIL and its subsidiaries.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.05, 13.06, or 13.07.

"**Termination Fee**" has the meaning set forth in Section 15.23.

"**United States Trustee**" means the Office of the United States Trustee for the district in which the Debtors commence their Chapter 11 Cases.

"**U.S. Tax Code**" means the Internal Revenue Code of 1986, as amended.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified in this Agreement, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act, or deadline is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(f) unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(g) the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(j) all exhibits attached hereto or referred to herein, including the Transaction Term Sheets, are hereby fully incorporated in and made a part of this Agreement as if set forth in full herein;

(k) the use of "include" or "including" is without limitation, whether stated or not; and

(l) the phrase "counsel to the Plan Sponsor" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties.

**Section 2.** ***Effectiveness of this Agreement***. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(b) the Plan Sponsor shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties.

**Section 3.** ***Definitive Documents***.

3.01. The Definitive Documents governing the Restructuring Transactions shall include all material documents in respect of the Restructuring Transactions (including but not limited to the following): (a) the Plan and any term sheet in respect thereof; (b) the Confirmation Order; (c) the Disclosure Statement (and the motion seeking approval thereof); (d) the Disclosure Statement Order; (e) the Solicitation Materials; (f) the DIP Documents; (g) the First Day Pleadings and Second Day Pleadings (and all orders sought pursuant thereto); (h) the Plan Supplement; (i) the New Organizational Documents; (j) the NOL Motion; (k) the Interim NOL Order; (l) the Final NOL Order; (m) the RSA Assumption Motion; (n) the RSA Assumption Order; (o) the DIP Motion; (p) the Interim DIP Order; (q) the Final DIP Order; (r) the Cash Management Motion; (s) the Cash Management Order; and (t) the Management Incentive Plan.

3.02. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and each other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and the Transaction Term Sheets, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance acceptable to the Company Parties and the Plan Sponsor.

3.03. The Company Parties shall negotiate in good faith and agree with the Plan Sponsor with respect to a method of implementation of the Restructuring Transactions in jurisdictions outside the United States which is, in the reasonable opinion of the Governing Body of any Foreign Company Party having taken legal advice, compliant with all local laws, including with respect to fiduciary duties, applicable to that Foreign Company Party or its directors and officers, in their respective capacities in such jurisdiction (any such method of implementation, a "**Foreign Implementation Process**").

**Section 4.** ***Milestones.*** The following milestones shall apply to this Agreement unless extended or waived in writing (email being sufficient) by the Plan Sponsor:

(a) the Petition Date shall occur no later than September 8, 2026 and within 24 hours thereafter, the Company Parties shall file the First Day Pleadings, including, without limitation, the NOL Motion and the Cash Management Motion;

(b) no later than 3 days following the Petition Date, the Bankruptcy Court shall have entered customary first day orders, including the Interim NOL Order;

(c) no later than 3 days following the Petition Date, the Company Parties shall file the DIP Motion and the RSA Assumption Motion;

(d) no later than 10 days following the Petition Date, (i) the Bankruptcy Court shall have entered (x) the RSA Assumption Order and (y) the Interim DIP Order, which shall include interim approval of the DIP Facility, and (ii) the Debtors shall have actually assumed this Agreement;

(e) on or prior to the date that this Agreement is assumed pursuant to the RSA Assumption Order (which shall, for the avoidance of doubt, be no later than 10 days following the Petition Date), PIF shall have become a party to this Agreement on terms and conditions acceptable to the Company Parties and the Plan Sponsor in their sole and absolute discretion (which may be an amendment / amendment and restatement of this Agreement and to include any required revisions to the documents related to any debtor-in-possession financing provided by PIF, as determined by the Plan Sponsor in its sole discretion) (the Milestone set forth in this Section 4(e), the "**PIF RSA Milestone**");

(f) no later than 35 days after the Petition Date, the Requisite Players shall have become parties to this Agreement on terms and conditions acceptable to the Plan Sponsor, which terms and conditions shall include but not be limited to (w) an agreement by each such Player not to trade any Player Claims, (x) an agreement by each such Player to grant the Plan Sponsor exclusivity with respect to the Restructuring Transactions as set forth in this Agreement, (y) an agreement by each such Player to support the Restructuring Transactions as set forth in this Agreement and (z) other customary terms and conditions to be agreed (the Milestone set forth in this Section 4(f), the "**Player RSA Milestone**");

(g) [Reserved]

(h) no later than 35 days following the Petition Date, the Bankruptcy Court shall have entered the Final NOL Order;

(i) no later than 45 days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; and

(j) no later than one-hundred and twenty (120) days following the Petition Date, the Plan Effective Date shall have occurred.

**Section 5.** ***Commitments of the Plan Sponsor***.

5.01. General Commitments, Forbearances, and Waivers.

(a) During the Agreement Effective Period, the Plan Sponsor agrees, in respect of all of its Company Claims/Interests (where applicable), to:

(i) support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable agents, representatives, employees, or related Persons necessary to give effect to the Restructuring Transactions;

(iv) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(v) provide the applicable investments in accordance with the BC Partners Term Sheet on the Plan Effective Date; and

(vi) fund the DIP Facility pursuant to the DIP Term Sheet.

(b) During the Agreement Effective Period, the Plan Sponsor agrees, in respect of all of its Company Claims/Interests (where applicable), that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v) exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in the Company Parties, in each case, except as contemplated by and in accordance with this Agreement, the Definitive Documents, or as otherwise agreed in writing to be necessary to the implementation of the Restructuring Transactions by the Company Parties and the Plan Sponsor;

(vi) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii) object to the approval of retention applications of the Company Parties' Advisors or otherwise seek to hinder the Company Parties' payment of the reasonable and documented fees and expenses of the Company Parties' Advisors.

5.02. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, the Plan Sponsor agrees that it shall, subject to receipt by the Plan Sponsor, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i) vote each of its Company Claims/Interests to accept the Plan, provided that such Plan is in form and substance acceptable to the Plan Sponsor, by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases, or, to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to opt in to the releases, in each case by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above, other than in connection with the termination of this Agreement as to the Plan Sponsor pursuant to Section 13.

(b) During the Agreement Effective Period, the Plan Sponsor, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c) The Plan Sponsor shall take, or refrain from taking, as applicable, analogous actions in respect of its Claims and Interests as set forth in Sections 5.01(a) and 5.01(b) in any applicable Foreign Implementation Process.

**Section 6.** ***Additional Provisions Regarding the Plan Sponsor's Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of the Plan Sponsor to consult with the Company Parties or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of the Plan Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent the Plan Sponsor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of the Plan Sponsor to appear and be heard in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with the Plan Sponsor's obligations hereunder; (e) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the First Lien Credit Agreement; (f) require the Plan Sponsor to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to the Plan Sponsor except as provided for in this Agreement; (g) prevent the Plan Sponsor from taking any action that is required to comply with applicable Law; (h) prohibit the Plan Sponsor from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (i) obligate the Plan Sponsor to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit the Plan Sponsor from withdrawing such vote, in each case, from and after the termination of this Agreement as to the Plan Sponsor on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); *provided* that upon the withdrawal of any such vote after the termination of this Agreement as to the Plan Sponsor on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and the Plan Sponsor shall have the opportunity to change its vote; or (j) require the Plan Sponsor to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege.

**Section 7.** ***Commitments of the Company Parties.***

7.01. Affirmative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with the terms, conditions and applicable deadlines set forth in this Agreement;

(b) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary to address any such impediment;

(c) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders, including as to PIF and the Requisite Players by the applicable Milestones;

(f) cooperate in good faith and coordinate with the Plan Sponsor to structure and implement the Restructuring Transactions in a tax-efficient manner;

(g) except as otherwise expressly set forth in this Agreement, operate their businesses and operations in the ordinary course in a manner that is consistent with this Agreement, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees), except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases;

(h) promptly inform the Plan Sponsor in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within one (1) Business Day after becoming so aware) of: (i) any event or circumstance that has occurred that would permit any Party to terminate or that would result in the termination of, this Agreement; (ii) any matter or circumstance that is a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) the threat or commencement of any insolvency proceeding, material lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Company Party; or (iv) a breach of this Agreement by any Party;

(i) to the extent applicable, oppose and, if necessary, timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under Chapter 7; or (iii) dismissing the Chapter 11 Cases;

(j) to the extent applicable, oppose and, if necessary, timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances for a plan of reorganization, as applicable;

(k) actively and timely oppose and object to the efforts of any person seeking in any manner to (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(l) provide reasonably timely responses to all reasonable diligence requests sent to the Company Parties by and through the Plan Sponsor and the Plan Sponsor Advisors on a continuing and rolling basis during the Agreement Effective Period;

(m) from the Agreement Effective Date through and including the Plan Effective Date, as applicable, promptly pay in full and in cash all Plan Sponsor Fees and Expenses when properly incurred and invoiced, and continue to pay such amounts as they come due; *provided* that: (i) all accrued and unpaid Plan Sponsor Fees and Expenses as of the Plan Effective Date, as applicable, including any reasonable estimate of such Plan Sponsor Fees and Expenses to be provided to the Company Parties two (2) Business Days prior to the Plan Effective Date, shall be paid by the Company Parties on the Plan Effective Date, as applicable, *provided* that, for the avoidance of doubt, the Company Parties' obligations to pay such Plan Sponsor Fees and Expenses shall not be limited to the amount provided in any such estimate or conditioned upon the provision of such estimate; (ii) in the event a Termination Date (as defined herein) occurs, the Company Parties shall remain obligated to pay all Plan Sponsor Fees and Expenses accrued and unpaid as of and up to such Termination Date; and (iii) any and all obligations to pay any Plan Sponsor Fees and Expenses hereunder, under the Transaction Term Sheets, and under the Definitive Documents shall be limited to the amounts provided for payment of such obligations under the DIP Facility provided by the Plan Sponsor or the Reorganized Debtors on the Plan Effective Date; *provided*, *further*, that the Plan Sponsor Fees and Expenses will (w) constitute allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, (x) not be subject to setoff, reduction, avoidance, subordination or disallowance, (y) automatically be secured by perfected DIP Liens to the extent such Plan Sponsor Fees and Expenses become payable and (z) survive termination of this Agreement (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination); and

(n) to the extent applicable, take, or refrain from taking, as applicable, analogous actions as set forth in Sections 7.01(a) through 7.01(m) in any applicable Foreign Implementation Process.

7.02. <u>Negative Commitments</u>. Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is materially inconsistent with this Agreement, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is materially inconsistent with this Agreement (including the Transaction Term Sheets);

(b) solicit, participate in, negotiate, propose, support, vote for, consummate, enter into a binding agreement to consummate, or take any other action to consummate any

Alternative Restructuring Proposal prior to the consummation of the Restructuring Transactions, except as permitted by Section 8;

(c) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(d) take any action (including the filing of any motion, pleading, document or other filing, or making any amendment, modification or other change to any Definitive Document) that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(e) seek to enter into, amend, modify, or file the Definitive Documents, in whole or part, in a manner that is not consistent with this Agreement in all material respects;

(f) amend or change, or propose to amend or change, any of their respective existing organizational documents without the prior written consent of the Plan Sponsor;

(g) (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, or make or declare any distribution on any Interest, in each case without the prior written consent of the Plan Sponsor;

(h) sell any assets (including, without limitation, any intellectual property) in a transaction or a series of transactions outside of the ordinary course of business without the prior written consent of the Plan Sponsor;

(i) except in the ordinary course of business and consistent with past practice, terminate or release (i) any obligors or guarantors of their obligations under the First Lien Credit Agreement or (ii) any of the liens on, security interests in, or guarantees of any of the assets of the Company Parties that secure the obligations under the First Lien Credit Agreement, in each case without the prior written consent of the Plan Sponsor;

(j) except in accordance with the Restructuring Transactions or in the ordinary course of business and consistent with past practice, incur any indebtedness or guarantee any indebtedness of another entity without the prior written consent of the Plan Sponsor;

(k) pledge, encumber, assign, sell or otherwise transfer, offer or contract to pledge, encumber, assign, sell or otherwise transfer, in whole or in part, any portion of its right, title or interest in any Interests in any other Company Party, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale or other transaction could reasonably be expected to impair any of the Company Parties' tax attributes; or

(l) to the extent applicable, take any analogous actions as set forth in Sections 7.02(a) through 7.02(k) in any applicable Foreign Implementation Process.

None of the foregoing in this Section (including Section 7.01 and 7.02) shall limit or prohibit in any way the Company Parties from entering into any negotiations, entering into any

documentation, or taking any action necessary or appropriate to satisfy the PIF RSA Milestone or the Player RSA Milestone, in each case in consultation with the Plan Sponsor.

**Section 8.** ***Additional Provisions Regarding Company Parties' Commitments***.

8.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar Governing Body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement. This Section 8.01 shall not impede the Plan Sponsor's right to terminate this Agreement pursuant to Section 13.

8.02. Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider and respond to (but not solicit or otherwise facilitate) Alternative Restructuring Proposals; (b) otherwise cooperate with, assist, or participate in (but not solicit or otherwise facilitate) any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (c) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including the Plan Sponsor), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions (the items set forth in this Section 8.02, the "**Permitted Actions**").

8.03. The Company Parties shall (x) provide counsel to the Plan Sponsor, on a professional-eyes-only basis, a copy of any written Alternative Restructuring Proposal (and notice and a description of any oral Alternative Restructuring Proposal) within one (1) Business Day of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal and (y) promptly provide such information to the Plan Sponsor's counsel regarding such discussions or any actions or inaction pursuant to Section 8.02 (including copies of any materials provided to or provided by the Company Parties with respect to the applicable Alternative Restructuring Proposal) as necessary to keep counsel to the Plan Sponsor reasonably contemporaneously informed as to the status and substance of the foregoing.

8.04. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.05. In the event that, whether as a result of any Permitted Action or otherwise, any Company Party has determined to pursue any Alternative Restructuring Proposal, the Company Parties shall provide notice of such determination (such notice, an "**Alternative Restructuring Engagement Notice**") within two (2) Business Days after such determination to the counsel to Plan Sponsor.

**Section 9.** ***Transfer of Claims and Interests***.

9.01. During the Agreement Effective Period, the Plan Sponsor shall not transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) in any Company Claims/Interests to any affiliated or unaffiliated party, except as provided in the DIP Documents and/or DIP Orders. The Plan Sponsor shall not take, or omit to take, or cause or permit any other person to take or omit to take, any action that would, or could reasonably be expected to, result in the reduction, limitation, impairment, forfeiture or other adverse effect on the availability or utilization of any tax attributes of LGIL or any of its subsidiaries, including net operating losses, tax credits, capital loss carryforwards, tax basis and other tax attributes, under the U.S. Tax Code, including Sections 108, 382 and 383 thereof, or any other applicable tax law whether in the United States or any other country, or take any action that would reasonably be expected to impair the ability for the Restructuring Transactions to meet the requirements of Section 382(l)(5) of the U.S. Tax Code.

**Section 10.** ***[Reserved]***.

**Section 11.** ***Representations and Warranties of Company Parties***. Each Company Party represents and warrants that, as of the date such Company Party executes and delivers this Agreement:

(a) to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of it or any other Company Party or affiliate or subsidiary of any Company Party, and no analogous procedure has been commenced in any jurisdiction; *provided* that this representation shall not apply to any statutory demands presented by any creditor of the Company Parties;

(b) except as expressly provided for in this Agreement, it has not entered into any arrangement regarding the treatment, settlement, compromise, or alteration of any Company Claims/Interests (including with any individual creditor thereunder) on terms that are not reflected in the Transaction Term Sheets; and

(c) notwithstanding its entry into this Agreement, each of the security interests securing the Claims of the Plan Sponsor, as applicable, remains legal, valid, binding, and enforceable and in full force and effect as of the Agreement Effective Date.

**Section 12.** ***Mutual Representations, Warranties, and Covenants***. Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a) it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization (to the extent such concept is applicable in the relevant state or jurisdiction), and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by

applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d) except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements (related to the Company Parties and the Company Claims/Interests) with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f) except as expressly provided by this Agreement, it is not party to any agreement restricting its ability to purchase or sell any Company Claims/Interests.

**Section 13.** ***Termination Events***.

13.01. Plan Sponsor Termination Events. This Agreement may be terminated by the Plan Sponsor by the delivery to the Company Parties of a written notice in accordance with Section 15.10 upon the occurrence of any of the following events and, except in respect of Sections 13.01(d) and 13.01(v), the continuation of such events for greater than three (3) Business Days (unless such other cure period is included in this Section 13):

(a) the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of such Company Parties set forth in this Agreement that (i) is adverse to the Plan Sponsor and (ii) remains uncured for three (3) Business Days after the Plan Sponsor transmits a written notice in accordance with Section 15.10 detailing any such breach;

(b) any Company Party (i) publicly announces, or announces in writing, to the Plan Sponsor or other holders of Company Claims/Interests (including but not limited to Section 8) its intention not to support or pursue the Restructuring Transactions, (ii) delivers (or is required to deliver) an Alternative Restructuring Engagement Notice, or (iii) breaches any of the covenants, agreements, or obligations herein in respect of an Alternative Restructuring Engagement Notice or Alternative Restructuring Proposal;

(c) subject to Section 15.23, the board of directors, board of managers, or such similar Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d) the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of the unavailability of the Bankruptcy Court;

(e) (i) a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, character, or priority of, or seeking avoidance or subordination of any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest; *provided* that this termination right does not apply to the Company Parties' efforts to comply with, or reply to, any validly served discovery requests, court order, or applicable Law, or (ii) entry of an order by any court (including the Bankruptcy Court) sustaining any such challenge;

(f) any Company Party files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion or pleading has not been withdrawn within three (3) Business Days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement;

(g) the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(h) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Plan Sponsor;

(i) any Definitive Document is amended, waived, or modified in any manner that is materially inconsistent with the terms of this Agreement and without the consent of the Plan Sponsor;

(j) occurrence of any "Event of Default" under (and as defined in) the DIP Orders or the DIP Documents that has not been cured (if susceptible to cure) or waived in accordance with the applicable DIP Document or the Company Parties fail to provide any adequate protection provided to the existing creditors under the DIP Orders;

(k) a Company Party files a motion or application seeking an order vacating or modifying the DIP Orders (without the prior consent of the Plan Sponsor);

(l) the Bankruptcy Court enters any order authorizing the use of postpetition financing or cash or other collateral that is not in the form of the DIP Orders or otherwise acceptable to the Plan Sponsor except for any debtor-in-possession financing facility provided by PIF;

(m) any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Plan Sponsor, except as set forth in the Transaction Term Sheets;

(n) the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest;

(o) without the prior written consent of the Plan Sponsor, a Company Party pays or grants adequate protection that is senior to or *pari passu* with any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest, except for the debtor-in-possession financing facility provided by PIF on substantially the same terms disclosed to the Plan Sponsor prior to the Petition Date, as determined by the Plan Sponsor in its sole discretion;

(p) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Plan Sponsor transmits a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(q) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Plan Sponsor), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under Chapter 7, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing any of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(r) except in accordance with Section 4 or Section 3.03 hereof, any Company Party (i) commences a voluntary case under chapter 11 of the Bankruptcy Code or a Foreign Implementation Process other than as provided for under this Agreement, (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party, (iii) makes any general assignment for the benefit of its creditors, or (iv) is subject to an involuntary case against any Company Party or the filing of an involuntary petition or application seeking bankruptcy, insolvency, winding up, dissolution, liquidation, administration, moratorium, reorganization, corporate reorganization, any stay of enforcement and/or proceedings, or other relief in respect of any Company Party, or their debts, or of a substantial part of their assets, under any federal, state, provincial, or other foreign bankruptcy, insolvency, corporate restructuring, administrative receivership, or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(s) [reserved];

(t) the Bankruptcy Court enters an order denying confirmation of the Plan or states clearly and unequivocally on the record at a hearing that it is denying approval of or will not approve the Plan;

(u) an ownership change (within the meaning of Section 382 of the U.S. Tax Code) occurs with respect to any Company Party;

(v) the Company Parties shall have failed to carry on more than an insignificant amount of an active trade or business;

(w) KPMG (or such other mutually acceptable tax advisor) shall have failed to deliver tax opinion to LIV Holdco and the Plan Sponsor, on which both parties may rely, as to the qualification of the Restructuring Transactions for Section 382(l)(5) of the U.S. Tax Code, that is in form and substance acceptable to the Plan Sponsor, by the Plan Effective Date; and

(x) the Requisite Players and/or PIF publicly announces their intent to consummate a transaction in respect of the Company Parties that is not the Restructuring Transactions set forth herein or otherwise acceptable to the Plan Sponsor.

13.02. [Reserved].

13.03. [Reserved].

13.04. [Reserved].

13.05. Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 upon the occurrence of any of the following events:

(a) the breach in any material respect by the Plan Sponsor of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Plan Sponsor of notice of such breach;

(b) subject to Section 15.23, the board of directors, board of managers, or such similar Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right does not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d) the Bankruptcy Court enters an order denying confirmation of the Plan or states clearly and unequivocally on the record at a hearing that it is denying approval of or will not approve the Plan.

13.06. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement of LGIL and the Plan Sponsor.

13.07. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the latest to occur of the Plan Effective Date or the date of full and final completion of a Foreign Implementation Process, as applicable.

13.08. <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Nothing in this Agreement shall be construed as prohibiting a Company Party or the Plan Sponsor from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Plan Sponsor, and (b) any right of the Plan Sponsor, or the ability of the Plan Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party. No purported termination of this Agreement shall be effective under this Section 13.08 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.01(t) or Section 13.05(d). Nothing in this Section 13.08 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.05(b).

**Section 14.** ***Amendments and Waivers.***

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by each Company Party and the Plan Sponsor.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any

other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15. *Miscellaneous.***

15.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04. Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08. Rules of Construction. This Agreement is the product of negotiations among the Company Parties and the Plan Sponsor, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Plan Sponsor were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or Entity.

15.10. Notices. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a) if to a Company Party, to:

LIV Golf Investments Ltd.
50 Hudson Yards
515 West 33rd Street
Suite 65B
New York, NY 10001
Attention: Scott O'Neil, Chief Executive Officer, and John Ruzich, General Counsel
Email address: scotto@livgolf.com, john.ruzich@livgolf.com

-and-

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Attention: Scott Greenberg, Richard Birns, Matthew Williams, Rob Fitzgerald, and Tommy Scheffer
Email address: sgreenberg@gibsondunn.com, rbirns@gibsondunn.com, mwilliams@gibsondunn.com, rfitzgerald@gibsondunn.com, tscheffer@gibsondunn.com

(b) if to the Plan Sponsor, to:

BC Partners Advisors L.P.
650 Madison Avenue, 3rd Floor
New York, NY 10022
Attention: Legal and Accounting
Email address: bcp.credit.legal@bcpartners.com, bcp.credit.accounting@bcpartners.com

-and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: James H.M. Sprayregen, Robert A. Britton, Douglas R. Keeton, Mitchell Mengden
Email address: jsprayregen@paulweiss.com, rbritton@paulweiss.com, dkeeton@paulweiss.com, mmengden@paulweiss.com

-and-

Rimon PC
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753
Attention: Ronald J. Friedman, Douglas J. Schneller
Email address: ronald.friedman@rimonlaw.com, douglas.schneller@rimonlaw.com

Any notice given by delivery, mail, electronic mail, or courier shall be effective when received.

15.11. Independent Due Diligence and Decision Making. The Plan Sponsor hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12. Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13. Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14. Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15. Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16. Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17. Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18. Capacities of the Plan Sponsor. The Plan Sponsor has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.19. Survival. Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 7.01(m) (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination), Section 15, any Confidentiality Agreement and any defined terms used in such Sections shall survive termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.20. Email Consents. Where a written consent, acceptance, approval, amendment, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties or the Plan Sponsor, such written consent, acceptance, approval, or waiver shall be deemed to have occurred

if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.21. Fiduciary Duties; Relationship Among the Parties. The Plan Sponsor shall not, solely by virtue of entry into this Agreement, have any fiduciary duty, any duty or trust of confidence in any form, or other duties or responsibilities to the Company Parties or any of the Company Parties' creditors or other stakeholders, including, without limitation, any holders of Company Claims/Interests. No prior history, pattern, or practice of sharing confidences among or between the Plan Sponsor and the Company Parties shall in any way affect or negate this understanding and agreement.

15.22. Disclosure; Publicity. The Company Parties shall submit to the Plan Sponsor drafts of any press releases regarding this Agreement and the Restructuring Transactions at least one (1) Business Day prior to making any such disclosure (or as soon as reasonably practicable thereafter); *provided* that, the Company Parties shall not include the name of the Plan Sponsor in a press release or any other public filing without the express written consent (email being sufficient) of the Plan Sponsor. Except as required by applicable law, rule, or regulation and notwithstanding any provision of any other agreement between the Company Parties and the Plan Sponsor to the contrary, the Company Parties and their advisors shall not disclose to any Person the principal amount or percentage of any Claims against the Debtors held by the Plan Sponsor without the Plan Sponsor's prior written consent (email being sufficient); *provided* that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the Plan Sponsor a reasonable opportunity to review and comment before such disclosure and shall take commercially reasonable measures to limit such disclosure, and (b) any Party may disclose information requested by a regulatory or self-regulatory authority with jurisdiction over its operations to such authority on a confidential basis without limitation or notice to any other Party. All signature pages executed by the Plan Sponsor shall (a) be delivered to the Company Parties' external legal advisors in an unredacted form; *provided* that such signature pages shall be delivered to the advisors to the Company Parties on a professionals-eyes-only basis; but which shall be held confidentially by such recipients to the maximum extent permitted by applicable law, including the Bankruptcy Code, unless otherwise agreed by the Plan Sponsor and (b) to the extent required to be delivered to other parties, be delivered in a redacted form that removes the Plan Sponsor beneficially owned outstanding principal amount of Claims.

15.23. Termination Fee. In the event that (i) this Agreement is terminated by any Party (x) as a result of any Company Party consummating or pursuing any transaction contemplated by an Alternative Restructuring Proposal, including pursuant to Section 13.01(c) or 13.05(b), or (y) while any Company Party is in discussions or negotiations with any other party in respect of an Alternative Restructuring Proposal, (ii) the Company Parties consummate any transactions contemplated by, or enter into a definitive agreement with respect to, an Alternative Restructuring Proposal, or (iii) any Company Party delivers an Alternative Restructuring Engagement Notice, the Company Parties shall pay to the Plan Sponsor a termination fee, in cash, equal to 3.00% of the Total Financing Amount (the "**Termination Fee**"), which shall (a) constitute an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) not be subject to setoff, reduction, avoidance, subordination or

disallowance, and (c) automatically be secured by perfected DIP Liens to the extent such fee becomes payable; *provided* that the Termination Fee shall be payable solely from the proceeds of any transaction contemplated by any Alternative Restructuring Proposal. For the avoidance of doubt, this Section 15.23 and any defined terms used herein, including the Termination Fee (whether triggered before or after the Termination Date), shall survive termination of this Agreement and shall be binding on the Company Parties, their respective successors and permitted assigns, the Debtors' estates, and, in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, such Chapter 7 estates and Chapter 7 trustee.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[***Signature Pages Follow***]

[*Signature Pages on File with the Debtors*]

# EXHIBIT A

## Company Parties

LIV Golf Holdings Ltd
Wedge IP Management Co, Limited
LIV Golf Ltd
LIV Golf Events (ISE) Ltd
LIV Golf Events Limited
LIV Golf Incorporated
LIV Golf US Media, LLC
Wedge Event 1 Co
Wedge Event 2 Co
Wedge Event 3 Co
Wedge Event 4 Co
Wedge WPB Inc.
Wedge Event 7 Co
Wedge IP Management Co, LLC
LIV Golf New Jersey LLC
Fairway TM Blocker 1, LLC
Fairway TM Co 1, LLC
Fairway TM Intermediate 1, LLC
Fairway TM Blocker 2, LLC
Fairway TM Co 2, LLC
Fairway TM Intermediate 2, LLC
Fairway TM Blocker 3, LLC
Fairway TM Co 3, LLC
Fairway TM Intermediate 3, LLC
Fairway TM Blocker 4, LLC
Fairway TM Co 4, LLC
Fairway TM Intermediate 4, LLC
Fairway TM Blocker 5, LLC
Fairway TM Co 5, LLC
Fairway TM Intermediate 5, LLC
Fairway TM Blocker 6, LLC
Fairway TM Co 6, LLC
Fairway TM Intermediate 6, LLC
Fairway TM Blocker 7, LLC
Fairway TM Co 7, LLC
Fairway TM Intermediate 7, LLC
Fairway TM Blocker 8, LLC

Fairway TM Co 8 GP, LLC
Fairway TM Co 8, LP
Fairway TM Intermediate 8, LLC
Fairway TM Blocker 9, LLC
Fairway TM Co 9, LLC
Fairway TM Intermediate 9, LLC
Fairway TM Blocker 10, LLC
Fairway TM Co 10, LLC
Fairway TM Intermediate 10, LLC
Fairway TM Blocker 11, LLC
Fairway TM Co 11, LLC
Fairway TM Intermediate 11, LLC
Fairway TM Blocker 12, LLC
Fairway TM Co 12 GP, LLC
Fairway TM Co 12, LP
Fairway TM Intermediate 12, LLC
Fairway TM Blocker 13, LLC
Fairway TM Co 13, LLC
Fairway TM Intermediate 13, LLC

# EXHIBIT B

## BC Partners Term Sheet

***STRICTLY CONFIDENTIAL***

BC PARTNERS

**TERM SHEET**

**September 8, 2026**

| | |
|---|---|
| **Transaction Overview:** | The restructuring of LIV Golf Investments Ltd. ("LGIL" and collectively with its direct and indirect subsidiaries, the "Company"), including the transactions set forth herein (the "Transaction") will facilitate ownership transition and financing of an updated business plan for both LIV Holdco and LIV League ("LIV 2.0"), while delivering equity value to the players.<br><br>**Reorganized Company**: LIV Golf, Incorporated ("LIV Holdco"), the entity in possession of NOL balances, with LIV 2.0 and LIV Team Holdings ("LIV Team Holdco") to operate as subsidiaries.<br><br>**New Investor(s)**: Invest $300 million ("Total Financing Amount") in LIV Holdco comprised of a $127.5 million term loan, subject to reduction as set forth in the DIP Term Sheet, that includes warrant coverage for the purchase of common stock equivalent to 5.00% of LIV Holdco, $147.5 million in senior preferred equity ("Senior Preferred") that includes warrant coverage for the purchase of common stock equivalent to 10.00% of LIV Holdco, and $25 million in a subordinated convertible preferred ("Convertible Preferred") equity that will own 30.00% of LIV Holdco on an as-converted basis (collectively, the "Financing"). The Total Financing Amount is subject to change through adjustment of the Senior Preferred and Convertible Preferred amounts, respectively, based on final determination of the Transaction Implementation discussed below and in connection with a Player Equity Adjustment as discussed below.<br><br>**Players**: Receive the following as recovery for their allowed claims in the Chapter 11 Cases, subject to providing mutual releases to all parties, and signing certain settlement agreements:<br>- Equity in LIV Holdco sufficient to qualify for Section 382(l)(5) of the U.S. Tax Code (and any adjustments required to achieve such qualification, the "Player Equity Adjustment") |

BC PARTNERS

| | |
|---|---|
| | - Rights to acquire additional equity in LIV Holdco to achieve their 52.50% common equity stake (subject to the Player Equity Adjustment)<br>- In exchange for players agreeing to play in LIV 2.0, those players will receive amended contracts subject to future services to be delivered to LIV, including (with each of the terms being set out in greater detail in the player support agreements):<br>- Signing bonuses<br>- Return of certain NIL Rights<br>- On average, aggregate player ownership of ~30% in the Teams<br>- Aggregate go-forward player ownership will equal 52.50%, including agreements with the players for exercise of certain rights received (subject to the Player Equity Adjustment)<br>- A detailed schedule by player to be agreed as part of transaction documentation<br><br>**Management**: Receive 2.5% of LIV Holdco common equity in the form of a Management Incentive Plan as described below ("Management Ownership")<br><br>**Existing PIF Funded Debt and Equity**: Cancelled and extinguished in exchange for releases with no economic distribution on account of such debt and equity. |
| **Transaction Implementation:** | Restructuring to be implemented through a chapter 11 plan consistent with that certain Restructuring Support Agreement, dated as of September 8, 2026 (the "Restructuring Support Agreement"), by and among the Company and BC Partners Advisors L.P. (collectively with the funds, accounts or investment vehicles managed or advised by, or managed or advised by affiliates that pursue a credit strategy of, BC Partners Advisors L.P., "BC Partners") and the other parties thereto (if any), and otherwise in a manner acceptable to BC Partners, including in respect of tax efficiency. Capitalized terms used but not otherwise defined herein have the meaning given to them in the Restructuring Support Agreement or the DIP Term Sheet, as applicable. |
| **Investment Amount:** | Total Financing Amount to be funded upon the effective date of the chapter 11 plan, consisting of:<br><br><u>**Term Loan**</u><br>- **Issuer**: LIV Holdco<br>- **Issue Size**: $127,500,000 subject to reduction as described in the Transaction Overview section<br>- **Position**: 1L<br>- **Security:** All assets of LIV Holdco and all subsidiaries, including, but not limited to, LIV 2.0<br>- **Rate**: S+800bps cash or PIK at LIV Holdco's election; 2.0% SOFR floor<br>- **Default Rate**: 200bps above the applicable rate<br>- **Term:** 5 years<br>- **Amortization:** Interest only through year 3, 5% per annum thereafter through maturity<br>- **Upfront Payment:** 2.00% (PIK) (treated as giving rise to OID for tax purposes, and not as a fee for services)<br>- **Exit Payment:** 2.00%<br>- **Warrants:** Term Loan holders will receive warrants to purchase the number of shares of common stock equivalent to 5% of LIV Holdco at a price per share of $0.01.<br>- **Disbursements:** Will be set based on per event and overall corporate operating expense budgeting<br>- **Excess Cashflow Sweep**: Proceeds from sales of interests in LIV 2.0 teams received by LIV Team Holdco according to the Team Sales Waterfall<br>- **Covenants**: TBD financial covenants customary and standard for this type of transaction and facility. To include approval rights on LIV 2.0 team sales below a TBD valuation threshold.<br>- **DIP Rollover**: Any DIP Loans held by BC Partners and any other Investors approved by |

*STRICTLY CONFIDENTIAL*

BC PARTNERS

| | |
|---|---|
| | BC Partners (collectively, "DIP Investors"), and any Class B PIF DIP Loans that repay or refinance such DIP Loans (on a cashless basis), that are not otherwise repaid in cash on or prior to the Effective Date will be rolled into Term Loans and reduce the amount of new capital funded in the Term Loans by the DIP Investors, in each case in accordance with the DIP Term Sheet.<br><br>**Senior Preferred Equity**<br>- **Issuer**: LIV Holdco<br>- **Issue Size:** $147,500,000 (subject to adjustment as noted in the Transaction Overview section)<br>- **PIK Rate**: 15% per annum<br>- **Minimum MOIC:** 1.2x increasing by 0.2x per annum (based on original Issue Size)<br>- **Liquidation Preference:** Upon any liquidation, dissolution, sale, or deemed liquidation event (including merger, acquisition, or sale of substantially all assets), preferred equity has a liquidation preference senior to the common stock equal to the Minimum MOIC applicable at the time of such event.<br>- **Warrants:** Preferred equity holders will receive warrants to purchase the number of shares of common stock equivalent to 10% of LIV Holdco at a price per share of $0.01.<br><br>**Convertible Subordinated Preferred Equity**<br>- Issuer: LIV Holdco<br>- Issue Size: $25,000,000 (subject to adjustment as noted in the Transaction Overview section)<br>- Conversion: Convertible into 30% of LIV Holdco at a price per share equivalent to the price per share of common equity issued to Players and Management<br>Liquidation Preference: Upon any liquidation, dissolution, sale, or deemed liquidation event (including merger, acquisition, or sale of substantially all assets), preferred equity has a liquidation preference senior to the common stock. Any remaining proceeds following this liquidation preference will be distributed to holders of preferred equity and common stock on an as-converted basis. |
| **Investor(s):** | Affiliated funds of BC Partners and co-investors to provide up to $150 million of the total Financing. Other investors mutually acceptable to BC Partners and the Company (collectively, the "Investors") will be offered the opportunity to co-invest in a pro-rata strip across Term Loan, Senior Preferred Equity and Convertible Subordinated Preferred Equity. Non-pro-rata co-investment will be subject to BC Partners approval. |
| **Tax Assets / NOLs:** | Transaction to be structured in a tax-efficient manner for LIV Holdco, its stakeholders and the Investors; parties to use reasonable best efforts to ensure that the Company is eligible to apply Section 382(l)(5) of the U.S. Tax Code with respect to the transactions contemplated by this Term Sheet. |
| **Governance and Minority Rights:** | Reorganized Company common equity to be allocated as follows (subject to adjustment as noted in the Transaction Overview section):<br>• New Investor(s): 45.00%<br>• Players: 52.50%<br>• Management: 2.50%<br><br>Following closing, LIV Holdco will be governed by a seven (7) member board comprised of three (3) board members designated by BC Partners, three (3) board members designated by the Players and Management (one (1) of whom shall be the then CEO of LIV Holdco), and one (1) independent member (the "Board").<br><br>The organizational documents of LIV Holdco will contain customary minority protections in favor of BC Partners, including consent rights over amendments to organizational documents, |

***STRICTLY CONFIDENTIAL***

BC PARTNERS

| | |
|---|---|
| | issuances of equity, incurrence of indebtedness, affiliate transactions, transfers of equity interests by Player equityholders, material asset sales and any other action that would reasonably be expected to impair the net operating loss carryforwards and other material tax attributes of LIV Holdco and its subsidiaries. |
| **Management Incentive Plan:** | Following consummation of the Transaction, the Board will establish a go-forward LTIP at LIV 2.0 for the retention, recruitment and alignment of incentives with members of the management team and the Board on market terms. |
| **Expansion Team and Revenue Rights:** | BC Partners shall receive the exclusive right to purchase one (1) expansion team of LIV 2.0, or any successor league, for $1 at any time following the introduction of two LIV 2.0 expansion teams post-emergence and at the discretion of the Investors, with such team eligible to be constituted with players and to compete in LIV 2.0, or any successor league, beginning with the first tournament following such constitution. This right shall expire after ten (10) years from the closing of the Transaction.<br>Investors shall also receive 2% of revenues generated by LIV 2.0, or any successor league, for a period of seven (7) years commencing upon LIV 2.0 achieving profitability, as determined by the Board, subject to mutually agreed upon buyout formula. |
| **Conditions:** | The Transaction will be subject to customary and other conditions, including:<br>• Approval by the board of directors of the Company or any applicable disinterested committee thereof;<br>• Execution and delivery of mutually acceptable definitive transaction documentation;<br>• Delivery of a tax opinion by KPMG (or such other mutually acceptable tax advisor), delivered to LIV Holdco and the Plan Sponsor, on which both parties may rely, as to the qualification of the Transaction for Section 382(l)(5) of the U.S. Tax Code that is in form and substance acceptable to the Company and BC Partners;<br>• Affirmations from major sponsors of commitment to honor contracts;<br>• Execution of go-forward player contracts consistent with the LIV 2.0 business plan that include players required by the Investors;<br>• Entry by the bankruptcy court of an order approving chapter 11 plan implementing the creation of LIV 2.0 on the terms outlined above;<br>• The Company Parties shall have carried on more than an insignificant amount of an active trade or business during the Chapter 11 Cases; and<br>• As of the closing date, no ownership change (within the meaning of Section 382 of the U.S. Tax Code) shall have occurred with respect to any Company Party during the pendency of the Chapter 11 Cases. |
| **Governing Law:** | The laws of the State of New York. |

BC PARTNERS

| | |
|---|---|
| **Fees and Expenses:** | The Company shall pay or reimburse, or cause to be paid or reimbursed, all reasonable and documented fees, costs and out-of-pocket expenses of BC Partners and its advisors (including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Rimon PC and any other local or special counsel or other professionals retained by BC Partners) related to the Debtors, the Transaction, this Term Sheet, the Restructuring Support Agreement, the Definitive Documents or the Chapter 11 Cases (the "Expense Reimbursement"), without any requirement to file a retention or fee application or to comply with the U.S. Trustee guidelines. For the avoidance of doubt, the Expense Reimbursement is payable solely from the proceeds of DIP financing to be provided by the Investors (and not, for the avoidance of doubt, from the proceeds of DIP financing provided by the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF")) or the Reorganized Debtors on the Plan Effective Date. The Expense Reimbursement will (i) constitute allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) not be subject to setoff, reduction, avoidance, subordination or disallowance, (iii) automatically be secured by perfected DIP Liens to the extent such fee becomes payable and (iv) survive termination of the Restructuring Support Agreement (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination).<br><br>In the event that (i) the Restructuring Support Agreement is terminated by any Party (x) as a result of any Company Party consummating or pursuing any transaction contemplated by an Alternative Restructuring Proposal, including pursuant to Section 13.01(c) or 13.05(b) thereof, or (y) while any Company Party is in discussions or negotiations with any other party in respect of an Alternative Restructuring Proposal, (ii) the Company Parties consummate any transactions contemplated by, or enter into a definitive agreement with respect to, an Alternative Restructuring Proposal, or (iii) any Company Party delivers an Alternative Restructuring Engagement Notice, the Company Parties shall pay to the Plan Sponsor a termination fee, in cash, equal to 3.00% of the Total Financing Amount (the "Termination Fee"), which shall (a) constitute an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) not be subject to setoff, reduction, avoidance, subordination or disallowance, and (c) automatically be secured by perfected DIP Liens to the extent such fee becomes payable; *provided* that the Termination Fee shall be payable solely from the proceeds of any transaction contemplated by any Alternative Restructuring Proposal. For the avoidance of doubt, this paragraph and any defined terms used herein, including the Termination Fee (whether triggered before or after the Termination Date), shall survive termination of the Restructuring Support Agreement and shall be binding on the Company Parties, their respective successors and permitted assigns, the Debtors' estates, and, in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, such Chapter 7 estates and Chapter 7 trustee. |
| **Exclusivity:** | The Company agrees that it will not and it shall, to the extent possible, cause its subsidiaries, and its and its subsidiaries' directors, officers, employees and representatives not to, for a period of 90 days from the date these terms are accepted (the "Exclusivity Period"), take any action to solicit, initiate, encourage or assist the submission of any proposal, negotiation or offer from any person or entity other than BC Partners relating to any financing (equity or debt) (other than (i) discussions with other investors mutually acceptable to BC Partners and the Company, (ii) ordinary course commercial arrangements and (iii) any funding of, or contribution or other financial support to, the Company and its subsidiaries by PIF or its affiliates) or other Alternative Restructuring Proposal and shall notify BC Partners promptly of any inquiries by any third parties in regard to the foregoing; provided, that, to the extent definitive documents for the Term Loan and/or Preferred Equity are not executed and the transactions contemplated thereby consummated during the Exclusivity Period, the Exclusivity Period shall be automatically extended by 90 days, so long as BC Partners and the Company are working in good faith to consummate the Term Loan and/or Preferred Equity investments; provided further, that the Exclusivity Period shall automatically terminate upon |

*STRICTLY CONFIDENTIAL*

BC PARTNERS

| | |
|---|---|
| | BC Partners notifying the Company that BC Partners has not approved the Term Loan and/or Preferred Equity investments or otherwise cannot or will not proceed with any investment. Notwithstanding the foregoing, this Exclusivity provision will not (a) require the directors or officers of the Company or any of its subsidiaries to take any action or refrain from taking any action that such parties determine, following consultation with external counsel, would be inconsistent with their fiduciary or similar duties, (b) prohibit the Company or any of its subsidiaries from soliciting proposals for DIP financing from PIF, or (c) prohibit the Company from taking any actions in connection with court-approved bidding procedures. For the avoidance of doubt, the Exclusivity Period and the other provisions hereof shall not be binding on PIF (absent their express written consent in their sole discretion). |
| **PIF:** | • On the effective date of the chapter 11 plan, PIF waives, releases and discharges in full all claims held against the Company (subject to agreed upon definitive documentation).<br>• Subject to the independent investigation of the special committee of the board of directors of the Company, on the effective date of the chapter 11 plan, the Company waives and releases all claims and causes of action against the PIF (subject to agreed upon definitive documentation). |
| **Team Sales Waterfall:** | • Sale proceeds distributed to party that sells their stake in the team (e.g., players, new investor, LIV)<br>• Proceeds from LIV-held stake distributed based on team ownership (i.e., 30% players, 70% LIV 2.0).<br>• The 70% to LIV 2.0 will be subject to the Term Loan excess cashflow sweep according to the following amounts:<br>  o In years 1-3 following the close of the Transaction:<br>    ▪ 50% of proceeds on first $25 million of TEV<br>    ▪ 33% of proceeds between $25-75 million of TEV<br>    ▪ 25% of proceeds greater than $75 million of TEV<br>  o In the subsequent years following the close of the Transaction:<br>    ▪ 50% of all proceeds |

# EXHIBIT C

## DIP Term Sheet

***Execution Version***

# DIP TERM SHEET

This summary of terms and conditions (this "***DIP Term Sheet***") sets forth the material terms of a proposed debtor-in-possession financing facility that the DIP Lenders are contemplating providing to LIV Golf, Incorporated in connection with the chapter 11 cases (the "***Chapter 11 Cases***") to be filed by LIV Golf, Incorporated and certain of its subsidiaries and affiliates that are debtors and debtors-in-possession (the "***Debtors***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***").

This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the transactions described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the Debtors and the DIP Lenders, in each case in their sole discretion. This DIP Term Sheet should not be construed as a commitment by any DIP Lender to lend, arrange for any credit facility or provide any other financial accommodation, and is for discussion purposes only.

Capitalized terms used but not defined in this DIP Term Sheet have the meanings assigned to such terms in (i) the Restructuring Support Agreement (the "***Restructuring Support Agreement***") or (ii) the BCP Term Sheet attached as Exhibit B to the Restructuring Support Agreement.

| | |
|---|---|
| **Borrower** | LIV Golf, Incorporated (the "***Borrower***"). |
| **Guarantors** | LIV Golf Investments Ltd. and LIV Golf Holdings Ltd. (the "***Guarantors***" and, together with the Borrower, the "***DIP Loan Parties***") |
| **DIP Lenders** | The Plan Sponsor (the "***DIP Lenders***" and, collectively with the DIP Agent, the "***DIP Secured Parties***"). All obligations of the DIP Lenders under the DIP Facility shall be several and not joint. |
| **DIP Agent** | At the election of the DIP Lenders, an institution selected by the DIP Lenders may act as administrative and collateral agent for the DIP Facility (the "***DIP Agent***"). |
| **DIP Facility** | A non-amortizing, senior secured, multi-draw, delayed draw debtor-in-possession credit facility (the "***DIP Facility***," the extensions of credit made thereunder, the "***DIP Loans***") with a maximum new money funded principal amount equal to up to $30 million in new money (the "***DIP Commitments***") to be funded subject to the terms and conditions set forth herein as follows:<br><br>(a) Up to $1.0 million of the DIP Commitments will be available and funded within one (1) Business Day after the date on which (i) each of the Interim DIP Order and the RSA Assumption Order have been entered, in each case in form and substance acceptable to the DIP Lenders (which in the case of the RSA Assumption Order shall include approval of the Termination Fee) and (ii) the PIF becomes a party to the Restructuring Support Agreement (the "***Initial DIP Loans***"); |

| | |
|---|---|
| | (b) Up to $1.0 million of the DIP Commitments will be available and funded in accordance with the Weekly Disbursement Schedule within three (3) Business Days after the PIF becomes a party to the Restructuring Support Agreement but prior to the Requisite Players becoming parties to the Restructuring Support Agreement;<br><br>(c) Up to $2.0 million of the DIP Commitments will be available and funded in accordance with the Weekly Disbursement Schedule within three (3) Business Days after each of the PIF and the Requisite Players become parties to the Restructuring Support Agreement; and<br><br>(d) Up to $26.0 million of the DIP Commitments may be made with the consent of the DIP Lenders, in their sole discretion, every other week in accordance with the funding needs set forth in the Weekly Disbursement Schedule (as defined below) (the "***Subsequent Loans***").<br><br>Notwithstanding the foregoing, (a) no more than $2.5 million of the DIP Commitments may be made available and funded prior to entry of the Final DIP Order and (b) no DIP Loans shall be funded unless (i) the RSA Assumption Order has been entered in form and substance acceptable to the DIP Lenders (which shall include approval of the Termination Fee), and such order shall not have been vacated, reversed, subject to a stay, modified or amended other than as acceptable to the DIP Lenders and (ii) the PIF has become a party to the Restructuring Support Agreement.<br><br>The Borrower may not re-borrow amounts under the DIP Facility that are repaid.<br><br>The DIP Facility will initially be provided pursuant to the terms of this DIP Term Sheet and the Interim DIP Order; provided that, at the election of the DIP Lenders (and to the extent the PIF DIP Election has not been exercised) the DIP Facility will be funded in accordance with the terms of a debtor-in-possession facility agreement (the "***DIP Credit Agreement***") and other definitive documentation, the forms of which shall be mutually acceptable to all the parties thereto (collectively with the DIP Credit Agreement and the related security and ancillary documents, the "***DIP Loan Documents***", and all obligations arising thereunder, the "***DIP Obligations***"). |
| **Weekly Disbursement Schedule** | On the date on which the conditions precedent to the closing of the DIP Facility have been satisfied or waived in accordance with the DIP Loan Documents and the effectiveness of the DIP Loan Documents and the DIP Facility has occurred (the "***Closing Date***"), and by the Thursday of each full week commencing thereafter, the Borrower shall deliver to the DIP Secured Parties a detailed weekly schedule of disbursements to be funded with proceeds of the DIP Facility during the two calendar weeks immediately following such date that is in form and substance acceptable to the DIP Lenders (the "***Weekly Disbursement Schedule***"), along with |

| | |
|---|---|
| | any back-up information requested by the DIP Lenders.<br><br>The Debtors shall not request, and the DIP Lenders shall not be required to fund, DIP Loans in excess of 105% of the amounts specified in the most recently delivered Weekly Disbursement Schedule acceptable to the DIP Lenders for the applicable two-week period immediately following the draw date. The DIP Loan Documents shall include limitations on the use of proceeds of the DIP Facility to be agreed, but in any event the use of such proceeds shall be limited to professional fees and other operational expenses incurred in direct connection with pursuing a chapter 11 plan acceptable to the DIP Lenders that provides for the restructuring of the Debtors as LIV 2.0 as set forth in the BCP Term Sheet and entering into the Exit Facility (as defined below). |
| **Interest Rate** | Interest on the DIP Loans shall accrue at a per annum rate equal to Term SOFR (as customarily defined, with a 2.00% floor) plus 14.00%, compounded monthly and payable in kind.<br><br>At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility, including any overdue amounts, shall bear interest, to the fullest extent permitted by law, at the otherwise applicable interest rate plus 2.00% per annum and shall be payable in cash on demand by the DIP Lenders (the "***Default Rate***"). |
| **Fees and Premiums** | • An upfront premium (the "***Upfront Premium***") of 10.0% of the aggregate amount of the DIP Commitments, payable in kind to the DIP Lenders on a pro rata basis in respect of their DIP Commitments upon entry of the Interim DIP Order;<br><br>• A repayment premium (the "***Repayment Premium***") payable in cash (or in kind to the extent the DIP Loans are rolled into the Exit Facility) upon the Maturity Date or any other repayment or prepayment (including following an acceleration of the DIP Facility or any satisfaction of the DIP Loans in respect of a credit bid by the DIP Lenders in any sale or disposition of DIP Collateral or upon rolling the DIP Loans into the Exit Facility) of the DIP Loans of 10.0% of the principal amount of the DIP Loans so repaid or prepaid; and<br><br>• An agency fee for the DIP Agent (if any) for the administration of the DIP Facility. |
| **Maturity** | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"):<br><br>(a) 30 days after the Closing Date (the "***Scheduled Maturity Date***");<br><br>(b) the effective date of a chapter 11 plan in the Chapter 11 Cases (the "***Effective Date***"); |

| | |
|---|---|
| | (c) the date that is forty (40) days after the Petition Date, if the Final DIP Order has not been entered by such date;<br><br>(d) the date on which the Restructuring Support Agreement terminates;<br><br>(e) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise (a "***Sale***");<br><br>(f) the date of termination of the DIP Commitments and the acceleration of any outstanding DIP Loans under DIP Loan Documents;<br><br>(g) the occurrence of the maturity date under, the termination of commitments under or the acceleration of any other debtor-in-possession financing facility entered into by any of the Debtors (including the PIF DIP Facility); and<br><br>(h) the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;<br><br>(i) the date on which the Debtors, without the prior written consent of the DIP Lenders, file or express written support for bidding procedures, sale processes, or transactions that are not acceptable to the DIP Lenders or any plan of liquidation or reorganization (or related disclosure statement) that is not in form and substance acceptable to the DIP Lenders.<br><br>The Scheduled Maturity Date may be extended by 30 days up to three (3) times at the written request of the Borrower delivered to the DIP Lenders no later than 5 days prior to the then-current Scheduled Maturity Date, subject to (a) no Default or Event of Default (each as defined below and in the definitive documents for the debtor-in-possession financing facility to be provided by the PIF (the "***PIF DIP Facility***")) under the DIP Facility and the PIF DIP Facility, as applicable, that has occurred and is continuing as of each of the Scheduled Maturity Date and the date of such written request (or that would result from such request or extension), (b) each of the representations and warranties made by the DIP Loan Parties in or pursuant to any DIP Loan Document shall be true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a material adverse effect, which representations and warranties shall be true and correct in all respects) on and as of the Scheduled Maturity Date and the date of such written request (or to the extent such representations and warranties specifically relate to an earlier date, on and as of such earlier date), (c) the Restructuring Support Agreement not having been terminated and no event or circumstance that would permit the DIP Lenders to terminate the Restructuring Support Agreement (including by the giving of notice or the passage of time) that has occurred and is continuing as of each of the |

| | |
|---|---|
| | Scheduled Maturity Date and the date of such written request (or that would result from such request or extension), (d) delivery of an officer's certificate, dated as of the Scheduled Maturity Date, confirming compliance with the foregoing conditions, and (e) payment of an extension premium in an amount equal to 0.75% of the sum of the DIP Commitments (including DIP Commitments that have already been funded), which premium shall be paid in kind. |
| **Exit Facility** | Subject to the occurrence of the effective date of a chapter 11 plan that is in form and substance acceptable to the DIP Lenders, no Default or Event of Default that has occurred and is continuing under the DIP Facility and no termination of the Restructuring Support Agreement (and no event or circumstance that has occurred and is continuing that would permit the DIP Lenders to terminate the Restructuring Support Agreement (including by the giving of notice or the passage of time)), the DIP Loans (including all principal, interest, fees, and premiums that have accrued in respect thereof) shall be refinanced and repaid on a dollar-for-dollar basis by loans under a term loan facility to be entered into by the Reorganized Debtors on such date as set forth in the Restructuring Support Agreement, including the BCP Term Sheet (the "***Exit Facility***"); provided that (x) the new money commitments of the DIP Lenders in respect of the Exit Facility shall be reduced on a dollar-for-dollar basis by amounts funded under the DIP Facility and (y) such reduction in respect of amounts funded to pay Plan Sponsor Fees and Expenses shall not exceed $4.0 million in the aggregate. |
| **DIP Refinancing** | In the event that the PIF becomes a party to the Restructuring Support Agreement, at the election of the DIP Lenders (such election, the "***PIF DIP Election***"), all DIP Loans (including principal, interest, fees, and premiums) and DIP Commitments may be repaid and refinanced or replaced (on a cashless basis) by a separate tranche of loans and commitments under the PIF DIP Facility (the "***Class B PIF DIP Loans***" and "***Class B PIF DIP Commitments***"), with the terms and conditions (including any fees and economics) of such Class B PIF DIP Commitments and Class B PIF DIP Loans to be mutually agreed, but in any case, will include (w) conditions to funding and covenants that are specified in this DIP Term Sheet, (x) a class vote on all matters requiring the consent of the requisite lenders under the PIF DIP Facility, (y) separate indemnification and expense reimbursement for the lenders providing such Class B PIF DIP Loans and Class B PIF DIP Commitments (including all documented fees and expenses of advisors to such lenders), and (z) provisions providing for the seniority in lien and payment priority of the Class B PIF DIP Loans to the other loans under the PIF DIP Facility with respect to the Specified Collateral, solely in the amount of the Initial DIP Loans (plus fees and interest) and the Termination Fee. |
| **DIP Collateral** | Effective immediately upon entry of the Interim DIP Order, the DIP Obligations shall be secured by continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (the "***DIP Liens***") all property of the estate of the DIP Loan Parties under section 541 of the Bankruptcy Code |

| | |
|---|---|
| | (subject to a professional fee carve out on the same terms as the PIF DIP Facility and exclusions to be agreed), including all real and personal property, whether now existing or hereafter arising and wherever located, whether tangible or intangible, of the DIP Loan Parties, including: (a) subject to entry of the Final DIP Order, the proceeds of any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) ("***Avoidance Actions***"); (b) the proceeds of any exercise of the DIP Loan Parties' rights under sections 506(c) and 550 of the Bankruptcy Code ("***Recovery Actions***"); (c) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral ("***Transfer Actions***"), and (d) the Specified Collateral (as defined below) (collectively, the "***DIP Collateral***").<br><br>The DIP Liens on the DIP Collateral shall be *pari passu* in lien and payment priority to the liens and claims securing the PIF DIP Facility (other than with respect to the amount of the Initial DIP Loans (plus fees and interest), the Specified Collateral and the payment of the Termination Fee (to the extent such fee becomes payable pursuant to the Restructuring Support Agreement), as to which the DIP Liens shall rank senior to the liens securing the PIF DIP Facility).<br><br>The DIP Obligations shall include, and the DIP Liens shall secure, the Termination Fee to the extent such fee becomes payable pursuant to the Restructuring Support Agreement.<br><br>The DIP Obligations (including the Termination Fee to the extent such fee becomes payable pursuant to the Restructuring Support Agreement) shall also be secured by a first priority pledge of, and the DIP Liens shall attach to all of the equity of the Borrower (including the equity held by LIV Golf Investments Ltd.), and the proceeds thereof (the "***Specified Collateral***") pursuant to documentation acceptable to the DIP Lenders. |
| **DIP Superpriority Claims** | The DIP Facility, including the Termination Fee to the extent such fee becomes payable pursuant to the Restructuring Support Agreement, shall also benefit from superpriority administrative expense claims against the DIP Loan Parties (the "***DIP Superpriority Claims***") that are senior to all other administrative expenses or other claims against the DIP Loan Parties (subject to (i) a professional fee carve out on the same terms as the PIF DIP Facility, to which the DIP Superpriority Claims shall rank junior and (ii) any administrative expense claims of the PIF DIP Facility, to which the DIP Superpriority Claims shall rank *pari passu* (other than with respect to the Initial DIP Loans (plus fees and interest), the Specified Collateral and the payment of the Termination Fee (to the extent such fee becomes payable pursuant to the Restructuring Support Agreement), as to which the DIP Superpriority Claims shall rank senior to the claims of the PIF DIP Facility)). |

| | |
|---|---|
| **Milestones** | The DIP Facility shall be subject to the milestones set forth in the Restructuring Support Agreement (the "***DIP Milestones***"), and the Debtors shall achieve each DIP Milestone, in each case, on terms and conditions and subject to documentation, including, in each case, forms of all applicable orders, in form and substance acceptable to the DIP Lenders in all respects. |
| **Affirmative and Negative Covenants** | The affirmative and negative covenants in the DIP Loan Documents shall be customary for a DIP financing facility and otherwise appropriate for this transaction, and in any case, shall include (a) the same affirmative and negative covenants as set forth in the PIF DIP Facility, including with respect to reporting, variance reporting, compliance with the approved budget (with any consent rights in favor of the PIF being in favor of the DIP Lenders), (b) an affirmative covenant (without a grace period) to maintain the Borrower's tax attributes and not take any action that would diminish the value of, or have the effect of diminishing the value of, or otherwise reduce, limit, impair, forfeit or otherwise adversely affect, such tax attributes, including by obtaining entry of the Interim NOL Order and Final NOL Order in accordance with the Milestones and enforcing the provisions thereof, (c) a covenant to not pledge, encumber, assign, sell or otherwise transfer, offer or contract to pledge, encumber, assign, sell or otherwise transfer, in whole or in part, any portion of its right, title or interest in any Equity Interests in any other Company Party (each as defined in the Restructuring Support Agreement), whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale or other transaction could reasonably be expected to impair any of the Company Parties' tax attributes, (d) a covenant not to surrender, abandon or forfeit any Equity Interests in any Company Party prior to the effective date of the chapter 11 plan or claim, report or otherwise take a position on any tax return or in any tax proceeding that any existing Equity Interest is worthless or has been abandoned, or claim any loss or deduction in respect thereof, for any tax year ending on or before such effective date, and (e) a covenant requiring the Borrower and each of its subsidiaries to continue an active trade or business.<br><br>The DIP Loan Parties shall use reasonable best efforts to secure undertakings from holders of existing Equity Interests (including the PIF) that such holders shall not surrender, abandon or forfeit any existing Equity Interest prior to the effective date of any chapter 11 plan of the Debtors, or claim, report or otherwise take a position on any tax return or in any tax proceeding that any existing Equity Interest is worthless or has been abandoned, or claim any loss or deduction in respect thereof, for any tax year ending on or before such effective date. |
| **Representations and Warranties** | Customary for a DIP financing facility and otherwise appropriate for this transaction, including representations and warranties with respect to the DIP Orders, the superpriority administrative expense claims of the DIP Agent and the DIP Lenders, and related bankruptcy matters, and in any case, shall include substantially the same representations as set forth in the PIF DIP Facility (with any consent rights in favor of the PIF being in favor |

| | |
|---|---|
| | of the DIP Lenders). |
| **Conditions Precedent** | Customary for a DIP financing facility and otherwise appropriate for this transaction, and in any case, to have substantially the same conditions as the PIF DIP Facility (with any consent rights in favor of the PIF being in favor of the DIP Lenders), and the following:<br><br>For the initial availability of the DIP Commitments, to include the satisfaction of the following:<br><br>1. At the time of and immediately after giving effect to the making of such DIP Loans, no Default or Event of Default shall have occurred and be continuing.<br><br>2. This DIP Term Sheet and the Restructuring Support Agreement shall have been executed and delivered by the DIP Loan Parties, the other Debtors and each of the DIP Lenders, and the Restructuring Support Agreement shall have been executed and delivered by the PIF, and no event or circumstance shall have occurred and be continuing that would permit the DIP Lenders or the PIF to terminate the Restructuring Support Agreement (including by the giving of notice and/or the expiration of any applicable grace period(s)).<br><br>3. Entry of the Interim DIP Order by the Bankruptcy Court in form and substance acceptable to the DIP Lenders, and such Interim DIP Order shall not have been vacated, reversed, subject to a stay, modified or amended other than as acceptable to the DIP Lenders;<br><br>4. Entry of the RSA Assumption Order by the Bankruptcy Court in form and substance acceptable to the DIP Lenders, including approval of the Termination Fee, and such RSA Assumption Order shall not have been vacated, reversed, subject to a stay, modified or amended other than as acceptable to the DIP Lenders;<br><br>5. Entry of the Interim NOL Order by the Bankruptcy Court in form and substance acceptable to the DIP Lenders, and such Interim NOL Order shall not have been vacated, reversed, subject to a stay, modified or amended other than as acceptable to the DIP Lenders;<br><br>6. Delivery of an initial Weekly Disbursement Schedule acceptable to the DIP Lenders;<br><br>7. Subject to the entry of the Interim DIP Order, the DIP Lenders shall have the DIP Superpriority Claims and valid and perfected liens on and security interests in the DIP Collateral on the basis and with the priority set forth herein;<br><br>8. The representations and warranties contained in this DIP Term Sheet or the DIP Credit Agreement, as applicable, shall be true |

| | |
|---|---|
| | and correct in all material respects as of the date of such draw, without any double materiality;<br><br>9. Receipt of customary officers' certificates, certified organizational documents and corporate resolutions authorizing the DIP Facility;<br><br>10. The DIP Agent and the DIP Lenders shall have received from the DIP Loan Parties and the Debtors all documentation and other information reasonably requested by the DIP Agent and any DIP Lender that such parties reasonably determine is required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;<br><br>11. None of the Chapter 11 Cases shall have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code;<br><br>12. No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or an examiner with enlarged powers (other than a fee examiner under section 1104(c) of the Bankruptcy Code) shall have been appointed in any of the Chapter 11 Cases; and<br><br>13. The DIP Loan Parties and the other Debtors shall have used commercially reasonable efforts to take, on or prior to the Closing Date, the relevant perfection steps necessary or advisable to ensure the DIP Agent and the DIP Lenders shall have valid perfected liens as contemplated by this DIP Term Sheet and in the Interim DIP Order.<br><br>For the subsequent availability of the DIP Commitments following the Closing Date, to include the satisfaction of the following:<br><br>1. At the time of and immediately after giving effect to the making of such DIP Loans, no Default or Event of Default shall have occurred and be continuing;<br><br>2. The representations and warranties contained in this DIP Term Sheet or the DIP Credit Agreement, as applicable, shall be true and correct in all material respects as of the date of such draw (or if such representations and warranties relate to a specific date or period, as of such date or period), without any double materiality;<br><br>3. The delivery of a customary draw request to the DIP Lenders;<br><br>4. The aggregate amount of DIP Loans outstanding shall not exceed the amount of the DIP Commitments available at such time;<br><br>5. Delivery of a Weekly Disbursement Schedule acceptable to the DIP Lenders; and<br><br>6. All reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Lenders, including the fees |

| | |
|---|---|
| | and expenses of the advisors to the DIP Lenders, shall have been paid, to the extent invoices for any such amounts are provided to the Debtors no later than one business day prior to such draw and otherwise in accordance with the DIP Orders. |
| **Events of Default** | Customary for a DIP financing facility and otherwise appropriate for this transaction, including the failure to achieve a DIP Milestone, and in any case, to have substantially the same events of default (an "***Event of Default***"; with any action or circumstance, that with the passage of time or the giving of notice, would result in an Event of Default, as a "***Default***") as the PIF DIP Facility, and the following:<br><br>1. Failure to pay any principal of any DIP Loan when due;<br><br>2. Failure to pay interest, fees or other amounts owed under the DIP Facility within three (3) business days of when due;<br><br>3. Failure to comply with affirmative covenants relating to maintaining the existence of the Borrower, the DIP Milestones, and the negative covenants (including any covenants relating to an Approved Budget referred to in the PIF DIP Facility);<br><br>4. the Restructuring Support Agreement having been terminated or the existence of any event or circumstance that would permit the DIP Lenders to terminate the Restructuring Support Agreement (including by the giving of notice or the expiration of any applicable grace period(s)) has occurred and is continuing;<br><br>5. The filing by any Debtor of a plan of reorganization or liquidation that is not consistent with the Restructuring Support Agreement and the consent rights of the DIP Lenders set forth therein that is not withdrawn within one Business Day after such filing;<br><br>6. The entry of an order approving any disclosure statement in support of a plan of reorganization or liquidation that does not meet the requirements of the Restructuring Support Agreement;<br><br>7. Appointment of a trustee, responsible officer or examiner with expanded powers (other than a fee examiner under section 1104(c) of the Bankruptcy Code) or any similar person is appointed or elected in any of the Chapter 11 Cases, or the filing by any Debtor of a motion or other pleading seeking such relief;<br><br>8. Entry of an order dismissing any of the Chapter 11 Cases, or the filing by any Debtor of a motion or other pleading seeking entry of such an order;<br><br>9. Entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the filing by any Debtor of a motion or other pleading seeking entry of such an order; |

| | |
|---|---|
| | 10. Invalidation or impairment of liens or security interests in favor of the DIP Facility;<br><br>11. The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit acceptances to a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lenders;<br><br>12. The failure of any Debtor to materially comply with the DIP Orders;<br><br>13. Any of the DIP Orders, the RSA Assumption Order, the Interim NOL Order or Final NOL Order is revoked, remanded, vacated, reversed, stayed, rescinded, or modified, without the prior written consent of the DIP Lenders, or the filing by any Debtor of a motion or other pleading seeking such relief;<br><br>14. Any administrative expense claim is allowed having priority over (other than a professional fee carve out on the same terms as the PIF DIP Facility) or ranking in parity with (other than the PIF DIP Facility claims) the DIP Obligations;<br><br>15. The DIP Liens or DIP Superpriority Claims granted pursuant to the DIP Orders shall at any time cease to be valid, perfected and enforceable in all respects with the priority described therein or any of the collateral documents shall be invalid;<br><br>16. The Debtors or any Affiliate thereof assert the invalidity of the liens or guarantees granted in favor of the DIP Lenders, or such liens or guarantees shall actually be invalidated;<br><br>17. The commencement by, or support by, the Debtors or any Affiliate thereof of any action against the DIP Lenders;<br><br>18. Termination of the Debtors' use of cash collateral;<br><br>19. The allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any DIP Collateral;<br><br>20. The granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases (i) that would permit other actions that would have a material adverse effect on the Debtors or their estates or (ii) with respect to any portion of the DIP Collateral exceeding $1,000,000 in value in the aggregate, in each case without the consent of the DIP Lenders;<br><br>21. Representations and warranties, certifications or other statements of a similar nature shall prove incorrect in any material respect |

| | |
|---|---|
| | when made or deemed made;<br><br>22. The payment of or granting adequate protection with respect to any of the existing secured debt of the Debtors, other than to the extent permitted under the DIP Orders (including for the avoidance of doubt under the PIF DIP Facility on the terms disclosed to the DIP Lenders prior to the Petition Date);<br><br>23. Any documents relating to any management incentive plan, retention plan or new, amended, or assumed employment agreements or documents with respect to the Debtors' officers are not in form and substance acceptable to the DIP Lenders;<br><br>24. The payment of any material prepetition obligation not approved by an order of the Bankruptcy Court and the DIP Lenders; and<br><br>25. Any ownership change (within the meaning of Section 382 of the Tax Code) occurs with respect to any Company Party. |
| **Other Bankruptcy Matters** | The DIP Orders shall be in form and substance satisfactory to the DIP Lenders and shall include the following provisions:<br><br>(a) modifying the automatic stay to permit the creation and perfection of the DIP Liens;<br><br>(b) authorizing and approving the DIP Facility and the transactions contemplated thereby, and granting of the superpriority status, security interests, and liens and the payment of all premiums, payments, and fees referred to herein;<br><br>(c) prohibiting the incurrence of any debt with a payment priority senior or equal to the DIP Facility (other than a professional fee carve out on the same terms as the PIF DIP Facility and the PIF DIP Facility on the terms disclosed to the DIP Lenders prior to the Petition Date and in each case solely to the extent described herein);<br><br>(d) prohibiting the granting or imposition of liens senior to or pari passu with the DIP Liens (other than the PIF DIP Facility on the terms disclosed to the DIP Lenders prior to the Petition Date and solely as described herein);<br><br>(e) providing that the DIP Agent, the DIP Lenders and their respective counsel, advisors, and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;<br><br>(f) providing that in connection with any sale or other disposition of the DIP Collateral, including sales pursuant to section 363(k) of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or any |

| | |
|---|---|
| | sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code and/or applicable law), or in connection with an exercise of remedies, in each case including with respect to the Specified Collateral, the DIP Lenders shall be authorized to credit bid on a dollar-for-dollar basis the full amount of the DIP Obligations, including any accrued interest, expenses, fees (including the Termination Fee to the extent such fee becomes payable pursuant to the Restructuring Support Agreement) and premiums, and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code or otherwise;<br><br>(g) providing that (i) the DIP Obligations and the terms and provisions of the DIP Orders shall survive entry of any order that may be entered (A) confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) pursuant to which the Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code, and (ii) the DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases;<br><br>(h) providing for (i) a release by the Debtors, on their own behalf and on behalf of their estates, upon entry of the Interim DIP Order, of the DIP Secured Parties and each of their current and former directors, officers, employees, agents, advisors, and other representatives of and from any and all claims and causes of action solely with respect to the negotiations and entry into the DIP Loan Document, and (ii) a waiver and release of any and all defenses as to the validity, perfection, priority, enforceability and avoidability of the DIP Liens and the DIP Obligations;<br><br>(i) prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the DIP Secured Parties with respect to the DIP Collateral;<br><br>(j) a waiver of any right that any Debtor may have to seek authority to (i) challenge, contest, or otherwise seek to impair or object to the validity, extent, enforceability, or priority of the DIP Agent's or the DIP Lenders' liens and claims under the DIP Facility, (ii) challenge the application of any payments or collections received in respect of the DIP Facility; and (iii) seek or obtain a discharge of the DIP Obligations pursuant to section 1141(d) of the Bankruptcy Code or otherwise;<br><br>(k) payment of the fees and expenses of the DIP Lenders and the DIP Agent (if any), including any professional advisors or consultants to the foregoing, without any obligation for such parties to seek Bankruptcy Court approval or otherwise comply with any |

| | |
|---|---|
| | applicable U.S. Trustee Guidelines, and indemnification of the DIP Secured Parties and their representatives; provided that, solely with the prior written consent of the DIP Lenders and upon notice to the Borrower, the DIP Loan Parties shall not be obligated to pay such fees and expenses in cash and such fees and expenses shall be capitalized, and the outstanding amount of the DIP Loans shall increase, on a dollar-for-dollar basis (for the avoidance of doubt, without any reduction of the DIP Commitments);<br><br>(l) providing that in no event shall any of the DIP Secured Parties with respect to the DIP Collateral be subject to the equitable doctrine of marshaling, and<br><br>(m) providing for intercreditor arrangements that reflect the priority of the DIP Facility contemplated herein, including customary rights for a senior creditor solely with respect to the Specified Collateral and the payment of the Termination Fee (to the extent such fee becomes payable pursuant to the Restructuring Support Agreement), including turn-over provisions, restrictions on amendments to junior debt documents and collateral release provisions. |
| **Assignments** | Each DIP Lender may assign all or a portion of its rights and obligations under the DIP Facility (including all or a portion of its DIP Commitment and the DIP Loans at the time owing to it) without the prior written consent of the Borrower, but solely to (a) an Affiliate of a DIP Lender or (b) a third party investor agreeing to provide a ratable portion of the investments contemplated by the BCP Term Sheet that executes a joinder to the Restructuring Support Agreement prior to or contemporaneously with such assignment; provided that, for the avoidance of doubt, such assignments shall not be restricted by the Interim NOL Order or the Final NOL Order. |
| **Governing Law** | New York; provided that the DIP Loan Documents will provide that the Debtors shall submit to the jurisdiction and venue of the Bankruptcy Court if the Bankruptcy Court exercises jurisdiction. |
| **Counsel to the DIP Lenders** | Paul, Weiss, Rifkind, Wharton & Garrison LLP |