**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al*.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND DIRECTING THE DEBTORS TO ENTER INTO, ASSUME, AND PERFORM UNDER THE AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT, (II) APPROVING THE TERMINATION FEE AND THE EXPENSE REIMBURSEMENT, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a), 362, 363(b), 365(a), 503(b), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and rules

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

4001, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) authorizing and directing the Debtors to enter into the Amended and Restated Restructuring Support Agreement, substantially in the form attached to the Order as **Exhibit 1** (the "A&R RSA"), by and among the Debtors and BC Partners Advisors L.P. ("BC Partners"), which amends and restates in its entirety that certain Restructuring Support Agreement, dated as of September 8, 2026, by and among the Debtors and BC Partners (the "Original RSA" and, as amended and restated by the A&R RSA, including all exhibits thereto and as may be further amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "RSA"), and to assume the RSA and perform their obligations thereunder; (b) approving the Termination Fee and the Expense Reimbursement (each as defined below); and (c) granting related relief. In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "First Day Declaration"),[2] the *Declaration of Bradley A. Robins in Support of Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Granting Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief* [Docket No. 23] (the "Robins Declaration"), and the *Declaration of Bradley A. Robins in Support of the Debtors' Motion to Enter Into and Assume the Amended and Restated RSA*, attached hereto as **Exhibit B** (the "Second Robins Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the First Day Declaration. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day Declaration or the RSA, as applicable.

**Preliminary Statement**

1. The RSA paves the way for the next chapter of the Debtors' business under a new and more efficient operating model ("LIV 2.0"). It is the product of an extensive prepetition marketing process that reached more than 300 potential investors and yielded the BC Partners proposal as the best and most viable, followed by weeks of arm's-length negotiations under the oversight of the Debtors' independent directors. Under the RSA, BC Partners has committed, subject to the terms and conditions thereof, to anchor a $300 million investment in LIV 2.0 through a chapter 11 plan in accordance with the BC Partners Term Sheet (as defined below) and has agreed to fund incremental postpetition financing for the costs of the LIV 2.0 transaction, which the RSA contemplates will be provided through a participation in the Debtors' existing PIF DIP Facility (as defined below). In exchange, the Debtors agreed to market-standard and, in the Debtors' business judgment, necessary protections: a 3.00% Termination Fee payable solely from the proceeds of an alternative transaction, and an Expense Reimbursement limited to budgeted amounts and payable solely from the proceeds of the postpetition financing that BC Partners funds.[3] The Debtors' obligations under the RSA remain subject to a fiduciary out that preserves their ability to consider and respond to unsolicited alternative proposals, subject to BC Partners' corresponding termination rights and the Termination Fee. The Debtors believe, in the exercise of their business judgment, that the RSA is the best means to preserve the value of their business as a going concern for the benefit of all stakeholders. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to enter into the A&R RSA and to assume the RSA.

---

[3] In connection herewith, the Debtors intend to file a notice of amendment to their existing PIF DIP Facility, pursuant to which BC Partners will provide an additional $4.0 million of DIP financing via a participation interest in the PIF DIP Facility.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 362, 363(b), 365(a), 503(b), and 507(a)(2) of the Bankruptcy Code, Bankruptcy Rules 4001, 6004, 6006, and 9014, and rules 9013-1 and 9013-5 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## Background

5. The Debtors own and operate an international men's professional golf league (the "League"). Founded in 2021 and financially backed by the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"), the Debtors host tournaments at golf courses around the world (the "Tournaments"). The Tournaments feature world-class entertainment as well as League-contracted professional golfers (the "Players") who compete in both individual and team competitions that take place alongside each other. The Debtors have built a recognizable global brand through attracting fans, broadcasters and commercial partners. Additional background, including the events leading to these chapter 11 cases, is set forth in the First Day Declaration.

6. On September 8, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On September 9, 2026, the Court entered an order authorizing the procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 62]. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On September 30, 2026, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 175] (the "Committee").

## The Debtors' Marketing Process and the Restructuring Support Agreement

### I. The Prepetition Marketing Process

7. Since the Debtors' inception in 2021, entities controlled by PIF, the Debtors' ultimate equity owner, have invested approximately $5 billion of equity capital in the Debtors and, until June 2026, the Debtors funded their operations solely through those equity infusions. *See* First Day Declaration ¶¶ 7, 37, 41. On April 30, 2026, PIF announced that it would fund the Debtors only through the remainder of the 2026 season, by way of a secured facility. *Id.* ¶¶ 8, 43. PIF provided that funding through the PIF Facility, under which approximately $495 million was outstanding as of the Petition Date. *Id.* ¶ 39.

8. In April 2026, the Debtors implemented a comprehensive governance process designed to ensure independent and disinterested oversight of their review of restructuring alternatives. On April 13, 2026, the Debtors appointed Gene Davis and Jon Zinman, individuals with extensive restructuring experience, as independent directors (the "Independent Directors"), and on April 24, 2026, the Independent Directors were appointed as the sole members of a newly

formed Strategic Initiatives Committee (the "SIC") of LIV Golf Holdings Ltd, to which the Debtors delegated, among other things, exclusive authority to review, negotiate, approve, and act upon any conflict matter and authority to take any and all actions with respect to any strategic, restructuring, financing, and/or sale transaction. *Id.* ¶¶ 9, 44–46. The Debtors also retained Gibson, Dunn & Crutcher LLP ("Gibson Dunn") as restructuring counsel, AlixPartners, LLP ("AlixPartners") as financial advisor in April 2026, and Ducera Partners LLC (together with its affiliates, "Ducera") as investment banker in May 2026. *Id.* ¶¶ 9, 49; Robins Declaration ¶ 6.

9. Beginning in May 2026, Ducera launched a broad marketing process to identify potential investors willing to fund a new iteration of the Debtors' business under a new and more efficient operating model, or otherwise to acquire or invest in the Debtors' business. First Day Declaration ¶¶ 9, 50, 59. Ducera prepared a confidential information memorandum and contacted more than 300 potential investors across strategic acquirers, financial sponsors (including both traditional and sports-focused sponsors), and high-net-worth individuals. *Id.* ¶ 59; Robins Declaration ¶ 11; Second Robins Declaration ¶ 8. Approximately 100 potential investors executed non-disclosure agreements and were granted access to a virtual data room; Ducera and the Debtors' management conducted more than 100 calls with more than 50 unique potential investors; and Ducera, the Debtors, Gibson Dunn and AlixPartners responded to more than 350 diligence questions from the approximately 30 potential investors that engaged in detailed diligence. *See* First Day Declaration ¶ 59; Robins Declaration ¶ 11; Second Robins Declaration ¶ 8.

10. Five leading prospects (in addition to potential minority investors) were invited to submit final non-binding bids by July 22, 2026 (the "Bid Deadline"), and the Debtors received two non-binding term sheets on the Bid Deadline. First Day Declaration ¶¶ 59-60; Robins

Declaration ¶ 11. Following continued engagement with both bidders, the Debtors, in consultation with Ducera, determined that the bid submitted by BC Partners (the "BC Partners Bid") was the best and most viable proposal, and on August 4, 2026, BC Partners signed a non-binding term sheet providing for up to $150 million of new capital from BC Partners, with an additional $150 million earmarked for co-investors. *See* First Day Declaration ¶ 60; Robins Declaration ¶ 11; Second Robins Declaration ¶ 9. Since that time, Ducera has re-engaged parties that indicated interest in a minority investment alongside a lead investor and has facilitated outreach to additional parties identified by BC Partners, and the Debtors continue to engage with several potential minority investors. *See* First Day Declaration, Ex. B ¶ 77; Second Robins Declaration ¶ 9.

11. Over the following weeks, the Debtors and their advisors negotiated the terms of the BC Partners Bid with BC Partners and its advisors, and on September 8, 2026, the Debtors, with the approval of the SIC, entered into the Original RSA, pursuant to which BC Partners agreed, subject to the terms and conditions thereof, to provide the funding for the BC Partners Bid, as well as supplemental postpetition financing to fund certain costs associated with LIV 2.0. *See* First Day Declaration ¶ 61; Second Robins Declaration ¶ 10.

12. Since the Petition Date, the Debtors and BC Partners have continued to negotiate the documentation and implementation of the Restructuring Transactions and have agreed to amend and restate the Original RSA via the A&R RSA. *See* Second Robins Declaration ¶ 11. The A&R RSA, among other things, (a) establishes the framework through which Players and Minority Investors (as defined below) can become parties to the RSA and commit to LIV 2.0; and (b) provides for BC Partners to fund incremental postpetition financing for LIV 2.0 costs through a participation in the postpetition financing facility provided by PIF and approved on an

interim basis by the *Interim Order (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Senior Secured Superpriority Postpetition Financing and Grant Senior Liens and Superpriority Administrative Claims, and (III) Provide Adequate Protection, (B) Scheduling Final Hearing, and (C) Granting Related Relief* [Docket No. 79] (the "PIF Interim DIP Order," and such facility, the "PIF DIP Facility"), to be implemented through an upsize of the PIF DIP Facility, as described below. The Debtors intend to execute and assume the A&R RSA promptly following entry of the Order. PIF has consented to the Debtors' filing of this Motion on the conditions that (among other things) the Restructuring Transactions remain subject to the negotiation and execution of the Definitive Documents contemplated by the RSA and to PIF's consent rights under the PIF DIP Facility. *See* RSA § 3.01. For the avoidance of doubt, PIF has not consented to the Debtors' entry into any transaction contemplated in the DIP Facility or the Restructuring Transactions and is not waiving any rights set forth under the PIF Interim Order, any order approving the PIF DIP Facility on a final basis, the PIF DIP Facility, or the Prepetition Facility (as defined in the PIF Interim DIP Order). PIF has reserved and reserves all rights

## II. The Restructuring Support Agreement

13. The RSA is by and among LIV Golf Investments Ltd. ("LGIL") and each of its subsidiaries and affiliates listed on Exhibit A thereto (collectively with LGIL, the "Company Parties"), BC Partners (collectively with the funds, accounts, or investment vehicles managed or advised by, or managed or advised by affiliates that pursue a credit strategy of, BC Partners, the "Plan Sponsor"), and each Player and Minority Investor that becomes a party to the RSA, with the consent of the Company Parties and the Plan Sponsor, by executing and delivering a Joinder (as defined below) (collectively, the "Consenting Stakeholders"). *See* RSA, preamble. Each of the Debtors is a Company Party. The A&R RSA will become effective and binding upon the execution and delivery of counterpart signature pages by each of the Company Parties and the

Plan Sponsor, and Players and Minority Investors may thereafter become parties to the RSA, as Consenting Stakeholders, by Joinder. *See* RSA § 2.

14. The RSA contemplates a restructuring of the Debtors' business through a chapter 11 plan (the "Plan") that will facilitate an ownership transition and finance an updated business plan for LIV 2.0 while delivering equity value to the Players. *See* RSA, Ex. B (the "BC Partners Term Sheet"), "Transaction Overview." Under the BC Partners Term Sheet, new investors will invest $300 million (the "Total Financing Amount") in reorganized LIV Golf Incorporated ("LIV Holdco"), comprised of (a) a $127.5 million first lien term loan (subject to reduction as set forth in the BC Partners Term Sheet) with warrant coverage for the purchase of 5.00% of LIV Holdco's common stock, (b) $147.5 million of senior preferred equity with warrant coverage for the purchase of 10.00% of LIV Holdco's common stock, and (c) $25 million of subordinated convertible preferred equity convertible into 30.00% of LIV Holdco on an as-converted basis, in each case subject to adjustment as set forth in the BC Partners Term Sheet (collectively, the "Financing"). *Id.* Affiliated funds of BC Partners and co-investors are to provide up to $150 million of the Total Financing Amount, and any other investor in the Financing (each such investor other than the Plan Sponsor, a "Minority Investor") that becomes a party to the RSA by Joinder on terms and conditions acceptable to BC Partners and the Debtors will be offered the opportunity to co-invest in a pro rata strip across the Financing. *Id.*, "Investor(s)"; *see also* RSA § 1.01 (defining "Minority Investor" and "Consenting Minority Investor"). Following the restructuring, the common equity of LIV Holdco is to be allocated 45.00% to the new investors, 52.50% to the Players (in satisfaction of their Allowed Eligible Player Claims, subject to providing mutual releases and signing New Player Agreements, and including rights to acquire additional equity to achieve that stake), and 2.50% to management pursuant to a management

incentive plan, in each case subject to adjustment. *See* BC Partners Term Sheet, "Transaction Overview," "Governance and Minority Rights." The RSA also provides for BC Partners to fund incremental postpetition financing for costs associated with LIV 2.0 through its participation in the PIF DIP Facility, as described below. *See* RSA §§ 1.02(m), 5.01(a)(vi).

## III. Material Terms of the RSA

15. The material terms of the RSA are summarized below.[4]

a. ***Commitments of the Plan Sponsor.*** During the Agreement Effective Period, the Plan Sponsor has agreed, among other things, to: (i) support the Restructuring Transactions on the terms and subject to the conditions of the RSA; (ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; (iii) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with the RSA to which it is required to be a party; (iv) provide the applicable investments in accordance with the BC Partners Term Sheet on the Plan Effective Date; and (v) fund the debtor-in-possession financing to be provided by the Plan Sponsor pursuant to the DIP Documents (including any agreement pursuant to which the Plan Sponsor agrees to purchase a participation in the PIF DIP Facility), or as otherwise agreed among the Company Parties, the Plan Sponsor, and PIF. RSA § 5.01(a). The Plan Sponsor has further agreed not to object to, delay, impede, or otherwise interfere with the Restructuring Transactions, not to propose, file, support, or vote for any Alternative Restructuring Proposal, and not to take any action that would reasonably be expected to impair the Company Parties' tax attributes. *Id.* §§ 5.01(b), 5.02, 9.01. The Plan Sponsor's commitment to vote to accept the Plan is conditioned on the Plan being in form and substance acceptable to the Plan Sponsor, and the Plan Sponsor's commitments are subject to the reservations set forth in the RSA, including that nothing in the RSA requires the Plan Sponsor to incur any expenses, liabilities, or other obligations except as provided for in the RSA and the DIP Documents. *Id.* §§ 5.02(a), 6.

b. ***Commitments of the Company Parties.*** During the Agreement Effective Period, and subject to the fiduciary out described below, the Company Parties have agreed, among other things, to: (i) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with terms, conditions, and applicable deadlines set forth in the RSA, including the Milestones; (ii) negotiate in good faith and use commercially reasonable efforts to execute and

[4] The summary of the RSA set forth in this Motion is provided for the convenience of the Court and parties in interest and is qualified in its entirety by the terms of the RSA. In the event of any inconsistency between this summary and the RSA, the RSA shall govern.

deliver the Definitive Documents; (iii) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders, including PIF and the Requisite Players; (iv) operate their businesses in the ordinary course consistent with the RSA; (v) oppose any motion seeking the appointment of a trustee or examiner with expanded powers, conversion or dismissal of these chapter 11 cases, or the termination of the Debtors' exclusive right to file and solicit a plan; (vi) provide timely responses to reasonable diligence requests and promptly notify the Plan Sponsor of, among other things, any event that would permit any Party to terminate the RSA; and (vii) promptly pay in full and in cash the reasonable and documented fees and expenses of the Plan Sponsor and its advisors, which the RSA limits to the amounts provided for such payment under the LIV 2.0 DIP Budget (as defined below) and makes payable solely from the proceeds of the debtor-in-possession financing funded by the Plan Sponsor (including through its participation in the PIF DIP Facility). RSA § 7.01. The Company Parties have also agreed not to, among other things, file any pleading materially inconsistent with the RSA, solicit or support any Alternative Restructuring Proposal except as permitted by Section 8 of the RSA, or, without the Plan Sponsor's consent, amend their organizational documents, issue additional Interests, sell assets outside the ordinary course, incur indebtedness other than in accordance with the Restructuring Transactions or in the ordinary course, release obligors or liens under the PIF Facility, or pledge, encumber, assign, sell or otherwise transfer any Interests to the extent doing so could reasonably be expected to impair any of the Company Parties' tax attributes. *Id.* § 7.02. Nothing in these covenants limits the Company Parties from negotiating or entering into documentation with PIF or the Players to satisfy the PIF RSA Milestone or the Player RSA Milestone (each as defined below), in each case in consultation with the Plan Sponsor and either to the extent not inconsistent with the RSA or with the Plan Sponsor's consent. *Id.* § 7.02 (final paragraph).

c. ***Fiduciary Out; Alternative Restructuring Proposals.*** Nothing in the RSA requires a Company Party, or its board of directors, board of managers, or similar Governing Body, after consulting with counsel, to take or refrain from taking any action with respect to the Restructuring Transactions to the extent doing so would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and no such action or inaction constitutes a breach of the RSA. Each Company Party and its directors, officers, and advisors expressly retain the right to consider and respond to (but not solicit or otherwise facilitate) Alternative Restructuring Proposals, to cooperate with, assist, or participate in (but not solicit or otherwise facilitate) any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals, and to continue discussions with holders of Claims or Interests and other parties in interest regarding the Restructuring Transactions. *Id.* § 8.02. The Company Parties must provide counsel to the Plan Sponsor, on a professional-eyes-only basis, a copy of any written Alternative Restructuring Proposal (and notice and a description of any Alternative Restructuring Proposal communicated orally) within one Business Day of receipt and keep such counsel reasonably contemporaneously informed as to the status and substance of any related discussions, and must deliver an Alternative Restructuring Engagement Notice within two Business Days after determining to pursue an Alternative Restructuring Proposal. *Id.* §§ 8.03, 8.05. In

addition, both the Plan Sponsor and the Company Parties may terminate the RSA if the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in each case subject to Section 15.23 of the RSA. *Id.* §§ 13.01(c), 13.05(b), 15.23.

d. ***Exclusivity.*** The Company Parties have agreed that, except as set forth in Section 8 (outlined above under the heading "***Fiduciary Out; Alternative Restructuring Proposals***") of the RSA, they will not solicit, participate in, negotiate, propose, support, vote for, consummate, or enter into a binding agreement to consummate any Alternative Restructuring Proposal prior to consummation of the Restructuring Transactions. RSA § 7.02(b). Separately, under the BC Partners Term Sheet, the Company Parties have agreed, for a period of 90 days from the acceptance of the BC Partners Term Sheet (subject to an automatic 90-day extension if the definitive documents for the Term Loan and/or Preferred Equity have not been executed and the parties are working in good faith to consummate the investments), not to take any action to solicit, initiate, encourage, or assist the submission of any proposal, negotiation, or offer from any person other than BC Partners relating to any financing or other Alternative Restructuring Proposal, and to notify BC Partners promptly of any third-party inquiries. BC Partners Term Sheet, "Exclusivity" (together with Section 7.02(b) of the RSA, the "Exclusivity Provisions"). The Exclusivity Provisions are expressly subject to the Company Parties' fiduciary out provisions.

e. ***Milestones.*** The RSA requires the Debtors to achieve the following Milestones, each of which may be extended or waived in writing (email being sufficient) by the Plan Sponsor: (i) no later than October 5, 2026, the filing of this Motion and the notice of the Proposed Final DIP Order (as defined below) seeking approval of BC Partners' participation in the PIF DIP Facility; (ii) no later than October 14, 2026, entry of the Order, the Debtors' execution and actual assumption of the RSA, and entry of an order approving BC Partners' initial participation in the PIF DIP Facility; (iii) no later than 35 days following the Petition Date, entry of the Final NOL Order; (iv) no later than October 25, 2026, the Requisite Players becoming parties to the RSA, with any amendments to the terms and conditions thereof to be acceptable to the Plan Sponsor and the Company Parties in their sole and absolute discretion (the "Player RSA Milestone"); (v) no later than October 30, 2026, PIF becoming a party to the RSA or otherwise agreeing in writing to support the Restructuring Transactions, in each case on terms and conditions acceptable to the Company Parties and the Plan Sponsor in their sole and absolute discretion (which may be accomplished through an amendment or an amendment and restatement of the RSA or an amendment to the documents governing the PIF DIP Facility, and may include any required revisions to the documents related to the PIF DIP Facility, as determined by the Plan Sponsor in its sole discretion) (the "PIF RSA Milestone"); (vi) no later than November 2, 2026, entry of a final order approving the Plan Sponsor's funding under the PIF DIP Facility, in excess of the initial participation in an aggregate amount agreed among the Company Parties, the Plan Sponsor, and PIF, or a final order approving the DIP Documents, in each case in form and substance acceptable to the Plan Sponsor; and

(vii) no later than January 6, 2027, the occurrence of the Plan Effective Date. RSA §§ 1.02(m), 4.

f. ***Termination.*** The Plan Sponsor may terminate the RSA upon the occurrence of, among other things, (i) an Alternative Restructuring Engagement Notice, (ii) a determination by the Company Parties to pursue an Alternative Restructuring Proposal or that proceeding with the Restructuring Transactions would be inconsistent with its fiduciary duties, (iii) the failure to satisfy a Milestone, (iv) the occurrence of an ownership change within the meaning of Section 382 of the U.S. Tax Code with respect to any Company Party, (v) the failure of the Company Parties to carry on more than an insignificant amount of an active trade or business, and (vi) certain events relating to the DIP Orders, the DIP Documents, and any DIP Claims held by the Plan Sponsor or in which it holds a participation interest. RSA § 13.01. The failure to satisfy a Milestone and the failure to carry on an active trade or business are not subject to any cure period, whereas the other termination events are generally subject to a three business day cure period. *Id.* Upon an uncured material breach by a Consenting Stakeholder, the Plan Sponsor (and, with the Plan Sponsor's consent, any Company Party) may terminate the RSA solely as to such Consenting Stakeholder. *Id.* §§ 13.01(y), 13.05(e). Any Company Party may also terminate the RSA upon the occurrence of, among other things, a determination by its Governing Body, after consulting with counsel, that proceeding with the Restructuring Transactions would be inconsistent with its fiduciary duties or that it should pursue an Alternative Restructuring Proposal, subject to the Termination Fee. *Id.* §§ 13.05, 15.23. Each Consenting Stakeholder may terminate the RSA solely as to itself upon specified events, including an uncured material breach by a Company Party or the Plan Sponsor, or the Company Parties' entry into or filing of a Definitive Document that is inconsistent with the RSA and its Stakeholder Term Sheet (as defined below), in each case that is materially and disproportionately adverse to such Consenting Stakeholder. *Id.* § 13.02. The RSA may also be terminated by mutual written agreement of LGIL, the Plan Sponsor, and the Majority Consenting Players, and terminates automatically following the Plan Effective Date (or, if later, the completion of any Foreign Implementation Process). *Id.* §§ 13.06, 13.07.

g. ***Termination Fee.*** In the event that (i) the RSA is terminated by any Party (x) as a result of any Company Party consummating or pursuing any transaction contemplated by an Alternative Restructuring Proposal, or (y) while any Company Party is in discussions or negotiations with any other party in respect of an Alternative Restructuring Proposal, (ii) the Company Parties consummate any transactions contemplated by, or enter into a definitive agreement with respect to, an Alternative Restructuring Proposal, or (iii) any Company Party delivers an Alternative Restructuring Engagement Notice, the Company Parties shall pay to the Plan Sponsor a termination fee, in cash, equal to 3.00% of the Total Financing Amount committed to be provided pursuant to the BC Partners Term Sheet and the Investor Commitments, as of immediately prior to the event giving rise to the Termination Fee (the "Termination Fee"). RSA § 15.23. The Termination Fee (a) constitutes an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable solely from, and with recourse solely to, the proceeds of

any transaction contemplated by any Alternative Restructuring Proposal, and (b) is not subject to setoff, reduction, avoidance, subordination, or disallowance. *Id.* The definition of "Alternative Restructuring Proposal" expressly excludes any liquidation or conversion of these chapter 11 cases to cases under chapter 7 and any wind-down plan under chapter 11 (i.e., such events themselves do not constitute an Alternative Restructuring Proposal), other than any sale, disposition, reorganization, or similar transaction in which any Debtor carries on an active trade or business. The Termination Fee (whether triggered before or after the Termination Date) survives termination of the RSA and remains binding on the Company Parties, their respective successors and permitted assigns, and the Debtors' estates and, in the event of any conversion of these chapter 11 cases to cases under chapter 7, such chapter 7 estates and any chapter 7 trustee. *Id.* §§ 1.01, 15.23.

h. ***Consenting Stakeholders.*** The RSA provides the framework through which Players and Minority Investors will commit to LIV 2.0. A Player or Minority Investor may become a party to the RSA, with the consent of the Company Parties and the Plan Sponsor, by executing and delivering a joinder substantially in the form attached to the RSA as Exhibit C (each, a "Joinder"), to which is attached a term sheet setting forth the terms of such Player's participation in LIV 2.0 from and after the Plan Effective Date or such Minority Investor's commitment to participate in the Financing, as applicable (each, a "Stakeholder Term Sheet"). RSA §§ 1.01, 2(c), 10.01. Each Consenting Stakeholder agrees, among other things, to support the Restructuring Transactions; to support, and not object to, this Motion and the Order (including approval of the Termination Fee), the DIP Motion, the DIP Facility, and the DIP Orders, and any other Definitive Documents that are materially consistent with the RSA and its Stakeholder Term Sheet; not to transfer its ownership in any Company Claims/Interests or acquire Player Claims; and not to propose, support, or vote for any Alternative Restructuring Proposal. Each Consenting Player further agrees to execute its New Player Agreements and to participate in LIV 2.0 in accordance with its Player Term Sheet, and each Consenting Minority Investor agrees to fund its Investor Commitment on the Plan Effective Date. *Id.* §§ 9.02, 10.02. Subject to the fiduciary out and the adjustments contemplated by the BC Partners Term Sheet, the Company Parties (and, solely to the extent within its control and consistent with its consent and approval rights under the RSA, the Plan Sponsor) have agreed not to pursue a Plan that does not provide for the treatment of each Consenting Player's Player Claims set forth in its Player Term Sheet or for the participation of each Consenting Minority Investor in the Financing set forth in its Minority Investor Term Sheet. *Id.* § 10.08(c). Except as expressly set forth in the RSA or the New Player Agreements, any consideration or other obligations to the Players contemplated by the Player Term Sheets are solely obligations of the Company Parties or the Reorganized Debtors, as applicable, and neither the Plan Sponsor nor any Consenting Minority Investor has any liability in respect thereof. *Id.* § 1.01 (definition of "Player Term Sheet"). The RSA also contemplates that each Consenting Player will support, and grant, releases of PIF and its related parties under the Plan conditioned upon (i) the Plan providing for, and (ii) such Consenting Player receiving on the Plan Effective Date (or such later date contemplated by the Plan), PIF Release Consideration in a proportional amount, after giving effect to any cash consideration

received by such Consenting Player under the Plan (which the Plan Sponsor is not obligated to fund), not less than the proportional amount of cash consideration provided to holders of General Unsecured Claims (excluding, for the avoidance of doubt, Allowed Eligible Player Claims, but including Player Claims held by non-Consenting Players) under the Plan or via separate payment from PIF (or any of its Affiliates and their respective related parties) to the holder of a Player Claim held by a non-Consenting Player (or any of its Affiliates and their respective related parties); provided that (x) these conditions may be waived as to any Consenting Player in such Consenting Player's sole discretion and (y) to the extent these conditions are not satisfied or waived as to any Consenting Player, such Consenting Player's sole and exclusive remedy shall be termination of the RSA as to such Consenting Player. *Id.* §§ 10.06, 13.02(h). The PIF Release Consideration is to be funded and paid by (or on behalf of) PIF, and shall not be funded or paid from property of the Debtors' estates, the Reorganized Debtors, or the Plan Sponsor. *Id.* § 10.06(d).

i. ***BC Partners' Participation in the PIF DIP Facility.*** The Debtors, BC Partners, and PIF have agreed that BC Partners will provide its incremental postpetition financing for LIV 2.0 costs through a participation in the PIF DIP Facility. *See* RSA §§ 1.02(m), 5.01(a)(vi). The RSA contemplates that BC Partners' initial participation in the PIF DIP Facility will be in an aggregate amount not to exceed $4.0 million (or such other amount as agreed among the Company Parties, the Plan Sponsor, and PIF), and that any funding by BC Partners under the PIF DIP Facility in excess of the initial $4.0 million in an aggregate amount agreed among the Company Parties, the Plan Sponsor, and PIF will be approved by a final order to be entered no later than November 2, 2026. *Id.* §§ 1.02(m)(iv), 4(h). The BC Partners Term Sheet further provides that BC Partners will negotiate with the Debtors and PIF to provide a $30 million debtor-in-possession financing facility to consummate the Restructuring Transactions, in a form (which may include further participations in the PIF DIP Facility) and on conditions acceptable to BC Partners, including that PIF and the Requisite Players shall have become parties to the RSA by the applicable Milestones. BC Partners Term Sheet, "Transaction Implementation." Consistent with the RSA, the Debtors, BC Partners, and PIF have agreed to increase the PIF DIP Facility by $4.0 million (the "DIP Upsize"), from $49.6 million to $53.6 million, to be funded by BC Partners through its purchase from PIF, at par, of a participation in the PIF DIP Facility pursuant to a participation agreement between PIF and the Plan Sponsor (the "Participation Agreement"). The DIP Upsize will be made available to the Debtors in a single draw following entry of a final order approving the PIF DIP Facility and satisfaction (or waiver) of the conditions to the final funding under the PIF DIP Facility, will be funded on the same terms and conditions as the other loans under the PIF DIP Facility, and will constitute loans under the PIF DIP Facility for all purposes. PIF will remain the lender under the PIF DIP Facility. The proceeds of the DIP Upsize will be held in the Debtors' proceeds account under the PIF DIP Facility, segregated from the Debtors' other cash, and used solely to pay incremental expenses in connection with the LIV 2.0 transaction (including the fees and expenses of BC Partners) on the timing and in the amounts set forth in the budget attached to the Participation Agreement, as it may be amended, supplemented, or otherwise modified from time to time with the consent of BC Partners and PIF (together with any budget

governing any further debtor-in-possession financing provided by BC Partners under the RSA, the "LIV 2.0 DIP Budget"), and any unused proceeds will be returned to BC Partners upon the occurrence of specified events, including a termination of the RSA or a pivot by the Debtors to a wind-down plan. *See* Proposed Final DIP Order ¶ 24. Those costs are not funded by the PIF DIP Facility as currently sized, which is designed to fund the Debtors' operations and the administration of these chapter 11 cases through consummation of a chapter 11 plan, and the Debtors would not otherwise have sufficient cash on hand to fund them. *See* First Day Declaration, Ex. B ¶¶ 76–77; Second Robins Declaration ¶¶ 17, 21–22. The Debtors are seeking approval of the DIP Upsize and BC Partners' participation through the proposed final order approving the PIF DIP Facility (the "Proposed Final DIP Order"), a revised form of which the Debtors are filing in connection herewith.

## IV. The Debtors' Decision to Enter Into the A&R RSA and Assume the RSA

16. The Debtors, with the assistance of their advisors and under the oversight and authority of the SIC, have determined that entry into the A&R RSA and assumption of the RSA, respectively, are in the best interests of their estates and all stakeholders. *See* Second Robins Declaration ¶¶ 12–16; First Day Declaration ¶¶ 9, 50, 59–61; Robins Declaration ¶¶ 11–12. The RSA is the culmination of a value-maximizing marketing process that canvassed hundreds of potential investors and yielded the BC Partners Bid as the best and most viable proposal, and it reflects weeks of arm's-length negotiations between sophisticated parties, each represented by experienced counsel and advisors. *Id.* The RSA commits the Plan Sponsor to, in accordance with the BC Partners Term Sheet, anchor a $300 million investment in LIV 2.0 and provides for the Plan Sponsor to fund incremental postpetition financing for LIV 2.0 costs through its participation in the PIF DIP Facility (and BC Partners was the only participant in the marketing process to offer postpetition financing of any kind, *see* Robins Declaration ¶ 12), provides a path to confirmation of a plan that preserves the League as a going concern for the benefit of the Players, sponsors, host venues, employees, and fans, and, through the A&R RSA, establishes the framework for the Players and Minority Investors to commit to LIV 2.0. *Id.*

17. The protections afforded to BC Partners under the RSA are market-standard and narrowly drawn. The Debtors' obligations are subject to a fiduciary out that permits the Debtors to consider and respond to unsolicited alternative proposals and to terminate the RSA if their fiduciary duties so require. *See* RSA § 8; BC Partners Term Sheet, "Exclusivity". The Termination Fee is equal to 3.00% of the Total Financing Amount committed as of immediately prior to the triggering event and is payable solely from, and with recourse solely to, the proceeds of an alternative transaction. *See* RSA §§ 1.01, 15.23. Accordingly, it imposes no cost on the Debtors' estates unless a transaction contemplated by an Alternative Restructuring Proposal is consummated, and then only from the proceeds of that transaction.

18. The only alternative is a wind-down. *See* First Day Declaration, Ex. B ¶ 77. Absent entry of the Order and the Debtors' execution and assumption of the RSA by October 14, 2026, as the Milestones require, BC Partners may terminate the RSA, and the Debtors would lose both the $300 million anchor investment and BC Partners' incremental postpetition financing, jeopardizing the going-concern path that the Debtors and their advisors have spent months developing. *See* RSA §§ 4(d), 13.01(d); Second Robins Declaration ¶ 13.

## Relief Requested

19. By this Motion, the Debtors request entry of the Order: (a) authorizing and directing the Debtors to enter into the A&R RSA pursuant to section 363(b) of the Bankruptcy Code, to assume the RSA pursuant to section 365(a) of the Bankruptcy Code, and to perform their obligations thereunder; (b) approving the Termination Fee and the Expense Reimbursement and, to the extent either becomes payable in accordance with the terms of the RSA, according it the status of an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, not subject to setoff, reduction, avoidance, subordination, or disallowance, and payable solely from, and with recourse solely to, the sources specified in the RSA, and

authorizing and directing the Debtors to pay the Expense Reimbursement in accordance with the RSA; (c) authorizing the Debtors, without further order of the Court, to enter into amendments, modifications, supplements, waivers, and restatements of the RSA, and to accept Joinders and other joinders thereto (including by any Player, any Minority Investor, and PIF), in each case in accordance with the terms of the RSA; (d) modifying the automatic stay to the extent necessary to effectuate the terms of the RSA; and (e) granting related relief.

## <u>Basis for Relief Requested</u>

### I. Entering Into the A&R RSA and Assuming the RSA Is a Sound Exercise of the Debtors' Business Judgment

20. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075-76 (3d Cir. 1992).[5] Section 365 enables a debtor in possession "to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not." *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000). The decision to assume or reject an executory contract is a matter within the "business judgment" of the debtor. *See NLRB v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513, 523 (1984); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39–40 (3d Cir. 1989); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); *Glenstone Lodge, Inc. v. Buckhead Am.*

---

[5] The RSA is an executory contract. As outlined herein, both the Debtors and the Plan Sponsor have material unperformed obligations under the RSA. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 39 (3d Cir. 1989) ("[An executory contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." (citation omitted)).

*Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995). Thus, debtors receive considerable discretion in determining whether to assume or reject an executory contract. *Id.*; *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005).

21. Further, section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

22. The business judgment standard "is not a difficult standard to satisfy." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). Courts ask whether the decision to assume was made "on an informed basis, in good faith, and with the honest belief that assumption . . . [is] in the best interests of [the debtor] and the estate." *In re Network Access Sols. Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-*

*Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Nickels Midway Pier, LLC*, 332 B.R. 262, 271 (Bankr. D.N.J. 2005) (bankruptcy court should defer to a debtor's decision unless it is so unreasonable that it could only be based on bad faith or whim), *aff'd in part, rev'd in part and remanded*, 341 B.R. 486 (D.N.J. 2006), *aff'd*, 255 F. App'x 633 (3d Cir. 2007); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take . . . a business risk if in its sound business judgment, it is worth the risk"); *Computer Sales Int'l v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003).

23. The Debtors' decision to enter into the A&R RSA and assume the RSA satisfies the business judgment standard. *First*, the RSA is the product of an extensive, competitive marketing process that reached more than 300 potential investors and produced the BC Partners Bid as the best and most viable proposal for the Debtors' business, followed by weeks of arm's-length negotiations among sophisticated parties represented by experienced counsel and financial advisors, all under the oversight of the SIC. *See* First Day Declaration ¶¶ 9, 45–50, 59–61; Robins Declaration ¶¶ 11–12; Second Robins Declaration ¶¶ 8–11. *Second*, the RSA is the linchpin of the Debtors' restructuring. It secures the committed support of BC Partners, whose investment will fund LIV 2.0, provides a detailed framework and timeline for confirmation of the Plan, establishes the mechanism through which the Players and Minority Investors will commit to LIV 2.0, and provides for incremental postpetition financing for the costs of the LIV 2.0 transaction. *See generally* RSA; BC Partners Term Sheet; Second Robins Declaration ¶ 12. *Third*, the transaction contemplated by the RSA preserves the League as a going concern, a result that would not be available in a wind-down. *See* Second Robins Declaration ¶ 12. *Fourth*, the

RSA preserves the Debtors' ability to consider and respond to unsolicited alternative proposals and to act according to their fiduciary duties and does not bind the Debtors to pay the Termination Fee in the event of a wind-down (other than any sale, disposition, reorganization, or similar transaction in which the Debtor carries on an active trade or business). *See* RSA §§ 1.01, 15.23. *Fifth*, the consequences of failing to enter into and assume the RSA would be severe: the Plan Sponsor would be entitled to terminate the RSA, the Debtors would lose the anchor investment and the incremental financing on which LIV 2.0 depends, and the Debtors may ultimately be forced to pivot to an orderly wind-down. First Day Declaration, Ex. B ¶ 77; Second Robins Declaration ¶ 13. *Finally*, the consummation of the Restructuring Transactions remains subject to the negotiation and execution of the Definitive Documents, many of which remain subject to Court approval, preserving the rights of parties in interest to object to such Definitive Documents.

24. Section 105(a) of the Bankruptcy Code provides additional authority for the relief requested. Section 105(a) provides that a Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Entry of the Order is an appropriate exercise of the Court's equitable powers because the relief requested is in the best interests of the Debtors and their estates, is consistent with the Bankruptcy Code, and will maximize value for the Debtors' stakeholders. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993) (exercise of section 105(a) power is proper where court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code).

25. Finally, courts in this District and elsewhere routinely authorize debtors to assume restructuring support agreements as a sound exercise of business judgment. *See, e.g.*, *In re Optio*

*Rx, LLC*, No. 24-11188 (TMH) (Bankr. D. Del. June 26, 2024) [Docket No. 95] (authorizing debtors to assume restructuring support agreement and pay related fees and expenses); *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Apr. 6, 2022) [Docket No. 458] (authorizing debtors to assume restructuring support agreement); *In re Am. Eagle Del. Holding Co. LLC*, No. 22-10028 (JKS) (Bankr. D. Del. Feb. 11, 2022) [Docket No. 145] (same); *In re New MACH Gen, LLC*, No. 18-11368 (MFW) (Bankr. D. Del. July 2, 2018) [Docket No. 92] (same); *In re Homer City Generation, L.P.*, No. 17-10086 (MFW) (Bankr. D. Del. Jan. 31, 2017) [Docket No. 122] (same); *In re Key Energy Servs., Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Dec. 1, 2016) [Docket No. 225] (same); *In re Dex Media, Inc.*, No. 16-11200 (KG) (Bankr. D. Del. June 8, 2016) [Docket No. 161] (same); *In re Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del. Mar. 16, 2015) [Docket No. 208] (same); *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014) [Docket No. 215] (finding that debtors' assumption of a plan support agreement was "within their sound business judgment"); *In re Rural/Metro Corp.*, No. 13-11952 (KJC) (Bankr. D. Del. Sept. 5, 2013) [Docket No. 217] (same); *In re Frank Theatres Bayonne/South Cove, LLC*, No. 18-34808 (SLM) (Bankr. D.N.J. Apr. 8, 2019) [Docket No. 408] (authorizing debtors to assume and perform under restructuring support agreement); *In re The Newark Grp., Inc.*, No. 10-27694 (NLW) (Bankr. D.N.J. June 30, 2010) [Docket No. 119] (same).[6]

## II. The Debtors' Agreement to Provide the Termination Fee and Pay the Expense Reimbursement Represents a Sound Exercise of the Debtors' Business Judgment

26. The Debtors' agreement to the Termination Fee and the Expense Reimbursement likewise satisfies the business judgment standard under section 363(b) of the Bankruptcy Code.

---

[6] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

The Termination Fee is a bargained-for and integral component of the RSA, and BC Partners would not have entered into the RSA absent the Debtors' agreement to the Termination Fee. *See* Second Robins Declaration ¶ 14. The Termination Fee provides assurance to all parties in interest that BC Partners will remain committed to the Restructuring Transactions while the Debtors pursue confirmation of the Plan on the timeline established by the Milestones, and it compensates BC Partners for the risk of losing its committed investment opportunity while providing the Debtors' estates with the certainty of a committed and binding transaction. *See id.*

27. The Termination Fee is also reasonable in light of the magnitude of the Restructuring Transactions and the benefit to the estates of a committed plan sponsor. It is equal to 3.00% of the Total Financing Amount committed as of immediately prior to the triggering event and is payable solely from, and with recourse solely to, the proceeds of a transaction contemplated by an Alternative Restructuring Proposal, which excludes any liquidation or conversion of these cases to chapter 7 and any wind-down plan under chapter 11 (other than any sale, disposition, reorganization, or similar transaction in which any Debtor carries on an active trade or business). If no such transaction is consummated, no amount is ever paid. *See* RSA §§ 1.01, 15.23. The RSA preserves the Debtors' ability to consider and respond to unsolicited Alternative Restructuring Proposals. *See id.* § 8. The Debtors and their advisors negotiated the Termination Fee and believe that the Termination Fee set forth in the RSA falls within market for similar fees in similar contexts. *See* Second Robins Declaration ¶ 14. Courts in this Circuit and others have approved similar fees. *See, e.g.*, *Optio Rx*, No. 24-11188 (TMH) (Bankr. D. Del. June 26, 2024) [Docket No. 95] (authorizing debtors to assume restructuring support agreement and to pay all fees and expenses contemplated thereunder); *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Feb. 26, 2024) [Docket No. 1826] (approving a 3.5%

break fee related to a restructuring support agreement for exit commitment); *In re IMPAC Mortgage Holdings, Inc.*, No. 26-10593 (CTG) (Bankr. D. Del. May 20, 2026) [Docket No. 122] (approving a 3% termination/break-up fee in connection with a restructuring support agreement); *In re Premier Int'l Holdings Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. Dec. 18, 2009) [Docket No. 1235] (approving backstop commitment agreement for a $450 million rights offering to fund the debtors' exit from chapter 11, including a 2.5% break-up fee and expense reimbursement). Given the significant economic commitment BC Partners is making, the time and expense it has incurred in the marketing process and the negotiation of the RSA, the time that remains before the Restructuring Transactions can be consummated through the Plan, and the immense benefit that BC Partners' agreement to enter into the RSA provides to the Debtors' estates, agreeing to the Termination Fee is well within the Debtors' sound business judgment. *See* Second Robins Declaration ¶ 14.

28. The Debtors' agreement to pay certain expense reimbursements is likewise a sound exercise of their business judgment. Under the RSA, the Company Parties have agreed to promptly pay in full and in cash, when properly incurred and invoiced, all reasonable and documented prepetition and postpetition fees and expenses of the Plan Sponsor and the Plan Sponsor Advisors related to the Debtors, the Restructuring Transactions, the RSA, the Definitive Documents, and these chapter 11 cases (the "Expense Reimbursement"), and remain obligated to pay all such amounts accrued and unpaid as of any Termination Date. RSA §§ 1.01, 7.01(m). Reimbursement of a plan sponsor's fees and expenses is a customary component of a restructuring support agreement, and here it reflects the diligence, negotiation, and documentation costs that BC Partners has incurred, and will continue to incur, in committing to anchor a $300 million investment in LIV 2.0 and agreeing to fund incremental postpetition

financing for LIV 2.0 costs. *See* Second Robins Declaration ¶ 15. The Expense Reimbursement is structured to avoid any incremental cash burden on the Debtors' estates. The RSA limits any and all obligations to pay the Expense Reimbursement to the amounts provided for such payment under the LIV 2.0 DIP Budget and makes the Expense Reimbursement payable solely from, and with recourse solely to, the proceeds of the debtor-in-possession financing funded by the Plan Sponsor (including through its participation in the PIF DIP Facility), to the extent those proceeds have been funded, remain undisbursed, and are not required for other budgeted amounts. RSA § 7.01(m). The Expense Reimbursement will therefore be funded only from financing that is available to the Debtors because of the RSA, and only to the extent that financing provides for it. Accordingly, agreeing to the Expense Reimbursement is well within the Debtors' sound business judgment. *See* Second Robins Declaration ¶ 15.

## III. The Termination Fee and Expense Reimbursement Also Constitute an Actual and Necessary Cost of Preserving the Debtors' Estates

29. The Termination Fee and the Expense Reimbursement also constitute an "actual, necessary cost[] and expense[] of preserving the estate" under section 503(b)(1)(A) of the Bankruptcy Code. A termination fee and an expense reimbursement preserve the value of the estate where they induce a bid that otherwise would not have been made or assure that a bidder adheres to its bid. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 313–14 (3d Cir. 2018) (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999), and *In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010)). In *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 147–48 (Bankr. D.N.J. 2010), Judge Wizmur described a fee paid to parties who committed to fund a chapter 11 plan as "more akin to an underwriting fee for agreeing to provide funding for the reorganization of the debtors" that "could readily be characterized as 'actual, necessary costs and expenses of preserving the

estate.'" BC Partners would not have entered into the RSA absent the Debtors' agreement to the Termination Fee and the Expense Reimbursement. *See* Second Robins Declaration ¶¶ 14–15. Because the Termination Fee is payable solely from, and with recourse solely to, the proceeds of a transaction contemplated by an Alternative Restructuring Proposal, it imposes no cost on the estates unless the Debtors, in the exercise of their fiduciary duties, consummate such a transaction, and the Debtors remain free to consider and respond to unsolicited proposals. *See* RSA §§ 1.01, 8. Additionally, the Expense Reimbursement is payable solely from, and with recourse solely to, the proceeds of the debtor-in-possession financing funded by the Plan Sponsor, so it does not create any incremental cash burden on the Debtors' estates. See RSA § 7.01(m).

30. Courts have accorded administrative expense status to termination fees and expense reimbursements provided to plan investors and backstop parties. *See, e.g.*, *In re IMPAC Mortgage Holdings, Inc.*, No. 26-10593 (CTG) (Bankr. D. Del. May 20, 2026) [Docket No. 122] (approving a restructuring support agreement and related plan sponsor protections, including an allowed claim under section 503 of the Bankruptcy Code); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Nov. 6, 2020) [Docket No. 1018] (granting super priority administrative claim to the backstop commitment premium in the event the backstop commitment agreement was terminated); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Sept. 11, 2020) [Docket No. 938] (expense reimbursement and break-up fee deemed allowed administrative expense claims); *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. Jan. 19, 2018) [Docket No. 2184] (same); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. Dec. 1, 2017) [Docket No. 1886] (break-up fee, expense reimbursement, and indemnification under backstop agreement deemed

allowed administrative expense claims). The RSA provides that the Termination Fee and the Expense Reimbursement shall constitute allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code. *See* RSA §§ 7.01(m), 15.23. Affording the Termination Fee and the Expense Reimbursement administrative expense status, to the extent either becomes payable in accordance with the RSA, is therefore necessary and appropriate.

## IV. Cause Exists to Modify the Automatic Stay to the Extent Necessary

31. Section 362(a) of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Section 362(d)(1) of the Bankruptcy Code permits a debtor or other party in interest to request modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1). Although the Debtors believe that the automatic stay is not implicated by the relief requested herein, to the extent necessary to permit the Plan Sponsor and the Consenting Stakeholders to exercise their rights and remedies under the RSA in accordance with its terms, including the delivery of any notice and the exercise of any termination right, the Debtors request that the automatic stay be modified for such purpose. For the reasons described herein, the Debtors submit that this relief is appropriate in the context of the assumption of the RSA.

## No Prior Request

32. No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Waiver of Bankruptcy Rules 6004(h) and 6006(d)

33. To implement the foregoing successfully and to the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay of an order authorizing the use, sale, or lease of

property under Bankruptcy Rule 6004(h) and, to the extent applicable, the fourteen-day stay under Bankruptcy Rule 6006(d). As set forth above, the RSA requires that the Court enter the Order, and that the Debtors execute and actually assume the RSA, no later than October 14, 2026. Ample cause therefore exists to justify the requested waivers.

**Notice**

34. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) counsel to the Committee; (c) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (d) counsel to PIF as prepetition lender and DIP lender; (e) counsel to BC Partners; (f) the office of the attorney general for each of the states in which the Debtors operate; (g) the United States Attorney's Office for the District of New Jersey; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the parties on the Master Service List maintained pursuant to the Court's General Order Governing Chapter 11 Complex Case Procedures; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors request that the Court enter the Order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: October 5, 2026

*/s/ Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq.
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg
Matthew J. Williams
Keith R. Martorana
Robert E. Fitzgerald
Tommy Scheffer
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

**Proposed Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| **UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY** | |
| --- | --- |
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Jointly Administered) |

**ORDER (I) AUTHORIZING AND DIRECTING THE DEBTORS TO ENTER INTO, ASSUME, AND PERFORM UNDER THE AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT, (II) APPROVING THE TERMINATION FEE AND THE EXPENSE REIMBURSEMENT, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through nine (9), is **ORDERED.**

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

-and-

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing and Directing the Debtors to Enter Into, Assume, and Perform Under the Amended and Restated Restructuring Support Agreement, (II) Approving the Termination Fee and the Expense Reimbursement, and (III) Granting Related Relief* (the "Motion"),[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing and directing the Debtors to enter into the A&R RSA, to assume the RSA, and to perform their obligations thereunder, (b) approving the Termination Fee and the Expense Reimbursement and, to the extent either becomes payable in accordance with the terms of the RSA, according it the status of an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, not subject to setoff, reduction, avoidance, subordination, recharacterization, or disallowance, and payable solely from, and with recourse solely to, the sources specified in the RSA, (c) authorizing the Debtors to enter into amendments, modifications, supplements, waivers, and restatements of, and to accept joinders to, the RSA without further order of the Court, (d) modifying the automatic stay to the extent necessary to effectuate the terms of the RSA, and (e) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration, the Robins Declaration, and the Second Robins Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the RSA, as applicable.

amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"), if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing, if any, establish just cause for the relief granted herein; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and this Court having found that the RSA is an executory contract within the meaning of section 365 of the Bankruptcy Code; and this Court having found that the Debtors' decision to enter into the A&R RSA and to assume the RSA is a sound exercise of their business judgment, and that the RSA is the product of an extensive prepetition marketing process and of arm's-length, good-faith negotiations between the Debtors, acting under the oversight of the SIC, and BC Partners; and this Court having found that (i) the Termination Fee and the Expense Reimbursement were negotiated at arm's length and in good faith, (ii) BC Partners would not have entered into the RSA without the Termination Fee and the Expense Reimbursement, (iii) the Termination Fee and the Expense Reimbursement are reasonable in amount and structure, and (iv) the Termination Fee and the Expense Reimbursement, to the extent they become payable in accordance with the RSA, constitute actual and necessary costs and expenses of preserving the

Debtors' estates within the meaning of section 503(b)(1)(A) of the Bankruptcy Code; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. Pursuant to sections 105(a), 363(b), and 365(a) of the Bankruptcy Code, the Debtors are authorized and directed to execute, deliver, and enter into the A&R RSA, substantially in the form attached hereto as **Exhibit 1**, and to assume the RSA, as amended and restated by the A&R RSA, and to perform all of their obligations thereunder. Upon the execution and delivery of the A&R RSA by each of the Company Parties and the Plan Sponsor in accordance with its terms, the RSA shall be deemed assumed by each of the Debtors pursuant to section 365(a) of the Bankruptcy Code.

3. The RSA shall be binding and enforceable against the parties thereto, including any party that becomes a party to the RSA by Joinder or amendment, in accordance with its terms. The Debtors, the Plan Sponsor, and each Consenting Stakeholder are granted all rights and remedies provided to them under the RSA, including, without limitation, the right to specifically enforce the RSA in accordance with its terms.

4. The Termination Fee and the Expense Reimbursement are approved. To the extent the Termination Fee or the Expense Reimbursement becomes payable in accordance with the terms of the RSA, any such amounts shall (a) constitute an allowed administrative expense claim against the Debtors' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code; (b) not be subject to setoff, reduction, avoidance, subordination, recharacterization, or

disallowance; (c) be payable by the Debtors in accordance with the terms of the RSA, without further order of the Court; *provided* that the Termination Fee shall be payable solely from, and with recourse solely to, the proceeds of any transaction contemplated by any Alternative Restructuring Proposal, in accordance with Section 15.23 of the RSA; *provided, further*, that the Company Parties' obligation to pay the Expense Reimbursement shall be limited to the amounts provided for payment of such obligations under the LIV 2.0 DIP Budget and shall be payable solely from, and with recourse solely to, the proceeds of the debtor-in-possession financing funded by the Plan Sponsor (including any participation interest in respect of the PIF DIP Facility), to the extent such proceeds have been funded and remain undisbursed and are not required for the payment of any other amounts, accrued or projected, payable from such proceeds under the LIV 2.0 DIP Budget, in accordance with Section 7.01(m) of the RSA. Section 15.23 of the RSA and, solely with respect to the Plan Sponsor Fees and Expenses incurred prior to such termination, Section 7.01(m) of the RSA, shall survive any termination of the RSA and shall be binding upon the Debtors, their estates, their successors and permitted assigns, and, in the event of a conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, any chapter 7 estate and chapter 7 trustee.

5. The failure to describe specifically or include any particular provision of the RSA in the Motion or this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the RSA be assumed by the Debtors in its entirety.

6. The Debtors are authorized, without further order of the Court, to (a) enter into amendments, modifications, supplements, waivers, and restatements of the RSA from time to

time in accordance with the terms and conditions of the RSA, including any amendment or amendment and restatement of the RSA entered into to satisfy the PIF RSA Milestone or the Player RSA Milestone, and (b) accept Joinders and other joinders to the RSA, including by any Player, any Minority Investor, or PIF, in each case with the consent of the Plan Sponsor and otherwise in accordance with the terms of the RSA.

7. To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are modified to effectuate all of the terms and provisions of the RSA and this Order, including permitting the Plan Sponsor to exercise all rights and remedies under the RSA in accordance with its terms, and permitting the Plan Sponsor and each Consenting Stakeholder to deliver any notice contemplated thereunder and to exercise any termination right thereunder in accordance with its terms, in each case without further order of the Court.

8. Nothing in this Order (a) approves or confirms the Plan, any disclosure statement, or any provision thereof, or constitutes a finding of fact or conclusion of law in connection therewith, and the rights of all parties in interest to object to confirmation of the Plan or approval of any disclosure statement are fully reserved; (b) constitutes a solicitation of acceptances or rejections of a chapter 11 plan within the meaning of section 1125 of the Bankruptcy Code; (c) approves any Management Incentive Plan or any other arrangement subject to section 503(c) of the Bankruptcy Code; (d) authorizes the cancellation of any existing equity interests in the Debtors, except pursuant to a confirmed chapter 11 plan; (e) except as expressly set forth in paragraph 4 of this Order with respect to the Termination Fee and the Expense Reimbursement,

allows any Claim against or Interest in any Debtor, or approves the treatment of any Claim or Interest under the Plan, including as set forth in any Stakeholder Term Sheet; or (f) approves the DIP Upsize or any amendment to the PIF DIP Facility, approval of which the Debtors are seeking through the Proposed Final DIP Order.

9. The Debtors' and the Plan Sponsor's entry into and performance under the RSA, and the execution and delivery of any Joinder by any Player or Minority Investor, in each case in accordance with the RSA, shall not constitute a solicitation of votes on a chapter 11 plan in violation of section 1125(b) of the Bankruptcy Code.

10. Nothing in this Order, the Motion, or the RSA shall be deemed or construed as consent by PIF to the Debtors' entry into any transaction contemplated in the DIP Facility or the Restructuring Transactions or PIF's waiver of any rights set forth under the PIF Interim DIP Order, any order approving the PIF DIP Facility on a final basis, the PIF DIP Facility, or the Prepetition Facility (as defined in the PIF Interim DIP Order). All rights of PIF shall be reserved.

11. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

12. Notwithstanding Bankruptcy Rules 6004(a), 6004(h), and 6006(d), or any other Bankruptcy Rule or Local Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be effective and enforceable immediately upon entry hereof.

13. The Debtors are authorized and directed to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

14. This Order shall be binding upon, and inure to the benefit of, the Debtors, their estates, and their respective successors and assigns, including any trustee or estates under chapter 7 of the Bankruptcy Code, and shall survive the dismissal or conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

15. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# **Exhibit 1**

## Amended and Restated Restructuring Support Agreement

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES (AS DEFINED HEREIN) THAT WILL BE EFFECTUATED ON THE TERMS AND CONDITIONS SET FORTH IN THE BC PARTNERS TERM SHEET (AS DEFINED HEREIN). THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

***AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT***

This AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02 and as may be amended, supplemented, or otherwise modified from time to time in accordance with Section 14, this "**Agreement**") is made and entered into as of [•], 2026 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"), and amends and restates the Original RSA (as defined herein) in its entirety:[1]

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1. Capitalized terms otherwise used but not defined herein shall have the meanings ascribed to them in the BC Partners Term Sheet.

i. LIV Golf Investments Ltd. ("**LGIL**"), and each of its subsidiaries and affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Plan Sponsor (the Entities in this clause (i), collectively, the "**Company Parties**");

ii. BC Partners Advisors L.P. (collectively with the funds, accounts or investment vehicles managed or advised by, or managed or advised by affiliates that pursue a credit strategy of, BC Partners Advisors L.P., the "**Plan Sponsor**"); and

iii. each Player and each Minority Investor that has executed and delivered a Joinder to counsel to the Company Parties and counsel to the Plan Sponsor in accordance with Section 2 (the Persons in this clause (iii), collectively, the "**Consenting Stakeholders**").

***RECITALS***

**WHEREAS**, the Company Parties and the Plan Sponsor have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' business and capital structure on the terms set forth in this Agreement and as specified in the investment term sheet attached as **Exhibit B** hereto (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, and including any exhibits and schedules thereto, the "**BC Partners Term Sheet**" and, such transactions as described in this Agreement and the BC Partners Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the Debtors' pending voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, on September 8, 2026, the Company Parties and the Plan Sponsor executed that certain Restructuring Support Agreement (the "**Original RSA**");

**WHEREAS**, the Company Parties and the Plan Sponsor have agreed to amend and restate the Original RSA as of the Execution Date to provide for Players and Minority Investors to become parties to this Agreement as Consenting Stakeholders pursuant to Joinders, on the terms and conditions set forth herein and in the applicable Joinders; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the BC Partners Term Sheet.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## *AGREEMENT*

**Section 1.** ***Definitions and Interpretation.***

1.01. Definitions. The following terms shall have the following definitions:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such individual or entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02 (including the BC Partners Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder that becomes a Party hereto after the Agreement Effective Date, as of the date such Consenting Stakeholder becomes a Party hereto) to the Termination Date applicable to that Party.

"**Allowed**" means a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a final order of the Bankruptcy Court.

"**Alternative Restructuring Engagement Notice**" has the meaning set forth in Section 8.05.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, debt investment, equity investment, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession-financing or exit financing), or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions contemplated in this Agreement. For the avoidance of doubt, the following shall not constitute an Alternative Restructuring Proposal: (a) any liquidation or conversion of any of the Chapter 11 Cases to cases under Chapter 7 (or any actions taken in connection therewith) or (b) any wind-down plan of reorganization under Chapter 11 (or any actions taken in connection therewith); *provided* that, in each case of clause (a) and clause (b), any sale, disposition, reorganization or similar transaction in which any Debtor carries on an active trade or business shall nonetheless constitute an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means (a) the United States Bankruptcy Court for the District of New Jersey or (b) another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**BC Partners Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Management Motion**" means the motion filed by the Debtors with the Bankruptcy Court seeking authority to continue the use of the Debtors' cash management system.

"**Cash Management Order**" means the order of the Bankruptcy Court approving the Cash Management Motion.

"**Chapter 7**" means chapter 7 of the Bankruptcy Code.

"**Chapter 11**" means chapter 11 of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Parties' Advisors**" means (a) Gibson, Dunn & Crutcher LLP, (b) AlixPartners, LLP, (c) Cole Schotz P.C., (d) Ducera Partners LLC, (e) Kobre & Kim LLP (as special counsel to the Special Committee) and (f) any other professionals or advisors retained by the Company Parties.

"**Confidentiality Agreement**" means any confidentiality or non-disclosure agreement between a Company Party on the one hand and the Plan Sponsor or any Consenting Stakeholder on the other.

"**Confirmation Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan.

"**Consenting Minority Investor**" means any Minority Investor that has become a party to this Agreement pursuant to a Joinder on terms and conditions acceptable to the Company Parties and the Plan Sponsor.

"**Consenting Player**" means any Player that has become a party to this Agreement pursuant to a Joinder on terms and conditions acceptable to the Plan Sponsor and the Company Parties.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Claim**" means, together, (a) any Claim on account of indebtedness under the DIP Facility and/or DIP Credit Agreement and (b) any Claim on account of indebtedness under any debtor-in-possession financing facility provided by PIF.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement acceptable to the DIP Lender, by and among certain Company Parties and the DIP Lender setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" means, collectively, the documentation governing the DIP Facility, including the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, budgets, and other security documents, the DIP Orders, the DIP Motion and any amendments, modifications and supplements to any of the foregoing.

"**DIP Facility**" means the debtor-in-possession financing facility provided by the DIP Lender pursuant to the DIP Documents.

"**DIP Lender**" shall mean the Plan Sponsor as the Lender under the DIP Documents.

"**DIP Motion**" means any motion, notice, or other filing with the Bankruptcy Court seeking approval of the DIP Facility.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court, which may be the Confirmation Order, approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code and, to the extent necessary, approving the Solicitation Materials.

"**Eligible Player Claims**" means Player Claims that (i) are held by a Consenting Player and (ii) are held by the Player that originally gave rise to such Player Claim.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Final DIP Order**" means any order, substantially consistent with the Interim DIP Order, entered by the Bankruptcy Court on a final basis approving the DIP Motion.

"**Final NOL Order**" means any order, substantially consistent with the Interim NOL Order, entered by the Bankruptcy Court on a final basis approving the NOL Motion.

"**First Lien Credit Agreement**" means that certain Facility Agreement, dated as of June 4, 2026, entered into between, among others, LIV Golf Holdings Ltd., as borrower, the guarantors party thereto, and PIF as Lender.

"**Foreign Company Party**" means any Company Party incorporated in any jurisdiction other than the United States, any State thereof, or the District of Columbia.

"**Foreign Implementation Process**" has the meaning set forth in Section 3.03.

"**General Unsecured Claims**" means the Claims classified and treated as general unsecured claims (however denominated) under the Plan, other than Allowed Eligible Player Claims.

"**Governing Body**" means, in each case in its capacity as such, a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Company Parties.

"**Interest**" means the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Interim DIP Order**" means any order entered by the Bankruptcy Court on an interim basis approving the DIP Motion.

"**Interim NOL Order**" means any order entered by the Bankruptcy Court on an interim basis approving the NOL Motion.

"**Investor Commitment**" means, with respect to a Consenting Minority Investor, the portion of the Financing that such Consenting Minority Investor has committed to provide in accordance with the BC Partners Term Sheet, as set forth in its Minority Investor Term Sheet.

"**Joinder**" means an executed joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**, providing, among other things, that the Player, Minority Investor or Affiliate thereof executing it agrees to be bound by the terms of this Agreement.

"**Joinder Effective Date**" has the meaning set forth in Section 2.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Majority Consenting Minority Investors**" means Consenting Minority Investors holding not less than 50.1% of all Investor Commitments held by all Consenting Minority Investors.

"**Majority Consenting Players**" means Consenting Players holding not less than 50.1% of all Eligible Player Claims held by all Consenting Players.

"**Management Incentive Plan**" means any management incentive plan adopted by the Reorganized Debtors in connection with the Restructuring Transactions.

"**Milestones**" means the milestones set forth in Section 4.

"**Minority Investor**" means any Person (other than the Plan Sponsor) that is or is to become an "Investor" (as such term is used in the BC Partners Term Sheet) in the Financing.

"**Minority Investor Term Sheet**" means, with respect to a Consenting Minority Investor, the term sheet attached to such Consenting Minority Investor's Joinder setting forth the terms of such Consenting Minority Investor's participation in the Financing (including its Investor Commitment), as agreed upon by such Consenting Minority Investor, the Company Parties, and the Plan Sponsor, and consistent with the BC Partners Term Sheet.

"**New Organizational Documents**" means the bylaws, charters, operating agreements, and other similar constating documents in respect of the Reorganized Debtors.

"**New Player Agreements**" means, with respect to a Consenting Player, to the extent applicable, the amended player participation agreement, the settlement agreement and mutual release, the stockholders', subscription, and team operating agreements governing any equity to be received by such Consenting Player, and any other agreements governing such Consenting Player's participation in LIV 2.0 from and after the Plan Effective Date, in each case as contemplated by, and consistent with, such Consenting Player's Player Term Sheet, and otherwise in form and substance acceptable to such Consenting Player, the Company Parties, and the Plan Sponsor.

"**NOL Motion**" means the motion approving the procedures for trading of equity interests and claims in respect of the Debtors.

"**Original RSA**" has the meaning set forth in the recitals to this Agreement.

"**Participation Agreement**" means that certain Participation Agreement, by and between The Public Investment Fund of the Kingdom of Saudi Arabia, as Seller, and one or more funds, accounts or investment vehicles managed or advised by, or managed or advised by affiliates of, BC Partners Advisors L.P., as Participant.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Actions**" has the meaning set forth in Section 8.02.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**PIF**" means the Public Investment Fund of the Kingdom of Saudi Arabia.

"**PIF Release Consideration**" means, with respect to a Consenting Player, the consideration to be provided by or on behalf of PIF to such Consenting Player in exchange for such Consenting Player's release of the PIF Released Parties.

"**PIF Released Parties**" means PIF and its Affiliates and their respective related parties, as such term is to be defined in the Plan.

"**PIF RSA Milestone**" has the meaning set forth in Section 4(g).

"**Plan**" means the Chapter 11 Plan governing the Restructuring Transactions to be filed by the Debtors.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Plan Sponsor Advisors**" means (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (b) Rimon PC and (c) any other local or special counsel or other professionals retained by the Plan Sponsor who are reasonably necessary to implement the Restructuring Transactions as determined by the Plan Sponsor in consultation with the Company Parties.

"**Plan Sponsor Fees and Expenses**" means all reasonable and documented prepetition and postpetition fees and expenses of the Plan Sponsor and the Plan Sponsor Advisors related to the Debtors, the Restructuring Transactions, this Agreement, the Definitive Documents or the Chapter 11 Cases.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Player**" means those independent contractors who participate in golf events presented by the Company Parties.

"**Player Claims**" means any Claim held by any Player, including any and all PPA Claims.

"**Player RSA Milestone**" has the meaning set forth in Section 4(f).

"**Player Term Sheet**" means, with respect to a Consenting Player, the player term sheet attached to such Consenting Player's Joinder setting forth the terms of such Consenting Player's participation in LIV 2.0 from and after the Plan Effective Date, as agreed upon by such Consenting Player, the Company Parties and the Plan Sponsor. Except as expressly set forth in this Agreement or the New Player Agreements, any consideration or other obligations to the Players contemplated by the Player Term Sheets shall be solely obligations of the Company Parties or the Reorganized Debtors, as applicable, and neither the Plan Sponsor nor any Consenting Minority Investor shall have any liability in respect thereof.

"**PPA Documents**" means the player participation agreement, player license and service agreement, or any other agreement governing the relationship between a Player and/or such Player's Affiliates on the one hand and the Company Parties on the other.

"**PPA Claims**" means any and all Claims or Interests arising out of or related to the PPA Documents.

"**Regulation S**" means Regulation S under the Securities Act.

"**Reorganized Debtors**" means the Company Parties as reorganized pursuant to the Plan.

"**Requisite Players**" means the number of Players holding Eligible Player Claims (solely with respect to clause (ii) of the definition thereof) necessary to ensure the continuation of the Company Parties' business as a bona fide golf league, as determined in the Plan Sponsor's sole discretion.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**RSA Assumption Motion**" means the motion seeking entry of the RSA Assumption Order.

"**RSA Assumption Order**" means an order authorizing and directing the Company Parties to execute, assume and perform their obligations under this Agreement, including payment of the Termination Fee, in each case in accordance with the terms and subject to the conditions hereof.

"**Rules**" means Rule 501(a)(1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act.

"**Second Day Pleadings**" means any "second day" pleadings that the Company Parties determine are necessary or desirable to file; *provided* that retention applications shall not be considered "second day" pleadings.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Solicitation Materials**" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved

by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code, including the Disclosure Statement and Disclosure Statement Order.

"**Special Committee**" means the special committees of the Governing Bodies of LGIL and its subsidiaries.

"**Stakeholder Term Sheet**" means, with respect to a Consenting Player, its Player Term Sheet, and, with respect to a Consenting Minority Investor, its Minority Investor Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.05, 13.06, or 13.07.

"**Termination Fee**" has the meaning set forth in Section 15.23.

"**United States Trustee**" means the Office of the United States Trustee for the district in which the Debtors commence their Chapter 11 Cases.

"**U.S. Tax Code**" means the Internal Revenue Code of 1986, as amended.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e) unless otherwise specified in this Agreement, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act, or deadline is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date;

(f) unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(g) the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(j) all exhibits attached hereto or referred to herein, including the BC Partners Term Sheet, are hereby fully incorporated in and made a part of this Agreement as if set forth in full herein;

(k) the use of "include" or "including" is without limitation, whether stated or not;

(l) the phrase "counsel to the Plan Sponsor" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties or counsel to any Consenting Stakeholder; and

(m) if the Plan Sponsor provides, or has agreed (in its sole discretion) in writing to provide, all or any portion of its debtor-in-possession financing to the Company Parties as a lender under, or a holder of a participation in respect of, the debtor-in-possession financing facility provided by PIF (as such facility may be amended to provide for the Plan Sponsor's participation therein), then solely with respect to such portion of the Plan Sponsor's debtor-in-possession financing, (i) the "DIP Facility" shall mean the Plan Sponsor's loans and commitments under such facility or Plan Sponsor's participation in PIF's loans and commitments under such facility, as applicable, (ii) the "DIP Credit Agreement" and the "DIP Documents" shall mean the documents governing such facility, including any amendments thereto or participation agreement in respect thereof, (iii) the "DIP Motion" shall mean the motion, notice, or other filing seeking approval of the Plan Sponsor's participation in such facility (whether by approval of such amendment or otherwise), (iv)(x) the "Interim DIP Order" shall mean the order approving the Plan Sponsor's initial participation in such facility in an aggregate amount not to exceed $4.0 million or such other amount agreed among the Company Parties, the Plan Sponsor and PIF and (y) the "Final DIP Order" (which may be a supplemental or incremental order approving the debtor-in-possession financing facility provided by PIF) shall mean the order of the Bankruptcy Court approving on a final basis the Plan Sponsor's funding in excess of $4.0 million under such facility, including the initial participation described in clause (x) and any further funding in an aggregate amount agreed among the Company Parties, the Plan Sponsor and PIF, in each case whether or not such motion or orders also approve or otherwise relate to the debtor-in-possession financing facility provided by PIF, (v) "DIP Lender" shall include the Plan Sponsor in its capacity as a holder of participation interest in the debtor-in-possession financing facility provided by PIF, and (vi) the Milestones set forth in Sections 4(c), 4(d), and 4(h), to the extent they relate to the DIP Motion, the Interim DIP Order, or the Final DIP Order,

shall be satisfied by the filing of such motion, notice, or other filing, or the entry of such orders, as applicable.

**Section 2.** ***Effectiveness of this Agreement***. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(b) the Plan Sponsor shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties.

Following the Agreement Effective Date, any Player or Minority Investor may become a party to this Agreement as a Consenting Stakeholder, with the consent of the Company Parties and the Plan Sponsor, by executing and delivering a Joinder to counsel to the Company Parties and counsel to the Plan Sponsor, which Joinder shall be acknowledged and agreed by the Company Parties (which acknowledgment and agreement may be executed by LGIL on behalf of itself and each of the other Company Parties) and the Plan Sponsor. Effective as of the date on which such Joinder has been executed and delivered by such Player or Minority Investor and acknowledged and agreed by the Company Parties and the Plan Sponsor (with respect to such Consenting Stakeholder, the "**Joinder Effective Date**"), such Player or Minority Investor shall become a party to this Agreement and shall be deemed a "Party" and a "Consenting Stakeholder" (and a "Consenting Player" or a "Consenting Minority Investor," as applicable) for all purposes of this Agreement.

**Section 3.** ***Definitive Documents***.

3.01. The Definitive Documents governing the Restructuring Transactions shall include all material documents in respect of the Restructuring Transactions (including but not limited to the following): (a) the Plan and any term sheet in respect thereof; (b) the Confirmation Order; (c) the Disclosure Statement (and the motion seeking approval thereof); (d) the Disclosure Statement Order; (e) the Solicitation Materials; (f) the DIP Documents; (g) the Second Day Pleadings (and all orders sought pursuant thereto); (h) the Plan Supplement; (i) the New Organizational Documents; (j) the NOL Motion; (k) the Interim NOL Order; (l) the Final NOL Order; (m) the RSA Assumption Motion; (n) the RSA Assumption Order; (o) the DIP Motion; (p) the Interim DIP Order; (q) the Final DIP Order; (r) the Cash Management Motion; (s) the Cash Management Order; (t) the Management Incentive Plan; (u) each Stakeholder Term Sheet; (v) each New Player Agreement, and (w) the Participation Agreement.

3.02. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and each other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and the BC Partners Term Sheet, as they may be modified, amended, or supplemented in accordance

with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance acceptable to the Company Parties and the Plan Sponsor. In addition, (a) the provisions of the Definitive Documents providing for the treatment of Eligible Player Claims shall also be in form and substance reasonably acceptable to the Majority Consenting Players and (b) any provisions of the Definitive Documents that (x) relate to the Financing and (y) have a material and disproportionate effect on the Consenting Minority Investors relative to the Plan Sponsor shall be reasonably acceptable to the Majority Consenting Minority Investors.

3.03. The Company Parties shall negotiate in good faith and agree with the Plan Sponsor with respect to a method of implementation of the Restructuring Transactions in jurisdictions outside the United States which is, in the reasonable opinion of the Governing Body of any Foreign Company Party having taken legal advice, compliant with all local laws, including with respect to fiduciary duties, applicable to that Foreign Company Party or its directors and officers, in their respective capacities in such jurisdiction (any such method of implementation, a "**Foreign Implementation Process**").

**Section 4.** ***Milestones.*** The following milestones shall apply to this Agreement unless extended or waived in writing (email being sufficient) by the Plan Sponsor:

(a) [***Reserved***]

(b) [***Reserved***]

(c) no later than October 5, 2026, the Company Parties shall file the RSA Assumption Motion and the DIP Motion;

(d) no later than October 14, 2026, (i) the Bankruptcy Court shall have entered the RSA Assumption Order, (ii) the Debtors shall have executed and actually assumed this Agreement, and (iii) the Bankruptcy Court shall have entered the Interim DIP Order;

(e) no later than 35 days following the Petition Date, the Bankruptcy Court shall have entered the Final NOL Order;

(f) no later than October 25, 2026, the Requisite Players shall have become parties to this Agreement with any amendments to terms and conditions to be acceptable to the Plan Sponsor and the Company Parties in their sole and absolute discretion (the Milestone set forth in this Section 4(f), the "**Player RSA Milestone**");

(g) no later than October 30, 2026, PIF shall have become a party to this Agreement, or shall otherwise have agreed in writing to support the Restructuring Transactions, in each case on terms and conditions acceptable to the Company Parties and the Plan Sponsor in their sole and absolute discretion (which agreements may be embodied in an amendment / amendment and restatement of this Agreement or in an amendment to the documents governing the debtor-in-possession financing facility provided by PIF, and may include any required revisions to the documents related to any debtor-in-possession financing facility provided by PIF, as determined by the Plan Sponsor in its sole discretion) (the Milestone set forth in this Section 4(g), the "**PIF RSA Milestone**");

(h) no later than November 2, 2026, the Bankruptcy Court shall have entered the Final DIP Order, which for the avoidance of doubt shall be (x) a final order approving the Plan Sponsor's funding under PIF's debtor-in-possession financing facility in excess of $4.0 million, including the initial participation and any further funding in an aggregate amount agreed among the Company Parties, the Plan Sponsor and PIF, or (y) a final order approving the DIP Documents, in each case in form and substance acceptable to the Plan Sponsor; and

(i) no later than January 6, 2027, the Plan Effective Date shall have occurred.

**Section 5.** ***Commitments of the Plan Sponsor*****.**

5.01. General Commitments, Forbearances, and Waivers.

(a) During the Agreement Effective Period, the Plan Sponsor agrees, in respect of all of its Company Claims/Interests (where applicable), to:

(i) support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote (to the extent applicable) and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable agents, representatives, employees, or related Persons necessary to give effect to the Restructuring Transactions;

(iv) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(v) provide the applicable investments in accordance with the BC Partners Term Sheet on the Plan Effective Date; and

(vi) fund the DIP Facility pursuant to the DIP Documents, including any agreement pursuant to which the Plan Sponsor agrees to purchase a participation in the debtor-in-possession financing facility provided by PIF, or as otherwise agreed among the Company Parties, the Plan Sponsor and PIF.

(b) During the Agreement Effective Period, the Plan Sponsor agrees, in respect of all of its Company Claims/Interests (where applicable), that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv) initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v) exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in the Company Parties, in each case, except as contemplated by and in accordance with this Agreement, the Definitive Documents, or as otherwise agreed in writing to be necessary to the implementation of the Restructuring Transactions by the Company Parties and the Plan Sponsor;

(vi) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii) object to the approval of retention applications of the Company Parties' Advisors or otherwise seek to hinder the Company Parties' payment of the reasonable and documented fees and expenses of the Company Parties' Advisors.

5.02. Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, the Plan Sponsor agrees that it shall, subject to receipt by the Plan Sponsor, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i) vote each of its Company Claims/Interests to accept the Plan, provided that such Plan is in form and substance acceptable to the Plan Sponsor, by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases, or, to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to opt in to the releases, in each case by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above, other than in connection with the termination of this Agreement as to the Plan Sponsor pursuant to Section 13.

(b) During the Agreement Effective Period, the Plan Sponsor, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c) The Plan Sponsor shall take, or refrain from taking, as applicable, analogous actions in respect of its Claims and Interests as set forth in Sections 5.01(a) and 5.01(b) in any applicable Foreign Implementation Process.

**Section 6.** ***Additional Provisions Regarding the Plan Sponsor's Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of the Plan Sponsor to consult with the Company Parties or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of the Plan Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent the Plan Sponsor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of the Plan Sponsor to appear and be heard in the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with the Plan Sponsor's obligations hereunder; (e) constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under the First Lien Credit Agreement; (f) require the Plan Sponsor to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to the Plan Sponsor except as provided for in this Agreement and the DIP Documents; (g) prevent the Plan Sponsor from taking any action that is required to comply with applicable Law; (h) prohibit the Plan Sponsor from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (i) obligate the Plan Sponsor to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit the Plan Sponsor from withdrawing such vote, in each case, from and after the termination of this Agreement as to the Plan Sponsor on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); *provided* that upon the withdrawal of any such vote after the termination of this Agreement as to the Plan Sponsor on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and the Plan Sponsor shall have the opportunity to change its vote; or (j) require the Plan Sponsor to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege.

**Section 7. *Commitments of the Company Parties.***

7.01. Affirmative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a) support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with the terms, conditions and applicable deadlines set forth in this Agreement;

(b) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary to address any such impediment;

(c) use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d) negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e) use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders, including as to PIF and the Requisite Players by the applicable Milestones;

(f) cooperate in good faith and coordinate with the Plan Sponsor to structure and implement the Restructuring Transactions in a tax-efficient manner;

(g) except as otherwise expressly set forth in this Agreement and as otherwise contemplated by the Chapter 11 Cases and the budget or disbursement schedule in effect from time to time under the DIP Documents, operate their businesses and operations in the ordinary course in a manner that is consistent with this Agreement, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, customers, and governmental and regulatory authorities and employees), except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases;

(h) promptly inform the Plan Sponsor in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within one (1) Business Day after becoming so aware) of: (i) any event or circumstance that has occurred that would permit any Party to terminate or that would result in the termination of, this Agreement; (ii) any matter or circumstance that is a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) the threat or commencement of any insolvency proceeding, material lawsuit, investigation, hearing, or enforcement action from or by any person or entity in respect of any Company Party; or (iv) a breach of this Agreement by any Party;

(i) to the extent applicable, oppose and, if necessary, timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those

set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under Chapter 7; or (iii) dismissing the Chapter 11 Cases;

(j) to the extent applicable, oppose and, if necessary, timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances for a plan of reorganization, as applicable;

(k) actively and timely oppose and object to the efforts of any person seeking in any manner to (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the Debtors' timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(l) provide reasonably timely responses to all reasonable diligence requests sent to the Company Parties by and through the Plan Sponsor and the Plan Sponsor Advisors on a continuing and rolling basis during the Agreement Effective Period;

(m) from the Agreement Effective Date through and including the Plan Effective Date, as applicable, promptly pay in full and in cash all Plan Sponsor Fees and Expenses when properly incurred and invoiced, including those incurred prior to the Agreement Effective Date, and continue to pay such amounts as they come due; *provided* that: (i) all accrued and unpaid Plan Sponsor Fees and Expenses as of the Plan Effective Date, as applicable, including any reasonable estimate of such Plan Sponsor Fees and Expenses to be provided to the Company Parties two (2) Business Days prior to the Plan Effective Date, shall be paid by the Company Parties on the Plan Effective Date, as applicable, *provided* that, for the avoidance of doubt, the Company Parties' obligations to pay such Plan Sponsor Fees and Expenses shall not be limited to the amount provided in any such estimate or conditioned upon the provision of such estimate; (ii) in the event a Termination Date (as defined herein) occurs, the Company Parties shall remain obligated to pay all Plan Sponsor Fees and Expenses accrued and unpaid as of and up to such Termination Date; and (iii) any and all obligations to pay any Plan Sponsor Fees and Expenses hereunder, under the BC Partners Term Sheet, and under the Definitive Documents shall be limited to the amounts provided for payment of such obligations under the LIV 2.0 DIP Budget (as defined in the BC Partners Term Sheet or, as applicable, the Participation Agreement, in each case as in effect from time to time under the DIP Documents) and payable solely from, and with recourse solely to, the proceeds of the BC DIP Funding Amount (as defined in the BC Partners Term Sheet) (including any participation interest in respect of the debtor-in-possession financing facility provided by PIF), and the Plan Sponsor shall have no claim against the Company Parties or their estates in respect of the Plan Sponsor Fees and Expenses, whether as an administrative expense, a general unsecured claim, or otherwise, except as set forth in this Section 7.01(m); *provided*, *further*, that the Plan Sponsor Fees and Expenses will (w) constitute allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable solely from, and with recourse solely to, the proceeds of the BC DIP Funding Amount (including any participation interest in respect of the debtor-in-possession financing facility provided by PIF), to the extent such proceeds have been funded and remain undisbursed and are not required for the payment of any other amounts, accrued or projected, payable from such proceeds under

the LIV 2.0 DIP Budget (as so defined) in effect from time to time under the DIP Documents, (x) not be subject to setoff, reduction, avoidance, subordination or disallowance, and (y) survive termination of this Agreement (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination); and

(n) to the extent applicable, take, or refrain from taking, as applicable, analogous actions as set forth in Sections 7.01(a) through 7.01(m) in any applicable Foreign Implementation Process.

7.02. Negative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) (i) execute, deliver, and/or file with the Bankruptcy Court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that, in whole or in part, is materially inconsistent with this Agreement, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is materially inconsistent with this Agreement (including the BC Partners Term Sheet);

(b) solicit, participate in, negotiate, propose, support, vote for, consummate, enter into a binding agreement to consummate, or take any other action to consummate any Alternative Restructuring Proposal prior to the consummation of the Restructuring Transactions, except as permitted by Section 8;

(c) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(d) take any action (including the filing of any motion, pleading, document or other filing, or making any amendment, modification or other change to any Definitive Document) that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(e) seek to enter into, amend, modify, or file the Definitive Documents, in whole or part, in a manner that is not consistent with this Agreement in all material respects;

(f) amend or change, or propose to amend or change, any of their respective existing organizational documents without the prior written consent of the Plan Sponsor;

(g) (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, or make or declare any distribution on any Interest, in each case without the prior written consent of the Plan Sponsor;

(h) sell any assets (including, without limitation, any intellectual property) in a transaction or a series of transactions outside of the ordinary course of business without the prior written consent of the Plan Sponsor;

(i) except in the ordinary course of business and consistent with past practice, terminate or release (i) any obligors or guarantors of their obligations under the First Lien Credit Agreement or (ii) any of the liens on, security interests in, or guarantees of any of the assets of the Company Parties that secure the obligations under the First Lien Credit Agreement, in each case without the prior written consent of the Plan Sponsor;

(j) except in accordance with the Restructuring Transactions or in the ordinary course of business and consistent with past practice, incur any indebtedness or guarantee any indebtedness of another entity without the prior written consent of the Plan Sponsor;

(k) pledge, encumber, assign, sell or otherwise transfer, offer or contract to pledge, encumber, assign, sell or otherwise transfer, in whole or in part, any portion of its right, title or interest in any Interests in any other Company Party, whether held directly or indirectly, to the extent such pledge, encumbrance, assignment, sale or other transaction could reasonably be expected to impair any of the Company Parties' tax attributes; or

(l) to the extent applicable, take any analogous actions as set forth in Sections 7.02(a) through 7.02(k) in any applicable Foreign Implementation Process.

Nothing in this Section 7 shall limit or prohibit in any way the Company Parties from entering into any negotiations, entering into any documentation, or taking any action necessary or appropriate to satisfy the PIF RSA Milestone or the Player RSA Milestone, in each case (a) in consultation with the Plan Sponsor and (b) either (x) to the extent not inconsistent with this Agreement or (y) with the consent of the Plan Sponsor.

**Section 8.** ***Additional Provisions Regarding Company Parties' Commitments***.

8.01. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar Governing Body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement. This Section 8.01 shall not impede the Plan Sponsor's right to terminate this Agreement pursuant to Section 13.

8.02. Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider and respond to (but not solicit or otherwise facilitate) Alternative Restructuring Proposals; (b) otherwise cooperate with, assist, or participate in (but not solicit or otherwise facilitate) any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (c) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including the Plan Sponsor), any

other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions (the items set forth in this Section 8.02, the "**Permitted Actions**").

8.03. The Company Parties shall (x) provide counsel to the Plan Sponsor, on a professionals-eyes-only basis, a copy of any written Alternative Restructuring Proposal (and notice and a description of any oral Alternative Restructuring Proposal) within one (1) Business Day of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal and (y) promptly provide such information to the Plan Sponsor's counsel regarding such discussions or any actions or inaction pursuant to Section 8.02 (including copies of any materials provided to or provided by the Company Parties with respect to the applicable Alternative Restructuring Proposal) as necessary to keep counsel to the Plan Sponsor reasonably contemporaneously informed as to the status and substance of the foregoing.

8.04. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.05. In the event that, whether as a result of any Permitted Action or otherwise, any Company Party has determined to pursue any Alternative Restructuring Proposal, the Company Parties shall provide notice of such determination (such notice, an "**Alternative Restructuring Engagement Notice**") within two (2) Business Days after such determination to the counsel to Plan Sponsor.

**Section 9.** ***Transfer of Claims and Interests***.

9.01. During the Agreement Effective Period, the Plan Sponsor shall not transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) in any Company Claims/Interests to any affiliated or unaffiliated party, except as provided in the DIP Documents and/or DIP Orders. The Plan Sponsor shall not take, or omit to take, or cause or permit any other person to take or omit to take, any action that would, or could reasonably be expected to, result in the reduction, limitation, impairment, forfeiture or other adverse effect on the availability or utilization of any tax attributes of LGIL or any of its subsidiaries, including net operating losses, tax credits, capital loss carryforwards, tax basis and other tax attributes, under the U.S. Tax Code, including Sections 108, 382 and 383 thereof, or any other applicable tax law whether in the United States or any other country, or take any action that would reasonably be expected to impair the ability for the Restructuring Transactions to meet the requirements of Section 382(l)(5) of the U.S. Tax Code.

9.02. During the Agreement Effective Period, no Consenting Stakeholder shall (a) transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Company Claims/Interests, including any Player Claims, to any affiliated or unaffiliated party or (b) acquire any Player Claims from any Player. No Consenting Stakeholder shall take, or omit to take, or cause or permit any other person to take or omit to

take, any action that would, or could reasonably be expected to, result in the reduction, limitation, impairment, forfeiture or other adverse effect on the availability or utilization of any tax attributes of LGIL or any of its subsidiaries, including net operating losses, tax credits, capital loss carryforwards, tax basis and other tax attributes, under the U.S. Tax Code, including Sections 108, 382 and 383 thereof, or any other applicable tax law whether in the United States or any other country, or take any action that would reasonably be expected to impair the ability for the Restructuring Transactions to meet the requirements of Section 382(l)(5) of the U.S. Tax Code. Any purported transfer in violation of this Section 9.02 shall be void *ab initio*. Without limiting the foregoing, no Consenting Stakeholder shall surrender, abandon, or forfeit any Interest in any Company Party prior to the Plan Effective Date, or claim, report, or otherwise take a position on any tax return or in any tax proceeding that any such Interest is worthless or has been abandoned, or claim any loss or deduction in respect thereof, for any tax year ending on or before the Plan Effective Date. Each Consenting Stakeholder shall provide such information and execute such certificates and other documentation as the Company Parties, the Plan Sponsor, or KPMG (or such other mutually acceptable tax advisor) may reasonably request in connection with the Section 382(l)(5) analysis.

**Section 10.** ***Consenting Stakeholders***.

10.01. Joinders.

(a) The rights and obligations of a Consenting Stakeholder in respect of this Agreement and the Restructuring Transactions are those set forth in (x) its Joinder (including its Stakeholder Term Sheet) and (y) those provisions of this Agreement that by their terms apply to the Parties generally or to the Consenting Stakeholders, the Consenting Players, or the Consenting Minority Investors, as applicable.

(b) Each Stakeholder Term Sheet is incorporated in and made a part of this Agreement as if set forth in full herein and, from and after the Joinder Effective Date of the Consenting Stakeholder party thereto, shall be binding on such Consenting Stakeholder, the Company Parties, and the Plan Sponsor in accordance with its terms.

(c) Each Consenting Stakeholder shall cause each of its Affiliates that holds any Company Claims/Interests to execute a counterpart signature to such Consenting Stakeholder's Joinder and to comply with this Agreement as if such Affiliate were such Consenting Stakeholder, and the Company Claims/Interests of each such Affiliate shall be deemed to be Company Claims/Interests of such Consenting Stakeholder for all purposes of this Agreement.

(d) The amounts of Company Claims/Interests set forth on a Consenting Stakeholder's signature page to its Joinder are such Consenting Stakeholder's asserted amounts and are subject to allowance. Unless the Company Parties or the Plan Sponsor notifies such Consenting Stakeholder in writing, prior to the later of (x) October 28, 2026 and (y) the date that is ten (10) Business Days after delivery of a Joinder from a Consenting Stakeholder, that they dispute the allowance or amount of any such Claims, the Company Parties and the Plan Sponsor shall be deemed to stipulate to the allowance and amount of all Claims set forth on such Consenting Stakeholder's signature page to its Joinder. Nothing herein shall alter or amend any limitations on stipulations and releases set forth in the DIP Orders.

10.02. General Commitments, Forbearances, and Waivers.

(a) During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests (where applicable), to:

(i) support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

(ii) use commercially reasonable efforts to (A) oppose any party or Person taking any actions contemplated in Section 10.02(b) and (B) in the case of each Consenting Player, cooperate with and assist the Company Parties and the Plan Sponsor in obtaining additional support for the Restructuring Transactions from other Players and from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to give any notice, order, instruction, or direction to any applicable agents, representatives, employees, or related Persons necessary to give effect to the Restructuring Transactions;

(iv) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(v) in the case of each Consenting Player, negotiate in good faith and, on or prior to the Plan Effective Date, execute and deliver its New Player Agreements (subject, in the case of any release of the PIF Released Parties, to Section 10.06);

(vi) in the case of each Consenting Player, participate in LIV 2.0 from and after the Plan Effective Date in accordance with its Player Term Sheet and its New Player Agreements;

(vii) in the case of each Consenting Minority Investor, provide its Investor Commitment in accordance with its Minority Investor Term Sheet and the BC Partners Term Sheet on the Plan Effective Date; and

(viii) support, and not object to, delay, impede or take any other action to interfere with, (A) the DIP Motion, the DIP Facility and the DIP Orders, (B) the RSA Assumption Motion and the RSA Assumption Order (including approval of the Termination Fee), (C) the NOL Motion, the Interim NOL Order and the Final NOL Order, (D) the Cash Management Motion and the Cash Management Order or (E) any other Definitive Documents that are materially consistent with this Agreement and such Consenting Stakeholder's Stakeholder Term Sheet.

(b) During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests (where applicable), that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) (A) propose, file, solicit, support, or vote for any Alternative Restructuring Proposal or, (B) in the case of a Consenting Player, participate in any negotiations, discussions, or conversations with any other golf league or other organization that would prohibit or limit such Consenting Player from fulfilling its obligations under its Player Term Sheet, or encourage or assist any other Person (including any other Player) in doing so;

(iii) file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv) initiate, or have initiated on its behalf, any litigation, arbitration, or proceeding of any kind with respect to the Chapter 11 Cases, the Player Claims, the PPA Documents, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v) exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in the Company Parties (including terminating or purporting to terminate any PPA Document), in each case, except as contemplated by and in accordance with this Agreement, the Definitive Documents, or as otherwise agreed in writing to be necessary to the implementation of the Restructuring Transactions by the Company Parties and the Plan Sponsor;

(vi) object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vii) object to the approval of retention applications of the Company Parties' Advisors or otherwise seek to hinder the Company Parties' payment of the reasonable and documented fees and expenses of the Company Parties' Advisors or the Plan Sponsor Advisors.

10.03. <u>Commitments with Respect to the Chapter 11 Cases</u>.

(a) During the Agreement Effective Period, each Consenting Stakeholder, to the extent it is entitled to vote to accept or reject the Plan (pursuant to its terms), agrees that it shall, subject to its receipt of the Solicitation Materials:

(i) vote each of its Company Claims/Interests to accept the Plan, provided that the Plan is consistent in all material respects with this Agreement and its Stakeholder Term Sheet as the Plan applies to the treatment or obligations of such Consenting Stakeholder, by delivering its duly executed and completed ballot accepting the Plan on a timely basis following

the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases, or, to the extent it is permitted to elect whether to opt in to the releases set forth in the Plan, elect to opt in to the releases, in each case by timely delivering its duly executed and completed ballot(s) indicating such election; *provided* that, in the case of a Consenting Player, with respect to the releases of the PIF Released Parties, the foregoing shall apply only if the Plan provides for the payment to such Consenting Player of PIF Release Consideration in the amount required by Section 10.06(b); and

(iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above, other than in connection with the termination of this Agreement as to such Consenting Stakeholder pursuant to Section 13.

(b) During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

(c) Each Consenting Stakeholder shall take, or refrain from taking, as applicable, analogous actions in respect of its Company Claims/Interests as set forth in Sections 10.02(a) and 10.02(b) in any applicable Foreign Implementation Process.

10.04. Confidentiality; Publicity. Each Consenting Stakeholder shall keep the terms of its Joinder (including its Stakeholder Term Sheet and its signature page) confidential (and, if such Consenting Stakeholder is party to a Confidentiality Agreement with the Company Parties, in accordance therewith), except (A) as required by applicable Law or by order of the Bankruptcy Court and (B) to such Consenting Stakeholder's bona fide advisors who have been informed of, and have agreed to be bound by, the confidentiality obligations set forth herein. No Consenting Stakeholder shall issue any press release or make any public statement regarding this Agreement, its Joinder, or the Restructuring Transactions without the prior written consent (email being sufficient) of the Company Parties and the Plan Sponsor.

10.05. Additional Provisions Regarding the Consenting Stakeholders' Commitments. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Plan Sponsor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement, enforcing any right in its capacity as a holder of a participation in respect of the debtor-in-possession financing facility provided by PIF, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit the rights of any Consenting Stakeholder to appear and be heard in the

Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting Stakeholder's obligations hereunder; (e) require any Consenting Stakeholder to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder except as provided for in this Agreement; (f) prevent any Consenting Stakeholder from taking any action that is required to comply with applicable Law; (g) prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (h) obligate any Consenting Stakeholder to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit any Consenting Stakeholder from withdrawing such vote, in each case, from and after the termination of this Agreement as to such Consenting Stakeholder on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); *provided* that, upon the withdrawal of any such vote after the termination of this Agreement as to such Consenting Stakeholder on the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed void *ab initio* and such Consenting Stakeholder shall have the opportunity to change its vote; or (i) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege.

10.06. <u>PIF Release; Release Consideration</u>.

(a) In exchange for the PIF Release Consideration, and subject to Section 10.06(b), each Consenting Player agrees that it shall (i) support, and shall not object to, the inclusion in the Plan of release, injunction, and exculpation provisions in favor of the PIF Released Parties consistent with its Player Term Sheet; (ii) make the elections in respect of such releases required by Section 10.03(a)(ii); and (iii) on the Plan Effective Date, execute and deliver such release of the PIF Released Parties as is contemplated by the Plan and its Player Term Sheet.

(b) Each Consenting Player's obligations under Section 10.06(a) are conditioned upon (i) the Plan providing for, and (ii) such Consenting Player receiving on the Plan Effective Date (or such later date contemplated by the Plan), PIF Release Consideration in a proportional amount, after giving effect to any cash consideration received by such Consenting Player under the Plan (*provided*, for the avoidance of doubt, that the Plan Sponsor shall not be obligated to fund any such cash consideration), not less than the proportional amount of cash consideration provided to holders of General Unsecured Claims (excluding, for the avoidance of doubt, Allowed Eligible Player Claims, but including Player Claims held by non-Consenting Players) under the Plan or via separate payment from PIF (or any of its Affiliates and their respective related parties) to the holder of a Player Claim held by a non-Consenting Player (or any of its Affiliates and their respective related parties); *provided* that (x) this Section 10.06(b) may be waived as to any Consenting Player in such Consenting Player's sole discretion and (y) to the extent the conditions set forth in this Section 10.06(b) are not satisfied or waived as to any Consenting Player, such Consenting Player's sole and exclusive remedy hereunder shall be termination of this Agreement as to such Consenting Player pursuant to Section 13.02(h).

(c) The Company Parties shall not file, or seek confirmation of, a Plan that provides for a release of the PIF Released Parties by a Consenting Player unless such Plan also provides for the payment to such Consenting Player of PIF Release Consideration in an amount not less than the amount required by Section 10.06(b). The Company Parties shall use commercially reasonable efforts to cause the Definitive Documents to which PIF is a party to provide for the PIF Release Consideration in accordance with this Section 10.06. The Company Parties shall provide PIF and the Plan Sponsor with notice of the asserted and Allowed amounts of the Player Claims held by each Consenting Player, and shall consult in good faith with PIF and the Plan Sponsor regarding such amounts.

(d) The PIF Release Consideration shall be (i) funded and paid by or on behalf of PIF and not from property of the Debtors' estates, the Reorganized Debtors or the Plan Sponsor, (ii) provided solely in consideration of the release of the PIF Released Parties and not on account of, in satisfaction of, or in exchange for any Player Claim, and shall not constitute a distribution on account of any Player Claim or property of the Debtors' estates for any purpose, (iii) measured by reference to the amount described in Section 10.06(b)(ii) solely as a measure of amount, and (iv) in addition to, and not in lieu of, the treatment of the applicable Consenting Player's Player Claims under the Plan and shall not be subject to setoff, recoupment, reduction, avoidance, subordination, or disallowance.

10.07. Representations and Warranties of the Consenting Stakeholders.

(a) Each Consenting Stakeholder, severally and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers its Joinder and as of the Plan Effective Date:

(i) it (or its Affiliate(s) party to such Joinder) is the beneficial or record owner, whether held directly or indirectly, of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for holders of the Company Claims/Interests (held directly or indirectly) reflected in, and, having made reasonable inquiry, neither it nor any of its Affiliates are the beneficial or record owner of any Company Claims/Interests other than those reflected in, its signature page to its Joinder;

(ii) in the case of a Consenting Player, it is the Player that originally gave rise to the Eligible Player Claims reflected in its signature page to its Joinder, and no such Eligible Player Claim has been transferred, assigned, pledged, sold, or otherwise disposed of, in whole or in part, to any other Person;

(iii) it has the full power and authority to act on behalf of, vote and consent to (or the power to direct those actions) matters concerning, such Company Claims/Interests;

(iv) such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(v) it has the full power to vote, approve changes to, and transfer (or the power to direct those actions) all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(vi) except as disclosed in writing to the Company Parties and the Plan Sponsor prior to its Joinder Effective Date, it is not a party to any other agreement, arrangement, or understanding with any Person (including PIF, any other Player, any team, or any prospective investor) with respect to the treatment, settlement, compromise, transfer, or alteration of any Player Claim, or with respect to any Alternative Restructuring Proposal;

(vii) in the case of a Consenting Player, it is not a party to, and has not entered into, any agreement, arrangement, or understanding with any other golf league or similar organization (or any Person acting on behalf of any of the foregoing) that would prohibit, limit or be inconsistent with its obligations under this Agreement, the Player Term Sheet or the New Player Agreements; and

(viii) in the case of a Consenting Player, to the extent it receives any securities pursuant to the Plan or the New Player Agreements other than in a transaction exempt from registration under section 1145 of the Bankruptcy Code, it is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act and is acquiring such securities for its own account and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act.

(b) If a Consenting Stakeholder is a natural person, the representation in Section 12(a) as to valid existence and good standing shall instead be a representation that such Consenting Stakeholder has full legal capacity to enter into and perform this Agreement.

(c) Each Consenting Minority Investor, severally and not jointly, represents and warrants that, as of the date such Consenting Minority Investor executes and delivers its Joinder and as of the Plan Effective Date, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S) (and if such holder is a resident in a member state of the EEA (European Economic Area) or in the United Kingdom, they are not a retail investor), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by such Consenting Minority Investor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

10.08. Acknowledgments of the Company Parties and the Plan Sponsor.

(a) By acknowledging and agreeing to a Joinder executed by a Player, the Plan Sponsor acknowledges and agrees that the terms and conditions of such Joinder (including the Player Term Sheet attached thereto) are acceptable to the Plan Sponsor for purposes of Section 4(f) and the definition of "Consenting Player." By acknowledging and agreeing to a Joinder executed by a Minority Investor, each of the Company Parties and the Plan Sponsor acknowledges and agrees that such Minority Investor is acceptable to it as an "Investor" for purposes of the BC Partners Term Sheet and that the terms and conditions of such Joinder

(including the Minority Investor Term Sheet attached thereto) are acceptable to it for purposes of the definition of "Consenting Minority Investor."

(b) The Company Parties and the Plan Sponsor acknowledge and agree that each Joinder constitutes a supplement to this Agreement for purposes of Section 14(b) and that, notwithstanding Section 15.02, in the event of any inconsistency between this Agreement and a Consenting Stakeholder's Joinder (including its Stakeholder Term Sheet) with respect to the rights or obligations of such Consenting Stakeholder, such Joinder shall govern.

(c) Subject to Section 8.01, each of the Company Parties and, solely to the extent within its control and consistent with its consent and approval rights under this Agreement, the Plan Sponsor, agrees that it shall not propose, file, support, or seek confirmation of a Plan that does not provide for the treatment of each Consenting Player's Player Claims set forth in its Player Term Sheet or for the participation of each Consenting Minority Investor in the Financing set forth in its Minority Investor Term Sheet; provided that nothing in this Section 10.08(c) shall limit or restrict the Player Equity Adjustment or any other adjustment contemplated by the BC Partners Term Sheet or reasonably necessary to cause the Restructuring Transactions to qualify under Section 382(l)(5) of the U.S. Tax Code.

**Section 11.** ***Representations and Warranties of Company Parties***. Each Company Party represents and warrants that, as of the date such Company Party executes and delivers this Agreement:

(a) to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of it or any other Company Party or affiliate or subsidiary of any Company Party, and no analogous procedure has been commenced in any jurisdiction; *provided* that this representation shall not apply to any statutory demands presented by any creditor of the Company Parties;

(b) except as expressly provided for in this Agreement, it has not entered into any arrangement regarding the treatment, settlement, compromise, or alteration of any Company Claims/Interests (including with any individual creditor thereunder) on terms that are not reflected in the BC Partners Term Sheet; and

(c) notwithstanding its entry into this Agreement, each of the security interests securing the Claims of the Plan Sponsor, as applicable, remains legal, valid, binding, and enforceable and in full force and effect as of the Agreement Effective Date.

**Section 12.** ***Mutual Representations, Warranties, and Covenants***. Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement or a Joinder, as applicable, and as of the Plan Effective Date:

(a) it is validly existing and in good standing under the Laws of the state or jurisdiction of its organization (to the extent such concept is applicable in the relevant state or jurisdiction), and this Agreement is a legal, valid, and binding obligation of such Party,

enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c) the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d) except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e) except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements (related to the Company Parties and the Company Claims/Interests) with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f) except as expressly provided by this Agreement, it is not party to any agreement restricting its ability to purchase or sell any Company Claims/Interests.

**Section 13.** ***Termination Events***.

13.01. Plan Sponsor Termination Events. This Agreement may be terminated by the Plan Sponsor (as to all Parties, except as otherwise provided in Section 13.01(y)) by the delivery to the Company Parties and each Consenting Stakeholder (or, in the case of Section 13.01(y), to the Company Parties and the applicable Consenting Stakeholder only) of a written notice in accordance with Section 15.10 upon the occurrence of any of the following events and, except in respect of Sections 13.01(d) and 13.01(v), the continuation of such events for greater than three (3) Business Days (unless such other cure period is included in this Section 13):

(a) the breach in any material respect by a Company Party or the Majority Consenting Players of any of the representations, warranties, or covenants of such Company Parties or Consenting Players, as applicable, set forth in this Agreement that (i) is adverse to the Plan Sponsor and (ii) remains uncured for three (3) Business Days after the Plan Sponsor transmits a written notice in accordance with Section 15.10 to the breaching Party or Parties detailing any such breach;

(b) any Company Party (i) publicly announces, or announces in writing, to the Plan Sponsor or other holders of Company Claims/Interests (including but not limited to Section 8) its intention not to support or pursue the Restructuring Transactions, (ii) delivers (or is required to deliver) an Alternative Restructuring Engagement Notice, or (iii) breaches any of the covenants,

agreements, or obligations herein in respect of an Alternative Restructuring Engagement Notice or Alternative Restructuring Proposal;

(c) subject to Section 15.23, the board of directors, board of managers, or such similar Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d) the failure to meet a Milestone, which has not been waived or extended by the Plan Sponsor in a manner consistent with this Agreement, unless such failure is the result of (i) the unavailability of the Bankruptcy Court, or (ii) a material breach by the Plan Sponsor of its obligations under this Agreement;

(e) (i) a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, character, or priority of, or seeking avoidance or subordination of any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest; *provided* that this termination right does not apply to the Company Parties' efforts to comply with, or reply to, any validly served discovery requests, court order, or applicable Law, or (ii) entry of an order by any court (including the Bankruptcy Court) sustaining any such challenge;

(f) any Company Party files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement and such motion or pleading has not been withdrawn within three (3) Business Days of receipt by the Company Parties of written notice from the party that such motion or pleading is inconsistent with this Agreement;

(g) the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset of the Company Parties and such order materially and adversely affects any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(h) (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, or reconsidered, or (ii) any provision of the DIP Orders the modification or amendment of which requires the consent of the Plan Sponsor under the DIP Documents (including any participation agreement in respect of the debtor-in-possession financing facility provided by PIF) is modified or amended without the consent of the Plan Sponsor;

(i) any Definitive Document is amended, waived, or modified in any manner that is materially inconsistent with the terms of this Agreement and without the consent of the Plan Sponsor;

(j) occurrence of any "Event of Default" under (and as defined in) the DIP Orders or the DIP Documents that has not been cured (if susceptible to cure) or waived in accordance with the applicable DIP Document or the Company Parties fail to provide any adequate protection provided to the existing creditors under the DIP Orders;

(k) a Company Party files a motion or application seeking an order vacating the DIP Orders, or modifying or amending any provision of the DIP Orders described in Section 13.01(h)(ii), in each case without the prior consent of the Plan Sponsor;

(l) the Bankruptcy Court enters any order authorizing the use of postpetition financing or cash or other collateral that is not in the form of the DIP Orders or otherwise acceptable to the Plan Sponsor except for any debtor-in-possession financing facility provided by PIF;

(m) any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Plan Sponsor, except as set forth in the BC Partners Term Sheet;

(n) the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest;

(o) without the prior written consent of the Plan Sponsor, a Company Party pays or grants adequate protection that is senior to or *pari passu* with any DIP Claims held by the Plan Sponsor or in which the Plan Sponsor holds a participation interest, except for the debtor-in-possession financing facility provided by PIF on substantially the same terms disclosed to the Plan Sponsor prior to the Petition Date, as determined by the Plan Sponsor in its sole discretion;

(p) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Plan Sponsor transmits a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(q) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Plan Sponsor), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under Chapter 7, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing any of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(r) except in accordance with Section 4 or Section 3.03 hereof, any Company Party (i) commences a voluntary case under chapter 11 of the Bankruptcy Code or a Foreign Implementation Process other than as provided for under this Agreement, (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party, (iii) makes any general assignment for the benefit of its creditors, or (iv) is subject to an involuntary case against any Company Party or the filing of an involuntary petition or application seeking bankruptcy, insolvency, winding up, dissolution, liquidation, administration,

moratorium, reorganization, corporate reorganization, any stay of enforcement and/or proceedings, or other relief in respect of any Company Party, or their debts, or of a substantial part of their assets, under any federal, state, provincial, or other foreign bankruptcy, insolvency, corporate restructuring, administrative receivership, or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding;

(s) any Company Party uses the Participation Proceeds (as defined in the Interim or Final DIP Order, as applicable) or any other amounts funded by the Plan Sponsor under the DIP Facility in any manner not in accordance with the LIV 2.0 DIP Budget (as defined in the Interim DIP Order or Final DIP Order, as applicable);

(t) the Bankruptcy Court enters an order denying confirmation of the Plan or states clearly and unequivocally on the record at a hearing that it is denying approval of or will not approve the Plan;

(u) an ownership change (within the meaning of Section 382 of the U.S. Tax Code) occurs with respect to any Company Party;

(v) the Company Parties shall have failed to carry on more than an insignificant amount of an active trade or business;

(w) KPMG (or such other mutually acceptable tax advisor) shall have failed to deliver tax opinion to LIV Holdco and the Plan Sponsor, on which both parties may rely, as to the qualification of the Restructuring Transactions for Section 382(l)(5) of the U.S. Tax Code, that is in form and substance acceptable to the Plan Sponsor, by the Plan Effective Date;

(x) any Company Party, the Requisite Players and/or PIF publicly announce their intent to consummate a transaction or liquidation in respect of the Company Parties that is not the Restructuring Transactions set forth herein or otherwise acceptable to the Plan Sponsor; and

(y) the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by such Consenting Stakeholder of notice of such breach; *provided* that the Plan Sponsor shall only have the right to terminate this Agreement as to such breaching Consenting Stakeholder pursuant to this subparagraph, and shall not have the right to terminate this Agreement as to any other Party pursuant to this subparagraph.

13.02. Consenting Stakeholder Termination Events. This Agreement may be terminated, with respect and solely as to a Consenting Stakeholder, by such Consenting Stakeholder's delivery to the Company Parties and the Plan Sponsor of a written notice in accordance with Section 15.10 upon the occurrence of any of the following events and the continuation of such events for greater than five (5) Business Days from such notice:

(a) the breach in any material respect by a Company Party or the Plan Sponsor of any of the representations, warranties, or covenants of the Company Parties or the Plan Sponsor, as applicable, set forth in this Agreement that (i) is materially and disproportionately adverse to the Consenting Stakeholder seeking termination pursuant to this provision and (ii) remains uncured

for ten (10) Business Days after such Consenting Stakeholder transmits a written notice in accordance with Section 15.10 detailing any such breach;

(b) any Company Party (i) publicly announces, or announces in writing, to the Plan Sponsor, any Consenting Stakeholder, or other holders of Company Claims/Interests (including but not limited to Section 8) its intention not to support or pursue the Restructuring Transactions, (ii) delivers (or is required to deliver) an Alternative Restructuring Engagement Notice, or (iii) breaches any of the covenants, agreements, or obligations herein in respect of an Alternative Restructuring Engagement Notice or Alternative Restructuring Proposal;

(c) the board of directors, board of managers, or such similar Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d) the Company Parties' entry into, implementation, modification, amendment, or filing of, or making publicly available, any of the Definitive Documents that is inconsistent with this Agreement and such Consenting Stakeholder's Stakeholder Term Sheet and materially and disproportionately adverse to such Consenting Stakeholder;

(e) the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Majority Consenting Players, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under Chapter 7, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing any of the Chapter 11 Cases, or (iv) rejecting this Agreement;

(f) the Plan Effective Date shall not have occurred on or before the date that is two hundred forty (240) days following the Petition Date;

(g) the Bankruptcy Court enters an order denying confirmation of the Plan or states clearly and unequivocally on the record at a hearing that it is denying approval of or will not approve the Plan; or

(h) with respect to any Consenting Player, Section 10.06(b) of this Agreement is not satisfied or waived with respect to such Consenting Player.

13.03. <u>[Reserved]</u>.

13.04. <u>[Reserved]</u>.

13.05. <u>Company Party Termination Events</u>. This Agreement may be terminated by any Company Party (as to all Parties, except as otherwise provided in Section 13.05(e)) by the delivery to the Plan Sponsor and each Consenting Stakeholder (or, in the case of Section 13.05(e), to the Plan Sponsor and the applicable Consenting Stakeholder only) of a written notice in accordance with Section 15.10 upon the occurrence of any of the following events:

(a) the breach in any material respect by the Plan Sponsor of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Plan Sponsor of notice of such breach;

(b) subject to Section 15.23, the board of directors, board of managers, or such similar Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 detailing any such issuance; *provided*, that this termination right does not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d) the Bankruptcy Court enters an order denying confirmation of the Plan or states clearly and unequivocally on the record at a hearing that it is denying approval of or will not approve the Plan;

(e) the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by such Consenting Stakeholder of notice of such breach; *provided* that the Company Parties shall only have the right to terminate this Agreement as to such breaching Consenting Stakeholder pursuant to this subparagraph, and shall not have the right to terminate this Agreement as to any other Party pursuant to this subparagraph; *provided*, *further*, that the Company Parties shall not terminate this Agreement as to any Consenting Stakeholder pursuant to this subparagraph without the prior written consent of the Plan Sponsor (email being sufficient), not to be unreasonably withheld.

13.06. <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement of LGIL, the Plan Sponsor, and the Majority Consenting Players.

13.07. <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the latest to occur of the Plan Effective Date or the date of full and final completion of a Foreign Implementation Process, as applicable; *provided* that such termination shall not affect any obligation to deliver, or right to receive, the treatment set forth in any Stakeholder Term Sheet or the New Player Agreements.

13.08. <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to

the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action. Nothing in this Agreement shall be construed as prohibiting a Company Party, the Plan Sponsor, or any Consenting Stakeholder from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against the Plan Sponsor or any Consenting Stakeholder, (b) any right of the Plan Sponsor, or the ability of the Plan Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or any Consenting Stakeholder, and (c) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or the Plan Sponsor. No purported termination of this Agreement shall be effective under this Section 13.08 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 13.01(t), Section 13.02(g), or Section 13.05(d). Nothing in this Section 13.08 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.05(b). The termination of this Agreement as to a Consenting Stakeholder pursuant to Section 13.01(y), Section 13.02, or Section 13.05(e) shall not, by itself, result in the termination of this Agreement as to any other Party.

**Section 14.** ***Amendments and Waivers.***

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in writing by each Company Party and the Plan Sponsor; *provided* that (i) any modification, amendment, supplement, or waiver of this Agreement that has a material and disproportionate effect on the treatment of Eligible Player Claims shall also require the written consent of the Majority Consenting Players, (ii) any modification, amendment, supplement, or waiver of this Agreement that (x) relates to the Financing and (y) has a material and disproportionate effect on the Consenting Minority Investors relative to the Plan Sponsor, shall also require the written consent of the Majority Consenting Minority Investors, and (iii) unless otherwise specified in this Agreement, any modification, amendment, supplement, or waiver of this Agreement that materially, disproportionately, and adversely affects the economic rights or releases of a Consenting Stakeholder relative to the other Consenting Stakeholders shall also require the written consent of such Consenting Stakeholder. Any such modification, amendment, supplement, or waiver made without such writing shall be ineffective and void *ab initio* as to the Consenting Stakeholders whose writing was so required. A Consenting Stakeholder's Joinder (including its Stakeholder Term Sheet) may be modified, amended, or supplemented, and any provision thereof may be waived, only with the written consent of such Consenting Stakeholder, the Company Parties, and the Plan Sponsor.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.** ***Miscellaneous.***

15.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signature pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04. Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims

arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07. Execution of Agreement. This Agreement and any Joinder may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement or any Joinder on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement or such Joinder on behalf of said Party.

15.08. Rules of Construction. This Agreement is the product of negotiations among the Company Parties, the Plan Sponsor, and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Plan Sponsor were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or Entity.

15.10. Notices. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice, including each address provided in a Joinder):

(a) if to a Company Party, to:

LIV Golf Investments Ltd.
50 Hudson Yards
515 West 33rd Street
Suite 65B
New York, NY 10001
Attention: Scott O'Neil, Chief Executive Officer, and John Ruzich, General Counsel
Email address: scotto@livgolf.com, john.ruzich@livgolf.com

-and-

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Scott Greenberg, Matthew Williams, Rob Fitzgerald, and Tommy Scheffer
Email address: sgreenberg@gibsondunn.com, mwilliams@gibsondunn.com, rfitzgerald@gibsondunn.com, tscheffer@gibsondunn.com

(b) if to the Plan Sponsor, to:

BC Partners Advisors L.P.
650 Madison Avenue, 3rd Floor
New York, NY 10022
Attention: Legal and Accounting
Email address: bcp-credit-legal@bcpartners.com, bcp-credit-accounting@bcpartners.com

-and-

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: James H.M. Sprayregen, Robert A. Britton, Douglas R. Keeton, Mitchell Mengden
Email address: jsprayregen@paulweiss.com, rbritton@paulweiss.com, dkeeton@paulweiss.com, mmengden@paulweiss.com

-and-

Rimon PC
100 Jericho Quadrangle, Suite 300
Jericho, NY 11753

Attention: Ronald J. Friedman, Douglas J. Schneller
Email address: ronald.friedman@rimonlaw.com,
douglas.schneller@rimonlaw.com

(c) if to a Consenting Stakeholder, to the address and e-mail address set forth on such Consenting Stakeholder's signature page to its Joinder, with a copy (which shall not constitute notice) to such Consenting Stakeholder's counsel identified thereon; *provided*, however, that a Consenting Stakeholder may elect to receive notice at another address and e-mail address by providing notice in accordance with this Section 15.10 to the Company Parties and the Plan Sponsor.

Any notice given by delivery, mail, electronic mail, or courier shall be effective when received.

15.11. Independent Due Diligence and Decision Making. Each of the Plan Sponsor and each Consenting Stakeholder hereby confirms that its decision to execute this Agreement (or, in the case of a Consenting Stakeholder, its Joinder) has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties. Each Consenting Stakeholder acknowledges that it has received and reviewed the BC Partners Term Sheet and its Stakeholder Term Sheet, has had the opportunity to consult with counsel and other advisors of its choosing, and has made its own independent decision to enter into its Joinder.

15.12. Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13. Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14. Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15. Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16. Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17. Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18. Capacities of the Plan Sponsor and the Consenting Stakeholders. Each of the Plan Sponsor and each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

15.19. Survival. Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 7.01(m) (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination), Section 10.04, Section 13.08, Section 15, any Confidentiality Agreement and any defined terms used in such Sections shall survive termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.20. Email Consents. Where a written consent, acceptance, approval, amendment, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties, the Plan Sponsor, or any Consenting Stakeholder, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.21. Fiduciary Duties; Relationship Among the Parties. Neither the Plan Sponsor nor any Consenting Stakeholder shall, solely by virtue of entry into this Agreement, have any fiduciary duty, any duty or trust of confidence in any form, or other duties or responsibilities to the Company Parties or any of the Company Parties' creditors or other stakeholders, including, without limitation, any holders of Company Claims/Interests. No prior history, pattern, or practice of sharing confidences among or between the Plan Sponsor, any Consenting Stakeholder, and the Company Parties shall in any way affect or negate this understanding and agreement.

15.22. Disclosure; Publicity. The Company Parties shall submit to the Plan Sponsor drafts of any press releases regarding this Agreement and the Restructuring Transactions at least one (1) Business Day prior to making any such disclosure (or as soon as reasonably practicable prior thereto); *provided* that, the Company Parties shall not include the name of the Plan Sponsor

in a press release or any other public filing without the express written consent (email being sufficient) of the Plan Sponsor. Except as required by applicable law, rule, or regulation and notwithstanding any provision of any other agreement between the Company Parties and the Plan Sponsor to the contrary, the Company Parties and their advisors shall not disclose to any Person the principal amount or percentage of any Claims against the Debtors held by the Plan Sponsor without the Plan Sponsor's prior written consent (email being sufficient); *provided* that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the Plan Sponsor a reasonable opportunity to review and comment before such disclosure and shall take commercially reasonable measures to limit such disclosure, and (b) any Party may disclose information requested by a regulatory or self-regulatory authority with jurisdiction over its operations to such authority on a confidential basis without limitation or notice to any other Party. All signature pages executed by the Plan Sponsor shall (a) be delivered to the Company Parties' external legal advisors in an unredacted form; *provided* that such signature pages shall be delivered to the advisors to the Company Parties on a professionals-eyes-only basis and shall be held confidentially by such recipients to the maximum extent permitted by applicable law, including the Bankruptcy Code, unless otherwise agreed by the Plan Sponsor, and (b) to the extent required to be delivered to other parties, be delivered in a redacted form that removes the Plan Sponsor's beneficially owned outstanding principal amount of Claims, if applicable. Except as required by applicable law, rule, or regulation or by the RSA Assumption Order or any other order of the Bankruptcy Court, neither the Company Parties nor the Plan Sponsor shall include the name of a Consenting Stakeholder in a press release or any other public filing without the express written consent (email being sufficient) of such Consenting Stakeholder; *provided* that each Consenting Stakeholder hereby consents to (i) the filing with the Bankruptcy Court of its Joinder (without its Stakeholder Term Sheet and with such Consenting Stakeholder's signature page redacted as provided in the last sentence of this Section 15.22), or a notice thereof, to the extent required by the RSA Assumption Order or any other order of the Bankruptcy Court, and (ii) the identification of such Consenting Stakeholder as a Consenting Player or a Consenting Minority Investor, as applicable, in the Plan, the Disclosure Statement, and any pleading filed in the Chapter 11 Cases in connection with the Player RSA Milestone, the Financing, or confirmation of the Plan. Except as required by applicable law, rule, or regulation and notwithstanding any provision of any other agreement between the Company Parties and a Consenting Stakeholder to the contrary, no Party or its advisors shall disclose to any Person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than advisors to the Debtors and the Plan Sponsor's external legal advisors (on a professionals-eyes-only basis), the principal amount or percentage of any Claims against the Debtors held by a Consenting Stakeholder or the amount of any Consenting Minority Investor's Investor Commitment without such Consenting Stakeholder's prior written consent (email being sufficient); *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford such Consenting Stakeholder a reasonable opportunity to review and comment before such disclosure and shall take commercially reasonable measures to limit such disclosure, (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of Claims held by all Consenting Players or by all Consenting Minority Investors, or of the aggregate amount of the Investor Commitments of all Consenting Minority Investors, and (iii) any Party may disclose information requested by a regulatory or self-regulatory authority with jurisdiction over its operations to such authority on a confidential basis without limitation or notice to any other

Party. All signature pages executed by a Consenting Stakeholder shall (i) be delivered to the Company Parties' and the Plan Sponsor's external legal advisors in an unredacted form, *provided* that such signature pages shall be delivered to such advisors on a professionals-eyes-only basis and shall be held confidentially by such recipients to the maximum extent permitted by applicable law, including the Bankruptcy Code, unless otherwise agreed by such Consenting Stakeholder, and (ii) to the extent required to be delivered to other parties or filed with the Bankruptcy Court, be delivered or filed in a redacted form that removes such Consenting Stakeholder's beneficially owned outstanding principal amount of Claims, such Consenting Stakeholder's address and e-mail address and, with respect to any Consenting Minority Investor, the Investor Commitment of such Consenting Minority Investor.

15.23. <u>Termination Fee</u>. In the event that (i) this Agreement is terminated by any Party (x) as a result of any Company Party consummating or pursuing any transaction contemplated by an Alternative Restructuring Proposal, including pursuant to Section 13.01(c) or 13.05(b), or (y) while any Company Party is in discussions or negotiations with any other party in respect of an Alternative Restructuring Proposal, (ii) the Company Parties consummate any transactions contemplated by, or enter into a definitive agreement with respect to, an Alternative Restructuring Proposal, or (iii) any Company Party delivers an Alternative Restructuring Engagement Notice, the Company Parties shall pay to the Plan Sponsor a termination fee, in cash, equal to 3.00% of the Total Financing Amount committed to be provided pursuant to the BC Partners Term Sheet and the Investor Commitments, as of immediately prior to the event giving rise to the Termination Fee (the "**<u>Termination Fee</u>**"), which shall (a) constitute an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable solely from, and with recourse solely to, the cash proceeds of any transaction contemplated by any Alternative Restructuring Proposal, and (b) not be subject to setoff, reduction, avoidance, subordination or disallowance; *provided that*, notwithstanding anything to the contrary herein or in any Definitive Document, the Termination Fee shall be payable solely from, and with recourse solely to, the proceeds of any transaction contemplated by any Alternative Restructuring Proposal, and the Plan Sponsor shall have no claim against the Company Parties or their estates in respect of the Termination Fee, whether as an administrative expense, a general unsecured claim, or otherwise, except as set forth in this Section 15.23. For the avoidance of doubt, this Section 15.23 and any defined terms used herein, including the Termination Fee (whether triggered before or after the Termination Date), shall survive termination of this Agreement and shall be binding on the Company Parties, their respective successors and permitted assigns, the Debtors' estates, and, in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, such Chapter 7 estates and Chapter 7 trustee. For the avoidance of doubt, this Section 15.23 shall not apply to, and shall not create any right or obligation of, any Consenting Stakeholder.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[***Signature Pages Follow***]

[*Signature Pages on File with the Debtors*]

# EXHIBIT A

## Company Parties

LIV Golf Holdings Ltd
Wedge IP Management Co, Limited
LIV Golf Ltd
LIV Golf Events (ISE) Ltd
LIV Golf Events Limited
LIV Golf Incorporated
LIV Golf US Media, LLC
Wedge Event 1 Co
Wedge Event 2 Co
Wedge Event 3 Co
Wedge Event 4 Co
Wedge WPB Inc.
Wedge Event 7 Co
Wedge IP Management Co, LLC
LIV Golf New Jersey LLC
Fairway TM Blocker 1, LLC
Fairway TM Co 1, LLC
Fairway TM Intermediate 1, LLC
Fairway TM Blocker 2, LLC
Fairway TM Co 2, LLC
Fairway TM Intermediate 2, LLC
Fairway TM Blocker 3, LLC
Fairway TM Co 3, LLC
Fairway TM Intermediate 3, LLC
Fairway TM Blocker 4, LLC
Fairway TM Co 4, LLC
Fairway TM Intermediate 4, LLC
Fairway TM Blocker 5, LLC
Fairway TM Co 5, LLC
Fairway TM Intermediate 5, LLC
Fairway TM Blocker 6, LLC
Fairway TM Co 6, LLC
Fairway TM Intermediate 6, LLC
Fairway TM Blocker 7, LLC
Fairway TM Co 7, LLC
Fairway TM Intermediate 7, LLC
Fairway TM Blocker 8, LLC

Fairway TM Co 8 GP, LLC
Fairway TM Co 8, LP
Fairway TM Intermediate 8, LLC
Fairway TM Blocker 9, LLC
Fairway TM Co 9, LLC
Fairway TM Intermediate 9, LLC
Fairway TM Blocker 10, LLC
Fairway TM Co 10, LLC
Fairway TM Intermediate 10, LLC
Fairway TM Blocker 11, LLC
Fairway TM Co 11, LLC
Fairway TM Intermediate 11, LLC
Fairway TM Blocker 12, LLC
Fairway TM Co 12 GP, LLC
Fairway TM Co 12, LP
Fairway TM Intermediate 12, LLC
Fairway TM Blocker 13, LLC
Fairway TM Co 13, LLC
Fairway TM Intermediate 13, LLC

# EXHIBIT B

**BC Partners Term Sheet**

*STRICTLY CONFIDENTIAL*

BC PARTNERS

**TERM SHEET**

**[•], 2026**

| | |
|---|---|
| **Transaction Overview:** | The restructuring of LIV Golf Investments Ltd. ("LGIL" and collectively with its direct and indirect subsidiaries, the "Company"), including the transactions set forth herein (the "Transaction") will facilitate ownership transition and financing of an updated business plan for both LIV Holdco and LIV League ("LIV 2.0"), while delivering equity value to the players.<br><br>**Reorganized Company**: LIV Golf, Incorporated ("LIV Holdco"), the entity in possession of NOL balances, with LIV 2.0 and LIV Team Holdings ("LIV Team Holdco") to operate as subsidiaries.<br><br>**New Investor(s)**: Invest $300 million ("Total Financing Amount") in LIV Holdco comprised of a $127.5 million term loan, subject to reduction on a dollar-for-dollar basis in an amount equal to the BC DIP Funding Amount (as defined below); provided that such reduction in respect of amounts funded to pay Plan Sponsor Fees and Expenses shall not exceed $4.0 million in the aggregate, that includes warrant coverage for the purchase of common stock equivalent to 5.00% of LIV Holdco, $147.5 million in senior preferred equity ("Senior Preferred") that includes warrant coverage for the purchase of common stock equivalent to 10.00% of LIV Holdco, and $25 million in a subordinated convertible preferred ("Convertible Preferred") equity that will own 30.00% of LIV Holdco on an as-converted basis (collectively, the "Financing"). The Total Financing Amount is subject to change through adjustment of the Senior Preferred and Convertible Preferred amounts, respectively, based on final determination of the Transaction Implementation discussed below and in connection with a Player Equity Adjustment as discussed below.<br><br>**Consenting Players**: Receive the following as recovery for their Allowed Eligible Player Claims in the Chapter 11 Cases, subject to providing mutual releases to all parties, and signing New Player Agreements:<br>- Equity in LIV Holdco sufficient to qualify for Section 382(l)(5) of the U.S. Tax Code (and any adjustments required to achieve such qualification, the "Player Equity Adjustment")<br>- Rights to acquire additional equity in LIV Holdco to achieve their 52.50% common equity stake (subject to the Player Equity Adjustment)<br>- In exchange for players agreeing to play in LIV 2.0, Consenting Players will receive New Player Agreements subject to future services to be delivered to LIV, including (with each of the terms being set out in greater detail in the New Player Agreements):<br>- Signing bonuses<br>- Return of certain NIL Rights<br>- On average, aggregate player ownership of approximately 30% in the Teams<br>- Aggregate go-forward player ownership will equal 52.50% (subject to the Player Equity Adjustment)<br>- A detailed schedule by player to be agreed as part of transaction documentation<br><br>**Management**: Receive 2.5% of LIV Holdco common equity in the form of a Management Incentive Plan as described below ("Management Ownership")<br><br>**Existing PIF Funded Debt and Equity**: Cancelled and extinguished in exchange for releases with no economic distribution on account of such debt and equity. |
| **Transaction Implementation:** | Restructuring to be implemented through a chapter 11 plan consistent with that certain Amended and Restated Restructuring Support Agreement, dated as of [•], 2026 (the "Restructuring Support Agreement"), which amends and restates that certain Restructuring Support Agreement, dated as of September 8, 2026 (the "Original RSA"), by and among the Company and BC Partners Advisors L.P. (collectively with the funds, accounts or investment |

| | |
|---|---|
| | vehicles managed or advised by, or managed or advised by affiliates that pursue a credit strategy of, BC Partners Advisors L.P., "BC Partners"), each Player and each Minority Investor that has executed and delivered a Joinder (collectively, the "Consenting Stakeholders") and the other parties thereto (if any), and otherwise in a manner acceptable to BC Partners, including in respect of tax efficiency. Capitalized terms used but not otherwise defined herein have the meaning given to them in the Restructuring Support Agreement.<br><br>Upon entry of the Final DIP Order, BC Partners agrees to fund $4.0 million as a participation in the loans funded under the debtor-in-possession financing facility provided by the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF", and such facility, the "PIF DIP Facility") pursuant to the terms and conditions of the Participation Agreement and in accordance with the Final DIP Order.<br><br>BC Partners shall negotiate with the Debtors and the PIF to provide the Debtors with a $30 million debtor-in-possession financing facility (the "BC DIP Facility") to consummate the transactions set forth in the Restructuring Support Agreement; provided that the BC DIP Facility shall be in form and substance acceptable to BC Partners, including with respect to (a) the form of such facility (which may be funded pursuant to a credit agreement, a term sheet, or in the form of participations under the PIF DIP Facility), (b) the lien and payment priority of such facility, including relative to the PIF DIP Facility, and (c) the conditions precedent to funding, which shall in any event include the requirement that the PIF and the Requisite Players shall have become a party to the Restructuring Support Agreement on terms and conditions acceptable to BC Partners by the Player RSA Milestone and the PIF RSA Milestone respectively. The BC DIP Facility shall be provided in accordance with a weekly budget of necessary expenses to consummate the transactions set forth in the Restructuring Support Agreement, which budget shall be in form and substance acceptable to BC Partners (the "LIV 2.0 DIP Budget"), and, without the prior written consent of BC Partners, (x) the BC DIP Facility shall not require funding in any week in excess of the amounts set forth in the LIV 2.0 DIP Budget for such week and (y) the proceeds of the BC DIP Facility shall be used only to pay expenses set forth in the LIV 2.0 DIP Budget. For the avoidance of doubt, in no event shall BC Partners be required to fund the BC DIP Facility as participations under the PIF DIP Facility without its prior written consent (which may be withheld in its sole discretion). The BC DIP Facility may be funded by BC Partners or any other investor approved by BC Partners and the Debtors (collectively, "DIP Investors"). |
| **Investment Amount:** | Total Financing Amount to be funded upon the effective date of the chapter 11 plan, consisting of:<br><br>**<u>Term Loan</u>**<br>- **Issuer**: LIV Holdco<br>- **Issue Size**: $127,500,000 subject to reduction as described in the Transaction Overview section<br>- **Position**: 1L<br>- **Security:** All assets of LIV Holdco and all subsidiaries, including, but not limited to, LIV 2.0<br>- **Rate**: S+800bps cash or PIK at LIV Holdco's election; 2.0% SOFR floor<br>- **Default Rate**: 200bps above the applicable rate<br>- **Term:** 5 years<br>- **Amortization:** Interest only through year 3, 5% per annum thereafter through maturity<br>- **Upfront Payment:** 2.00% (PIK) (treated as giving rise to OID for tax purposes, and not as a fee for services)<br>- **Exit Payment:** 2.00%<br>- **Warrants:** Term Loan holders will receive warrants to purchase the number of shares of common stock equivalent to 5% of LIV Holdco at a price per share of $0.01.<br>- **Disbursements:** Will be set based on per event and overall corporate operating expense budgeting<br>- **Excess Cashflow Sweep**: Proceeds from sales of interests in LIV 2.0 teams received by LIV Team Holdco according to the Team Sales Waterfall |

***STRICTLY CONFIDENTIAL***

BC PARTNERS

| | |
|---|---|
| | - **Covenants**: TBD financial covenants customary and standard for this type of transaction and facility. To include approval rights on LIV 2.0 team sales below a TBD valuation threshold.<br>- **DIP Rollover**: Any DIP Claims held by, or in which a participation interest is held by, the DIP Investors, whether held (i) as loans under the BC DIP Facility, (ii) as loans under the PIF DIP Facility, or (iii) in the form of a participation interest in loans under the PIF DIP Facility (the aggregate amounts funded pursuant to the foregoing, the "BC DIP Funding Amount"), that are not otherwise repaid in full in cash on or prior to the Plan Effective Date will be rolled into Term Loans and reduce the amount of new capital funded in the Term Loans by the DIP Investors, in each case in accordance with the DIP Documents (including any applicable participation agreement).<br><br>__**Senior Preferred Equity**__<br>- **Issuer**: LIV Holdco<br>- **Issue Size:** $147,500,000 (subject to adjustment as noted in the Transaction Overview section)<br>- **PIK Rate**: 15% per annum<br>- **Minimum MOIC:** 1.2x increasing by 0.2x per annum (based on original Issue Size)<br>- **Liquidation Preference:** Upon any liquidation, dissolution, sale, or deemed liquidation event (including merger, acquisition, or sale of substantially all assets), preferred equity has a liquidation preference senior to the common stock equal to the Minimum MOIC applicable at the time of such event.<br>- **Warrants:** Preferred equity holders will receive warrants to purchase the number of shares of common stock equivalent to 10% of LIV Holdco at a price per share of $0.01.<br><br>__**Convertible Subordinated Preferred Equity**__<br>- Issuer: LIV Holdco<br>- Issue Size: $25,000,000 (subject to adjustment as noted in the Transaction Overview section)<br>- Conversion: Convertible into 30% of LIV Holdco at a price per share equivalent to the price per share of common equity issued to Players and Management<br>- Liquidation Preference: Upon any liquidation, dissolution, sale, or deemed liquidation event (including merger, acquisition, or sale of substantially all assets), preferred equity has a liquidation preference senior to the common stock. Any remaining proceeds following this liquidation preference will be distributed to holders of preferred equity and common stock on an as-converted basis. |
| **Investor(s):** | Affiliated funds of BC Partners and co-investors to provide up to $150 million of the total Financing. Any Minority Investor that has become a party to the Restructuring Support Agreement pursuant to a Joinder on terms and conditions acceptable to BC Partners and the Company (collectively, the "Consenting Minority Investors") will be offered the opportunity to co-invest in a pro-rata strip across Term Loan, Senior Preferred Equity and Convertible Subordinated Preferred Equity. Non-pro-rata co-investment will be subject to BC Partners approval. |
| **Tax Assets / NOLs:** | Transaction to be structured in a tax-efficient manner for LIV Holdco, its stakeholders, BC Partners and the Minority Investors; parties to use reasonable best efforts to ensure that the Company is eligible to apply Section 382(l)(5) of the U.S. Tax Code with respect to the transactions contemplated by this Term Sheet. |

BC PARTNERS

| | |
|---|---|
| **Governance and Minority Rights:** | Reorganized Company common equity to be allocated as follows (subject to adjustment as noted in the Transaction Overview section):<br>• New Investor(s): 45.00%<br>• Players: 52.50%<br>• Management: 2.50%<br><br>Following closing, LIV Holdco will be governed by a seven (7) member board comprised of three (3) board members designated by BC Partners, three (3) board members designated by the Players and Management (one (1) of whom shall be the then CEO of LIV Holdco), and one (1) independent member (the "Board").<br><br>The organizational documents of LIV Holdco will contain customary minority protections in favor of BC Partners, including consent rights over amendments to organizational documents, issuances of equity, incurrence of indebtedness, affiliate transactions, transfers of equity interests by Player equityholders, material asset sales and any other action that would reasonably be expected to impair the net operating loss carryforwards and other material tax attributes of LIV Holdco and its subsidiaries. |
| **Management Incentive Plan:** | Following consummation of the Transaction, the Board will establish a go-forward LTIP at LIV 2.0 for the retention, recruitment and alignment of incentives with members of the management team and the Board on market terms. |
| **Expansion Team and Revenue Rights:** | BC Partners shall receive the exclusive right to purchase one (1) expansion team of LIV 2.0, or any successor league, for $1 at any time following the introduction of two LIV 2.0 expansion teams post-emergence and at the discretion of BC Partners, with such team eligible to be constituted with players and to compete in LIV 2.0, or any successor league, beginning with the first tournament following such constitution. This right shall expire after ten (10) years from the closing of the Transaction.<br>BC Partners shall also receive 2% of revenues generated by LIV 2.0, or any successor league, for a period of seven (7) years commencing upon LIV 2.0 achieving profitability, as determined by the Board, subject to mutually agreed upon buyout formula. |
| **Conditions:** | The Transaction will be subject to customary and other conditions, including:<br>• Approval by the board of directors of the Company or any applicable disinterested committee thereof;<br>• Execution and delivery of mutually acceptable definitive transaction documentation;<br>• Delivery of a tax opinion by KPMG (or such other mutually acceptable tax advisor), delivered to LIV Holdco and BC Partners, on which both parties may rely, as to the qualification of the Transaction for Section 382(l)(5) of the U.S. Tax Code that is in form and substance acceptable to the Company and BC Partners;<br>• Affirmations from major sponsors of commitment to honor contracts;<br>• Execution of New Player Agreements consistent with the LIV 2.0 business plan that include players required by BC Partners;<br>• Entry by the bankruptcy court of an order approving chapter 11 plan implementing the creation of LIV 2.0 on the terms outlined above;<br>• The Company Parties shall have carried on more than an insignificant amount of an active trade or business during the Chapter 11 Cases; and<br>• As of the closing date, no ownership change (within the meaning of Section 382 of the U.S. Tax Code) shall have occurred with respect to any Company Party during the pendency of the Chapter 11 Cases. |
| **Governing Law:** | The laws of the State of New York. |

***STRICTLY CONFIDENTIAL***

BC PARTNERS

| | |
|---|---|
| **Fees and Expenses:** | The Company shall pay or reimburse, or cause to be paid or reimbursed, all reasonable and documented fees, costs and out-of-pocket expenses of BC Partners and its advisors (including Paul, Weiss, Rifkind, Wharton & Garrison LLP, Rimon PC and any other local or special counsel or other professionals retained by BC Partners) related to the Debtors, the Transaction, this Term Sheet, the Restructuring Support Agreement, the Definitive Documents or the Chapter 11 Cases (the "Expense Reimbursement"), without any requirement to file a retention or fee application or to comply with the U.S. Trustee guidelines. For the avoidance of doubt, the Expense Reimbursement (i) is limited to the amounts provided for payment of such obligations under the LIV 2.0 DIP Budget and payable from proceeds of the BC DIP Funding Amount (including any participation interest held by BC Partners in respect of the PIF DIP Facility), (ii) will constitute allowed administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable solely from, and with recourse solely to, the proceeds of the BC DIP Funding Amount (including any participation interest held by BC Partners in respect of the PIF DIP Facility) (and not, for the avoidance of doubt, from the proceeds of the PIF DIP Facility), to the extent such proceeds have been funded and remain undisbursed and are not required for the payment of any other amounts, accrued or projected, payable from such proceeds under the LIV 2.0 DIP Budget in effect from time to time under the DIP Documents, (iii) will not be subject to setoff, reduction, avoidance, subordination or disallowance, and (iv) will survive termination of the Restructuring Support Agreement (solely with respect to Plan Sponsor Fees and Expenses incurred prior to such termination).<br><br>In the event that (i) the Restructuring Support Agreement is terminated by any Party (x) as a result of any Company Party consummating or pursuing any transaction contemplated by an Alternative Restructuring Proposal, including pursuant to Section 13.01(c) or 13.05(b) thereof, or (y) while any Company Party is in discussions or negotiations with any other party in respect of an Alternative Restructuring Proposal, (ii) the Company Parties consummate any transactions contemplated by, or enter into a definitive agreement with respect to, an Alternative Restructuring Proposal, or (iii) any Company Party delivers an Alternative Restructuring Engagement Notice, the Company Parties shall pay to the Plan Sponsor a termination fee, in cash, equal to 3.00% of the Total Financing Amount committed to be provided pursuant to this Term Sheet and the Investor Commitments, as of immediately prior to the event giving rise to the Termination Fee (the "Termination Fee"), which shall (a) constitute an allowed administrative expense under sections 503(b) and 507(a)(2) of the Bankruptcy Code, payable solely from, and with recourse solely to, the cash proceeds of any transaction contemplated by any Alternative Restructuring Proposal, and (b) not be subject to setoff, reduction, avoidance, subordination or disallowance. For the avoidance of doubt, this paragraph and any defined terms used herein, including the Termination Fee (whether triggered before or after the Termination Date), shall survive termination of the Restructuring Support Agreement and shall be binding on the Company Parties, their respective successors and permitted assigns, the Debtors' estates, and, in the event of a conversion of the Chapter 11 Cases to cases under Chapter 7, such Chapter 7 estates and Chapter 7 trustee. For the avoidance of doubt, this provision shall not apply to, and shall not create any right or obligation of, any Consenting Stakeholder. |

***STRICTLY CONFIDENTIAL***

BC PARTNERS

| | |
|---|---|
| **Exclusivity:** | The Company agrees that it will not and it shall, to the extent possible, cause its subsidiaries, and its and its subsidiaries' directors, officers, employees and representatives not to, for a period of 90 days from the date these terms are accepted (the "Exclusivity Period"), take any action to solicit, initiate, encourage or assist the submission of any proposal, negotiation or offer from any person or entity other than BC Partners relating to any financing (equity or debt) (other than (i) discussions with other investors mutually acceptable to BC Partners and the Company, (ii) ordinary course commercial arrangements and (iii) any funding of, or contribution or other financial support to, the Company and its subsidiaries by PIF or its affiliates) or other Alternative Restructuring Proposal and shall notify BC Partners promptly of any inquiries by any third parties in regard to the foregoing; provided, that, to the extent definitive documents for the Term Loan and/or Preferred Equity are not executed and the transactions contemplated thereby consummated during the Exclusivity Period, the Exclusivity Period shall be automatically extended by 90 days, so long as BC Partners and the Company are working in good faith to consummate the Term Loan and/or Preferred Equity investments; provided further, that the Exclusivity Period shall automatically terminate upon BC Partners notifying the Company that BC Partners has not approved the Term Loan and/or Preferred Equity investments or otherwise cannot or will not proceed with any investment. Notwithstanding the foregoing, this Exclusivity provision will not (a) require the directors or officers of the Company or any of its subsidiaries to take any action or refrain from taking any action that such parties determine, following consultation with external counsel, would be inconsistent with their fiduciary or similar duties, (b) prohibit the Company or any of its subsidiaries from soliciting proposals for debtor-in-possession financing from PIF, or (c) prohibit the Company from taking any actions in connection with court-approved bidding procedures. For the avoidance of doubt, the Exclusivity Period and the other provisions hereof shall not be binding on PIF (absent their express written consent in their sole discretion). |
| **PIF:** | • On the effective date of the chapter 11 plan, the PIF waives, releases and discharges in full all claims held against the Company (subject to agreed upon definitive documentation).<br>• Subject to the independent investigation of the special committee of the board of directors of the Company, on the effective date of the chapter 11 plan, the Company waives and releases all claims and causes of action against the PIF (subject to agreed upon definitive documentation). |
| **Team Sales Waterfall:** | • Sale proceeds distributed to party that sells their stake in the team (e.g., players, new investor, LIV)<br>• Proceeds from LIV-held stake distributed based on team ownership (i.e., 30% players, 70% LIV 2.0).<br>• The 70% to LIV 2.0 will be subject to the Term Loan excess cashflow sweep according to the following amounts:<br>  o In years 1-3 following the close of the Transaction:<br>    ▪ 50% of proceeds on first $25 million of TEV<br>    ▪ 33% of proceeds between $25-75 million of TEV<br>    ▪ 25% of proceeds greater than $75 million of TEV<br>  o In the subsequent years following the close of the Transaction:<br>    ▪ 50% of all proceeds |

# EXHIBIT C

## Form of Joinder

The undersigned (the "**Joinder Party**") hereby acknowledges that it has read and understands that certain Amended and Restated Restructuring Support Agreement, dated as of [•], 2026 (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**RSA**"),[1] by and among LIV Golf Investments Ltd. and its affiliates and subsidiaries bound thereto, BC Partners Advisors L.P., as Plan Sponsor, and the Consenting Stakeholders, and agrees to be bound by the terms and conditions thereof applicable to a Consenting Stakeholder and a ["Consenting Player"]["Consenting Minority Investor"], and shall be deemed a "Consenting Stakeholder" and a ["Consenting Player"]["Consenting Minority Investor"] under the terms of the RSA.

The Joinder Party specifically agrees to be bound by the terms and conditions of the RSA and makes the representations and warranties of a Consenting Stakeholder and a [Consenting Player][Consenting Minority Investor] contained therein as of the date this Joinder is executed and any further date specified in the RSA.

The term sheet attached hereto as Exhibit A is the Joinder Party's [Player Term Sheet][Minority Investor Term Sheet] for purposes of the RSA.

[*Remainder of Page Intentionally Left Blank*]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the RSA.

Date Executed: ____________________, 2026

[JOINDER PARTY]

By: _______________________________________
Name:
Title (if applicable):
Address:
E-mail address(es):
With a copy to (counsel):

[PLAYER AFFILIATE (if applicable)]

By: _______________________________________
Name:
Title:

Aggregate Amounts Beneficially Owned or Managed on Account of:[1]

Eligible Player Claims:
Other Player Claims:
Interests:
DIP Claims:

[1] The amounts set forth above are the Joinder Party's asserted amounts and are subject to allowance. Unless the Company Parties or the Plan Sponsor notifies such Consenting Stakeholder in writing, prior to the later of (x) October 28, 2026 and (y) the date that is ten (10) Business Days after delivery of this Joinder, that they dispute the allowance or amount of any such Claims, the Company Parties and the Plan Sponsor shall be deemed to stipulate to the allowance and amount of all Claims set forth on this signature page. Nothing herein shall alter or amend any limitations on stipulations and releases set forth in the DIP Orders.

ACKNOWLEDGED AND AGREED as of the date set forth above:

**LIV GOLF INVESTMENTS LTD.**, on behalf of itself and each of the other Company Parties

By: ______________________________
Name:
Title:

**BC PARTNERS ADVISORS L.P.**, as Plan Sponsor

By: ______________________________
Name:
Title:

**<u>Exhibit B</u>**

**Second Robins Declaration**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LIV GOLF NEW JERSEY LLC, *et al*., | Case No. 26-20189 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DECLARATION OF BRADLEY A. ROBINS IN SUPPORT OF THE DEBTORS' MOTION TO ENTER INTO AND ASSUME THE AMENDED AND RESTATED RSA

I, Bradley A. Robins, hereby declare under penalty of perjury as follows:

1. I am a Partner at Ducera Partners LLC (together with its affiliates, including, where appropriate, Ducera Securities LLC, collectively, "Ducera"), an independent investment banking firm with offices located at 11 Times Square, 36th Floor, New York, New York 10036.

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

Ducera is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases.[2]

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of an Order (I) Authorizing and Directing the Debtors to Enter Into, Assume, and Perform Under the Amended and Restated Restructuring Support Agreement, (II) Approving the Termination Fee and the Expense Reimbursement, and (III) Granting Related Relief* (the "RSA Assumption Motion")[3], to which this Declaration is attached.

3. I am not being compensated specifically for this Declaration or related testimony, other than through payments received by Ducera as a professional proposed to be retained by the Debtors, subject to approval by the Court.[4] Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations, finances, and restructuring initiatives; (b) my review of relevant documents, including the Original RSA, the A&R RSA, the BC Partners Term Sheet, the Participation Agreement, and the Proposed Final DIP Order; (c) information provided to me by the Debtors' management team, the Debtors' independent directors (the "Independent Directors"), or the Debtors' other advisors, including AP Services, LLC, an affiliate of AlixPartners, LLP, providing interim management services to the Debtors ("AlixPartners"); (d) information provided to me by the employees of Ducera working directly with me or under my supervision; or (e) my experience as a restructuring and corporate finance professional. If called to testify, I

---

2 The Debtors anticipate filing shortly hereafter an application to retain Ducera as their investment banker, effective as of the Petition Date (the "Ducera Retention Application").

3 Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to them in the RSA Assumption Motion or the RSA, as applicable. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "First Day Declaration").

4 In accordance with the Engagement Letter (as defined below), and subject to approval by the Court, Ducera will be entitled to receive certain fees in connection with the transactions described herein.

could and would testify competently to the statements set forth herein. I am over the age of eighteen (18) and am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

4. Ducera is an independent investment bank with expertise in a range of corporate finance advisory services, including restructuring services. Ducera's professionals, with roots in complex corporate finance, offer impartial and independent strategic advice to stakeholders in a broad range of industries and situations, and specialize in, among other things, providing clients with capital structure and restructuring advice and services in workout and bankruptcy situations, including the solicitation, negotiation, and arrangement of postpetition financing and investments in distressed assets. Founded in 2015, Ducera has served as investment banker to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of recent in-court restructurings, including: (a) *In re DISH DBS Corporation, DISH Wireless L.L.C., et al.*, No. 26-90627 (CML) (Bankr. S.D. Tex.); (b) *In re Wolfspeed, Inc., et al.*, No. 25-90163 (CML) (Bankr. S.D. Tex.); (c) *In re Franchise Group, Inc., et al.*, No. 24-12480 (LSS) (Bankr. D. Del.); (d) *In re Casa Systems, Inc.*, No. 24-10695 (KBO) (Bankr. D. Del.); (e) *In re Yellow Corporation, et al.*, No. 23-11069 (CTG) (Bankr. D. Del.); (f) *In re Diebold Holding Co., LLC*, No. 23-90602 (DRJ) (Bankr. S.D. Tex.); (g) *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del.); (h) *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex.); (i) *In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex.); (j) *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y.); (k) *In re GBG USA Inc.*, No. 21-11369 (MEW) (Bankr. S.D.N.Y.); (l) *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del.); (m) *In re Superior Energy Servs., Inc.*, No. 20-35812 (DRJ) (Bankr. S.D. Tex.); and (n) *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex.). Ducera Securities LLC, an affiliate of

Ducera Partners LLC, is a broker-dealer registered with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority.

5. I am a Partner at Ducera and have more than thirty (30) years of experience advising companies, boards of directors, creditors, and other stakeholders in connection with restructuring, financing, merger, and other complex corporate finance transactions across a broad range of industry sectors. Select restructuring advisory engagements on which I have worked include: Adelphia Communications, American Airlines, BearingPoint, Chrysler, Delphi, Diebold Nixdorf, Energy Future Holdings Corporation, iHeartMedia, and Refco. Prior to joining Ducera in 2016, I spent approximately fifteen (15) years at Greenhill & Co., LLC, where I was a Partner and Co-Head of Financing Advisory and Restructuring for North America. Before Greenhill, I was a member of the restructuring group at Houlihan Lokey Howard & Zukin, and I began my career as an attorney at Wachtell, Lipton, Rosen & Katz. I received a Bachelor of Arts from Middlebury College and a Juris Doctor from the University of Pennsylvania's Carey Law School.

**The Debtors' Retention of Ducera**

6. As described in the First Day Declaration, on April 30, 2026, the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"), the Debtors' ultimate equity owner, announced that it would fund the Debtors only through the remainder of the 2026 season. In response, and under the oversight of the Debtors' Independent Directors and the Strategic Initiatives Committee (the "SIC"), the Debtors launched a broad marketing process to identify an investor or investors willing to fund a new iteration of the Debtors' business under a new and more efficient operating model ("LIV 2.0").

7. Shortly after the April 30, 2026 announcement by PIF, the Debtors engaged Ducera as their investment banker pursuant to an engagement letter dated as of May 3, 2026 (the "Engagement Letter"). *See* First Day Declaration ¶¶ 9, 49. Since that time, I have led the Ducera team that has worked closely with the Debtors' management team, the Independent Directors and the SIC, whose sole members are the Independent Directors, and the Debtors' other advisors to evaluate and pursue the Debtors' strategic, financing, and restructuring alternatives. Ducera's work has included, among other things: (a) reviewing the Debtors' liquidity and projected cash flows in coordination with the Debtors' management team and other advisors; (b) understanding the Debtors' business, operations, and finances; (c) reviewing and analyzing the Debtors' capital structure and financing alternatives; (d) preparing a confidential information memorandum and conducting a broad marketing process for an investment in, or acquisition of, the Debtors' business (the "Strategic Marketing Process"); (e) soliciting, negotiating, and analyzing proposals for postpetition financing, including conducting a marketing process for postpetition financing from third-party financing sources (the "DIP Marketing Process"); (f) participating in negotiations with PIF regarding postpetition financing and the consensual use of cash collateral; (g) providing strategic advice to the Debtors' management team and governing bodies, including the SIC; and (h) assisting the Debtors in connection with preparations for the commencement of these chapter 11 cases. As a result of this work, and my engagement with the Debtors' other restructuring professionals, I am familiar with the Debtors' capital structure, business operations, and current liquidity needs, as well as the terms of the RSA and the proposed participation of BC Partners in the PIF DIP Facility.

**The Strategic Marketing Process and the RSA**

8. Beginning in May 2026, Ducera commenced a process to raise $250 to $350 million of new capital from qualified investors to fund LIV 2.0. Ducera initiated outreach to more than 300 potential investors across strategic acquirers, financial sponsors (including both traditional and sports-focused sponsors), and high-net-worth individuals. More than 130 parties engaged across the outreach process, and approximately 100 parties executed non-disclosure agreements and were granted access to a virtual data room. Ducera and the Debtors' management conducted more than 100 calls with more than 50 unique potential investors, and Ducera, the Debtors, Gibson Dunn, and AlixPartners responded to more than 350 diligence questions from the approximately 30 potential investors that engaged in detailed diligence.

9. Five leading prospects (in addition to potential minority investors) were invited to submit final non-binding bids by July 22, 2026, and the Debtors received two non-binding term sheets on that date. Following continued engagement with both bidders, the Debtors, in consultation with Ducera, determined that the proposal submitted by BC Partners Advisors L.P. ("BC Partners") was the best and most viable, and on August 4, 2026, BC Partners signed a non-binding term sheet providing for up to $150 million of new capital from BC Partners, with an additional $150 million earmarked for co-investors. Following receipt of that term sheet, Ducera re-engaged parties that had indicated interest in a minority investment alongside a lead investor and facilitated outreach to additional parties identified by BC Partners. As of the date hereof, more than a dozen investors remain in active discussions with the Debtors and BC Partners about participating in the BC Partners-led financing.

10. Over the following weeks, the Debtors and their advisors, including Gibson, Dunn & Crutcher LLP, AlixPartners, and Ducera, negotiated the terms of the bid submitted by BC

Partners with BC Partners and its advisors, including Paul, Weiss, Rifkind, Wharton & Garrison LLP and Rimon PC. Those negotiations were conducted at arm's length and in good faith. On September 8, 2026, the Debtors and BC Partners entered into the Original RSA. The Debtors' negotiation of, and ultimate entry into, the Original RSA was overseen and approved by the SIC, which is comprised solely of the Independent Directors and which holds exclusive authority over any conflict matter and authority to act with respect to any strategic, restructuring, financing, or sale transaction. Throughout the process, the SIC has met approximately twice weekly (or more frequently as needed) with the Debtors' advisors, including Ducera, to consider transactional options and stakeholder feedback.

11. Following the Petition Date, the Debtors and their advisors continued to negotiate with BC Partners and its advisors, and with PIF and its advisors with respect to BC Partners' participation in the PIF DIP Facility, the documentation and implementation of the Restructuring Transactions. Those negotiations resulted in the A&R RSA, which amends and restates the Original RSA and which the Debtors intend to execute promptly following entry of an order authorizing them to do so. Among other things, the A&R RSA (a) establishes the framework through which Players and Minority Investors become parties to the RSA and commit to LIV 2.0; and (b) provides for BC Partners to fund incremental postpetition financing for LIV 2.0 costs through a participation in the PIF DIP Facility.

12. I believe that entry into the A&R RSA and assumption of the RSA are in the best interests of the Debtors, their estates, and all stakeholders. The RSA commits BC Partners, subject to its terms, to anchor a $300 million investment in LIV 2.0 and, as set forth more fully herein, provides for BC Partners to fund incremental postpetition financing for LIV 2.0 costs through its participation in the PIF DIP Facility. It provides a clear framework and timeline for

confirmation of a chapter 11 plan that would preserve the League as a going concern for the benefit of the Players, sponsors, host venues, employees, and fans, and, through the A&R RSA, it provides the mechanism by which the Players and Minority Investors will commit to LIV 2.0. At the same time, the RSA preserves the Debtors' ability to consider and respond to unsolicited alternative proposals and to act according to their fiduciary duties. In my judgment, the RSA reflects the best restructuring terms available to the Debtors following the extensive marketing process described above.

13. Prompt authority to enter into the A&R RSA and assumption of the RSA is critical. The RSA requires that the Court enter an order authorizing the Debtors to enter into and assume the RSA, and that the Debtors execute and actually assume the RSA, no later than October 14, 2026. If the RSA is not assumed within the time required by its Milestones, BC Partners may terminate the RSA, and the Debtors would lose both the anchor investment and the incremental postpetition financing on which LIV 2.0 depends.

14. The Termination Fee, equal to 3.00% of the Total Financing Amount committed as of immediately prior to the triggering event, was a bargained-for and integral component of the RSA. Throughout the negotiations, BC Partners made clear that it would not commit to anchor the Financing, or agree to provide its incremental postpetition financing, without the Termination Fee, and it rejected the Debtors' proposals to eliminate or reduce the fee. Between June 2026 and the execution of the Original RSA, BC Partners and its advisors conducted extensive diligence on the Debtors' business and the LIV 2.0 business plan and negotiated its term sheets and the Original RSA over approximately eight weeks, at significant expense and without any assurance that the Restructuring Transactions would be consummated. The Termination Fee is payable solely from, and with recourse solely to, the proceeds of a transaction

contemplated by an Alternative Restructuring Proposal, so no amount is paid unless such a transaction is consummated; a liquidation, a conversion of these cases to chapter 7, or a wind-down plan does not, in and of itself, constitute an Alternative Restructuring Proposal (other than any sale, disposition, reorganization, or similar transaction in which any Debtor carries on an active trade or business). The Debtors and their advisors negotiated the Termination Fee and believe that the Termination Fee set forth in the RSA falls within the market for similar fees in similar contexts. Based on the foregoing, I believe that the Termination Fee is reasonable, is consistent with market terms, and was necessary to secure BC Partners' commitment to the Restructuring Transactions.

15. I also understand that the Expense Reimbursement was a bargained-for and integral component of the RSA. Reimbursement of a plan sponsor's fees and expenses is a customary component of a restructuring support agreement, and here it reflects the diligence, negotiation, and documentation costs that BC Partners has incurred, and will continue to incur, in committing to anchor a $300 million investment in LIV 2.0 and agreeing to fund incremental postpetition financing for LIV 2.0 costs. Because the RSA limits the Company Parties' obligation to pay the Expense Reimbursement to the amounts budgeted for that purpose in the LIV 2.0 DIP Budget and makes it payable solely from the proceeds of the debtor-in-possession financing funded by BC Partners, including through its participation in the PIF DIP Facility, it does not create any incremental cash burden on the Debtors' estates. The Expense Reimbursement will therefore be funded from financing that is available to the Debtors only because of the RSA. Based on the foregoing, I believe that the Expense Reimbursement is reasonable, is consistent with market terms, and was necessary to secure BC Partners' commitment to the Restructuring Transactions.

16. I also believe that the Exclusivity Provisions are reasonable and appropriate. Exclusivity is customary consideration for a plan sponsor that commits to fund a restructuring on a fixed timeline, and it provides BC Partners with the assurance necessary to commit its capital while the Debtors pursue confirmation. The Debtors agreed to the Exclusivity Provisions only after canvassing more than 300 potential investors. Importantly, the RSA does not require the Debtors to take or refrain from taking any action inconsistent with their fiduciary duties, and the Debtors remain free to consider and respond to unsolicited alternative proposals. The exclusivity covenant in the BC Partners Term Sheet is further limited: it does not restrict discussions with mutually acceptable co-investors, ordinary course arrangements, or financing from PIF, and it does not prohibit actions taken in connection with court-approved bidding procedures.

**BC Partners' Participation in the PIF DIP Facility**

17. The Strategic Marketing Process informed the Debtors' postpetition financing efforts in two respects. The process provided the Debtors and Ducera with a comprehensive view of the universe of parties with an interest in the Debtors' business and the terms on which such parties were prepared to commit capital. None of the parties that participated in the Strategic Marketing Process, other than BC Partners, offered to provide postpetition financing to the Debtors, and the incremental postpetition financing that BC Partners has agreed to provide under the RSA is directed to costs of the LIV 2.0 transaction rather than to funding the Debtors' operations and the administration of these chapter 11 cases. Absent the liquidity provided by BC Partners' incremental postpetition financing, the Debtors will not have sufficient cash on hand to fund costs needed for LIV 2.0.

18. In parallel with the Debtors' negotiations with PIF regarding postpetition financing, in August 2026, Ducera commenced the DIP Marketing Process to solicit proposals

for postpetition financing from third-party financing sources. Ducera contacted twelve (12) third-party financial institutions that Ducera deemed to be sophisticated, experienced in providing debtor-in-possession financing in complex distressed situations, and capable of providing financing in the timeframe and amount required by the Debtors. Of the twelve (12) parties contacted by Ducera to solicit indicative terms, four (4) were already parties to non-disclosure agreements entered into in connection with the Strategic Marketing Process. Ducera provided each of the twelve (12) parties with a public teaser summarizing the opportunity and requested indicative terms by September 3, 2026. For the remaining eight (8) parties, execution of a non-disclosure agreement and access to additional diligence materials would follow the submission of indicative terms.

19. Each of the twelve (12) parties contacted declined to pursue a postpetition financing transaction with the Debtors, and no party submitted a proposal to provide postpetition financing on any basis. As of the date of this Declaration, no further discussions with third-party financing sources are scheduled, and, in my view, no actionable third-party postpetition financing alternative is available to the Debtors.

20. In parallel with the DIP Marketing Process, the Debtors, with the assistance of Ducera and their other advisors, negotiated with BC Partners regarding the terms on which BC Partners would provide incremental postpetition financing for LIV 2.0 costs. The Debtors' evaluation of, and negotiations regarding, postpetition financing were conducted under the oversight and exclusive authority of the SIC, advised by counsel. As noted above, BC Partners was separately represented by its own counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP. Multiple iterations of the debtor-in-possession financing term sheet attached to the Original RSA (the "DIP Term Sheet") were exchanged and negotiated at arm's length over the course of

several weeks, and the Original RSA contemplated that BC Partners would provide up to $30 million of incremental postpetition financing through a separate debtor-in-possession credit facility on the terms set forth in the DIP Term Sheet. *See* First Day Declaration ¶¶ 45–48. Following the Petition Date, the Debtors, BC Partners, and PIF agreed that BC Partners would instead provide its incremental postpetition financing through a participation in the PIF DIP Facility, implemented through an increase of the PIF DIP Facility by $4.0 million (the "DIP Upsize"), with any further financing from BC Partners, including the $30 million debtor-in-possession facility that the BC Partners Term Sheet contemplates BC Partners will negotiate to provide, to be on terms agreed among the Debtors, BC Partners, and PIF and subject to further Court approval.

21. Based on the results of the DIP Marketing Process, my experience, and current market conditions, I believe that the Debtors are unable to obtain postpetition financing for the costs of LIV 2.0 on an unsecured, junior, or any other basis on terms more favorable than those of the DIP Upsize. Moreover, the PIF DIP Facility, as currently sized, is not intended to cover costs associated with LIV 2.0. Simply put, there are no alternatives for the requisite incremental financing other than the financing that BC Partners has agreed to provide under the RSA.

22. The DIP Upsize will increase the PIF DIP Facility from $49.6 million to $53.6 million. BC Partners will fund the DIP Upsize by purchasing from PIF, at par and in cash, a participation in the PIF DIP Facility in an amount equal to the DIP Upsize under the Participation Agreement. The DIP Upsize will be made available to the Debtors in a single draw following entry of the Proposed Final DIP Order and satisfaction (or waiver) of the conditions to the final funding under the PIF DIP Facility, will be funded on the same terms and conditions as the other loans under the PIF DIP Facility, and will constitute loans under the PIF DIP Facility

for all purposes. PIF will remain the lender under the PIF DIP Facility. The proceeds of the DIP Upsize will be funded directly to the Debtors, held segregated from the Debtors' other cash, and used solely to pay incremental expenses in connection with the LIV 2.0 transaction (including the fees and expenses of BC Partners) on the timing and in the amounts set forth in the LIV 2.0 DIP Budget, and any unused proceeds will be returned to BC Partners upon the occurrence of specified events, including a termination of the RSA or a pivot by the Debtors to a wind-down plan. As described above, the PIF DIP Facility as originally sized was designed to fund the Debtors' operations and the administration of these chapter 11 cases, not the costs of the LIV 2.0 transaction, and no other source of financing for those costs is available to the Debtors. The DIP Upsize therefore provides the incremental liquidity the Debtors need to pursue the LIV 2.0 transaction through confirmation of a chapter 11 plan.

## **Conclusion**

23. For the foregoing reasons, and based on my professional opinion and experience with and analysis of comparable RSAs and debtor-in-possession financing transactions, as well as my participation in the marketing and negotiation of the RSA and postpetition financing alternatives for the Debtors, both of which were conducted at arm's length and in good faith under the oversight of the SIC, I believe that the Debtors' decision to enter into the A&R RSA and assume the RSA, and the relief requested in the RSA Assumption Motion, reflect a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: October 5, 2026

*/s/ Bradley A. Robins*
Name: Bradley A. Robins
Title: Partner
Ducera Partners LLC