**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LIV GOLF NEW JERSEY LLC, *et al.*, | Case No. 26-20189 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SEPARATION AGREEMENT AND MUTUAL RELEASE BETWEEN THE DEBTORS AND THE RAHM PARTIES PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that, on **November 5, 2026 at 11:30 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, the above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned proposed counsel, shall move the *Debtors' Motion for Entry of an Order (I) Approving the Separation Agreement and*

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

*Mutual Release Between the Debtors and the Rahm Parties Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Motion") before the Honorable Michael B. Kaplan, United States Bankruptcy Judge, in Courtroom 8 of the United States Bankruptcy Court for the District of New Jersey, 402 East State Street, Trenton, NJ 08608 (the "Court"), for entry of an order (the "Order"), substantially in the form submitted with the Motion.

**PLEASE TAKE FURTHER NOTICE** that, in support of the relief requested in the Motion, the Debtors shall rely on the accompanying Motion, which sets forth the relevant legal and factual bases upon which the relief requested should be granted. A proposed Order granting the relief requested in the Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall: (i) be in writing, (ii) state with particularity the basis of the objection; and (iii) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "General Order") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary, and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Omni Agent Solutions,

Inc. at https://omniagentsolutions.com/livgolf. You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless responses are timely and properly filed and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

[*Remainder of page intentionally left blank*]

Dated: October 14, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LIV GOLF NEW JERSEY LLC, *et al.*, | Case No. 26-20189 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SEPARATION AGREEMENT AND MUTUAL RELEASE BETWEEN THE DEBTORS AND THE RAHM PARTIES PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE JUDGE MICHAEL B. KAPLAN,
UNITED STATES BANKRUPTCY JUDGE:

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (the "Motion"):[2]

## Preliminary Statement

1. By this Motion, the Debtors seek approval of a consensual, global resolution of their relationship with Jon Rahm Rodriguez ("Mr. Rahm") and Rahm, LLC ("RightsCo" and, together with Mr. Rahm, the "Rahm Parties"), who hold the largest unsecured claim listed on the Debtors' consolidated list of their thirty largest unsecured creditors.

2. The Separation Agreement resolves, without litigation, the disputes between the Debtors and the Rahm Parties, the estate's largest creditor, regarding the Rejection Motion (as defined below) as applied to the Rahm Contracts—including disputes regarding the integrated nature of those agreements, the Debtors' ability to retain license rights under rejected agreements, and the scope of any rights that would survive rejection—while eliminating from the pool of general unsecured claims the Rahm Parties' listed claim as well as any claim for rejection damages or any administrative expense claim against the estates. In summary, and subject in all respects to the terms of the Separation Agreement: (a) the Rahm Parties will release all of their claims against the Debtors and their affiliates arising under the Rahm Contracts and all other claims against the Debtors based upon conduct occurring on or before the Effective Date; (b) each of the Rahm Contracts (as defined below) will be terminated by agreement as of the Effective Date, and the Rahm Parties will be released from any further service or performance obligations to the Debtors; (c) all rights in Mr. Rahm's name, image, likeness, Player Identification, Additional Rights,

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of David Orlofsky, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 27] (the "First Day Declaration"), which is incorporated by reference herein. Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the Separation Agreement (as defined herein) or, if not defined therein, in the First Day Declaration.

persona, and other elements of his identity will revert exclusively to Mr. Rahm, and the Debtors will relinquish all licenses and other rights relating thereto, except that the Debtors will retain ownership of the Historical Content in which Mr. Rahm appears (and of Historical Data to the extent owned by them) together with a perpetual, irrevocable, royalty-free license under the Rahm Parties' rights in Player Identification and Additional Rights solely to the extent embodied in that content, and the right to sell, license, and exploit that content solely for the Permitted Historical Uses, while agreeing not to make new, standalone, or extracted commercial uses of Mr. Rahm's name, image, and likeness but will retain no ownership interest in, or independent right to use or commercially exploit, Mr. Rahm's name, image, likeness, Player Identification, Additional Rights, persona, or other elements of his identity apart from that limited Permitted Historical Uses; (d) the Debtors will assign the Legion XIII Marks and related assets to RightsCo on an as-is, where-is basis; (e) the Rahm Parties will acknowledge that their former equity interests in the Team Operator were cancelled for no consideration in the prepetition Team 13 Merger and that all associated rights and obligations have terminated; and (f) the parties will exchange other customary mutual releases. The Separation Agreement is the product of extensive, good-faith, arm's-length negotiations between sophisticated parties represented by counsel, and the Debtors submit that it satisfies the standards of Bankruptcy Rule 9019 and reflects a sound exercise of their business judgment. The Debtors respectfully request that the Court approve it.

## Relief Requested

3. The Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"): (a) approving the Separation Agreement and Mutual Release, substantially in the form attached as Exhibit 1 to the Order (the "Separation Agreement"), by and among the Rahm Parties and the Debtors party thereto (the "LIV Parties"), pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019; (b) authorizing the Debtors to enter into and perform all of their obligations under the Separation Agreement, including (i) the consensual termination of the Rahm Contracts, effective as of the Effective Date, (ii) the assignment and transfer of the Legion XIII Marks to RightsCo free and clear of all liens, claims, encumbrances, and interests pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, and (iii) the mutual releases provided therein; (c) deeming the Rejection Motion withdrawn solely to the extent it seeks rejection of, or other relief concerning, the Rahm Contracts and the Rahm Parties; and (d) granting related relief.

## Jurisdiction and Venue

4. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 363(f) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002(a)(3), 6004, and 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9019-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## Background

### I. The Chapter 11 Cases

7. On September 8, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 30, 2026, the U.S. Trustee for the District of New Jersey appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 175]. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

8. As described in the First Day Declaration, the Debtors own and operate an international men's professional golf league (the "League") featuring 13 teams, a 14-tournament schedule, and many of the world's best golfers. Unlike other professional golf tours, the League adds team competition to individual competition: the League is currently comprised of 57 golfers, 52 of whom are divided into 13 four-member teams, each operated by a separate operating entity wholly owned by Debtor LIV Golf Incorporated. The League compensates its players through a mix of guaranteed "commitment" and "annual" payments, team equity for certain players, and performance-based prize money, and the player contracts comprise a significant portion of the Debtors' overall unsecured obligations.

9. As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to implement a restructuring transaction anchored by a $300 million investment by BC Partners in a recapitalized League ("LIV 2.0") pursuant to the restructuring support agreement

entered into on the Petition Date (the "BC Partners RSA"). A key element of LIV 2.0 is the overall reduction of operating costs, and the Debtors' existing player contracts do not reflect the compensation structure contemplated under LIV 2.0. Accordingly, on the first day of these cases, the Debtors sought to reject all of the existing player contracts *nunc pro tunc* to the Petition Date.

## II. The Rahm Parties, the Rahm Contracts, and Legion XIII

10. Mr. Rahm is a professional golfer who joined the League in December 2023 and competed as a member of the League team known as Legion XIII, which is operated by Debtor Fairway TM Co 13, LLC (the "Team Operator"). Prior to the Petition Date, the Rahm Parties and certain of the Debtors entered into the following agreements (collectively, together with all amendments, supplements, modifications, restatements, ancillary agreements, side letters, and related instruments, the "Rahm Contracts"):

a. the Player Participation Agreement among LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Ltd, Rahm, LLC, and Jon Rahm Rodriguez, dated December 6, 2023 (the "PPA");

b. the Player License and Services Agreement among Wedge IP Management Co, LLC, Wedge IP Management Co, Ltd, Rahm, LLC, and Jon Rahm Rodriguez, dated December 6, 2023 (the "PLSA");

c. the Team Participation Agreement among LIV Golf Holdings Ltd, LIV Golf Incorporated, LIV Golf Ltd, Jon Rahm Rodriguez, Rahm, LLC, Fairway TM Co 13, LLC, Fairway TM Blocker 13, LLC, and Fairway TM Intermediate 13, LLC, dated December 30, 2024 (the "TPA");

d. the Amended and Restated Operating Agreement of Fairway TM Co 13, LLC among Fairway TM Blocker 13, LLC, Fairway TM Intermediate 13, LLC, Jon

Rahm Rodriguez, Rahm, LLC, and the other members party thereto, dated December 30, 2024, as amended and restated as of March 5, 2025 (the "Operating Agreement"); and

e. the Subscription Agreement among Fairway TM Co 13, LLC, Jon Rahm Rodriguez, and Rahm, LLC, dated December 30, 2024 (the "Subscription Agreement").

11. Under the PPA and the PLSA, Mr. Rahm agreed to participate in League tournaments and to provide related services in exchange for fixed and contingent compensation, and the Rahm Parties granted the applicable Debtors licenses to Mr. Rahm's name, image, likeness, and related rights (as defined in the PPA, the "Player Identification") and to certain additional rights (as defined in the PLSA, the "Additional Rights"), including the RAHMBO trademark (U.S. Reg. No. 6,672,306) (the "RAHMBO Mark"). The TPA, the Operating Agreement, and the Subscription Agreement governed the Rahm Parties' participation in, and former equity interest in, the Team Operator.

12. Prior to the Petition Date, as part of the Team Consolidation described in the First Day Declaration, the Team Operator was consolidated through the merger of Fairway TM Merger Sub 13, LLC with and into the Team Operator (the "Team 13 Merger"), in connection with which the equity interests in the Team Operator held by the Rahm Parties were cancelled for no consideration and following which Fairway TM Intermediate 13, LLC became the sole member of, and holds 100% of the equity interests in, the Team Operator.

## III. The Rejection Motion and the Rahm Parties' Position

13. As noted above, on the Petition Date, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and*

*Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Any Personal Property, Each Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 24] (the "Rejection Motion"), which seeks, among other things, authority to reject the "Jon Rahm Player Participation Agreement & Related Agreements" and the "Jon Rahm Player License and Services Agreement" effective as of the Petition Date. The Rejection Motion explains that, absent rejection, the Player Contracts could "continue to impose substantial payment obligations on the Debtors' estates without corresponding benefit," while providing that the Debtors "do not seek to impair, and rejection of the Player Contracts . . . shall not affect, any rights, licenses, or assignments previously granted or made to the Debtors under the Player Contracts . . . , including with respect to content and Player identification rights, that by their express terms survive termination, all of which remain property of the Debtors' estates."

14. The Rahm Parties informed the Debtors that they disputed the relief requested in the Rejection Motion as applied to the Rahm Contracts. Among other things, the Rahm Parties took the position that the Rahm Contracts constitute a single, integrated agreement that must be assumed or rejected in its entirety; that the Debtors may not reject their obligations under the Rahm Contracts while retaining license rights granted thereunder; that the Rahm Contracts are personal-services agreements that may not be assumed over Mr. Rahm's objection under section 365(c)(1) of the Bankruptcy Code; and that any order granting the Rejection Motion should modify the automatic stay as necessary and provide that the Rahm Contracts are terminated as of the Petition Date, rather than merely rejected, so as to eliminate uncertainty regarding Mr. Rahm's post-rejection status and the scope of any surviving rights. The Debtors have reserved all rights with respect to the Rahm Parties' positions.

15. Beginning in mid-September 2026, the Debtors and the Rahm Parties, through counsel, engaged in extensive, good-faith, arm's-length negotiations regarding the treatment of the Rahm Contracts and the parties' respective rights. Those discussions initially contemplated a stipulation clarifying the effect of rejection on the Rahm Contracts and ultimately produced the comprehensive resolution embodied in the Separation Agreement. The Debtors consulted with their professionals, the Strategic Initiative Committee of LIV Golf Holdings Ltd, the Committee, PIF, and BC Partners regarding the terms of the Separation Agreement. In addition, the DIP Lender has consented to the transfer of the Legion XIII Marks to RightsCo free and clear of the DIP Liens, as required by Article VII of the Separation Agreement.

## IV. The Separation Agreement

16. On October 14, 2026, the LIV Parties and the Rahm Parties executed the Separation Agreement. The Separation Agreement is attached as Exhibit 1 to the Order. Its key terms are summarized below pursuant to Local Rule 9019-3:[3]

| Term | Summary |
|---|---|
| **Parties** | The Rahm Parties (Mr. Rahm and RightsCo) and the LIV Parties (LIV Golf Holdings Ltd ("League HoldCo"); LIV Golf Incorporated ("US OpCo"); LIV Golf Ltd ("UK OpCo" and, together with League HoldCo and US OpCo, the "League Operator"); Wedge IP Management Co, LLC and Wedge IP Management Co, Ltd (together, "League IP ManagementCo"); Fairway TM Co 13, LLC (the "Team Operator"); Fairway TM Blocker 13, LLC; Fairway TM Intermediate 13, LLC; and LIV Golf New Jersey LLC (the "Lead Debtor")) (Preamble). |
| **Termination of the Rahm Contracts (Art. II)** | Effective as of the Effective Date, each of the Rahm Contracts (defined in the Separation Agreement as the "Contracts") is terminated, and the parties' rights and obligations thereafter are governed solely by the Separation Agreement and the Contract provisions expressly preserved in it (§ 2.1). Except solely for the ownership, permissions, and archive-appurtenant license set forth in Article IV, each LIV Party terminates and relinquishes all Contract-based licenses, approval and consent rights, first-look and matching rights, and other |

[3] Capitalized terms used but not otherwise defined in this summary have the meanings set forth in the Separation Agreement. This summary is qualified in its entirety by the terms of the Separation Agreement, and in the event of any inconsistency between this summary and the Separation Agreement, the Separation Agreement controls.

| Term | Summary |
|---|---|
| | continuing rights relating to Player Identification, Additional Rights, the RAHMBO Mark, or the Legion XIII Marks, and the PLSA § 7.1 post-term fee and all Contract-based post-termination sell-through, runoff, inventory-disposition, and other future-use rights are terminated (§ 2.2(a)–(b)). Ownership of Historical Content and of Subject IP validly assigned to a LIV Party before the Effective Date is unaffected (§ 2.2(c)). After the Effective Date, no LIV Party may newly produce or authorize production of merchandise or other products bearing Player Identification, the RAHMBO Mark, or any Legion XIII Mark, other than team or League photographs, yearbooks, programs, and record books depicting multiple players in which Mr. Rahm is not individually featured, and outstanding production orders are to be cancelled except to the extent required to perform a Scheduled Commitment (§ 2.3). From and after the Effective Date, no existing inventory bearing Player Identification, the RAHMBO Mark, or any Legion XIII Mark ("Affected Inventory") may be sold or distributed; Affected Inventory excludes copies or formats of Historical Content distributed solely as a Permitted Historical Use and multi-player team or League photographs, yearbooks, programs, and record books in which Mr. Rahm is not individually featured. Within five Business Days after the Effective Date, the LIV Parties will elect, in their discretion, either to make the Affected Inventory available for collection by RightsCo at RightsCo's cost and risk or to destroy it within thirty days, without any inventory schedule, count, or valuation (§ 2.4). Confidentiality obligations survive, subject to disclosures required for Court approval (§ 2.5). |
| **Confirmation of Rahm Rights (Art. III)** | Following the Effective Date, Mr. Rahm holds the rights in Player Identification and Additional Rights addressed by the Separation Agreement, and RightsCo holds the RAHMBO Mark and, upon the transfer under Article VII, the Legion XIII Marks, in each case subject only to the express provisions of the Separation Agreement; the confirmation does not impair the LIV Parties' ownership of Materials, Historical Content, or Subject IP validly assigned before the Effective Date, and any authority to use Player Identification or Additional Rights embodied in Historical Content arises solely under Article IV (§ 3.1). |
| **Historical Content and Historical Data; License; Restrictions on New Uses (Arts. IV–V)** | As between the parties, the LIV Parties continue to own the Historical Content, the Subject IP and Materials validly assigned to them, and Historical Data to the extent owned by them, subject to the PLSA § 6.1 exclusion of Additional Rights incorporated into Materials and to Article IV (§ 4.1). The LIV Parties may own, retain, sell, license, assign, or transfer Historical Content, or an archive comprising Historical Content, as an asset, including separately from live League broadcast operations; reproduce, restore, edit, clip, compile, caption, translate, display, broadcast, stream, distribute, and otherwise technically process it; incorporate it into programming, still photography, editorial, print and digital publications (including yearbooks, record books, websites, and applications), podcasts and other audio, awards, hall-of-fame, museum and exhibition presentations, and League-wide, team, season-retrospective, documentary, editorial, event-coverage, or similar historical programming; and monetize, license, advertise, promote, sponsor, and |

| Term | Summary |
|---|---|
| | commercially distribute the archive and resulting qualifying programming, including through advertising or sponsorship around qualifying programming, sponsorship of an archive platform, series, or content library, and sponsor integrations existing in Historical Content as of the Effective Date (§ 4.2(a)). Promotion of the League, its Events, and its programming using Historical Content in which Mr. Rahm appears with no greater prominence than other players, without naming or depicting him in titles, thumbnails, key art, or sponsor-specific assets, is a Permitted Historical Use (§ 4.2(a)). No LIV Party or downstream recipient may make an Extracted Use or otherwise separately monetize Mr. Rahm or use his identity, marks, or player-specific data as an independent commercial identifier or asset, and no permitted use may materially misrepresent his participation, views, or endorsement, subject to the LIV Parties' ordinary editorial discretion (§ 4.2(b)). Absent prior written consent, Permitted Historical Uses exclude synthetic performances, deepfakes, digital replicas, voice clones, avatars, and other simulated depictions of Mr. Rahm; depiction of Mr. Rahm as a playable or selectable character or avatar in any game; fantasy, betting, wagering, tokenized-asset, NFT, digital-collectible, merchandise, endorsement, promotional, data, or similar products named, branded, promoted, or constituted using his identity or player-specific data; and any other Extracted Use. Analytical, operational, and production uses of artificial-intelligence tools on Historical Content are permitted if they do not create a prohibited output or Extracted Use, and factual Historical Data may be licensed to data partners, media, and other recipients as historical facts and not as a product principally focused on Mr. Rahm (§ 4.2(c)). Accurate factual, statistical, historical-record, results, archival, news, editorial, and league-history references to Mr. Rahm, and the licensing of Historical Data as factual data, are permitted, provided the use is not an Extracted Use and is not presented as a current endorsement, affiliation, sponsorship, or approval (§ 4.2(d)). Any use principally focused on Mr. Rahm or using Mr. Rahm, Player Identification, Additional Rights, the RAHMBO Mark, or any Legion XIII Mark as a featured, promotional, sponsor-facing, or commercial identifier or draw—including titles, thumbnails, key art, title or presenting sponsorship, sponsor pitches, investor materials, and advertising principally focused on Mr. Rahm—requires prior written consent (§ 4.2(e)). The Rahm Parties consent to the appearance of the RAHMBO Mark and the Legion XIII Marks as authentically embedded in Historical Content, as sponsor or apparel branding captured as filmed, or as neutral descriptive identifiers in factual league history, results, standings, record books, archives, hall-of-fame materials, and descriptive metadata, but neither mark may be extracted, recreated, or used as a designed element in a title, thumbnail, key art, advertising, promotion, sponsorship, product, or service without RightsCo's prior written consent (§ 4.2(f)). Archive Owners that assume Article IV in writing, Licensed Exploiters, and operational recipients may exercise limited Article IV rights, and "LIV Party" includes each LIV Party's successors by merger, conversion, plan of reorganization, or operation of law, including any reorganized Debtor and any trustee or other estate representative, without any assumption requirement (§ 4.2(h)). A Pre-Effective Date Commitment may be performed only to the extent its use falls |

| Term | Summary |
|---|---|
| | within the Permitted Historical Uses, except that a Scheduled Commitment listed on Schedule 4.2(i) may be performed in accordance with its terms through the end of its term as in effect on the Effective Date (§ 4.2(i)). Article IV constitutes the Rahm Parties' written consent for right-of-publicity and similar purposes (§ 4.2(j)), and Mr. Rahm consents to the processing of personal data embodied in Historical Content and Historical Data for Permitted Historical Uses (§ 4.2(k)). Each Rahm Party grants each LIV Party a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully paid-up license under its rights in Player Identification and Additional Rights, solely to the extent embodied in Historical Content and as necessary to own, sell, license, assign, transfer, and exploit that Historical Content for the Permitted Historical Uses; the license is appurtenant to and inseparable from the Historical Content, passes automatically to an Archive Owner with the content it acquires upon its written assumption, may be sublicensed only to operational recipients and Licensed Exploiters as provided in § 4.2(h), and does not extend to the RAHMBO Mark or the Legion XIII Marks, the appearance and use of which are governed exclusively by § 4.2(f) (§ 4.3). Except as permitted by Article IV, no LIV Party may make any new use of Player Identification or Additional Rights without Mr. Rahm's prior written consent, or of the RAHMBO Mark or any Legion XIII Mark without RightsCo's prior written consent (§ 5.1). |
| **Surviving Provisions; No § 365(n) Rights (§ 6.1)** | After the Effective Date, the only Contract provisions or pre-existing rights that survive are: PLSA § 6.1 solely as to ownership of Materials (subject to its exclusion of Additional Rights and to Article IV); PLSA Article IX (confidentiality); ownership interests and completed assignments acknowledged in the Separation Agreement, including Historical Content and Subject IP validly assigned to a LIV Party before the Effective Date; PPA § 4.9 and § 7(e) of Schedule 5 to the PPA as applied to Historical Content and Permitted Historical Uses, and the second sentence of PPA § 7.1 as applied to the League Marks and other intellectual property validly owned by the LIV Parties; PPA § 7.2 and PLSA § 6.3 as limited further-assurances obligations for three years; PLSA § 6.2 and PPA § 7.3 as limited ownership confirmations and moral-rights waivers; and the Separation Agreement itself. TPA §§ 12.2(e)(i), (ii), and (iv) and 16.1 do not survive (§ 6.1(a)). No Contract provision, survival clause, election, or asserted right under section 365(n) of the Bankruptcy Code arising from any Contract preserves any license, approval, sell-through, runoff, inventory, or other future-use right except the ownership and rights expressly preserved or granted by the Separation Agreement, including the § 4.3 license (§ 6.1(b)). The Separation Agreement does not characterize the § 4.3 license as a license of "intellectual property" for purposes of section 365(n); that license is granted by the non-debtor Rahm Parties to the LIV Parties and excludes the RAHMBO Mark and the Legion XIII Marks. |
| **No Restrictions on Rahm Activities; Freedom to Compete;** | From the Effective Date, and subject to § 6.6, the Rahm Parties owe no further service or performance obligations under any Contract, are not bound by League Regulations or Team Rules and Policies, and may join or contract with any tour, league, or sponsor without notice to or consent from any LIV Party; |

| Term | Summary |
|---|---|
| **League Marks (§§ 6.2, 6.4–6.6)** | the LIV Parties agree not to assert Contract-based claims against the Rahm Parties or third parties on that basis, except to enforce the Separation Agreement or as required by law. The Rahm Parties acknowledge the LIV Parties' ownership of the League Marks and of the Historical Content, Materials, Historical Data, Subject IP, and other intellectual property validly owned by them (excluding the Legion XIII Marks and the RAHMBO Mark), and covenant not to use or register any League Mark or confusingly similar mark, not to challenge the LIV Parties' ownership of the League Marks or validly assigned Subject IP, and not to use Historical Content except as separately authorized in writing by its owner, without restricting Mr. Rahm's accurate factual references to his League participation and results (§ 6.6). |
| **Team Operator Equity (§ 6.3)** | The parties acknowledge that, prior to the Petition Date, the Team 13 Merger became effective and that, at its effective time, all equity or membership interests in the Team Operator held of record or beneficially by the Rahm Parties (the "Rahm Equity Interests") were cancelled and extinguished for no consideration; that the Rahm Parties thereupon ceased to be members or equityholders of the Team Operator, each Rahm-designated manager ceased to serve, and the limited liability company agreement adopted in connection with the Team 13 Merger replaced the A&R LLCA (together, the "Merger Acknowledgments"); that no Rahm Party holds any equity or membership interest in, or any right to acquire any such interest in, any LIV Party, and no put/call price, distribution, or other amount is or will become payable in respect of the Rahm Equity Interests; that all membership, governance, economic, transfer, put/call, Team Principal, League Owners Alliance, and similar rights and obligations under the A&R LLCA, the Subscription Agreement, and the TPA terminated at the Team 13 Merger and, to the extent not previously terminated, terminate as of the Effective Date; and that no Rahm Party has any further capital contribution, Funding Commitment, capital call, repayment, clawback, indemnity, guarantee, or tax-distribution obligation relating to the Team Operator or the Team (including Mr. Rahm's guarantee under Section 19 of the Subscription Agreement and any obligation under Section 13.2 of the TPA), other than tax reporting and related obligations required by law. The Team Operator will provide final tax reporting for all periods through the Effective Date, including a final Schedule K-1 and capital-account statement, and will update its membership and ownership records. Effective as of the Effective Date, each Rahm Party waives notice of the Team 13 Merger and any claim that the merger or the cancellation was invalid or breached any Contract or duty. The Merger Acknowledgments become effective only on the Effective Date and do not survive if the Separation Agreement becomes null and void under § 11.2 (§ 6.3). |
| **Legion XIII Marks (Art. VII)** | The assignment is subject to the following conditions precedent: (i) the Approval Order authorizes the transfer under sections 363(b) and 363(f) of the Bankruptcy Code free and clear of all liens, claims, and interests, including the DIP Liens and the Prepetition Liens; (ii) the DIP Lender has delivered its written consent; (iii) any consent required under the Restructuring Support Agreement has been obtained; and (iv) the LIV Parties have delivered the |

| Term | Summary |
|---|---|
| | Legion XIII Asset and Title Schedule attached as Schedule 1, completed in good faith. Any dispute concerning the completeness or accuracy of Schedule 1 is to be resolved after the Effective Date under § 7.2(g) and, if necessary, § 12.5 or the Approval Order, and does not delay the Effective Date, the releases, or the free-and-clear transfer. If the conditions are not satisfied, the assignment does not become effective and the parties' rights are governed by § 11.2 (Art. VII). Effective as of the Effective Date, each LIV Party assigns to RightsCo all right, title, and interest it owned as of that date in the Legion XIII Marks (defined to exclude the League Marks, composite logos, and sponsor or third-party marks) and related assets identified or required to be identified on Schedule 1 (including registrations, applications, goodwill, domain names other than the livgolf.com domain, social-media accounts and credentials, page content, and rights to sue for past infringement), and transfers controlled (but not owned) assets only to the extent legally transferable and within its power, in each case free and clear of all liens, claims, encumbrances, and interests (including the DIP Liens and the Prepetition Liens) as authorized by the Approval Order, and on an as-is, where-is basis without representation other than those in § 12.11 (§ 7.1). The LIV Parties will deliver recordable short-form trademark assignments (§ 7.2(a)–(b)). During an operational transition period not exceeding sixty (60) days after the Effective Date, the LIV Parties may use a Legion XIII Mark or related transferred asset solely as reasonably necessary to complete the transfer and remove or replace the mark from operational materials, with no manufacture, sale, distribution, new promotion, sponsorship, licensing, or other commercial exploitation during that period; thereafter, no LIV Party may use or exploit any Legion XIII Mark except as part of a Permitted Historical Use, and no recall or destruction is required for material distributed or published before the Effective Date (§ 7.2(f)). RightsCo bears all recordation costs and is solely responsible for prosecution, maintenance, and enforcement of the marks, and no LIV Party is required to incur costs to maintain them pending recordation (§ 7.2(h)). Transferred social-media accounts and webpages pass as usable containers with credentials and an export of operating content, copyright in Account Content remains with its owners, the LIV Parties may retain archival copies, RightsCo receives a limited operational license to LIV-owned Account Content, and RightsCo must remove items implicating third-party rights within ten Business Days after a written request (§ 7.3). RightsCo covenants not to use the Legion XIII Marks in combination with, or in a manner suggesting current affiliation with, any League Mark, any LIV Party, the League or any League team, or the TGL, and not to assert that the continued operation of a League team under a new name or identity that does not use "Legion," any Legion XIII design mark, or confusingly similar branding infringes the Legion XIII Marks, unless that team is marketed as a continuation, successor, or rebrand of Legion XIII (§ 7.4). The Article VII transfer does not transfer any third-party sponsorship agreement (including the Team Sponsorship Agreement between the Team Operator and Banco Santander), or any sponsorship receivable, account, payment right, claim, defense, cure right, rejection right, or other contract right of any LIV Party, all of which remain with the Debtors' estates, and RightsCo may not use any |

| Term | Summary |
|---|---|
| | Transferred Account to interfere with, administer, or monetize any existing sponsorship arrangement of a LIV Party. |
| **RAHMBO Mark (Art. VIII)** | RightsCo's ownership of the RAHMBO Mark is confirmed; all licenses to the LIV Parties are terminated; the LIV Parties disclaim any interest and covenant not to challenge RightsCo's ownership (§ 8.1). |
| **Mutual Releases (Art. IX)** | Effective upon the Effective Date, the Rahm Parties release the LIV Parties and their related persons from (i) all monetary and economic claims under the Contracts arising from pre-Effective Date conduct or performance, including claims for fees, bonuses, indemnities, rejection damages, prize money, annual payments, commitment fees, and other payment claims, intended as a complete economic walk-away, and (ii) all other claims and causes of action (including all Claims as defined in section 101(5) of the Bankruptcy Code) based upon conduct occurring on or before the Effective Date (together, the "Rahm Claims") (§ 9.1). The Rahm Parties expressly waive and withdraw all Rahm Claims, including any proof of claim, rejection damages claim, cure claim, or administrative expense claim (including under section 503(b) of the Bankruptcy Code), and will withdraw with prejudice any proof of claim within five Business Days after the Effective Date, with the claims agent authorized to expunge it (§ 9.1). The LIV Parties release the Rahm Parties and their related persons from all Contract-based monetary claims and all other claims and causes of action based upon conduct occurring on or before the Effective Date, expressly including claims arising under chapter 5 of the Bankruptcy Code and analogous law (§ 9.2). The releases do not release (a) claims arising from conduct after the Effective Date, including a use outside Article IV or a breach of the Separation Agreement or the Approval Order; (b) claims of a Rahm Party against any Person other than a LIV Party concerning ownership, title, authorization, infringement, false endorsement, publicity, or other noncontract misuse of Subject IP, to the extent not resolved by the Separation Agreement and excluding any claim against a Person released under § 9.1 based on pre-Effective Date conduct; (c) noncontract claims of a Rahm Party arising from a pre-Effective Date use that was not actually authorized (including by the general grants of rights in the Contracts) by or on behalf of a LIV Party; or (d) rights to enforce the Separation Agreement or the Approval Order; the carve-outs do not preserve any chapter 5 claim released by § 9.2 or any terminated-Contract obligation (§ 9.3). Each Rahm Party covenants not to sue any downstream recipient, Archive Owner, or Licensed Exploiter with respect to any use that was so authorized before, or is within Article IV after, the Effective Date (§ 9.3). All payment, repayment, indemnity, guarantee, and other monetary or performance obligations under the terminated Contracts are irrevocably extinguished (§ 9.3). Each Rahm Party represents that it has not assigned or transferred any released claim (§ 9.4). |
| **Downstream Notice; Public-Facing Corrections (Art. X)** | The LIV Parties will notify known licensees, distributors, and other recipients of the termination of rights and the Article IV limits, and will, as soon as reasonably practicable and in no event later than fifteen (15) Business Days after the Effective Date, correct or remove current public-facing material owned or controlled by a LIV Party stating or implying that Mr. Rahm is |

| Term | Summary |
|---|---|
| | currently affiliated with any LIV Party, using commercially reasonable efforts as to third-party platforms, without any duty of general monitoring, and without any obligation to amend, terminate, or breach a Scheduled Commitment during its term as in effect on the Effective Date (§§ 10.1–10.2). |
| **Effectiveness; Interim Period; Rejection Motion (Art. XI)** | Upon execution, the parties are bound solely to seek Court approval, to cooperate and not frustrate the transactions, and to observe the interim standstill (§ 11.1). The termination, releases, and Legion XIII assignment become effective on the Effective Date, which is the first date on which the Approval Order has been entered, is not stayed, and the Article VII conditions have been satisfied, and which does not depend on finality of the Approval Order (Art. I; § 11.1). The Approval Order is to be in form and substance reasonably acceptable to the Debtors, the DIP Lender, and the Rahm Parties, and the parties agree to request a waiver of, and waive any right to request, a stay under Bankruptcy Rule 6004(h) (§ 11.1). On the Effective Date, the Rejection Motion is deemed withdrawn solely to the extent it pertains to the Contracts and the Rahm Parties, and until then the Debtors retain the right to prosecute the Rejection Motion in full (§ 11.1). If the Court denies approval, any Article VII condition is denied or becomes incapable of satisfaction, or the Court enters an order that materially modifies the Separation Agreement or the proposed Approval Order in a manner materially adverse to a party without that party's consent, the agreement becomes null and void (other than specified provisions) and all parties' positions are reserved (§ 11.2). During the interim period, no LIV Party will enforce service, exclusivity, approval, economic self-help, or similar provisions against the Rahm Parties or initiate new uses of Mr. Rahm's identity (Permitted Historical Uses, including performance of Pre-Effective Date Commitments to the extent permitted by Article IV, are not new uses); and each LIV Party acknowledges that, consistent with the Rejection Motion, no Rahm Party has any performance obligation under any Contract on or after the Petition Date, agrees that no LIV Party has asserted or will assert a breach on that basis, and waives any such claim, which acknowledgment and waiver is effective upon execution, is not conditioned on the Approval Order, and survives termination under § 11.2 (§ 11.3). |

## Basis for Relief

### I. The Separation Agreement Satisfies the Standards of Bankruptcy Rule 9019 and Should Be Approved.

17. Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n the [debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In addition, section 105(a) of the Bankruptcy Code

provides that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

18. Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotation marks and citation omitted); *see also Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *In re Petersburg Regency LLC*, 540 B.R. 508, 535 (Bankr. D.N.J. 2015) (quoting *Martin*, 91 F.3d at 393).

19. The decision to approve a settlement is committed to the sound discretion of the bankruptcy court, which must determine whether the compromise is fair, reasonable, and in the best interests of the estate. *See In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997) ("[T]he decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."); *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."); *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014).

20. In *Martin*, the Third Circuit set forth a four-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily

attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *see also Nutraquest*, 434 F.3d at 644.

21. In applying the *Martin* factors, courts should not "have a 'mini-trial' on the merits," but rather should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (D. Del. 2012) (citations omitted); *see also In re Roper & Twardowsky, LLC*, 559 B.R. 375, 394 (Bankr. D.N.J. 2016) (the court's role is "to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness" (alteration in original)); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008) (settlement should be approved if it falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness"). Nor should a court substitute its judgment for the business judgment of the debtor in possession. *See Roper & Twardowsky*, 559 B.R. at 394.

22. Each of the *Martin* factors weighs in favor of approving the Separation Agreement.

**A. The Probability of Success in Litigation Is Uncertain.**

23. Absent the Separation Agreement, the Debtors would be required to litigate an objection by the Rahm Parties to the Rejection Motion, including the Rahm Parties' contentions that the Rahm Contracts form a single, integrated agreement; that the Debtors may not retain license rights under rejected agreements; that section 365(c)(1) of the Bankruptcy Code bars assumption of the Rahm Contracts over Mr. Rahm's objection; and that the Rahm Contracts should be terminated rather than rejected. The Rahm Parties further contended that any determination of the scope of the Debtors' surviving rights in Mr. Rahm's Player Identification would require an adversary proceeding under Bankruptcy Rule 7001. While the Debtors believe their positions are meritorious, the issues presented—including questions of New York and Delaware contract law

regarding the integration of the Rahm Contracts, the interaction of section 365 with license grants under which a debtor is the licensee, and the scope of rights that survive rejection, *see Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370 (2019)—are contested, and the outcome of any litigation over them is uncertain. The Separation Agreement eliminates that uncertainty by resolving the parties' disputes in full on terms that the Debtors, in their business judgment, consider favorable to the estates.

**B. Litigation Would Be Complex, Expensive, and Protracted, and Any Estate Recovery Would Be Uncertain.**

24. The second and third *Martin* factors likewise weigh decisively in favor of approval. "The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation," and it is "axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation." *Nutraquest*, 434 F.3d at 646 (citing *TMT Trailer*, 390 U.S. at 434 ("Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.")). Here, the alternative to settlement is not a single contested hearing but a multi-stage dispute. First, the Rejection Motion would proceed as a contested matter as to the Rahm Contracts, with discovery and an evidentiary record on the negotiation and structure of five interrelated agreements executed in December 2023 and December 2024, the parties' course of dealing, and the integration question under New York and Delaware law. Second, the Rahm Parties have taken the position that the scope of the Debtors' surviving rights in Historical Content and Player Identification cannot be determined on the Rejection Motion at all and would require an adversary proceeding under Bankruptcy Rule 7001, with its own pleadings, discovery, and trial. Third, the legal questions presented—the effect of rejection on a debtor-licensee's rights after *Tempnology*, and whether section 365(c)(1) of the Bankruptcy Code bars assumption of a

personal-services agreement over the counterparty's objection—are of the kind that invite protracted litigation, so that a final resolution could take many months or longer.

25. Such litigation would burden the Debtors' estates with substantial professional fees and would divert the Debtors' limited management resources from the implementation of LIV 2.0 and the plan process at a critical stage of these chapter 11 cases, including in light of the milestones contained in the BC Partners RSA. Nor would the Debtors stand to gain anything from that process that the Separation Agreement does not already deliver. The Separation Agreement avoids these costs and delays entirely, while preserving, through Article IV of the Separation Agreement, the Debtors' ability to use Historical Content and Historical Data on defined terms—the very rights that would otherwise be the subject of the adversary proceeding. Accordingly, the second and third *Martin* factors weigh in favor of approval.

**C. The Paramount Interest of Creditors Favors Approval.**

26. The fourth *Martin* factor—the paramount interest of creditors—strongly favors approval. Under the Separation Agreement, the Rahm Parties waive and release all of their claims under the Rahm Contracts, including any claim for rejection damages on account of the remaining term of the PPA and the PLSA, any cure claim, and any administrative expense claim, including under section 503(b) of the Bankruptcy Code, and all other claims against the Debtors based upon conduct occurring on or before the Effective Date, thereby eliminating from the pool of general unsecured claims the largest claim listed on the Debtors' consolidated list of thirty largest unsecured creditors ($7,472,527.47) and any associated rejection damages or administrative expense claim, and requiring the withdrawal of any proofs of claim asserting such claims. The Debtors also retain ownership of the Historical Content and of the Subject IP and Materials validly assigned to them (and of Historical Data to the extent owned by them), together with the right to

sell, license, or transfer that content as an asset, receive a perpetual, irrevocable, royalty-free license from the Rahm Parties under their rights in Mr. Rahm's Player Identification and Additional Rights as embodied in that content for the Permitted Historical Uses, obtain certainty regarding the scope of their continued ability to use Historical Content in League programming and other Permitted Historical Uses, and eliminate the risk of future disputes over the use of Mr. Rahm's Player Identification. In exchange, the Debtors transfer the Legion XIII Marks (but no sponsorship agreement, receivable, or other contract right), terminate their continuing license rights in Mr. Rahm's Player Identification and Additional Rights, confirm that the Rahm Parties have no further funding, capital contribution, or guarantee obligations relating to the Team Operator, and release their other claims against the Rahm Parties—consideration that is of limited value to the estates in light of the rejection of the Legion XIII players' contracts and the restructured compensation model contemplated by LIV 2.0.

27. Finally, the Separation Agreement is the product of extensive, good-faith, arm's-length negotiations between the Debtors and the Rahm Parties, each represented by experienced counsel, and reflects reasonable compromises by both sides. For all of these reasons, the Separation Agreement falls well above the lowest point in the range of reasonableness and should be approved under Bankruptcy Rule 9019.

## II. Entry into the Separation Agreement Is a Sound Exercise of the Debtors' Business Judgment Under Section 363(b) of the Bankruptcy Code.

28. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A settlement of claims and causes of action by a debtor in possession constitutes a use of property of the estate. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 350–51 (3d Cir. 1999) ("[t]he scope of [11 U.S.C. § 541] is broad. It

includes all kinds of property, including tangible or intangible property, causes of action . . . ." (quoting H.R. Rep. No. 95-595, at 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323)). If a settlement is outside of the ordinary course of business of the debtor, it requires approval of the bankruptcy court pursuant to section 363(b) of the Bankruptcy Code. *See Martin*, 91 F.3d at 395 n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy.").

29. Courts in the Third Circuit have made clear that a debtor may use property of the estate outside of the ordinary course of business if there is a good business reason for doing so. *See, e.g., Martin*, 91 F.3d at 395 ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991). Where a valid business justification exists, a debtor's decision enjoys a strong presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

30. The Debtors' entry into the Separation Agreement, including the assignment and transfer of the Legion XIII Marks to RightsCo free and clear of the DIP Liens and the Prepetition Liens with the consent of the DIP Lender, the termination of the Debtors' continuing license rights under the Rahm Contracts, and the release of the Debtors' claims against the Rahm Parties, is

supported by sound business justifications. The Legion XIII Marks are associated with a team whose player-members' contracts are being rejected and whose continuation under LIV 2.0 is uncertain; the Debtors' remaining license rights in Mr. Rahm's Player Identification would be of limited utility following Mr. Rahm's separation from the League; and the consideration received by the estates—the release of the Rahm Parties' claims under the Rahm Contracts (including any rejection damages claims) and their other Claims against the Debtors, the perpetual license under the Rahm Parties' rights in Player Identification and Additional Rights as embodied in Historical Content and Historical Data for the Permitted Historical Uses, and the elimination of continuing disputes—substantially exceeds the value of the consideration given. Accordingly, the Debtors submit that entry into and performance of the Separation Agreement is a sound exercise of their business judgment and should be approved under section 363(b) of the Bankruptcy Code.

## III. The Transfer of the Legion XIII Marks Free and Clear of Liens, Claims, and Interests Is Appropriate Under Section 363(f) of the Bankruptcy Code.

31. Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f). Section 363(f) is drafted in the disjunctive; satisfaction of any one of its requirements suffices to warrant a transfer free and clear. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The DIP Lender and the holders of the Prepetition Liens are the only parties known to the Debtors to assert liens on or interests in the

Legion XIII Marks, and each has consented to the transfer of the Legion XIII Marks to RightsCo free and clear of the DIP Liens and the Prepetition Liens, as contemplated by Article VII of the Separation Agreement. Accordingly, the transfer of the Legion XIII Marks free and clear of the DIP Liens and the Prepetition Liens satisfies section 363(f)(2) of the Bankruptcy Code and should be approved. The transfer is limited to the Legion XIII Marks and related assets described in Article VII of the Separation Agreement. No third-party sponsorship agreement (including the Team Sponsorship Agreement between the Team Operator and Banco Santander), and no sponsorship receivable, account, payment right, claim, defense, cure right, rejection right, or other contract right of any Debtor, is transferred by the Legion XIII asset transfer, all of which remain property of the Debtors' estates, and RightsCo may not use any transferred social-media account or other Transferred Account to interfere with, administer, or monetize any existing sponsorship arrangement of any Debtor.

**<u>Waiver of Bankruptcy Rule 6004(h)</u>**

32. Bankruptcy Rule 6004(h) provides that, "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). The Separation Agreement provides that the termination of the Rahm Contracts, the releases, and the assignment of the Legion XIII Marks become effective on the Effective Date, which occurs on the first date on which the Order has been entered and is not stayed and the conditions set forth in Article VII of the Separation Agreement have been satisfied, and that the Effective Date does not depend on the finality of the Order. Absent a waiver, therefore, the fourteen-day stay would delay the Effective Date and the implementation of the Separation Agreement. To implement the Separation Agreement promptly and to provide the Debtors and the Rahm Parties with certainty regarding their respective rights,

the Debtors request that, to the extent the relief requested in this Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Court waive the fourteen-day stay under Bankruptcy Rule 6004(h) and provide that the Order is effective immediately upon its entry. The parties to the Separation Agreement have agreed to request a waiver of, and have waived any right to request, a stay under Bankruptcy Rule 6004(h). See Separation Agreement § 11.1.

**Reservation of Rights**

33. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) except as expressly provided in the Separation Agreement, a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

**No Prior Request**

34. No prior request for the relief sought in this Motion has been made to this Court or any other court.

**Notice**

35. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) counsel to the Committee; (c) counsel to PIF as prepetition lender and DIP Lender; (d) counsel to BC Partners; (e) the United States Attorney's Office for the District of New Jersey; (f) the Internal Revenue Service; (g) the Rahm Parties and their counsel, Dentons US LLP; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: October 14, 2026

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

- and -

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# <u>Exhibit A</u>

**Proposed Order**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| **UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY** | |
|---|---|
| In re:<br><br>LIV GOLF NEW JERSEY LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-20189 (MBK)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING THE SEPARATION AGREEMENT AND MUTUAL RELEASE BETWEEN THE DEBTORS AND THE RAHM PARTIES PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO PERFORM ALL OF THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through ten (10), is **ORDERED**.

[1] The last four digits of Debtor LIV Golf New Jersey LLC's tax identification number are 5081. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/livgolf. The location of the Debtors' service address in these chapter 11 cases is: 50 Hudson Yards, Suite 65B, New York, NY 10001.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GIBSON, DUNN & CRUTCHER LLP**
Scott J. Greenberg (admitted *pro hac vice*)
Matthew J. Williams (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
Tommy Scheffer (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
sgreenberg@gibsondunn.com
mjwilliams@gibsondunn.com
kmartorana@gibsondunn.com
rfitzgerald@gibsondunn.com
tscheffer@gibsondunn.com

- and -

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Seth Van Aalten, Esq. (admitted *pro hac vice*)
Anthony De Leo, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
svanaalten@coleschotz.com
adeleo@coleschotz.com
mpercontino@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

Upon the *Debtors' Motion for Entry of an Order (I) Approving the Separation Agreement and Mutual Release Between the Debtors and the Rahm Parties Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Perform All of Their Obligations Thereunder, and (III) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) approving the Separation Agreement and Mutual Release attached hereto as Exhibit 1 (the "Separation Agreement") by and among the Rahm Parties and the LIV Parties, (b) authorizing the Debtors to enter into and perform all of their obligations under the Separation Agreement, including the consensual termination of the Rahm Contracts, the assignment and transfer of the Legion XIII Marks to RightsCo free and clear of all liens, claims, encumbrances, and interests, and the mutual releases provided therein, (c) deeming the Rejection Motion withdrawn solely to the extent it seeks rejection of, or other relief concerning, the Rahm Contracts and the Rahm Parties, and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution;

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or, if not defined therein, in the Separation Agreement.

and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"), if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED as set forth herein.

2. Any objections to the Motion and to the relief requested therein and/or granted in this Order that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are overruled on the merits.

3. The Separation Agreement, including each of the terms and transactions contemplated therein, is approved pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code and Bankruptcy Rule 9019.

4. The Debtors are authorized to enter into, execute, deliver, and perform under the Separation Agreement and any other documents and instruments in connection therewith, and to take all actions necessary or appropriate to implement and consummate the Separation Agreement and the transactions contemplated thereby, including, without limitation, executing and delivering recordable trademark assignments and other instruments of transfer, transferring digital assets and credentials, delivering tax reporting information, electing the transfer or destruction of Affected Inventory, and providing the notices and public-facing corrections, all as contemplated by Articles

II, VI, VII, and X of the Separation Agreement, and to fully consummate and effect the transactions provided for in, and carry out the relief granted in, this Order in accordance with the terms of the Separation Agreement, in each case without further order of the Court.

5. The Separation Agreement is the product of good-faith, arm's-length negotiations between the Debtors and the Rahm Parties, each of which was represented by counsel. The Separation Agreement, including the releases contained therein, is fair and equitable and in the best interests of the Debtors, their estates, and their creditors, based upon the record before the Court as to the probability of success in litigation, the likely difficulties in collection, the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it, and the paramount interest of creditors, and exceeds the lowest point in the range of reasonableness. The Debtors' entry into the Separation Agreement is a sound exercise of their business judgment.

6. Effective as of the Effective Date (as defined in the Separation Agreement), each of the Rahm Contracts is terminated by agreement of the parties thereto in accordance with Section 2.1 of the Separation Agreement, and the rights and obligations of the LIV Parties and the Rahm Parties thereafter are governed solely by the Separation Agreement and the provisions of the Rahm Contracts expressly preserved therein. For the avoidance of doubt, nothing in this Order terminates or impairs the ownership by any LIV Party of Historical Content, or of Materials or Subject IP validly assigned to a LIV Party before the Effective Date, or of Historical Data to the extent owned by a LIV Party, or the license granted to the LIV Parties under Section 4.3 of the Separation Agreement, as set forth in Sections 2.2(c), 4.1, 4.3, and 6.1 of the Separation Agreement.

7. Effective as of the Effective Date, the Rejection Motion is deemed withdrawn solely to the extent it seeks rejection of, or other relief concerning, the Rahm Contracts and the Rahm Parties, without further action or filing by any party. Until the Effective Date, nothing in this Order limits the Debtors' right to prosecute the Rejection Motion in full. For the avoidance of doubt, nothing in this Order modifies or otherwise affects the Rejection Motion, or any order entered thereon, with respect to any contract or lease other than the Rahm Contracts.

8. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the assignment and transfer of the Legion XIII Marks and related assets to RightsCo in accordance with Article VII of the Separation Agreement is authorized and approved, effective as of the Effective Date, free and clear of all liens, claims, encumbrances, and interests, including the DIP Liens and the Prepetition Liens (each as defined in the Separation Agreement), the holders of which have consented to such transfer, and the Debtors are authorized to execute, deliver, and record such instruments as are necessary or appropriate to effect and record such assignment and transfer. The Rahm Parties are purchasers in good faith within the meaning of section 363(m) of the Bankruptcy Code and entitled to all of the benefits and protections afforded thereby.

9. Notwithstanding anything to the contrary in the Separation Agreement or this Order, no third-party sponsorship agreement (including the Team Sponsorship Agreement between the Team Operator and Banco Santander), and no sponsorship receivable, account, payment right, claim, defense, cure right, rejection right, or other contract right of any Debtor, is assigned or transferred to RightsCo or any other Rahm Party by this Order or the Separation Agreement, all of which remain property of the Debtors' estates, and RightsCo shall not use any

Transferred Account (as defined in the Separation Agreement) to interfere with, administer, or monetize any existing sponsorship arrangement of any Debtor.

10. Effective as of the Effective Date, the acknowledgments set forth in Section 6.3 of the Separation Agreement regarding the Team 13 Merger and the Rahm Equity Interests (each as defined in the Separation Agreement) are approved and shall be binding on the Rahm Parties, and no Rahm Party holds, or shall assert, any equity or membership interest in, or any claim in respect of any equity or membership interest in, any LIV Party.

11. The releases set forth in Article IX of the Separation Agreement are approved and shall be binding and effective as of the Effective Date in accordance with their terms, including, without limitation, (a) the release by the Rahm Parties of the Rahm Claims (as defined in the Separation Agreement) against the LIV Parties and their related persons as set forth in Section 9.1, and (b) the release by the LIV Parties of the claims and causes of action described in Section 9.2, in each case subject to the carve-outs set forth in Section 9.3 of the Separation Agreement. In accordance with Section 9.1 of the Separation Agreement, the Rahm Parties shall withdraw with prejudice any proof of claim asserting a claim released under the Separation Agreement within five (5) Business Days after the Effective Date, and the Debtors' claims and noticing agent is authorized to expunge any such proof of claim from the claims register without further order of the Court.

12. To the extent applicable, the automatic stay pursuant to section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to permit the implementation of the Separation Agreement and the transactions contemplated therein in accordance with its

terms and this Order; *provided* that any action or proceeding by any Rahm Party to enforce the Separation Agreement or this Order against any Debtor or property of the Debtors' estates shall be brought exclusively in this Court, consistent with Section 12.5 of the Separation Agreement, or as otherwise expressly permitted by this Order; and *provided further* that nothing in this paragraph modifies the automatic stay to permit any Rahm Party to assert, liquidate, or collect any claim released under the Separation Agreement.

13. Nothing contained in the Motion or this Order is intended or should be construed to create an administrative priority claim.

14. Notwithstanding anything to the contrary in the Motion or this Order, any payment made or other action taken by the Debtors pursuant to the authority granted in this Order must be in compliance with, and any authorization of the Debtors contained herein is subject to: (a) any interim or final orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the use of cash collateral; (b) the documentation in respect of any such debtor-in-possession financing or use of cash collateral; and (c) any budget or cash flow forecasts in connection therewith (in each case, the "DIP Order"). To the extent there is any inconsistency between the terms of the DIP Order and this Order, the terms of the DIP Order shall control.

15. The terms and provisions of this Order shall survive the entry of any order (a) confirming any chapter 11 plan in any of these chapter 11 cases, (b) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, or (c) dismissing any of these chapter

11 cases, and shall continue in full force and effect in these chapter 11 cases, or following the dismissal of these chapter 11 cases, notwithstanding the entry of any such order.

16. To the extent of any inconsistency between the Motion and this Order, this Order shall govern. To the extent of any inconsistency between this Order and the Separation Agreement, this Order shall govern solely to the extent necessary to implement the relief approved herein, including the authorizations granted under sections 363(b) and 363(f) of the Bankruptcy Code; in all other respects, the Separation Agreement shall govern the contractual rights and obligations of the LIV Parties and the Rahm Parties as between themselves, and nothing in this Order shall be construed to grant any Rahm Party any right beyond those set forth in the Separation Agreement.

17. Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Order or the Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) except as expressly provided in the

Separation Agreement, a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law.

18. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

19. Notwithstanding Bankruptcy Rule 6004(h) or any other applicable rule to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

20. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

21. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order and the Separation Agreement.

# Exhibit 1

## Separation Agreement and Mutual Release

## SEPARATION AGREEMENT AND MUTUAL RELEASE

This Separation Agreement and Mutual Release (including all exhibits and schedules, this **"Agreement"**) is entered into as of the date of the last signature below by and among:

(a) Jon Rahm Rodriguez, an individual resident of Arizona ("Mr. Rahm");

(b) Rahm, LLC, an Arizona limited liability company ("RightsCo" and, together with Mr. Rahm, the "Rahm Parties");

(c) LIV Golf Holdings Ltd, a private limited company incorporated under the laws of Jersey ("League HoldCo");

(d) LIV Golf Incorporated, a Delaware corporation ("US OpCo");

(e) LIV Golf Ltd, a private limited company incorporated under the laws of England and Wales ("UK OpCo" and, together with League HoldCo and US OpCo, the "League Operator");

(f) Wedge IP Management Co, LLC, a Delaware limited liability company ("League US IP ManagementCo");

(g) Wedge IP Management Co, Ltd, a company incorporated under the laws of England and Wales ("League UK IP ManagementCo" and, together with League US IP ManagementCo, "League IP ManagementCo");

(h) Fairway TM Co 13, LLC, a Delaware limited liability company (the "Team Operator");

(i) Fairway TM Blocker 13, LLC, a Delaware limited liability company;

(j) Fairway TM Intermediate 13, LLC, a Delaware limited liability company;

(k) LIV Golf New Jersey LLC, a New Jersey limited liability company (the "Lead Debtor" and, together with the entities listed in clauses (c) through (j), the "LIV Parties").

The Rahm Parties and the LIV Parties are referred to collectively as the "Parties" and individually as a "Party."

## RECITALS

**WHEREAS**, the LIV Parties and the Rahm Parties are or were parties to certain agreements (the "Contracts"), including the Player Participation Agreement dated December 6, 2023 (the "PPA"), the Player License and Services Agreement dated December 6, 2023 (the "PLSA"), the Team Participation Agreement dated December 30, 2024 (the "TPA"), and certain related operating, subscription, and ancillary agreements, in each case only to the extent included within the definition of Contracts in Article I;

**WHEREAS**, on September 8, 2026 (the "Petition Date"), the Lead Debtor and the other LIV Parties (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Court"), Case No. 26-20189 (MBK);

**WHEREAS**, the Debtors filed the Debtors' First Omnibus Motion, Docket No. 24 (the "Rejection Motion"), seeking rejection or other relief concerning the Contracts;

**WHEREAS**, the Parties have reached agreement on the terms of a complete separation, including termination of the Contracts and a mutual release of claims; and

**WHEREAS**, the Parties wish to memorialize their agreement and obtain approval of the Court;

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

**"Additional Rights"** has the meaning given to that term in the PLSA.

**"Affiliate"** means, with respect to any Person, any other Person that controls, is controlled by, or is under common control with that Person.

**"Approval Order"** means the order of the Court approving this Agreement pursuant to Bankruptcy Rule 9019 and authorizing the transactions contemplated hereby, in form and substance reasonably acceptable to the Debtors, the DIP Lender, and the Rahm Parties.

**"Bankruptcy Code"** means title 11 of the United States Code.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure.

**"Business Day"** means a day other than Saturday, Sunday, or a day on which commercial banks in New York, New York are authorized or required by law to close.

**"Chapter 11 Cases"** means the Debtors' jointly administered cases under chapter 11 of the Bankruptcy Code pending before the Court under Case No. 26-20189 (MBK).

**"Composite Logo"** has the meaning given to that term in the TPA.

**"Contracts"** means, collectively, the PPA, the PLSA, the TPA, the Amended and Restated Operating Agreement of Fairway TM Co 13, LLC dated December 30, 2024, as amended and restated as of March 5, 2025 (the "A&R LLCA"), the Subscription Agreement among the Team Operator, Mr. Rahm, and RightsCo dated December 30, 2024, and all amendments, supplements, modifications, restatements, ancillary agreements, side letters, and related instruments, in each case only to the extent (a) at least one Rahm Party and at least one LIV Party are parties and (b) the agreement or instrument relates specifically to Mr. Rahm, RightsCo, the team operated by the Team Operator, Player Identification, Additional Rights, the RAHMBO Mark, or Legion XIII.

**"Data"** has the meaning given to that term in the PPA.

**"DIP Lender"** means the lender(s) (together with any agent, arranger, and participants) under the Debtors' debtor-in-possession financing facility approved by the Court, together with its successors and assigns.

**"DIP Liens"** means the liens and security interests granted to or for the benefit of the DIP Lender under any interim or final order of the Court approving the Debtors' debtor-in-possession financing.

**"Distributor"** has the meaning given to that term in the PPA.

**"Effective Date"** means the first date on which (a) the Court has entered the Approval Order, (b) neither the entry nor effectiveness of the Approval Order is stayed, and (c) the conditions precedent to the

assignment and transfer under Article VII have been satisfied. For clarity, the Effective Date does not depend on finality of the Approval Order or expiration of any appeal period.

**"Event"** has the meaning given to that term in the PPA.

**"Extracted Use"** means any use in which Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, biographical information, performance attributes, or player-specific data embodied in Historical Content is functionally separated from, or deployed independently of, the qualifying Historical Content as an identifier, promotional asset, product or service feature, endorsement element, data product, synthetic input, or other independently exploitable element, whether used alone or together with the identity or rights of any other person. Editing, clipping, compilation, restoration, captioning, translation, indexing, search, editorial sequencing, analytics, moderation, recommendation, platform processing, and incorporation into archival, editorial, documentary, retrospective, or event-coverage programming do not constitute an Extracted Use solely by reason of that treatment if the resulting use continues to present or facilitate the historical record and otherwise complies with Article IV. Historical Data reported, licensed, or distributed as historical facts in accordance with Section 4.2(d) is not an Extracted Use.

**"Historical Content"** means authentic underlying pre-Effective Date audiovisual, photographic, broadcast, editorial, digital, social-media, interview, promotional, behind-the-scenes, event, team, or similar source content, to the extent owned or controlled by a LIV Party, or by an Affiliate of a LIV Party, an Other Team Operator, a Distributor, or another League Rights Holder under authority derived from a LIV Party, that was created or captured by or on behalf of the League Operator or an authorized Team Operator during the term of the Contracts in connection with the league, an event, a tournament, team competition, or related official league or team activity, and in which Mr. Rahm appears or is identified in his historical role as a LIV participant, player, or team member. Historical Content includes Subject IP, Materials, and Data only to the extent actually embodied in or constituting that source content. It excludes content outside that scope, newly created or synthetic material, and separately held biographical information, persona rights, marks, or data not embodied in that source content.

**"Historical Data"** means factual scores, results, standings, records, shot data, and aggregate statistics generated from Mr. Rahm's participation in the League, any Event, tournament, or team competition during the term of the Contracts, together with neutral identification reasonably necessary to report those facts. Historical Data may be reported, licensed, and distributed as historical facts, but does not include any right to package, brand, promote, or monetize Mr. Rahm's identity, biography, persona, marks, performance attributes, or player-specific data as a betting, gaming, fantasy, endorsement, promotional, data, or similar product principally focused on Mr. Rahm, except with the applicable prior written consent.

**"Law"** means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree, or order of any governmental authority.

**"League"** means the professional golf league operated by the League Operator, including all Events, teams, and competitions conducted under its auspices.

**"League Marks"** has the meaning given to that term in the PPA, and includes all other names, marks, logos, trade dress and other intellectual property owned or used by a LIV Party or its Affiliates, other than the Legion XIII Marks and the RAHMBO Mark.

**"League Owners Alliance"** has the meaning given to that term in the TPA.

**"League Regulations"** means all rules, regulations, guidelines, codes of conduct, and policies published by or on behalf of the League Operator, including any anti-tampering and non-solicitation guidelines, as in effect at any time.

**"League Rights Holder"** has the meaning given to that term in the PPA.

**"Legion XIII Marks"** means the Legion XIII name and all other marks associated with the team operated by the Team Operator, including the LEGION XIII word mark, all logo, crest, insignia, device, and other design marks, all trade dress, all registrations and applications for registration of any of the foregoing, all common-law rights therein, and all associated goodwill and related intellectual property. For clarity, the Legion XIII Marks exclude (i) the League Marks and any other mark, name, logo, trade dress or design element owned or used by a LIV Party or its Affiliates other than in respect of the team operated by the Team Operator (including the LIV name and house marks and any design template, shield, crest or other element used across multiple League teams); (ii) any Composite Logo (as defined in the TPA) and any League Mark or third-party mark forming part of a composite mark, to the extent of that League Mark or third-party mark; and (iii) any mark, name or logo of any sponsor or other third party.

"**Licensed Exploiter**" means a Person licensed in writing by a LIV Party or an Archive Owner to exploit identified Historical Content for its own account for Permitted Historical Uses, that has agreed in writing to be bound by the restrictions of Article IV with respect to that Historical Content.

**"Materials"** has the meaning given to that term in PLSA Section 6.1.

**"Other Team Operator"** has the meaning given to that term in the PPA.

**"Permitted Historical Uses"** means the uses permitted by Article IV.

**"Person"** means any individual or entity.

**"Player Identification"** has the meaning given to that term in the PPA, including Mr. Rahm's name, image, likeness, persona, voice, signature, endorsement, reputation, and all intellectual property rights in connection therewith.

**"Pre-Effective Date Commitments"** means a binding written agreement or commitment entered into on or before the Effective Date, including an option then exercisable as of right, in each case only as in effect on the Effective Date. Pre-Effective Date Commitments exclude renewals, extensions, new products, and any post-Effective Date expansion of scope.

**"Prepetition Liens"** means the liens and security interests securing the Debtors' prepetition secured obligations.

**"RAHMBO Mark"** means the trademark RAHMBO, including all common-law trademark rights therein and the U.S. federal trademark registration (U.S. Reg. No. 6,672,306), and all goodwill of the business symbolized thereby.

**"Restructuring Support Agreement"** means that certain restructuring support agreement entered into by the Debtors, as amended, restated, supplemented, or otherwise modified from time to time.

"**Scheduled Commitment**" means a Pre-Effective Date Commitment identified on Schedule 4.2(i).

**"Subject IP"** means the intellectual property rights actually assigned under PPA Section 7.1.

**"Team"** means the League team operated by the Team Operator, known as Legion XIII.

**"Team Principal"** has the meaning given to that term in the TPA.

**"Team Rules and Policies"** means the rules, regulations, guidelines, handbooks, and policies adopted by the Team Operator at any time.

## ARTICLE II

## TERMINATION OF THE CONTRACTS

### Section 2.1. Termination.

Effective as of the Effective Date, each of the Contracts is terminated, and the Parties' rights and obligations thereafter are governed solely by this Agreement and the Contract provisions expressly preserved in it.

### Section 2.2. Targeted Termination of Continuing Rights.

(a) **Continuing Rights Terminated.** Effective as of the Effective Date, and except solely for the ownership, permissions, and archive-appurtenant license expressly set forth in Article IV, each LIV Party terminates and irrevocably relinquishes all Contract-based licenses, sublicenses, permissions, authorizations, exploitation rights, approval and consent rights, notice and consultation rights, first-look and matching rights, rights of first refusal, deemed-approval mechanisms, no-challenge and further-assurances rights, control rights, and other continuing rights relating to Player Identification, Additional Rights, the RAHMBO Mark, or the Legion XIII Marks.

(b) **Post-Term Fees, Sell-Through, and Runoff.** The PLSA Section 7.1 post-term fee and all Contract-based post-termination sell-through, runoff, inventory-disposition, and other future-use rights are likewise terminated and of no further force or effect. No Contract provision, including any provision purporting to survive termination or expiration, preserves any such right except as expressly provided in this Agreement.

(c) **Ownership Unaffected.** This Section does not terminate or impair ownership of Historical Content or Subject IP validly assigned to a LIV Party before the Effective Date. That ownership creates no independent right to use, exploit, license, sublicense, approve, authorize, control, or require further assurances concerning Player Identification, Additional Rights, the RAHMBO Mark, the Legion XIII Marks, biographical information, performance attributes, or player-specific data embodied in that property, except through and within Article IV. Ownership and title otherwise remain governed by Articles IV, VII, and VIII.

### Section 2.3. New Production.

After the Effective Date, no LIV Party may, directly or indirectly, manufacture, replenish, procure, or newly produce, or authorize, direct, license, commission, or otherwise cause or permit any third party to manufacture, replenish, procure, or newly produce, any merchandise or other product bearing or incorporating Player Identification, the RAHMBO Mark, or any Legion XIII Mark, other than team or League photographs, yearbooks, programs, and record books depicting multiple players in which Mr. Rahm is not individually featured. Each LIV Party shall promptly terminate or cancel any then-outstanding production, manufacturing, or replenishment order for any such product, except to the extent required to perform a Scheduled Commitment. This Section does not prohibit the creation of copies or formats of Historical Content solely for a Permitted Historical Use.

### Section 2.4. Existing Inventory.

(a) **No Further Sale or Distribution.** From and after the Effective Date, no existing inventory bearing or incorporating Player Identification, the RAHMBO Mark, or any Legion XIII Mark (the "Affected Inventory") may be sold or distributed. Affected Inventory excludes copies or formats of Historical Content distributed solely as a Permitted Historical Use, and team or League photographs, yearbooks, programs, and record books depicting multiple players in which Mr. Rahm is not individually featured.

(b) **Election.** Within five (5) Business Days after the Effective Date, the LIV Parties shall notify RightsCo in writing whether they elect transfer or destruction of the Affected Inventory. No inventory schedule, count, or valuation is required.

(c) **Transfer Election.** If transfer is elected, the LIV Parties shall, within thirty (30) days after the Effective Date, assemble the Affected Inventory at a single location in the continental United States and notify RightsCo of that location and the date on which it is available for collection. RightsCo or its designee shall collect the Affected Inventory at its own cost and risk within thirty (30) days after that notice, and title shall pass upon collection. Pending collection, the LIV Parties shall store the Affected Inventory and may not sell, distribute, or otherwise dispose of it.

(d) **Destruction Election.** If destruction is elected, the LIV Parties shall destroy the Affected Inventory within thirty (30) days after the Effective Date at their sole cost and expense and provide an officer certificate reasonably identifying the Affected Inventory destroyed and the date and method of destruction.

(e) **Custodians and Third Parties.** The LIV Parties shall use their contractual and control rights, and commercially reasonable efforts, to identify and procure compliance from Affiliates, licensees, distributors, manufacturers, warehouses, and other current custodians, without guaranteeing compliance by a genuinely independent third party beyond those rights.

**Section 2.5. Confidentiality.**

(a) **Survival.** Notwithstanding the termination of the Contracts, PLSA Article IX and the Parties' other confidentiality obligations under the Contracts remain in full force according to their terms.

(b) **Contract Economics.** Subject to subsection (c), each Party shall continue to treat the terms of the Contracts, including all economic terms, as confidential.

(c) **Permitted Disclosures.** A Party may disclose confidential information to the extent required for approval of this Agreement pursuant to Bankruptcy Rule 9019, any filing with the Court, legal process, or applicable Law, if, where legally permitted, it gives the other Parties reasonable advance notice, consults with them regarding the scope and manner of disclosure, and uses commercially reasonable efforts to redact or seek to seal confidential Contract economics and other protected information. No Party is required to seek sealing where unavailable or legally improper.

## ARTICLE III

## CONFIRMATION OF RAHM RIGHTS

**Section 3.1. Confirmation.**

Following the Effective Date, Mr. Rahm holds the rights in Player Identification and Additional Rights addressed by this Agreement, and RightsCo holds the RAHMBO Mark and, upon the transfer under Article VII, the Legion XIII Marks, in each case subject only to the express provisions of this Agreement. This confirmation does not impair the LIV Parties' ownership of Materials, Historical Content, or Subject IP

validly assigned before the Effective Date. Any authority of a LIV Party or downstream recipient to use Player Identification or Additional Rights embodied in Historical Content arises solely under Article IV and creates no ownership interest or freestanding right in Mr. Rahm or his intellectual property.

## ARTICLE IV

## HISTORICAL CONTENT

**Section 4.1. Ownership Acknowledgment.**

As between the Rahm Parties and the LIV Parties, the LIV Parties continue to own the Historical Content, the Subject IP and Materials validly assigned to them, and Historical Data to the extent owned by them, subject to the express exclusion in PLSA Section 6.1 of Additional Rights incorporated into Materials and to Article IV. Nothing in this Agreement transfers, rescinds, unwinds, or impairs that ownership, but ownership alone does not authorize any use of Player Identification, Additional Rights, the RAHMBO Mark, or any Legion XIII Mark outside Article IV.

**Section 4.2. Use Covenant.**

(a) **Permitted Historical Uses.** Subject to the remainder of this Article IV, the LIV Parties may own, retain, sell, license, assign, or transfer Historical Content, or an archive comprising Historical Content, as an asset, including separately from live League broadcast operations. They may reproduce, restore, edit, clip, compile, caption, translate, index, search, format, sequence, display, perform, broadcast, stream, distribute, and otherwise technically process Historical Content; incorporate it into programming, still photography, editorial, print and digital publications (including yearbooks, record books, websites and applications), podcasts and other audio, awards, hall-of-fame, museum and exhibition presentations, and League-wide, team, season-retrospective, documentary, editorial, event-coverage, or similar historical programming; and monetize, license, advertise, promote, sponsor, and commercially distribute the archive and resulting qualifying programming. Permitted monetization includes advertising or sponsorship around qualifying programming and sponsorship of an archive platform, series, or content library, sponsor, partner, venue, or apparel branding captured as filmed, and sponsor integrations existing in Historical Content as of the Effective Date. Promotion of the League, its Events, and its programming using Historical Content in which Mr. Rahm appears with no greater prominence than other players, without naming or depicting Mr. Rahm in titles, thumbnails, key art, or sponsor-specific assets, is a Permitted Historical Use and not an Extracted Use. These permissions do not authorize an Extracted Use, a use requiring consent under Sections 4.2(c), (e), or (f), or any implication of current endorsement, affiliation, sponsorship, or approval by Mr. Rahm.

(b) **No Standalone or Extracted Use.** No LIV Party or downstream recipient may make an Extracted Use or otherwise separately license, price, advertise, promote, sponsor, endorse, merchandise, or monetize Mr. Rahm or use Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, biographical information, performance attributes, or player-specific data as an independent commercial identifier, promotional asset, product or service feature, endorsement element, or other separately exploitable input, whether used alone or together with any other person or rights. Ordinary editing, clipping, compilation, restoration, translation, indexing, search, editorial sequencing, and incorporation into qualifying archival, editorial, documentary, retrospective, or event-coverage programming are not prohibited merely because Mr. Rahm appears in the resulting work. However, no permitted use may materially misrepresent Mr. Rahm's participation, views, or endorsement, and the LIV Parties retain ordinary editorial discretion subject to this Article IV.

(c) **Excluded Uses.** No Permitted Historical Use includes: (i) using Historical Content to train or develop a model for the purpose of generating, or using any model or tool to create, a synthetic performance, deepfake, digital replica, voice clone, avatar, fabricated statement, or other simulated depiction of Mr. Rahm; (ii) depicting Mr. Rahm as a playable or selectable character or avatar in any game, including a League-wide or multi-player product; (iii) using Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, Historical Data, or other player-specific data to name, brand, promote, or constitute a fantasy, gambling, betting, wagering, sportsbook, tokenized-asset, NFT, digital-collectible, merchandise, endorsement, promotional, data, or materially similar product or service; or (iv) any other Extracted Use, in each case without the applicable prior written consent. Analytical, operational, and production uses of artificial-intelligence or machine-learning tools on Historical Content—including restoration, upscaling, captioning, translation, indexing, search, clipping, highlight generation, officiating and performance analytics, content moderation and recommendation, and automated platform processing—are permitted if they do not create a prohibited output or Extracted Use. Factual Historical Data and aggregate statistics may be licensed or distributed to data partners, media, and other recipients only as historical facts and not as a product, market, promotion, or commercial input principally focused on Mr. Rahm.

(d) **Historical References and Historical Data.** The LIV Parties may publish and distribute accurate factual, statistical, historical-record, results, archival, news, editorial, and league-history references to Mr. Rahm, including neutral identification of him as a participant and his name and image as they appear in records, results, leaderboards, standings, record books, archives, and qualifying historical programming. They may license and distribute Historical Data as factual data and may accurately identify participants when promoting qualifying historical programming, provided that the use is not an Extracted Use and is not presented as a current endorsement, affiliation, sponsorship, or approval.

(e) **Featured, Promotional, and Sponsor-Facing Uses.** Any use that is principally focused on Mr. Rahm or uses Mr. Rahm, Player Identification, Additional Rights, the RAHMBO Mark, or any Legion XIII Mark as a featured, promotional, sponsor-facing, or commercial identifier or draw requires the applicable prior written consent. This includes titles, thumbnails, key art, title or presenting sponsorship, sponsor pitches, investor materials, and advertising or promotional materials that are principally focused on Mr. Rahm or use Mr. Rahm to sell the sponsor, program, archive, product, service, or transaction. Accurate neutral identification of Mr. Rahm as a participant in qualifying historical programming does not by itself require consent.

(f) **Marks in Historical Context.** The Rahm Parties consent to, and covenant not to assert a claim solely by reason of, the appearance of the RAHMBO Mark or Legion XIII Marks as authentically embedded in Historical Content, as sponsor or apparel branding captured as filmed, or as a neutral descriptive identifier of the team or historical period in factual league history, results, standings, record books, archives, hall-of-fame materials, (including display of the Legion XIII logo in historical standings, results, and record books in the same manner and prominence as the logos of other League teams for the relevant seasons) and descriptive metadata for qualifying Historical Content. Neither mark may be extracted, recreated, or used as a designed element in a title, thumbnail, key art, advertising, promotion, sponsorship, product, or service without RightsCo's prior written consent. This subsection supplies the sole authority under this Agreement for use of those marks in Historical Content and grants no ownership interest or freestanding trademark license in either mark.

(g) **No Limitation on Article VII.** Nothing in this Section limits the assignment, transfer, or cease-use obligations under Article VII.

(h) **Archive Owners and Operational Recipients.** (i) A Person that acquires, in a bona fide sale, assignment, or other disposition, ownership of an archive or one or more identified items or a defined package of Historical Content (an "Archive Owner") may exercise the permissions and license in this Article IV solely with respect to the Historical Content it acquires and solely for Permitted Historical Uses, provided that the Archive Owner assumes in writing the restrictions and obligations of this Article IV. Possession, custody, access, hosting, servicing, or operational control does not make a Person an Archive Owner. (ii) A broadcaster, platform, Distributor, production vendor, archive operator, data vendor, or other operational recipient may receive only the limited authority reasonably necessary to perform an identified Permitted Historical Use for a LIV Party or Archive Owner. That operational authority is non-exclusive, nonseverable, nontransferable, and not independently exercisable; provided that a recipient may engage a necessary subcontractor under written restrictions at least as protective as this Article IV and remains responsible for that subcontractor's compliance. (iii) A Licensed Exploiter may exploit the Historical Content licensed to it for its own account for Permitted Historical Uses and only to the extent of its written license, subject to this Article IV; provided that a Licensed Exploiter may not sublicense the rights granted under this Article IV except to an operational subcontractor subject to clause (ii). (iv) For purposes of this Article IV and Section 4.3, "LIV Party" includes each LIV Party's successors by merger, conversion, plan of reorganization, or operation of law, including any reorganized Debtor and any trustee or other estate representative, without any assumption under clause (i). No Archive Owner, Licensed Exploiter or operational recipient receives any independent or broader right in Mr. Rahm, Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, Historical Data, biographical information, performance attributes, or player-specific data.

(i) **Pre-Effective Date Commitments.** Notwithstanding Section 4.2(e), existing sponsor campaign materials may continue to be used, without material modification, through the fixed term of a binding Pre-Effective Date Commitment as in effect on the Effective Date if a Rahm Party is a party to the commitment or specifically approved or acknowledged the applicable use in writing. Any other Pre-Effective Date Commitment may be performed outside the Permitted Historical Uses only if identified on Schedule 4.2(i), solely within the scope identified on that Schedule and through its fixed term as in effect on the Effective Date. No renewal, extension, new production or campaign materials, new product, or post-Effective Date expansion of scope is permitted, and nothing in this subsection authorizes an Extracted Use or any use prohibited by Section 4.2(c) or (f)..

(j) **Statutory Consent.** The Rahm Parties acknowledge that this Article IV constitutes their written consent, for purposes of any statute, regulation or common-law rule governing rights of publicity, privacy or personality in any jurisdiction, to the Permitted Historical Uses, and that no further consent is required for any Permitted Historical Use.

(k) **Personal Data.** Mr. Rahm acknowledges and consents that personal data relating to him actually embodied in Historical Content or Historical Data may be processed by the LIV Parties and Persons described in Section 4.2(h) solely for Permitted Historical Uses. Nothing in this Section supplies consent to an Extracted Use or another use outside Article IV or limits any other lawful basis available under applicable data-protection Law.

**Section 4.3. License.**

Effective as of the Effective Date, each Rahm Party grants to each LIV Party a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully paid-up license under that Rahm Party's rights in Player Identification and Additional Rights, solely to the extent actually embodied in Historical Content and solely as necessary to own, sell, license, assign, transfer, and exploit that Historical Content for the Permitted

Historical Uses. The RAHMBO Mark and Legion XIII Marks are not subject to this license; their appearance and use are governed exclusively by Section 4.2(f). The license is appurtenant to and inseparable from the Historical Content to which it relates and automatically passes to an Archive Owner only with the Historical Content acquired and only upon the written assumption required by Section 4.2(h). A LIV Party or Archive Owner may grant an operational sublicense only to the extent reasonably necessary for the recipient to perform an identified Permitted Historical Use of that content, subject to Section 4.2(h), and may grant a sublicense to a Licensed Exploiter only to the extent of that Licensed Exploiter's written license under Section 4.2(h)(iii). The license and any operational sublicense may not be separately sold, assigned, transferred, pledged, marketed, valued, or exploited apart from the Historical Content to which it relates and grants no independent right in Mr. Rahm, Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, Historical Data, biography, performance attributes, or player-specific data.

## ARTICLE V

## RESTRICTIONS ON USE OF PLAYER IDENTIFICATION

**Section 5.1. Covenant Against New Uses.**

Except as permitted by Article IV, no LIV Party may make or authorize any new use of Player Identification or Additional Rights without Mr. Rahm's prior written consent, or of the RAHMBO Mark or any Legion XIII Mark without RightsCo's prior written consent. Article VII controls the transfer and transition duties concerning the Legion XIII Marks, and this Section creates no exception to those duties.

## ARTICLE VI

## NO CONTINUING RIGHTS OR APPROVALS

**Section 6.1. Exclusive Survival of Contract Rights.**

(a) After the Effective Date, the only Contract provisions or pre-existing rights that survive are: (i) PLSA Section 6.1 solely as to ownership of Materials and subject to its exclusion of Additional Rights incorporated into Materials and to Article IV; (ii) PLSA Article IX confidentiality; (iii) ownership interests and completed assignments expressly acknowledged and retained under this Agreement, including Historical Content and Subject IP validly assigned to a LIV Party before the Effective Date; (iv) PPA Section 4.9 and Section 7(e) of Schedule 5 to the PPA, solely as applied to Historical Content and Permitted Historical Uses, and the second sentence of PPA Section 7.1, solely as applied to the League Marks and other intellectual property validly owned by the LIV Parties and subordinate to Article IV; (v) PPA Section 7.2 and PLSA Section 6.3 solely as further-assurances obligations for a period of three (3) years after the Effective Date, only to confirm or perfect ownership expressly preserved by this Agreement, without requiring Mr. Rahm or RightsCo to incur any out-of-pocket cost; (vi) PLSA Section 6.2 solely to the extent it confirms ownership of qualifying Materials or effects a waiver of moral rights in those Materials, with any fallback license limited to those qualifying Materials and to Permitted Historical Uses under Article IV; (vii) PPA Section 7.3 solely to the extent it effects a waiver of moral rights, performer's rights, and similar rights in Historical Content, limited to Historical Content and Permitted Historical Uses under Article IV; and (viii) this Agreement. TPA Sections 12.2(e)(i), (ii), and (iv) and 16.1 do not survive and create no post-Effective Date right or obligation. Retained ownership creates no independent exploitation, approval, control, or further-assurances right concerning Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, biographical information,

performance attributes, or player-specific data except as expressly provided in Article IV. This Agreement controls over every inconsistent Contract provision.

(b) Notwithstanding PLSA Sections 6.4 and 8.8, no Contract provision, survival clause, election, or asserted right under Section 365(n) of the Bankruptcy Code arising from any Contract preserves any license, sublicense, approval, deemed approval, no-challenge, further-assurances, exploitation, post-term fee, sell-through, runoff, inventory, or other future-use right except the ownership and rights expressly preserved or granted by this Agreement. The Contract provisions identified in Section 6.1(a) remain in force only to that extent.

**Section 6.2. No Restrictions on Rahm Activities.**

For the avoidance of doubt, and subject to Section 6.6, nothing in the Contracts, this Agreement, or any prior course of dealing restricts or conditions Mr. Rahm's freedom to engage in any playing, endorsement, sponsorship, licensing, media, business, or other activity with any person on any terms, without notice to or consent from any LIV Party. From and after the Effective Date, neither Mr. Rahm nor RightsCo owes any LIV Party any future playing, appearance, promotional, media, content, endorsement, cooperation, exclusivity, noncompetition, or other service or performance obligation under any Contract.

**Section 6.3. Team Operator Equity.**

The Parties acknowledge that (a) the merger of Fairway TM Merger Sub 13, LLC with and into the Team Operator (the "Team 13 Merger") became effective before the Petition Date and (b) at its effective time, all equity or membership interests in Fairway TM Co 13, LLC held of record or beneficially by Rahm, LLC or Mr. Rahm (the "Rahm Equity Interests") were cancelled and extinguished for no consideration, Rahm, LLC and Mr. Rahm ceased to be members or equityholders of the Team Operator, each Rahm-designated manager ceased to serve, and the limited liability company agreement adopted in connection with the Team 13 Merger replaced the A&R LLCA (collectively, the "Merger Acknowledgments"). No Rahm Party holds any equity or membership interest in, or any option, warrant, or other right to acquire any equity or membership interest in, any LIV Party, and no put/call price, distribution, tax distribution, or other amount is or will become payable to any Rahm Party in respect of the Rahm Equity Interests. All membership, governance, voting, consent, information, distribution, capital-account, economic, transfer, put/call, Team Principal, League Owners Alliance, approval, and similar rights and obligations associated with the Rahm Equity Interests under the A&R LLCA, the Subscription Agreement, the TPA, or any related Contract terminated at the effective time of the Team 13 Merger and, to the extent not previously terminated, terminate as of the Effective Date. No Rahm Party has any further capital contribution, Funding Commitment (as defined in the A&R LLCA), funding, capital call, repayment, clawback, indemnity, guarantee, tax-distribution, or other contractual obligation relating to the Rahm Equity Interests, the Team Operator, or the Team, including Mr. Rahm's guarantee under Section 19 of the Subscription Agreement and any obligation under Section 13.2 of the TPA, except tax reporting, filing, withholding, recordkeeping, and information obligations required by applicable Law. The Team Operator shall provide final tax forms and reporting information required by applicable Law for all periods through the Effective Date, including a final Schedule K-1 and final capital-account statement, shall update its membership register, capital accounts, and ownership records to reflect the agreed treatment, and shall provide written confirmation of those updates. The Team Operator and the relevant LIV Parties shall not take a tax position materially inconsistent with that final reporting, except as required by applicable Law or a final determination of a taxing authority. Nothing in this Section characterizes the Team 13 Merger or any other transaction for tax purposes. Notwithstanding anything to the contrary in the Contracts, this Section governs. Effective as of the Effective Date, each Rahm

Party waives notice of the Team 13 Merger and any claim that the merger or cancellation was invalid or breached any Contract or duty. The Merger Acknowledgments become effective only on the Effective Date and do not survive if this Agreement becomes null and void under Section 11.2.

**Section 6.4. League Regulations and Team Rules.**

From and after the Effective Date, and subject to Section 6.6, no League Regulations or Team Rules and Policies, code, handbook, guideline, or similar instrument imposes or may be enforced to impose on Mr. Rahm or RightsCo any duty, restriction, approval, consent, notice, conduct, exclusivity, noncompetition, non-solicitation, anti-tampering, or other obligation.

**Section 6.5. Freedom to Compete; No Contract-Based Interference.**

From and after the Effective Date, Mr. Rahm may join, become a member of, contract with, compete on, and be promoted by any golf tour, league, circuit, or event, and may enter into any endorsement, sponsorship, licensing, media, or other engagement, without notice to or consent from any LIV Party. No LIV Party shall assert, threaten, fund, or support any claim, objection, demand, or proceeding against any Rahm Party or any tour, league, sanctioning body, sponsor, agent, or other Person, or impair Mr. Rahm's eligibility, membership, reinstatement, status, ranking, or points, based on rights or obligations under the terminated Contracts or on Mr. Rahm's participation in, membership in, or agreement with any other tour, league, circuit, or event, except to enforce this Agreement or as required by applicable Law.

**Section 6.6. League Marks and LIV Intellectual Property.**

(a) **Acknowledgment.** Each Rahm Party acknowledges that, as between the Parties and subject to Article VII, the LIV Parties and their Affiliates own the League Marks and the Historical Content, Materials, Historical Data, Subject IP, and other intellectual property validly owned by them, excluding the Legion XIII Marks and the RAHMBO Mark. This acknowledgment does not concede ownership of Player Identification, Additional Rights, or other rights of Mr. Rahm or RightsCo embodied in that property, does not expand the scope of Subject IP, and is subject to Articles IV, VII, and VIII.

(b) **Covenants.** From and after the Effective Date, no Rahm Party shall directly or indirectly: (i) use, register, or seek to register any League Mark or confusingly similar mark; (ii) challenge the LIV Parties' ownership, validity, enforceability, or registration of the League Marks or of Subject IP validly assigned to a LIV Party, except that nothing restricts a dispute concerning the scope of Subject IP or ownership of Player Identification, Additional Rights, the RAHMBO Mark, any Legion XIII Mark, or another right of Mr. Rahm or RightsCo; or (iii) use Historical Content except as separately authorized in writing by its owner. Nothing in this Section restricts Mr. Rahm's accurate factual or biographical references to his participation in the League and its Events, including his results, provided he does not use a League Mark as a logo or design mark or imply a current LIV affiliation or endorsement.

## ARTICLE VII

## LEGION XIII MARKS

Solely for purposes of effecting the assignment under this Article VII, the Parties acknowledge that, immediately before the Effective Date and as among the parties to the TPA, TPA Section 16.1 allocated ownership of the Legion XIII Marks to the League Operator. That acknowledgment does not cause TPA Section 16.1 to survive, establish record title in any particular entity, limit the assignment under this Article VII, or preserve any post-Effective Date right in the Legion XIII Marks. The assignment and transfer

contemplated by this Article VII are subject to the following conditions precedent: (i) the Approval Order authorizes such assignment and transfer under sections 363(b) and (f) of the Bankruptcy Code, free and clear of all liens, claims, and interests, including DIP Liens and Prepetition Liens; (ii) the DIP Lender has delivered its written consent; (iii) any consent required under the Restructuring Support Agreement has been obtained; and (iv) the LIV Parties have delivered the Legion XIII Asset and Title Schedule attached as Schedule 1, completed in good faith; any dispute concerning the completeness or accuracy of Schedule 1 shall be resolved after the Effective Date under Section 7.2(g) and, if necessary, Section 12.5 and/or the Approval Order but shall not delay or condition the Effective Date, the releases in Article IX, or the free and clear transfer in this Article VII. If those conditions are not satisfied, the assignment and transfer shall not become effective and the Parties' rights and obligations shall be governed by Section 11.2.

**Section 7.1. Assignment.**

(a) **Owned Marks and Assets.** Effective as of the Effective Date, each LIV Party hereby irrevocably assigns, transfers, and conveys to RightsCo all right, title, and interest that such LIV Party owned as of the Effective Date (including any such right, title, or interest later discovered to have been owned as of the Effective Date) in and to all Legion XIII Marks and related assets identified or required to be identified on Schedule 1, including all registrations, applications, renewals, common-law rights, trade dress, goodwill, domain names other than the livgolf.com domain, social-media accounts, pages, profiles, handles, administrator credentials, website and page content, associated digital assets and content packages (in each case subject to Section 7.3), and rights to sue for past infringement.

(b) **Controlled Assets.** With respect to any Legion XIII Mark or related asset that a LIV Party controlled as of the Effective Date, whether or not that control was identified before or after the Effective Date, but did not own, such LIV Party hereby irrevocably transfers to RightsCo all rights and control that it had as of the Effective Date in or to that Mark or asset, but only to the extent legally transferable and within its power to transfer.

(c) **Clear Title; livgolf.com Domain.** Any assignment or transfer by a LIV Party under this Section shall be authorized and effected by the Approval Order free and clear of all liens, claims, encumbrances, and interests, including DIP Liens and Prepetition Liens, notwithstanding that any such lien, claim, encumbrance, or interest was created by or through that LIV Party. No transfer of the livgolf.com domain is made or required by this Section.

(d) **Limited Representations; As-Is.** Except for the representations in Section 12.11, the transfers under this Article VII are made on an "as-is, where-is" basis without any representation concerning validity, registrability, enforceability, non-infringement, scope, or the status of any registration, application, opposition, cancellation, or other proceeding. No disclaimer in this Section limits a LIV Party's representation that it owns or controls the rights it purports to transfer, its authority to transfer them, its obligation to transfer all such rights, or the requirement that the Approval Order effect the transfer free and clear as provided in Section 7.1(c).

**Section 7.2. Recordable Instruments.**

(a) **Owned Registrations.** Each LIV Party that owns a registered or applied-for Legion XIII Mark shall execute and deliver to RightsCo short-form trademark assignments in recordable form, identifying applicable registration and application numbers to the extent reasonably necessary for recordation.

(b) **Controlled Registrations.** Each LIV Party that controls but does not own a registered or applied-for Legion XIII Mark shall execute and deliver such instruments only to the extent legally transferable and

within its power to transfer, and shall execute and deliver any other instruments within its power reasonably necessary to carry out the transfer contemplated by Section 7.1.

(c) **Webpages and Digital Assets.** For any Legion XIII webpage or subpage under the livgolf.com domain, no transfer of the livgolf.com domain is required; instead, each LIV Party shall transfer, to the extent transferable and within its possession or control, the Legion XIII page content and credentials, cease its use of the page, and, at RightsCo's election, use commercially reasonable efforts to implement a redirect to a location designated by RightsCo or deactivate the page.

(d) **Independently Held Assets.** For any Legion XIII asset owned or controlled by a genuinely independent owner or controller, the LIV Parties shall use commercially reasonable efforts to obtain any assignment or other instrument reasonably necessary to transfer or record the applicable rights, but no LIV Party guarantees the performance of that independent owner or controller.

(e) **Continuing Responsibility.** Each named LIV Party remains fully responsible for assigning any Legion XIII asset it owns and transferring any Legion XIII asset it controls only to the extent legally transferable and within its power to transfer, and for executing instruments within its own power.

(f) **Transition Period; Cessation of Use.** During an operational transition period not exceeding sixty (60) days after the Effective Date, the LIV Parties and their Affiliates may use a Legion XIII Mark or related transferred asset solely as reasonably necessary to complete the transfer and remove or replace the mark from operational materials. No manufacture, replenishment, sale, distribution, new promotion, sponsorship, licensing, or other commercial exploitation is permitted during the transition period. Thereafter, no LIV Party may use, license, sublicense, display, market, promote, register, challenge, or otherwise exploit any Legion XIII Mark or related transferred asset, except as part of a Permitted Historical Use under Article IV. No sell-through or continuing brand license is granted, and no recall or destruction is required for material distributed or published before the Effective Date.

(g) **Further Assurances.** The LIV Parties shall provide further assurances and execute and deliver any additional documents reasonably necessary to carry out this Article.

(h) **Costs; Prosecution and Maintenance.** RightsCo shall bear all recordation fees, transfer taxes and other costs of recording the assignments and transfers under this Article VII in every jurisdiction. From and after the Effective Date, RightsCo shall be solely responsible for the prosecution, maintenance, renewal, statements of use, oppositions, cancellations and enforcement of the Legion XIII Marks. Pending recordation, no LIV Party shall intentionally abandon any registration or application for a Legion XIII Mark, but no LIV Party shall have any obligation to incur costs or take affirmative action to prosecute, maintain or defend any such registration or application.

**Section 7.3. Account and Page Content.**

(a) **Transferred Accounts and Content Package.** The transfer of any social-media account, page, profile, handle, webpage, or digital asset under Section 7.1 (each, a "Transferred Account") includes the account or page as a usable container, all transferable administrator and recovery credentials, associated metadata and account records, and an export or copy of the content reasonably necessary to operate the Transferred Account (collectively, "Account Content"), subject to the applicable platform terms and third-party rights. Copyright and other intellectual property in Account Content remain with their respective owners, and the LIV Parties may retain archival copies of Account Content they own.

(b) **Operational License.** Subject to Section 7.3(c), the LIV Parties grant RightsCo a non-exclusive, perpetual, royalty-free license to display, maintain, organize, archive, repost within the Transferred Accounts, and edit for formatting, length, or platform functionality the Account Content owned by a LIV Party, in each case as reasonably necessary to operate the Transferred Accounts and promote the Legion XIII identity. RightsCo may not sell or license Account Content as a standalone asset, make an Extracted Use of another player's rights, or use Account Content to imply a current affiliation with or endorsement by any LIV Party.

(c) **Third-Party Rights.** The Rahm Parties acknowledge that Account Content may embody rights of other League players, sponsors, and third parties that are not transferred or licensed by this Agreement. A written removal request must identify the specific item and the third-party intellectual-property, publicity, or contractual right reasonably implicated. RightsCo shall remove that item within ten (10) Business Days after receiving such a request.

**Section 7.4. RightsCo Covenants.**

From and after the Effective Date, RightsCo shall not, and shall cause its Affiliates and licensees not to, (a) use any Legion XIII Mark in combination with, or in a manner suggesting current affiliation with, any League Mark or any LIV Party, the League or any League team, or the TGL (TMRW Golf League) or any of its related entities; or (b) assert that the LIV Parties' or the Team Operator's continued operation of a League team (including with any former member of the team operated by the Team Operator) or the adoption and use of a new name, logo or identity for that team that does not incorporate the word "Legion," any Legion XIII design mark, or any mark or other source-identifying branding confusingly similar to a Legion XIII Mark infringes, dilutes or otherwise violates any right in the Legion XIII Marks; provided that clause (b) does not restrict RightsCo from objecting if the renamed or replacement team is marketed or held out as a continuation, successor, or rebrand of Legion XIII or otherwise uses the goodwill associated with the Legion XIII Marks, other than through accurate factual references to the team's prior name, roster, and results.

## ARTICLE VIII

## RAHMBO MARK

**Section 8.1. Confirmation of Ownership.**

As between the Parties, RightsCo owns the RAHMBO Mark as of the Effective Date. Effective as of the Effective Date, every license, sublicense, permission, authorization, and right of use in or to the RAHMBO Mark granted to any LIV Party under the Contracts is terminated and irrevocably relinquished, and each LIV Party disclaims any right, title, or interest in or to the RAHMBO Mark and covenants not to challenge, contest, or take any action inconsistent with RightsCo's ownership, validity, enforceability, or registration of the RAHMBO Mark. No separate recordation or further-assurances obligation applies to the RAHMBO Mark except to the extent reasonably necessary to remove a filing or claim affirmatively made by a LIV Party.

## ARTICLE IX

## MUTUAL RELEASE

**Section 9.1. Release by Rahm Parties.**

Effective upon the Effective Date, each Rahm Party, for itself and its successors, assigns, heirs, executors, and administrators, expressly waives, releases, withdraws, and forever discharges the LIV Parties and their respective current and former Affiliates, successors, assigns, representatives, professionals, officers, directors, managers, members, employees, agents, and attorneys from (i) all monetary and economic claims under the Contracts arising from pre-Effective Date conduct or performance, whether known or unknown, accrued, contingent, disputed, or unliquidated, including claims for fees, reimbursements, bonuses, indemnities, expenses, rejection damages, prize money, annual payments, adjusted earnings payments, commitment fees, incentive fees, profit-related payments, equity-related payments, loans, offsets, deductions, repayment obligations, and other payment claims under the Contracts, and intended as a complete economic walk-away for all such Contract-based claims; and (ii) all other claims and causes of action (including all Claims as defined in section 101(5) of the Bankruptcy Code) of any kind or nature whatsoever that do not arise under the Contracts, whether known or unknown, asserted or unasserted, accrued or unaccrued, fixed or contingent, matured or unmatured, liquidated or unliquidated, disputed or undisputed, secured or unsecured, that are based upon or arise from any act, omission, transaction, event, circumstance, agreement, relationship, or conduct occurring on or before the Effective Date (the claims and causes of action described in clauses (i) and (ii) of this Section 9.1, collectively, the "Rahm Claims"). Without limiting the foregoing, each Rahm Party expressly waives, releases, and withdraws all Rahm Claims, including any proof of claim, rejection damages claim, cure claim, or administrative expense claim, including any administrative expense claim under section 503(b) of the Bankruptcy Code. Each Rahm Party shall withdraw with prejudice any proof of claim asserting a Rahm Claim within five (5) Business Days after the Effective Date, and the claims agent is authorized to expunge any such proof of claim. Each release granted in this Section is subject in all respects to the carve-outs in Section 9.3, and no Person is released under this Section with respect to any claim preserved by Section 9.3. Nothing in this Section releases, waives, impairs, or discharges (a) any obligation arising under this Agreement, the Approval Order, or any document executed pursuant to this Agreement; (b) any claim or right arising from conduct occurring after the Effective Date; (c) any right to enforce this Agreement or the Approval Order; or (d) any claim expressly preserved by this Agreement or the Approval Order.

**Section 9.2. Release by LIV Parties.**

Effective upon the Effective Date, each LIV Party, for itself and its estate, successors, assigns, officers, directors, employees, agents, attorneys, and representatives, expressly waives, releases, and forever discharges each of the Rahm Parties and their respective current and former Affiliates, successors, assigns, representatives, professionals, officers, directors, managers, members, employees, agents, and attorneys from (i) all monetary and economic claims under the Contracts arising from pre-Effective Date conduct or performance, whether known or unknown, accrued, contingent, disputed, or unliquidated, including claims for fees, reimbursements, bonuses, indemnities, expenses, rejection damages, prize money, annual payments, adjusted earnings payments, commitment fees, incentive fees, profit-related payments, equity-related payments, loans, offsets, deductions, repayment obligations, and other payment claims under the Contracts, and intended as a complete economic walk-away for all such Contract-based claims; and (ii) all other claims and causes of action of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, accrued or unaccrued, fixed or contingent, matured or unmatured, liquidated or unliquidated, disputed or undisputed, secured or unsecured, that are based upon or arise from any act, omission, transaction, event, circumstance, agreement, relationship, or conduct occurring on or before the Effective Date. The release in this Section includes, whether or not arising under or relating to the Contracts, all claims and causes of action arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 510, 541, 542, 543, 544, 545,

547, 548, 549, 550, 551, and 553 thereof, and any analogous or related claims or causes of action arising under applicable federal, state, or other applicable Law, including any claim to avoid, recover, disallow, subordinate, or recharacterize any payment, transfer, or obligation made or incurred under or in connection with any Contract. Nothing in this Section releases, waives, impairs, or discharges (a) any obligation arising under this Agreement, the Approval Order, or any document executed pursuant to this Agreement; (b) any claim or right arising from conduct occurring after the Effective Date; (c) any right to enforce this Agreement or the Approval Order; or (d) any claim expressly preserved by this Agreement or the Approval Order.

**Section 9.3. Carve-Outs.**

The releases in Sections 9.1 and 9.2 do not release, waive, or impair: (a) any claim arising from conduct after the Effective Date, including a use outside Article IV or a breach of this Agreement or the Approval Order; (b) any claim of a Rahm Party, whether known or unknown, against any Person (other than a LIV Party) concerning ownership, title, authorization, infringement, false endorsement, rights of publicity or personality, or other noncontract misuse of Subject IP, in each case only to the extent not expressly resolved by this Agreement and not including any claim for damages or other relief against a Person released under Section 9.1 arising from any act, omission, or conduct occurring on or before the Effective Date; (c) any noncontract claim of a Rahm Party arising from a pre-Effective Date use that was not specifically undertaken, licensed, or made subject to a binding commitment before the Effective Date under authority derived from a LIV Party; or (d) any right or remedy to enforce this Agreement or the Approval Order. This Section does not preserve any chapter 5 claim released by Section 9.2 or any terminated-Contract economic or performance obligation. Articles IV, VII, and VIII remain operative and are not altered by this Section.

As of the Effective Date, all payment, repayment, reimbursement, fee, expense, indemnity, offset, recoupment, clawback, guarantee, and other monetary or performance obligations under the terminated Contracts are irrevocably extinguished, whether accrued, contingent, disputed, unliquidated, or previously demanded, including any guarantee by Mr. Rahm or RightsCo. No preserved claim may enforce, recover under, or revive any such terminated-Contract obligation.

Each Rahm Party covenants not to sue or assert a claim against a licensee, sublicensee, broadcaster, distributor, platform, sponsor, manufacturer, agent, representative, or other downstream recipient, Archive Owner, or Licensed Exploiter solely with respect to a specific use that, before the Effective Date, was actually undertaken, specifically licensed, or made subject to a binding commitment under authority derived from a LIV Party, or that, after the Effective Date, complies with Article IV or the specifically grandfathered scope of a Scheduled Commitment under Section 4.2(i). Recipient status, affiliation, possession of Historical Content, or reliance solely on a general grant of rights in a Contract does not independently create authorization, immunity, or a broader right.

**Section 9.4. No Assignment of Claims.**

Each Rahm Party represents and warrants that it has not assigned, transferred, conveyed, pledged, or otherwise disposed of any Rahm Claim or any claim or cause of action released under Section 9.1.

## ARTICLE X

## DOWNSTREAM NOTICE

**Section 10.1. Notification.**

Promptly after the Effective Date, the LIV Parties shall notify known current users, licensees, sublicensees, distributors, manufacturers, sponsors, custodians, controllers, and other recipients of the applicable termination and Article IV limits. The LIV Parties shall use available contractual and control rights, together with commercially reasonable efforts, to stop uses prohibited by this Agreement. This Section requires no inventory or schedule of Historical Content, general monitoring, forensic investigation, or guarantee of compliance by a genuinely independent third party, and no Rahm Party's rights depend on downstream compliance. Ordinary distribution arrangements for Permitted Historical Uses need only be conformed to Article IV, and this Section does not require any LIV Party to amend, terminate, or breach a Scheduled Commitment during its term as in effect on the Effective Date.

**Section 10.2. Public-Facing Corrections.**

As soon as reasonably practicable after the Effective Date, and in no event later than fifteen (15) Business Days, the LIV Parties shall correct or remove any current public-facing webpage, roster, listing, metadata, marketing or campaign material, product description, or similar material owned or controlled by a LIV Party that states or implies Mr. Rahm is currently affiliated with, sponsored by, endorses, is a member of, or is authorized by any LIV Party, the League Operator, or the Team Operator. For known material on third-party platforms not owned or controlled by a LIV Party, the LIV Parties shall use commercially reasonable efforts to request correction or removal, but have no duty to monitor the internet or guarantee independent-party compliance. This Section does not require general internet searches or forensic monitoring and does not limit permitted uses of Historical Content under Article IV.

## ARTICLE XI

## EFFECTIVENESS

**Section 11.1. Binding Effect and Court Approval.**

This Agreement creates binding obligations on the Parties upon execution solely to seek Court approval, cooperate in obtaining that approval, not frustrate the transactions contemplated hereby, and observe the interim standstill in Section 11.3. The termination of the Contracts, the releases and extinguishment stated in this Agreement, and the assignment and transfer under Article VII become effective on the Effective Date. The Parties shall seek an Approval Order substantially implementing and authorizing those outcomes in form and substance reasonably acceptable to the Debtors, the DIP Lender, and the Rahm Parties, including the limited withdrawal of Docket No. 24 to the extent the Rejection Motion concerns the Contracts. The Parties shall request a waiver, and each Party waives any right to request a stay under Bankruptcy Rule 6004(h). On the Effective Date, and without further action or filing, Docket No. 24 shall be deemed withdrawn solely to the extent it pertains to the Contracts and the Rahm Parties. Until the Effective Date, the Debtors retain their right to prosecute the Rejection Motion in full.

**Section 11.2. Conditional Approval; Reservation of Rights.**

If the Court denies approval, any condition stated in the introductory paragraph of Article VII is denied or becomes incapable of satisfaction, or the Court enters an Approval Order that materially modifies this Agreement or the proposed Approval Order in a manner materially adverse to a Party without that Party's prior written consent, including by omitting implementation required by Section 11.1, this Agreement automatically becomes null and void except for the confidentiality obligations in Section 2.5, the cooperation and non-frustration obligations in Section 11.1, and provisions expressly intended to operate before the

Effective Date. All positions, claims, objections, defenses, and arguments of every Party remain reserved, including with respect to the Contracts, the Rejection Motion, and the transactions contemplated by this Agreement.

**Section 11.3. Interim Period.**

From execution of this Agreement through the Effective Date (or, if no Effective Date occurs, until this Agreement becomes null and void under Section 11.2), no LIV Party shall, directly or indirectly, demand, require, impose, reduce, deduct, set off, recoup, or enforce against Mr. Rahm or RightsCo: (a) any service or performance obligation; (b) any restrictive, exclusivity, noncompetition, approval, consent, notice, matching, first-look, right-of-first-refusal, post-term fee, or similar control right under any Contract; or (c) any Annual Payment reduction, AP Notice, repayment demand, Conflicting Contract reduction, fine, deduction, setoff, recoupment, withholding, or comparable economic self-help or remedy under any Contract (with "Annual Payment," "AP Notice," and "Conflicting Contract" having the meanings given in the PPA). No LIV Party shall initiate any new use of Mr. Rahm's name, image, likeness, persona, voice, signature, reputation, Player Identification, Additional Rights, the RAHMBO Mark, or any Legion XIII Mark; provided that a Permitted Historical Use, including performance of a Pre-Effective Date Commitment only to the extent permitted by Article IV, is not a new use. During that period, Mr. Rahm and RightsCo remain free to pursue any Covered Golf Activity (as defined in the PPA), non-LIV event, playing, endorsement, sponsorship, licensing, media, business, or other activity with any person on any terms, without notice to or consent from any LIV Party, and no such activity triggers any remedy described in this Section. Each LIV Party further acknowledges and agrees that, consistent with the relief requested in the Rejection Motion, no Rahm Party has any obligation to render any playing, apparel, appearance, promotional, media, content, or other service or performance under any Contract on or after September 8, 2026, that no LIV Party has asserted or will assert that any Rahm Party is in breach or default of any Contract by reason of not rendering any such service or performance on or after that date, and that each LIV Party waives any such claim. This acknowledgment and waiver is effective upon execution, is not conditioned on entry of the Approval Order, and survives any termination of this Agreement under Section 11.2.

## ARTICLE XII

## MISCELLANEOUS

**Section 12.1. Entire Agreement.**

This Agreement constitutes the entire agreement among the Parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions concerning that subject matter. The Contract provisions identified in Section 6.1(a) survive only as stated in this Agreement. If this Agreement conflicts with any Contract provision, including any purported survival provision, this Agreement controls. No Contract provision creates a continuing right or obligation except as expressly stated in this Agreement, and Article IV is the exclusive source of authority for post-Effective Date use of Player Identification or Additional Rights embodied in Historical Content.

**Section 12.2. Amendment.**

This Agreement may not be amended, modified, or supplemented except by a written instrument signed by all Parties and, to the extent required, approved by the Court.

**Section 12.3. Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart by electronic transmission shall be effective as delivery of an original.

**Section 12.4. Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict-of-laws principles.

**Section 12.5. Jurisdiction.**

Notwithstanding any arbitration or dispute-resolution provision in a Contract, the Court has exclusive jurisdiction over any dispute arising from or relating to this Agreement, including its interpretation, implementation, enforcement, validity, breach, or termination, and shall retain jurisdiction after the closing of the Chapter 11 Cases to the fullest extent permitted by Law. If the Court lacks or declines jurisdiction, the state or federal courts located in New York County, New York shall have exclusive jurisdiction over any such dispute.

**Section 12.6. Successors and Assigns.**

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, trustees, and estate representatives. This Section binds those Persons to the Agreement but does not grant any exploitation, license, sublicense, transfer, or immunity right beyond Article IV.

**Section 12.7. No Admission.**

Nothing in this Agreement constitutes an admission by any Party regarding any matter.

**Section 12.8. No Presumption Against Drafter.**

This Agreement has been negotiated by the Parties and their respective counsel. No provision shall be construed against any Party on the ground that such Party or its counsel drafted the provision.

**Section 12.9. Further Assurances.**

Each Party shall execute and deliver such additional documents and instruments as may be reasonably necessary to carry out this Agreement, including recordable instruments required under Article VII.

**Section 12.10. Notices.**

All notices under this Agreement shall be in writing and delivered by hand, nationally recognized overnight courier, or email with confirmation of receipt, as follows: (a) for the Rahm Parties, to Rahm, LLC / Jon Rahm Rodriguez, c/o Sportfive, 6929 E Greenway Parkway, Suite 250, Scottsdale, AZ 85254, email: jeff.koski@sportfive.com, with copies to Dentons US LLP, Attn: Van C. Durrer II, van.durrer@dentons.com, and John D. Beck, john.beck@dentons.com; and (b) for the LIV Parties collectively, to c/o LIV Golf Holdings Ltd, 50 La Colomberie, St Helier, Jersey JE2 4QB, Attention: Chief Legal Officer and General Counsel, email: legalnotices@livgolf.com, with copies to Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com); Matthew J. Williams (mjwilliams@gibsondunn.com); Keith R. Martorana

(kmartorana@gibsondunn.com); Rob E. Fitzgerald (rfitzgerald@gibsondunn.com); and Tommy Scheffer (tscheffer@gibsondunn.com). Counsel copies do not constitute notice.

**Section 12.11. Authority.**

Each Party represents and warrants that it has all requisite power and authority to enter into and perform this Agreement. Each LIV Party further represents and warrants, as applicable, that: (a) Schedule 1 completely and accurately identifies in all material respects the Legion XIII assets it owns or controls, the record owner or controller of each asset, all excluded composite or third-party elements, and every license, sublicense, lien, security interest, encumbrance, or other interest affecting those assets; (b) it owns or controls the rights it purports to transfer and has authority to transfer them; (c) except as expressly identified on Schedule 1, it has granted no license, sublicense, lien, encumbrance, or other interest that will survive the Effective Date; and (d) it has obtained or will timely obtain every internal approval, consent, and authorization required to perform Article VII. This Section does not guarantee the independent authority or performance of a third party, but no such limitation excuses a named LIV Party from transferring an asset it owns or controls or from executing an instrument within its power.

**Section 12.12. Equitable Relief.**

Unauthorized use of Player Identification, Additional Rights, the RAHMBO Mark, or any Legion XIII Mark; failure to transfer or deliver any Legion XIII Mark or related asset, webpage content, credential, or recordable instrument required under Article VII; failure to cease use of, redirect, or deactivate a Legion XIII webpage as required under Article VII; failure to transfer or destroy Affected Inventory as required under Section 2.4; or interference with Mr. Rahm's participation in another tour, league, or circuit in breach of Section 6.5; and any use by a Rahm Party of the League Marks, Historical Content or Account Content in breach of Section 6.6 or Section 7.3, or any breach of Section 7.4 or of the confidentiality obligations preserved by Section 2.5, may cause irreparable harm for which monetary damages may be inadequate. Accordingly, the affected Party may seek injunctive relief, specific performance, or other equitable relief, without the necessity of posting a bond to the extent permitted by applicable Law and subject to the Court's discretion regarding any bond, without limiting any other remedy available at law or in equity. This Section applies only to the matters identified above.

**Section 12.13. Severability.**

If any provision of this Agreement is held invalid, illegal, or unenforceable, it shall be severed or modified to the minimum extent necessary to make it valid, legal, and enforceable, and the remaining provisions shall remain in full force and effect.

**Section 12.14. Successor Binding Effect.**

This Agreement and the Approval Order shall be binding upon and enforceable against any chapter 7 or chapter 11 trustee, plan administrator, liquidating trustee, or other estate representative appointed or serving in respect of any Debtor, and any purchaser or plan sponsor of any Debtor's assets, to the fullest extent permitted by applicable Law. This binding effect does not create or expand any right to exploit Historical Content, Player Identification, or Additional Rights beyond Article IV.

**IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date of the last signature below.**

**JON RAHM RODRIGUEZ**

____________________________

Jon Rahm Rodriguez

Date:

**RAHM, LLC**

By: ____________________________

Name:

Title:

Date:

**LIV GOLF HOLDINGS LTD**

By: ____________________________

Name:

Title:

Date:

**LIV GOLF INCORPORATED**

By: ____________________________

Name:

Title:

Date:

**LIV GOLF LTD**

By: ____________________________

Name:

Title:

Date:

**WEDGE IP MANAGEMENT CO, LLC**

By: ____________________________

Name:

Title:

Date:

**WEDGE IP MANAGEMENT CO, LTD**

By: ____________________________

Name:

Title:

Date:

**FAIRWAY TM CO 13, LLC**

By: ____________________________

Name:

Title:

Date:

**FAIRWAY TM BLOCKER 13, LLC**

By: ____________________________

Name:

Title:

Date:

**FAIRWAY TM INTERMEDIATE 13, LLC**

By: ___________________________

Name:

Title:

Date:

**LIV GOLF NEW JERSEY LLC**

By: ___________________________

Name:

Title:

Date:

# SCHEDULE 1

## LEGION XIII ASSET AND TITLE SCHEDULE

**[TO BE COMPLETED BEFORE THE EFFECTIVE DATE.]**

**Assets to Be Identified**

**(a) Each registered or applied-for Legion XIII Mark, including the jurisdiction, registration or application number, mark, and record owner.**

**(b) Each material domain name, social-media account, webpage, or other digital asset to be transferred, including its owner or controller.**

**(c) Any material license, lien, encumbrance, third-party ownership interest, or required consent known to the LIV Parties that would impair the transfer of an identified asset.**

**Transfer instruments, credentials, and other closing deliverables required by Article VII shall be delivered at the Effective Date and need not be separately listed on this Schedule.**

## SCHEDULE 4.2(i)

## SCHEDULED COMMITMENTS

[To be completed before the Effective Date. For each agreement: counterparty, date, subject matter, current term expiration, and the Historical Content uses it requires.]